**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CONNECTICUT BANK OF COMMERCE, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE REPUBLIC OF CONGO, )<br><br>Defendant; )<br><br>CMS NOMECO CONGO INC., )<br><br>Garnishee. ) | Civil Action No. 05-762 |

## ANSWER TO WRIT OF GARNISHMENT

CMS Nomeco Congo Inc. (now named CMS Nomeco Congo LLC) ("CMS Nomeco") files this Answer to the Writ of Garnishment that was served on its registered agent in Delaware on October 12, 2005.

## INTRODUCTION

CMS Nomeco is the operator of an oil and gas concession under an agreement with the Republic of Congo ("the Congo") that relates to the development of oil in Congolese territorial waters. Under the terms of the Convention agreement that governs the concession, the Congo is entitled to take royalty oil "in-kind" in the Congo.

CMS Nomeco is unfairly caught between a rock and a hard place or, better stated, between a sovereign rock – the Congo – and multiple hard places – multiple U.S. Courts. This case is just one of multiple garnishment actions filed against CMS Nomeco on behalf of judgment creditors of the Congo, including Plaintiff, a so-called "vulture fund" that is in the business of purchasing the defaulted debt of distressed African nations for pennies on the dollar.

Plaintiff has named CMS Nomeco as a garnishee in this latest case despite the fact that the United States District Court for the Western District of Texas has held, in an identical garnishment action filed by Plaintiff in Texas, that the royalty that Plaintiff seeks to garnish in the State Court Action is not subject to garnishment as a matter of law.

The innocent third-party in this case, CMS Nomeco, a real company with a valuable oil concession in the Congo, faces possible conflicting orders from U.S. and Congolese courts creating a real risk that CMS Nomeco will lose its own assets in the Congo through no fault of its own. As an innocent garnishee, CMS Nomeco is entitled to protection from vexatious litigation and risk of double liability and loss of its investment in the Congo.

In seeking and obtaining issuance of the writ of garnishment against CMS Nomeco in the Superior Court before this action was removed, Af-Cap failed to disclose to the state court a number of critical facts that demonstrate that issuance of the requested writ was improper:

1. Af-Cap failed to inform the Superior Court that the Congo obtained court orders from a Congolese court in December 2004 and July 2005 holding that writs of garnishment issued by U.S. courts in Texas directed to CMS Nomeco against the royalty are unenforceable under Congolese law, which governs the Convention between the Congo and CMS Nomeco. The Congo court held that the oil royalties cannot be attached according to Congolese law, that the garnishment writs issued by the courts in Texas are contrary to the Congo public order and interfere with the Congo's national sovereignty, and that CMS Nomeco is required to deliver royalty oil to the Congo in the Congo, notwithstanding the U.S. proceedings and court decisions. This requirement by the Congolese courts to deliver oil produced in the Congo to the Congo was backed up by the threat of the use of public force.

Copies of the December 2004 and July 2005 Congo court orders with regard to the royalty oil are attached hereto as Exhibits A and B.

2.   In this new garnishment proceeding, Af-Cap is asking this Court to impose obligations on CMS Nomeco that are in direct conflict with the requirement to deliver royalty oil as imposed by the Congo court orders.  This Court has expressly held that garnishment is not proper under Delaware law when the foreign law governing the garnishee's obligation would not regard a payment pursuant to a writ of garnishment as a discharge of the garnishee on the underlying debt, exposing the garnishee to double liability.  *LNC Investments, Inc. v. Republic of Nicaragua*, No. 01-134-JJF (D. Del. December, Dec. 18, 2002) (unpublished decision) (Exhibit C hereto), *appeal dism'd*, 396 F.3d 342 (3d. Cir. 2005).  A garnishee is an innocent bystander and must be protected from exposure to double liability.  Just as the exposure to double liability precluded the garnishment writs in *LNC Investments v. Nicaragua*, the writ issued by the Superior Court in this case is improper, in light of the Congolese court orders determining that U.S. garnishment writs provide no defense to the requirement that CMS Nomeco deliver oil in the Congo.

3.   Additionally, because the new writ seeks to impose obligations inconsistent with those imposed by the Congo court orders with regard to acts to be undertaken by CMS Nomeco in Congolese territory, the doctrines of foreign state compulsion under Section 441 of the Restatement (Third) of the Foreign Relations Law of the United States and the act of state doctrine preclude issuance of the writs.

