# EXHIBIT D

RECEIVED
FEB 11 2005
GSL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2005 FE -4  P:1 2: 06

AF-CAP, INC.,
        Plaintiff,

vs.

REPUBLIC OF CONGO,
        Defendant,                                    Case No. A-01-CA-100-SS

and

CMS OIL AND GAS COMPANY, et al.,
        Garnishees.

_____

AF-CAP, INC.,
        Plaintiff,

-vs-                                                  Case No. A-01-CA-321-SS

REPUBLIC OF CONGO,
        Defendant.

_____

## O R D E R

BE IT REMEMBERED that on the 4th day of February 2005, the Court reviewed the file

in the above-styled causes and specifically Af-Cap, Inc.'s ("Af-Cap") Motion for Turnover

Order [#110 in A-01-CA-321-SS], Garnishees CMS Nomeco Congo Inc., the Nuevo Congo

Company, and Nuevo Congo, Ltd.'s ("Garnishees") Motion to Dismiss Pursuant to Rules 12(b)(1),

12(b)(2), 12(b)(5), and 12(b)(6) [#153 in A-01-CA-100-SS], Garnishees' Answer to Writs of

Garnishment [#158 in A-01-CA-100-SS], Af-Cap's Motion for Issuance of New Garnishment

## EXHIBIT D

121

P

Writs [#160 in A-01-CA-100-SS], Garnishees' Motion for Expedited Consideration of Motion to
Quash Writs of Garnishment [#163 in A-01-CA-100-SS], Garnishees' Motion to Quash Writs of
Garnishment [#164 in A-01-CA-100-SS], Garnishees' Emergency Motion for Expedited
Consideration of Garnishees' Dispositive Motions [#168 in A-01-CA-100-SS], Garnishees' Motion
for Partial Summary Judgment [#169 in A-01-CA-100-SS], and Af-Cap's Emergency Request for
Stay Pending Ruling on its Motion for Turnover Order or Appeal [#189 in A-01-CA-100-SS]
After considering the motions, responses, replies, each of the case files as a whole, and the
applicable law, the Court enters the following opinion and orders.

## I.    Background

Plaintiff Af-Cap is the sixth owner of the claims at issue in this case. Af-Cap's predecessor
in interest, the Connecticut Bank of Commerce ("the Bank"), was the assignee of a judgment
entered in England against Defendant Republic of Congo ("the Congo"). On January 11, 2001, the
Bank brought an action in a New York state court to enforce that judgment. When the Congo did
not appear, the New York court granted summary judgment in favor of the Bank and entered an
order granting the Bank permission to execute pursuant to 28 U.S.C. § 1610(c) ("the New York
judgment"). The Bank then filed the New York judgment in the 345th District Court of Travis
County to convert it into a Texas judgment ("the judgment action"). The Bank simultaneously filed
a garnishment action in the same court against CMS Oil & Gas Company, CMS Oil & Gas
International Company, CMS Nomeco International Congo Holdings, Inc., CMS Nomeco Congo,
Inc., CMS Oil & Gas International, Ltd., and CMS Oil & Gas (Congo), Ltd. and Nuevo Energy

-2-

Company, Congo Holding Company, Nuevo Congo Company, Nuevo Congo International, Inc.,

and Nuevo International Holdings, Ltd. (the garnishment action).[1] By that action, the Bank sought

to prohibit the garnishees from paying debts or delivering any property to the Congo.

Subsequently, the Congo and all garnishees removed the garnishment action (A-01-CA-100-SS,

"the 100 case"), the judgment action (A-01-CA-321-SS, "the 321 case"), and several additional,

subsequently filed garnishment actions to this Court on the basis of diversity jurisdiction.

On March 16, 2001, this Court entered an order in the 100 case dismissing the causes of

action against the Congo and dissolving the writs of garnishment against the garnishees pursuant

to the Foreign Sovereign Immunities Act ("FSIA"). The Court found both the tax obligations and

the in-kind royalty obligations owed by the garnishees to the Congo were immune from execution

and attachment by plaintiffs.[2] The Bank appealed the 100 case to the Fifth Circuit, and during the

---

[1] CMS Nomeco Congo Inc., the Nuevo Congo Company, and Nuevo Congo, Ltd. are the only garnishees presently remaining in the case.

[2] The Court has previously explained the background surrounding Garnishees' royalty obligations as follows:

In 1979, the Congo issued a permit to drill offshore to its state-owned oil company, the Societe Nationale de Petrol du Congo ("SNPC"). On May 25, 1979, in order to exploit the permit, the Congo and SNPC entered into a joint venture with various oil companies to produce oil and gas. The parties do not dispute that SNPC and the Garnishees are the current working interest owners under the Convention. Currently, CMS is the operator of the joint venture and owns a 25% working interest, while Nuevo, Nuevo Congo Ltd. and SNPC are non-operators, possessing 18.75%, 6.25%, and 50% working interests, respectively. The Congo is entitled to royalty on production from the working interest owners under the Convention, which it can elect to take in cash or in-kind.

The oil is produced at offshore wells in Congolese waters. The oil flows through a subsurface pipeline system to an offshore storage facility, a retired transport tanker called the "Conkouati," which is also located in Congolese waters. Once the Conkouati is filled with between 550,000 and 650,000 barrels of oil, CMS and Nuevo take a "lifting" and sell the oil. The Congo and Garnishees maintain the oil is always sold on the Conkouati, and therefore title passes from seller to buyer in the Congo. CMS and Nuevo keep an over/under accounting of the amount of oil they have lifted and sold, and note the

-3-

pendency of the appeal, the Bank assigned its interest in the judgment to Af-Cap. The Fifth Circuit vacated and remanded the dismissal of the garnishment action, holding this Court and the parties had not made the appropriate factual inquiry in applying the "commercial use" test under the FSIA. *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 260–61 (5th Cir. 2002). On remand, this Court reexamined the question of whether the tax and royalty obligations at issue in this case met the "commercial use" test with the benefit of the Fifth Circuit's opinion and again concluded the obligations did not satisfy the test's requirements. Af-Cap appealed the Court's judgment against it in the initial garnishment action (the 100 case) and the judgment action (the 321 case), but it did not appeal the Court's judgment in any of the other individual garnishment actions.

