**EXHIBIT "G"**

# FRENCH

*congo # 6.1.2 (b)*

## CONVENTION

- La République Populaire du Congo
- Congolese Superior Oil Company
- Cities Service Congo Petroleum Corporation
- Canadian Superior Oil Ltd.
- Société Nationale de Recherches et
  d'Exploitation Pétrolières "HYDRO-CONGO"

le 25 mai 1979

GAR 00001

**EXHIBIT 1**

FRENCH
Copied from

INDEX

1.  Table des matières.

2.  Convention.

3.  Annexe I:    Décret attributif du permis "Marine 1".

4.  Annexe II.

5.  Annexe III:   Taux d'amortissements applicables aux
               SOCIETES.

6.  Annexe IV:   Paiement de la redevance et de l'impôt sur
               les sociétés.

7.  Annexe V:    Modèle de lettre de garantie.

8.  Appendice.

GAR 00002

## TABLE DES MATIERES

Page

1.  Définitions .......................................... 2
2.  Objet ................................................ 4
3.  Entrée en vigueur – Durée – Permis d'exploitation ...... 4
4.  Bénéficiaires ........................................ 4
5.  Garanties ............................................ 5
6.  Charges fiscales ..................................... 6
    6.03  Etablissement de l'impôt sur les sociétés de
          chacune des SOCIETES ........................... 7
7.  Redevance minière .................................... 8
8.  Changes .............................................. 10
9.  Paiements forfaitaires ............................... 11
10. Disposition des HYDROCARBURES ........................ 12
11. Emploi et formation du personnel ..................... 13
12. Fournisseurs congolais ............................... 15
13. Mise à disposition des informations .................. 15
14. Transport et traitement des produits ................. 16
15. Force majeure ........................................ 16
16. Déclaration et paiement d'impôts ..................... 17
17. Arbitrage ............................................ 18
18. Droit applicable ..................................... 18
19. Avis ................................................. 18
20. Avenants ............................................. 20
21. Garantie par société mère ............................ 20

ANNEXE I
  Copie du décret accordant le PERMIS

ANNEXE II

ANNEXE III
  Taux d'amortissements applicables aux SOCIETES

ANNEXE IV
  I - Paiement de la redevance
  II - Paiement de l'impôt sur les sociétés

ANNEXE V
  Modèle de lettre de garantie

(i)

GAR 00003

CONVENTION

ENTRE

La République Populaire du Congo (ci-après désignée le "CONGO") représentée aux présentes par Monsieur Rodolphe Adada, Ministre des Mines et de l'Energie,

d'une part,

ET

Congolese Superior Oil Company (ci-après parfois désignée "SUPERIOR"), société de l'Etat du Nevada, Etats-Unis d'Amérique, dont le siège est à Houston, Texas, Etats-Unis d'Amérique, 26th Floor, First City National Bank Building, représentée par Monsieur Diego O. Giordano-Echegoyen, dûment autorisé à cet effet,

Cities Service Congo Petroleum Corporation (ci-après parfois désignée "CITIES SERVICE"), société de l'Etat du Delaware, Etats-Unis d'Amérique, dont le siège est à Dover, Delaware, Etats-Unis d'Amérique, 306 South State Street, représentée par Antoine Saadi, dûment autorisé aux fins des présentes,

Canadian Superior Oil Ltd. (ci-après parfois désignée "CANADIAN"), société constituée au Canada, dont le siège est à Calgary, Three Calgary Place, 355 4th Avenue S.W., Province d'Alberta, Canada, représentée par Robert C. Schrader, dûment autorisé à cet effet,

Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" (ci-après parfois désignée "HYDRO-CONGO"), société nationale ayant son siège à Brazzaville, agis-sant par Monsieur Alphonse M'Boudo-Nesa, dûment autorisé à cet effet,

ci-après désignées collectivement les "SOCIETES" ou indivi-duellement "l'une des SOCIETES" ou la "SOCIETE",

d'autre part,

EXPOSE PRELIMINAIRE

Le CONGO désire promouvoir et réaliser dans les meil-leures conditions d'efficacité la recherche et le développement

GAR 00004

2.

des ressources du CONGO en hydrocarbures liquides et/ou gazeux afin d'assurer par la suite leur exploitation dans les meilleures conditions possibles.

A cet effet, le CONGO désire obtenir la coopération de sociétés pétrolières qualifiées et réputées pour qu'elles fournissent à HYDRO-CONGO l'aide nécessaire à la réalisation, dans le cadre d'une association, de certains travaux de recherche d'hydrocarbures, et de développement et d'exploitation des gisements découverts sur le permis de recherches du type "A" dit "Marine 1" accordé à HYDRO-CONGO et plus amplement décrit ci-après, et sur les permis d'exploitation qui peuvent être accordés sur ce permis de recherches.

Les SOCIETES exerceront leurs activités de recherche et d'exploitation en conformité avec les principes de la politique pétrolière du CONGO tels que repris dans la présente Convention.

EN CONSEQUENCE, IL EST CONVENU CE QUI SUIT:

1.  Définitions

Aux fins de la présente Convention, les termes et expressions suivants auront la signification indiquée ci-dessous.

1.01. Convention:  La présente Convention entre le CONGO et les SOCIETES.

1.02  Association:  L'association constituée par le contrat d'opérations en association pour l'exécution des travaux pétroliers, tel que ce terme est défini au sous-paragraphe 1.10 ci-dessous.

1.03  Contrat d'association:  Le contrat d'opérations en association pour la recherche et l'exploitation d'hydrocarbures conclu entre les SOCIETES pour la recherche et l'exploitation éventuelle de gisements d'hydrocarbures sur le permis, tel que ce terme est défini au sous-paragraphe 1.04 ci-après.

1.04  Permis:  Le permis de recherches de type "A" dit "Marine 1" visé en tête de la CONVENTION attribué à HYDRO-CONGO pour le bénéfice de l'ASSOCIATION par le décret dont copie est jointe en Annexe I à la Convention, avec toutes ses prorogations, modifications, variations ou renouvellements éventuels, ainsi que tous les permis d'exploitation qui pourront être accordés sur une partie quelconque de sa surface.

1.05  Opérateur:  La SOCIETE qui est chargée, au nom des membres de l'ASSOCIATION, des travaux pétroliers -- tel que ce terme est défini au sous-paragraphe 1.10 ci-dessous -- sur le PERMIS, conformément aux dispositions du CONTRAT D'ASSOCIATION.

GAR 00005

3.

1.06  Hydrocarbures:  Les hydrocarbures solides, liquides et/ou gazeux découverts et/ou exploités sur le PERMIS.

1.07  Gaz naturel:  Tous les HYDROCARBURES gazeux produits par les SOCIETES sur le PERMIS, à l'exception des condensats qui sont séparés et récupérés sous forme liquide par utilisation des méthodes normales de récupération au champ.

1.08  Hydrocarbures liquides:  Les HYDROCARBURES produits par les PARTIES sur le PERMIS, à l'exception du GAZ NATUREL.

1.09  Société affiliée:

1.09.1    Toute société dans laquelle plus de 50% des droits de vote dans les assemblées générales ordinaires sont détenus directement ou indirectement par l'une des SOCIETES;

1.09.2    Toute société qui détient, directement ou indirectement, plus de 50% des droits de vote dans les assemblées générales ordinaires de l'une des SOCIETES;

1.09.3    Toute société dont les droits de vote dans les assemblées générales ordinaires sont détenus pour plus de 50% par une société qui détient elle-même, directement ou indirectement, plus de 50% des droits de vote dans les assemblées générales ordinaires de l'une des SOCIETES;

1.09.4    Toute société dans laquelle plus de 50% des droits de vote dans les assemblées générales ordinaires détenus directement ou indirectement par plusieurs SOCIETES ou par plusieurs sociétés telles que décrites aux paragraphes 1.09.1 à 1.09.3 ci-dessus.

1.10  Travaux pétroliers:  L'ensemble des activités, où qu'elles s'exercent, relatives à la recherche, au développement, à l'exploitation, au transport, au stockage et à la disposition des HYDROCARBURES au CONGO ou à l'exportation.

1.11  Travaux de recherche:  Ceux des TRAVAUX PETROLIERS réalisés dans le but de découvrir un gisement d'HYDROCARBURES, y compris le forage de découverte et les travaux d'appréciation, réalisés jusqu'à la date à laquelle le Comité de Direction prévu au CONTRAT D'ASSOCIATION aura déterminé, conformément à l'article 5 du CONTRAT D'ASSOCIATION, qu'une découverte est commercialement exploitable.

1.12  Travaux de développement et d'exploitation:  Tous TRAVAUX PETROLIERS autres que les TRAVAUX DE RECHERCHE, y compris le transport des HYDROCARBURES jusqu'au point d'enlèvement par les SOCIETES.

1.13  Sociétés étrangères:  Les SOCIETES, à l'exception d'HYDRO-CONGO.

**GAR 00006**

4.

1.14  Franc CFA:    Monnaie définie au titre II de la Con-
vention de Coopération Monétaire entre les Etats membres de la
Banque des Etats d'Afrique Centrale (B.E.A.C.) et la République
Française, signée à Brazzaville le 23 novembre 1972.

## 2.  Objet

2.01  La CONVENTION et ses annexes ont pour objet de
définir les conditions dans lesquelles les SOCIETES
participeront aux TRAVAUX PETROLIERS sur le PERMIS dans le
cadre de l'ASSOCIATION.

## 3.  Entrée en vigueur - Durée - Permis d'exploitation

3.01  La CONVENTION sera approuvée par un acte ayant force
de loi.  Elle entrera en vigueur lors de la publication de cet
acte au Journal Officiel du CONGO.

3.02  La CONVENTION est conclue pour la durée du PERMIS.

3.03  Chaque permis d'exploitation aura une durée de trente
(30) ans.

## 4.  Bénéficiaires

4.01  Les dispositions de la CONVENTION s'appliquent de
plein droit aux SOCIETES et à tout cessionnaire des droits de
chaque SOCIETE sur le PERMIS, ainsi qu'à toute société à
laquelle les SOCIETES ou l'une d'entre elles se seront asso-
ciées en lui cédant tout ou partie de leurs droits et obli-
gations sur le PERMIS.  Cependant, toute cession devra être
soumise préablablement à son entrée en vigueur à l'approbation
du Ministre de tutelle.

Si la décision du Ministre de tutelle n'intervient pas
dans un délai d'un (1) mois à compter de la signification de la
cession qui doit être soumise à son approbation, celle-ci sera
considérée comme étant tacitement rejetée.

4.01.1    Si le cessionnaire proposé est une société
entièrement contrôlée par le cédant ou par la société mère de
son groupe, l'autorisation du Ministre de tutelle est de droit
et, dans ce cas, nonobstant les dispositions du paragraphe 4.01
ci-dessus, l'autorisation sera réputée donnée un (1) mois
après le dépôt de la demande.  Si le cessionnaire proposé est
une SOCIETE AFFILIEE, l'autorisation du Ministre de tutelle ne
sera pas refusée sans raison et de manière discrétionnaire.

4.01.2    Tout acte ultérieur ayant pour effet de
faire perdre au cessionnaire le caractère de société entière-
ment contrôlée par le cédant ou par la société mère de son
groupe ou le caractère de SOCIETE AFFILIEE sera considéré comme
une nouvelle cession soumise à l'approbation préalable du
Ministre du tutelle dans les mêmes conditions.

GAR 00007

5.

4.01.3    Conformément à la politique pétrolière du CONGO, HYDRO-CONGO ne cédera pas sa participation dans l'ASSO-CIATION à moins que le cessionnaire ne soit entièrement con-trôlé par le CONGO.

5.    Garanties

5.01    Sous réserve des dispositions du sous-paragraphe 5.01.3 ci-dessous, le CONGO garantit aux SOCIETES, pour la durée de la CONVENTION, la stabilité des conditions juridiques, financières, minières et économiques dans lesquelles les SOCIETES exerceront leurs activités au CONGO, telles que ces conditions résultent de la législation et de la réglementation en vigueur à la date de signature de la CONVENTION et des modalités de la CONVENTION.

5.01.1    En conséquence, les SOCIETES ne seront soumises en quelque domaine que ce soit à aucune mesure aggravante par rapport au régime défini au paragraphe 5.01 ci-dessus.

