**EXHIBIT C**

## LOAN AGREEMENT

THIS LOAN AGREEMENT dated 13 December, 1984 is made between The People's Republic of the Congo (the "Borrower") and Equator Bank Limited (the "Lender").

WHEREAS

(A) By an agreement dated 23rd January 1984 (the "Contract") between the Ministry of Building and Public Works of The People's Republic of the Congo (hereinafter called the "Ministry") and Bovis International Limited (the "Contractor"), the Contractor agreed to manage, to organise, to supervise and to secure the execution of certain building works for the construction of the Brazzaville – Mayama – Kindamba highway (the "Highway") in The People's Republic of the Congo.

(B) At the request of the Borrower the Lender is willing to grant to the Borrower on the terms of this Agreement a loan of up to U.S. $6,500,000 in order to assist it in financing payment of local costs of the construction of the Highway.

NOW IT IS AGREED AS FOLLOWS:

1.   Certain Definitions – In this Agreement

a "banking day" means a day on which banks and foreign exchange markets are open in London, New York and Nassau for business of the type required for the purposes of this Agreement;

"Commitment" means the obligation of the Lender to make the Loan during the period from the date hereof until December 31, 1984 in an aggregate principal amount of up to U.S. $6,500,000 in accordance with the terms of this Agreement;

"Congolese Public Entity" means The People's Republic of the Congo or an agency, authority, department, ministry or other instrumentality of The People's Republic of the Congo and any person directly or indirectly controlled or wholly owned by The People's Republic of the Congo or by a Congolese Public Entity;

"dollars," "U.S. $" and the sign "$" mean the lawful currency of the United States of America;

"Interest Date" means each date falling at the end of each successive period of six months after the date of this Agreement or, if any such date is not a banking day, the next date that is a banking day;

the "Loan" means the loan made or to be made to the Borrower under the terms of this Agreement or such part thereof as is from time to time outstanding;

CERTIFIED A TRUE COPY

Allen+overy
...........................................
ALLEN & OVERY

DATED: 21/7/99

a "potential" Event of Default is any condition, event or act that with the giving of notice and/or the lapse of time and/or the fulfillment of any other requirement would constitute an Event of Default;

"relevant debt" means debt in respect of monies borrowed or raised or the deferred price of goods or services or under guarantees or similar undertakings or under finance leases;

"tax" includes any present or future tax, impost, levy, duty, charge, fee, deduction or withholding of any nature;

## 2.    The Facility

(A)    The Loan — Subject to the terms of this Agreement, the Lender agrees to make the Loan to the Borrower in two advances of U.S. $3,250,000 each, both on or before December 31, 1984.

(B)    Disbursement — The Contractor may present to the Lender disbursement claims totalling the amount of the Loan for payment of amounts due from the Borrower for local costs of the construction of the Highway under the Contract. The Lender shall, subject to the other provisions of this Agreement, meet the first U.S. $3,250,000 of the Contractor's claims by making the first advance. The Lender shall not be obliged to make the first advance to meet the claims unless they (a) are received in time for disbursement on or before December 31, 1984 and (b) are substantially in the form of Exhibit A, duly completed and signed by all persons whose signature is provided for in that Exhibit. On or before December 31, 1984 the Lender shall, subject to the other provisions of this Agreement, make the second advance by depositing the second U.S. $3,250,000 in the account of the Borrower on the books of the Lender. The funds constituting the second advance as aforesaid shall be paid out of the Borrower's account only to meet additional claims from the Contractor. The Lender shall not be obliged to make payments to the Contractor from the Lender's account as aforesaid unless those claims are substantially in the form of Exhibit A, duly completed and signed by all persons whose signature is provided for in that Exhibit. The Lender shall make the first advance and all subsequent payments required by this Agreement to be made to the Contractor by causing dollars to be credited to the account of the Contractor with a Bank in the United Kingdom mentioned in the disbursement claim.

(C)    Contract — The Borrower hereby acknowledges (for the avoidance of doubt) that its liability to perform this Agreement in accordance with its terms is in no way conditional upon performance of the Contract by the Contractor or the validity of any disbursement claim made under the Contract and that the Borrower's liability shall be in no way affected by any claim that it may have or may consider it has against the Contractor.

3.  Interest

(A)  Interest Periods – Interest shall accrue on the Loan during successive periods ("Interest Periods") and the Borrower shall on the last day of each such Interest Period pay to the Lender the amount of interest so accrued. The first Interest Period as to each advance shall begin on that date on which the advance is made and shall end on the first Interest Date thereafter. Subsequent Interest Periods shall (subject to sub-clause (C) of this clause) begin on the expiry of the preceding Interest Period and end on the next succeeding Interest Date.

