**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CONNECTICUT BANK OF COMMERCE, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| THE REPUBLIC OF CONGO, | ) ) ) |
| Defendant; | ) ) ) |
| CMS NOMECO CONGO INC., | ) ) ) |
| Garnishee. | ) |

Civil Action No. 05-762 SLR

**CMS NOMECO'S ANSWERING BRIEF IN OPPOSITION TO AF-CAP'S MOTION
FOR SUMMARY JUDGMENT AND OPENING BRIEF IN SUPPORT OF CMS
NOMECO'S CROSS-MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

Guy S. Lipe
Jason M. Powers
VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin Street, Suite 2300
Houston, TX 77002-6760
(713) 758-2222

Dated: December 14, 2005

M. Duncan Grant (Del. Bar No. 2994)
James C. Carignan (Del. Bar No. 4230)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500

Attorneys for Garnishee CMS Nomeco Congo Inc.

TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS ............................................................................ 1

SUMMARY OF ARGUMENT ................................................................................................... 4

STATEMENT OF FACTS .......................................................................................................... 9

I.      CMS Nomeco, Two Other Private Companies, and the Congo's State-Owned Oil
        Company are the Working Interest Owners under a Convention for the Production of
        Oil in the Congo ............................................................................................................. 9

II.     Under the Convention, the Congo is Entitled to Lift its In-Kind Royalty Oil, Which is
        Produced, Stored, and Lifted in Congolese Territorial Waters ....................................... 9

III.    Af-Cap's Alleged Predecessor-in-Interest Attempts to Garnish the In-Kind Royalty in
        Texas ............................................................................................................................ 10

IV.     The Congo and its State-Owned Oil Company Obtain Court Orders from a Congolese
        Court Compelling CMS Nomeco to Deliver Oil in Congolese Waters ......................... 11

V.      The Western District of Texas Dismisses Af-Cap's Texas Garnishment Action ......... 12

VI.     The Western District of Texas Enters Turnover Orders Against the Congo ................. 12

VII.    In July 2005, the Congo and SNPC Obtain New Orders Against CMS Nomeco
        Requiring Delivery of Oil in Congolese Waters .......................................................... 13

VIII.   Af-Cap and Walker File a Delaware Lawsuit Against CMS Nomeco in Delaware
        Chancery Court, and Af-Cap Seeks Contempt Sanctions Against CMS Nomeco in the
        Western District of Texas ............................................................................................ 14

IX.     The Western District of Texas Denies Af-Cap's Contempt Motion Against CMS
        Nomeco and the Other Working Interest Owners ......................................................... 14

X.      Having Failed in Their Efforts to Obtain Relief Against CMS Nomeco in Texas, Af-
        Cap and Walker Seek Garnishment Writs Against CMS Nomeco in New Actions in
        Delaware ...................................................................................................................... 14

XI.     The Congo Was Not Entitled to Take Any Royalty Oil At the Time of Service of the
        Writ of Garnishment or as of the Answer Date ........................................................... 15

ARGUMENT ........................................................................................................................... 16

I.      Af-Cap's Procedural Arguments Are Frivolous ........................................................... 16

II.     Collateral Estoppel Principles Do Not Bar CMS Nomeco's Defenses, and Delaware
        Law Requires Dismissal Because Delaware (Like Texas) Precludes Garnishment of
        Non-Monetary Obligations .......................................................................................... 18

III.    This Court's Decision in LNC Investments v. Republic of Nicaragua Requires
        Dismissal of the Garnishment Action .......................................................................... 24

IV.     The Doctrine of "Foreign State Compulsion" Precludes Enforcement of a Writ that
        Conflicts with Congo Court Orders Compelling Delivery of Oil in the Congo ........... 28

V.      The Act of State Doctrine Also Precludes Enforcement of the Writ ............................ 30

VI.     The In-Kind Royalty Sought to be Garnished is Immune from Garnishment Under the
        FSIA ............................................................................................................................ 32

VII.    The Writ of Garnishment Captured No Property of the Congo ..................................... 34

CONCLUSION ......................................................................................................................... 37

TABLE OF AUTHORITIES

Page

## CASES

Af-Cap, Inc. v. Republic of Congo,
    383 F.3d 361 (5th Cir.), modified on rehearing,
    389 F.3d 503 (5th Cir. 2004),
    cert. denied 125 S.Ct. 1735 (2005) .......................................................11, 20, 28, 29, 30, 32, 33

Argentine Republic v. Amerada Hess Shipping Corp.,
    488 U.S. 428 (1989)...................................................................................................................34

Banco Nacional de Cuba v. Sabbatino,
    376 U.S. 398 (1964)...................................................................................................................30

Board of Trustees v. Centra,
    983 F.2d 495 (3d Cir. 1992)................................................................................................19, 20

Callejo v. Bancomer, S.A.,
    764 F.2d 1101 (5th Cir. 1985) ..................................................................................................34

Cooper's Home Furnishings, Inc. v. Lolly,
    270 A.2d 676 (Del. Super. 1970)........................................................................................17, 35

D'Angelo v. Petroleos Mexicanos,
    378 F. Supp. 1034 (D. Del. 1974)........................................................................................23, 24

First State Bank v. Burton,
    64 So. 2d 421 (La. 1953) ..........................................................................................................26

Harris v. Balk,
    198 U.S. 215 (1905)...................................................................................................................26

Hospital of St. Raphael v. New Haven Savings Bank,
    534 A.2d 1189 (Conn. 1987) .....................................................................................................26

Iglehart v. Moore,
    21 Tex. 501 (Tex. 1858) ...........................................................................................................26

Interamerican Refining Corp v. Texaco Maracaibo, Inc.,
    307 F. Supp. 1291 (D. Del. 1970).............................................................................................32

K-M Automobile Supply, Inc. v. Reno,
    236 A.2d 706 (Del. 1967) ..........................................................................................................35

LNC Investments, Inc. v. Republic of Nicaragua,
    No. 01-134-JJF (D. Del. 2002),
    appeal dism'd, 396 F.3d 342 (3d Cir. 2005) .................................................24, 25, 26, 27, 28

McNeilly v. Furman,
    95 A.2d 267 (Del. 1953) ................................................................................................22, 24

O'Leary v. Liberty Mutual Insurance Co.,
    923 F.2d 1062 (3d Cir. 1991)................................................................................................21

P.J Noyes Co. v. Frost,
    170 A. 493 (R.I. 1934) ..........................................................................................................26

Philippine National Bank v. United States District Court,
    397 F.3d 768 (9th Cir. 2005) ....................................................................................30, 31, 32

Raytech Corp. v. White,
    54 F.3d 187 (3d Cir. 1995)....................................................................................................20

Reebok Intern. Ltd. v. McLaughlin,
    49 F.3d 1387 (9th Cir. 1995) ...............................................................................................29

Rush-Presbyterian-St. Luke's Medical Ctr. v. Hellenic Republic,
    877 F.2d 574 (7th Cir. 1989) ........................................................................................27, 31

Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,
    549 F.2d 597 (9th Cir. 1976) ...............................................................................................32

Underhill v. Hernandez,
    168 U.S. 250 (1897)..............................................................................................................30

W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International,
    493 U.S. 400 (1990)..............................................................................................................30

Walker v. Horn,
    385 F.3d 321 (3d Cir. 2004)..................................................................................................19

Weitzel v. Weitzel,
    27 Ariz. 117, 230 P. 1106 (Ariz. 1924) ...............................................................................25

West v. Baker,
    510 P.2d 731 (Ariz. 1973).....................................................................................................26

Wilmington Trust Co. v. Barron,
    470 A.2d 257 (Del. 1983) ...........................................................................................23, 24, 35

World Wide Minerals, Ltd. v. Republic of Kazakhstan,
    296 F.3d 1154 (D.C. Cir. 2002) .........................................................................................27, 31

## STATUTES AND RULES

Foreign Sovereign Immunities Act,
    28 U.S.C. §§1609, 1610................................................11, 20, 21, 28, 29, 30, 33, 34

10 *Del. C.* § 3509  .................................................................................................................17, 18

Fed. R. Civ. P. 70...................................................................................................................13

Fed. R. Civ. P. 81(c) .............................................................................................................3, 4, 16

## TREATISES

6 Am. Jur. 2d, Attachment and Garnishment § 111.......................................................22

38 C.J.S. Garnishment § 105 ...............................................................................................21

Restatement (Third) of Foreign Relations Law of the United States,
    Section 441.....................................................................................................................28, 29, 30

CMS Nomeco Congo Inc. (now named CMS Nomeco Congo LLC) ("CMS Nomeco") files this Answering Brief in Opposition to Af-Cap's Motion for Summary Judgment. In addition, CMS Nomeco has cross-moved for summary judgment, and this is also the Opening Brief in support of that Motion. CMS Nomeco requests that the Court deny Af'-Cap's motion, grant CMS Nomeco's cross-motion and dismiss this garnishment action.

