- 5 -

**Article 7 :**

Le Ministre des Mines et de l'Energie est chargé de l'exécution du présent Décret qui sera enregistré, diffusé partout où besoin sera et publié au Journal Officiel de la République Populaire du Congo.

Fait à Brazzaville, le 16 MAI 1979.-

Par le Président du Comité Central du Parti Congolais du Travail, Président de la République, Chef de l'Etat, Président du Conseil des Ministres

Colonel Denis SASSOU-NGUESSO.-

Le Ministre des Mines et de l'Energie

Le Premier Ministre, Chef du Gouvernement

Colonel Louis SYLVAIN-GOMA.-

Rodolphe A D A D A.-

AMPLIATIONS :

- Présidence de la Rép. .............. 1
- Premier Ministre .................. 1
- Mini-Mines et Energie ............. 1
- Secrétariat Gl aux Mines ..........15
- Domaines ......................... 2
- Société Nat. Hydro-Congo ......... 2
- Secrétariat Gl du Gouvernement ... 1
- J.O.R.P.C. ....................... 2/25

GAR 00030

# ANNEXE 1

## CARTE DU PERMIS "MARINE I"

GAR 00031



GAR 00032

## A N N E X E 2

### I. – PROGRAMME MINIMUM DE TRAVAUX

#### A. – Première Période

La première période aura une durée de cinq (5) ans.

Phase I

La phase I aura une durée de trois (3) ans, et se décomposera comme suit :

a) Campagne sismique de mille (1.000) kilomètres.

b) Dans les six (6) mois qui suivent la réception du traitement des données obtenues, abandon du permis, ou engagement de forer un puits dans l'antésalifère qui devra être commencé dans les vingt quatre (24) mois qui suivent la date de signature de la convention avec l'Etat, et au plus tard trente (30) mois après cette date, selon la disponibilité des équipements appropriés à des prix compétitifs.

c) Le titulaire aura l'option soit d'abandonner le permis à la plus lointaine des deux dates suivantes : (i) quatre vingt dix (90) jours après la réalisation de ce forage de recherche, ou (ii) quatre vingt dix (90) jours avant la fin de la phase I, soit de passer à la phase II.

Phase II

La phase II aura une durée de deux (2) ans.

Au cours de cette phase, le titulaire devra forer deux (2) puits de recherche dans l'antésalifère. Le titulaire aura le droit d'abandonner le permis après réalisation du forage de chaque puits.

#### B. – Deuxième période

Le permis de recherche sera renouvelé à la demande du titulaire pour une période de renouvellement de trois (3) ans au cours de laquelle il sera foré au moins trois (3) puits. Toutefois, le titulaire aura le droit d'abandonner le permis après forage de chaque puits.

C. – Pour les besoins des paragraphes A e  ci-dessus, l'obligation de forer un puits sera censée avoir été satisfaite par le titulaire lorsque l'objectif (profondeur ou formation) est atteint, ou lorsque les dépenses effectivement engagées pour la réalisation de ce forage auront atteint un montant égal à cent cinquante pour cent (150 %) du coût estimé pour le forage en question, tel que fixé par le Comité de Direction de l'Association à constituer par le titulaire avec d'autres sociétés signataires avec lui de la Convention avec la République Populaire du Congo visée à l'article 3 du Décret.

GAR 00033

## II. - RENDUS

Le titulaire procédera à des rendus comme suit :

a) - une surface égale à vingt cinq pour cent (25 %) de la zone contractuelle d'origine sera rendue à la fin de la phase I de la première période ;

b) - une autre surface égale à vingt cinq pour cent (25 %) de la zone contractuelle d'origine sera rendue à la fin de la phase . de la première période, et

c) - la surface restante de la zone contractuelle d'origine sera rendue en totalité à l'expiration de la période de renouvellement, à l'exception de la ou des surfaces du permis couvertes par un ou plusieurs permis d'exploitation, s'il y en a.

d) - Seront exclues des surfaces rendues par le titulaire à l'expiration de la phase I et de la phase II de la première période, et à l'expiration de la période de renouvellement, les surface du permis dont le Comité de Direction de l'Association visée ci-dessus a déterminé, avant la prise d'effet des rendus ou de l'expiration du permis, qu'elles recouvreront des gisements commercialement exploitables.

## ANNEXE II

L'assiette de la redevance et de l'impôt sur les sociétés sera la valeur commerciale des HYDROCARBURES LIQUIDES vendus.

Pour la redevance, la valeur commerciale des HYDROCARBURES LIQUIDES sera réputée égale à la valeur commerciale de référence FOB Congo fondée sur les ventes au Moyen-Orient calculée comme décrit ci-dessous.

