# EXHIBIT 2

# FRENCH

## AVENANT I A L'ACCORD D'ENLEVEMENT

**ENTRE LES SOUSSIGNES :**

La Société Nationale des Pétroles du Congo (« SNPC »), venue aux droits de la Société Nationale de Recherche et d'Exploitation Pétrolières (Hydro-Congo), représentée par son Président Directeur Général, Mr. Bruno J.R. ITOUA,

D'une part,

**ET :**

D'autre part,

Les compagnies CMS NOMECO Congo, Inc, venue aux droits de Walter International, Inc., elle même venue aux droits de Amoco Congo Exploration) ("CMS Congo"), représentée par son Président Directeur Général, Mr. Jon M. Oznargut,

The Nuevo Congo Company, venue aux droits de Amoco Congo Petroleum Co. ("Nuevo Congo"), représentée par son Vice-Président Senior, Mr. Robert M. King,

et NUEVO Congo Ltd, venue aux droits de Kufpec (Congo) Limited) ("Nuevo Ltd."), représentée par son Vice-Président Senior, Mr. Robert M. King,

ensemble désignées aux termes des présentes par les "Parties" et individuellement par la "Partie", CMS Congo, Nuevo Congo and Nuevo Ltd. étant parfois collectivement désignés aux termes des présentes comme les "Compagnies Pétrolières Internationales" ou "CPIs".

## IL A ETE PREALABLEMENT EXPOSE CE QUI SUIT:

1. Par décret n° 79/253 du 16 Mai 1979, le Gouvernement de la République du Congo ("le Gouvernement") a attribué à la Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO), un Permis d'Exploration dénommé Marine I.

2. Le 25 Mai 1979, les prédécesseurs aux Parties actuelles et le Gouvernement sont partie à une Convention relative à la zone Marine I (la "Convention");

EXHIBIT
Garnishee 5
12-9-02 CJ

*Af-Cap
v. The Republic of Congo, et al.
A:01-CA-321-SS
Plaintiff Exhibit 12*

GAR 03426

## EXHIBIT 2

Received 12/06/2002 10:18AM in 05:50 on line [10] for GL0607 * Pg 2/11
DEC-06-2002   11:51      ANADARKO CONGO COMPANY                    201 261 0192        P.02/11

3.  Le 25 Mai 1979, les prédécesseurs aux Parties actuelles sont partie à un contrat
    d'Association (le "JOA"), régissant les opérations pétrolières de la zone Marine I;

4.  Le 15 mars 1989, le Gouvernement a, par Décret n° 89/211, attribué à la Société
    Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO), le Gisement
    dit Yombo-Masseko-Youbi, la zone en cours de production couverte par ledit permis
    étant désignée aux termes des présentes comme le "Gisement Yombo";

5.  En Juin 1991, les prédécesseurs aux Parties actuelles avaient commencé la production de
    pétrole brut à partir du Gisement Yombo, après la mise en service des installations
    pétrolières marines, ladite production devant être acheminée au moyen d'un réseau de
    pipeline sous-marin jusqu'à un réservoir central offshore lequel est un navire de stockage
    flottant destiné à la production, au stockage et au déchargement (ci-après désigné la
    "Navire de Stockage");

6.  Le 20 Septembre 1991, les prédécesseurs aux Parties ont conclu un Accord d'Enlèvement
    définissant les procédures, les priorités et les règles applicables aux fins de mettre en
    œuvre l'enlèvement méthodique et efficace du pétrole brut à partir du Navire de
    Stockage jusqu'au Navire d'Enlèvement;

7.  Le Gouvernement a pris les décrets suivants (ensemble désignés aux termes des présentes
    "Décrets") concernant la SNPC;

    ▪ Le Décret n° 99-51 du 9 Avril 1999 portant transfert à la SNPC de l'ensemble des
      actifs pétroliers et des droits directs et indirects, de quelque nature que ce soit,
      détenus initialement par la société Hydro-Congo, dans toutes les activités relatives à
      la recherche, à l'exploitation, au traitement et à la transformation des hydrocarbures et
      des substances dérivées ou connexes.

    ▪ Le Décret n° 99-171 du 18 Septembre 1999 portant transfert des actifs, des droits et
      des participations détenus directement par l'Etat sur les permis et les contrats
      pétroliers à la société nationale des pétroles du Congo;

8.  Le 14 Octobre 1991, la République du Congo et National Union Fire Insurance Company
    de Pittsburgh et American International Group ont conclu un Accord de Règlement
    (l'"Accord de Règlement") en résolution du litige intitulé National Union Fire Insurance
    Company de Pittsburgh ("NUFI") c/. la République Populaire du Congo, Cause N°. 91 C
    3172, alors en attente de règlement à la Cour de Justice américaine du district de l'Illinois
    (le "Litige NUFI").

9.  Le 5 Décembre 1991, le Tribunal dans le Litige NUFI, en conformité avec les termes de
    l'Accord de Règlement, émis un Amendement à l'Arrêté sur Chiffre d'Affaires (l'"Arrêté
    sur Chiffre d'Affaires") ordonnant à Amoco Congo Exploration Company et Amoco
    Congo Production Company (devenus CMS NOMECO Congo, Inc. et The Nuevo Congo
    Company) de payer à NUFI, 50% de la redevance minière (la "Redevance") tel que ce

2

Received 12/06/2002 10:18AM in 05:50 on line [10] for GL0607 * Pg 3/11
DEC-06-2002   11:52        ANADARKO CONGO COMPANY                    281 261 0192        P.03/11

terme est défini par l'Arrêté sur Chiffre d'Affaires et l'Accord de Règlement) due à la République du Congo en vertu de la Convention et du JOA, intérêts compris.