4.   Af-Cap failed to disclose in its motion filed in the Superior Court that in its Texas garnishment action filed against CMS Nomeco, the United States District Court for the Western District of Texas held that the in-kind royalty under CMS Nomeco's Convention with

the Congo is not subject to garnishment because non-monetary obligations are not subject to garnishment. This is a recognized rule in the United States. *See, e.g.*, C.J.S. Garnishment §105 ("In the absence of specific statutory sanction it is generally held that obligations other than for the payment of money are not subject to garnishment; and within this rule are obligations payable in particular kinds of personalty"). A copy of the Texas federal court's memorandum opinion holding the in-kind royalty obligations not subject to garnishment is attached hereto as Exhibit D, and the Final Judgment dismissing the garnishment action is attached as Exhibit E. In August 2005, Af-Cap, Inc. again sought issuance of garnishment writs from the federal court in Texas, and the Court denied that motion. A copy of that Order is attached as Exhibit F. In dismissing the garnishment action in Texas, the Western District recognized that garnishment of an "in-kind" royalty, requiring delivery of oil produced, stored, and deliverable in Congolese territorial waters, was neither legally authorized nor practically subject to implementation. A court in the United States has no mechanism to effectuate the delivery of oil produced, stored, and deliverable in Congolese waters to a judgment creditor of the Congo rather than to the Congo, particularly where, as here, the Congo has obtained Congo court orders that require delivery of the oil to the Congo notwithstanding garnishment writs and orders issued by courts in the United States. Af-Cap has never explained, in the Texas proceedings or in this proceeding, how a garnishment of the "in-kind" royalty, which is deliverable in the Congo, can be practically effectuated by a court in the United States or by a garnishee.

5. Af-Cap failed to disclose to the Superior Court that in *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 247 (5th Cir. 2002), the Fifth Circuit held that a writ directed to a garnishee with regard to property of a foreign state cannot issue unless the district court first determines that the property falls within an exception to immunity under the

Foreign Sovereign Immunities Act, 28 U.S.C. §1610 ("FSIA").  Although the Fifth Circuit held

in the case of *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir.), *modified on rehearing*,

389 F.3d 503 (5th Cir. 2004), *cert. denied*, 125 S. Ct. 1735 (2005), that the in-kind royalty owed

to the Congo in early 2003 was located "in the United States" for purposes of the "in the United

States" requirement for exceptions to immunity under the FSIA, that holding was based on the

Fifth Circuit's determination that in early 2003, CMS Nomeco was "formed and headquartered"

in the United States.  That is no longer the case.  CMS Nomeco no longer has any physical

offices, directors, officers, or activities in the United States, as a result of a stock acquisition by

the Perenco group of companies (which is headquartered in Europe).  Specifically, in the fall of

2002, CMS Nomeco and twelve of its affiliates with operations in seven countries were sold and

became members of the Perenco group.  Over the period October 2002 through February 2004,

the activities of CMS Nomeco that previously had been performed in the United States were

moved to the Congo and to Perenco's European headquarters, consistent with the typical practice

of companies in the Perenco group.  The transition of activities out of the United States arose out

of the Perenco acquisition and was totally unrelated to the efforts of judgment creditors of the

Congo to collect judgments against the Congo.  All of CMS Nomeco's activities relating to the

Convention are performed in the Congo and in Europe, and CMS Nomeco's sole current

connection to the United States is its incorporation in Delaware.  That connection is insufficient

to render the in-kind royalty, which is oil produced, stored, and delivered in Congolese territorial

waters, property that is "in the United States" for purposes of the FSIA.  Af-Cap has failed to

demonstrate that the royalty falls within an exception to immunity under the FSIA.

      6.  Af-Cap failed to disclose to the Superior Court that the Fifth Circuit held on

rehearing in the *Af-Cap* case that tax obligations owed by CMS Nomeco are immune from

garnishment under the FSIA unless they were used to pay an unrelated debt owed by the Congo to National Union Fire Insurance Company. *See Af-Cap, Inc. v. Republic of Congo*, 389 F.3d at 503. It is undisputed that no tax obligations were so used, and those obligations are not subject to garnishment. Af-Cap's motion filed in the Superior Court seeking issuance of the writ of garnishment against CMS Nomeco did not differentiate between the royalty and tax obligations, and the writ sought and obtained from the Superior Court does not differentiate between the royalty and the tax obligations. In short, Af-Cap failed to disclose to the Superior Court that the Fifth Circuit had already determined that tax obligations are not subject to garnishment absent a showing that tax obligations were used to pay another judgment creditor, a showing that Af-Cap has not made and cannot make.