The Fifth Circuit again reversed, holding the royalty obligations in the case met the requirements of the commercial use test under the FSIA, and hence were not entitled to immunity from execution. *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, 373 (5th Cir. 2004). On remand, Af-Cap moved the Court to reinstate the previously dissolved writs of garnishment. On

---

Congo's royalty entitlement and SNPC's working interest entitlement under the Convention. CMS and Nuevo continue to take liftings and sell the oil until the combination of the Congo's royalty entitlement and the SNPC's working-interest entitlement exceeds 275,000 barrels—or as the Defendants put it, until they are "under-delivered" by 275,000 barrels or more. At this point, SNPC takes a lifting and sells the oil. In this way, both the Congo's in-kind royalty entitlement and SNPC's working interest are satisfied. Ordinarily, when SNPC conducts a lifting, it lifts about 550,000 to 650,000 barrels, at which point it is "over-delivered," which is accounted for in the over/under accounting described above. SNPC will not take another lifting until it is under-delivered by 275,000 barrels.

Order of Apr. 7, 2003 at 5–7 (internal citations omitted).

-4-

November 5, 2004, this Court entered an order denying Af-Cap's request on the grounds the underlying debts had been paid. Order of Nov. 5, 2004 at 6–7. The Court did, however, authorize the issuance of new writs against Garnishees. *Id.* Af-Cap then filed a petition for writ of mandamus with the Fifth Circuit seeking to compel this Court to reinstate the previously dissolved writs of garnishment. The Fifth Circuit denied the petition. *In re Af-Cap, Inc.*, 04-51357, slip. op. at 2 (5th Cir. Dec. 20, 2004). On December 23, 2004, the Court entered an interim opinion and order dissolving the new writs of garnishment that issued on November 5, 2004. The Court now withdraws that order, leaving in its place the opinion and orders contained herein.

## II.    Analysis

### A.    Garnishees' Motion to Dismiss

#### 1.    Personal Jurisdiction

Garnishees move to dismiss the writs of garnishment on the ground they are not subject to the exercise of personal jurisdiction by this Court. However, they concede: (1) they made no objection to the Court's jurisdiction with regard to the garnishment actions initiated in 2001 by Af-Cap's predecessor-in-interest; and (2) they have twice asked for and obtained affirmative relief from this Court in the form of attorneys' fees in this action. These concessions alone are seemingly sufficient to waive Garnishees' jurisdictional objections. *Maiz v. Virani*, 311 F.3d 334, 341 & n.6 (5th Cir. 2002) (holding that a request for affirmative relief operates as a waiver of any objections to the exercise of personal jurisdiction).

-5-

Garnishees contend, however, a general appearance in this case is not, in itself, sufficient to confer jurisdiction over them. Rather, they argue each separate writ of garnishment requires a fresh inquiry into the presence of personal jurisdiction. This argument is an outgrowth of their position that each garnishment action must be filed as a new lawsuit, under a separate cause number. In support of this position, Garnishees cite two well-established propositions of garnishment law. First, an individual writ of garnishment captures only certain debts and property—those maintained by a garnishee from the time the writ is served to the deadline for filing an answer. Second, a garnishment action, which involves a unique set of parties, is ancillary to a suit in which a judgment is obtained. Neither of these propositions have any direct bearing on the question at hand, however—namely, does the issuance of multiple writs of garnishment require the filing of separate actions and the creation of new cause numbers for each? The only court apparently to have considered that narrow question expressly rejected the view advanced here by Garnishees and held the filing of multiple garnishment writs in a single garnishment action does not constitute error. *Dupree v. Quinn*, 290 S.W.2d 329, 331 (Tex. Civ. App.–Texarkana 1956), *rev'd on other grounds*, 303 S.W.2d 769 (Tex. 1957).

Garnishees further argue that allowing the filing of multiple garnishment writs under a single cause number would encourage gamesmanship since would-be garnishors could always avoid the problem of losing jurisdiction by simply filing new garnishment writs in old lawsuits. Any such concern is not warranted in this case, however. Af-Cap does not seek to reopen a closed garnishment action. Rather, it seeks the issuance of writs in a case on remand from the Fifth

-6-

Circuit where the original writs were erroneously dissolved. The earlier writs cannot now be reinstated because the debts they had sought to capture have been fully paid. However, to require a renewed showing of the existence of personal jurisdiction would unnecessarily frustrate the Court's power to grant appropriate relief on remand.

## 2.   In Rem Jurisdiction

Garnishees also contend the Court lacks subject matter jurisdiction because a Texas garnishment action has an "in-rem aspect" requiring that any property to be garnished must be located in Texas. However, as even the cases cited by Garnishees make clear, the test for in rem jurisdiction over a garnishee's obligations is satisfied so long as the court has personal jurisdiction over the garnishee. *Missouri, Tex., and Kan. Ry. Co. v. Swartz*, 115 S.W. 275, 277 (Tex. Civ. App. 1909, no writ) (relying on *Harris v. Balk*, 198 U.S. 215, 223–24 (1905)) (rejecting the view that a debt can only be garnished in the state of the garnishee's domicile). Since the Court holds it maintains personal jurisdiction over Garnishees, any debts they owe the Congo are subject to the exercise of in rem jurisdiction by this Court.

## 3.   FSIA Immunity

Garnishees further argue their tax and royalty obligations are immune from garnishment under the FSIA. As to Garnishees' tax obligations, the Court previously held Af-Cap failed to demonstrate they were ever used by the Congo for commercial purposes. The Fifth Circuit did not disturb this finding on appeal. Order of Apr. 7, 2003 at 9; *Af-Cap, Inc. v. Republic of Congo*, 03-50506, slip. op. at 3 (5th Cir. Nov. 1, 2004) ("We clarify that our opinion should not be

-7-

interpreted to permit garnishment of obligations that were not used in the past for commercial purposes in the United States. Thus, to the extent that tax obligations were not used to satisfy the NUFI debt, such obligations cannot be reached by the garnishment proceedings in this case."). Accordingly, the tax obligations are immune from garnishment.

However, as to the Garnishees' royalty obligations, the Fifth Circuit has already expressly held such obligations are not immune from execution under the FSIA because they meet the "commercial use" test's requirements and their situs is the United States. *Af-Cap, Inc.*, 383 F.3d at 373. Garnishees argue the Fifth Circuit's holding with respect to the situs of the royalty obligations is no longer binding because facts have changed since the court's opinion issued. Specifically, Garnishees argue they are no longer "formed and headquartered" in the United States—which they argue is the test for determining their location. The Garnishees' position is flawed for two reasons. First, two of the Garnishees are incorporated in Delaware. Thus, the factual basis for their claim is questionable at best.