5.01.2    En particulier, devra être considérée comme aggravante, au sens du sous-paragraphe 5.01.1 ci-dessus, toute mesure ayant pour effet soit de diminuer les profits nets des activités exercées dans le cadre de la CONVENTION en limitant les recettes ou en augmentant les charges d'exploitation des SOCIETES, soit, en général, de compromettre l'exécution ou la conduite des TRAVAUX PETROLIERS par des restrictions apportées aux droits des SOCIETES.

5.01.3    Toutefois, les modifications apportées à la législation du travail, de la sécurité et de la protection de l'environnement et à l'impôt sur le revenu des personnes physiques seront applicables de plein droit aux SOCIETES et à leur personnel, sauf si elles comportent des restrictions aux droits des SOCIETES concernant la propriété de leurs biens ou la libre disponibilité des HYDROCARBURES leur revenant au sens de l'article 10 ci-dessous.

5.01.4    En outre, les SOCIETES ne seront soumises, notamment en ce qui concerne le régime des biens et des per-sonnes, à aucune mesure discriminatoire de droit ou de fait à leur encontre.

5.02    Le CONGO garantit aux SOCIETES pour la durée de la CONVENTION que les conditions fiscales de l'exercice de leurs activités au CONGO au titre de la CONVENTION, en ce qui con-cerne l'impôt sur les sociétés visé à l'article 6 ci-dessous, seront régies par le Code Général de Impôts du CONGO et les textes législatifs ou réglementaires modifiant ledit Code et par la CONVENTION.  En conséquence, les SOCIETES ne seront soumises, pour leurs activités au CONGO au titre de la CON-VENTION, à aucune mesure fiscale discriminatoire par rapport au droit commun applicable aux sociétés congolaises ou étrangères autres que celles résultant de la CONVENTION.

**GAR 00008**

6.

5.03  Le CONGO garantit aux SOCIETES pour la durée de la CONVENTION, en application du Code Général des Impôts, que la redevance minière versée au CONGO sur les quantités d'HYDROCARBURES revenant aux SOCIETES aux termes du CONTRAT D'ASSOCIATION sera fixée au taux de quatorze et demi pour cent (14 1/2%) pour les HYDROCARBURES LIQUIDES, et de neuf pour cent (9%) pour le GAZ NATUREL.

## 6.  Charges fiscales

6.01  Pour les TRAVAUX PETROLIERS, chacune des SOCIETES sera assujettie à la redevance minière visée au paragraphe 5.03 ci-dessus et à l'article 7 ci-dessous, et à l'impôt sur les sociétés visé aux articles 106 à 126 du Code Général des Impôts du CONGO, à l'exclusion de toute autre imposition.

6.02  En conséquence, chacune des SOCIETES est exonérée pour les TRAVAUX PETROLIERS et pour la durée de la CONVENTION de tous autres impôts et taxes.  Cette exonération comprend notamment:

6.02.1  L'exonération de tous droits de douanes et de toutes taxes ou cautions à l'importation pour tous les biens d'équipements, matières et fournitures consommables et pièces de rechange de biens d'équipements destinés aux TRAVAUX PETRO-LIERS, qu'ils soient importés par la SOCIETE directement, ou indirectement par l'OPERATEUR au nom de la SOCIETE ou par l'intermédiaire de fournisseurs et d'entreprises sous-traitantes.

6.02.2  L'exonération de tous droits ou taxes à l'exportation applicables aux biens d'équipement et pièces de rechange pour lesdits biens d'équipement lorsque ceux-ci ont été importés en franchise de tout droit, conformément au sous-paragraphe 6.02.1 ci-dessus, ainsi qu'aux HYDROCARBURES produits sur le PERMIS appartenant à la SOCIETE conformément à l'article 10 ci-dessous.

6.02.3  L'exonération de l'impôt sur le chiffre d'affaires intérieur, de la taxe unique, de la taxe sur les transactions et tous autres impôts indirects, relatifs à la fourniture des biens (matériels, équipements, pièces de rechange, etc.), services et travaux de toute espèce relatifs aux TRAVAUX PETROLIERS prévus à la CONVENTION, que la fourniture soit faite par la SOCIETE, par l'OPERATEUR ou par des entrepreneurs de travaux, des fournisseurs et prestataires de services travaillant directement ou indirectement pour le compte de la SOCIETE.

6.02.4  L'exonération des droits d'enregistrement relatifs à tous les actes de toute nature auxquels la SOCIETE ou l'OPERATEUR au nom de la SOCIETE peut être partie dans le cadre des TRAVAUX PETROLIERS sur le PERMIS, à toutes trans-missions de propriété ou de jouissance à la SOCIETE de biens

**GAR 00009**

7.

mobiliers ou immobiliers pour la réalisation des TRAVAUX PETRO-
LIERS, ou relatifs aux contrats d'assurance auxquels la SOCIETE
ou l'OPERATEUR en son nom peut être partie et qui concernent
les TRAVAUX PETROLIERS.

6.02.5    L'exonération de tout droit ou impôt relatif
au paiement d'intérêts ou de dividendes par la SOCIETE.

6.03  Etablissement de l'impôt sur les sociétés de chacune
des SOCIETES

6.03.1    A l'exception de celles précisées au présent
paragraphe 6.03, les règles de l'assiette et du recouvrement de
l'impôt sur les sociétés sont celles fixées par le Code Général
des Impôts du CONGO.

6.03.2    Chacune des SOCIETES sera soumise à l'impôt
sur les sociétés, conformément aux dispositions du Code Général
des Impôts du CONGO, et, si le taux de l'impôt sur les sociétés
fixé par le Code Général des Impôts du CONGO est inférieur à
cinquante cinq pour cent (55%), à un impôt additionnel calculé
en appliquant au bénéfice imposable un pourcentage égal à la
différence entre le taux de l'impôt sur les sociétés et
cinquante cinq pour cent (55%).

6.03.3    L'assiette de l'impôt sur les sociétés
applicable à chacune des SOCIETES au titre de ses activités
exercées dans le cadre de la CONVENTION sera calculée sur la
base des prix tels que définis à l'annexe II jointe à la CON-
VENTION. Les amortissements seront calculés par chacune des
SOCIETES conformément aux règles posées par le Code Général des
Impôts du CONGO; toutefois, chacune des SOCIETES appliquera les
taux élément par élément figurant au tableau joint à la
CONVENTION en annexe III.

6.03.4    Afin de permettre le calcul de l'impôt sur
les sociétés dû par chacune des SOCIETES au titre de ses
activités exercées dans le cadre de la CONVENTION, chaque
SOCIETE devra, à compter de la date d'entrée en vigueur et
pendant la durée de la CONVENTION, tenir une comptabilité con-
forme aux règles fixées par le Code Général des Impôts du CONGO.

6.03.5    Les dispositions de l'article 109 du Code
Général des Impôts du CONGO ne seront pas applicables aux
SOCIETES.

6.03.6    Par dérogation à l'article 116 du Code
Général des Impôts du CONGO, les SOCIETES ne sont pas
autorisées à déduire de leur bénéfice imposable à l'impôt sur
les sociétés les intérêts et agios payés sur des emprunts
éventuellement réalisés pour le financement des TRAVAUX PETRO-
LIERS auprès de SOCIETES AFFILIEES. A partir de la date à
laquelle le Comité de Direction prévu au CONTRAT D'ASSOCIATION
aura déterminé, conformément au CONTRAT D'ASSOCIATION, qu'une

GAR 00010

8.

découverte est commercialement exploitable, chaque SOCIETE sera admise à déduire de son bénéfice imposable les intérêts et agios payés sur des emprunts réalisés pour le financement des TRAVAUX DE DEVELOPPEMENT ET D'EXPLOITATION auprès d'organismes financiers indépendants des SOCIETES, moyennant présentation par la SOCIETE emprunteuse aux autorités fiscales de certificats émanant desdits organismes financiers.

6.03.7    La redevance minière visée à l'article 7 ci-dessous est déductible du résultat imposable et elle ne peut en aucun cas être traitée comme une avance sur l'impôt sur les sociétés.

6.03.8    La limite de dix pour cent (10%) posée par le deuxième alinéa de l'article 20.I.6º, du Code Général des Impôts du Congo, tel que modifié par l'article 5 de la loi nº 30/74, ne sera pas applicable aux SOCIETES.

6.04   Les rémunérations et salaires versés au personnel des SOCIETES en service au CONGO pour la réalisation des TRAVAUX PETROLIERS seront soumis aux impôts afférents à ces revenus conformément aux dispositions du Code Général des Impôts du CONGO.

6.05   L'impôt sur les sociétés fait l'objet du versement d'acomptes mensuels provisoires suivant les modalités fixées à l'annexe IV jointe à la CONVENTION.

7.   Redevance minière

7.01   L'assiette de la redevance minière acquittée en espèces ou en nature est égale, pour chaque SOCIETE, à la valeur des HYDROCARBURES enlevés par elle, calculée sur la base du prix déterminé conformément à l'annexe II jointe à la CON-VENTION, diminuée des frais de transport intérieur, traitement, stockage et chargement, tels que ces frais résultent de la comptabilité de la SOCIETE et   constituent des charges fiscalement déductibles.   La redevance n'est pas due sur les quantités d'HYDROCARBURES utilisées pour les besoins des TRAVAUX PETROLIERS, ou perdues.

7.02   La redevance minière prévue au présent article 7 est payée en espèces ou en nature au choix du CONGO.

7.03   L'OPERATEUR communiquera à l'autorité compétente du CONGO la date prévue pour la première exportation d'HYDRO-CARBURES au moins six (6) mois à l'avance, afin que cette autorité puisse faire connaître à la SOCIETE ou à l'OPERATEUR, dans un délai de cinq (5) mois après la réception de ladite communication, le mode de règlement de la redevance minière choisi par l'Administration.   L'Administration pourra toujours modifier le mode de règlement ainsi choisi, sauf à en notifier la SOCIETE ou l'OPERATEUR en son nom au moins trois (3) mois à l'avance.   Toutefois, l'Administration est réputée avoir opté

**GAR 00011**

9.

initialement pour le paiement en espèces de la redevance minière.

Si, à un moment où l'Administration prélève la redevance minière en espèces, les SOCIETES ont la possibilité de prendre des engagements de ventes pour une période de plus de trois (3) mois, lesquels ne pourraient être satisfaits au cas où l'Administration déciderait de prélever la redevance en nature, les SOCIETES pourront soumettre le projet de contrat de vente au Ministre de tutelle, qui pourra à sa discrétion l'approuver ou non. En cas d'approbation, la redevance continuera d'être perçue en espèces pendant la durée dudit contrat.

7.04   La quantité d'HYDROCARBURES sur laquelle s'applique la redevance minière est mesurée au point de livraison décrit au sous-paragraphe 10.02.1. Les méthodes de mesure utilisées seront agréées par l'autorité congolaise compétente qui devra être tenue au fait du déroulement des opérations afin de pouvoir se faire représenter et de procéder, si elle l'estime nécessaire, à toute mesure de contrôle.

Dans le mois qui suit la fin de la période pour laquelle la redevance minière est due, chaque SOCIETE, ou l'OPERATEUR en son nom, transmettra à l'autorité congolaise compétente un relevé des quantités d'HYDROCARBURES assujetties à la redevance minière, accompagné de toutes justifications utiles.

7.05   La redevance minière, qu'elle soit en nature ou en espèces, sera liquidée et versée trimestriellement dans les conditions visées ci-après:

7.05.1    Le paiement en nature de la redevance minière sera effectué au profit d'HYDRO-CONGO agissant pour le compte du CONGO selon les modalités arrêtées au paragraphe 4.11 et aux articles 9 et 10 du CONTRAT D'ASSOCIATION pour la remise à HYDRO-CONGO de la part de production lui revenant. Les quantités d'HYDROCARBURES dues au CONGO au titre du présent article 7 seront livrées à HYDRO-CONGO au cours du mois suivant celui au titre duquel la redevance minière proportionnelle est due.

7.05.2    Le paiement en espèces de la redevance minière se fera au cours du mois qui suit la fin du trimestre calendaire au titre duquel la redevance minière en espèces est due.

7.06   La redevance minière, lorsqu'elle est payée en espèces, fait l'objet de déclarations et de versements provi-soires mensuels suivant les modalités figurant dans l'annexe IV jointe à la CONVENTION.