(B)  Rate of Interest – The rate of interest applicable to the Loan during any Interest Period shall (subject to sub-clause (C) of this clause) be the rate per annum determined by the Lender to be the sum of two percent (2%) per annum (the "Margin") and the arithmetic mean (rounded upwards to the nearest whole multiple of one-sixteenth of one percent (1/16%)) of the rate at which, on the second banking day before the beginning of that Interest Period, the Lender is offered by prime banks in the London Interbank Eurocurrency Market dollar deposits in amounts equal to the Loan and for a term equal to that of the Interest Period. If the Borrower fails to pay any sum under this Agreement on the date on which it falls due it shall (without prejudice to any other rights of the Lender) pay to the Lender interest on that sum from the date on which it fell due until the date of actual payment to the Lender (as well after as before any judgment) at a rate (the "Default Rate") equal, in respect of each successive period of such duration as the Lender may select, to the sum of (x) one percent (1%) per annum and (b) the rate that would have applied to that period if it had been an Interest Period and if the defaulted sum had been the Loan, provided that, if the Lender determines that sub-clause (C) of this clause 3 would have applied to the defaulted sum during any such period if that period had been an Interest Period and if the defaulted sum had been the Loan the rate of interest payable on the defaulted sum during that period shall be the higher of (1) the Default Rate and (2) the sum of (x) one percent (1%) per annum and (y) the Margin and (z) the rate determined by the Lender to represent its cost of funding the defaulted amount (whether in dollars or otherwise) during that period. The Borrower shall pay such interest on the earlier of the last day of the period by reference to which it is calculated and the date of actual payment of the sum on which it has accrued.

(C)  Alternative Rate of Interest – Notwithstanding the foregoing provisions of this clause, if with respect to any Interest Period (a) the Lender determines that by reason of circumstances affecting the London Interbank Eurocurrency Market fair and adequate means do not or will not exist for ascertaining a rate of interest applicable to the Loan during that Interest Period or (b) the Lender is unable to obtain dollar deposits in amounts or for a term necessary to fund the Loan for that Interest Period or that the interest rate during that Interest Period does not, after deducting the Margin, reflect the cost to the Lender of funding the Loan during that Interest Period, the Lender shall so notify the Borrower and, notwithstanding anything else in this Agreement:

(x)  if the Interest Period would have been the first in relation to an Advance, that Advance shall not be made unless within one month from

the day that would otherwise have been the first day of that Interest Period the Borrower and the Lender agree in writing that that advance will be made on terms different (as to rate of interest, currency or otherwise) from those that would otherwise apply (an "alternative basis") and as to such other matters as may be necessary in order to implement that agreement;

(y) in any other case, the duration of the Interest Period shall be one month and the rate of interest applicable to it shall be the sum of the Margin and the rate that expresses as a rate per annum the cost to the Lender (as determined by it) of funding (whether in dollars or otherwise) the Loan during that Interest Period;

(z) if, where the circumstances are those set out in paragraph (y), the Borrower and the Lender fail to agree in writing on an alternative basis on which the Loan is to be maintained after the end of the Interest Period mentioned in that paragraph, the Borrower shall prepay the Loan on the last day of that Interest Period.

4.   Repayment and Prepayment

(A) Repayment – The Borrower shall repay the Loan in ten consecutive instalments, each equal to one tenth of the amount of the Loan. The first such instalment shall be payable on the first Interest Date and the remaining instalments shall be payable one on each of the nine succeeding Interest Dates.

(B) Voluntary Prepayment – The Borrower may prepay the Loan in full (but not in part) on the last day of any Interest Period if it has given to the Lender at least one month's prior written notice of its intention to do so, and by giving any such notice shall become liable to make the prepayment on the date to which it refers.

(C) Other Prepayments – If the Borrower has become obliged to indemnify the Lender under clause 14 it may by one month's prior written notice prepay the Loan in full (but not in part) on any banking day (without prejudice to its obligation to indemnify the Lender in accordance with clause 14). Any such prepayment and any such prepayment made pursuant to clause 7(f) shall reduce ratably each remaining repayment instalment.

(D) Provisions Generally Applicable – The Borrower may not make any repayment or prepayment except as expressly provided in this Agreement and may not reborrow any amount repaid or prepaid. The Borrower shall, at the same time as any repayment or prepayment is made to the Lender under any provision of this Agreement, pay all interest accrued on the amount repaid or prepaid and all other amounts then payable under this Agreement.

5.   Fees and Expenses

(A) Fees – The Borrower shall pay to the Lender (a) a management fee of U.S.$121,875 which fee shall be payable on or before the date of the first advance under this Agreement; and (b) a legal fee of U.S.$10,000 payable on or before the date of the first advance under this Agreement.

- 5 -

(B)  Expenses – The Borrower shall on request reimburse to the Lender against production of relevant invoices (a) all expenses and taxes thereon incurred by the Lender in connection with the negotiation, preparation and execution of this Agreement, except that all legal expenses in connection with the preparation of this Agreement shall be deemed included in the legal fee specified in clause 5(A)(c); (b) all other expenses and taxes thereon incurred by the Lender in connection with any amendment or variation of or waiver given in connection with this Agreement and (c) all expenses (including legal fees) and taxes thereon incurred by the Lender for the enforcement or preservation of any rights under this Agreement.

6.  Taxes – All payments to be made by the Borrower to the Lender under this Agreement, including under this clause, shall be made free and clear of and without any deduction or withholding on account of tax unless a deduction or withholding is required by law, in which event the Borrower shall (i) promptly pay or cause to be paid to the appropriate authority the amount of the withholding or deduction, (ii) produce to the Lender not later than thirty (30) days after that payment a receipt of that authority evidencing that it has received the proper amount from the Borrower and (iii) pay such further sums as may be necessary so that, after the deduction or withholding, the Lender receives on the due date the amount it would have received had no such deduction or withholding been required. Without prejudice to the preceding provisions of this clause 6, the Borrower shall (a) on demand indemnify the Lender against any liability to make any payment in respect of tax on or in relation to any sum payable under this Agreement otherwise than in respect of tax levied on its overall net income in the jurisdiction in which its principal office or lending office is located and (b) pay (and indemnify the Lender against any liability to pay) any stamp, registration or similar taxes or duties that may be or become payable with respect to this Agreement.