## NATURE AND STAGE OF PROCEEDINGS

Over a period of almost five years, CMS Nomeco, the operator under a concession with the Republic of Congo ("the Congo") for the production of oil in Congolese territorial waters, has been forced to defend multiple garnishment actions filed in multiple district courts by multiple judgment creditors of the Congo, seeking to collect judgments against the Congo on bad debts purchased for pennies on the dollar. CMS Nomeco is an innocent third party not involved in the underlying debt transactions who finds Af-Cap's new garnishment action in yet another jurisdiction an absolute outrage and an affront to the U.S. courts.

The judgment creditors in the various jurisdictions, and now Af-Cap here, seek to garnish the in-kind oil royalty of the Congo that the Congo is entitled to take under the concession agreement in its own territorial waters. The in-kind royalty oil is produced in Congolese territorial waters, transported through an underwater pipeline system in those waters, and taken on behalf of the Congo by the Congo's state-owned oil company from a storage terminal that sits in Congolese territorial waters.

The Congo has steadfastly refused to acknowledge the authority of the United States courts to garnish its property and has taken the position that CMS Nomeco will be in default of its contractual obligations under the concession agreement if the Congo is restricted from taking liftings of its in-kind royalty oil. The Congo and its state-owned oil company have sought and obtained court orders from a Congolese court, requiring that CMS Nomeco, as

operator of the storage terminal, deliver the Congo's oil, notwithstanding any U.S. garnishment writs.

Nonetheless, Af-Cap, a vulture fund in the business of acquiring the bad debts of distressed foreign countries at pennies on the dollar, continues to seek to collect the Congo's bad debts from CMS Nomeco through enforcement of garnishment writs. In February 2005, in garnishment litigation filed by Af-Cap against CMS Nomeco in Texas, the United States District Court for the Western District of Texas dissolved garnishment writs issued at Af-Cap's request in that litigation and dismissed all claims against CMS Nomeco. The court correctly held that, as a matter of state law, non-monetary obligations are not subject to garnishment.

Having lost in Texas, Af-Cap moved its garnishment efforts to Delaware. Even though it was fully aware of the Congo court's actions, and without disclosure of the existence of the Congo court orders or of the dismissal of its earlier garnishment action against CMS Nomeco in Texas, Af-Cap sought and obtained from the Delaware Superior Court a writ of garnishment directed to CMS Nomeco, falsely representing that the writ was "unopposed." The writ was served on CMS Nomeco's registered agent in Delaware on October 12, 2005. In seeking to enforce a writ of garnishment against CMS Nomeco, in the face of contrary Congo court orders, Af-Cap is attempting to impose double liability on CMS Nomeco, which has no choice but to permit the Congo to take its royalty oil that is produced, stored, and taken in Congolese waters. Af-Cap has never suggested, nor can it suggest, how CMS Nomeco could deliver oil for the benefit of Af-Cap in the face of the contrary mandates of the Congolese government and the courts of the Congo.

On November 1, 2005, CMS Nomeco removed the garnishment action to this Court (D.I. 1), and in compliance with the time requirements for filing its answer in this removed

action under Fed. R. Civ. P. 81(c), it filed and served its Answer to the Writ of Garnishment

(D.I. 2) the next day, November 2, 2005.  Af-Cap then filed its Motion to Remand Action

(D.I. 3) on November 9, 2005, to which CMS Nomeco timely responded on November 23, 2005

(D.I. 5).  On November 17, 2005, Af-Cap filed its Exceptions to CMS Nomeco's Answer

(D.I. 4), arguing, among other things, that CMS Nomeco failed to verify its Answer.  On

November 23, 2005, CMS Nomeco filed a motion for leave to amend its answer to add a

verification (D.I. 6).  Despite the pendency of its Motion to Remand Action, Af-Cap filed on

November 30, 2005 its Motion for Summary Judgment (D.I, 7) and its Opening Brief in support

of that motion (D.I. 8).

    CMS Nomeco has now cross-moved for summary judgment.  This is CMS

Nomeco's Answering Brief in Opposition to Af-Cap's Motion for Summary Judgment and

Opening Brief in support of its own Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

Af-Cap is attempting to impose liability on CMS Nomeco, an innocent third party not involved in the debt transaction giving rise to the judgment that Af-Cap allegedly holds against the Congo, for the full amount of that multi-million dollar judgment. Having lost its attempt to obtain a garnishment judgment against CMS Nomeco in Texas, Af-Cap is seeking a second bite at the apple in this Court. Its actions in this Court evidence a desperate attempt to avoid a decision on the merits, with Af-Cap focusing its arguments on alleged procedural defects concerning the timing and form of CMS Nomeco's answer and collateral estoppel principles arising out of a judgment that was adverse to Af-Cap, not CMS Nomeco. In making those technical arguments, Af-Cap is seeking to prevent this Court from applying the controlling legal principles that doom Af-Cap's garnishment efforts.

Af-Cap's technical arguments are frivolous. CMS Nomeco's answer was indisputably timely under Fed. R. Civ. P. 81(c), which permits the filing of an answer in a removed action within five days after the notice of removal is filed. The answer in this case was timely filed one day after the filing of the notice of removal. Nor does CMS Nomeco's failure to attach a verification to its detailed answer provide a basis for Af-Cap to collect from CMS Nomeco a multi-million dollar monetary judgment against the Congo. CMS Nomeco promptly moved for leave to amend its answer to cure the failure by attaching a verification to its timely-filed answer, and Af-Cap has made no showing, and cannot make any showing, of any prejudice associated with the verification issue. In any event, Delaware law is clear that a garnishor's sole remedy for a garnishee's failure to answer a writ of garnishment is an order compelling the filing of an answer. Af-Cap's contention that it is entitled to a default judgment against CMS Nomeco by virtue of the alleged defect in the answer is directly refuted by Delaware statutory and case law and is therefore frivolous.

Af-Cap's willingness to misrepresent the facts and law is further evidenced by its collateral estoppel argument. Af-Cap argues that CMS Nomeco is collaterally estopped from litigating all of the defenses raised in its answer, by virtue of the Fifth Circuit's decision in <u>Af-Cap, Inc. v. Republic of Congo</u>, 383 F.3d 361 (5th Cir.), <u>modified on rehearing</u>, 389 F.3d 503 (5th Cir. 2004), <u>cert. denied</u> 125 S.Ct. 1735 (2005). That contention is baseless because: (1) the Fifth Circuit addressed only FSIA issues based on the record before it and remanded the case for further proceedings; (2) on remand, CMS Nomeco raised a number of non-FSIA defenses; (3) after remand the Western District of Texas *ruled in favor of CMS Nomeco and entered a judgment against Af-Cap, dismissing Af-Cap's garnishment action* holding, *as a matter of state law*, non-monetary obligations are not subject to garnishment, (4) the Western District of Texas specifically rejected Af-Cap's argument that the Fifth Circuit had resolved non-FSIA defenses; and (5) a number of CMS Nomeco's defenses are based on Congo court orders issued months after the Fifth Circuit decided <u>Af-Cap.</u>

The essence of Af-Cap's collateral estoppel argument is that the Texas litigation precludes CMS Nomeco from asserting in this case the very defense that CMS Nomeco *won on* in the Texas case. Af-Cap further argues that CMS Nomeco is precluded from raising other defenses that are based on Congo court orders that did not even exist at the time of the Fifth Circuit decision purportedly giving rise to Af-Cap's collateral estoppel assertions here. As these facts demonstrate, it is Af-Cap (the loser in Texas), not CMS Nomeco, that should be precluded from relitigating issues already decided in Texas.

Upon a review of the merits of the legal issues presented in this case, it is apparent why Af-Cap seeks to avoid a decision on the merits. The Delaware Supreme Court, consistent with the decision of the Western District of Texas, has held that only fixed monetary

obligations are subject to garnishment. Additionally, this Court has held, as a matter of Delaware garnishment law, that a garnishment writ must be quashed when the garnishment will not provide a defense to the garnishee's performance of obligations owed to a foreign government under the law of that foreign government. Here, a Congolese court has already ruled as a matter of Congolese law (which governs CMS Nomeco's contractual relationship with the Congo) that the Congo is entitled to take its royalty oil in Congolese waters, notwithstanding any orders or garnishment writs issued by U.S. courts. The Congolese court has, on two occasions, ordered CMS Nomeco, as operator of the storage terminal where the oil is stored, to deliver the Congo's royalty oil to the Congo's state-owned oil company, holding that the U.S. orders and writs provide no defense to CMS Nomeco, and directing the use of public force in the event of non-compliance. CMS Nomeco, which is producing oil in Congolese waters, has no choice but to comply with Congolese law and with the Congo court orders issued in the jurisdiction in which it operates. Despite its efforts to characterize CMS Nomeco as a "mere stakeholder," Af-Cap is fully aware, by virtue of the Congo court orders, that CMS Nomeco cannot avoid the Congo's lifting of its royalty oil, yet it nevertheless seeks a garnishment judgment against CMS Nomeco. Af-Cap is affirmatively attempting to impose double liability on CMS Nomeco in this case, notwithstanding the fact that Delaware law precludes such a result.