Pour l'impôt sur les sociétés, la valeur commerciale des HYDROCARBURES LIQUIDES sera le prix de vente, étant entendu toutefois qu'en cas de ventes à des acheteurs affiliés, le prix de vente ne sera pas inférieur au prix moyen pondéré des ventes de la SOCIETE venderesse à des acheteurs non affiliés pendant la même période pour des quantités raisonnables d'HYDROCARBURES LIQUIDES de qualité et de gravité similaires, ou, faute de telles ventes de quantités raisonnables à des acheteurs non affiliés, le prix de vente ne sera pas inférieur à un prix égal à la valeur de concurrence pour la même période d'HYDROCARBURES LIQUIDES de qualité et de densité similaires.

### Calcul de la valeur commerciale de référence FOB Congo

La valeur commerciale de référence FOB Congo sera calculée par référence aux prix de vente gouvernementaux de l'Arabe Léger pour la période applicable, ajustée pour tenir compte du fret, de la densité, du soufre et d'autres différentiels de qualité.

### Définitions

1. "Arabe Léger" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 34° API.

2. "Berri" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 39° API.

3. Les "Prix de Vente Gouvernementaux" (ou "PVG") désignent les prix de vente officiels du gouvernement d'Arabie Séoudite pour la vente de l'Arabe Léger ou du Berri.

4. "AFRA VLCC" et "AFRA LR2" désignent les frets tels que déterminés par le London Tanker Brokers Panel ou par toute autre organisation qui la remplacerait à cet effet, pour des livraisons par très grands pétroliers ou par pétroliers <u>large range two</u> respectivement.

**GAR 00035**

<u>ANNEXE II</u>

L'assiette de la redevance et de l'impôt sur les sociétés sera la valeur commerciale des HYDROCARBURES LIQUIDES vendus.

Pour la redevance, la valeur commerciale des HYDROCARBURES LIQUIDES sera réputée égale à la valeur commerciale de référence FOB Congo fondée sur les ventes au Moyen-Orient calculée comme décrit ci-dessous.

Pour l'impôt sur les sociétés, la valeur commerciale des HYDROCARBURES LIQUIDES sera le prix de vente, étant entendu toutefois qu'en cas de ventes à des acheteurs affiliés, le prix de vente ne sera pas inférieur au prix moyen pondéré des ventes de la SOCIETE venderesse à des acheteurs non affiliés pendant la même période pour des quantités raisonnables d'HYDROCARBURES LIQUIDES de qualité et de gravité similaires, ou, faute de telles ventes en quantités raisonnables à des acheteurs non affiliés, le prix de vente ne sera pas inférieur à un prix égal à la valeur de concurrence pour la même période d'HYDROCARBURES LIQUIDES de qualité et de densité similaires.

## Calcul de la valeur commerciale de référence FOB Congo

La valeur commerciale de référence FOB Congo sera calculée par référence aux prix de vente gouvernementaux de l'Arabe Léger pour la période applicable, ajustée pour tenir compte du fret, de la densité, du soufre et d'autres différentiels de qualité.

## Définitions

1. "Arabe Léger" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 34° API.

2. "Berri" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 39° API.

3. Les "Prix de Vente Gouvernementaux" (ou "PVG") désignent les prix de vente officiels du gouvernement d'Arabie Séoudite pour la vente de l'Arabe Léger ou du Berri.

4. "AFRA VLCC" et "AFRA LR2" désignent les frets tels que déterminés par le London Tanker Brokers Panel ou par toute autre organisation qui la remplacerait à cet effet, pour des livraisons par très grands pétroliers ou par pétroliers <u>large</u> <u>range</u> <u>two</u> respectivement.

GAR 00036

2.

5.  "SPOT VLCC" et "SPOT LR2" désignent le coût de transport
    calculé à partir de l'Average Worldscale Rates for Single
    Voyage Dirty Fixture publié mensuellement par H.P. Drewry
    Ltd., Londres, Royaume Uni, dans leur Shipping Statistics
    and Economics -- SSE Publication pour une cargaison moyenne
    pondérée de navires ayant une capacité de 70.000 à 174.999
    DWCT en ce qui concerne les "SPOT LR2" et pour une
    cargaison moyenne pondérée de navires ayant une capacité de
    175.000 à 300.000 DWCT ou plus en ce qui concerne le "SPOT
    VLCC". Pour les besoins des alinéas 2. et 3. ci-dessus, le
    fret sera calculé sur la base des taux publiés pour le mois
    au cours duquel les HYDROCARBURES LIQUIDES seront enlevés.

La valeur commerciale de référence FOB Congo sera déterminée
comme suit:

1.  Prendre le PVG d'un baril d'Arabe Léger d'une gravité de
    34° à 34,09°.

2.  Déterminer le fret par baril pour le transport de l'Arabe
    Léger de Ras Tanura à Rotterdam via Le Cap et retour de
    Rotterdam à Ras Tanura via Le Cap, en divisant la moyenne
    du fret publié AFRA VLCC et SPOT VLCC par tonne par le
    nombre de barils par tonne du pétrole brut en question.