10.  Le 9 Décembre 1991, le Secrétaire d'Etat au Budget de la République du Congo ordonnait parallèlement à Amoco Congo Exploration Company et Amoco Congo Production Company de payer à NUFI 50% de la redevance minière due à la République du Congo en vertu de la Convention et du JOA. Depuis lors, CMS NOMECO Congo, Inc et The NUEVO Congo Company ont conséquemment payé cinquante pour cent (50%) de la redevance minière du Gouvernement à NUFI.

11.  Le 30 Octobre 1999, la SNPC notifia CMS Congo, l'Opérateur du Gisement Yombo, en vertu des dispositions des Décrets, de la Convention et du JOA, son intention de commercialiser elle-même sa quote-part de part de pétrole brut disponible du Gisement Yombo. Les Parties ont tenu des réunions informelles et se sont accordées sur le timing et les méthodes permettant à la SNPC d'enlever sa quote-part de pétrole brut en nature. Par courrier en date du 26 Novembre 1999, CMS confirma ces arrangements.

Il est rappelé, à titre d'information, que les procédures correspondant à ces arrangements et reprises à l'article 1.1 ci-dessous ont été mises en pratique depuis l'enlèvement no 82. Les détails des enlèvements depuis l'enlèvement 82 jusqu'à la date d'effet du présent Accord ainsi que les états courants des soldes de Sur/Sous-Enlèvement de la SNPC et des CPIs sont joints en Annexe et incorporés au présent Accord.

12.  Les Parties souhaitent maintenant formaliser leur accord de principe sur les procédures et les conditions par lesquelles la SNPC exercera ses droits d'enlever et de commercialiser séparément sa quote-part de pétrole brut disponible en nature.

Le présent Avenant expose complètement les devoirs et obligations en ce qui concerne ses droits d'enlever sa quote-part de pétrole brut en nature et, annule et remplace la lettre du 26 Novembre 1999.

Les termes en lettres capitales doivent avoir la signification qui leur est conférée par les définitions aux termes de cet Avenant, de l'Accord d'Enlèvement, de la Convention ou du JOA.

En conséquence, les Parties acceptent les termes et conditions suivants, qui amendent les termes et conditions de l'Accord d'Enlèvement, en ses dispositions concernées.

## ARTICLE 1 - APPELS D'ENLEVEMENT

Les procédures définies par les Parties au cours de leurs réunions de Novembre 1999 sont adoptées comme il est dit ci-après.

1.1  Les CPIs auront initialement la priorité d'appeler et enlèveront tout le Pétrole Disponible tandis que la SNPC ne fera aucun appel d'enlèvement du Pétrole Disponible mais, progressivement, se constituera un solde de Sous-Enlèvement. La SNPC fera l'appel

3

GAR 03423

Received 12/06/2002 10:18AM in 05:50 on line [10] for QL0607 * Pg 4/11
DEC-06-2002  11:53        ANADARKO CONGO COMPANY                    2B1 261 0192   P.04/11

d'enlèvement du Pétrole Disponible et enlèvera en nature et commercialisera séparément l'enlèvement succédant celui au cours duquel son solde de Sous-Enlèvement SNPC dépassera 275,000 barils, soit la moitié de ce qui aura historiquement été le chargement moyen au cours des enlèvements au Terminal Yombo.

Aux termes des présentes, l'expression "Pétrole Disponible" désigne le brut qui a été traité et stocké dans le Navire de Stockage à l'exclusion des quantités de pétrole brut traité et utilisé par l'Opérateur pour les opérations de production et de maintien des ballasts du Navire de Stockage, et des stocks de Pétrole Hydraté (défini ci-dessous).

1.2 En cas ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ de Sous-Enlèvement résultant de ses précédents enlèvements, diminué du nombre de barils représentant ses droits pour le présent enlèvement.

1.3 Les CPIs se constitueront un solde de Sous-Enlèvement correspondant. Par la suite, les CPIs feront l'appel d'enlèvement et enlèveront à nouveau tout le Pétrole Disponible jusqu'à ce que le solde de Sous-Enlèvement de la SNPC atteigne à nouveau les 275,000 barils, quantité mettant la SNPC en position de prendre le prochain enlèvement.

1.4 (1) Dans les dix jours qui suivent la fin de chaque mois, l'Opérateur fournira aux parties les informations ci-après :

      (a) Production totale du mois,
      (b) Pour chaque partie,
          1. La quote-part de pétrole disponible
          2. La production brute,
          3. L'autoconsommation.
      (c) Quantité de pétrole de remboursement,
      (d) Position de stock de chaque partie à la fin du mois.

(2) Dans les quinze (15) jours à compter de chaque enlèvement, l'Opérateur communiquera aux parties les états courants des soldes de Sous-Enlèvement ou de Sur-Enlèvement.

## ARTICLE 2   AVIS ET DEFAUT D'ENLEVEMENT

2.1 Nonobstant les dispositions de l'Article 2 de l'Accord d'Enlèvement, chaque Partie devra donner 25 jours de préavis aux autres Parties de son intention d'effectuer un enlèvement de pétrole brut et préciser une Date Intervalle de 5 jours.