In summary, Af-Cap is not entitled to garnish the royalty or any alleged obligations to the Congo. The writ issued by the Superior Court, based on Af-Cap's failure to disclose material facts to the Superior Court, should be quashed.

## STATEMENT OF FACTS

1.   CMS Nomeco is the current operator of the Marine 1 permit under a Convention dated May 25, 1979 between it and other working interest owners and the Congo ("the Convention"). The Convention relates to operations for the exploration and development of oil in waters off the coast of the Congo. A true and correct copy of the Convention is attached as Exhibit G.

2.   The oil produced under the Convention is produced and transported via a submarine pipeline network to a centralized offshore storage vessel located offshore of the coast of the Congo which is known as the "Conkouati." A "lifting" occurs when oil is offloaded from the Conkouati onto a vessel nominated by the buyer of the oil. Under the terms of Article 7 of

the Convention, the Congo is entitled to royalty on volumes lifted and sold. The Congo has elected to take its royalty "in-kind" in Congolese territorial waters.

3. Pursuant to an agreement memorialized in an Amendment to Lifting Agreement, a true and correct copy of which is attached as Exhibit H, CMS Nomeco makes liftings of oil stored on the Conkouati for its own account and that of the other private working interest owners and sells 100% of the oil so lifted. CMS Nomeco, as operator, calculates the effect of liftings on the over- or under-delivered position of SNPC, the state-owned oil company of the Congo (as co-working interest owner) and of the Congo (as royalty interest owner), on a barrel basis, and records that effect on an "over/under statement." Once the combined under-delivered position of SNPC and the Congo reaches at least 275,000 barrels, SNPC is entitled to take a lifting of oil for itself and for the Congo. When SNPC takes a lifting, SNPC sells, for its account and for the account of the Congo, all of the barrels that it lifts. The SNPC lifting extinguishes the in-kind royalty, and puts SNPC into an over-delivered position. CMS Nomeco and the other private working interest owners take future liftings until the combined under-delivered position of SNPC and the Congo again exceeds 275,000 barrels, when SNPC again has the right to take and sell another lifting.

4. The alleged predecessor-in-interest of Af-Cap filed a garnishment action in Texas in January 2001, seeking to garnish royalty and taxes owed by CMS Nomeco and other working interest owners under the Convention. That action was removed to the United States District Court for the Western District of Texas. The district court dismissed the action on the grounds that the attempted garnishment violated the FSIA. In September 2004, the Fifth Circuit held that the Foreign Sovereign Immunities Act did not protect the royalty from garnishment, and it remanded the case for further proceedings. *Af-Cap*, 383 F.3d 361, *modified on rehearing,*

389 F.3d 503. Shortly after remand, the district court issued writs of garnishment in favor of Af-Cap. Writs also were issued in other litigation against CMS Nomeco filed by other judgment creditors in federal courts in Houston and Dallas. Walker International Holdings Limited (another judgment creditor of the Congo represented by the same counsel as Af-Cap) also filed a garnishment action against CMS Nomeco in the Western District of Texas (the same court where Af-Cap's garnishment action was pending), but Walker did not pursue that garnishment action, and no writs were served.

5.   On December 28, 2004, a court in Point Noire, Congo issued an order compelling CMS Nomeco to deliver oil to the Congo, notwithstanding the writs of garnishment that were then pending in the U.S. court proceedings. A copy of that order is attached hereto as Exhibit A. Under compulsion of that order, SNPC took the Congo's royalty oil on December 28-29, 2004. Two declarations regarding the events leading to the issuance of the Congo court order and the delivery of the oil on December 28-29, 2004, are attached hereto as Exhibits I and J.

6.   On February 4, 2005, the court in the Western District of Texas dismissed Af-Cap's garnishment action, holding that the royalty was a non-monetary obligation that was not subject to garnishment under Texas law. Copies of the opinion holding that the royalty was not subject to garnishment and the final judgment dismissing the garnishment action are attached as Exhibits D and E respectively. Af-Cap appealed the dismissal, and that appeal is pending in the Fifth Circuit Court of Appeals. No stay of the dismissal has been granted.