Second, Garnishees have not properly framed the relevant legal inquiry. In determining that the situs of the Garnishees' obligations to the Congo is the United States, the Fifth Circuit applied the rule used to determine the presence of jurisdiction over a debt in a garnishment action. *Af-Cap, Inc.*, 383 F.3d at 371–72. That rule provides the situs of the debt is the same as the situs of the garnishee. *Id.* (relying on *Harris*, 198 U.S. at 223–24; *Swartz*, 115 S.W. at 277). The Fifth Circuit did not expressly set forth the criteria by which the situs of a garnishee should be determined, but it did note the garnishees in the case were "formed and headquartered in the United States."

-8-

*Af-Cap Inc.*, 383 F.3d at 372–73. However, whether the garnishees remain formed and headquartered in the United States is not determinative on the question of where the obligations are now located. The Fifth Circuit in no way indicated Garnishees' formation and headquartering in this country was a necessary and exclusive basis for holding their debt obligations are located here for FSIA purposes. Rather, the court clearly adopted the same situs-of-the-debtor rule applied in the context of the jurisdictional inquiry in garnishment proceedings. *Af-Cap, Inc.*, 383 F.3d at 371–72.

As explained above in the Court's discussion of the presence of in rem jurisdiction in this case, under both *Swartz* and *Harris*, the situs-of-the-debtor rule dictates not that a debt is located only where the debtor is domiciled, but rather, it provides that the debt follows the debtor wherever he or she goes and is subject to service of process. Accordingly, this Court holds that because Garnishees have appeared in this suit and are subject to the exercise of personal jurisdiction by this Court, any obligations they owe the Congo remain in the United States for the purposes of the FSIA.

### 4.   Service of Process

Garnishees also contend Af-Cap's service of the garnishment writs against Nuevo Congo Company and Nuevo Congo, Ltd. was improper because Af-Cap served the writs on CT Corporation. They claim neither garnishee authorized CT Corporation to act as its agent for receiving service. CMS Nomeco Congo, Inc. does not make any objections to the form of its service. The service of process defense thus applies to only two of the three garnishees. Because

-9-

all of the Garnishees have filed an answer and a motion for partial summary judgment which, as explained below, entitles each of them to the ultimate relief they seek, the Court declines to reach the service of process defense, as the resolution of the issues raised in the latter set of pleadings is a more expeditious means of resolving the issues in this case.

## B.      Garnishees' Answer and Motion for Partial Summary Judgment

Under Texas law, a plaintiff may seek to satisfy a judgment through garnishment proceedings in two distinct ways—through the garnishment of debts owed by the garnishee to the judgment debtor, or through the garnishment of property belonging to the judgment debtor, but in the hands of the garnishee. *See* TEX. R. CIV. P. 668–69 (setting forth the separate procedures for the garnishment of debts and "effects"); *see also Baytown State Bank v. Nimmons*, 904 S.W.2d 902, 905 (Tex. App.–Houston [1st Dist.] 1995, writ denied) ("The only real issue in a garnishment action is whether the garnishee is indebted to the judgment debtor, or has in its possession effects belonging to the debtor, at the time of service of the writ on the garnishee, and at the time the garnishee files its answer."). If the garnishee is "indebted" to the judgment debtor, the plaintiff may seek to have the amount by which the garnishee is indebted reduced to a judgment in favor of the plaintiff against the garnishee. TEX. R. CIV. P. 668. Alternatively, if the garnishee is in possession of any "effects" belonging to the judgment debtor, the plaintiff may seek to have those effects delivered by the garnishee for the purpose of a court-ordered sale, the proceeds of which are applied to satisfy the plaintiff's judgment. TEX. R. CIV. P. 669.

-10-

The parties seem to agree the only thing possessed by the Garnishees potentially subject to garnishment is the above-described obligation to deliver oil to the Congo in satisfaction of its royalty interest.[3]  It is not entirely clear from Af-Cap's pleadings whether it believes the royalty obligation should be characterized as a debt owed by the Garnishees to the Congo or as an effect of the Congo in the hands of the Garnishees.  Not surprisingly, Garnishees take the position the royalty obligation is not garnishable, no matter how characterized.

### 1.    Royalty Obligations Viewed as Debts

First, Garnishees contend the royalty obligation is not garnishable as a debt because the Congo had no right to the delivery of oil during the period between the service of the writ and the time for answer. Garnishees' Answer to the Writs of Garnishment ¶ 8.  In other words, because the obligation to deliver oil was not effective during the relevant period, no debt capable of garnishment existed.

Initially, Af-Cap failed to file an affidavit to traverse Garnishees' answer as contemplated by Texas Rule of Civil Procedure 673.  Thus, the Court took Garnishees' assertions as true in issuing its December interim order.  *See Goodson v. Carr*, 428 S.W.2d 875, 878 (Tex. Civ. App.–Houston [14th Dist.] 1968, writ ref'd n.r.e.) ("[W]hen a verified answer which makes

---

[3] One possible point of disagreement exists with respect to Garnishees' tax obligations. Garnishees' answer mentioned only two possibly garnishable items: (1) the royalty obligation; and (2) certain tax obligations which were due to the Congo during the relevant period. Although Af-Cap's position is somewhat unclear, it may be that it persists in asserting the tax obligations are independently subject to garnishment. However, as explained above, such obligations are immune under the FSIA since Af-Cap has been unable to demonstrate they were used by the Congo for commercial purposes in the United States.

negative responses concerning indebtedness is not controverted, the answer is presumed to speak

the truth and in the absence of a proper controverting affidavit made by the plaintiff in garnishment,

a judgment may not be entered against a garnishee.").

The Court there noted, "a plaintiff in garnishment merely steps into the shoes of his debtor

as against the garnishee, and may enforce, as against such garnishee, whatever rights the debtor

could have enforced had such debtor been suing the garnishee directly." *Rowley v. Lake Area Nat'l

Bank*, 976 S.W.2d 715, 719 (Tex. App.–Houston [1st Dist.] 1998, pet. denied). The Court thus

concluded that just as the Congo would have had no right to seek delivery of the oil prior to the

time for which it was agreed due, Af-Cap, standing in the Congo's shoes, could not be permitted

to garnish this unripe obligation.