GAR 00012

10.

7.07  En raison du caractère particulier du GAZ NATUREL, les parties se consulteront en cas de découverte de GAZ NATUREL pour préciser les modalités de règlement en nature de la redevance minière sur le GAZ NATUREL conformément aux principes énoncés au présent article 7.

8.  Changes

8.01  Le CONGO garantit pour la durée de la CONVENTION, aux SOCIETES, aux personnes physiques régulièrement employées par elles et aux personnes physiques ou morales chargées par elles de réaliser ou financer les TRAVAUX PETROLIERS ou la commercialisation des HYDROCARBURES que:

8.01.1  Le CONGO n'impose pas aux SOCIETES d'obligation de rapatriement du produit de la vente à l'exportation d'HYDROCARBURES.

8.01.2  Les SOCIETES pourront payer à l'étranger en devises, en utilisant les fonds conservés par elles à l'étranger, les entreprises, fournisseurs et prêteurs en exécution des contrats conclus pour l'exécution des TRAVAUX PETROLIERS.

8.01.3  Les SOCIETES pourront emprunter à l'étranger toutes les sommes qui peuvent leur être nécessaires pour réaliser les TRAVAUX PETROLIERS.

8.01.4  Les SOCIETES pourront transférer en faveur des fournisseurs résidant hors de la zone franc toutes les sommes dues à ces derniers.

8.01.5  Les SOCIETES pourront librement rapatrier du CONGO vers les pays membres de la zone franc les capitaux provenant de ces pays investis au CONGO dans le cadre des TRAVAUX PETROLIERS, et transférer dans les mêmes conditions leurs produits éventuels.

8.01.6  Les SOCIETES pourront rapatrier du CONGO vers les pays extérieurs à la zone franc les capitaux provenant de ces pays investis au CONGO dans le cadre des TRAVAUX PETRO-LIERS, et transférer dans les mêmes conditions leurs produits éventuels. Le CONGO garantit aux SOCIETES qu'elles obtiendront des moyens de règlement sur les pays extérieurs à la zone franc nécessaires à la réalisation des opérations visées à la CONVENTION.

8.01.7  Les SOCIETES pourront exporter librement du CONGO à destination des pays membres de la zone franc toutes les sommes dont elles pourront être débitrices envers les fournisseurs, affréteurs et autres prestataires de services, ainsi qu'envers leurs actionnaires qui résident en zone franc et, d'une manière générale, toutes les sommes dont les SOCIETES pourront être débitrices à un titre quelconque pendant la durée de la CONVENTION.

**GAR 00013**

11.

8.01.8    Les membres du personnel ressortissant des pays membres de la zone franc régulièrement employés par les SOCIETES pourront exporter librement du CONGO à destination des pays de la zone franc leurs économies sur salaire.

8.01.9    Les SOCIETES pourront exporter du CONGO à destination des pays extérieurs à la zone franc toutes les sommes dont elles pourront être débitrices envers les fournisseurs, affréteurs et autres prestataires de services, ainsi qu'envers leurs actionnaires qui résident dans ces pays.

8.01.10    Les membres du personnel ressortissant des pays extérieurs à la zone franc régulièrement employés par les SOCIETES pourront exporter du CONGO à destination de ces pays leurs économies sur salaire.

8.02    Tout transfert de devises à destination ou en provenance de la zone franc effectué conformément aux sous-paragraphes 8.01.4, 8.01.6, 8.01.9 et 8.01.10 ci-dessus sera réalisé sous le contrôle du Bureau des relations financières avec l'étranger ("B.R.F.E.") conformément à la réglementation en vigueur au CONGO et relative à la zone franc.

8.03    Les transactions visées aux sous-paragraphes 8.01.4, 8.01.6, 8.01.9 et 8.01.10 ci-dessus ne seront pas rendues plus onéreuses pour les SOCIETES qu'elles ne le sont pour d'autres acheteurs et vendeurs de devises en matière commerciale par imposition d'un taux différent ou de taxes ou commissions spéciales.

9.    Paiements forfaitaires

9.01    La SOCIETE nommée Opérateur par le CONTRAT D'ASSO-CIATION paiera au CONGO au nom et pour le compte des SOCIETES ETRANGERES les montants forfaitaires suivants:

9.01.1    Deux cent cinquante millions (250.000.000) de FRANCS CFA lorsque la production journalière d'HYDROCARBURES LIQUIDES sur le PERMIS aura atteint trente mille (30.000) barils par jour et se sera maintenue pendant une période de cent vingt (120) jours consécutifs à une moyenne de trente mille (30.000) barils par jour;  et

9.01.2    Six cent vingt cinq millions (625.000.000) de FRANCS CFA lorsque la production journalière d'HYDROCARBURES LIQUIDES sur le PERMIS aura atteint soixante quinze mille (75.000) barils par jour et se sera maintenue pendant une période de cent vingt (120) jours consécutifs à une moyenne de soixante quinze mille (75.000) barils par jour.

9.01.3    Les montants forfaitaires visés aux sous-paragraphes 9.01.1 et 9.01.2 ci-dessus deviendront exigibles trente (30) jours après l'expiration de chacune des périodes de cent vingt (120) jours visées auxdits sous-paragraphes.

GAR 00014

12.

9.02   Les montants visés aux sous-paragraphes 9.01.1 et
9.01.2 ci-dessus pourront donner lieu à constitution
d'immobilisations amortissables fiscalement dans les comptes
des SOCIETES ETRANGERES.

## 10.   Disposition des HYDROCARBURES

10.01   Chaque SOCIETE aura le droit d'enlever librement la
part d'HYDROCARBURES qui lui revient au titre du CONTRAT
d'ASSOCIATION.

Elle pourra librement vendre, céder, transporter,
consommer ou exporter, directement ou indirectement, ladite
part.

10.02   Toutefois, et par dérogation au principe posé par le
paragraphe 10.01 ci-dessus, chaque SOCIETE pourra être tenue, à
la demande du CONGO, d'affecter en priorité les HYDROCARBURES
provenant de son exploitation à la satisfaction des besoins de
l'industrie congolaise aux conditions définies ci-après, à
condition: (a) que la part de production revenant à
HYDRO-CONGO ait été utilisée pour satisfaire les besoins de
l'industrie congolaise; (b) que le maximum de la part de
production de chacune des SOCIETES ETRANGERES ainsi affectée à
la satisfaction des besoins de l'industrie congolaise n'excède
pas trente pour cent (30%) des HYDROCARBURES qui lui reviennent.

10.02.1   La livraison des quantités d'HYDROCARBURES
revenant au CONGO, y compris les HYDROCARBURES LIQUIDES
destinés à la Raffinerie de Pointe Noire, sera faite soit à la
tête de puits, soit à la sortie du centre de collecte si les
parties au CONTRAT D'ASSOCIATION décident, conformément aux
dispositions du CONTRAT D'ASSOCIATION, d'en construire un.  Au
cas où les livraisons d'HYDROCARBURES LIQUIDES au CONGO au
titre du présent sous-paragraphe 10.02.1 excèderaient la part
revenant au CONGO au titre de la redevance minière conformément
au paragraphe 5.03 ci-dessus, le prix de vente de cet excédent
sera le prix moyen réalisé par les SOCIETES pour les ventes à
des acheteurs non affiliés conclues au cours du mois calendaire
précédant celui au cours duquel a lieu la vente d'HYDROCARBURES
LIQUIDES au CONGO.

10.02.2   L'engagement de chaque SOCIETE de céder une
part de sa production d'HYDROCARBURES provenant du PERMIS dans
les conditions définies au paragraphe 10.02 ci-dessus et au
prix défini au sous-paragraphe 10.02.1 ci-dessus est limité,
pour chaque année calendaire, à la fraction des besoins de
l'industrie congolaise en HYDROCARBURES de la qualité requise
par l'industrie congolaise qui est égale au rapport entre la
part de la production d'HYDROCARBURES de cette qualité revenant
à la SOCIETE au titre du CONTRAT D'ASSOCIATION et la production
totale d'HYDROCARBURES de ladite qualité issue du territoire du
CONGO pour cette même année calendaire.  Le CONGO notifiera à
la SOCIETE, avant le début de chaque année calendaire, les
tonnages requis par elle pour cette même année calendaire au
titre de l'engagement ci-dessus.

13.

dans la mesure où l'OPERATEUR détermine que cela est possible dans le cadre des opérations visées par la CONVENTION, l'OPERATEUR tentera de fournir au CONGO les différentes qualités que le CONGO peut demander.

10.02.4    Les quantités d'HYDROCARBURES cédées en application des dispositions du présent article 10 seront payées par le CONGO dans un délai de quinze (15) jours à compter de la fin du mois calendaire de livraison, sur présentation de la facture correspondante par chacune des SOCIETES.

10.03  En cas de découverte de GAZ NATUREL, les parties se réuniront dans les plus brefs délais pour envisager les aménagements qui devront être éventuellement apportés au présent article 10 pour appliquer les principes de la CONVENTION à une telle exploitation.

10.03.1    L'exploitation éventuelle des gisements de GAZ NATUREL se fera conformément aux principes qui régissent les rapports entre les membres de l'ASSOCIATION.

10.03.2    Si l'utilisation du GAZ NATUREL découvert sur le PERMIS n'est pas jugée rentable par les membres de l'ASSOCIATION conformément aux dispositions du CONTRAT D'ASSO-CIATION, le CONGO aura la possibilité, directement ou par l'intermédiaire d'HYDRO-CONGO, d'utiliser le GAZ NATUREL et ceci à ses frais.

Si le CONGO exerce son droit d'utiliser le GAZ NATUREL pour son propre usage comme prévu ci-dessus, les installations nécessaires au développement, à la production, au transport et au traitement, y compris notamment la séparation, la compres-sion ou la liquéfation du GAZ NATUREL, depuis le premier séparateur après le point de production, et d'une capacité suffisante pour traiter le GAZ NATUREL, seront fournies à ses frais par HYDRO-CONGO. Les SOCIETES conviennent de fournir, à des conditions qui seront convenues alors, telle assistance et telle coopération techniques dont HYDRO-CONGO peut avoir besoin pour le developpement et l'exploitation des gisements de GAZ NATUREL, et pour l'élaboration, la construction, la gestion et l'entretien de ces installations.  En aucun cas lesdites acti-vités ne pourront interférer avec les TRAVAUX PETROLIERS de l'ASSOCIATION.

10.03.3    Tout GAZ NATUREL produit sur le PERMIS et non utilisé directement pour les TRAVAUX PETROLIERS ou conformément au sous-paragraphe 10.03.2 ci-dessus pourra être brûlé en torche.

11.  Emploi et formation du personnel

11.01  Conformément au sous-paragraphe 5.01.3 ci-dessus, chacune des SOCIETES sera soumise à la législation et à la réglementation du travail, telles qu'elles résultent des textes

GAR 00016

14.

relatifs notamment aux conditions générales de travail, au régime des rémunérations, à la prévention et aux réparations des accidents du travail et des maladies professionnelles, ainsi qu'aux associations professionnelles et aux syndicats. De son côté, le CONGO n'édictera à l'égard de chaque SOCIETE ainsi que du personnel de celle-ci en matière de législation du travail et des lois sociales, aucune mesure qui puisse être considérée comme discriminatoire par rapport à celles qui seraient imposées aux autres entreprises exerçant leur activité au CONGO.

11.02  Chacune des SOCIETES s'engage à prendre en charge, conjointement avec les autres membres de l'ASSOCIATION et proportionnellement à son pourcentage de participation au sein de l'ASSOCIATION, la formation, tant sur le plan technique qu'administratif, des cadres, agents de maîtrise et employés congolais nécessaires aux activités d'exploitation, par l'organisation, dans les limites correspondant à l'importance des activités en question, de stages au CONGO ou à l'étranger, l'attribution de bourses d'études à l'étranger et la création de centres de formation professionnelle au CONGO.

11.02.1  Les programmes et les budgets de formation professionnelle devront être approuvés par le Comité de Direction prévu au CONTRAT D'ASSOCIATION après consultation avec l'Administration congolaise.

11.02.2  Chacune des SOCIETES, conjointement avec les autres membres de l'ASSOCIATION, emploiera en priorité, à qualification égale, dans ses établissements et instal-lations, du personnel congolais.  Elle s'engage à assurer la formation professionnelle et technique dudit personnel afin de faciliter à tous les niveaux son accession à des emplois en rapport avec ses capacités.