7.  Conditions Precedent – The Lender shall not be obliged to make the loan if (A) an Event of Default or potential Event of Default has occurred or will occur by reason of the Loan being made or (B) the Borrower has not paid such fees mentioned in clause 5 as have then fallen due. The Lender shall not be obliged to make payments to the Contractor from the Borrower's account as provided in clause 2 (X) if the Lender has not received before the date on which the payment is to be made:

(a)  a copy certified as true and correct by the Minister of Finance of The People's Republic of the Congo or a person duly authorised by him of, (i) documents evidencing the authority of the person who has executed this Agreement for the Borrower including without limitation, an authorisation [plaine pouvoirs] granted by the President and of the persons who will (until replaced by other duly empowered persons) sign any other documents in connection with this Agreement, and (ii) an undertaking of the "Direction Generale du Credit et de Relations Financieres", acting by delegation from the Minister of Finance of the People's Republic of the Congo, whereby the said "Direction" undertakes to grant, as and when necessary, all authorisations necessary to enable the Borrower to acquire dollars at such times and in such amounts as to enable it to meet on due date its payment obligations under this Agreement, all such documents to be satisfactory in form and substance to the Lender;

(b) documents evidencing:

(i) the appointment of The Law Debenture Trust Corporation p.l.c. as process agent in London for the purposes of this Agreement, and its acceptance of that appointment, substantially in the form of Exhibit B;

(ii) the appointment of United States Corporation Company as process agent in New York and its acceptance of that appointment, in the form of Exhibit C;

(c) an opinion of the President of the Supreme Court of The People's Republic of the Congo, or his duly authorized representative, in the form of a French text corresponding substantially to the English text set out in Exhibit D;

(d) a copy of the Contract, certified as true and correct by the Central Commercial Director of State Contracts of The People's Republic of the Congo or a person duly authorised by him and evidence satisfactory to the Lender that the Contract has entered into force in accordance with Clause 8.1 of the "General Conditions of Contract" forming part of the Contract or will, immediately upon any portion of the Loan being made, enter into force;

(e) certified copies of evidence of the authority and specimen signatures of (i) the person who will sign the disbursement claims on behalf of the Contractor and (ii) the person who will countersign the disbursement claims on behalf of Caisse Congolaise d'Amortissement;

(f) an opinion of a Congolese lawyer selected by the lender, in form and substance satisfactory to the Lender.

8.    Representations and Warranties – The Borrower represents and warrants to the Lender that:

(A)   Power – Under the laws of The People's Republic of the Congo it has full legal right, authority and power to enter into and to perform this Agreement and has taken all necessary action to authorise the execution and performance of this Agreement.

4

(3) Binding Obligations - All the obligations expressed to be assumed by the Borrower under this Agreement are legal, valid and binding as obligations of The People's Republic of the Congo, enforceable in accordance with their respective terms.

(C) No Breach - The Borrower will not by entering into or performing this Agreement breach any agreement or any order of a court or any law, regulation, decree or other instrument in The People's Republic of the Congo.

(D) Authorisations - All approvals or authorisations (including exchange control authorisations) necessary in connection with this Agreement in The People's Republic of the Congo have been obtained and are in full force and effect.

(E) Registration - No registration, notarisation or similar formality is required in connection with this Agreement in The People's Republic of the Congo except (a) for (i) registration for the purposes of documentary registration tax which, unless exempted, will be assessed at a fixed nominal amount and (ii) registration in connection with proceedings brought under this Agreement in The People's Republic of the Congo which, unless exempted, will give rise to a proportional registration tax; all of which aforementioned taxes will, unless exempted, be paid by the Borrower in accordance with clause 6, and (b) that this Agreement should be approved by the "Commission Centrale des Marches et Contrats de l'Etat."

(F) Default - No Event of Default or potential Event of Default has occurred or will occur by reason of the Loan being made.

(G) Commercial Act - Execution and performance of this Agreement by the Borrower constitute private and commercial rather than public or governmental acts.

(H) No Litigation - No litigation, arbitration or administrative proceeding is in process or, to the best of the knowledge of the Borrower, threatened against the Borrower or any other Congolese Public Entity that is reasonably likely to have a material adverse effect on the interests of the Lender under this Agreement.

(I) Form - This Agreement is in proper form for enforcement in The People's Republic of the Congo.

(J) Ranking - There is, at the date of this Agreement, nothing to prevent any claim under this Agreement from ranking as a general obligation of the Borrower at least pari passu with the claims of all other creditors of the Borrower. Except as disclosed in writing to the Lender prior to the date hereof, as at the date of this Agreement there is in existence no mortgage, pledge, security or similar preferential arrangement over any assets or revenues of the Borrower or of any other Congolese Public Entity.

(K) Proceedings - The obligations of the Borrower under this Agreement may be enforced in the courts of The People's Republic of the Congo and the Borrower would not be entitled in any proceedings brought in those courts for enforcement of any such obligation to any immunity of jurisdiction.

(L) I.M.F. - The Borrower is a member in good standing of the International Monetary Fund ("I.M.F.").