The Congo court orders also mandate the dismissal of this garnishment action on other legal grounds. Under the doctrine of "foreign state compulsion," preference among conflicting commands of the courts of different nations is accorded to the orders of the nation in which the act is to be done or not to be done. In this case, such preference must be given to the Congo court orders since the oil is produced, stored, and lifted in the Congo.

Af-Cap's argument in response to this defense is its contention that the Fifth Circuit rejected the argument but, again, that argument is frivolous. The Fifth Circuit did not address and could not have addressed the foreign state compulsion argument, as the Congo court orders had not even been issued when the Fifth Circuit rendered its decision.

The same is true of CMS Nomeco's act of state defense that is based on the Congo court orders. If this Court were to enforce the writ against CMS Nomeco, it necessarily would be required to sit in judgment of the conduct of the Congo and its courts within the Congo's own territory in compelling CMS Nomeco to deliver oil to the Congo's state-owned oil company in Congolese waters. Enforcement of a garnishment writ in these circumstances would violate the act of state doctrine because, as the Ninth Circuit has held in an analogous case involving an order of a Philippine court, the act of state doctrine prevents district courts in this country from ordering a private party to take action that is inconsistent with the order of a foreign court obtained upon the application of the foreign government in the exercise of its governmental interests. Again, Af-Cap's argument that the Fifth Circuit rejected this argument is demonstrably false, as the Congo court orders that are the basis of the act of state defense were not issued by the Congolese court until months after the Fifth Circuit's decision.

Yet, even if Af-Cap could overcome all of these controlling legal principles that preclude garnishment of the Congo's in-kind royalty, the writ served on October 12, 2005 would entitle Af-Cap to no judgment against CMS Nomeco because the Congo was not entitled to take any royalty oil on the date of service of the writ, on the answer date for the writ, or on any date in between. Under Delaware garnishment law, a garnishment writ only captures an obligation that is owed to the judgment debtor at the time the writ is served or that becomes owing between the service date and the answer date.

Furthermore, the garnishor has no greater rights than the judgment debtor against the garnishee with regard to any such obligation. As shown in CMS Nomeco's answer, and as confirmed by the evidence attached to this motion, the Congo's state-owned oil company took a lifting of royalty oil in September 2005, and under the agreements between the parties, the Congo will not be entitled to take another lifting of royalty oil until sometime in 2006. At the time of the service of the writ on October 12, 2005 and at all times since service of the writ, the Congo has not been entitled to take any in-kind royalty oil. Af-Cap would be entitled to no greater rights, even if it could overcome all of the other legal principles that preclude garnishment of the Congo's royalty, which it cannot.

In summary, Af-Cap obtained the garnishment writ in this case without disclosing the adverse judgment on its identical garnishment action in Texas and without disclosing the existence of Congo court orders mandating, as a matter of Congolese law, that CMS Nomeco deliver the Congo's royalty oil notwithstanding any U.S. garnishment writs. Af-Cap's technical arguments, which sidestep law mandating dissolution of the writ and dismissal of this case, are frivolous. Under the controlling legal principles summarized above and discussed in detail below, Af-Cap's motion for summary judgment should be denied, CMS Nomeco's cross-motion for summary judgment should be granted, the writ of garnishment dissolved, and this garnishment action dismissed.

STATEMENT OF FACTS[1]

I.  **CMS Nomeco, Two Other Private Companies, and the Congo's State-Owned Oil Company are the Working Interest Owners under a Convention for the Production of Oil in the Congo**

CMS Nomeco, The Nuevo Congo LLC, Nuevo Congo Ltd., and Société Nationale des Pétroles du Congo ("SNPC," the Congolese state-owned oil company) are the current working interest owners[2] under a Convention for oil production in Congolese waters ("the Convention"). CMS Nomeco is the current operator under the Convention. Although CMS Nomeco is incorporated in Delaware, it has no business activities, officers, directors, employees, or physical offices in the United States. The business activity of CMS Nomeco is focused on the oil production activities that are ongoing in the Congo.

II.  **Under the Convention, the Congo is Entitled to Lift its In-Kind Royalty Oil, Which is Produced, Stored, and Lifted in Congolese Territorial Waters**

The Convention entitles the Congo to receive royalties. Ex. 1 to Ex. A, Art. 7. Under Article 7, the Congo may elect to receive royalties in cash or in-kind. Id. In 1999, the Congo changed its election to an in-kind election and has not changed its election since that time. Ex. A ¶3; Ex. 2, ¶11 to Ex. A ¶11.

The Convention was executed in the Congo and is governed by Congolese law. Ex. A, ¶4; Ex. 1, §18 to Ex. A. The oil is extracted from the submerged seabed adjacent to the Congo's coast, in areas within the Congo's exclusive jurisdiction under Congolese and

---

[1]  In most respects, the facts described herein are established by the Declaration of Maryse Bernard attached hereto as Exhibit A and the exhibits thereto.

[2]  A working interest in an oil exploration and production venture typically is an interest in which the holder has the right to explore for, develop, and produce oil and is required to bear its proportionate share of costs associated with those activities. Often in the context of oil concessions such as that involved in this case, the government will insist that its state-owned oil company hold a working interest, but under the terms of the applicable agreements, the state-owned oil company's share of costs will be advanced by the private working interest owners, to be reimbursed out of a portion of the state-owned oil company's proportionate share of production.

international law. Ex. A, ¶4; Ex. 1 (p. GAR00088) to Ex. A. The oil flows through a subsurface pipeline system to a storage vessel, known as the "Conkouati," floating in Congolese coastal waters. Ex. A, ¶4. A lifting occurs when oil is offloaded from the Conkouati onto a vessel nominated by the buyer of the oil. Id. CMS Nomeco and the other private working interest owners take liftings of oil stored on the Conkouati for their own account, and sell 100% of the oil so lifted for their own account. Id.

CMS Nomeco, as operator, calculates the effect of liftings on the over- or under-lifted position of SNPC and the Congo, on a barrel basis, and records that effect on an "over/under statement." Id., ¶5. Once the combined under-lifted position of SNPC and the Congo reaches at least 275,000 barrels, SNPC may schedule and take a lifting of oil for itself and the Congo. Id. When SNPC takes a lifting, SNPC sells, for its own and the Congo's account, all the barrels it lifts. Id. The SNPC lifting satisfies the Congo's in-kind royalty and puts SNPC into an over-lifted position. Id. CMS Nomeco and the other private working interest owners take liftings until the combined under-lifted position of SNPC and the Congo again exceeds 275,000 barrels, when SNPC may schedule, take, and sell another lifting of oil for itself and the Congo, again satisfying the Congo's in-kind royalty and again putting SNPC into an over-lifted position. Id.

## III.  Af-Cap's Alleged Predecessor-in-Interest Attempts to Garnish the In-Kind Royalty in Texas

The alleged predecessor-in-interest of Af-Cap, Connecticut Bank of Commerce, filed a garnishment action in Texas in January 2001, seeking to garnish royalty and taxes owed by CMS Nomeco and the other private working interest owners under the Convention. That action was removed to the United States District Court for the Western District of Texas. The district court dismissed the action on the grounds that the attempted garnishment violated the

execution provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. §§1609, 1610 ("FSIA"). In September 2004, after Af-Cap had been substituted as plaintiff for Connecticut Bank of Commerce, the Fifth Circuit held that the FSIA did not protect from garnishment the royalty Af-Cap sought to garnish in part because CMS Nomeco was "formed and headquartered" in the United States at the time the district court entered its dismissal order, and the Fifth Circuit remanded the case for further proceedings. Af-Cap, 383 F.3d at 372-373, modified on rehearing, 389 F.3d 503. Shortly after remand, the district court issued writs of garnishment in favor of Af-Cap. Writs also were issued in other litigation against CMS Nomeco filed by other judgment creditors in federal courts in Houston and Dallas. Walker International Holdings Limited (another judgment creditor of the Congo represented by the same counsel as Af-Cap) also filed a garnishment action against CMS Nomeco in the Western District of Texas (the same court where Af-Cap's garnishment action was pending), but Walker did not pursue that garnishment action, and no writs were served.