3.  Déterminer le fret par baril pour le transport des
    HYDROCARBURES LIQUIDES de Pointe Noire à Rotterdam en
    divisant la moyenne du fret publié AFRA LR2 et SPOT LR2 par
    tonne par le nombre de barils par tonne du pétrole brut en
    question. Soustraire le fret correspondant du fret
    déterminé conformément au paragraphe 2 ci-dessus et ajouter
    le résultat au PVG déterminé conformément au paragraphe 1
    ci-dessus.

Le montant déterminé conformément à la procédure ci-dessus sera
ajusté en hausse ou en baisse conformément aux facteurs de
qualité suivants qui seront calculés comme suit:

1.  Facteur de densité:

    Le différentiel de densité sera déterminé comme suit:

    (a)  Prendre la densité de 34° API pour l'Arabe Léger.

    (b)  Déduire cette densité de la densité établie des
         HYDROCARBURES LIQUIDES. Tout résultat positif sera
         ajouté à la valeur commerciale de référence FOB Congo;
         tout résultat négatif sera soustrait de la valeur
         commerciale de référence FOB Congo.

    (c)  Multiplier le solde obtenu en (b) par dix pour obtenir
         un produit.

GAR 00037

3.

(d)  Multiplier le produit obtenu en (c) par la valeur
     cotée pour un différentiel de densité par dixième de
     degré API pour l'Arabe Léger; le résultat sera
     l'ajustement de densité.

2.  <u>Facteur de soufre:</u>

    (a)  <u>Arabe Léger et Berri</u>

         (i)   Déterminer la différence des PVG entre
               l'Arabe Léger et le Berri.

         (ii)  Déterminer le montant de la différence en (i)
               imputable à la densité en soustrayant de ladite
               différence le produit résultant de la
               multiplication du nombre de dixièmes de degré de
               densité entre les deux bruts par la moyenne de la
               valeur des différentiels de densité par dixième
               de degré API pour les deux bruts.

         (iii) Déduire le produit obtenu conformément à (ii) de
               la différence obtenue conformément à (i).

         (iv)  Diviser le solde obtenu par application de (iii)
               par le différentiel de dixième de SWT% entre les
               deux bruts.  Prendre comme référence 1,8 SWT%
               pour l'Arabe Léger et 1,1 SWT% pour le Berri,
               sauf accord contraire.

    .(b)  Obtenir l'ajustement de soufre congolais en
         multipliant la différence en nombre de dixièmes de
         SWT% entre le contenu en soufre des HYDROCARBURES
         LIQUIDES et la moyenne de la teneur en soufre de
         l'Arabe Léger et du Berri en cents des Etats-Unis
         d'Amérique par un dixième de SWT% déterminé comme il
         est dit à l'alinéa (a) (iv) ci-dessus.

Ledit ajustement s'ajoutera à la valeur commerciale de
référence FOB Congo si le soufre congolais est inférieur à
ladite moyenne et sera réduit de la valeur commerciale de
référence FOB Congo si le soufre congolais excède ladite
moyenne.

3.  <u>Autres facteurs de qualité:</u>

    (a)  Si le gazole lourd distillé à partir des HYDROCARBURES
         LIQUIDES (ce produit étant distillé entre 600 et 960°
         Fahrenheit conformément à la procédure de distillation
         de l'<u>American Society for Testing Metals</u>, ou toute
         autre organisation qui la remplacerait) a un indice de
         neutralisation supérieur à 0,5 (indice de
         neutralisation signifiant le nombre de milligrammes
         d'hydroxyde de potassium nécessaire pour neutraliser
         l'acide contenu dans un grammme de gazole lourd), ou

4.

   (b)  Si le gazole lourd extrait des HYDROCARBURES LIQUIDES,
tel que défini dans (a) ci-dessus, contient plus de
0,24 parties par million de parties de nickel et de
cuivre, ou d'équivalent nickel (calculé par addition
des parties par million de vanadium, divisé par 4,3,
plus les parties par million de nickel et de cuivre),
ou

   (c)  Si un quelconque autre facteur de qualité des
HYDROCARBURES LIQUIDES, inconnu à la date de la
CONVENTION, devait se révéler,

les Parties se réuniront pour se mettre d'accord sur un
ajustement équitable de la valeur commerciale de référence FOB
Congo déterminée conformément à ce qui précède; dans la mesure
où ces caractéristiques auraient une importance appréciable.