Cette Partie devra alors désigner un Navire d'Enlèvement à 14 jours de la Date Intervalle et donner les 3 jours de Date Intervalle obligatoire conformément aux dispositions de l'Article 2.6 de l'Accord d'Enlèvement.

4

GAR 03429

Received 12/06/2002 10:18AM in 05:50 on line (10) for GL0607 * Pg 5/11
DEC-06-2002   11:53          ANADARKO CONGO COMPANY          281 261 0192      P.05/11

La Partie ayant la charge d'enlever devra fournir l'effort de communiquer à l'Opérateur la date précise du commencement de l'Enlèvement afin de permettre à l'Opérateur de faire les arrangements relatifs aux remorqueurs et au personnel. Les Navires d'Enlèvement devront conduire les opérations d'enlèvement en stricte conformité avec les règlements portuaires du Terminal Pétrolier de Yombo, amendements compris.

En vertu de l'Article 2.6 de l'Accord d'Enlèvement, la Partie ayant la charge d'enlever doit fournir toute information que l'Opérateur pourrait raisonnablement demander. En moins de 24 heures après la réception de l'appel d'enlèvement et des informations obligatoires, l'Opérateur informera la Partie concernée si le Navire d'Enlèvement proposé est acceptable ou non.

Si le Navire n'est pas acceptable, la Partie doit désigner un Navire d'Enlèvement de rechange dans un délai de 72 heures.

2.2     Si cet avis n'est pas donné à temps, le Navire d'Enlèvement n'est pas désigné à temps, ou si le chargement n'a pas lieu comme programmé, alors, conformément aux dispositions de l'Article 5 de l'Accord d'Enlèvement, l'Opérateur pourra faire d'autres arrangements pour procéder à l'enlèvement et la commercialisation du pétrole brut en conformité avec les dispositions de l'article 5.2 de l'Accord d'enlèvement.

La Partie ainsi en défaut d'enlèvement supportera en conséquence les coûts et les frais associés au chargement réellement encourus, tels que ceux liés aux remorqueurs, au personnel, aux amarrages ou pilotage, aux inspecteurs gouvernementaux, au temps d'accostage, sans que cette liste n'ait un caractère limitatif.

## ARTICLE 3    TRAITEMENT DE L'HUILE

La procédure de traitement du pétrole brut Yombo à bord du Navire de Stockage pour le rendre commercialisable comme pétrole brut N°.6, engendre des quantités résiduelles de pétrole brut ayant une teneur élevée en soufre, en eau et en sédiments, et doit être commercialisé séparément du Yombo N°. 6 (ci-après "Pétrole Hydraté"). Les Parties conviennent de ce que CMS Congo en tant qu'Opérateur se chargera de l'enlèvement et de la commercialisation du Pétrole Hydraté, et reversera aux Parties les produits de cette vente y compris la part de redevance revenant à NUFI.

## ARTICLE 4    ACCORDS DE COMMERCIALISATION

4.1     Les Parties acceptent que pour le calcul de la redevance minière, y compris la part de redevance revenant à NUFI, le prix effectif de l'Opérateur issu du contrat de vente en vigueur entre l'Opérateur et l'Acheteur servira de base de calcul aussi longtemps qu'un tel contrat garantira les ventes à un prix concurrentiel et à une entité non affiliée.

En cas de ventes à une filiale de l'Opérateur, la redevance minière sera calculée sur la base d'un prix moyen des ventes internationales identiques de pétrole brut de qualité, de

5

GAR 03430

Received 12/06/2002 10:18AM in 05:50 on line [10] for GL0607 * Pg 6/11

DEC-06-2002    11:54    ANADARKO CONGO COMPANY    201 261 8192    P.06/11

gravité et de coûts de transport équivalents. Le calcul de la redevance stipulé aux termes des présentes remplacent les provisions de l'Annexe II de la Convention.

4.2    Les quantités de pétrole à enlever en nature, enlevées conformément aux stipulations du présent Accord d'Enlèvement tel qu'amendé et, commercialisées séparément par la SNPC ("Droits à l'Huile de la SNPC") désigneront (I) la quote-part de pétrole brut libre du Gouvernement et/ou de la SNPC aux termes de l'Articles 9.02 et (II) de la redevance minière enlevée en nature aux termes de l'Article 4.11 du JOA et de leur droit à la redevance minière conformément aux Articles 5.03 et 7 de la Convention telle qu'amendée, déduction faite de la part de la redevance revenant à NUFI jusqu'à la liquidation de la dette correspondante.

4.3    Pour les enlèvements SNPC, les CPIs paieront cash la part de la redevance revenant à NUFI sur la base du volume enlevé par la SNPC. Ces avances au titre du paiement de la redevance revenant à NUFI seront imputées au compte avance de la SNPC conformément aux dispositions de l'Article 9 du JOA et seront récupérées par les CPIs sur les ventes futures d'hydrocarbures conformément aux dispositions de l'Article 9.02 du JOA. Les versements à NUFI continueront à courir jusqu'au remboursement des sommes dues aux termes de l'Accord de Règlement et de l'Arrêté sur le Chiffre d'Affaires.

## ARTICLE 5    COUTS ET FRAIS ASSOCIES

5.1    La SNPC supportera certains coûts associés à ses enlèvements.

Ces coûts comprennent, et ce de manière non exhaustive, ceux liés aux remorqueurs, personnel, aux opérations d'arrimage et aux frais de transport au terminal (globalement désignés aux termes des présentes "Coûts d'Enlèvement").