7.   In separate proceedings to which CMS Nomeco was not a party, the court in the Western District of Texas entered turnover orders against the Congo in favor of Af-Cap and Walker, ordering the Congo to sign instruction letters directed to CMS Nomeco and the other working interest owners under the Convention, first in favor of Af-Cap and subsequently in favor

of Walker. Under the instruction letters the Congo was ordered to sign, the Congo would have (1) elected to take royalty in cash, and (2) directed CMS Nomeco and the other working interest owners to pay the cash royalty into the registry of the Western District of Texas. The Congo refused to sign the instruction letters and sent a letter to the district court explaining its reasons for that refusal. A copy of the Congo's letter is attached hereto as Exhibit K.

8.    Subsequently, the district court in the Western District of Texas issued orders under Rule 70 of the Federal Rules of Civil Procedure, directing the clerk of the Court to sign the instruction letters on behalf of the Congo and to send them to Mr. Guy Lipe, the attorney who had represented CMS Nomeco and the other working interest owners in the garnishment action that had been dismissed in February 2005. The letters were not sent by the clerk to any representative of CMS Nomeco authorized to receive royalty elections or other notices under the Convention.

9.    On July 4, 2005, a Congo court in Point Noire, Congo issued an order against CMS Nomeco holding that under Congolese law, royalty oil could not be subject to attachment and that the turnover orders of the Texas federal court and other U.S. court orders in proceedings by judgment creditors of the Congo relating to the royalty oil violated the Congo public order and were not enforceable in the Congo. The Congo court held that CMS Nomeco was obligated to deliver royalty oil to the Congo, notwithstanding the U.S. court proceedings and orders in those proceedings. A true and correct copy of the Congo court's July 4, 2005 Order is attached as Exhibit B.

10. On July 11, 2005, Af-Cap and Walker filed a lawsuit against CMS Nomeco in Delaware Chancery Court, claiming that CMS Nomeco had violated the instruction letters by failing to pay royalty into the registry of the Court in the Western District of Texas. On July 21,

2005, Af-Cap filed a motion for issuance of a show cause order against CMS Nomeco and the

other working interest owners with the Texas federal court, claiming that their failure to pay

royalty in cash into the registry of the court on July 20, 2005 (the date Af-Cap contended to be

the first royalty payment date following the effective date set out in the instruction letter in the

Af-Cap case) violated the Court's turnover order and instruction letter and was a contempt of

court.

11. On July 26, 2005, the court in the Western District of Texas denied Af-Cap's

motion for a show cause order, finding that the turnover orders were not court orders directed to

CMS Nomeco and could not adjudicate the substantive rights and obligations of CMS Nomeco

under the Convention.  A true and correct copy of the July 26, 2005 Order is attached as Exhibit

L. Af-Cap subsequently filed a motion seeking issuance of new writs against CMS Nomeco,

which was denied by the court in the Western District of Texas, by Order dated August 17, 2005.

A copy of that Order is attached as Exhibit F.

12. Approximately two weeks later, Af-Cap and Walker initiated separate actions

in Delaware seeking issuance of new writs directed to CMS Nomeco, with Af-Cap filing in the

Superior Court and Walker filing in this Court.  Af-Cap presented the motion to the Superior

Court as "unopposed," obtaining issuance of the writ, without disclosing the prior proceedings or

the dismissal of its identical garnishment proceedings in federal court in Texas.

## DEFENSES TO THE WRIT OF GARNISHMENT

A.      *The Congo Court Orders Compelling CMS Nomeco to Deliver Royalty Oil in the
        Congo, Notwithstanding Writs of Garnishment Issued In U.S. Litigation, Preclude
        Enforcement of the Writ Issued by the Superior Court*

      **1.      Double Liability**

A Congo court, in December 2004 and again in July 2005, held that garnishment writs issued in proceedings filed by judgment creditors of the Congo in U.S. courts are not enforceable under Congolese law and do not relieve CMS Nomeco of the requirement that it deliver royalty oil to the Congo under the Convention. Copies of those orders are attached hereto as Exhibits A and B. Although Af-Cap did not disclose the existence of these orders to this Superior Court, it must concede that by virtue of the Congo court orders, CMS Nomeco has no choice but to deliver royalty oil to the Congo in Congolese territory. It is simply impractical, and unlawful in the Congo, for it to do otherwise. In this garnishment action, Af-Cap is attempting to impose double liability on CMS Nomeco for the royalty. This Court has expressly held that under Delaware law, garnishment is not appropriate in such circumstances.