Af-Cap subsequently filed a traverse challenging Garnishees' position that their obligation

to pay royalties did not accrue until the date set for delivery of the oil. Af-Cap's Traverse of

Garnishee's Answer at 9–10. Af-Cap contends the royalty obligation accrues as the oil is lifted,

and therefore it was owed during the relevant period. Assuming Af-Cap's position is correct, and

further assuming its traverse may appropriately be considered despite its untimeliness, Af-Cap

nonetheless has failed to demonstrate the in-kind royalty obligation is garnishable as a debt. Even

if the Court were to construe the obligation to deliver oil to have become ripe during the relevant

time period, Garnishees demonstrate in their Motion for Partial Summary Judgment that

non-monetary obligations are not garnishable debts for the purposes of Texas garnishment law.

-12-

Neither party has cited a Texas case dealing expressly with the question of whether a non-monetary obligation may be construed as a garnishable debt. Nonetheless, the garnishment statute and relevant rules of civil procedure, as well as the cases cited by the parties dealing with garnishment of debts, all appear to presume garnishable debts are solely monetary. *See, e.g., Daniel v. E. Tex. Theaters*, 127 S.W.2d 240, 242 (Tex. Civ. App.–Fort Worth 1939, writ dism'd judgm't cor.) ("The effect of a writ of garnishment is to impound any monies or property held by the garnishee belonging to the defendant debtor. The writ fixes a lien, in favor of the plaintiff below, on property thus impounded, and if a debt is impounded, a money judgment may be taken against the garnishee which may be enforced like any other judgment."). For instance, the statute describing the effect of service of a writ of garnishment distinguishes debts, of which payment is forbidden, from effects, of which delivery is prohibited. TEX. CIV. PRAC. & REM. CODE § 63.003. Furthermore, the rules governing garnishment provide when a garnishee admits to being indebted to a defendant, the court is to render a judgment against the garnishee in the amount it admits to being indebted. TEX. R. CIV. P. 668. Apparently, the rules do not contemplate indebtedness as encompassing obligations other than for money, as there is no procedure for valuing such obligations.

Although the parties have cited almost no case law that is directly on point, Garnishees have directed the Court's attention to a case decided by the Alabama Supreme Court that lends some support to their position. *Jones's Adm'r v. Crews*, 64 Ala. 368 (1879). The court in that case held an obligation to deliver cotton under a contract was not a garnishable debt under the Alabama

-13-

garnishment statute as only monetary obligations were debts capable of garnishment. *Id.* at 374. The court noted Alabama's statutes authorized the garnishment of chattels belonging to the judgment debtor, but it held the cotton due to be delivered to the defendant under the contract could not be characterized as property belonging to the judgment debtor in the hands of the garnishee. *Id.* One of the reasons cited by the Alabama court for its conclusion was that a contrary result would have interfered with the rights of the parties to enter into contracts of their own making. *Id.* The court concluded it would be unfair to compel a garnishee who agreed only to deliver goods to instead make a payment in money. *Id.*

The Court also finds relevant the long-standing principal of Texas law that an unliquidated claim for breach of contract is not a garnishable debt. *Waples-Platter Grocer Co. v. Tex. & Pac. Ry. Co.*, 68 S.W. 265, 266 (Tex. 1902). The underlying policy of this rule is that a garnishee should not be made to answer for the amount in money owed to the defendant, so long as the potential value of the breach of contract claim is uncertain. *Id.* In reaching its holding, the Court in *Waples* looked, in part, to the fact the garnishment rules require the garnishee to state its indebtedness as an amount in money in its answer to the writ. *Id.* If an unliquidated claim for breach of contract is not a garnishable debt because it cannot be stated as an amount in money, then non-monetary obligations—which, by definition, cannot be stated as an amount in money—clearly are not debts to be answered for. Additionally, *Waples* clearly prohibits the imposition of any requirement that a garnishee attempt to reduce its non-monetary obligation to a dollar figure in formulating its answer. If a garnishee cannot be made to place a monetary value on a judgment

-14-

debtor's unliquidated breach of contract claim against it, there is certainly no basis for forcing such

a valuation in the context of a judgment debtor's rights under a contract not even breached.

Af-Cap first responds to Garnishees' summary judgment motion by claiming Garnishees

lack standing to bring their motion because "a Garnishee has no standing to contest the underlying

claim between the judgment creditor and judgment debtor." Af-Cap's Resp. to Mot. for Part.

Summ. J. at 3. This argument has no merit since Garnishees' motion in no way addresses the

merits of Af-Cap's claim against the Congo.

Af-Cap also argues there are material facts in dispute that preclude the Court's granting

Garnishees' motion. Specifically, Af-Cap claims there is a dispute over whether the Congo has

elected to take its royalty in kind as opposed to in cash. However, Garnishees have submitted the

text of the 1979 Convention, which gives the Congo the right to elect how it takes its royalty, as

well as the "Amendment to Lifting Agreement," which recites the Congo has elected to take its

royalty in kind since 1999. Garnishees' Mot. for Partial Summ. J., Exs. A-1 at GAR00066 & A-2

at GAR03439. Af-Cap has submitted no evidence to suggest the election has since changed.[4]

Af-Cap next asserts it is entitled to change the Congo's election and convert Garnishees'

in-kind royalty obligation into one for cash. Af-Cap argues that as the plaintiff in garnishment, it

---

[4] Af-Cap suggests it would be able to generate a genuine issue of material fact on the question of the Congo's election if permitted to take additional discovery. In a footnote, it states, "If the Court agrees with the motion, Af-Cap requests the opportunity to depose Garnishees' Declarant, Mr. Marquez, in Austin, Texas, and to take such other discovery as is necessary based upon that deposition. See Fed. R. Civ. P. 56(f)." Af-Cap's request, notwithstanding its citation to Rule 56(f), does not meet the requirement for the granting of a continuance under the rules, which require a party seeking such a continuance to make a filing with the court setting forth the reasons it cannot present the facts necessary to oppose the motion for summary judgment. FED. R. CIV. P. 56(f).