11.02.3  Sur les chantiers d'exploitation situés en dehors des agglomérations ou dans leur voisinage, les SOCIETES assureront conjointement le logement des travailleurs dans des conditions normales d'hygiène et de salubrité et créeront, si nécessaire, l'infrastructure médicale, scolaire, sportive et culturelle correspondant aux besoins normaux des travailleurs et de leurs familles.

11.02.4  Les moyens mis en oeuvre conjointement par les SOCIETES pour l'application des dispositions du présent article 11 ont pour objet de permettre le remplacement progressif du personnel étranger des SOCIETES affecté aux TRAVAUX PETROLIERS par un personnel congolais.  A cet effet, les SOCIETES s'engagent à faire de leur mieux pour qu'à l'expiration de la dixième année après le début des TRAVAUX DE DEVELOPPEMENT ET D'EXPLOITATION, le personnel utilisé par l'OPERATEUR pour les TRAVAUX PETROLIERS au CONGO comprenne cent pour cent (100%) d'ouvriers et d'employés, quatre vingt pour cent (80%) d'agents de maîtrise et de techniciens, et cinquante pour cent (50%) de cadres, de nationalité congolaise.

**GAR 00017**

15.

11.02.5   Le personnel de nationalité congolaise utilisé par l'OPERATEUR pour les TRAVAUX PETROLIERS au CONGO sera recruté par l'OPERATEUR et engagé, à sa demande, par HYDRO-CONGO qui le détachera auprès de l'OPERATEUR pour être formé par celui-ci puis, à l'issue de la période de formation, pour être affecté aux TRAVAUX PETROLIERS.  A compter de la fin de ladite période de formation, les employés d'HYDRO-CONGO que l'OPERATEUR aura décidé de retenir pour les TRAVAUX PETROLIERS seront, pendant toute la durée de leur détachement auprès de l'OPERATEUR, les employés de ce dernier.

## 12.   Fournisseurs congolais

12.01  Les SOCIETES, ou l'OPERATEUR en leur nom, donneront la priorité pour la réalisation des TRAVAUX PETROLIERS aux fournitures et aux services fournis par des sociétés de droit congolais à égalité de qualité, de quantité, de conditions de vente, de délais de livraison et de services annexes, avec les fournitures et services disponibles à l'étranger.

12.02  Toutefois, les SOCIETES, ou l'OPERATEUR en leur nom, pourront choisir librement les armateurs et les pavillons des navires utilisés par elles à quelque titre que ce soit, sous réserve des restrictions d'application générale que le CONGO peut édicter.  Les SOCIETES utiliseront la flotte marchande congolaise qui pourrait être disponible pendant la durée de la CONVENTION, dans la mesure où les tarifs et les autres conditions offertes ne seront pas moins favorables que celles offertes sur le marché international.

## 13.   Mise à disposition des informations

13.01  Les SOCIETES mettront à la disposition du CONGO tous les renseignements en leur possession qu'elles doivent communiquer aux termes du Code Minier.  De son côté, le CONGO pourra communiquer aux SOCIETES les informations, notamment de caractère technique, susceptibles d'être utilement employées dans la conduite des TRAVAUX PETROLIERS.  Les SOCIETES s'engagent à ne pas divulguer ces renseignements et documenta- tions à des tiers, sauf dans la mesure requise par les TRAVAUX PETROLIERS et à condition, dans ce cas, qu'un engagement soit obtenu du récipiendaire de traiter ces renseignements et documentations comme confidentiels.

13.02  Outre les renseignements qu'elles doivent lui communiquer aux termes des dispositions du Code Minier, les SOCIETES devront mettre gratuitement à la disposition du CONGO toutes les informations géologiques qui seront susceptibles d'être utilisées pour la recherche et l'exploitation des sub- stances minérales autres que les HYDROCARBURES sur le PERMIS. La SOCIETE qui agit en qualité d'OPERATEUR doit déclarer aux autorités congolaises compétentes toute découverte de sub- stances minérales autres que des HYDROCARBURES réalisée sur le PERMIS; les SOCIETES se consulteront en vue d'apprécier l'op- portunité, compte tenu des données techniques et économiques,

**GAR 00018**

16.

de s'associer pour l'exploitation desdites substances
minérales. Les SOCIETES s'engagent à ne pas divulguer ces
informations à des tiers. Le CONGO pourra librement utiliser
toute information reçue au titre du présent paragraphe si les
SOCIETES expriment leur absence d'intérêt ou ne parviennent
pas, dans un délai de quatre (4) mois à compter de la réception
de ces informations, à faire une proposition acceptable au
CONGO pour un permis de recherches ou d'exploitation concernant
la ou lesdites substances minérales.

13.03  A la demande du Ministre de tutelle, les SOCIETES
examineront toutes les informations disponibles concernant les
possibilités de recherche de substances minérales dans toute
partie du territoire congolais qui leur sera indiquée par
ladite autorité, et se consulteront entre elles en vue
d'apprécier l'opportunité, compte tenu des données techniques
et économiques, de s'associer pour la recherche desdites
substances minérales.

14.  Transport et traitement des produits

14.01  Le Ministre de tutelle pourra demander aux SOCIETES
de s'associer avec d'autres exploitants au CONGO en vue de
réaliser ou d'utiliser en commun des installations ou des
canalisations pour évacuer tout ou partie de la production
d'HYDROCARBURES, à condition, d'une part, que la réalisation
desdites installations ou canalisations soit techniquement
possible dans des conditions économiques normales, et, d'autre
part, que leur utilisation ne porte pas atteinte directement ou
indirectement au rendement économique des gisements découverts.

14.01.1  Les tarifs de transport à l'évacuation de la
production seront établis par les sociétés exploitantes, après
consultation de l'autorité congolaise compétente.

14.02  Dans le cas où la production le permettrait et où
les produits finis seraient assurés d'un écoulement certain, le
CONGO pourrait demander aux SOCIETES de se consulter en vue
d'apprécier l'opportunité, compte tenu des conditions écono-
miques et des prévisions de rentabilité, de la réalisation par
les SOCIETES, en association avec le CONGO et/ou avec les
partenaires agréés par le CONGO, d'une unité de traitement
d'HYDROCARBURES au CONGO.

15.  Force majeure

15.01  Si le CONGO ou l'une ou plusieurs des SOCIETES se
trouve dans l'impossibilité, partielle ou totale, d'exécuter
l'une ou plusieurs de ses obligations prévues à la CONVENTION
ou en découlant par suite d'une force majeure, d'un cas fortuit
ou d'un événement assimilé à la force majeure (ci-après col-
lectivement désignés "FORCE MAJEURE"), la partie qui invoque la
FORCE MAJEURE devra en informer les autres parties dans les
plus brefs délais.

**GAR 00019**

17.

15.02  Ladite notification sera adressée par écrit soit par télex confirmé par lettre, soit par lettre recommandée avec demande d'avis de réception et devra faire état des éléments de nature à établir la FORCE MAJEURE.

15.03  Seront considérés comme FORCE MAJEURE tous les événements indépendants de la volonté ou échappant à la maîtrise de l'une des parties et ayant pour conséquence d'empêcher totalement ou partiellement, ou de retarder notable-ment, l'exécution des obligations des parties sans qu'ils aient pu être raisonnablement maîtrisés ou évités.  Aux fins de la CONVENTION, seront notamment considérés comme FORCE MAJEURE: la guerre, les troubles civils graves, l'insurrection, les grèves nationales et toutes grèves d'ordre général, le tremblement de terre, l'incendie, l'explosion, les autres catastrophes et tous les empêchements qui résultent directe-ment ou indirectement des commandements ou des prohibitions de la puissance publique.

15.04  La FORCE MAJEURE ne saurait toutefois être valablement invoquée si les cas, faits ou événements dont il s'agit étaient raisonnablement prévisibles ou s'il pouvait y être porté remède par l'exercice d'une diligence raisonnable. L'impossibilité de trouver le matériel nécessaire, si ce n'est à un prix prohibitif, constituera une FORCE MAJEURE.  Le manque de moyens financiers ne constituera pas une FORCE MAJEURE.

15.05  Les délais d'exécution des obligations de chaque SOCIETE affectées par une FORCE MAJEURE seront prorogés auto-matiquement d'une durée équivalente au retard entraîné par ladite FORCE MAJEURE, étant entendu que, d'une part, cette prorogation n'entraînera pas de pénalité à la charge de la partie à laquelle ces obligations incombent et que, d'autre part, les obligations autres que celles affectées par la FORCE MAJEURE devront continuer à être remplies conformément aux dis-positions de la CONVENTION.

15.06  Dans tous les cas, la partie concernée devra prendre, en accord avec les autres parties, toutes dispositions utiles pour assurer la reprise normale de l'exécution des obli-gations affectées par la FORCE MAJEURE.  Si, par suite d'une FORCE MAJEURE, l'une des parties ne pouvait exécuter ses obli-gations telles que prévues à la CONVENTION pendant une période de trois (3) mois consécutifs à compter de la notification prévue ci-dessus, les parties se rencontreraient dans les plus brefs délais pour examiner les incidences des événements dont il s'agit, en particulier sur les délais d'exécution des obli-gations respectives de chacune des parties.  Si les parties ne peuvent se mettre d'accord sur les incidences dont il s'agit, elles soumettront leur différend à l'arbitrage conformément aux dispositions de l'article 17 ci-dessous.

16.  Déclaration et paiement d'impôts

Chaque SOCIETE sera seule responsable de ses déclara-tions aux autorités fiscales du CONGO, et du paiement de ses

**GAR 00020**

18.

impôts au titre de sa participation dans les activités de l'ASSOCIATION au CONGO, sur la base de son revenu imposable au titre de ses activités visées par la CONVENTION.

## 17. Arbitrage

17.01  Tous différends découlant de la CONVENTION, entre le CONGO d'une part et toute SOCIETE d'autre part, qui ne peuvent pas être résolus à l'amiable, seront tranchés définitivement par arbitrage conformément aux règles en vigueur du Centre International pour le Règlement des Différends relatifs aux Investissements (le "Centre") institué par la Convention pour le Règlement des différends relatifs aux investissements entre Etats et ressortissant d'autres Etats, à laquelle le CONGO est partie depuis le 14 octobre 1966.

17.02  Chaque partie à un différend sera autorisée à nommer un arbitre et les arbitres ainsi nommés se mettront d'accord sur un autre arbitre, si nécessaire, afin d'obtenir un nombre impair d'arbitres.  Au cas où un accord sur un autre arbitre ne pourrait être obtenu, cet arbitre sera nommé par le Président du Centre.

17.03  L'arbitrage aura lieu à Genève, Suisse.  La sentence qui sera rendue en anglais et en français, les deux textes ayant la même force, sera définitive et liera les parties à l'arbitrage.  Un jugement d'exequatur pourra être rendu par tout tribunal ou toute autorité compétente ou, selon le cas, une demande pourra être introduite devant ledit tribunal ou devant ladite autre autorité pour obtenir la confirmation judiciaire de la sentence et une décision exécutoire.

17.04  Les honoraires du Centre relatifs à l'arbitrage d'un différend seront supportés de manière égale par les parties audit arbitrage.

17.05  Tous différends pouvant survenir entre les SOCIETES seront tranchés conformément à la clause d'arbitrage du CONTRAT D'ASSOCIATION.

## 18. Droit applicable

La CONVENTION est régie par le droit congolais.

## 19. Avis

19.01  Tous avis seront valablement donnés par cable, télex ou courrier adressé à l'autre ou aux autres parties à l'adresse indiquée ci-dessous.

(a)  pour le CONGO:

Monsieur le Ministre des Mines et de l'Energie
Ministère des Mines et de l'Energie
Brazzaville
République Populaire du Congo

GAR 00021

19.