(M) The Borrower is not aware of the existence of any fact or circumstance that has not been disclosed to the Lender and that could reasonably be expected adversely to affect the decision of the Lender to lend to the Borrower.

9.    Undertakings - The Borrower undertakes

(A) To furnish to the Lender, as and when produced, copies of such reports and documents concerning the financial position of the Borrower as are from time to time publicly available and to provide to the Lender such other information relevant to this Agreement or to the Contract as the Lender may reasonably request;

(B) To obtain promptly from time to time all such approvals and authorisations (including exchange control authorisations) and to affect all such registrations and similar formalities as may be or become necessary or advisable in connection with this Agreement and to comply with the terms of all such approvals, authorisations and registrations as have been or may be obtained or affected;

(C) Promptly to notify to the Lender from time to time the occurrence of any Event of Default or potential Event of Default of which it has knowledge;

(D) To procure that the claims of the Lender under this Agreement will rank as general obligations of The People's Republic of the Congo at least pari passu in right and priority of payment with the claims of all other creditors of The People's Republic of the Congo and not to create or to allow to subsist any mortgage, pledge or other security or other preferential arrangement over any of the assets or revenues of The People's Republic of the Congo or of any Congolese Public Entity in favour of any creditor; and

(E) To procure that the Ministry makes payment to the Contractor, no later than the date on which the disbursement claim referred to in sub-clause 2(B) is presented to the Lender, of all amounts payable under clause 5.1 of the "General Conditions" forming part of the Contract that are not financed by the Loan.

10. Acceleration - The Lender shall not be obliged to make the Loan or any portion thereof and shall be entitled by notice to the Borrower to require the Loan to be repaid immediately or on the date specified in the notice (together with accrued interest and all other amounts payable under this Agreement) if any of the following events ("Events of Default") occur:

(A) The Borrower fails to pay when due any amount payable under this Agreement;

(B) Any representation or statement made by the Borrower in or in connection with this Agreement or made in any document provided under this Agreement proves to have been incorrect in any material respect when made or (except in respect of clauses 8(E) and 8(F) of this Agreement) would be

AR

-7-

incorrect in any material respect if repeated at any time during the term
of this Agreement with respect to the circumstances then existing;

(C) The Borrower fails to perform any of its obligations under clause 9(C),
9(D) or 9(E) of this Agreement;

(D) The Borrower fails to perform any obligation under this Agreement (other
than an obligation mentioned in sub-clause (A) or (C) above) and the
failure, if capable of remedy, is not remedied within thirty (30) days
after a requirement to that effect made by the Lender;

(E) The Borrower or any other Congolese Public Entity defaults in the payment
when due of any relevant debt (arising otherwise than under this
Agreement) or any condition, event or act occurs that causes any relevant
debt of the Borrower or of any other Congolese Public Entity to become
due prior to its specified due date or entitles the creditor to whom it
is owed (or any agent for that creditor) to declare it due prior to its
specified due date;

(F) (i) The Borrower or any other Congolese Public Entity is unable to pay
its debts generally as they fall due or takes any steps with a view to a
readjustment or a rescheduling of its debts or of any category of its
debts or suspends or declares its intention of suspending payment of its
debts generally or of any category of debt or of any amount payable under
this Agreement or (ii) any Congolese Public Entity is the subject of
proceedings under any bankruptcy law, law for the relief of debtors or
law otherwise affecting creditors' rights generally or takes an
assignment for the benefit of or enters into any composition or
arrangement with creditors or any class of creditors or (iii) a receiver,
intervenor or similar officer is appointed with respect to any Congolese
Public Entity or a substantial part of its respective assets or revenues
or (iv) execution, distress, attachment or other legal process is levied
on any substantial part of the assets or revenues of the Borrower or of
any Congolese Public Entity and is not discharged within thirty (30)
days;

(G) Any approval, authorisation or registration required in connection with
this Agreement is withdrawn, suspended, limited or ceases to be in full
force and effect;

(H) The Contract is set aside, suspended or terminated for any reason
whatsoever or otherwise ceases to be in full force and effect or action
is initiated by any person with a view to any of the foregoing;

(I) Any event occurs or circumstances arise that may have a material adverse
effect on the ability of the Borrower to perform its obligations under
this Agreement;

(J) The People's Republic of the Congo ceases to be a member in good standing
of the I.M.F. or ceases to be eligible to use the resources of the I.M.F.
under the Articles of Association of the I.M.F.

-10-

11.  Payments

(A)  Adjustment of Dates — If the date for payment of any sum under this Agreement is not a banking day, the date for payment shall be postponed to the next banking day.

(B)  Dollar Payments — The dollar is the currency of account and of payment under this Agreement. All payments to be made by the Borrower under this Agreement shall be made in dollars and in same day funds (or such other form of dollar funds as may at the time of payment be customary for the settlement of international dollar transactions in New York City) through the New York Clearing House Interbank Payments System not later than 11 a.m. (New York time) on the date for payment to account No. UO-016618-01 of the Lender at The Hongkong and Shanghai Banking Corporation, Five World Trade Center, New York, New York 10048 U.S.A. or such other account as the Lender may from time to time designate by notice in writing to the Borrower.

(C)  No Set-off — Without prejudice to clause 6, all payments to be made by the Borrower under this Agreement shall be made without deduction for or on account of any set-off or counterclaim.