## IV.    The Congo and its State-Owned Oil Company Obtain Court Orders from a Congolese Court Compelling CMS Nomeco to Deliver Oil in Congolese Waters

On December 28, 2004, a court sitting in the Congo, upon applications by the Congo and SNPC, entered two orders requiring that CMS Nomeco, as operator of the storage terminal, deliver working interest oil and royalty oil to SNPC. Ex. A and Exs. 3 and 4 thereto. CMS Nomeco received virtually no notice of the Congolese court proceedings; at approximately 1:00 p.m. on the afternoon of December 28, 2004, a court representative and two representatives of SNPC arrived at the offices of CMS Nomeco in Point Noire, Congo and informed CMS Nomeco's acting operations manager that he was required to attend a hearing at the court that

afternoon. Ex. B.[3] Upon such short notice, the acting operations manager was unable to obtain legal counsel for the hearing. Id. At the hearing on the afternoon of December 28, 2004, the Congolese court issued the orders requiring delivery of the oil. Id.

CMS Nomeco's president was in Brazzaville, Congo on December 28, 2004 to inform government officials of the decision to not allow a lifting of oil in light of writs issued by U.S. courts. She was informed that public force would be used if the lifting of oil by SNPC was not allowed to take place. Ex. A, ¶6. The Director General of the Congo's Ministry of Hydrocarbons showed CMS Nomeco's president copies of the Congo court orders and told her that she would be detained until the lifting of oil was completed. Id. Based on these events, CMS Nomeco's president authorized the operations manager to give instructions to permit the lifting of oil. Id. On December 28-29, 2005, SNPC took a lifting of 550,032 barrels of oil, which included SNPC working interest oil as well as the Congo's royalty oil, thereby extinguishing any in-kind royalty arguably subject to any pending writs. Id.

## V.    The Western District of Texas Dismisses Af-Cap's Texas Garnishment Action

On February 4, 2005, the district court in the Western District of Texas dismissed Af-Cap's garnishment action against CMS Nomeco, holding that the royalty was a non-monetary obligation that was not subject to garnishment under Texas law. Exs. 5 and 6 to Ex. A. Af-Cap appealed the dismissal, and that appeal is pending in the Fifth Circuit Court of Appeals.

## VI.   The Western District of Texas Enters Turnover Orders Against the Congo

In separate proceedings to which CMS Nomeco was not a party, the court in the Western District of Texas entered turnover orders against the Congo in favor of Af-Cap and

---

[3] Exhibit B is the declaration of CMS Nomeco's acting operations manager on December 28, 2004, which was filed in a federal court lawsuit in the Southern District of Texas in which another judgment creditor of the Congo has attempted to garnish the Congo's royalty.

Walker, ordering the Congo to sign instruction letters directed to CMS Nomeco and the other private working interest owners under the Convention, first in favor of Af-Cap and subsequently in favor of Walker. Under the instruction letters the Congo was ordered to sign, the Congo would have (1) elected to take its royalty in cash, and (2) directed CMS Nomeco and the other working interest owners to pay the allegedly cash royalty into the registry of the court for the Western District of Texas. The Congo refused to sign the instruction letters and sent a letter to the district court explaining its reasons for that refusal. Ex. 7 to Ex. A.

Subsequently, the district court in the Western District of Texas issued orders under Rule 70 of the Federal Rules of Civil Procedure, directing the clerk of the Court to sign the instruction letters on behalf of the Congo and to send them to Mr. Guy Lipe, the attorney who had represented CMS Nomeco and the other working interest owners in the garnishment action that had been dismissed in February 2005. The letters were not sent by the clerk to any representative of CMS Nomeco authorized to receive the Congo's royalty elections or other notices under the Convention.

## VII.   In July 2005, the Congo and SNPC Obtain New Orders Against CMS Nomeco Requiring Delivery of Oil in Congolese Waters

On July 4, 2005, a Congo court in Point Noire, Congo, again upon applications filed by the Congo and SNPC, issued orders against CMS Nomeco holding that under Congolese law, the Congo's royalty oil and SNPC's working interest oil could not be subject to attachment and that the turnover orders of the Texas federal court and other U.S. court orders in proceedings by judgment creditors of the Congo relating to the oil violated the Congo public order and were not enforceable in the Congo. The Congo court held that CMS Nomeco was obligated to deliver the Congo's royalty oil and SNPC's working interest oil to SNPC, notwithstanding the U.S. court proceedings and orders issued in those proceedings. Exs. 8 and 9 to Ex. A.

VIII.  **Af-Cap and Walker File a Delaware Lawsuit Against CMS Nomeco in Delaware Chancery Court, and Af-Cap Seeks Contempt Sanctions Against CMS Nomeco in the Western District of Texas**

On July 11, 2005, Af-Cap and Walker filed a lawsuit against CMS Nomeco in Delaware Chancery Court, now claiming that CMS Nomeco had violated the instruction letters by failing to pay the allegedly cash royalty into the registry of the court in the Western District of Texas. Ex. A, ¶11. On July 21, 2005, Af-Cap filed a motion in the Western District of Texas for issuance of a show cause order against CMS Nomeco and the other private working interest owners, claiming that their failure to pay royalty in cash into the registry of the court on July 20, 2005 (the date Af-Cap contended to be the first royalty payment date following the effective date set out in the instruction letter in the *Af-Cap* case) violated the court's turnover order and instruction letter and was a contempt of court. *See* Ex. 10 to Ex. A.

IX.  **The Western District of Texas Denies Af-Cap's Contempt Motion Against CMS Nomeco and the Other Working Interest Owners**

On July 26, 2005, the court in the Western District of Texas denied Af-Cap's motion for a show cause order, finding that the turnover orders were not court orders directed to CMS Nomeco and could not adjudicate the substantive rights and obligations of CMS Nomeco under the Convention. Ex. 10 to Ex. A. Af-Cap subsequently filed a motion seeking issuance of new writs against CMS Nomeco, which was denied by the court in the Western District of Texas, by Order dated August 17, 2005. Ex. 11 to Ex. A.

X.  **Having Failed in Their Efforts to Obtain Relief Against CMS Nomeco in Texas, Af-Cap and Walker Seek Garnishment Writs Against CMS Nomeco in New Actions in Delaware**

Approximately two weeks after the Western District of Texas denied Af-Cap's request for new writs, Af-Cap and Walker initiated separate actions in Delaware seeking to

enforce the judgments against the Congo, and asking for issuance of new garnishment writs directed to CMS Nomeco. Af-Cap filed its action in the Superior Court and Walker filed in this Court. Af-Cap presented its motion for a garnishment writ to the Superior Court as "unopposed," obtaining issuance of the writ, without disclosing the dismissal of its identical garnishment proceedings in Texas. Following service of the writ, CMS Nomeco removed the Superior Court action to this Court.

## XI.   The Congo Was Not Entitled to Take Any Royalty Oil At the Time of Service of the Writ of Garnishment or as of the Answer Date

On September 7, 2005, several weeks prior to issuance and service of the writ at issue in this case, SNPC took a lifting of the Congo's royalty oil and SNPC's working interest oil totaling 605,006 barrels, leaving SNPC in an over-lifted position with regard to its working interest oil and extinguishing the Congo's royalty entitlement. Ex. A, ¶13. As discussed above, SNPC is entitled to take a lifting of the Congo's royalty oil and its own working interest oil only when the combined under-lifted position of the Congo (with regard to royalty oil) and SNPC (with regard to working interest oil) exceeds 275,000 barrels. Ex. A, ¶5. The garnishment writ in this case was served on October 12, 2005, and on that date, on the date the answer to the October 12, 2005 writ was filed, and at all times in between, neither the Congo nor SNPC had any right to take a lifting of oil, as the Congo and SNPC were in a combined over-lifted position during that time period. Ex. A, ¶13 and Ex. 12 thereto. Under the terms of the agreements, SNPC will not have any right to take another lifting of the Congo's royalty oil and SNPC's working interest oil until sometime in 2006. Id.

Because Af-Cap's procedural arguments are frivolous and the law dictates dismissal of this action, Af-Cap's motion for summary judgment should be denied and CMS Nomeco's cross motion for summary judgment should be granted.

ARGUMENT

## I.    Af-Cap's Procedural Arguments Are Frivolous

Af-Cap argues that it is entitled to a money judgment against CMS Nomeco, as garnishee, for the full amount of its judgment against the Congo, based on its allegations that (1) CMS Nomeco purportedly filed its answer a day late, and (2) CMS Nomeco neglected to attach a verification to its answer. Af-Cap's arguments are frivolous.

With regard to the timing of the answer, CMS Nomeco filed its Notice of Removal on November 1, 2005, twenty days after service of the writ on October 12, 2005. The next day, on November 2, 2005, CMS Nomeco filed its Answer, in compliance with the time requirements of Fed. R. Civ. P. 81(c), which allows the filing of an answer in a removed case within five days of the filing of the notice of removal. Specifically, Rule 81(c) states, in pertinent part: "In a removed action in which the defendant has not answered, the defendant shall answer or present the other defenses or objections available under these rules within 20 days after the receipt through service or otherwise of a copy of the initial pleading setting for the claim for relief upon which the action or proceeding is based, or within 20 days after the service of summons upon such initial pleading, then filed, *or within 5 days after the filing of the petition for removal, whichever period is longest.* Fed. R. Civ. P. 81(c) (emphasis added). CMS Nomeco has pointed out in a prior filing that Rule 81(c) absolutely establishes that CMS Nomeco's answer was timely,[4] yet Af-Cap continues to press its untimeliness argument, without any effort to address the clear language of Rule 81(c). The untimeliness argument is patently without merit.