GAR 00039

ANNEXE III

TAUX D'AMORTISSEMENTS APPLICABLES AUX SOCIETES

| Nature des immobilisations à amortir | Taux annuel |
|---|---|

**TRAVAUX SOUTERRAINS ET SONDAGES**

| | |
|---|---|
| Sondes improductives | 50,0% |
| Sondes productives: fixé en fonction de la durée probable de production de la sonde. | |
| En cas d'indétermination | 12,5% |

**MATERIEL DE TRANSPORT**

| | |
|---|---|
| Pipe-lines intérieurs | 10,0% |
| Pipe-lines extérieurs | 7,5% |

**MATERIEL DE FORAGE** (en général:  10,0%)

| | |
|---|---|
| Tiges de forage | 20,0% |
| Outillage de forage | 20,0% |
| Moteur diesel | 20,0% |
| Outillage de derricks, transmissions | 20,0% |

**IMMOBILISATIONS INCORPORELLES**

| | |
|---|---|
| Frais de recherches géologiques et géophysiques | 20,0% |

**CONSTRUCTIONS**

| | |
|---|---|
| Immeubles et constructions en dur pour ateliers, bureaux, magasins, garages, laboratoires, apprentissage, logements, services sociaux et sportifs, cantines, hospitalisation, salles de réunion | 3,1/3% |
| Bâtiments à charpentes métalliques | 3,1/3% |
| Constructions légères semi-fixes sans fondations | 10,0% |
| Cases et tous bâtiments de chantier démontables ou transportables | 10,0% |
| Aménagements intérieurs des ateliers | 10,0% |

**GAR 00040**

<u>ANNEXE III</u>

<u>TAUX D'AMORTISSEMENTS APPLICABLES AUX SOCIETES</u>

| <u>Nature des immobilisations à amortir</u> | <u>Taux annuel</u> |
|---|---|
| **TRAVAUX SOUTERRAINS ET SONDAGES** | |
| Sondes improductives | 50,0% |
| Sondes productives: fixé en fonction de la durée probable de production de la sonde. | |
| En cas d'indétermination | 12,5% |
| **MATERIEL DE TRANSPORT** | |
| Pipe-lines intérieurs | 10,0% |
| Pipe-lines extérieurs | 7,5% |
| <u>MATERIEL DE FORAGE</u> (en général: | 10,0%) |
| Tiges de forage | 20,0% |
| Outillage de forage | 20,0% |
| Moteur diesel | 20,0% |
| Outillage de derricks, transmissions | 20,0% |
| <u>IMMOBILISATIONS INCORPORELLES</u> | |
| Frais de recherches géologiques et géophysiques | 20,0% |
| <u>CONSTRUCTIONS</u> | |
| Immeubles et constructions en dur pour ateliers, bureaux, magasins, garages, laboratoires, apprentissage, logements, services sociaux et sportifs, cantines, hospitalisation, salles de réunion | 3,1/3% |
| Bâtiments à charpentes métalliques | 3,1/3% |
| Constructions légères semi-fixes sans fondations | 10,0% |
| Cases et tous bâtiments de chantier démontables ou transportables | 10,0% |
| Aménagements intérieurs des ateliers | 10,0% |

GAR 00041

2.

| | |
|---|---|
| Machines de bureau | 15,0% |
| Mobilier de bureau ou autre | 10,0% |
| Téléphone | 15,0% |

### INSTALLATIONS DE CHARGEMENT ET STOCKAGE

| | |
|---|---|
| Installation de stockage | 10,0% |
| A l'exception des parcs à tubes et des conduites | 20,0% |
| Môles de chargement | 3,1/3% |
| Installations de chargement | 10,0% |
| Conduites flottantes | 20,0% |

### VEHICULES ET VOIES D'ACCES

| | |
|---|---|
| Engins de génie civil | 30,0% |
| Véhicules automobiles et leurs remorques | 33,0% |
| A l'exception des camions-incendie, camions-ateliers, camions-cimentation | 20,0% |

### TRANSPORTS FLUVIAUX

| | |
|---|---|
| Pinasses | 15,0% |
| Remorques, pousseurs, chalands-citernes, barges | 10,0% |
| Voies d'accès aux travaux de géophysique et aux sondes improductives | 50,0% |
| Voies d'accès aux sondes productives | 25,0% |

### AUTRES IMMOBILISATIONS

| | |
|---|---|
| Distribution d'eau | 10,0% |
| Distribution d'air comprimé | 10,0% |
| Distribution d'électricité | 10,0% |

### LIGNES DE TRANSPORT DE FORCE

| | |
|---|---|
| Pylônes | 3,1/3% |
| Autres éléments | 5,0% |

### TRANSFORMATEURS

| | |
|---|---|
| Bâtiments et outillage fixe | 5,0% |
| Outillage mobile | 10,0% |