Si la SNPC n'acquitte pas ses coûts d'enlèvement, les Parties conviennent de ce que les CPIs supportent et payent les Coûts d'Enlèvement de la SNPC, sous réserve de remboursement sous la forme de livraison et commercialisation d'une fraction des Droits à l'Huile de la SNPC, représentant l'équivalent économique des Coûts d'Enlèvement de la SNPC supportés par les CPIs.

5.2    En sus de la conservation des dossiers requis par l'Accord d'Enlèvement, l'Opérateur créera et conservera dans ses livres un compte (« le compte Sur et Sous Enlèvement ») dans lequel les Coûts d'Enlèvements de la SNPC payés par les CPIs pour le compte de la SNPC au titre de ses enlèvements seront enregistrés comme dettes de la SNPC vis à vis des CPIs.

La dette de la SNPC vis à vis des CPIs sera remboursée sur la quote-part de la production de pétrole brut revenant à la SNPC.

6

GAR 03431

Received 12/06/2002 10:18AM in 05:50 on line (10) for GL0607 * Pg 7/11

DEC-06-2002    11:54    ANADARKO CONGO COMPANY    281 261 0192    P.07/11

Au prochain enlèvement succédant celui de la SNPC, les CPIs enlèveront et commercialiseront ce nombre de barils au prix contractuel suffisant pour rembourser leur créance sur la SNPC.

L'Opérateur conservera un dossier dans ses livres afin de comptabiliser les barils équivalents enlevés et commercialisés par les CPIs pour couvrir les Coûts d'Enlèvement de la SNPC. Les barils ainsi vendus diminueront les droits au Pétrole Disponible de la SNPC ainsi que sa Position de Stock comme stipulés dans l'Article 1.4 ci-dessus.

En conformité avec la procédure comptable du JOA, le présent Avenant ne modifie ni ne restreint les droits de la SNPC en tant que non-Opérateur, à faire vérifier les états tenus dans ces livres.

5.3    La SNPC pourra choisir de payer ses coûts d'enlèvement et faire ses arrangements pour les remorqueurs, personnel, les amarrages ou pilotages, les inspecteurs gouvernementaux, etc..., en donnant à l'Opérateur par écrit, un préavis de 30 jours avant l'enlèvement.

Cependant, toutes sommes dues par la SNPC enregistrées au compte Sur/Sous dans les livres de l'Opérateur, au titre de ses précédents enlèvements seront payés conformément aux dispositions de l'article 5.2 ci-dessus.

En cas de défaut de paiement par la SNPC de ses coûts d'enlèvement après avoir communiqué son intention de les supporter, les CPIs, par conséquent, acquitteront lesdits coûts, à charge pour l'Opérateur d'inscrire les montants correspondants au compte Sur/Sous Enlèvement de la SNPC. Ces montants seront remboursés suivant les dispositions du présent article 5.

5.4    La SNPC fera son affaire de la Taxe Maritime associée à ses propres enlèvements. En conséquence, les CPIs sont affranchies de toute responsabilité au regard des obligations d'acquittement de la Taxe Maritime relative aux enlèvements réalisés par la SNPC.

## ARTICLE 6    APPROBATIONS

A l'exception des amendements apportés aux termes des présentes, les Parties réaffirment et ratifient l'Accord d'Enlèvement y compris les stipulations du JOA qui y sont incorporées ou citées en référence, et acceptent d'y être liées et de se conformer à ses clauses y compris, sans se limiter aux, dispositions relatives aux enlèvements et livraisons, aux états fournis par l'Opérateur, au démarrage, au chargement et à l'amarrage, aux mesurages, au risque de perte, au règlement définitif, et autres.

7

GAR 03432

Received 12/06/2002 10:18AM in 05:50 on line (10) for GL0607 * Pg 9/11
DEC-06-2002   11:55          ANADARKO CONGO COMPANY              281 261 0192    P.09/11

## OVER/UNDER LIFT CALCULATION
### YOMBO FIELD LIFTING

GAR 03434

# ENGLISH

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 1/12

DEC-06-2002  12:50        ANADARKO CONGO COMPANY                    281 261 0192    P.01/12

## AMENDMENT TO LIFTING AGREEMENT

### BETWEEN THE UNDERSIGNED :

The Société Nationale des Pétroles du Congo ("SNPC"), successor to the Société Nationale de Recherche et d'Exploitation Pétrolières (Hydro-Congo), represented by its Chairman, Mr. Bruno J.R. ITOUA.

On one part,

### AND:

On the other hand,

The corporations CMS NOMECO Congo, Inc. successor to Walter International Inc., itself successor to Amoco Congo Exploration ("CMS Congo"), represented by its Chairman, Mr. Jon Ozourgit.

The Nuevo Congo Company successor to Amoco Congo Petroleum Co. ("Nuevo Congo"), represented by its Senior Vice-President, Mr. Robert M. King,

and NUEVO Congo Ltd successor to Kufpec (Congo) Limited) ("Nuevo Ltd."), represented by its Senior Vice-President, Mr. Robert M. King,

jointly referred to hereinafter as the "Parties" and individually as the "Party", with CMS Congo, Nuevo Congo and Nuevo Ltd. being sometimes hereinafter collectively referred to as the "International Oil Companies" or "IOC's".