On December 18, 2002, in *LNC Investments, Inc. v. Republic of Nicaragua*, No. 01-134-JJF (D. Del. 2002) (unpublished decision), *appeal dism'd*, 396 F.3d 342 (3d Cir. 2005), this Court analyzed the propriety of enforcing a writ of garnishment in a case involving an attempt by a creditor, LNC Investments, to recover a debt owed by a foreign sovereign, the Republic of Nicaragua ("Nicaragua"), by serving a writ of attachment on Megatel, a garnishee indebted to Nicaragua. Concluding that Nicaraguan law would not recognize the garnishment writs as a defense to Megatel's payment obligation to the Nicaraguan government, and based on Megatel's exposure to double liability, the court issued an order granting the motion to quash. Id. This Court applied authorities from another jurisdiction involving comparable circumstances holding that writs of garnishment cannot be enforced in such circumstances. *See Weitzel v. Weitzel*, 27 Ariz. 117, 230 P. 1106 (Ariz. 1924) (court upheld the dissolution of writs of garnishment of debts owed in a foreign country because the writs would not be recognized as a defense to performance of the obligations in the foreign country); *West v. Baker*, 510 P.2d 731,

734 (Ariz. 1973) (dissolution of the writs of garnishment is proper when the court "cannot insure that [garnishees] will not incur double liability").

Under the authority of this Court's decision in *LNC Investments v. Nicaragua*, the writ issued by the Superior Court should be quashed.

### 2.    Foreign State Compulsion

Under the doctrine of "foreign state compulsion" recognized in Section 441 of the Restatement (Third) of Foreign Relations Law of the United States ("Restatement Section 441"), preference among conflicting commands of the courts of different nations is accorded to the orders of the nation in which the act is to be done or not to be done. In this case, such preference must be given to the Congo court orders since the oil is produced, stored, and delivered in Congo, and the writ issued by the Superior Court should not be enforced.

Subsection (1)(b) of Restatement Section 441 states, in pertinent part: "In general, a state may not require a person . . . to refrain from doing an act in another state that is required by the law of that state." Comment a to this section states:

> This section applies . . . to protect persons caught between
> conflicting commands. In determining preference between
> conflicting exercises of jurisdiction to prescribe, this section
> generally accords preference to the state in which the act is to be
> done (or is not to be done).

Restatement Section 441, comment a. Under the authority of Section 441 of the Restatement and Reebok, the doctrine of foreign state compulsion precludes the enforcement against CMS Nomeco of the writ issued by the Superior Court.

### 3.    The Act of State Doctrine

In *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897), the United States Supreme Court said:

> Every sovereign state is bound to respect the independence of
> every other sovereign state, and the courts in one country will not
> sit in judgment on the acts of the government of another, done
> within its own territory. Redress of grievance by reason of such
> acts must be obtained through the means open to be availed of by
> sovereign powers as between themselves.

This principle, known as the "act of state" doctrine, reflects "'the strong sense of

the judicial branch that its engagement in the task of passing on the validity of foreign acts of

state may hinder' the conduct of foreign affairs." *W.S. Kirkpatrick & Co. v. Evntl. Tectonics*

*Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S.

398, 423 (1964)).

To order a diversion of royalty to Af-Cap in this garnishment action, this Court

necessarily would be required to sit in judgment of the conduct of the Congo and its courts

within the Congo's own territory in compelling CMS Nomeco to deliver oil to SNPC in

Congolese waters. Enforcement of a writ of garnishment against the royalty in these

circumstances would violate the act of state doctrine.

B.    *The Writ Does Not Apply to the In-Kind Royalty Because, as Held by the Western
      District of Texas, Only Monetary Obligations Are Subject to Garnishment*

In his February 4, 2005 Order in the Af-Cap case attached hereto as Exhibit D,

Judge Sparks of the Western District of Texas granted CMS Nomeco's motion for summary

judgment with regard to writs of garnishment issued in the Af-Cap case in connection with the

same royalty that it seeks to garnish in this case. Judge Sparks held that under Texas

garnishment law, "only debts in money are subject to garnishment, . . . Texas garnishment law

does not authorize the garnishment of a non-monetary obligation, . . . [and] the Garnishees'

obligations to deliver oil to the Congo are not garnishable as debts under Texas law." Judge