-15-

stands in the shoes of the judgment debtor and is entitled to enforce whatever rights the Congo has

with respect to Garnishees.  Assuming Texas law would authorize this novel application of the

principal that a garnishment plaintiff "stands in the shoes" of its judgment debtor, Garnishees point

out the Congo's right to change its election is not unconstrained. The Convention clearly entitles

the Garnishees to three months' notice prior to any change of the method by which the Congo

elects to receive its royalty.  Garnishees' Mot. for Partial Summ. J., Ex. A-1 at GAR00066.  Thus,

even the Congo would not have the power to change the in-kind nature of the Garnishees'

obligation to it with respect to any obligations that accrued during the garnishment period.

Finally, Af-Cap argues Texas law authorizes the garnishment of non-monetary obligations.

First, it contends the Fifth Circuit definitively decided this question in its favor in its most recent

appeal. Af-Cap is simply incorrect.  Although the Fifth Circuit concluded this Court previously

erred when it found the Garnishees' royalty obligations were immune from attachment under the

FSIA, it did not purport to consider any issues raised by Texas garnishment law.

Second, Af-Cap cites a number of cases for the unremarkable proposition that a

garnishment action can be used to reach the "effects" of the debtor which are in the garnishee's

possession. It is clear a garnishee can be made to: (1) pay debts owed in money over to a plaintiff

in garnishment, and (2) deliver to the court effects that it possesses which belong to the debtor (e.g.,

goods it holds as the debtor's bailee).  However, Af-Cap has failed to cite a single case, or even

make an argument, that would demonstrate a non-monetary obligation to deliver goods can ever

be garnished *as a debt*.  Rather, the only authorities presented to the Court, as indicated above,

-16-

suggest only debts in money are subject to garnishment. Persuaded by the Garnishees' position that Texas garnishment law does not authorize the garnishment of a non-monetary obligation, the Court holds the Garnishees' obligations to deliver oil to the Congo are not garnishable as debts under Texas law.

### 2.    Royalty Obligations Viewed as "Effects"

On the other hand, the Fifth Circuit's opinion remanding the case back to this Court suggested the Garnishees' royalty obligations are themselves property possessed by the Garnishees. Specifically, in concluding the royalty obligations satisfied the FSIA's situs requirements, the Fifth Circuit held the obligations were "property" in the United States. *Af-Cap, Inc.*, 383 F.3d at 371–73. In so holding, the court looked to various cases in which courts have held there is in rem jurisdiction over a garnishee owing a debt in the state where he or she is found because the debt follows the debtor. *Id.*

Notwithstanding the Fifth Circuit's holding that an obligation to pay money is "property" located at the situs of a garnishee in the specific context of the FSIA, it is clear Texas garnishment proceedings do not contemplate such obligations as garnishable "effects." For instance, the procedure for garnishment of effects belonging to a judgment debtor and in possession of a garnishee contemplates a court-ordered sale of such effects. TEX. R. CIV. P. 672. Given "the peculiar character of the intangible obligations" at issue in this case, *see In re Af-Cap, Inc.*, 04-51357, slip. op. at 2 (5th Cir. Dec. 20, 2004), a judicial sale would appear to be problematic. The Court finds it difficult to imagine being able to attract many buyers willing to pay any money

-17-

at all in exchange for an obligation to deliver oil to the Congo. Even if the Congo's right to receive

its royalty is construed as the relevant garnishable property however, (which—even though it is the

only way to envision the procedure for a judicial sale in a way that is not utter nonsense—is not

how the Fifth Circuit conceived of the "property" in reaching its FSIA holding), Garnishees simply

do not have the capacity to *deliver*[5] the Congo's contract rights to the Court for the purpose of

facilitating a sale as contemplated by the rules.[6] TEX. R. CIV. P. 669. Af-Cap has not advocated

a judicial sale of the Congo's royalty rights. Rather, Af-Cap's position appears to be that the

royalty obligation is a garnishable *debt*, in satisfaction of which, the Garnishees should be subjected

to a money judgment in Af-Cap's favor.[7] For the reasons already stated, however, the royalty

obligation is not garnishable as a debt.

---

[5] Although it may be fairly easy to conceive of a situation in which Garnishees were directed to deliver *oil* (or make a cash payment) to some entity or person who came to "purchase" the Congo's royalty rights at a judicial sale, such a procedure could hardly be said to involve any act by the Garnishees of delivery of the Congo's intangible property rights for the purpose of a judicial sale.

[6] Moreover, as Garnishees' point out, it makes no sense to construe an ongoing and accruing obligation as a personal effect of an obligor in the possession of his or her obligee under Texas law. To do so in the garnishment context would contravene the conclusion of the Texas courts that "the policy of the law [is] to impound existing debts, rather than future accruing debts." *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 163 (Tex. App.–Houston [14 Dist.] 1996, writ denied) (quoting *Consolidated Gasoline Co. v. Jarecki Mfg. Co.*, 72 S.W.2d 351, 353 (Tex. App.–Eastland 1934), *opin. adopted*, 105 S.W.2d 663 (Tex. 1937)); *see also Daniels v. Pecan Valley Ranch, Inc.*, 831 S.W.2d 372, 383 (Tex. App.–San Antonio 1992, writ denied) (holding turnover relief, rather than garnishment, is the appropriate form of relief with respect to future rights to payment). If an ongoing obligation owed by a garnishee could be construed as an effect of the judgment debtor in the garnishee's hands, plaintiffs in garnishment could easily evade the prohibition on the garnishment of future debts by simply re-labeling such debts as presently garnishable effects.

[7] It may be that Af-Cap's position is the oil itself constitutes the "effects" which are garnishable under Texas law. That position, however, is flawed for at least two reasons. First, there is no basis on which to conclude the oil possessed by the Garnishees "belongs" to the Congo prior to its delivery. Af-Cap has not suggested the Congo owns anything prior to the oil's delivery other than the right to have its royalty interest paid. Second, the entire basis of the Fifth Circuit's conclusion the disputed property in this case is located in the United States is that the obligation to deliver oil, rather than the oil itself, constitutes the property to be garnished. *Af-Cap, Inc.*, 383 F.3d at 371–72 & n.13.

-18-

In light of the fact Garnishees have not admitted to owing any debts or possessing any property belonging to the Congo subject to garnishment, the Garnishees are entitled to have the writs issued against them dissolved. Accordingly, the Court need not reach the issues raised in their Motion to Quash Writs of Garnishment [#164], which the Court dismisses as moot.