à l'attention de:  Monsieur le Ministre

(b)  pour SUPERIOR:

Congolese Superior Oil Company
P.O. Box 1521
Houston, Texas 77001
Etats-Unis d'Amérique

Télex:  0775369

à l'attention de:  <u>Vice-President Exploration</u>

(c)  pour CITIES SERVICES:

Cities Services Congo Petroleum Corporation
P.O. Box 642
Houston, Texas 77001
Etats-Unis d'Amérique

Télex:  762056

à l'attention de:  <u>Vice-President Operations</u>

(d)  pour CANADIAN:

Canadian Superior Oil Ltd.
Three Calgary Place
355 4th Avenue S.W.
Calgary, Alberta T2P OJ3
Canada

Telex:  03826640

à l'attention de:  <u>Vice-President Exploration</u>

(e)  pour HYDRO-CONGO:

Société Nationale de Recherches
  et d'Exploitation Pétrolières --
  Hydro-Congo
B.P. 2008
Brazzaville
République Populaire du Congo

Télex:  5220

à l'attention de Monsieur le Directeur Général

**GAR 00022**

20.

Tous avis formels seront donnés par lettre recommandée avec demande d'avis de réception ou, si ils sont donnés par câble ou télex, confirmés par lettre recommandée avec demande d'avis de réception.

19.02  Chacune des parties pourra modifier l'adresse ci-dessus en avisant les autres par écrit conformément aux dispositions du présent article 19.

19.03  Au stade de la recherche, chacune des SOCIETES désignera un représentant au CONGO auprès duquel tous avis formels seront faits valablement.  En cas de découverte commercialement exploitable, la SOCIETE établira au CONGO une succursale régulièrement immatriculée au Registre du Commerce. Par dérogation à l'article 20 de la loi n° 29-62 du 16 juin 1962, tel que modifié, les SOCIETES ne seront pas requises de constituer une société filiale de droit congolais.

20.  Avenants

Il pourra être procédé par avenant, à la demande de l'une des parties, à la révision d'une ou plusieurs clauses de la CONVENTION, une telle révision ne pouvant intervenir que d'un commun accord.

21.  Garantie par société mère

Les obligations des SOCIETES au titre de la CONVENTION sont garanties par les sociétés mères de leurs groupes respectifs, le cas échéant, conformément à des lettres de garantie dont un modèle est joint en annexe V à la CONVENTION.

Fait à Brazzaville, le 25 mai 1979

Pour la République Populaire
du Congo

Rodolphe Adada,
Ministre des Mines et de l'Energie

Pour Congolese Superior
Oil Company

Diego Di Giordano-Echegoyen
Vice-President

Pour Société Nationale de
Recherches et d'Exploitation
Pétrolières "HYDRO-CONGO"

Alphonse M'Boudo-Nesa,
Directeur Général

Pour Cities Service Congo
Petroleum Corporation

Antoine Saadi

Pour Canadian Superior
Oil Ltd.

Robert C. Bohadden

GAR 00023

## ANNEXE I

## COPIE DU DECRET ACCORDANT LE PERMIS

GAR 00024

<u>ANNEXE I</u>

<u>COPIE DU DECRET ACCORDANT LE PERMIS</u>

GAR 00025

PRESIDENCE DE LA REPUBLIQUE
PRESIDENCE DU CONSEIL DES
MINISTRES

REPUBLIQUE POPULAIRE DU CONGO
Travail + Démocratie + Paix
-=-=-=-=-=-=-=-=-=-=-=-=-

DECRET N° 253  /  du 16 MAI 1979.

Attribuant à la Société HYDRO-CONGO un Permis de
recherche de type "A" pour hydrocarbures (dit
"Permis MARINE I").-

LE PRESIDENT DU COMITE CENTRAL DU PARTI CONGOLAIS DU TRAVAIL
PRESIDENT DE LA REPUBLIQUE, CHEF DE L'ETAT,
PRESIDENT DU CONSEIL DES MINISTRES,

- Vu l'Acte n° 038/PCT/CC du 30 Mars 1979 portant fondement, organisa-
  tion et fonctionnement des Pouvoirs Publics ;

- Vu le Décret n° 79/154 du 4 Avril 1979 portant nomination du Premier
  Ministre ;

- Vu le Décret n° 79/155 du 4 Avril 1979 portant nomination des Membres
  du Conseil des Ministres ;

- Vu la Loi n° 29/62 du 16 Juin 1962 portant Code Minier ;

- Vu la Loi n° 31/62 du 16 Juin 1962 fixant les taux et règles de
  perception des droits sur les titres miniers ;

- Vu la Loi n° 35/65 du 12 Août 1965 complétant les dispositions du
  Code Minier ;

- Vu le Décret n° 62/247 du 17 Août 1962 déterminant certaines condi-
  tions d'application de la loi n° 29/62 susvisée ;

- Vu l'Ordonnance n° 14/73 du 4 Juin 1973 portant création de la So-
  ciété Nationale Hydro-Congo ;

- Vu le Décret n° 79/111 du 10 Mars 1979 accordant l'Autorisation
  Personnelle Minière à la Société Hydro-Congo ;

- Vu la demande présentée par Hydro-Congo en date du 13 Janvier 1979
  sous le n° DRP/HC/538/252/ILJR/MM ;

    Le Conseil des Ministres entendu ;

            D E C R E T E :

Article 1er : Il est octroyé à la Société Hydro-Congo dans les conditions
prévues par le présent Décret un Permis de recherches de type "A" dit per-
mis "MARINE I" valable pour les hydrocarbures liquides et gazeux, sous le
n° RC 1-15 dont la surface, réputée égale à 1432 (mille quatre cent trente
deux) kilomètres carrés et représentée sur la carte jointe en annexe 1 au
présent Décret et comprise à l'intérieur du périmètre défini par :

    1.a. Les droites joignant les points 1 et 2, 2 et 3, 3 et 4, 4 et 5,
5 et 6, 6 et 7, 7 et 8, 8 et 9, 9 et 10; ces droites étant réputées coïn-
cider avec la limite séparant le permis "MADINGO MARITIME (A)" renouvelé
et le permis "MARINE I".

                                    ...../...

**GAR 00026**

- 2 -

b. La droite joignant les points 10 et 11, cette droite étant réputée
   coincider en partie avec la limite séparant le permis "MADINGO MARITIME
   (A)" renouvelé et le permis "MARINE I", et en partie avec la limite
   séparant la concession "LOANGO EST" et le permis "MARINE I ".

c. Les droites joignant les points 11 et 12, 12 et 13, 13 et 14, 14 et 15,
   15 et 16, 16 et 17, ces droites étant réputées coincider avec la limite
   séparant la concession "LOANGO EST" et le permis "MARINE I".

d. Les droites joignant les points 17 et 18, 18 et 19, ces droites étant
   réputées coincider avec la limite séparant la concession "LOANGO OUEST"
   et le permis "MARINE I".

e. Les droites joignant les points 19 et 20, 20 et 21, 21 et 22, 22 et 23,
   23 et 24, 24 et 25, ces droites étant réputées coincider avec la limite
   séparant le permis " POINTE-NOIRE GRANDS FONDS (A)" renouvelé et le permis
   " MARINE I".

f. La droite joignant les points 25 et 26, cette droite étant réputée
   coincider avec la limite séparant le permis "MER PROFONDE" et le permis
   " MARINE I".

g. La droite joignant les points 26 et 1, c'est-à-dire une partie de la
   droite passant à l'intersection de la laisse de basse-mer avec la limite
   des territoires du Congo et du Gabon dans un   azimut   géographique de
   212 degrés, cette droite étant réputée coincider avec la limite des eaux
   respectivement sous juridiction du Congo et du Gabon.

2. Les points 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17,
   18, 19, 20, 21, 22, 23, 24, 25, et 26 qui sont définis comme suit :

.... / ....

**GAR 00027**

| Points | Coordonnées Géographiques Ellipsoide de Clarke 1880 | | Coordonnées U.T.M. (Clarke 1880) Fuseau 32-Me : 9°E. | |
|---|---|---|---|---|
| | Longitude Est | Latitude Sud | Est | Nord |
| 1 | Point situé à 38 kms de la laisse de basse-mer sur la droite précé- demment définie au paragraphe 1.g. ci-dessus. | | | |
| 2 | 10°58'14"260 | 4°14'54"560 | 718.730 | 9.530.170 |
| 3 | 11°02'31"668 | 4°18'29"055 | 726.652 | 9.523.560 |
| 4 | 11°05'15"851 | 4°15'11"226 | 731.214 | 9.529.624 |
| 5 | 11°09'50"804 | 4°15'10"446 | 740.214 | 9.529.624 |
| 6 | 11°09'51"271 | 4°17'56"970 | 740.214 | 9.524.308.361 |
| 7 | 11°15'05"727 | 4°17'56"056 | 749.914 | 9.524.308.361 |
| 8 | 11°15'05"241 | 4°15'09"563 | 749.914 | 9.529.624 |
| 9 | 11°23'36"921 | 4°15'08"046 | 765.700 | 9.529.624 |
| 10 | 11°27'26"845 | 4°18'20"020 | 772.775 | 9.523.700 |
| 11 | 11°27'28"782 | 4°28'12"323 | 772.775 | 9.505.500 |
| 12 | 11°16'15"217 | 4°28'14"496 | 752.000 | 9.505.500 |
| 13 | 11°16'15"066 | 4°27'25"670 | 752.000 | 9.507.000 |
| 14 | 11°15'10"219 | 4°27'12"878 | 750.000 | 9.507.000 |
| 15 | 11°15'09"972 | 4°26'04"515 | 750.000 | 9.509.500 |
| 16 | 11°14'21"337 | 4°26'04"661 | 748.500 | 9.509.500 |
| 17 | 11°14'21"191 | 4°25'15"849 | 748.500 | 9.511.000 |
| 18 | 11°10'40"712 | 4°25'16"499 | 741.700 | 9.511.000 |
| 19 | 11°09'55"210 | 4°24'38"710 | 740.000 | 9.512.400 |
| 20 | 11°09'55"600 | 4°26'54"240 | 740.000 | 9.508.000 |
| 21 | 11°07'32"384 | 4°26'54"636 | 736.500 | 9.508.000 |
| 22 | 11°07'53"139 | 4°31'15"025 | 736.500 | 9.500.000 |
| 23 | 11°04'54"774 | 4°31'15"544 | 731.000 | 9.500.000 |
| 24 | 11°04'54"312 | 4°28'32"796 | 731.000 | 9.505.000 |
| 25 | 11°00'46"128 | 4°28'33"491 | 725.346.900 | 9.505.000 |
| | Intersection du méridien de Longitude Est 11°00'46"944 et de la droi- te JK du Permis d'origine "POINTE NOIRE GRANDS FONDS" déterminée dans le Décret n° 68-270 M/CAEIH du 17 Octobre 1968. | | | |
| 26 | Point situé à 65 kms de la laisse de basse-mer sur la droite précedem- ment définie au paragraphe 1.G. | | | |

.../...

GAR 00028

Article 2 :

Le programme minimum de travaux à exécuter sur le permis de recherches visé à l'article 1 ci-dessus est défini en Annexe 2 au présent Décret.

Article 3 :

Hydro-Congo est autorisé à s'associer avec des sociétés signataires d'une Convention avec la République Populaire du Congo pour la mise en valeur du Permis de recherches visé à l'article 1 ci-dessus ainsi que des permis d'exploitation et de transport qui en découleront éventuellement.

Article 4 :

Le permis de recherches visé à l'article 1 ci-dessus pourra faire l'objet d'un renouvellement pour une durée de 5 ans dans les conditions prévues au Code Minier. Le programme minimum de travaux à exécuter au cours de la période initiale et de la période de renouvellement, ainsi que les réductions de la superficie du permis de recherches visé à l'article 1 ci-dessus, sont précisées dans l'Annexe 2 jointe au présent Décret.

Article 5 :

En cas de découverte d'un gisement exploitable sur la superficie du permis de recherches visé à l'article 1 ci-dessus, Hydro-Congo demandera un permis d'exploitation d'hydrocarbures, dont l'attribution est en ce cas de droit.

Chaque permis d'exploitation d'hydrocarbures est valable trente (30) ans. Le permis d'exploitation d'hydrocarbures ne fait pas l'objet de renouvellement.

Sur tous les points qui ne sont pas définis par le présent Décret, le ou les permis d'exploitation découlant du permis de recherches visé à l'article 1 sont régis par les dispositions du Code Minier relatives aux concessions.

Article 6 :

Les sous-traitants engagés par Hydro-Congo ou l'une des Sociétés auxquelles elle se sera associée devront se conformer aux dispositions applicables du Code Minier.