12.  Indemnities — The Borrower shall on demand pay to the Lender amounts sufficient to indemnify the Lender:

(A)  Against any loss (including loss of Margin), premium, penalties or expense (including without limitation those incurred in liquidating deposits or re-employing funds taken or borrowed to fund the Loan) that the Lender determines it has sustained as a consequence of (i) payment of any amount on which interest accrues otherwise than on the last day of the period by reference to which interest is calculated, (ii) the failure by the Borrower to fulfil its obligations under this Agreement, (iii) the Loan not being made for any reason other than the negligence or wilful default of the Lender or (iv) the acceleration of the Loan under clause 10;

(B)  Against any loss or expense that the Lender determines it has sustained by reason of any discrepancy between (a) the rate of exchange (which expression includes any premium and costs of exchange) at which a sum payable in one currency (the "first currency") under this Agreement has been converted into any other currency (the "second currency") for the purpose of making or of filing a claim against the Borrower or of obtaining an order or judgment of any court against the Borrower or of enforcing any such order or judgment and (b) the rate of exchange at which the Lender is able to purchase the first currency with the second currency on the first day on which such purchase is practicable after receipt by the Lender of any amount of the second currency paid in satisfaction (in whole or in part) of the claim, order or judgment. Any amount payable by the Borrower under this sub-clause (3) shall be a separate debt the liability for which shall not be affected by judgment being obtained for any other amount payable by the Borrower under this Agreement.

13.  Calculations and Determinations

(A)  Basis of Computation - All interest and commitment fees shall accrue from day to day and be computed on the basis of the actual number of days elapsed and as if the year were composed of three hundred and sixty (360) days.

(B)  Determinations - Whenever this Agreement provides for the determination by the Lender of any matter or thing, that determination shall be conclusive, in the absence of manifest error.

14.  Increased Costs - If the Lender determines that the result of the introduction of or any change in, or in the interpretation of, any instrument having the force of law or compliance with any directive or request from any central bank or fiscal, monetary or other relevant authority (whether or not having the force of law) is (a) to increase the cost to it of making or agreeing to make available or funding the Loan or (b) to reduce the amount of any payment receivable by it under this Agreement or to require it to forgo any amount payable under this Agreement, the Borrower shall (except to the extent that it is liable to indemnify the Lender therefor under clause 6) on demand from time to time pay to such amounts as the Lender may determine to be necessary to indemnify it against the increased cost mentioned in (a) or against the reduction or requirement mentioned in (b).

15.  Change in Circumstances - If the Lender determines that it has become unlawful for it to make or to maintain the Loan or that, in light of any directive or request from any central bank or fiscal, monetary or other relevant authority (whether or not having the force of law) it would be impracticable for it to do so, it shall promptly so notify the Borrower, whereupon it shall be released from all obligation to make the Loan and, if the Loan has been advanced, the Borrower shall repay the Loan on demand by the Lender.

16.  Assignment - This Agreement shall be binding upon the Borrower and its successors and assigns and shall inure to the benefit of the Lender and its successors and assigns. The Borrower may not assign any of its rights under this Agreement without the consent of the Lender. The Lender may assign any of its rights and obligations under this Agreement to any bank or lending institution and may maintain the Loan out of such office as it may from time to time select and notify to the Borrower.

17.  Set-off - The Borrower authorises the Lender (i) to set-off any credit balance to which the Borrower is entitled on any account of the Borrower (irrespective of currency) against any unpaid amounts due and payable by the Borrower under this Agreement and (ii) to apply any non-dollar balances on such accounts toward the purchase of dollars, in exercise of any such right of set-off.

18.  Notices - All notices or other communications shall be given at the respective addresses set forth at the end of this Agreement or at such other address as either party may designate as its address by notice from time to time to the other party. Notices or communications to the Borrower shall be deemed to have been received, in the case of telexes, on the day on which sent (or, if that day is not a working day in the place where the telex is

received, on the next working day in that place), in the case of letters thirty days after having been put in the post (airmail if addressed to another country) postage prepaid and in the case of telegrams, fifteen days after despatch.

19.  Law and Jurisdiction

(A)  This Agreement shall be governed by the laws of England. The Borrower hereby irrevocably agrees that any suit, action or proceeding against the Borrower arising out of or in connection with this Agreement may be brought in the High Court of Justice in England, Federal Courts sitting in, and the State Courts of, New York, New York U.S.A. and the Courts of The People's Republic of the Congo and irrevocably submits to the jurisdiction of each such court, but nothing shall preclude the Lender from bringing any proceedings arising out of or in connection with this Agreement in the courts of any other competent jurisdiction, and proceedings in one jurisdiction shall not preclude proceedings in another jurisdiction whether concurrent or not.

(B)  The Borrower hereby irrevocably appoints The Law Debenture Trust Corporation p.l.c., Estates House, 66 Gresham Street, London EC2B 7EX, England and United States Corporation Company, 70 Pine Street, New York, New York 10270 U.S.A. as its agents for service of process in any such suit, action or proceedings in England and New York, respectively, provided that if at any time The People's Republic of the Congo maintains an Embassy or Consulate in London or New York, any process relating to proceedings arising out of or in connection with this Agreement may be validly served on the Borrower if served on the Ambassador or Consul-General for the time being of The People's Republic of the Congo in London or, as the case may be, New York.

(C)  The Borrower consents generally in respect of any suit, action or proceedings arising out of or in connection with this Agreement to the giving of any relief, or the issuance of any process in connection with any such suit, action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment that may be made or given in such action or proceedings.