---

[4] *See* CMS Nomeco's Answering Brief in Opposition to Af-Cap's Motion to Remand Action (D.I. 5), at 10 n.2.

The same is true of Af-Cap's argument concerning the verification requirement. CMS Nomeco's answer fully responded to the writ and raised defenses. Though CMS Nomeco neglected to attach a verification to the Answer, CMS Nomeco promptly filed a motion for leave to amend its answer to add the missing verification. Af-Cap acknowledges in its motion for summary judgment that such a motion has been filed, yet it fails to make any showing that the granting of leave will prejudice it in any way. Af-Cap has cited no authority supporting its extreme contention that the failure to attach a verification to a garnishee's answer cannot be cured by amendment and requires entry of a monetary default judgment against the garnishee.

In fact, Delaware law directly refutes Af-Cap's contention. Specifically, 10 *Del. C.* § 3509 provides that even when a garnishee does not file *any* answer to a writ of garnishment, the only remedy available to the plaintiff / judgment creditor is to force the garnishee to file such an answer. Section 3509 provides, "If any garnishee, duly summoned shall not appear as required, he may be compelled, by attachment, to appear and answer or plead." Thus, section 3509 permits a plaintiff / judgment creditor to force a garnishee to answer the writ of garnishment, but it does not allow any other remedy, even against a garnishee who has completely ignored the writ.

Delaware case law has upheld the plain meaning of section 3509. In *Cooper's Home Furnishings, Inc. v. Lolly*, 270 A.2d 676 (Del. Super. 1970), the plaintiff, Cooper's, obtained judgments against two individuals who had bought furniture on credit but had failed to make their payments. Cooper's then garnished the debtors' wages from their employer, the City of Wilmington. However, the City never answered the writ of garnishment. Instead, the City turned over to the Sheriff, for delivery to Cooper's, amounts that purported to equal 10% of each employee's paycheck, the percentage of the wages that could be garnished under Delaware law

at that time, see 10 Del. C. § 4913. Cooper's filed a motion to require the City to plead in

response to the writs of garnishment. Relying upon section 3509, the Superior Court granted the

motion and required the City to answer the writ of garnishment. No other relief was granted

against the City, despite the default in answering the writ of garnishment. Id. at 678-79.

The facts here are far less extreme. Here, CMS Nomeco did not ignore the writ of

garnishment, as the City had in Cooper's, but instead filed an extensive Answer to the writ of

garnishment. Unlike Cooper's, which did not know the City of Wilmington's position in

response to the writ, Af-Cap knows CMS Nomeco's exact position in response to the writ of

garnishment. The lack of a verification, a technical issue that CMS Nomeco seeks to cure by

motion for leave to amend, entitles Af-Cap to no relief against CMS Nomeco, and it certainly

does not require a multi-million dollar default judgment against CMS Nomeco for the full

amount of the Congo's alleged debt.

## II.    Collateral Estoppel Principles Do Not Bar CMS Nomeco's Defenses, and Delaware Law Requires Dismissal Because Delaware (Like Texas) Precludes Garnishment of Non-Monetary Obligations

As a further effort to avoid a decision on the merits, Af-Cap argues that CMS

Nomeco is barred by collateral estoppel from litigating its defenses to the garnishment writ by

virtue of the Texas litigation. This argument is remarkable, in light of the fact that the Western

District of Texas *dismissed* Af-Cap's garnishment action *on one of the very defenses raised in

CMS Nomeco's answer in this case.* The "final judgment" in the Texas litigation, which is a

basic requirement for application of collateral estoppel in subsequent litigation, was in favor of

CMS Nomeco, not Af-Cap.

As such, Af-Cap's collateral estoppel argument violates a fundamental

requirement of that doctrine. As the Third Circuit has held, a decision on an issue in prior

-18-

litigation between the parties can have preclusive effect *only if* the decision of the court in the earlier case was "necessary to its judgment." Walker v. Horn, 385 F.3d 321, 336 (3d Cir. 2004). The final judgment of the Western District of Texas dismissed the garnishment action and provided CMS Nomeco with all the relief it sought in the case. To the extent any alternative grounds for dismissal were resolved against CMS Nomeco in the Texas litigation, the resolution of those issues was not "necessary to [the] judgment," as the final judgment in the case was a dismissal of the case against CMS Nomeco on a state-law ground independent of any other issue.

Furthermore, Af-Cap has not and cannot establish another critical element of collateral estoppel. The case relied on by Af-Cap in its Exceptions to CMS Nomeco's Answer proves this point. In its Exceptions, Af-Cap cited the Third Circuit's decision in Board of Trustees v. Centra, 983 F.2d 495, 505-506 (3d Cir. 1992) as setting out the elements for application of collateral estoppel. In that case, the Third Circuit specifically held that collateral estoppel applies only if "*the identical issue* was decided in a prior adjudication." 983 F.2d at 506 (emphasis added). Because none of CMS Nomeco's non-FSIA defenses were decided adversely to CMS Nomeco in the Texas litigation, collateral estoppel cannot apply to bar any of those defenses.

A review of the Fifth Circuit's opinion confirms that the Fifth Circuit only addressed FSIA immunity issues and remanded the garnishment action to the district court for further proceedings. Id. at 364, 368, 371-373. The Western District's decision on remand specifically confirms that (1) the Fifth Circuit's decision only addressed FSIA issues, (2) the state law defenses were not affected by the Fifth Circuit's decision, and (3) the state law defenses were appropriately presented for decision on the merits by the district court. Ex. 5 to Ex. A at 16. Af-Cap's argument that the Fifth Circuit decided the state law defenses was expressly

rejected by the district court in the Texas litigation, and Af-Cap itself is precluded from

relitigating that issue in this Court under the test set out in <u>Centra</u>.

Even with regard to the FSIA issues, which were the subject of a decision by the

Fifth Circuit in <u>Af-Cap</u>, <u>Centra</u>'s "identity" test is not satisfied, since the controlling facts that

formed the basis for the Fifth Circuit's FSIA holding have substantially changed. As the Third

Circuit has recognized, "collateral estoppel is inappropriate if facts essential to the earlier

litigated issue have changed." <u>Raytech Corp. v. White</u>, 54 F.3d 187, 190 (3d Cir. 1995). The

Fifth Circuit specifically predicated its FSIA holding on its conclusion that CMS Nomeco had its

"situs" in the United States, because it was "formed and headquartered" in the United States,

based on the facts in existence at the time of the April 2003 decision of the district court being

reviewed. 383 F.2d at 372-373. However, those circumstances had dramatically changed by the

fall of 2005, when Af-Cap obtained a garnishment writ against CMS Nomeco in Delaware.

Specifically, as shown by the Declaration of Maryse Bernard attached hereto as

Exhibit A, CMS Nomeco currently has no activities, no offices, and no personnel in and is not

"headquartered" in the United States. Ex. A, ¶2. While Af-Cap may now argue that CMS

Nomeco's incorporation in Delaware alone is sufficient to render the in-kind royalty property "in

the United States" for purposes of the FSIA, the Fifth Circuit did not address, and was not

required to address, that issue.

The rule that collateral estoppel is inappropriate if the essential facts have

changed further demonstrates the frivolous nature of Af-Cap's collateral estoppel arguments with

regard to CMS Nomeco's defenses based on the Congo court orders. Those orders were issued

by the Congo court in December 2004 and July 2005. The Fifth Circuit's decision was rendered

in September 2004, months before the Congo court orders were issued. Af-Cap can make no

legitimate argument that the Fifth Circuit decided the "identical" issue presented by CMS Nomeco's defenses, or that the essential facts with regard to those defenses have not changed since the Fifth Circuit's decision, because the Congo court orders did not even exist when the Fifth Circuit rendered its decision.

It is Af-Cap, not CMS Nomeco, who is barred by collateral estoppel principles. As shown in the order dated February 4, 2005 of the Western District of Texas (Ex. 5 to Ex. A at 11-19), and its Final Judgment of that same date (Ex. 6 to Ex. A), the district court in the Texas litigation decided one of CMS Nomeco's defenses (CMS Nomeco's argument that non-monetary obligations are not subject to garnishment) in favor of CMS Nomeco and against Af-Cap. That decision specifically formed the basis of the court's judgment dismissing Af-Cap's action. The fact that Af-Cap has appealed the decision of the Western District of Texas does not enable Af-Cap to avoid the preclusive effect of the adverse judgment rendered by that Court. O'Leary v. Liberty Mut. Ins. Co., 923 F.2d 1062, 1066 n.6 (3d Cir. 1991) (a pending appeal does not vitiate the preclusive effect of a trial court judgment). Furthermore, as shown below, the fact that Delaware law is at issue here, rather than Texas law, does not provide Af-Cap with a means of escape.