### MACHINES FIXES

| | |
|---|---|
| Compresseurs | 10,0% |
| Compresseurs en mer | 20,0% |
| Moteurs et pompes diverses à terre | 10,0% |
| Moteurs et pompes diverses en mer | 20,0% |
| Machines-outils à terre | 10,0% |
| Machines-outils en mer | 20,0% |
| Petit outillage | 15,0% |

3.

| | |
|---|---|
| Matériel fixe de laboratoire | 10,0% |
| Matériel mobile de laboratoire | 20,0% |
| Matériel de topographie | 10,0% |
| Matériel de campement en mer | 50,0% |
| Matériel de campement à terre | 20,0% |

## MATERIEL SPECIFIQUE OFF-SHORE

| | |
|---|---|
| Barges de forage | 20,0% |
| Plate-formes de forage et de production | 15,0% |
| Equipements de puits en mer | 20,0% |
| Câbles sous-marins de transport d'énergie | 20,0% |
| Bouées d'amarrage | 25,0% |
| Equipements sur plate-forme | 20,0% |
| Têtes de puits sous-marines et support de têtes de puits | 20,0% |
| Lignes de collecte entre puits et stations de stockage | 20,0% |
| Lignes principales | 10,0% |
| Lignes de chargement sous-marines | 20,0% |

Les frais accumulés par les SOCIETES pour les TRAVAUX DE RECHERCHES seront traités de la manière suivante: ceux de ces frais correspondant à la création d'immobilisations seront amortis, à compter du premier exercice qui dégagera des revenus imposables, suivant les taux d'amortissement ci-dessus. Les autres constitueront des frais de premier établissement, dont l'amortissement pourra à ce titre être pratiqué, au choix de chaque SOCIETE, sans limite de temps.

## ANNEXE IV

### I- PAIEMENT DE LA REDEVANCE

Lorsque la redevance est payée en espèces, chaque SOCIETE fera, au plus tard le 20 de chaque mois, une déclaration des quantités d'HYDROCARBURES enlevées par elle durant le mois calendaire précédent.

Quatre-vingt-cinq pour cent (85%) de la redevance due pour ledit mois précédent de chaque trimestre seront versés lors de la déclaration mensuelle correspondante. Le solde de la redevance due pour chaque trimestre sera calculé et payé en même temps que la déclaration mensuelle faite au cours du deuxième mois suivant la fin du trimestre en question.

### II- PAIEMENT DE L'IMPOT SUR LES SOCIETES

Chaque SOCIETE procédera au versement d'acomptes sur l'impôt sur les sociétés de la manière suivante:

(a)  Au cours du premier trimestre, chaque SOCIETE fera une estimation de l'impôt qui sera dû par elle au titre de l'année en cours.

(b)  Un montant correspondant à 8/120e de cette estimation sera versé au plus tard le 20 de chacun des mois d'avril, mai, juin, juillet, août et septembre.

(c)  Au cours du troisième trimestre, chaque SOCIETE reverra, en fonction du résultat effectif du premier semestre, l'estimation faite par elle de l'impôt annuel.

(d)  Un montant correspondant à 8/120e de la nouvelle estimation sera versé au plus tard le 20 de chacun des mois d'octobre, novembre, décembre, et janvier, février et mars de l'année suivante, le versement du mois d'octobre étant toutefois ajusté de manière à ce que le montant total des acomptes versés le 20 octobre corresponde à 56/120e de la nouvelle estimation.

(e)  Le solde de liquidation de l'impôt sur les sociétés sera payé lors du dépôt de la déclaration, et les excédents éventuels seront traités conformément à l'article 126 bis du Code Général de Impôts.

GAR 00044

## ANNEXE IV

### I- PAIEMENT DE LA REDEVANCE

Lorsque la redevance est payée en espèces, chaque SOCIETE fera, au plus tard le 20 de chaque mois, une déclaration des quantités d'HYDROCARBURES enlevées par elle durant le mois calendaire précédent.

Quatre-vingt-cinq pour cent (85%) de la redevance due pour ledit mois précédent de chaque trimestre seront versés lors de la déclaration mensuelle correspondante. Le solde de la redevance due pour chaque trimestre sera calculé et payé en même temps que la déclaration mensuelle faite au cours du deuxième mois suivant la fin du trimestre en question.

### II- PAIEMENT DE L'IMPOT SUR LES SOCIETES

Chaque SOCIETE procédera au versement d'acomptes sur l'impôt sur les sociétés de la manière suivante:

(a)  Au cours du premier trimestre, chaque SOCIETE fera une estimation de l'impôt qui sera dû par elle au titre de l'année en cours.

(b)  Un montant correspondant à 8/120e de cette estimation sera versé au plus tard le 20 de chacun des mois d'avril, mai, juin, juillet, août et septembre.