### WHEREAS:

1.   Per the decree № 79/253 of the 16th of May 1979, the Government of the Republic of Congo ("the Government") has granted to the Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO) an Exploration Permit known as "Marine I".

2.   On May 25, 1979 the predecessors to the present Parties and the Government executed a Convention relating to the Marine I area (the "Convention");

1

GAR 03437



Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 2/12
DEC-06-2002  12:50        ANADARKO CONGO COMPANY                   201 261 0192     P.02/12

3.  On May 25, 1979, the predecessors to the present Parties executed an Association Contract (the "JOA"), regulating the petroleum operations on the Marine I area;

4.  On the 15th of March 1989, the Government, via Decree № 89/211, granted to the Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO), the Field known as the Yombo-Masseko-Youbi, the currently productive area covered by the said permit being hereinafter referred as "Yombo Field";

5.  In June 1991, the predecessors to the Parties commenced production of crude oil from the Yombo Field, after the commissioning of the offshore installations, the said production having to be routed through a network of subsea pipelines up to a central offshore tank that is a floating storage vessel intended to the production, storage and unloading of the said crude (hereinafter referred as the "Storage Vessel");

6.  On September 20, 1991 the predecessors to the Parties entered into a Lifting Agreement which defined the procedures, priorities and rules applicable in order to implement the methodical and efficient lifting of the crude oil from the Storage Vessel onto the Lifting Vessel;

7.  The Government has enacted the following decrees (hereinafter collectively referred to as the "Decrees") regarding SNPC;

•  Decree No 99-51 dated April 9, 1999 transferred to SNPC all the petroleum assets and direct and indirect taxes of whatever kind, formerly held by Hydro-Congo , in all the activities relating to the exploration, the exploitation, the processing and transformation of the hydrocarbons and the derivative or related substances.

•  Decree No 99-171 dated September 18, 1999 transferred to the Société Nationale des Pétroles du Congo the assets, rights and participating interests held directly by the Government on the permits and petroleum contracts;

8.  On October 14, 1991, The Republic of Congo and the National Union Fire Insurance Company of Pittsburgh and the American International Group entered into a Settlement Agreement (the "Settlement Agreement") settling a law suit entitled National Union Fire Insurance Company of Pittsburgh ("NUFI") vs. The People's Republic of Congo, Case № 91 C 3172, then pending in the United States District Court for the Northern District of Illinois (the "NUFI Litigation").

9.  On December 5, 1991, the Tribunal in the NUFI Litigation, in accordance with the terms of the Settlement Agreement, has issued an Amended Turnover Order (the "Turnover Order") directing Amoco Congo Exploration Company and Amoco Congo Production Company (since renamed CMS NOMECO Congo, Inc. and The Nuevo Congo Company) to pay to NUFI 50% of the mining royalty (the "Royalty ") as that term is defined in the

2

GAR 03438

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 3/12

DEC-06-2002  12:51        ANADARKO CONGO COMPANY           281 261 0192    P.03/12

Turnover Order and Settlement Agreement, due to the Republic of Congo, under the
Convention and JOA, interests included.

10.  On December 9, 1991, the Secretary of State for the Budget of the Republic of Congo
     similarly directed Amoco Congo Exploration Company and Amoco Congo Production
     Company to pay 50% of the mining royalty due to the Republic of Congo under the
     Convention and JOA, to NUPL. Consequently CMS NOMECO Congo, Inc and The
     NUEVO Congo Company have since paid fifty percent (50%) of the Government's share
     of corresponding mining royalty to NUPL

11.  On October 30, 1999, SNPC was notifying CMS Congo, Operator of Yombo Field, that
     in accordance with the provisions of the Decrees and the Convention and JOA, it
     intended to market itself its share of crude oil available from Yombo Field. The Parties
     met informally and agreed in principle to the timing and methods by which SNPC would
     take its crude oil entitlement in kind. CMS confirmed these understandings by a letter
     dated November 26, 1999.

     For your information, it is reminded that the procedures concerning these arrangements
     and repeated in the article 1.1 hereunder have been applied since the lifting № 82. The
     details of the lifting since the lifting № 82 until the effective date of the present
     Agreement, as well as the actual balance states of Over-Under-Lifting for the SNPC and
     the IOC's are enclosed in the Annex 1 and incorporated in the present Agreement.

12.  The Parties now wish to formalize their agreement in principle on the procedures and
     conditions by which SNPC will exercise its right to take in kind and separately market its
     share of crude oil available in kind.

     This Amendment completely explain the duties and obligations regarding its rights to
     take its own share of crude oil in kind and, cancel and replace the letter of November 26,
     1999.

Capitalized terms shall have the meaning ascribed to them in definitions within this Amendment,
the Lifting Agreement, the Convention or JOA.

NOW THEREFORE the Parties agree to the following terms and conditions which hereby amend
the terms and conditions of the Lifting Agreement into these relevant provisions.

## ARTICLE 1 -  LIFTING NOMINATIONS

The procedures defined by the Parties during their meetings of the month of November 1999 are
adopted as said hereafter:

1.1  The IOC's will initially have priority to nominate and lift all the Available Oil whereas
     the SNPC will nominate no Available Oil but will progressively accrue a resulting

3

GAR 03439

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 4/12

DEC-06-2002  12:51    ANADARKO CONGO COMPANY    281 261 0192    P.04/12

Underlift balance. The SNPC will nominate the Available Oil and will take in kind and separately market the next lifting after the lifting at which SNPC's Underlift balance exceeds 275,000 barrels that is to say one-half of what historically has been an average load during liftings at the Yombo Terminal.