Sparks cited with approval the decision of the Alabama Supreme Court in *Jones's Adm'r v.*

*Crews*, 64 Ala. 368 (1879), which interpreted Alabama garnishment statutes as providing for

-13-

garnishment only of monetary obligations and concluded that it would be unfair to compel a garnishee who agreed only to deliver goods to instead make a payment in money. Exhibit D at 14; *Jone's Adm'r*, 64 Ala. at 374. Judge Sparks's decision is consistent with the generally recognized rule that "[i]n the absence of specific statutory sanction, obligations other than for the payment of money are generally not subject to garnishment prior to a default which gives the debtor a cause of action for money." 38 C.J.S. Garnishment §105.

Because non-monetary obligations are not subject to garnishment, the writ of attachment does not capture any royalty. Furthermore, Af-Cap is barred by res judicata and collateral estoppel from asserting in this case that the in-kind royalty is subject to garnishment.

C.    *Af-Cap Has Failed to Demonstrate that the In-Kind Royalty Sought to be Garnished Is Currently "in the United States" as Required by the FSIA*

Before a writ may issue, a court must first determine that the property of the Congo that is sought to be attached meets the requirements of an exception to immunity under the FSIA. Under Section 1610(c) of the FSIA, each exception to immunity applies only to property that is located "in the United States" and "used for commercial activity in the United States." *Connecticut Bank of Commerce v. Republic of Congo*, 390 F.3d 240, 247 (5th Cir. 2002). The Fifth Circuit held in *Connecticut Bank* that under the FSIA, a district court must first make a determination that the property sought to be garnished falls within an exception to immunity before it issues writs of garnishment. *Id.* Although the Fifth Circuit determined in *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir.), *modified on rehearing*, 389 F.3d 503 (5th Cir.), *cert. denied*, 125 S. Ct. 1735 (2005), that the royalty owed by CMS Nomeco to the Congo in early 2003 was used for commercial activity in the United States and was located "in the United States" for purposes of the FSIA exceptions to immunity, that determination was based on the Court's conclusion that CMS Nomeco at that time was "formed and headquartered"

in the United States, and the royalty was appropriately sited there. 383 F.3d at 372-373. As previously explained, for reasons totally unrelated to the garnishment claims, CMS Nomeco has ceased to be headquartered in the United States. Af-Cap has made no showing that the royalty sought to be garnished is currently located in the United States, as required by the FSIA.

Established principles of in-rem jurisdiction mandate that the determination of the location of property on which execution is sought must be made at the time the writ is issued. A "garnishment or foreign attachment is a proceeding quasi in rem . . . [in which] [t]he thing belonging to the absent defendant is seized and applied to the satisfaction of his obligation." *McLaughlin v. Bahre*, 35 Del. 446, 166 A. 800, 803 (Del. Sup. Ct. 1933). "The seizure of property, or that which . . . is the same in effect, the levy of the writ of attachment on it, is the one essential requisite to jurisdiction." *Id.* at 804 (quoting *Cooper v. Reynolds*, 77 U.S. 308, 319 (1870)). Thus, if the property is not present within the jurisdiction of the court at the time of issuance and service of the writ, the court is without jurisdiction. *Cooper*, 77 U.S. at 319.

The same approach is appropriate in applying the FSIA's "in the United States" requirement for exceptions to execution immunity under Section 1610(a). Just as a court's in rem jurisdiction to seize property depends on the location of the property at the time it is "seized" by service of writs issued by the court (not at the time of filing of an application), the court's authority to execute on a foreign state's property under the FSIA's "in the United States" requirement should depend on the property being "in the United States" at the time of service of the writs. It is the exercise of judicial power in seizing the property of a foreign state that has the potential to interfere with the United States government's foreign relations with foreign nations, and the exercise of that judicial power occurs when the writs are issued and served, not before.

If the property is not located in the United States at the time of its "seizure" by a

U.S. court through issuance and service of writs, the writs are not authorized under the FSIA.

Such a seizure at a point in time when the property is located outside the United States would

constitute an extraterritorial exercise of jurisdiction that is inconsistent with Congress' intent to

limit the courts' exercise of such power to the territorial jurisdiction of the United States. *Cf.*

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989) (holding that the

term "in the United States" for purposes of the non-commercial tort exception to immunity from

suit in Section 1605(a)(5) of the FSIA refers to the geographical area that is "within the territorial

jurisdiction of the United States" and that the statutory language conferring jurisdiction over

claims against foreign states for damage to property occurring "in the United States" did not

evince a legislative intent that the provision apply to property damaged by foreign states outside

of U.S. territorial jurisdiction).