### C.    Af-Cap's Motion for Turnover Order

By this motion, filed in the 321 case, Af-Cap seeks a turnover order pursuant to Rule 69(a) of the Federal Rules of Civil Procedure[8] and § 31.002 of the Texas Civil Practice and Remedies Code. Specifically, Af-Cap asks this Court to issue a turnover order whereby a receiver would prepare letters of instruction addressed to Garnishees which would: (1) assign the Congo's right to royalty payments under the Convention to the receiver until Af-Cap's judgment is fully paid; and (2) direct the Garnishees to make such payments monthly in cash, rather than through periodic liftings of oil in kind. Af-Cap has also filed an "Emergency Request for Stay Pending Ruling on its Motion for Turnover Order or Appeal" [#189] in the 100 case. Because the Court will today enter an order on Af-Cap's motion for turnover order, the request for a stay is moot.

### 1.    Texas Turnover Statue

Under the Texas turnover statute, a judgment creditor is entitled to aid from a court in order to reach property to satisfy a judgment. TEX. CIV. PRAC. & REM. CODE § 31.002. The Texas turnover statute provides in part:

---

[8] A federal court may enforce a money judgment "in accordance with the practice and procedure of the state in which the district court is held." FED. R. CIV. P. 69(a).

(a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:

> (1) cannot readily be attached or levied on by ordinary legal process; and
> (2) is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

b) The court may:

> (1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, to a designated sheriff or constable for execution;
> (2) otherwise apply the property to the satisfaction of the judgment; or
> (3) appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment.

TEX. CIV. PRAC. & REM. CODE § 31.002. The statute is "'the procedural device by which judgment creditors may reach assets of a debtor that are otherwise difficult to attach or levy on by ordinary legal process.'" *Resolution Trust Corp. v. Smith*, 53 F.3d 72, 77 (5th Cir.1995) (quoting *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 224 (Tex. 1991)).[9] It allows a court to reach assets owned and subject to the control of a judgment debtor. *Norsul Oil & Mining Ltd. v. Commercial Equip. Leasing Co.*, 703 S.W.2d 345, 349 (Tex. App.–San Antonio 1985, no writ).

### 2.    Personal Jurisdiction

The Congo's primary objection to the entry of a turnover order is that this Court lacks personal jurisdiction. As the Congo correctly points out, the FSIA provides the exclusive basis for

---

[9] However, "[n]either the statute nor the case law provides a ... requirement that the judgment creditor demonstrate that other methods of collecting the judgment have failed." *Resolution Trust*, 53 F.3d at 78. *See also Hennigan v. Hennigan*, 666 S.W.2d 322, 323 (Tex. App.–Houston [14th Dist.] 1984, writ ref'd n.r.e.) (former turnover statute did not require judgment creditor to "first exhaust his legal remedies of attachment, execution, garnishment, etc. prior to seeking relief").

-20-

the exercise of personal jurisdiction over a foreign state. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). Under the provisions of the FSIA, personal jurisdiction over a foreign state exists where: (1) subject matter jurisdiction is present under 42 U.S.C. §§ 1605–1607; and (2) the foreign state has been properly served with process pursuant to § 1608. 42 U.S.C. § 1330; *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548–49 n.11 (D.C. Cir. 1987); *see also Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981) (under the FSIA "subject matter jurisdiction plus service of process equals personal jurisdiction").

The first question then is whether there is subject matter jurisdiction for an action against the Congo under the FSIA. Although the lawsuit in this case consists solely of the registry of a foreign judgment for the purposes of execution in accordance with Texas law, the requirements for obtaining personal jurisdiction over the Congo must still be satisfied. *See Flatow v. Alavi Found.*, No. 99-2409, 2000 WL 1012956, at *4 (4th Cir. July 24, 2000) (holding the requirements of the FSIA must be satisfied in an action solely for execution pursuant to Rule 69(a) of the Federal Rules of Civil Procedure). Af-Cap's sole argument is that the Congo has waived its right to assert its sovereign immunity as a defense. 42 U.S.C. § 1605(a)(1) (a foreign state may waive its immunity from suit in the United States district courts, either implicitly or explicitly).

Af-Cap contends the Congo has waived its sovereign immunity against suits brought to collect amounts due under an underlying loan agreement in this case under the plain terms of the agreement, which include the following:

-21-

(19)    Law and Jurisdiction

    (A)    This Agreement shall be governed by the laws of England. The Borrower hereby irrevocably agrees that any suit, action or proceeding against the borrower arising out of or in connection with this Agreement may be brought in the High Court of Justice in England, Federal Courts sitting in, and the State Courts of, New York, New York U.S.A. and the Courts of the People's Republic of Congo and irrevocably submits to the jurisdiction of each such court, but nothing shall preclude the Lender from bringing any proceeding arising out of or in connection with this agreement in the courts of any other competent jurisdiction, and proceedings in one jurisdiction shall not preclude proceedings in another jurisdiction whether concurrent or not.

                * * *

    (C)    The Borrower consents generally in respect of any suit, action or proceedings arising out of or in connection with this Agreement to the giving of any relief, or the issuance of any process in connection with such suit, action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment that may be made or given in such action or proceedings.

Af-Cap's Mot. for Permission to Execute [#58], Ex. 95.

The Congo argues the loan agreement provisions do not prevent it from asserting its sovereign immunity in this action because the plain language of the agreement provides a consent to the jurisdiction of courts sitting in the state of New York, not Texas. The Congo is correct as far as an express waiver of immunity is concerned. However, under § 1605(a)(1), a waiver of immunity may also be implied. *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 376–77 (7th Cir. 1985). Among the cases in which courts have found an implicit waiver of sovereign immunity to be present are those "involving contracts in which a foreign state has agreed

-22-

to arbitrate disputes [in a foreign country] without specifying jurisdiction in a particular country or forum." *Id.* Since a foreign state's consent to arbitration in an unspecified location outside of its own territory is sufficient to create an implicit waiver of sovereign immunity in the federal courts, a foreign state's consent to be sued in a specific federal court within the United States even more clearly operates as a general, implicit waiver of sovereign immunity.