.../...

GAR 00029

- 5 -

Article 7 :

Le Ministre des Mines et de l'Energie est chargé de l'exécution du présent Décret qui sera enregistré, diffusé partout où besoin sera et publié au Journal Officiel de la République Populaire du Congo.

Fait à Brazzaville, le 16 MAI 1979.-

Par le Président du Comité Central
du Parti Congolais du Travail;
Président de la République, Chef de
l'Etat, Président du Conseil des Ministres

Colonel Denis SASSOU-NGUESSO.-

Le Premier Ministre,
Chef du Gouvernement

Le Ministre des Mines et de l'Energie

Colonel Louis SYLVAIN-GOMA.-

Rodolphe A D A D A.-

AMPLIATIONS :

- Présidence de la Rép. ............... 1
- Premier Ministre ................... 1
- Mini-Mines et Energie ............... 1
- Secrétariat Gl aux Mines ...........15
- Domaines .......................... 2
- Société Nat. Hydro-Congo ........... 2
- Secrétariat Gl du Gouvernement .... 1
- J.O.R.P.C. ..................... 2/25

GAR 00030

A N N E X E 1

CARTE DU PERMIS "MARINE I"





GAR 00032

A N N E X E 2

## I. - PROGRAMME MINIMUM DE TRAVAUX

### A. - Première Période

La première période aura une durée de cinq (5) ans.

### Phase I

La phase I aura une durée de trois (3) ans, et se décomposera comme suit :

a) Campagne sismique de mille (1.000) kilomètres.

b) Dans les six (6) mois qui suivent la réception du traitement des données obtenues, abandon du permis, ou engagement de forer un puits dans l'antésalifère qui devra être commencé dans les vingt quatre (24) mois qui suivent la date de signature de la convention avec l'Etat, et au plus tard trente (30) mois après cette date, selon la disponibilité des équipements appropriés à des prix compétitifs.

c) Le titulaire aura l'option soit d'abandonner le permis à la plus lointaine des deux dates suivantes : (i) quatre vingt dix (90) jours après la réalisation de ce forage de recherche, ou (ii) quatre vingt dix (90) jours avant la fin de la phase I, soit de passer à la phase II.

### Phase II

La phase II aura une durée de deux (2) ans.

Au cours de cette phase, le titulaire devra forer deux (2) puits de recherche dans l'antésalifère. Le titulaire aura le droit d'abandonner le permis après réalisation du forage de chaque puits.

### B. - Deuxième période

Le permis de recherche sera renouvelé à la demande du titulaire pour une période de renouvellement de trois (3) ans au cours de laquelle il sera foré au moins trois (3) puits. Toutefois, le titulaire aura le droit d'abandonner le permis après forage de chaque puits.

### C. - Pour les besoins des paragraphes A et ci-dessus,

l'obligation de forer un puits sera censée avoir été satisfaite par le titulaire lorsque l'objectif (profondeur ou formation) est atteint, ou lorsque les dépenses effectivement engagées pour la réalisation de ce forage auront atteint un montant égal à cent cinquante pour cent (150 %) du coût estimé pour le forage en question, tel que fixé par le Comité de Direction de l'Association à constituer par le titulaire avec d'autres sociétés signataires avec lui de la Convention avec la République Populaire du Congo visée à l'article 3 du Décret.

GAR 00033

## II. - RENDUS

Le titulaire procédera à des rendus comme suit :

a) - une surface égale à vingt cinq pour cent (25 %) de la zone con-
tractuelle d'origine sera rendue à la fin de la phase I de la première
période ;

b) - une autre surface égale à vingt cinq pour cent (25 %) de la
zone contractuelle d'origine sera rendue à la fin de la phase   de la
première période, et

c) - la surface restante de la zone contractuelle d'origine sera
rendue en totalité à l'expiration de la période de renouvellement, à
l'exception de la ou des surfaces du permis couvertes par un ou plusieurs
permis d'exploitation, s'il y en a.

d) - Seront exclues des surfaces rendues par le titulaire à l'expi-
ration de la phase I et de la phase II de la première période, et à
l'expiration de la période de renouvellement, les surface du permis dont
le Comité de Direction de l'Association visée ci-dessus a determiné,
avant la prise d'effet des rendus ou de l'expiration du permis, qu'elles
recouvreront des gisements commercialement exploitables.

<u>ANNEXE II</u>

L'assiette de la redevance et de l'impôt sur les sociétés sera la valeur commerciale des HYDROCARBURES LIQUIDES vendus.

Pour la redevance, la valeur commerciale des HYDROCARBURES LIQUIDES sera réputée égale à la valeur commerciale de référence FOB Congo fondée sur les ventes au Moyen-Orient calculée comme décrit ci-dessous.

Pour l'impôt sur les sociétés, la valeur commerciale des HYDROCARBURES LIQUIDES sera le prix de vente, étant entendu toutefois qu'en cas de ventes à des acheteurs affiliés, le prix de vente ne sera pas inférieur au prix moyen pondéré des ventes de la SOCIÉTÉ venderesse à des acheteurs non affiliés pendant la même période pour des quantités raisonnables d'HYDROCARBURES LIQUIDES de qualité et de gravité similaires, ou, faute de telles ventes de quantités raisonnables à des acheteurs non affiliés, le prix de vente ne sera pas inférieur à un prix égal à la valeur de concurrence pour la même période d'HYDROCARBURES LIQUIDES de qualité et de densité similaires.

<u>Calcul de la valeur commerciale de référence FOB Congo</u>

La valeur commerciale de référence FOB Congo sera calculée par référence aux prix de vente gouvernementaux de l'Arabe Léger pour la période applicable, ajustée pour tenir compte du fret, de la densité, du soufre et d'autres différentiels de qualité.

<u>Définitions</u>

1.  "Arabe Léger" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 34° API.

2.  "Berri" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 39° API.

3.  Les "Prix de Vente Gouvernementaux" (ou "PVG") désignent les prix de vente officiels du gouvernement d'Arabie Séoudite pour la vente de l'Arabe Léger ou du Berri.

4.  "AFRA VLCC" et "AFRA LR2" désignent les frets tels que déterminés par le London Tanker Brokers Panel ou par toute autre organisation qui la remplacerait à cet effet, pour des livraisons par très grands pétroliers ou par pétroliers <u>large range two</u> respectivement.

GAR 00035

<u>ANNEXE II</u>

L'assiette de la redevance et de l'impôt sur les sociétés sera la valeur commerciale des HYDROCARBURES LIQUIDES vendus.

Pour la redevance, la valeur commerciale des HYDROCARBURES LIQUIDES sera réputée égale à la valeur commerciale de référence FOB Congo fondée sur les ventes au Moyen-Orient calculée comme décrit ci-dessous.

Pour l'impôt sur les sociétés, la valeur commerciale des HYDROCARBURES LIQUIDES sera le prix de vente, étant entendu toutefois qu'en cas de ventes à des acheteurs affiliés, le prix de vente ne sera pas inférieur au prix moyen pondéré des ventes de la SOCIETE venderesse à des acheteurs non affiliés pendant la même période pour des quantités raisonnables d'HYDROCARBURES LIQUIDES de qualité et de gravité similaires, ou, faute de telles ventes de quantités raisonnables à des acheteurs non affiliés, le prix de vente ne sera pas inférieur à un prix égal à la valeur de concurrence pour la même période d'HYDROCARBURES LIQUIDES de qualité et de densité similaires.

<u>Calcul de la valeur commerciale de référence FOB Congo</u>

La valeur commerciale de référence FOB Congo sera calculée par référence aux prix de vente gouvernementaux de l'Arabe Léger pour la période applicable, ajustée pour tenir compte du fret, de la densité, du soufre et d'autres différentiels de qualité.

<u>Définitions</u>

1.  "Arabe Léger" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 34° API.

2.  "Berri" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 39° API.

3.  Les "Prix de Vente Gouvernementaux" (ou "PVG") désignent les prix de vente officiels du gouvernement d'Arabie Séoudite pour la vente de l'Arabe Léger ou du Berri.

4.  "AFRA VLCC" et "AFRA LR2" désignent les frets tels que déterminés par le London Tanker Brokers Panel ou par toute autre organisation qui la remplacerait à cet effet, pour des livraisons par très grands pétroliers ou par pétroliers <u>large range two</u> respectivement.

GAR 00036

2.

5. "SPOT VLCC" et "SPOT LR2" désignent le coût de transport calculé à partir de l'Average Worldscale Rates for Single Voyage Dirty Fixture publié mensuellement par H.P. Drewry Ltd., Londres, Royaume Uni, dans leur Shipping Statistics and Economics -- SSE Publication pour une cargaison moyenne pondérée de navires ayant une capacité de 70.000 à 174.999 DWCT en ce qui concerne les "SPOT LR2" et pour une cargaison moyenne pondérée de navires ayant une capacité de 175.000 à 300.000 DWCT ou plus en ce qui concerne le "SPOT VLCC". Pour les besoins des alinéas 2. et 3. ci-dessus, le fret sera calculé sur la base des taux publiés pour le mois au cours duquel les HYDROCARBURES LIQUIDES seront enlevés.

La valeur commerciale de référence FOB Congo sera déterminée comme suit:

1. Prendre le PVG d'un baril d'Arabe Léger d'une gravité de 34° à 34,09°.

2. Déterminer le fret par baril pour le transport de l'Arabe Léger de Ras Tanura à Rotterdam via Le Cap et retour de Rotterdam à Ras Tanura via Le Cap, en divisant la moyenne du fret publié AFRA VLCC et SPOT VLCC par tonne par le nombre de barils par tonne du pétrole brut en question.

3. Déterminer le fret par baril pour le transport des HYDROCARBURES LIQUIDES de Pointe Noire à Rotterdam en divisant la moyenne du fret publié AFRA LR2 et SPOT LR2 par tonne par le nombre de barils par tonne du pétrole brut en question. Soustraire le fret correspondant au fret déterminé conformément au paragraphe 2 ci-dessus et ajouter le résultat au PVG déterminé conformément au paragraphe 1 ci-dessus.

Le montant déterminé conformément à la procédure ci-dessus sera ajusté en hausse ou en baisse conformément aux facteurs de qualité suivants qui seront calculés comme suit:

1. Facteur de densité:

   Le différentiel de densité sera déterminé comme suit:

   (a) Prendre la densité de 34° API pour l'Arabe Léger.

   (b) Déduire cette densité de la densité établie des HYDROCARBURES LIQUIDES. Tout résultat positif sera ajouté à la valeur commerciale de référence FOB Congo; tout résultat négatif sera soustrait de la valeur commerciale de référence FOB Congo.

   (c) Multiplier le solde obtenu en (b) par dix pour obtenir un produit.

GAR 00037

3.

   (d) Multiplier le produit obtenu en (c) par la valeur
       cotée pour un différentiel de densité par dixième de
       degré API pour l'Arabe Léger; le résultat sera
       l'ajustement de densité.

2. <u>Facteur de soufre</u>:

   (a) <u>Arabe Léger et Berri</u>

       (i) Déterminer la différence des PVG entre
           l'Arabe Léger et le Berri.

       (ii) Déterminer le montant de la différence en (i)
            imputable à la densité en soustrayant de ladite
            différence le produit résultant de la
            multiplication du nombre de dixièmes de degré de
            densité entre les deux bruts par la moyenne de la
            valeur des différentiels de densité par dixième
            de degré API pour les deux bruts.

       (iii) Déduire le produit obtenu conformément à (ii) de
             la différence obtenue conformément à (i).

       (iv) Diviser le solde obtenu par application de (iii)
            par le différentiel de dixième de SWT% entre les
            deux bruts.  Prendre comme référence 1,8 SWT%
            pour l'Arabe Léger et 1,1 SWT% pour le Berri,
            sauf accord contraire.

   .(b) Obtenir l'ajustement de soufre congolais en
        multipliant la différence en nombre de dixièmes de
        SWT% entre le contenu en soufre des HYDROCARBURES
        LIQUIDES et la moyenne de la teneur en soufre de
        l'Arabe Léger et du Berri en cents des Etats-Unis
        d'Amérique par un dixième de SWT% déterminé comme il
        est dit à l'alinéa (a) (iv) ci-dessus.