(D)  To the extent that the Borrower may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed) the Borrower agrees not to claim and waives such immunity to the fullest extent permitted by the laws of that jurisdiction including, in particular, that in any proceedings taken in New York the foregoing waiver of immunity shall have effect under and be construed in accordance with the United States Foreign Sovereign Immunities Act of 1976.

20.  Language — This Agreement is being executed in English and French versions. In the event of any discrepancy between the two versions, the English version shall for all purposes prevail. All notices, communications and other documents to be delivered under this Agreement by the Borrower

-15-

shall in French or in English.

-21.  No Waiver - No failure to exercise nor any delay in exercising on the part of the Lender any right or remedy under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy.  The rights and remedies provided for in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

22.  Severability - The invalidity, illegality or unenforceability of any provision of this Agreement in any relevant jurisdiction shall not affect the validity, legality or enforceability of any other provision of this Agreement, nor that of the former provision in any other relevant jurisdiction.

IN WITNESS WHEREOF the parties have caused this Agreement to be executed the day and year first above written.

SIGNATORIES

THE PEOPLE'S REPUBLIC OF THE CONGO

[stamp: Etienne NOTE / Directeur Général / Caisse Congolaise d'Amortissement / B.P. 2090 - Télex 52M XG / BRAZZAVILLE]

By
  Name:  Etienne Note
  Title:  Directeur General de la Caisse Congolaise d'Amortissement
  Address:  Brazzaville
    The People's Republic of the Congo

CCA-B.P. 2090  télex 5294 KG CACONAM.

EQUATOR BANK LIMITED

By
  Name:  Etienne P. Ndao
  Title:  Attorney-in-Fact
  Address:  Norfolk House
    Frederick Street
    P. O. Box SS-6273
    Nassau, N.P., Bahamas

EXHIBIT A

FORM OF DISBURSEMENT CLAIM


To:  Equator Bank Limited
     Norfolk House
     Frederick Street
     P. O. Box SS-6273
     Nassau, N.P., Bahamas

We refer to (i) the Contract (as defined in the Loan Agreement hereinafter
referred to) between the Ministry of Building and Public Works of The People's
Republic of the Congo and Bovis International Limited and (ii) the agreement
dated _____ 1984 (the "Loan Agreement") between The People's Republic
of the Congo, as borrower (the "Borrower") and Equator Bank Limited.

We hereby claim payment of the equivalent in pounds sterling of
U.S. $_____ (at your prevailing rate of exchange on the date of payment
to us) in respect of all or a part of the _____ referred to in
the Contract, and confirm that the amount so claimed is now due and owing to
us under the Contract.

Please credit the amount claimed to our Account No. (_____) with
(_____).

                              Bovis International Limited



                         By_____
                              Name:
                              Title:
                              Date:_____ 198

We refer to the above disbursement claim and hereby request that the Loan be
made under the Loan Agreement there referred to in accordance with the
procedures described therein.

                              Caisse Congolaise d'Amortissement



                         By_____
                              Name:
                              Title:
                              Date:_____ 198

EXHIBIT B

PRIVATE AND CONFIDENTIAL

The Law Debenture Trust Corporation p.l.c.
Estates House
66 Gresham Street
London EC2V 7HX
ENGLAND

Dear Sirs:

We refer to the Loan Agreement dated ____ December, 198  a brief summary of
which appears in the record sheet attached hereto. We write to record the
terms upon which you have agreed to be appointed by us in the Loan Agreement
to receive on our behalf service of process in the Courts of England in
respect of any legal action or proceedings arising out of or in connection
with the Loan Agreement.

1.    Upon receipt of any service of process issued out of the Courts of
England addressed to us and arising out of or in connection with the Loan
Agreement, you will on our behalf accept such service and will notify us by
telex or cable at the number or address shown in the record sheet attached
hereto (or such other number or address as may from time to time be specified
by us in writing) to the effect that you have accepted service of process on
our behalf. Such notification need only inform us of the name of the party
issuing the proceedings, the date upon which you accepted service of process
and the date (if any) by which action must be taken to avoid judgment being
entered against us in default of appearance before the Court. The
notification need not include any details of the nature or substance of the
claim or claims made by the issuing party. You shall, however, ask us the
names of our London solicitors (if any) to whom copies of the relevant
documents should be sent.

2. .  Following such notification by telex or cable you will confirm the
acceptance to us by airmail letter at the address shown in the record sheet
attached hereto (or such other address as may from time to time be specified
by us in writing), enclosing the documents which you have received in .
connection with service of such process. In the event that, at our request,
you agree to provide some details of the nature or substance of the claim or
claims made by the issuing party prior to the receipt by us of the relevant
documents, we agree that this shall be without responsibility on your part and
that we will have regard only to the relevant documents in determining our
response to the legal action or proceedings.

3.    You shall have no other duties whatsoever under the terms of this letter
save as expressly provided in paragraphs 1 and 2 above.

-2-

4.   In the event that in your opinion communications between the United
Kingdom and The Republic of the Congo are disrupted in any way, you shall be
under no responsibility if a telex, cable or letter cannot be despatched to
us, but you will use your best endeavours to inform us of this fact by
telephone and shall despatch such telex, cable or letter, as the case may be,
as soon as it becomes reasonably practicable so to do.  The despatch of a
telex or cable to the number or address provided in paragraph 1 above or the
despatch of a letter to the address provided in paragraph 2 above by
depositing it with the postal authorities shall be a good discharge of your
duties hereunder.