It is established law in the United States that in the "absence of specific statutory sanction, obligations other than for the payment of money are generally not subject to garnishment prior to a default which gives the debtor a cause of action for money." 38 C.J.S. Garnishment § 105. Indeed, it is "a rule of wide acceptance, at least in the absence of statutory provision to the contrary, . . . that only debts payable in money are attachable." 6 Am. Jur. 2d, Attachment and Garnishment § 111. The Western District applied this rule and held that nothing in the Texas garnishment statutes provides for garnishment of non-monetary obligations.

Similarly, the Delaware garnishment statute does not provide for garnishment of such obligations.

Although the Delaware garnishment statute permits garnishment of "rights and credits," the Delaware Supreme Court has held that with regard to the phrase "rights and credits" as used in the Delaware garnishment statute, "[t]he word 'rights' is bracketed with the word 'credits', *which imports a fixed monetary obligation*." McNeilly v. Furman, 95 A.2d 267, 271 (Del. 1953) (emphasis added). In McNeilly, the Court recognized this limitation on "rights and credits" and held that due to the absence of "specific statutory authority" for garnishment of an unliquidated tort claim for damages, such a garnishment was not permitted. Under McNeilly, "rights and credits" under the Delaware garnishment statute are limited to "fixed monetary obligation[s]," precluding garnishment of the Congo's in-kind royalty, regardless of whether Af-Cap is barred by collateral estoppel or not.

The in-kind royalty provides a perfect illustration of the practical reasons that non-monetary obligations are not subject to garnishment. The Congo, at certain times, is entitled to take royalty oil that is produced, stored and lifted in Congolese territorial waters. Exs. 1 and 2 to Ex. A. When SNPC takes a lifting of working interest oil and the Congo's royalty oil, SNPC arranges for a tanker to connect to the storage vessel and offload a lifting of oil. Id. Af-Cap has never suggested how CMS Nomeco could deliver oil for the benefit of Af-Cap against the dictates of the Congo, or how CMS Nomeco could persuade a third party to purchase oil from CMS Nomeco for the benefit of Af-Cap when the Congo claims ownership of that oil. It is instructive that Af-Cap itself has never offered to send its own hired tanker into Congolese waters to take delivery of the oil. Af-Cap offers no explanation as to what CMS Nomeco could do or could be expected to do under the circumstances and how, in practice, it could sell and

physically deliver oil which is located in the Congo against the express instructions of the Congo and the courts of the Congo who have threatened to use public force to ensure compliance with what the Congo considers to be its lawful rights.

Not surprisingly, Delaware garnishment law provides no authority or mechanism for carrying out a garnishment under such circumstances. The Court can render no monetary judgment against CMS Nomeco or require delivery of money to the sheriff without changing the nature of the obligation from a non-monetary obligation to a monetary one, involving the payment of millions of dollars, which would violate the rule that the garnishor has no greater rights against the garnishee than the judgment debtor. As the Delaware Supreme Court held in Wilmington Trust Co. v. Barron, 470 A.2d 257, 263 (Del. 1983):

> [A] creditor's right to recover from the garnishee is derived from, and no greater than, the debtor's right to recover from the garnishee in an action at law. . . . An attaching creditor stands in no better position than the defendant in the judgment, as to the collection of a debt due to the latter from the garnishee. The right of such creditor to recover from the garnishee depends upon the subsisting rights between the garnishee and the debtor in the attachment; and the test of the garnishee's liability is that he has funds, property or credits in his hands belonging to the debtor, for which the latter would have a right to sue. The garnishee stands in every respect in the same position as if the suit had been brought by his own creditor.

The Congo had no right to sue CMS Nomeco for payment of money in royalties in October 2005, and Af-Cap's garnishment can give it no such rights. Nor is there any provision in Delaware garnishment law, nor any practical way, as discussed above, for the Court or the sheriff to effectuate a lifting of the oil by or for Af-Cap in Congolese territorial waters. These problems illustrate why only monetary obligations are subject to garnishment.

Af-Cap argues that two Delaware cases, D'Angelo v. Petroleos Mexicanos, 378 F. Supp. 1034 (D. Del. 1974) and Wilmington Trust Co. v. Barron, 470 A.2d 257, 262 (Del. 1983)

hold that non-monetary obligations are subject to garnishment in Delaware. Neither case even addresses that issue. Af-Cap misstates the holding in D'Angelo, arguing "this Court held that oil royalties are subject to sequestration in Delaware even though the oil company, Mobil, was only incorporated in Delaware." Af-Cap Op. Br. at 7. Contrary to Af-Cap's representations to the Court, the debt sequestered in D'Angelo was a monetary debt owed by Mobil on an "open account" based on sales of crude oil to Mobil by the defendant. Id. at 1036. That case did not involve sequestration or garnishment of an in-kind royalty or any other non-monetary obligation, and it provides no support for Af-Cap's argument. Nor does Wilmington Trust v. Barron support Af-Cap's argument. That case involved garnishment of monetary wages, and it did not address the question of whether non-monetary obligations are subject to garnishment under Delaware law. 470 A.2d at 263. On the other hand, the Delaware Supreme Court in the McNeilly case specifically held that "rights and credits" as used in the garnishment statute "imports a fixed monetary obligation." 95 A.2d at 271.

Because non-monetary obligations are not subject to garnishment, as held by the Western District of Texas in Af-Cap's Texas garnishment litigation and as confirmed by the Delaware Supreme Court in McNeilly, Af-Cap's motion for summary judgment should be denied, CMS Nomeco's cross-motion should be granted, and this action should be dismissed.

**III.    This Court's Decision in LNC Investments v. Republic of Nicaragua Requires Dismissal of the Garnishment Action**

It is easy to understand Af-Cap's desperate attempts to avoid a decision on the merits in light of this Court's decision in LNC Investments, Inc. v. Republic of Nicaragua, No. 01-134-JJF (D. Del. 2002) (unpublished decision), appeal dism'd, 396 F.3d 342 (3d Cir. 2005) (Ex. C). As discussed below, the rule adopted in that decision compels the conclusion that Delaware garnishment law precludes Af-Cap's garnishment of the Congo's royalty.

A Congo court, in December 2004 and again in July 2005, held that garnishment writs issued in proceedings filed by judgment creditors of the Congo in U.S. courts are not enforceable under Congolese law and do not relieve CMS Nomeco of the requirement to deliver royalty oil to the Congo and working interest oil to SNPC. Exs. 3 and 4 to Ex. A. Although Af-Cap did not disclose the existence of these orders to the Superior Court, it must concede that by virtue of the Congo court orders, CMS Nomeco has no choice but to deliver royalty oil to the Congo in Congolese territory. It is simply impractical, and unlawful in the Congo, for CMS Nomeco to do otherwise. In this garnishment action, Af-Cap is attempting to impose double liability on CMS Nomeco for the royalty. This Court has expressly held that under Delaware law, garnishment is not appropriate in such circumstances.

In LNC Investments, Inc. v. Republic of Nicaragua, No. 01-134-JJF (D. Del. 2002) (unpublished decision), appeal dism'd, 396 F.3d 342 (3d Cir. 2005), a copy of which is attached hereto as Exhibit C, this Court analyzed the propriety of enforcing a writ of garnishment in a case involving an attempt by a creditor, LNC Investments, to recover a debt owed by a foreign sovereign, the Republic of Nicaragua ("Nicaragua"), by serving a writ of attachment on Megatel, a garnishee indebted to Nicaragua. Concluding that Nicaraguan law would not recognize the garnishment writ as a defense to Megatel's payment obligation to the Nicaraguan government, and based on Megatel's exposure to double liability, the court issued an order granting the motion to quash the writ. Id.

This Court applied authorities from another jurisdiction involving comparable circumstances holding that writs of garnishment cannot be enforced in such circumstances. See Weitzel v. Weitzel, 27 Ariz. 117, 230 P. 1106 (Ariz. 1924) (upholding dissolution of writs of garnishment of debts owed in a foreign country because writs would not be recognized as

defense to performance of obligations in foreign country); <u>West v. Baker</u>, 510 P.2d 731, 734 (Ariz. 1973) (finding dissolution of writs of garnishment proper when court "cannot insure that [the garnishee] will not incur double liability").