(c)  Au cours du troisième trimestre, chaque SOCIETE reverra, en fonction du résultat effectif du premier semestre, l'estimation faite par elle de l'impôt annuel.

(d)  Un montant correspondant à 8/120e de la nouvelle estimation sera versé au plus tard le 20 de chacun des mois d'octobre, novembre, décembre, et janvier, février et mars de l'année suivante, le versement du mois d'octobre étant toutefois ajusté de manière à ce que le montant total des acomptes versés le 20 octobre corresponde à 56/120e de la nouvelle estimation.

(e)  Le solde de liquidation de l'impôt sur les sociétés sera payé lors du dépôt de la déclaration, et les excédents éventuels seront traités conformément à l'article 126 bis du Code Général de Impôts.

ANNEXE V

MODELE DE LETTRE DE GARANTIE

GARANTIE

ATTENDU QUE la République Populaire du Congo (ci-après désignée le "CONGO"), et Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd. et la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" ont passé une convention en date du 25 mai 1979 pour la recherche et l'exploitation des ressources en hydrocarbures liquides et gazeux en mer au large du Congo (ci-après désignée la "CONVENTION"), et

ATTENDU QUE /nom de la société mère_/ (ci-après désignée la "SOCIETE MERE") agissant en tant que titulaire, directement ou indirectement, de toutes les actions représentant le capital de /nom de la société affiliée_/ (ci-après désignée la "SOCIETE AFFILIEE") désire assurer au CONGO l'exécution des obligations de la SOCIETE AFFILIEE au titre de la CONVENTION.

EN CONSEQUENCE,

La SOCIETE MERE accepte et s'engage par la présente à fournir ou à faire tenir à la disposition de la SOCIETE AFFILIEE les fonds qui lui seront nécessaires pour satisfaire à ses obligations résultant de la CONVENTION.

Signé à _____, le _____ 1979.

Pour (nom de la SOCIETE MERE)

_____
(Titre)

GAR 00046

ANNEXE V

MODELE DE LETTRE DE GARANTIE

GARANTIE

ATTENDU QUE la République Populaire du Congo (ci-après désignée le "CONGO"), et Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd. et la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" ont passé une convention en date du 25 mai 1979 pour la recherche et l'exploitation des ressources en hydrocarbures liquides et gazeux en mer au large du Congo (ci-après désignée la "CONVENTION"), et

ATTENDU QUE /nom de la société mère_/ (ci-après désignée la "SOCIETE MERE") agissant en tant que titulaire, directement ou indirectement, de toutes les actions représentant le capital de /nom de la société affiliée_/ (ci-après désignée la "SOCIETE AFFILIEE") désire assurer au CONGO l'exécution des obligations de la SOCIETE AFFILIEE au titre de la CONVENTION.

EN CONSEQUENCE,

La SOCIETE MERE accepte et s'engage par la présente à fournir ou à faire tenir à la disposition de la SOCIETE AFFILIEE les fonds qui lui seront nécessaires pour satisfaire à ses obligations résultant de la CONVENTION.

Signé à _____ , le _____ 1979.

Pour (nom de la SOCIETE MERE)

_____

(Titre)

GAR 00047

A P E N D I C E

GAR 00048

2.

## CONGOLESE SUPERIOR OIL COMPANY
### P. O. Box 1521
### HOUSTON, TEXAS 77001

Monsieur le Ministre des
Finances
Ministère des Finances

Houston, le 17 mai 1979

BRAZZAVILLE

Monsieur le Ministre,

Notre société et les sociétés Cities Service Congo Petroleum
Corporation et Canadian Superior Oil Ltd. signons le 25 mai
1979 avec la République Populaire du Congo, représentée par
le Ministre des Mines et de l'Energie, une Convention rela-
tive à la recherche et à l'exploitation d'hydrocarbures sur
le permis dit MARINE 1.  A cette occasion, nous aimerions
recevoir de vous un éclaircissement sur les points suivants :

1.  Les travaux relatifs à la mise en valeur de ce permis
nous amèneront, en qualité d'Opérateur de l'Association,
et peuvent amener dans une moindre mesure nos partenaires
non congolais dans l'Association, à envoyer au Congo un
personnel spécialisé pour des périodes temporaires mais qui
pourront durer quelques années.

(a) Les employés expatriés pourront amener avec eux des
biens meubles, véhicules automobiles personnels, et effets
personnels et de ménage destinés à leur usage personnel
pendant la durée de leur séjour au Congo.  Ces biens
pourront-ils être importés et réexportés en fin de séjour
en franchise de droit ou taxe ?