As used herein, the term "Available Oil" shall mean all the oil that has been processed and is in storage on the Storage Vessel except for quantities of such crude oil processed and used by the Operator for production operations and to maintain the ballast of the Storage Vessel as well as any stocks of Wet Crude (defined herein below).

1.2    As a result of its lifting, SNPC will incur an Overlift balance equal to the number of barrels actually lifted reduced by its cumulative Underlift balance resulting from its previous lifting, reduced by the number of barrels representing its entitlement from this lifting.

1.3    IOC's will build-up a corresponding Underlift balance. Thereafter, the IOC's will again nominate and lift all the Available Oil until the SNPC's Underlift balance reaches again 275,000 barrels, a quantity bringing this one in the position to carry out the next lifting.

1.4    (1) Within the ten days following the end of each month, the Operator will provide the following information:

      (a)  Total production of the month.
      (b)  For each party,
          1. The share of available oil,
          2. The crude production,
          3. The autoconsumption.
      (c)  Quantity of refunding oil,
      (d)  Position of each party's stock at the end of each month.

(2) Within fifteen (15) days from each lifting, the Operator will communicate to the parties the current accounts of the Underlift or Overlift balances.

## ARTICLE 2 - NOTICE AND FAILURE TO LIFT

2.1  Notwithstanding the provisions of Article 2 of the Lifting Agreement, each Party shall give 25 days advance notice to the other Parties of its intent to conduct a lifting of crude oil and specify a five-day Date Range.

This Party must then nominate a Lifting Vessel within 14 days of the start of the Date Range and give the required three-day Date Range as per the provisions of Article 2.6 of the Lifting Agreement.

4

GAR 03440

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 5/12
DEC-06-2002   12:52       ANADARKO CONGO COMPANY              281 261 0192      P.05/12

The Lifting Party shall make the effort to communicate to the Operator a precise date for commencement of the Lifting to allow the Operator to arrange for tugs and personnel. The Lifting Vessels shall conduct lifting operations in strict observance of the Yombo Oil Terminal regulations, including the amendments.

The lifting Party must provide, as per Article 2.6 of the Lifting Agreement, any information that the Operator could reasonably request. Within 24 hours of receiving the lifting nomination and the required information, the Operator will inform the relevant Party if the nominated Lifting Vessel is acceptable or not.

If the Vessel is not acceptable, the Party must nominate an alternate Lifting Vessel within 72 hours.

2.2    If this notice is not timely given, the Lifting Vessel is not timely nominated, or if a lifting is not carried out as scheduled, then, in accordance with the provisions of Article 5 of the Lifting Agreement, the Operator may make other arrangements to carry out the lifting and marketing of the crude oil, in accordance with the provisions of article 5.2 of the Lifting Agreement

The Party that defaults lifting in this way will consequently bear all the costs and expenses really incurred, associated with the loading, as those tied to tugboats, personnel, mooring or piloting, governmental inspectors, berthing time, without being a closed list.

## ARTICLE 3 -    OIL PROCESSING

The process of treating Yombo crude oil on the Storage Vessel to make it marketable as No. 6 crude oil, generates certain quantities of residual crude oil having high sulfur, sediment and water content and must be marketed separately from Yombo No. 6 (hereinafter "Wet Oil"). The Parties agree that CMS Congo as Operator shall be responsible for causing the Wet Oil to be lifted and marketed and it will pay back to the Parties the proceeds of this sale including the Royalty share coming to NUFI.

## ARTICLE 4 -    MARKETING AGREEMENTS

4.1    The Parties agree that for the purpose of calculating mining royalty, including the NUFI Royalty , the actual price of the Operator, stemming from the current sales contract in force between the Operator and the Purchaser, shall be used as calculation base so long as such contract will guarantee competitive price and has a non affiliated entity.

In the event of sales to an affiliate of the Operator, the mining royalty will be calculated, based on the average price of identical international sales of crude oil of equivalent

5

GAR 03441

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 6/12

DEC-06-2002   12:52        ANADARKO CONGO COMPANY              281 261 0192    P.06/12

quality and gravity and transportation costs. The royalty calculation provided herein shall be in lieu of the provisions of Annex II of the Convention.

4.2    Quantities of oil to be taken in kind, in accordance with this Lifting Agreement as amended and, separately marketed by the SNPC ("SNPC Oil Entitlement") will correspond (i) to the Government's and/or SNPC's share of crude oil that is free under Article 9.02 of the JOA and (ii) mining royalty taken in kind under 4.11 of the JOA and their share entitlement to the mining royalty under Articles 5.03 and 7 of the Convention, as amended, decreased by the NUPI royalty share until the settlement of the corresponding debt

4.3    For the SNPC's liftings, the IOC's will pay cash the royalty share that comes to NUPI, on the volume base lifted by the SNPC. These advances as payment of the NUPI royalty share shall be charged into the SNPC advance account, in accordance with the Article 9 of the JOA and shall be recouped by the IOC's on the future sales of hydrocarbons in accordance with the Article 9.02 of the JOA. The payments to the NUPI will continue until the refund of the amounts due under the Settlement Agreement and Turnover Order.