In the Fifth Circuit's *Af-Cap* decision, the Court applied the state law rule that

"the situs of the debt is the situs of the debtor" in determining whether the royalty at issue in that

case was located "in the United States." 383 F.3d at 371-372. The question with regard to the

newly requested writ, which was not answered in *Af-Cap*, is whether any royalty owed by CMS

Nomeco to the Congo currently is located in the United States. There is no basis for an

affirmative answer to that question.

CMS Nomeco's only current connection to the United States is its incorporation

in Delaware. *Af-Cap* does not stand for the proposition that mere incorporation in the United

States of a debtor of a foreign state renders the debt owed to the foreign state "in the United

States" for purposes of the FSIA. The Court in *Af-Cap* emphasized that at the point in time

relevant to the determination of that appeal, CMS Nomeco was "headquartered" in the United

States. 383 F.3d at 372-373. *Af-Cap* did not hold, and it does not require a holding in this case, that a foreign state's debtor that has no business activities in the United States, that has its principal place of business in the foreign state, and that incurs its debt to the foreign state based on activities undertaken within the territory of the foreign state, has its "situs" in the United States for purposes of the FSIA, merely by virtue of its incorporation in Delaware. Considering the totality of the circumstances that existed in October 2004, CMS Nomeco does not have its "situs" in the United States for purposes of the FSIA.

Furthermore, any argument that the situs of a debt can be in multiple locations for purposes of the FSIA is inconsistent with the decisions in *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1122 (5th Cir. 1985), and *Tabacalara Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 714-15 (5th Cir. 1968). Those cases require that the court discern the "true situs" of intangible property where an "overriding national concern" is implicated. There is no basis for concluding that the true situs of the royalty is in Delaware based solely on CMS Nomeco's incorporation there, when (1) its principal place of business is in the Congo, (2) the activities giving rise to the royalty take place in the Congo, (3) it engages in no business activities in Delaware or anywhere else in the United States, and (4) it has no physical offices or personnel there.

Though *Callejo* and *Tabacalara* were act of state cases (rather than FSIA cases), that is no valid distinction. In *Callejo*, the Court acknowledged the interrelated policies of foreign sovereign immunity and the act of state doctrine, both of which limit "'involvement of the courts'" that "'might frustrate the conduct of the Nation's foreign policy.'" *Callejo*, 764 F.2d at 1113 (quoting *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 769 (1972)). As a result, the Fifth Circuit noted that courts "traverse much of the same path" in their

respective application of the FSIA and the act of state doctrine and "focus…on preventing friction with coequal sovereigns." *Callejo*, 764 F.2d at 1113.

Consistent with *Callejo*, a rule that allows more than one situs of a foreign state's property for purposes of Section 1610(a) implicates the same foreign relations issues that underlie the act of state doctrine. Just as the act of state doctrine requires that the U.S. courts not attempt to adjudicate the actions of a foreign state within its own territory, Section 1610(a) of the FSIA requires that U.S. courts not interfere with a foreign state's exercise of its property rights within its own borders. A "multiple situs" rule that allows a U.S. court to seize property that has a situs in the foreign state's territory would permit the very type of interference that the "in the United States" requirement of the FSIA is designed to prevent.

A "common sense appraisal of the requirements of justice and convenience in this particular context," *Af-Cap*, 383 F.3d at 371, compels the conclusion that the "true situs" of any royalty owed by CMS Nomeco that is the purported subject of the writ sought and obtained by Af-Cap from the Superior Court is in the Congo, not the United States, and the issuance of the writ violated Section 1610(a) and (c) of the FSIA.

D.    *Even if the FSIA Requirements Were Met with Regard to the Royalty, There is no Basis for Any Contention that Tax Obligations Fall Within An Exception to Immunity Under the FSIA*

In *Af-Cap*, the Fifth Circuit expressly held on rehearing that tax obligations that CMS Nomeco owes to the Congo are immune from garnishment under the FSIA unless shown to have been used to pay National Union Fire Insurance Company in connection with a prior and unrelated debt owed by the Congo. 389 F.3d at 503. It is undisputed that tax obligations to the Congo were not used to pay National Union, and there is no basis for any contention that tax obligations are subject to garnishment. The FSIA precludes garnishment of the tax obligations,

and furthermore, Af-Cap is precluded by principles of res judicata and collateral estoppel from contending that tax obligations are subject to garnishment.