The Congo also maintains the effect of the contractual immunity waiver has already been decided by the Fifth Circuit, which has stated the provisions of the Loan Agreement are not in themselves sufficient to establish jurisdiction. *Af-Cap, Inc.*, 383 F.3d at 367; *Conn. Bank of Commerce*, 309 F.3d at 247. The holdings cited by the Congo are limited, however, to the question of sovereign immunity as it relates to a foreign state's property under § 1610(c). Since the issue raised here concerns subject matter jurisdiction over an action against the Congo *personally*, the governing statute and the relevant requirements are different. In the opinions cited by the Congo, the Fifth Circuit merely confirmed this Court's earlier conclusion, based on the text of § 1610(c), that property is not subject to execution unless it is located in the United States and "used for a commercial activity in the United States," even though an explicit waiver of sovereign immunity may be present. *Af-Cap, Inc.*, 383 F.3d at 367; *Conn. Bank of Commerce*, 309 F.3d at 247. The plain language of § 1605(a)(1), on the other hand, imposes no additional threshold requirements for a finding of subject matter jurisdiction beyond a finding of express or implied waiver of sovereign immunity by the foreign state. 42 U.S.C. § 1605(a)(1).

The second prong of the personal jurisdiction inquiry relates to service of process. The FSIA requires that for personal jurisdiction to exist, service of process must be made on the foreign state according to the provisions of 28 U.S.C. § 1608. 28 U.S.C. § 1330. Section 1608(a) authorizes service through a number of means including "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." *Id.* Af-Cap argues service has been properly made because the Congo waived its right to have service accomplished in any other manner. Af-Cap's Reply to Congo's Opp. [#115] at 2; Notice of Filing of Proof of Service [#21]. A close reading of the letter waiving service reveals that the Congo only waived its objections to what it once contended were defective attempts at service; it does not establish effective service ever occurred. Nonetheless, the Congo has not argued since Af-Cap's predecessor filed its Notice of Filing of Proof of Service [#21] that an effective service of process is lacking in this case. Since there is no question the Congo has received the underlying pleadings in this case, and since the Congo has explicitly waived its right to be served according to the provisions of § 1608(a)(2)–(4), the Court holds the Congo has effectively accepted service "in accordance with [a] special arrangement for service between [it and] the plaintiff." Because the Court finds subject matter jurisdiction exists over this action under § 1605 and service of process has been made under § 1608, the Court may appropriately exercise personal jurisdiction over the Congo.

-24-

### 3.    Permissibility of Injunctive Relief Under the FSIA

The Congo next contends a turnover order is impermissible under the FSIA because such orders are, in effect, "in personam injunctions compelling that property be turned over and sometimes requiring other facilitating actions." Congo's Opp. to Af-Cap's Mot. for Turnover Order at 4; *Schultz v. Fifth Judicial Dist. Ct. of App. at Dallas*, 810 S.W.2d 738, 741 (Tex. 1991) (holding a turnover order operates "as a mandatory injunction against the judgment debtor"), *abrogated on other grounds by In re Sheshtawy*, No. 03-0766, 2004 WL 3019232, at *6–7 (Tex. Dec. 31, 2004). According to the Congo, the FSIA limits the forms of post-judgment relief a Court may order to "attachment arrest and execution" under §§ 1610 and 1611, none of which is broad enough to include a turnover order. Congo's Opp. to Af-Cap's Mot. for Turnover Order at 5 (relying on the text of § 1609).

The Congo's position, however, ignores the legislative history of the FSIA. "The term 'attachment in aid of execution' [in 28 U.S.C. § 1610] is intended to include attachments, garnishments, and supplemental proceedings available under applicable Federal or State law to obtain satisfaction of a judgment. See [R]ule 69, F.R. Civ. P." H.R. Rep. No. 94-1487, at 28 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6627. The purpose of the turnover order Af-Cap has requested is to facilitate and enable attachment of the royalty obligation. *See* Tex. Civ. Prac. & Rem. Code § 31.002(a) ("judgment creditor is entitled to aid from the court . . . to reach property to obtain satisfaction on the judgment."). *See also Bowers v. Transportes Navieros Ecuadorianos*, 719 F. Supp. 166, 171 (S.D.N.Y. 1989) (holding order requiring interim payments

-25-

did not violate the FSIA, because order is not injunction drawing upon court's equitable powers, but rather merely enforces a statutory right). Thus, turnover orders appear to be precisely the type of relief Congress envisioned the FSIA would make available to judgment creditors.

Moreover, there is no basis for concluding Congress intended to impose any special exceptions for injunction-based relief to the broad panoply of remedies it sought to make available under the FSIA. As to a claim not barred by sovereign immunity, the FSIA provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances" except that punitive damages are barred. 28 U.S.C. § 1606. The legislative history indicates the broad scope of liability is intended to encompass post-judgment injunctive relief in an appropriate case: "Section 1606 makes clear that if the foreign state, political subdivision, agency or instrumentality is not entitled to immunity from jurisdiction, liability exists as it would for a private party under like circumstances. . . . Consistent with this section, a court could, when circumstances were clearly appropriate, order an injunction or specific performance." H.R. REP. NO. 94-1487, at 22 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6621.

### 4.    Procedural Prerequisites to Turnover Relief

The Congo contends turnover relief is not appropriate in this case because such orders are "appropriate only when property 'cannot readily be attached or levied on by ordinary legal process.'" Congo's Opp. to Af-Cap's Mot. for Turnover Order at 6; TEX. CIV. PRAC. & REM. CODE § 31.002(a)(1). Because it assumes the property at issue is subject to garnishment, the Congo suggests other means of attachment besides turnover relief are readily available. However, the

-26-

Court has already concluded the intangible property in this case involves future obligations not capable of being garnished. These are precisely the kind of obligations to which the Texas turnover statute was intended to apply. Thus, the Congo's argument is facially defective. Moreover, as the Court has already noted, Af-Cap need not make any special showing that other forms of execution have been exhausted before it may obtain turnover relief.

The Congo also contends because turnover relief is a kind of injunction, the Court must be satisfied the turnover order is workable before granting it. The relief sought by Af-Cap fails the workability requirement, the Congo argues, because the Court would be unable to supervise the signing of letters of instruction by foreign officials who are physically located outside the United States. Although the Court agrees workability concerns are ordinarily quite relevant in determining the appropriateness of injunctive relief, the concerns raised by the Congo are insufficient to demonstrate the sought-after relief is inappropriate. First, the turnover order sought by Af-Cap would not entail any extraordinary supervisory efforts by the Court. The proposed order calls for the Congo to do nothing more than execute appropriate letters of instruction, which are to be prepared in advance by a receiver appointed by this Court, and cause those letters to be delivered to three companies. Thus, aside from its supervision of the proposed receiver, the turnover order requires the Court to supervise only two acts: (1) the Congo's signing of the letters of instruction; and (2) its delivery of them.