Ledit ajustement s'ajoutera à la valeur commerciale de
référence FOB Congo si le soufre congolais est inférieur à
ladite moyenne et sera réduit de la valeur commerciale de
référence FOB Congo si le soufre congolais excède ladite
moyenne.

3. <u>Autres facteurs de qualité</u>:

   (a) Si le gazole lourd distillé à partir des HYDROCARBURES
       LIQUIDES (ce produit étant distillé entre 600 et 960°
       Fahrenheit conformément à la procédure de distillation
       de l'<u>American Society for Testing Metals</u>, ou toute
       autre organisation qui la remplacerait) a un indice de
       neutralisation supérieur à 0,5 (indice de
       neutralisation signifiant le nombre de milligrammes
       d'hydroxyde de potassium nécessaire pour neutraliser
       l'acide contenu dans un grammme de gazole lourd), on

GAR 00038

4.

(b) Si le gazole lourd extrait des HYDROCARBURES LIQUIDES,
tel que défini dans (a) ci-dessus, contient plus de
0,24 parties par million de parties de nickel et de
cuivre, ou d'équivalent nickel (calculé par addition
des parties par million de vanadium, divisé par 4,3,
plus les parties par million de nickel et de cuivre),
ou

(c) Si un quelconque autre facteur de qualité des
HYDROCARBURES LIQUIDES, inconnu à la date de la
CONVENTION, devait se révéler,

les Parties se réuniront pour se mettre d'accord sur un
ajustement équitable de la valeur commerciale de référence FOB
Congo déterminée conformément à ce qui précède, dans la mesure
où ces caractéristiques auraient une importance appréciable.

GAR 00039

ANNEXE III

TAUX D'AMORTISSEMENTS APPLICABLES AUX SOCIETES

| Nature des immobilisations à amortir | Taux annuel |
|---|---|

TRAVAUX SOUTERRAINS ET SONDAGES

Sondes improductives — 50,0%
Sondes productives: fixé en fonction de la durée probable de production de la sonde.
En cas d'indétermination — 12,5%

MATERIEL DE TRANSPORT

Pipe-lines intérieurs — 10,0%
Pipe-lines extérieurs — 7,5%

MATERIEL DE FORAGE (en général: — 10,0%)

Tiges de forage — 20,0%
Outillage de forage — 20,0%
Moteur diesel — 20,0%
Outillage de derricks, transmissions — 20,0%

IMMOBILISATIONS INCORPORELLES

Frais de recherches géologiques et géophysiques — 20,0%

CONSTRUCTIONS

Immeubles et constructions en dur pour ateliers, bureaux, magasins, garages, laboratoires, apprentissage, logements, services sociaux et sportifs, cantines, hospitalisation, salles de réunion — 3,1/3%

Bâtiments à charpentes métalliques — 3,1/3%
Constructions légères semi-fixes sans fondations — 10,0%
Cases et tous bâtiments de chantier démontables ou transportables — 10,0%
Aménagements intérieurs des ateliers — 10,0%

GAR 00040

ANNEXE III

TAUX D'AMORTISSEMENTS APPLICABLES AUX SOCIETES

| Nature des immobilisations à amortir | Taux annuel |
|---|---|

TRAVAUX SOUTERRAINS ET SONDAGES

| | |
|---|---|
| Sondes improductives | 50,0% |
| Sondes productives:  fixé en fonction de la durée probable de production de la sonde. | |
| En cas d'indétermination | 12,5% |

MATERIEL DE TRANSPORT

| | |
|---|---|
| Pipe-lines intérieurs | 10,0% |
| Pipe-lines extérieurs | 7,5% |

MATERIEL DE FORAGE (en général: | 10,0%)

| | |
|---|---|
| Tiges de forage | 20,0% |
| Outillage de forage | 20,0% |
| Moteur diesel | 20,0% |
| Outillage de derricks, transmissions | 20,0% |

IMMOBILISATIONS INCORPORELLES

| | |
|---|---|
| Frais de recherches géologiques et géophysiques | 20,0% |

CONSTRUCTIONS

| | |
|---|---|
| Immeubles et constructions en dur pour ateliers, bureaux, magasins, garages, laboratoires, apprentissage, logements, services sociaux et sportifs, cantines, hospitalisation, salles de réunion | 3,1/3% |
| Bâtiments à charpentes métalliques | 3,1/3% |
| Constructions légères semi-fixes sans fondations | 10,0% |
| Cases et tous bâtiments de chantier démontables ou transportables | 10,0% |
| Aménagements intérieurs des ateliers | 10,0% |

2.

| | |
|---|---|
| Machines de bureau | 15,0% |
| Mobilier de bureau ou autre | 10,0% |
| Téléphone | 15,0% |

### INSTALLATIONS DE CHARGEMENT ET STOCKAGE

| | |
|---|---|
| Installation de stockage | 10,0% |
| A l'exception des parcs à tubes et des conduites | 20,0% |
| Môles de chargement | 3,1/3% |
| Installations de chargement | 10,0% |
| Conduites flottantes | 20,0% |

### VEHICULES ET VOIES D'ACCES

| | |
|---|---|
| Engins de génie civil | 30,0% |
| Véhicules automobiles et leurs remorques | 33,0% |
| A l'exception des camions-incendie, | |
| camions-ateliers, camions-cimentation | 20,0% |

### TRANSPORTS FLUVIAUX

| | |
|---|---|
| Pinasses | 15,0% |
| Remorques, pousseurs, chalands-citernes, barges | 10,0% |
| Voies d'accès aux travaux de géophysique et aux sondes improductives | 50,0% |
| Voies d'accès aux sondes productives | 25,0% |

### AUTRES IMMOBILISATIONS

| | |
|---|---|
| Distribution d'eau | 10,0% |
| Distribution d'air comprimé | 10,0% |
| Distribution d'électricité | 10,0% |

### LIGNES DE TRANSPORT DE FORCE

| | |
|---|---|
| Pylônes | 3,1/3% |
| Autres éléments | 5,0% |

### TRANSFORMATEURS

| | |
|---|---|
| Bâtiments et outillage fixe | 5,0% |
| Outillage mobile | 10,0% |

### MACHINES FIXES

| | |
|---|---|
| Compresseurs | 10,0% |
| Compresseurs en mer | 20,0% |
| Moteurs et pompes diverses à terre | 10,0% |
| Moteurs et pompes diverses en mer | 20,0% |
| Machines-outils à terre | 10,0% |
| Machines-outils en mer | 20,0% |
| Petit outillage | 15,0% |

GAR 00042

3.

| | |
|---|---|
| Matériel fixe de laboratoire | 10,0% |
| Matériel mobile de laboratoire | 20,0% |
| Matériel de topographie | 10,0% |
| Matériel de campement en mer | 50,0% |
| Matériel de campement à terre | 20,0% |

MATERIEL SPECIFIQUE OFF-SHORE

| | |
|---|---|
| Barges de forage | 20,0% |
| Plate-formes de forage et de production | 15,0% |
| Equipements de puits en mer | 20,0% |
| Câbles sous-marins de transport d'énergie | 20,0% |
| Bouées d'amarrage | 25,0% |
| Equipements sur plate-forme | 20,0% |
| Têtes de puits sous-marines et support de têtes de puits | 20,0% |
| Lignes de collecte entre puits et stations de stockage | 20,0% |
| Lignes principales | 10,0% |
| Lignes de chargement sous-marines | 20,0% |

Les frais accumulés par les SOCIETES pour les TRAVAUX DE RECHERCHES seront traités de la manière suivante: ceux de ces frais correspondant à la création d'immobilisations seront amortis, à compter du premier exercice qui dégagera des revenus imposables, suivant les taux d'amortissement ci-dessus. Les autres constitueront des frais de premier établissement, dont l'amortissement pourra à ce titre être pratiqué, au choix de chaque SOCIETE, sans limite de temps.

## ANNEXE IV

### I- PAIEMENT DE LA REDEVANCE

Lorsque la redevance est payée en espèces, chaque SOCIETE fera, au plus tard le 20 de chaque mois, une déclaration des quantités d'HYDROCARBURES enlevées par elle durant le mois calendaire précédent.

Quatre-vingt-cinq pour cent (85%) de la redevance due pour ledit mois précédent de chaque trimestre seront versés lors de la déclaration mensuelle correspondante. Le solde de la redevance due pour chaque trimestre sera calculé et payé en même temps que la déclaration mensuelle faite au cours du deuxième mois suivant la fin du trimestre en question.

### II- PAIEMENT DE L'IMPOT SUR LES SOCIETES

Chaque SOCIETE procédera au versement d'acomptes sur l'impôt sur les sociétés de la manière suivante:

(a) Au cours du premier trimestre, chaque SOCIETE fera une estimation de l'impôt qui sera dû par elle au titre de l'année en cours.

(b) Un montant correspondant à 8/120e de cette estimation sera versé au plus tard le 20 de chacun des mois d'avril, mai, juin, juillet, août et septembre.

(c) Au cours du troisième trimestre, chaque SOCIETE reverra, en fonction du résultat effectif du premier semestre, l'estimation faite par elle de l'impôt annuel.

(d) Un montant correspondant à 8/120e de la nouvelle estimation sera versé au plus tard le 20 de chacun des mois d'octobre, novembre, décembre, et janvier, février et mars de l'année suivante, le versement du mois d'octobre étant toutefois ajusté de manière à ce que le montant total des acomptes versés le 20 octobre corresponde à 56/120e de la nouvelle estimation.

(e) Le solde de liquidation de l'impôt sur les sociétés sera payé lors du dépôt de la déclaration, et les excédents éventuels seront traités conformément à l'article 126 bis du Code Général de Impôts.

GAR 00044

## ANNEXE IV

### I- PAIEMENT DE LA REDEVANCE

Lorsque la redevance est payée en espèces, chaque SOCIETE fera, au plus tard le 20 de chaque mois, une déclaration des quantités d'HYDROCARBURES enlevées par elle durant le mois calendaire précédent.

Quatre-vingt-cinq pour cent (85%) de la redevance due pour ledit mois précédent de chaque trimestre seront versés lors de la déclaration mensuelle correspondante. Le solde de la redevance due pour chaque trimestre sera calculé et payé en même temps que la déclaration mensuelle faite au cours du deuxième mois suivant la fin du trimestre en question.

### II- PAIEMENT DE L'IMPOT SUR LES SOCIETES

Chaque SOCIETE procédera au versement d'acomptes sur l'impôt sur les sociétés de la manière suivante:

(a)  Au cours du premier trimestre, chaque SOCIETE fera une estimation de l'impôt qui sera dû par elle au titre de l'année en cours.

(b)  Un montant correspondant à 8/120e de cette estimation sera versé au plus tard le 20 de chacun des mois d'avril, mai, juin, juillet, août et septembre.

(c)  Au cours du troisième trimestre, chaque SOCIETE reverra, en fonction du résultat effectif du premier semestre, l'estimation faite par elle de l'impôt annuel.

(d)  Un montant correspondant à 8/120e de la nouvelle estimation sera versé au plus tard le 20 de chacun des mois d'octobre, novembre, décembre, et janvier, février et mars de l'année suivante, le versement du mois d'octobre étant toutefois ajusté de manière à ce que le montant total des acomptes versés le 20 octobre corresponde à 56/120e de la nouvelle estimation.

(e)  Le solde de liquidation de l'impôt sur les sociétés sera payé lors du dépot de la déclaration, et les excédents éventuels seront traités conformément à l'article 126 bis du Code Général de Impôts.

ANNEXE V

MODELE DE LETTRE DE GARANTIE

GARANTIE

ATTENDU QUE la République Populaire du Congo (ci-après désignée le "CONGO"), et Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd. et la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" ont passé une convention en date du 25 mai 1979 pour la recherche et l'exploitation des ressources en hydrocarbures liquides et gazeux en mer au large du Congo (ci-après désignée la "CONVENTION"), et

ATTENDU QUE /nom de la société mère / (ci-après désignée la "SOCIETE MERE") agissant en tant que titulaire, directement ou indirectement, de toutes les actions représentant le capital de /nom de la société affiliée / (ci-après désignée la "SOCIETE AFFILIEE") désire assurer au CONGO l'exécution des obligations de la SOCIETE AFFILIEE au titre de la CONVENTION.

EN CONSEQUENCE,

La SOCIETE MERE accepte et s'engage par la présente à fournir ou à faire tenir à la disposition de la SOCIETE AFFILIEE les fonds qui lui seront nécessaires pour satisfaire à ses obligations résultant de la CONVENTION.