5.   In consideration of your accepting these arrangements, we hereby agree to
pay you within thirty days a fee of £_____ and all costs (if any) incurred
by you in the preparation of this letter (including telex and other
out-of-pocket expenses) and, in addition, agree to indemnify you forthwith
upon written demand by you from and against all costs, charges and expenses
whatsoever incurred or sustained by you in performance of your duties
hereunder (including the cost of copying and transmitting notices and
documents despatched to us or to our order as required under the terms of this
letter) and agree that we shall have no right of action against you for any
failure to perform any of such duties, except where such failure is due to
your negligence or wilful default or that of your officers or agents.

6.   Upon receiving the duplicate of this letter with the Form of
Acknowledgment at the foot thereof duly signed by yourselves by way of
acceptance of the terms hereof, we shall notify the Lender (by delivery to it
of a copy of this letter) that you have accepted the terms of this letter and
that any service of process issued out of the Courts of England should be made
by it quoting reference _____.

7.   This appointment shall cease on the expiry of the period for the duration
of the Loan Agreement as described in the record sheet attached hereto unless
in the case of any extension of such period (whether by written agreement,
waiver or otherwise) you agree in writing to continue this appointment (which
you will normally endeavour to do upon the payment of a further fee to be
agreed at such time), provided that we hereby agree that this appointment
shall continue in force upon payment to you of such fee as you may agree with
the Lender in the event that at the date for the final repayment under the
Loan Agreement, we have not complied with (or are alleged by the Lender not to
have complied with) any of the terms of the Loan Agreement.

8.   The terms of this letter shall override any terms to the contrary
contained in the Loan Agreement regarding your appointment and you shall duly
be taken to have notice of these provisions of the Loan Agreement which are
contained in the record sheet.

                Yours truly,

signed by

on behalf of The People's Republic of the Congo



-3-

We hereby acknowledge receipt of a letter dated _____ from The People's Republic of the Congo of which the above is a true copy and agree to the terms of such letter and to a copy thereof being given to the financial institutions who are parties to the Loan Agreement.

Yours truly,


DIRECTOR

For and on behalf of
The Law Debenture Trust Corporation p.l.c.

THE LAW DEBENTURE TRUST CORPORATION p.l.c.

Estates House
66 Gresham Street
London EC2V 7HX

Telephone:  01-606-5451
Telex:      883347 and 8956839

SERVICE OF PROCEEDINGS – RECORD SHEET

A separate sheet must be completed by each party appointing The Law Debenture Trust Corporation p.l.c. as its agent to accept service of proceedings. The appointor must inform The Law Debenture Trust Corporation p.l.c. immediately of any alteration to the information set out below.

1.  Name of Appointor:  The People's Republic of the Congo

2.  Address of Appointor's
    Registered Office or
    Place of Business

3.  Appointor's telex number(s)

4.  Appointor's telephone number(s)

5.  Appointor's cable address(es)

6.  Name/title/references of person
    to be contacted in the event of
    proceedings being served

7.  Telex number/telephone number/
    cable address to be used in the
    event of proceedings being served

8.  Name/title/reference and address
    of person to whom proceedings
    should be sent

9.  Name and address of London
    Solicitors (if any) to whom
    copy proceedings should be sent

10. Any special instructions

11. Details of document(s) concerned in appointment:
    (Details may be continued overleaf if necessary)

-2-

Nature of Document: LOAN AGREEMENT

Parties: (1)  The People's Republic of the Congo

as Borrower,

(2)  Equator Bank Limited
     Norfolk House
     Frederick Street
     P. O. Box 55-6273
     Nassau, N.P., Bahamas

Date:        _____  December 1984
Duration:    _____

Amount Involved:    U.S. Dollars 6,500,000

Jurisdiction Clause Number:    Clause 19

_____

Date:  _____

_____

                         on behalf of
                         The People's Republic of the Congo

EXHIBIT C

THE PEOPLE'S REPUBLIC OF THE CONGO
Brazzaville
The People's Republic of the Congo

___ December, 1984

United States Corporation Company
70 Pine Street
New York, New York 10270

Gentlemen:

We refer to the Loan Agreement (the "Agreement") dated ___ December, 1984 between The People's Republic of the Congo ("Congo") and Equator Bank Limited ("Equator") providing for a loan in the maximum principal amount of U.S. $6,500,000. Unless otherwise defined herein, all capitalized terms used herein shall have the respective meanings provided therefor in the Agreement.

Congo, for itself and its successors and assigns, has submitted itself and its properties and revenues to the jurisdiction of the courts of the State of New York and to the jurisdiction of the courts of the United States of America located in the Southern District of New York for the purposes of any suit, action or other proceeding arising out of the Agreement. The final maturity date of the Loan is five years after the first Interest Date.

Congo, for itself and its successors and assigns, hereby confirms its desig- nation and appointment of the United States Corporation Company, 70 Pine Street, New York, New York 10270, as its attorney-in-fact to receive service of summons and other legal process in any action, suit or proceeding with respect to any matter as to which it has submitted to jurisdiction as set forth above, it being stipulated that service upon such attorney-in-fact shall constitute service upon Congo or its successors and assigns, all as more fully set forth in the Agreement.