   The rule applied in <u>LNC Investments</u>, precluding garnishment where the garnishee cannot be protected from double liability, is a general rule of garnishment that has been applied consistently by courts across the United States, including the United States Supreme Court.  <u>See</u> <u>Harris v. Balk</u>, 198 U.S. 215, 226 (1905) ("It ought to be and it is the object of courts to prevent the payment of any debt twice over."); <u>Hospital of St. Raphael v. New Haven Savings Bank</u>, 534 A.2d 1189, 1195 (Conn. 1987) ("A garnishee cannot be compelled to pay the full amount of the original indebtedness twice"); <u>First State Bank v. Burton</u>, 64 So. 2d 421, 423 (La. 1953) ("Our courts strive to protect garnishees against double liability as a consequence of garnishment proceedings"); <u>P.J Noyes Co. v. Frost</u>, 170 A. 493 (R.I. 1934) ("a judgment is subject to garnishment whenever it is feasible to protect the garnishee from double liability"); <u>Iglehart v. Moore</u>, 21 Tex. 501, 502 (Tex. 1858) (a garnishee should not be placed in a "worse condition than he would otherwise be, and . . . no judgment should be rendered against a garnishee when he answers fully, unless it would be available to him as a defense against any action brought for the same debt").

   Dismissal of this garnishment action based on the rationale of <u>LNC Investments</u> and the double liability principles that underlie that decision would further important policy considerations.  To allow garnishment actions to proceed in the circumstances of this case would create substantial disincentive for American companies to pursue overseas oil, gas and mineral investment opportunities that are vital to the economy of the United States.  If the law does not preclude garnishment actions in such circumstances, American companies will be exposed to

double liability or contract termination by virtue of court proceedings in the United States arising out of debt transactions to which they are not parties, in connection with the companies' operations conducted within the sovereign territory of a foreign state subject to that foreign state's laws. Those companies also will be subject to huge legal costs associated with the defense of such litigation, such as those incurred by CMS Nomeco in the litigation pursued by multiple judgment creditors of the Congo in multiple districts in Texas and in this district. Equally, there would exist a major disincentive for any foreign government to award such concessions to an American company.[5]

Adoption of a rule that would permit garnishment in circumstances like those presented in this case would also threaten international relations between the United States and oil-producing countries such as the Congo, because in most countries, the development of natural resources is a uniquely sovereign function, as natural resources are "'affected with the public interest'" and "'goods in which only the sovereign may deal.'" See World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic, 877 F.2d 574, 578 (7th Cir. 1989)).

In summary, a ruling by this Court that garnishment actions cannot proceed in circumstances such as those presented in this case will be consistent with this Court's prior decision in LNC Investments and will further the United States' interest in promoting development by American companies of overseas natural resources and in preserving international relations between the United States and foreign oil-producing states.

Although CMS Nomeco's Answer raised the double liability defense and specifically cited this Court's decision in LNC Investments, Af-Cap fails to mention LNC

---

[5] This disincentive is not limited to mineral investments. If judgment creditors are able to impose expensive garnishment litigation and the risk of double liability on parties who have contracted with foreign governments with regard to royalties, taxes, or other payments, the ramifications extend far beyond the oil industry.

Investments or to address the double liability issue in its motion, other than to generally claim, without specifically mentioning LNC Investments, that the Fifth Circuit's decision in *Af-Cap* precludes CMS Nomeco from raising that defense. Af-Cap's argument is frivolous for the same reasons set out above in Section II, which demonstrated that the Fifth Circuit's decision only addressed FSIA issues and left non-FSIA issues to be resolved by the district court on remand. Af-Cap's argument is further refuted by the fact that the Congolese court orders that are at the center of CMS Nomeco's double liability defense were not even issued until several months after the Fifth Circuit's FSIA decision. Af-Cap's contention that the Fifth Circuit resolved defenses based on Congo court orders, which did not even exist at the time of the Fifth Circuit's decision, is totally baseless.

Under the authority of this Court's decision in LNC Investments v. Nicaragua, Af-Cap's motion for summary judgment should be denied, the writ issued by the Superior Court should be quashed, and this garnishment action should be dismissed.

## IV.    The Doctrine of "Foreign State Compulsion" Precludes Enforcement of a Writ that Conflicts with Congo Court Orders Compelling Delivery of Oil in the Congo

Under the doctrine of "foreign state compulsion" recognized in Section 441 of the Restatement (Third) of Foreign Relations Law of the United States ("Restatement Section 441"), preference among conflicting commands of the courts of different nations is accorded to the orders of the nation in which the act is to be done or not to be done. In this case, such preference must be given to the Congo court orders because the oil is produced, stored, and lifted in the Congo.

Subsection (1)(b) of the Restatement Section 441 states, in pertinent part: "In general, a state may not require a person . . . to refrain from doing an act in another state that is required by the law of that state." Comment a to this section states:

> This section applies . . . to protect persons caught between conflicting commands.
> In determining preference between conflicting exercises of jurisdiction to
> prescribe, this section generally accords preference to the state in which the act is
> to be done (or is not to be done).

Restatement Section 441, comment a.

These principles were applied on facts indistinguishable from those presented in

this case in Reebok Intern. Ltd. v. McLaughlin, 49 F.3d 1387 (9th Cir. 1995). In that case, a

federal district court granted a temporary restraining order enjoining a Luxembourg bank from

transferring funds of the defendant which were in the bank's hands. The defendant sought and

obtained an order from a Luxembourg court that instructed the bank to release the funds to the

defendant because the U.S. order was not legally valid in Luxembourg, as it had not been

registered there. The bank then released the funds. The federal district court then found the

bank in contempt for delivering the funds to the defendant, but the Ninth Circuit reversed. The

Ninth Circuit relied on Restatement Section 441, concluding that the bank was entitled to comply

with the Luxembourg court order notwithstanding the temporary restraining order entered by the

U.S. court, stating that "it would defy logic were we to decide that the district court could hold

[the bank] in contempt for complying with the order of the Luxembourg court," and that the bank

"was under no obligation to comply" with the temporary restraining order. 49 F.3d at 1392-

1393.

Under the authority of Section 441 of the Restatement and Reebok, the doctrine of

foreign state compulsion precludes enforcement of the writ. Af-Cap argues in response to this

defense that the Fifth Circuit in Af-Cap rejected the argument, but again, the Fifth Circuit

addressed only FSIA issues, and it could not have addressed the foreign state compulsion

argument, as the Congo court orders had not even been issued as of the date of the Fifth Circuit's

decision. Not only does the foreign state compulsion defense require denial of Af-Cap's motion

for summary judgment, it entitles CMS Nomeco to summary judgment.

## V.    The Act of State Doctrine Also Precludes Enforcement of the Writ

In Underhill v. Hernandez, 168 U.S. 250, 252 (1897), the United States Supreme

Court said:

> Every sovereign state is bound to respect the independence of every other
> sovereign state, and the courts in one country will not sit in judgment on the acts
> of the government of another, done within its own territory. Redress of grievance
> by reason of such acts must be obtained through the means open to be availed of
> by sovereign powers as between themselves.

This principle, known as the "act of state" doctrine, reflects "'the strong sense of the judicial

branch that its engagement in the task of passing on the validity of foreign acts of state may

hinder' the conduct of foreign affairs." W.S. Kirkpatrick & Co. v. Environmental Tectonics

Corp., Int'l, 493 U.S. 400, 404 (1990) (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S.

398, 423 (1964)).

If this Court enforces the writ against CMS Nomeco, it necessarily sits in

judgment of the conduct of the Congo and its courts within the Congo's own territory in

compelling CMS Nomeco to deliver oil to SNPC in Congolese waters. Enforcement of a

garnishment writ in these circumstances would violate the act of state doctrine.

The correctness of this conclusion is illustrated by the decision of the Ninth

Circuit Court of Appeals in Philippine National Bank v. United States District Court, 397 F.3d

768 (9th Cir. 2005). The federal district court in Hawaii entered an injunction prohibiting

transfer of assets of the Estate of Ferdinand Marcos. Subsequently, the Philippine Supreme

Court entered an order that required that certain funds of the estate held by the Philippine

National Bank be forfeited to the Republic of the Philippines. The bank transferred the assets in

-30-

compliance with the order of the Philippine Supreme Court. The district court in Hawaii then entered a show cause order requiring that the Philippine National Bank show cause why it was not in contempt of the earlier injunction that enjoined transfers of assets of the estate. Prior to the show cause hearing, the Philippine National Bank filed a petition for writ of mandamus with the Ninth Circuit, seeking to restrain the district court from enforcing its show cause order on the grounds that the order violated the act of state doctrine. The Ninth Circuit granted the petition, vacated the show cause order, and directed the district court to refrain from further action against the Philippine National Bank or the funds that were the subject of the Philippine Supreme Court's order. Id. at 772-775. The Ninth Circuit reasoned that because the Philippine Supreme Court's order was obtained at the request of the Philippine government in furtherance of governmental interests, the act of state doctrine prevented the district court from holding the bank in contempt for transferring the funds in compliance with the Philippine Supreme Court's order. Id.