(b) L'expatriation au Congo pourra entraîner pour ces em-
ployés des frais exceptionnels qui seront la conséquence
directe de leur détachement : maintien d'une double rési-
dence, scolarisation particulière des enfants et, en l'ab-
sence d'une convention particulière fiscale entre la Répu-
blique Populaire du Congo et les Etats-Unis d'Amérique,
double imposition éventuelle à l'impôt sur le revenu des

GAR 00049

3.

Monsieur le Ministre des    -2-              le 17 mai 1979
Finances

personnes physiques.  L'envoi de ce personnel au Congo
nous amènera probablement à verser à ce personnel une
indemnité destinée à rembourser les frais de cette na-
ture.  Une telle indemnité sera-t-elle assujettie à l'im-
pôt congolais sur le revenu des personnes physiques, en
sus de l'impôt applicable à la rémunération du personnel,
déduction faite de l'abattement de 30 % de droit commun
pour frais professionnels ?

2.  Au cas où l'Association serait amenée pour des raisons
de force majeure à interrompre l'exploitation pour une du-
rée appréciable, les participants à l'Association pourraient-
ils obtenir le remboursement de trop-versés éventuels au ti-
tre de l'impôt sur les sociétés ?

3.  En ce qui concerne l'ensemble des frais accumulés pen-
dant la période de recherche, nous avons compris que les
règles fiscales du Congo conduiraient à les traiter de la
manière suivante : ceux de ces frais correspondant à la
création d'immobilisations seront amortis, à compter du
premier exercice qui dégagera des revenus imposables, sui-
vant les taux d'amortissement figurant en annexe à la con-
vention susvisée.  Les autres constitueront des frais de
premier établissement, dont l'amortissement pourra à ce
titre être pratiqué, au choix du contribuable, sans limite
de temps.  Nous vous serions reconnaissants de bien vouloir
nous confirmer qu'il en est bien ainsi.

Nous vous prions d'agréer, Monsieur le Ministre, l'expression
de notre considération distinguée.

Diego O. Giordano
Vice-Président

GAR 00050



Ministère des Finances

**CONFIDENTIEL**

2 5 MAI 1979

Messieurs,

En réponse à votre lettre du 17 mai 1979, nous avons l'honneur de vous indiquer ce qui suit :

1. (a) Le mobilier et les effets personnels et de ménage peuvent être importés et réexportés en franchise, quelle que soit la durée du séjour, tant que leur usage est limité à l'usage personnel des employés expatriés. Les véhicules automobiles personnels ne peuvent être importés en franchise que pour une période de six (6) mois.

1. (b) Les indemnités décrites dans votre lettre ayant le caractère de remboursement de frais réels de nature exceptionnelle, différents par nature des frais que l'abattement de droit commun a pour objet de couvrir, ne seront pas comprises dans le revenu imposable des intéressés, sous réserve bien entendu de la production des justificatifs appropriés.

2. L'interruption d'exploitation dans les circonstances décrites dans votre lettre peut être interprétée comme une cessation d'activité entraînant l'application des dispositions de l'article 126 bis (4) du Code Général des Impôts.

3. Nous vous confirmons que votre description de l'amortissement des frais accumulés pendant la période de recherche est bien exacte. Ce point est d'ailleurs réglé dans des termes identiques par le dernier alinéa de l'Annexe III à la Convention que votre Société et les sociétés Cities Service Congo Petroleum Company et Canadian Superior Oil Ltd. signent ce jour avec la République Populaire du Congo et Hydro-Congo.

Je vous prie d'agréer, Messieurs, l'expression de mes sentiments distingués.

CONGOLESE SUPERIOR OIL COMPANY

26 th Floor

Brazzaville, le 25 mai 1979

- La République Populaire du Congo,

- Congolese Superior Oil Company,

- Cities Service Congo Petroleum Corporation,

- Canadian Superior Oil Ltd., et

- Société Nationale de Recherches et d'Exploitation
  Pétrolières "Hydro-Congo",

signent ce jour une convention ayant pour objet de définir les
conditions dans lesquelles les parties feront des travaux de
recherche et éventuellement d'exploitation d'hydrocarbures sur
le permis marin dit "Marine 1".

Cette convention est rédigée et signée en français.
En cas de difficulté d'interprétation, il sera fait référence à
la traduction anglaise ci-jointe, dans un but de clarification.

Pour la République Populaire
du Congo:

Rodolphe ADADA,
Ministre des Mines et de l'Energie

Pour Congolese Superior                Pour Société Nationale de Recherches
Oil Company                            et d'Exploitatation Pétrolières
                                       "HYDRO-CONGO"

Diego U. Giordano-Echegoyen,           Alphonse M⁰ Bpudó-Nesa,
Vice-President                         Directeur Général

Pour Cities Service Congo              Pour Canadian Superior Oil Ltd.
Petroleum Corporation

Antoine Saadi,                         Robert C. Schrader,
Vice-President                         Vice-President,
                                       International Contracts

GAR 00052

Amendment No. 1
to the May 25, 1979
"Marine I" Convention

December 11, 1981

French version not in our files.