## ARTICLE 5 -   LIFTING AND RELATED COSTS

5.1    The SNPC will incur certain costs associated with its liftings.

Those costs include, and are not limited to those tied to the tugs, the personnel, the mooring operations and the costs of transportation to the terminal (collectively referred hereinafter as "Lifting Costs").

If the SNPC does not pay its lifting costs, the Parties agree that the IOC's will bear and pay SNPC's Lifting Costs, subject to reimbursement in the form of the receipt and marketing of a portion of SNPC's Oil Entitlement, representing the economic equivalent of the said Lifting Costs of the SNPC borne by the IOC's.

5.2    In addition to maintaining records required under the Lifting Agreement, the Operator shall create and maintain on its books an accounting ("Over and Under Account") in which SNPC's Lifting Costs paid by the IOC's on behalf of the SNPC on its liftings shall be registered as debts from the SNPC to IOC's.

The debt from SNPC to the IOC's will be repaid out of SNPC's share of the production of crude oil.

6

GAR 03442

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 7/12

DEC-06-2002   12:53       ANADARKO CONGO COMPANY                 281 261 0192      P.07/12

At the next lifting succeeding a SNPC lifting, the IOC's will lift and market this number of barrels at the contract price sufficient to reimburse their claim from the SNPC.

The Operator shall maintain a record in its accounting books in order to register the equivalent quantities of crude, lifted and sold by the IOC's to defray SNPC's Lifting Costs. The barrels sold this way will reduce SNPC's entitlement to Available Oil as well as its Stock Position as mentioned in Article 1.4 above.

In accordance with the accounting procedure of JOA, this Amendment does not change nor restrict the rights of the SNPC as a non-Operator, to have the statements kept in these books audited.

5.3    The SNPC may elect to pay its own lifting costs and make its own arrangements for tugs, personnel, mooring or piloting, governmental inspectors, etc. by giving 30 days written notice in advance of its lifting to the Operator.

However any amounts owed by SNPC entered in the Operator's Over and Under account for its previous liftings will be paid in accordance with the terms of Article 5.2 above.

In the event of non-payment by the SNPC of its lifting costs after having given notice of its intent to bear same, the IOC's will consequently pay such costs, subject for the Operator to enter the corresponding amounts to the Over and Under Account of the SNPC. These amounts will be refunded in accordance with the provisions of this article 5.

5.4    The SNPC will settle the Maritime Tax associated to its own liftings. Consequently, the IOC's will be discharged of any liability concerning the obligations to settle the Maritime Tax relating to liftings carried out by the SNPC.

## ARTICLE 6 - APPROVALS

Except for the amendments brought hereby, the Parties re-affirm and ratify the Lifting Agreement, including the provisions from the JOA which are incorporated or quoted as reference and agree to be bound by and to comply with its clauses including, without limitation, the provisions relating to liftings and deliveries, to the statements provided by the Operator, demurrage, loading and mooring, measurements, risk of loss, final settlement, and the like.

7

GAR 03443

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 8/12
DEC-06-2002  12:53     ANADARKO CONGO COMPANY              281 261 0192    P.08/12

This Amendment cancels and replaces the letter of November 26, 1999 mentioned in point 11 of the preamble, in its provisions contrary to the provisions hereby.

Made in Pointe Noire , on the 4th of July 2001

In as many copies as parties:

Société Nationale des Pétroles du Congo


By: _____
          Chairman


CMS NOMECO Congo, Inc.

By: _____
          Chairman


The Nuevo Congo Company


By: _____
        Senior Vice-President


NUEVO Congo Ltd.


By: _____
        Senior Vice-President

GAR 03444

Received 12/06/2002 11:17AM in 05:34 on line (7) for GLO407 * Pg 9/12

DEC-06-2002    12:54          ANADARKO CONGO COMPANY              201 261 0192    P.09/12

Le présent Avenant annule et remplace la lettre du 26 novembre 1999 visée au point 11 du préambule, en ses dispositions contraires aux présentes.

Fait à Pointe Noire le, 4 Juillet 2001.

En autant d'exemplaires originaux que de parties.

Société Nationale des Pétroles du Congo

Par: _Bruno J.R. ITOUA_____
       Président Directeur Général

CMS NOMECO Congo, Inc.

Par: _____
       Président Directeur Général

The Nuevo Congo Company

Par: _____
       Vice-Président Senior

NUEVO Congo Ltd.

Par: _____
       Vice-Président Senior

8

GAR 0345

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 10/12
DEC-06-2002   12:54          ANADARKO CONGO COMPANY                    281 261 0192    P.10/12