## ANSWER WITH REGARD TO INFORMATION REQUIRED BY THE WRIT

Subject to the objections and defenses to the writ of attachment set out above, and without waiver of such objections and defenses, CMS Nomeco provides the information required by the writ, as follows.

1.       CMS Nomeco and SNPC (the state-owned oil company of the Congo) are successors to original parties to, and are the current owners of working interests in a Convention for the production of oil in The Republic of Congo dated May 25, 1979 ("the Convention"). The Convention relates to operations for the exploration and development of oil in waters off the coast of the Congo. CMS Nomeco Congo Inc. is the current operator of the Marine 1 permit under the Convention. The Nuevo Congo Company, Nuevo Congo Ltd., and SNPC are non-operator working interest owners. The oil produced under the Convention is produced and transported via a submarine pipeline network to a centralized offshore storage vessel located offshore of the coast of the Congo which is known as the "Conkouati." A "lifting" occurs when oil is offloaded from the Conkouati onto a vessel nominated by the buyer of the oil. Under the terms of Article 7 of the Convention, the Congo is entitled to royalty. The Congo has elected to take its royalty "in-kind."

2.       Pursuant to the lifting agreement, as amended by the amendment attached as Exhibit H, CMS Nomeco and the other private working interest owners make liftings of oil stored on the Conkouati for their own account, and sell 100% of the oil so lifted for their own account. CMS Nomeco Congo Inc., as operator, calculates the effect of liftings on the over- or under-delivered position of SNPC and the Congo, on a barrel basis, and records that effect on an "over/under statement." Once the combined under-delivered position of SNPC and the Congo

reaches at least 275,000 barrels, SNPC is entitled to take a lifting of oil for itself and for the Congo. When SNPC takes a lifting, SNPC sells, for its account and for the account of the Congo, all of the barrels that it lifts. The SNPC lifting extinguishes the in-kind royalty, and puts SNPC into an over-delivered position. Garnishees take future liftings until the combined under-delivered position of SNPC and the Congo again exceeds 275,000 barrels, when SNPC again has the right to take and sell another lifting.

        3.      The amendment to the lifting agreement provides the mechanism by which SNPC takes liftings when the combined under-lifted position of SNPC and the Congo exceeds 275,000 barrels, as described above. In September 2005, SNPC took a lifting of oil for the Congo and SNPC. Subsequent to the September 2005, lifting of oil, SNPC was in an over-delivered position, and neither the Congo nor SNPC were entitled to take delivery of any oil.

        4.      CMS Nomeco's registered agent in Delaware was served with the writ of attachment issued by the Superior Court on October 12, 2005. As of the service date of the writ of attachment and as of the answer date for the writ, SNPC and the Congo were not entitled to take a lifting of oil and CMS Nomeco was not indebted to the Congo, except with regard to tax obligations that have already been determined to be immune from garnishment under the FSIA. As of the service date of the writ of attachment and as of the answer date for the writ, CMS Nomeco was not in possession of any effects, assets, or other property of the Congo.

## DEMAND FOR TRIAL BY JURY

        Pursuant to Fed. R. Civ. P. 38, Garnishees demand a trial by jury of all triable issues.

        WHEREFORE, CMS Nomeco Congo Inc. (now named CMS Nomeco Congo LLC) requests that the garnishment action arising out of the writ of garnishment issued by the Superior Court and served on October 12, 2005 be dismissed and that those writs be dissolved, or

in the alternative, that CMS Nomeco be discharged on the basis of its answer and recover its

reasonable attorney's fees incurred in this proceeding and any appeal, together with all costs.

CMS Nomeco also requests such other and further relief to which it is justly entitled.


OF COUNSEL:

Guy S. Lipe
Jason M. Powers
VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin Street, Suite 2300
Houston, TX 77002-6760
(713) 758-2222

Dated: November 2, 2005

/s/ M. Duncan Grant
M. Duncan Grant (Del. Bar No. 2994)
James C. Carignan (Del. Bar No. 4230)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500

Attorneys for Garnishee CMS Nomeco Inc.