Second, the Congo's argument the Court is unable to supervise actions to be taken by the Congo's officials proves too much. If an injunction compelling a foreign state's officials to

-27-

perform two simple, ministerial acts is outside the Court's power to grant injunctive relief, there would be nothing left of such power. The workability argument would preclude injunctive relief in every case brought pursuant to the FSIA. Since the Court has already concluded Congress intended injunctive relief to be available under the FSIA, the Congo's workability argument is not a sound basis for denying a turnover order in this case.[10]

Finally, the Congo argues a turnover order would improperly interfere with the priority rights to the intangible property at issue in this case belonging to parties that have obtained garnishment writs in other courts. However, as the Court has already noted, Garnishees in this case are entitled to three months' advance notice before an election by the Congo to take its royalty in cash can become effective. The Garnishees' right to advance notice would necessarily be reflected in the issuance of any turnover relief as the Congo can be expected to turn over no greater payment

---

[10] Similarly without merit is the Congo's contention that, because it would compel certain Congolese government officials to perform a pair of ministerial acts, a turnover order should be rejected as "a grave affront to the Congo's sovereignty." Congo's Opp. to Af-Cap's Mot. for Turnover Order at 8. Like its workability argument, the sovereignty objection fails where it would be available to every foreign state defendant in an action brought pursuant to the FSIA—a result foreclosed by Congress' clear intent to make such relief available to plaintiffs under the FSIA.

Additionally, the Congo's sovereignty argument is foreclosed by the law of this case. The Congo attempts to couch its position in terms of an objection to the particular form of relief Af-Cap now seeks. *Id.* (suggesting injunctive relief is a particular affront to a foreign state's sovereignty). However, its argument is nothing more than a transparent attempt to reassert the act of state doctrine, a tactic already specifically rejected by the Fifth Circuit in this case:

The Congo Defendants also argue that the act of state doctrine should apply; this means that the situs of foreign debt obligations must be the foreign country because a contrary conclusion would improperly "antagonize the foreign government." However, the act of state doctrine is inapplicable in this context. As the Supreme Court, and this court, have made clear, the act of state doctrine applies only when the dispute implicates the legitimacy of public acts undertaken by a sovereign nation. Because this case does not involve such a public act, but rather a mere dispute over the payment of a debt the Congo does not dispute that it owes, the act of state doctrine does not apply.

*Af-Cap, Inc.*, 383 F.3d at 372 n.14 (internal citations omitted).

-28-

rights than it actually possesses. Accordingly, any future royalty obligations captured by a turnover order issued by this Court will fall outside the service-and-answer period for garnishment actions instituted prior to the date of this Order, which could capture obligations accruing over no more than the next 27 days. *See* TEX. R. CIV. P. 659 (stating a garnishee's answer to a writ of garnishment is due "the Monday next following the expiration of twenty days from the date the writ was served").

Having concluded Af-Cap has established the propriety of turnover relief in this case and finding the Congo's objections to be unavailing, the Court holds Af-Cap is entitled to a turnover order under § 31.002 of the Texas Civil Practice and Remedies Code. The Court declines, however, to enter the turnover order in the form proposed by Af-Cap. That order, which calls for the appointment of a receiver, would unnecessarily require the Court to inject a third party into litigation that has proved to be exceedingly contentious and drawn-out. Rather than subject any independent party to that responsibility, the Court deems it appropriate to make Af-Cap responsible for its own collection and enforcement efforts.[11]

More importantly, the turnover statute does not require the appointment of a receiver. Rather, it specifically authorizes the Court generally to order the judgment debtor to "otherwise apply the property to the satisfaction of the judgment." TEX. CIV. PRAC. & REM. CODE § 31.002(b)(2); *Ross v. 3D Tower Ltd.*, 824 S.W.2d 270, 272 (Tex. App.–Houston [14th Dist.]

---

[11] The Court notes the Congo previously paid off the "NUFI debt"—which served as the basis for the Fifth Circuit's "commercial use" determination in this case—pursuant to a turnover order that did not make use of a receiver. Af-Cap's Mot. for Turnover Order at 1.

1992, writ denied). Therefore, the Court ORDERS that Af-Cap shall prepare a proposed form of turnover order that does not call for the appointment of a receiver. Similarly, Af-Cap shall prepare and file for the Court's approval proposed letters of instruction to be signed by the Congo's authorized representative(s), whereby the Congo would (1) elect to take its royalty interest from CMS Nomeco Congo Inc., the Nuevo Congo Company, and Nuevo Congo, Ltd. in cash; and (2) direct each of those companies to direct all royalty payments into the registry of this Court from the time the Congo's in-cash election becomes effective until the time Af-Cap's judgment is fully satisfied.

## III.    Conclusion

In accordance with the foregoing:

IT IS ORDERED that Garnishees' Motion to Dismiss [#153 in A-01-CA-100-SS] is DENIED as to Rules 12(b)(1), 12(b)(2), and 12 (b)(6);

IT IS FURTHER ORDERED that Garnishees' Motion to Dismiss [#153 in A-01-CA-100-SS] is DISMISSED AS MOOT as to Rule 12(b)(5);

IT IS FURTHER ORDERED that Garnishee's Motion for Partial Summary Judgment [#169 in A-01-CA-100-SS] is GRANTED;

IT IS FURTHER ORDERED that the writs of garnishment issued on Garnishees on November 5, 2004 in A-01-CA-100-SS are DISSOLVED;

IT IS FURTHER ORDERED that Af-Cap's Motion for Issuance of New Garnishment Writs [#160 in A-01-CA-100-SS] is DENIED;

-30-

IT IS FURTHER ORDERED that Garnishees' Motion for Expedited Consideration

of Motion to Quash Writs of Garnishment [#163], Garnishees' Motion to Quash Writs of

Garnishment [#164], Garnishees' Emergency Motion for Expedited Consideration of

Garnishees' Dispositive Motions [#168], and Af-Cap's Emergency Request for Stay

Pending Ruling on its Motion for Turnover Order or Appeal [#189] (all of which are

docketed in A-01-CA-100-SS) are DISMISSED AS MOOT; and

IT IS FINALLY ORDERED that Af-Cap's Motion for Turnover Order [#110 in

A-01-CA-321-SS] is GRANTED.

SIGNED this the 4ᵗʰ day of February 2005.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE

-31-