Signé à _____, le _____ 1979.

Pour (nom de la SOCIETE MERE)

_____

(Titre)

GAR 00046

ANNEXE V

MODELE DE LETTRE DE GARANTIE

GARANTIE

ATTENDU QUE la République Populaire du Congo (ci-après désignée le "CONGO"), et Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd. et la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" ont passé une convention en date du 25 mai 1979 pour la recherche et l'exploitation des ressources en hydrocarbures liquides et gazeux en mer au large du Congo (ci-après désignée la "CONVENTION"), et

ATTENDU QUE /nom de la société mère_/ (ci-après désignée la "SOCIETE MERE") agissant en tant que titulaire, directement ou indirectement, de toutes les actions représentant le capital de /nom de la société affiliée_/ (ci-après désignée la "SOCIETE AFFILIEE") désire assurer au CONGO l'exécution des obligations de la SOCIETE AFFILIEE au titre de la CONVENTION.

EN CONSEQUENCE,

La SOCIETE MERE accepte et s'engage par la présente à fournir ou à faire tenir à la disposition de la SOCIETE AFFILIEE les fonds qui lui seront nécessaires pour satisfaire à ses obligations résultant de la CONVENTION.

Signé à _____, le _____ 1979.

Pour (nom de la SOCIETE MERE)

_____
(Titre)

GAR 00047

A P E N D I C E

2.

# CONGOLESE SUPERIOR OIL COMPANY

P. O. Box 1521
HOUSTON, TEXAS 77001

Monsieur le Ministre des
Finances                                    Houston, le 17 mai 1979
Ministère des Finances

BRAZZAVILLE

Monsieur le Ministre,

Notre société et les sociétés Cities Service Congo Petroleum
Corporation et Canadian Superior Oil Ltd. signons le 25 mai
1979 avec la République Populaire du Congo, représentée par
le Ministre des Mines et de l'Energie, une Convention rela-
tive à la recherche et à l'exploitation d'hydrocarbures sur
le permis dit MARINE 1.  A cette occasion, nous aimerions
recevoir de vous un éclaircissement sur les points suivants :

1.  Les travaux relatifs à la mise en valeur de ce permis
nous amèneront, en qualité d'Opérateur de l'Association,
et peuvent amener dans une moindre mesure nos partenaires
non congolais dans l'Association, à envoyer au Congo un
personnel spécialisé pour des périodes temporaires mais qui
pourront durer quelques années.

(a) Les employés expatriés pourront amener avec eux des
biens meubles, véhicules automobiles personnels, et effets
personnels et de ménage destinés à leur usage personnel
pendant la durée de leur séjour au Congo.  Ces biens
pourront-ils être importés et réexportés en fin de séjour
en franchise de droit ou taxe ?

(b) L'expatriation au Congo pourra entraîner pour ces em-
ployés des frais exceptionnels qui seront la conséquence
directe de leur détachement : maintien d'une double rési-
dence, scolarisation particulière des enfants et, en l'ab-
sence d'une convention particulière fiscale entre la Répu-
blique Populaire du Congo et les Etats-Unis d'Amérique,
double imposition éventuelle à l'impôt sur le revenu des

GAR 00049

3.

Monsieur le Ministre des    -2-           le 17 mai 1979
Finances

personnes physiques. L'envoi de ce personnel au Congo
nous amènera probablement à verser à ce personnel une
indemnité destinée à rembourser les frais de cette na-
ture.  Une telle indemnité sera-t-elle assujettie à l'im-
pôt congolais sur le revenu des personnes physiques, en
sus de l'impôt applicable à la rémunération du personnel,
déduction faite de l'abattement de 30 % de droit commun
pour frais professionnels ?

2.  Au cas où l'Association serait amenée pour des raisons
de force majeure à interrompre l'exploitation pour une du-
rée appréciable, les participants à l'Association pourraient-
ils obtenir le remboursement de trop-versés éventuels au ti-
tre de l'impôt sur les sociétés ?

3.  En ce qui concerne l'ensemble des frais accumulés pen-
dant la période de recherche, nous avons compris que les
règles fiscales du Congo conduiraient à les traiter de la
manière suivante : ceux de ces frais correspondant à la
création d'immobilisations seront amortis, à compter du
premier exercice qui dégagera des revenus imposables, sui-
vant les taux d'amortissement figurant en annexe à la con-
vention susvisée. Les autres constitueront des frais de
premier établissement, dont l'amortissement pourra à ce
titre être pratiqué, au choix du contribuable, sans limite
de temps. Nous vous serions reconnaissants de bien vouloir
nous confirmer qu'il en est bien ainsi.

Nous vous prions d'agréer, Monsieur le Ministre, l'expression
de notre considération distinguée.

Diego O. Giordano
Vice-Président

4.

n: 166/MF

Ministère des Finances

Le Ministre

CONFIDENTIEL

2 5 MAI 1979

Messieurs,

En réponse à votre lettre du 17 mai 1979, nous avons l'honneur de vous indiquer ce qui suit :

1. (a) Le mobilier et les effets personnels et de ménage peuvent être importés et réexportés en franchise, quelle que soit la durée du séjour, tant que leur usage est limité à l'usage personnel des employés expatriés. Les véhicules automobiles personnels ne peuvent être importés en franchise que pour une période de six (6) mois.

1. (b) Les indemnités décrites dans votre lettre ayant le caractère de remboursement de frais réels de nature exceptionnelle, différents par nature des frais que l'abattement de droit commun a pour objet de couvrir, ne seront pas comprises dans le revenu imposable des intéressés, sous réserve bien entendu de la production des justificatifs appropriés.

2. L'interruption d'exploitation dans les circonstances décrites dans votre lettre peut être interprétée comme une cessation d'activité entraînant l'application des dispositions de l'article 126 bis (4) du Code Général des Impôts.

3. Nous vous confirmons que votre description de l'amortissement des frais accumulés pendant la période de recherche est bien exacte. Ce point est d'ailleurs réglé dans des termes identiques par le dernier alinéa de l'Annexe III à la Convention que votre Société et les sociétés Cities Service Congo Petroleum Company et Canadian Superior Oil Ltd. signent ce jour avec la République Populaire du Congo et Hydro-Congo.

Je vous prie d'agréer, Messieurs, l'expression de mes sentiments distingués.

CONGOLESE SUPERIOR OIL COMPANY

26 th Floor

Brazzaville, le 25 mai 1979

- La République Populaire du Congo,

- Congolese Superior Oil Company,

- Cities Service Congo Petroleum Corporation,

- Canadian Superior Oil Ltd., et

- Société Nationale de Recherches et d'Exploitation
  Pétrolières "Hydro-Congo",

signent ce jour une convention ayant pour objet de définir les
conditions dans lesquelles les parties feront des travaux de
recherche et éventuellement d'exploitation d'hydrocarbures sur
le permis marin dit "Marine 1".

Cette convention est rédigée et signée en français.
En cas de difficulté d'interprétation, il sera fait référence à
la traduction anglaise ci-jointe, dans un but de clarification.

Pour la République Populaire
du Congo:

_____
Rodolphe ADADA,
Ministre des Mines et de l'Energie

Pour Congolese Superior          Pour Société Nationale de Recherche
Oil Company                      et d'Exploitation Pétrolières
                                 "HYDRO-CONGO"

_____  _____
Diego V. Giordano-Echegoyen,     Alphonse Mᵉ Boudo-Nesa,
Vice-President                   Directeur Général

Pour Cities Service Congo        Pour Canadian Superior Oil Ltd.
Petroleum Corporation

_____  _____
Antoine Saadi,                   Robert C. Schrader,
Vice-President                   Vice-President,
                                 International Contracts

GAR 00052

Amendment No. 1

to the May 25, 1979

"Marine I" Convention

December 11, 1981

**French version not in our files.**

GAR 00053

## AVENANT N°2 A LA CONVENTION DU 25 MAI 1979
### PORTANT SUR LE PERMIS MARINE-1

**ENTRE**

- La République du Congo, ci-après désignée « Le Congo »), représentée par Monsieur Nguila MOUNGOUNGA NKOMBO, son Ministre de l'Economie, des Finances et du Plan chargé de la Prospective,

d'une part

**ET**

- La société Nationale de Recherche et d'Exploitation Pétrolières « Hydro-Congo », ci-après désignée « Hydro-Congo », entreprise publique ayant son siège social à Brazzaville République du Congo, représentée par Monsieur Bernard OKIORINA, son      Directeur Général Président,

- CMS NOMECO Congo Inc., ci-après désignée « NOMECO », société légalement constituée ayant son siège à Pointe-Noire, République du Congo, représentée par Monsieur K. CHARSINSKY, son Directeur Général,

- Kuwait Foreign Petroleum Exploration Co. k.s.c. société légalement constituée selon les lois du Kuwait, ayant son siège à Kuwait, PO Box 5291, Safat 13053, Kuwait, représentée par Monsieur Mahmoud A. AL RAHMANI, son Président Directeur Général, pour le compte de KUFPEC (Congo) Limited, ci-après désignée « KUFPEC »,

- ~~The NUEVO Congo Company, ci-après désignée « NUEVO », société légalement constituée~~ ayant son siège à Houston (TEXAS), représentée par Monsieur Michael D. WATFORD, son Président,

     ci-après désignées collectivement « les Sociétés » ou individuellement « la Société »,

Etant précisé que la République du Congo, d'une part, Hydro-Congo, Nomeco, Kufpec et Nuevo d'autre part, sont collectivement désignées ci-après « les Parties », ou individuellement « la Partie ».

d'autre part,

## ETANT PREALABLEMENT EXPOSE CE QUI SUIT:

Les Sociétés sont les ayant-droits des signataires de la Convention Marine-I en date du 25 mai 1979, ci-après désignée « la Convention », laquelle définit en son article 7.01 l'assiette de la redevance minière proportionnelle.

Les Parties ayant constaté leurs divergences d'interprétation de l'article 7.01 de la Convention, ont convenu d'en clarifier et harmoniser la rédaction.

## IL A ETE CONVENU CE QUI SUIT:

### Article 1: Définitions

Les définitions contenues dans la Convention s'appliqueront au présent Avenant, sauf si le contexte du présent Avenant indiquait clairement le contraire.

**GAR 00054**

**Article 2** De l'article 7.01 de la Convention

L'article 7.01 de la Convention se lit comme suit:

« L'assiette de la redevance minière proportionnelle payée en espèce ou en nature est égale pour chaque Société à la valeur des Hydrocarbures enlevés par celle-ci et calculée sur la base du prix déterminé conformément à l'Annexe II à la Convention ou à toute autre méthode sur laquelle les Parties s'accorderaient, diminuée des frais de transport intérieur, traitement, stockage et chargement tels que ces frais apparaissent dans les comptes de ladite Société.

Ne sont pas déductibles de l'assiette de la redevance minière proportionnelle, tous les frais autres que ceux rappelés au paragraphe ci-dessus, notamment les charges d'amortissement et les frais financiers relatifs aux investissements.

La redevance minière proportionnelle n'est pas due sur les quantités d'Hydrocarbures utilisées pour les besoins des travaux pétroliers ou perdues ».

**Article 3** Autres dispositions

Toutes les autres dispositions de la Convention et ses avenants demeurent en conséquence inchangées et pleinement applicables.

**Article 4** Prise d'effet

Le présent Avenant prend effet rétroactivement le 1er janvier 1994 et sera approuvé par une loi selon les formes requises.

Fait à Paris, en cinq (5) exemplaires, le 25 janvier 1997

Pour la République du Congo
le Ministre de l'Economie, des Finances
et du Plan, chargé de la Prospective

Pour la Société Nationale de Recherche et
d'Exploitation Pétrolières "Hydro-Congo"
le Directeur Général Président

Nguila MOUNGOUNGA NKOMBO

Bernard OKIORINA

Pour CMS Nomeco Congo
le Directeur Général

Pour The NUEVO Congo Company
le Président

K. CHARSINSKY

Michael D. WATFORD

Pour Kuwait Foreign Petroleum Exploration Co. k.s.c.
pour le compte de KUFPEC (Congo) Limited
le Président Directeur Général

Mahmoud A. AL-RAHMANI

GAR 00055