Congo further agrees that (i) the sole responsibilities of the United States Corporation Company shall be to send a copy of any such summons and other legal process so received to Congo, by registered or certified mail, at Brazzaville, The People's Republic of the Congo and (ii) that the United States Corporation Company shall have no responsibility for the receipt or non-receipt by Congo of such summons and other legal process, nor for any performance or non-performance by Congo, or any other party to the Agreement or their respective successors and assigns. Congo hereby agrees to hold the United States Corporation Company harmless against all liability, loss, cost, damage or expense for any reason whatsoever, except its failure or refusal to receive or to send any summons and other legal process or notice as above set forth. Congo also hereby agrees to reimburse the United States Corporation Company for all its out-of-pocket disbursements in connection with services to Congo hereunder.

Page 2
Letter to United States Corporation Company

Please acknowledge receipt of this letter and your agreement to the
terms hereof by signing and returning the enclosed copy of it. This
letter shall also inure to the benefit of Equator and its successors and
assigns.

                                        THE PEOPLE'S REPUBLIC OF THE CONGO


                                   By_____
                                        Name:
                                        Title:

Accepted and agreed:

UNITED STATES CORPORATION COMPANY


By_____
    Name:
    Title:

EXHIBIT D

FORM OF OPINION OF THE PRESIDENT OF THE SUPREME COURT

I the undersigned Charles ASSEMEKANG, Doctor of Law, President of the Supreme Court of The People's Republic of the Congo

Having been requested by letter No. _____ dated _____ from the Minister of Finance to issue a legal opinion with relation to the Loan Agreement entered into on ____ December, 1984 between on the one hand The People's Republic of the Congo and on the other hand Equator Bank Limited.

After having examined:

1. The Loan Agreement (the "Agreement") entered into on ____ December, 1984 between on the one hand The People's Republic of the Congo and on the other hand Equator Bank Limited, under which Equator Bank Limited (the "Lender") agrees to grant to The People's Republic of the Congo, on the terms and conditions there set out, a loan facility for a maximum amount of U.S. $6,500,000 in order to assist in financing the payment to Boris International Limited of the local costs of the construction of the Brazzaville - Mayama - Kindamba highway under a contract relative to certain road building works in The People's Republic of the Congo;

2. All other documents it has deemed necessary to examine as well as the Constitution, laws and regulations in force of The People's Republic of the Congo.

Give the following opinion (words and phrases defined in the Agreement having the same meaning herein):

1. The Agreement constitutes a charge on public funds within the meaning of the provisions of the Constitution of July 8, 1979 promulgated by Decree 79/445 of August 8, 1979.

2. Mr. Bota, Directeur General de la Caisse Congolaise d'Amortissement, is fully empowered to sign the Agreement and all other documents in connection with the Agreement on behalf of The People's Republic of the Congo.

3. The Directeur General de la Caisse Congolaise d'Amortissement signed the Agreement on ____ December, 1984.

4. In consequence the Agreement has been validly and duly signed and the obligations it creates for the "Borrower" are irrevocable and unconditional obligations of The People's Republic of the Congo, enforceable according to its terms.

5. All authorisations (including exchange control authorisation), registrations or other formalities of or with any governmental authority that are required in The People's Republic of the Congo in connection with the Agreement have been obtained and are in full force and effect.

-2-

6.    The claims of the Lender on The People's Republic of the Congo arising out of the Agreement will rank pari passu with all other borrowings, guarantees and debts of The People's Republic of the Congo. There is in existence no mortgage, pledge or other security or other preferential arrangement over any assets or revenues of The People's Republic of the Congo.

7.    The payments to be effected by The People's Republic of the Congo under the Agreement are not subject to any tax or duty in The People's Republic of the Congo. The Agreement is not subject in The People's Republic of the Congo to any stamp or registration or similar duty other than documentary registration tax, unless exempted, at a fixed nominal amount.

8.    The Agreement satisfies the conditions of form required by Congolese law.

9.    The conclusion of the Agreement by The People's Republic of the Congo constitutes a private and commercial act rather than an act carried out for public purposes or in the interests of public purposes. The People's Republic of the Congo is not entitled to claim any right of immunity, whether of jurisdiction or execution, in The People's Republic of the Congo and the waiver of immunity from jurisdiction and execution before foreign courts contained in the Agreement is valid under Congolese law.

10.    So far as I am aware after making due and careful enquiry neither the Borrower nor any Congolese Public Entity is in default in the payment of any relevant debt.

11.    The choice of English law to govern the Agreement is valid under Congolese law and that choice would be given effect to in any proceedings before the Courts of The People's Republic of the Congo concerning the Agreement. The submission to the jurisdiction of the English and New York courts to settle any differences arising in connection with the Agreement is valid under Congolese law. The Lender would nonetheless have the right, in the event of such differences, to bring them before the Congolese courts, which would accept jurisdiction to decide the matter.

12.    A judgment given in England or New York against The People's Republic of the Congo under the Agreement would be recognised in The People's Republic of the Congo without investigation of the merits.

AM

13. It is not necessary that the Lender be registered or authorised to carry out its activities in The People's Republic of the Congo in order for it to enforce its rights under the Agreement. It would not be treated merely by reason of signature or performance of the Agreement as resident for tax purposes in The People's Republic of the Congo.

Done in Brazzaville this _____ day of _____, 1984.

Ch. ASSEMEKANG
Judge

President of the Supreme Court