The same rationale applies in this case. The Congo court orders were the result of applications filed with the Congolese court by the Congo and its state-owned oil company, to obtain delivery of oil produced in the Congo's territorial waters. The Congo's rights in its natural resources are sovereign in nature because they are "'affected with the public interest,'" and "'goods in which only the sovereign may deal.'" See World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d at 1164 (quoting Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic, 877 F.2d at 578). The Congo court orders were obtained in furtherance of the Congo's sovereign interests, and under the rationale of the Philippine National Bank case, the act of state doctrine precludes enforcement of a writ of garnishment directed to the Congo's in-kind royalty.

The <u>Philippine National Bank</u> case demonstrates that the application of the act of state doctrine is not limited to claims against the foreign state itself. The Ninth Circuit held that the Philippine National Bank, a private party subject to compulsion of an order of the Philippine court, was entitled to assert the protection of the act of state doctrine. In the same vein, the court in <u>Timberlane Lumber Co. v. Bank of America, N.T. & S.A.</u>, 549 F.2d 597, 606 (9th Cir. 1976), said in the context of an antitrust case that "corporate conduct which is compelled by a foreign sovereign is also protected from antitrust liability, as if it were an act of the state itself." The Ninth Circuit quoted this Court's decision in <u>Interamerican Refining Corp v. Texaco Maracaibo, Inc.</u>, 307 F. Supp. 1291, 1298 (D. Del. 1970) for the proposition that "when a nation compels a trade practice, firms there have no choice but to obey. Acts of business become effectively acts of the sovereign." 549 F.2d at 606.

Under <u>Philippine National Bank</u> and the act of state doctrine as applied therein, this Court should not enforce a writ of garnishment directed to the Congo's in-kind royalty. Af-Cap's argument that the Fifth Circuit's decision in <u>Af-Cap</u> precludes the defense is again baseless. The Fifth Circuit's decision came months before the first Congo court order was issued, and the Court therefore did not address the act of state defense based on the Congo court orders. Af-Cap's motion for summary judgment should be denied, and CMS Nomeco's cross-motion for summary judgment should be granted.

## VI.    The In-Kind Royalty Sought to be Garnished is Immune from Garnishment Under the FSIA

The FSIA supplies yet another ground for denial of Af-Cap's motion for summary judgment and the granting of CMS Nomeco's cross-motion. The Fifth Circuit's decision in <u>Af-Cap</u>, holding that the in-kind royalty was not immune from garnishment under the FSIA, was predicated (in part) on the Court's conclusion that CMS Nomeco was "formed and

headquartered" in the United States when the district court issued its decision in April 2003, and that CMS Nomeco's "situs" – and that of the in-kind royalty – was "in" the United States at that time. Af-Cap, 383 F.3d at 373. The district court decision under review in Af-Cap was dated April 7, 2003, and involved the immunity of the in-kind royalty to which the Congo was entitled at that time, based on the factual record presented to the district court in that case. The Court in Af-Cap addressed only the immunity issue with regard to royalty that the Congo was entitled to take in April 2003; it did not decide the location, for purposes of the FSIA, of royalty that the Congo may be entitled to take in 2005. Af-Cap is not controlling on the FSIA issue with regard to the writ issued by the Superior Court in the fall of 2005. A new determination is necessary as to whether the Congo's in-kind royalty is "in the United States" for purposes of the FSIA based on the facts and circumstances that currently exist.

Through the writ served on October 12, 2005, Af-Cap seeks a garnishment judgment against CMS Nomeco, a company having no business activities, no officers, no directors, no employees, and no physical offices in the United States, and arising out of the production of oil exclusively in Congolese territory, performable wholly within Congolese territory, and governed by Congolese law. Ex. A ¶¶2, 4, 5 and Exs. 1 and 2 thereto. The business activity of CMS Nomeco is focused on the oil production activities that are ongoing in the Congo. Ex. A, ¶2. The only connection of CMS Nomeco to the United States is its incorporation in Delaware. Id.

The purposes of the FSIA compel the conclusion that under these circumstances, which are dramatically different than those that existed in 2003, there is no basis for a conclusion that the in-kind royalty had its situs in the United States in October 2005. The international relations policy concerns implicated by the limitations on execution set out in the FSIA mandate

-33-

that a single, "true situs" of intangible property be identified to insure that U.S. courts are not

reaching outside of U.S. territory and interfering with the foreign state's property rights outside

of U.S. territory. See Callejo v. Bancomer, S.A., 764 F.2d 1101, 1122 (5th Cir. 1985) (court

must discern the "true situs" of intangible property where an "overriding national concern" is

implicated); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 441 (1989) ("in

the United States" requirement as used in a jurisdictional provision in the FSIA evinced

legislative intent to preclude reach outside of U.S. territorial jurisdiction). Enforcement of a writ

of garnishment against the Congo's in-kind royalty would constitute interference by the U.S.

courts with the Congo's entitlement to receive its in-kind royalty oil in its own territory, under an

agreement performable wholly in Congolese waters and governed by Congolese law, with the

garnishee having no connection to the United States other than its incorporation in Delaware.

Under the circumstances of this case, there is no rational basis for concluding that the "true situs"

of the in-kind royalty is currently "in the United States" for purposes of the FSIA.

## VII.    The Writ of Garnishment Captured No Property of the Congo

Even if Af-Cap could overcome all of the legal principles discussed above which

doom its garnishment case, it would not be entitled to relief through the garnishment writ served

on October 12, 2005 because the Congo was not entitled to take any royalty oil as of the date that

writ was served, as of the answer date for the writ, or as of any date in between. Af-Cap's

argument that CMS Nomeco's Answer "demonstrates that it holds property belonging to the

Congo" is a misstatement of the plain terms of CMS Nomeco's Answer, as it completely ignores

the specific allegations of the Answer showing that the writ captured no in-kind royalty, as

discussed in more detail below.

As shown in the Answer, and as confirmed by the Declaration of Maryse Bernard attached as Exhibit A, SNPC is entitled to take a lifting of the Congo's royalty oil and its own working interest oil only when the combined under-lifted position of the Congo (with regard to royalty oil) and SNPC (with regard to working interest oil) exceeds 275,000 barrels. Ex. A, ¶5; CMS Nomeco's Answer, pages 19-20. On September 7, 2005, SNPC took a lifting of the Congo's royalty oil and SNPC's working interest oil totaling 605,006 barrels, leaving SNPC in an over-lifted position with regard to its working interest oil and extinguishing the Congo's royalty entitlement. Ex. A, ¶13 and Ex. 12 thereto. On October 12, 2005, when the writ of garnishment was served, on the date the answer was filed, and at all times in between, neither the Congo nor SNPC have had any right to take a lifting of oil, as the Congo and SNPC were in a combined over-lifted position during that time period. Id. Under the terms of the agreements, SNPC will not have any right to take another lifting of the Congo's royalty oil and SNPC's working interest oil until sometime in 2006. Id.

Under Delaware law, a garnishment writ captures only an obligation owed as of the service date of the writ of garnishment and the answer date. See Cooper's, 270 A.2d at 679 ("Delaware law contemplates attaching property which comes into the hands of the garnishee subsequent to the serving of the attachment upon the garnishee until the garnishee makes his answer."). Additionally, the garnishor has no greater rights against the garnishee than the judgment creditor. Wilmington Trust Co. v. Barron, 470 A.2d at 263. "The test of the right to garnish is whether or not the garnishee has funds in his hands belonging to the debtor for which the debtor could bring suit." K-M Auto Supply, Inc. v. Reno, 236 A.2d 706, 707 (Del. 1967). Thus, even if Af-Cap could overcome the insurmountable obstacles presented by CMS Nomeco's other defenses discussed above, the garnishment writ captured nothing, because the

-35-

Congo was not entitled to take royalty oil on the date of service of the writ, the answer date for the writ, or any date in between, and had no right to sue CMS Nomeco with regard thereto on those dates. Not only is Af-Cap's motion for summary judgment without merit, the undisputed facts establish that CMS Nomeco is entitled to judgment as a matter of law, dismissing the garnishment action.

## CONCLUSION

For the myriad reasons discussed herein, Af-Cap's garnishment action against CMS Nomeco fails as a matter of law. CMS Nomeco respectfully requests that the Court deny Af-Cap's motion for summary judgment, grant CMS Nomeco's cross-motion for summary judgment, and dismiss this garnishment action. CMS Nomeco also requests such other and further relief to which it is justly entitled.

Respectfully submitted,

OF COUNSEL:

Guy S. Lipe
Jason M. Powers
VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin Street, Suite 2300
Houston, TX 77002-6760
(713) 758-2222

Dated: December 14, 2005
1834310

/s/ M. Duncan Grant
M. Duncan Grant (Del. Bar No. 2994)
James C. Carignan (Del. Bar No. 4230)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500

Attorneys for Garnishee CMS Nomeco Congo Inc.