GAR 00053

**AVENANT N°2 A LA CONVENTION DU 25 MAI 1979**
**PORTANT SUR LE PERMIS MARINE-1**

**ENTRE**

- La République du Congo, ci-après désignée « Le Congo »), représentée par Monsieur Nguila MOUNGOUNGA NKOMBO, son Ministre de l'Economie, des Finances et du Plan chargé de la Prospective,

                                                                    **d'une part**

**ET**

- La société Nationale de Recherche et d'Exploitation Pétrolières « Hydro-Congo », ci-après désignée « Hydro-Congo », entreprise publique ayant son siège social à Brazzaville République du Congo, représentée par Monsieur Bernard OKIORINA, son Directeur Général Président,

- CMS NOMECO Congo Inc., ci-après désignée « NOMECO », société légalement constituée ayant son siège à Pointe-Noire, République du Congo, représentée par Monsieur K. CHARSINSKY, son Directeur Général,

- Kuwait Foreign Petroleum Exploration Co. k.s.c. société légalement constituée selon les lois du Kuwait, ayant son siège à Kuwait, PO Box 5291, Safat 13053, Kuwait, représentée par Monsieur Mahmoud A. AL RAHMANI, son Président Directeur Général, pour le compte de KUFPEC (Congo) Limited, ci-après désignée « KUFPEC »,

- ~~The NUEVO Congo Company, ci-après désignée « NUEVO »~~, société légalement constituée ayant son siège à Houston (TEXAS), représentée par Monsieur Michael D. WATFORD, son Président,

    ci-après désignées collectivement « les Sociétés » ou individuellement « la Société »,

Etant précisé que la République du Congo, d'une part, Hydro-Congo, Nomeco, Kufpec et Nuevo d'autre part, sont collectivement désignées ci-après « les Parties », ou individuellement « la Partie ».

                                                                    **d'autre part,**

**ETANT PREALABLEMENT EXPOSE CE QUI SUIT:**

Les Sociétés sont les ayant-droits des signataires de la Convention Marine-I en date du 25 mai 1979, ci-après désignée « la Convention », laquelle définit en son article 7.01 l'assiette de la redevance minière proportionnelle.

Les Parties ayant constaté leurs divergences d'interprétation de l'article 7.01 de la Convention, ont convenu d'en clarifier et harmoniser la rédaction.

**IL A ETE CONVENU CE QUI SUIT:**

**Article 1: Définitions**

Les définitions contenues dans la Convention s'appliqueront au présent Avenant, sauf si le contexte du présent Avenant indiquait clairement le contraire.

                                                                    **GAR 00054**

**Article 2.** De l'article 7.01 de la Convention

L'article 7.01 de la Convention se lit comme suit:

« L'assiette de la redevance minière proportionnelle payée en espèce ou en nature est égale pour chaque Société à la valeur des Hydrocarbures enlevés par celle-ci et calculée sur la base du prix déterminé conformément à l'Annexe II à la Convention ou à toute autre méthode sur laquelle les Parties s'accorderaient, diminuée des frais de transport intérieur, traitement, stockage et chargement tels que ces frais apparaissent dans les comptes de ladite Société.

Ne sont pas déductibles de l'assiette de la redevance minière proportionnelle, tous les frais autres que ceux rappelés au paragraphe ci-dessus, notamment les charges d'amortissement et les frais financiers relatifs aux investissements.

La redevance minière proportionnelle n'est pas due sur les quantités d'Hydrocarbures utilisées pour les besoins des travaux pétroliers ou perdues ».

**Article 3** Autres dispositions

Toutes les autres dispositions de la Convention et ses avenants demeurent en conséquence inchangées et pleinement applicables.

**Article 4** Prise d'effet

Le présent Avenant prend effet rétroactivement le 1er janvier 1994 et sera approuvé par une loi selon les formes requises.

Fait à Paris, en cinq (5) exemplaires, le 25 janvier 1997

Pour la République du Congo
le Ministre de l'Economie, des Finances
et du Plan, chargé de la Prospective

Pour la Société Nationale de Recherche et
d'Exploitation Pétrolières "Hydro-Congo"
le Directeur Général Président

**Nguila MOUNGOUNGA NKOMBO**

**Bernard OKIORINA**

Pour CMS Nomeco Congo
le Directeur Général

Pour The NUEVO Congo Company
le Président

**K. CHARSINSKY**

**Michael D. WATFORD**

Pour Kuwait Foreign Petroleum Exploration Co. k.s.c.
pour le compte de KUFPEC (Congo) Limited
le Président Directeur Général

**Mahmoud A. AL-RAHMANI**

GAR 00055