## OVER/(UNDER) LIFT CALCULATION
### YOMBO FIELD LIFTING

GAR 03446

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 11/12
DEC-06-2002   12:54      ANADARKO CONGO COMPANY                    281 261 0192    P.11/12

| | | | | | | |
|---|---|---|---|---|---|---|
| | | OVERLANDERS LIFT | (477,808) | (187,376) | 477,808 | 187,381 |
| | | ROYALTIES IN KIND | 31,800 | (135,491) | (31,800) | 123,491 |
| | | LIFT 80NT | (7,108) | (193,840) | 7,592 | 193,840 |
| 63 | 87,139 | BARRELS LIFTED ENTITLEMENT OVER(UNDER) LIFT | 87,833 82,142 7,382 | (185,404) | 0 2,85 (7,382) | 185,471 |
| 90 | 413,588 | BARRELS LIFTED ENTITLEMENT OVER(UNDER) LIFT | 413,588 420,143 53,845 | (85,482) | 0 53,845 (53,845) | 85,482 |
| | | ROYALTIES IN KIND | 33,483 | (35,593) | (33,483) | 35,593 |
| 3RD QTR 90 | | ROYALTIES IN KIND | 17,345 | (16,353) | (17,345) | 16,353 |
| 94 | 603,143 | BARRELS LIFTED ENTITLEMENT OVER(UNDER) LIFT | 603,143 614,538 53,832 | 41,445 | 0 57,835 (53,835) | (58,887) |
| 4TH QTR 05 | | ROYALTIES IN KIND | 8,481 | 65,673 | (65,480) | (104,122) |
| FINAL 90 | | ROYALTIES IN KIND | (835) | 55,446 | (8,704) | (116,504) |
| 95 | 603,335 603,335 | BARRELS LIFTED ADVANCED BARRELS LIFTED ENTITLEMENT OVER(UNDER) LIFT | 603,353 467,358 53,832 | 187,871 | 0 53,835 (53,835) | (171,348) |
| | 105,043 | ROYALTIES IN KIND TAX MONETISE (LIFT 70-55) | 35,885 (103,043) | 104,840 (91,488) | (55,885) (105,043) | (805,479) (105,580) |
| 1ST QTR 91 | | ROYALTIES IN KIND | 8,855 | 65,375 | (8,555) | (195,504) |
| 96 | 603,341 603,384 | BARRELS LIFTED ADVANCED BARRELS LIFTED ENTITLEMENT OVER(UNDER) LIFT | 603,334 485,135 75,845 | 371,710 | 0 75,844 (75,844) | (105,056) |
| | 4,488 | ROYALTIES IN KIND TAX MONETISE (LIFT 74) | 33,588 (4,888) | 184,483 354,403 | (55,385) 4,888 | (308,457) (391,447) |
| 97 | 604,876 603,876 | BARRELS LIFTED ADVANCED BARRELS LIFTED ENTITLEMENT OVER(UNDER) LIFT | 604,876 485,135 75,533 | 375,588 | 0 75,844 (75,844) | (308,957) |
| | 4,318 | ROYALTIES IN KIND Balance TAX MONETISE (LIFT 97) Balance | 33,580 (4,588) | 146,893 371,838 | (55,385) 4,388 | (308,837) (308,912) |

FOREIGN PARTNERS REVENUE PERCENTAGE/ENTITLEMENT = 87.35
SNPC REVENUE PERCENTAGE/ENTITLEMENT = 18.85
LIFT 84 WAS WET CRUDE LIFTING AND PROCEEDS AND ROYALTIES WERE PAID IN CASH

*[handwritten notes]*

GAR 03447

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 12/12
DEC-06-2002   12:55       ANADARKO CONGO COMPANY           281 261 8192     P.12/12

## SNPC OVER/UNDER CHECK

| ACTIVITIES | SALE | O/U SNPC | O/U ROY |
|---|---|---|---|
| LB 82 | 600,081 | 62,810 | |
| 82 royalty | | | 28,209 |
| LB 83 | 549,409 | 67,887 | |
| 83 royalty | | | 31,538 |
| LB 85 | 584,445 | 74,306 | |
| 85 royalty | | | 34,191 |
| 4 qtr 99 royalty | | | 18,781 |
| LB 86 (snpc) | 802,888 | (421,036) | (104,497) |
| 86 royalty | | | 34,695 |
| LB 87 98 cost | 78,530 | | |
| LB 87 remainder | 494,206 | 54,276 | |
| 87 royalty | | | 28,788 |
| LB 88 | 585,784 | 66,734 | |
| 88 royalty | | | 31,065 |
| 1 qtr 00 royalty | | | 12,912 |
| LB 89 | 522,162 | 66,645 | |
| 89 royalty | | | 31,666 |
| LB 90 | 590,712 | 73,969 | |
| 90 royalty | | | 35,120 |
| 2 qtr 00 royalty | | | 10,165 |
| LB 91 | 504,743 | 63,093 | |
| 91 royalty | | | 28,655 |
| LB 92 (snpc) | 545,223 | (262,405) | (214,664) |
| 92 royalty | | | 31,850 |
| LB 93 98 cost | 87,699 | | |
| LB 93 remainder | 489,590 | 60,449 | |
| 93 royalty | | | 32,400 |
| 3 qtr 00 royalty | | | 17,249 |
| LB 94 | 656,162 | 82,020 | |
| 94 royalty | | | 36,455 |
| 4 qtr 00 royalty | | | 9,761 |
| 1998 final roy | | | (186) |
| Tax multiese (LB 70-85) | 100,046 | | (100,046) |
| LB 85 remainder | 500,283 | 62,535 | |
| 85 royalty | | | 30,895 |
| 1 qtr 01 royalty | | | 8,889 |
| LB 96 | 600,391 | 75,044 | |
| Tax multilese (LB 96) | 4,660 | | (4,660) |
| 96 royalty | | | 35,566 |
| LB 97 Exim | 600,670 | 75,084 | |
| Tax multilese (LB 97) Exim | 4,916 | | (4,916) |
| 97 royalty Exim | | | 36,299 |

| | 197,781 | 136,761 | 328,813 Total Over/Under |

GAR 03446