# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONNECTICUT BANK OF COMMERCE | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-762 (SLR) |
| THE REPUBLIC OF CONGO, | ) ) | |
| Defendant. | ) ) | |

## AF-CAP, INC.'S REPLY BRIEF IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**GREENBERG TRAURIG LLP**
Sanford M. Saunders, Jr.
Kenneth P. Kaplan
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC  20006
(202) 331-3100

*Attorneys for Af-Cap, Inc.*

Dated:  December 21, 2005

**GREENBERG TRAURIG LLP**
Paul D. Brown (No. 3903)
Joseph B. Cicero (No. 4388)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801
(302) 661-7000

*Attorneys for Af-Cap, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................1

ARGUMENT .....................................................................................................................2

    I.     CMS's Default In Answering The Writ of Garnishment Was Not Cured By The Notice of Removal ................................................................................................2

    II.    CMS's Defenses Are Barred Under The Doctrine Collateral Estoppel...................4

          A. The Fifth Circuit has Ruled that the Royalty Obligation is Subject to Attachment................................................................................................4

          B. The Fifth Circuit has Ruled Against CMS and Held that the Royalty Obligation is in the United States. ............................................................5

          C. The Fifth Circuit has Ruled Against CMS and Held that they Act of State Doctrine Does Not Apply. ..........................................................................6

    III.   CMS's Argument of "Double Liability" Fails As A Matter Of Law. .....................7

    IV.   There Is No Other Impediment To This Enforcement Proceeding........................12

          A. When Dissolving Writs in Texas, The Texas District Court Judge Applied Texas, not Delaware Garnishment Law..........................................................12

          B. The Timing of the Lifting is Irrelevant to the Garnishment of the Royalty Obligation. ....................................................................................................13

    V.    CMS's Assertion Of The Doctrine Of "Foreign State Compulsion" Fails As A Matter Of Law...................................................................................................17

CONCLUSION.................................................................................................................19

# TABLE OF AUTHORITIES

**Federal Cases**

Af-Cap, Inc. v. Republic of Congo and CMS Oil and Gas Co., et al.,
383 F.3d 361 (5th Cir. 2004)..................................................................passim

All Serivce Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus
Do Brazil, S.A., New York Branch, 921 F.2d 32, 36 (2d Cir. 1990)......................8

All Service Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do
Brazil, S.A., New York Branch, 1990 WL 170343 (No. 90 Civ. 6797)
(S.D.N.Y. Oct. 31, 1990) affirmed 921 F.2d 32 (2d Cir. 1990)...........................7, 8

Arnold v. Blast Intermediate Unit 17, 843 F.2d 122, 125 (3d Cir. 1988).......................3

Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S. Ct. 923
(1964)......................................................................................................6

Banco de Nacional de Cuba v. Sabbatino, 84 U.S. 923, 931, 76 U.S. 298
(1964)......................................................................................................7

Banco de Vizcaya, S.A. v. First National Bank of Chicago, 514 F. Supp. 1280 (7th Cir.
1981)...................................................................................................9, 10

Bank Leumi Trust Co. v. Wulkan, 735 F. Supp. 72, 77 (S.D.N.Y. 1990)..........................9

Board of Trustees v. Centra, 983 F.2d 495, 505 (3d Cir. 1995)................................4, 5, 7

Callejo v. Bancomer, S.A., 764 F.2d 1101, 1112-24 (5th Cir. 1985)................................6

Copeland v. Merrill Lynch & Co., Inc., 47 F.3d 1415 (5th Cir. 1995)..............................13

D'Angelo v. Petroleos Mexicanos, 378 F. Supp. 1034, 1038-39 (D. Del. 1977)............6, 15, 16

FG Hemisphere v. Republique du Congo, No. H-02-4261 (S.D. Tx. Sept. 14, 2005)..............14

General Electric Capital Corp. v. Jane R. Her Engines, 2000 WL 825679 (E.D.La.
June 23, 2000)...........................................................................................3

Guild Trust v. Union Pacific Land Resources Corp., 682 F.2d 208 (10th Cir. 1982)............13

Interamerican Ref. Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291,
1298 (D. Del. 1970)....................................................................................17

LNC Investments, Inc. v. Democratic Republic of Congo, 69 F. Supp. 2d 607, 611.........14

LNC Investments, Inc. v. Repubic of Nicaragua, No. 01-134-JJF (D. Del. Dec. 18, 2002).......10

Mannington Mill, Inc. v. Congoleum Corp., 595 F.2d 1287, 1293 (3d Cir. 1979)...........17

Medical Corp. v. Baker, 1996 WL 571544.....................................................13

Metromedia Co. v. Fugazy, 983 F.2d 350, 365 (2d Cir. 1992) cert. denied 508 U.S. 952
      (1993)..................................................................................12

Philippine National Bank v. United States District Court, 397 F.3d 768 (9th Cir. 2005)....6

Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 78 F.R.D. 445, 459 (D. Del. 1978)...........17

Reebok Int'l Ltd. v. McLauglin, 49 F.3d 1387 (9th Cir. 1995).................................18

Resolution Trust Corp. v. Ruggiero, 994 F.2d 1221, 1226 (7th Cir. 1993)....................3

RSB Manufacturing Corp. v. Bank of Baroda, 15 B.R. 650, 654 (S.D.N.Y. 1981)...........7

Schreiber v. Kellogg, 50 F.3d 264, 267 (3d Cir. 1995)..........................................3

U.S. v. First Nat'l City Bank, 396 F.2d 897, 901 (2d Cir. 1968)...............................17

U.S. v. Pacific Forwarding Co., 8 F. Supp. 647, 650 (D.C. Wa. 1934).......................2, 3

UMS Partners, Ltd. v. Jackson, 1995 WL 413395, *5 (Del. Super. Ct. Jun 15, 1995).......5, 6

World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154 (D.C. Cir. 2002)...7

**State Cases**
Canadian Imperial Bank of Commerce v. Pamukbank, 166 Misc.2d 647,
      632 N.Y.S.2d 918 (Sup. Ct. N.Y. Cty. 1994)..........................................10

Cooper's Home Furnishings, Inc. v. Lolly, 270 A.2d 676, 678..............................2, 14

McNeilly v. Furman, 95 A.2d 267, 271 (Del. 1953).........................................14

Netter Bros. v. Stoeckle, 56 A. 604 (Del. Super. Ct. 1903)...................................6

Parker, Peebles & Know v. Nat'l Fire Ins. Co., 150 A.313 (Conn. 1930)....................11

Weitzel v. Weitzel, 27 Ariz. 117 (Ariz. 1924).................................................11

West v. Baker, 510 P.2d 710, 734 (Ariz. 1973)...................................................11

**State Statutes**
10 *Del. C.* § 3508..........................................................................................14
10 *Del. C.* § 3509............................................................................................2

**State Rules**
Fed. R. Civ. P. 69...........................................................................................3
Fed. R. Civ. P. 81(c)........................................................................................2

## PRELIMINARY STATEMENT

In this garnishment action, Plaintiff Af-Cap, Inc. ("Af-Cap"), submits this brief in further support of its motion for summary judgment against garnishee CMS Nomeco Congo, Inc. ("CMS").

CMS defaulted under Delaware garnishment rules by failing to serve a verified answer to the writ of garnishment. CMS now claims that the notice of removal it filed instead tolled the time within which it was required to answer the writ. Although, upon removal of a non-garnishment action, the Federal Rules of Civil Procedure may supersede local procedural rules, this is a garnishment action under Delaware law and the rules governing such actions are substantive and applied in federal court through Federal Rule 69. CMS is in default and judgment should be entered accordingly.

Even if this Court were to reach CMS's defenses to the motion, Af-Cap would still prevail because CMS relies largely on the very issues it raised before the Fifth Circuit and lost, namely that (1) the royalty obligations of CMS to the Republic of Congo ("Congo") under the Convention are subject to attachment; (2) the situs of the royalty obligations is the United States, and CMS is therefore subject to attachment in the United States, specifically Delaware where CMS is incorporated; and (3) the "act of state doctrine" in no way shields CMS from an attachment of its royalty obligations. Thus, CMS is collaterally estopped from even raising them here.

Ironically -- and baselessly, CMS asserts that Af-Cap is somehow barred from seeking to garnish the royalty obligation at issue by reason of a district court ruling in Texas that under the unique provisions of Texas garnishment, the obligation owed by CMS to Congo was not attachable at the time because CMS had no obligation to Congo at the time. A ruling under Texas garnishment statutory law cannot possibly prevent or prejudge a ruling under Delaware

statutory garnishment law -- indeed, since the two bodies of statutory law involve different statutory terms, different legislative history and a different body of judicial interpretation, any basis for such an argument escapes imagination. Case law clearly demonstrates that under Delaware statutory law, CMS's royalty obligations are clearly subject to attachment.

Finally, CMS's attempt to defeat garnishment here by invocation of "double liability" and the "foreign compulsion" doctrines is equally unavailing. Simply because CMS may be facing liability both in the courts of the United States and in courts of the Congo does not permit CMS to avoid an adjudication of the parties' rights. The courts are clear that this is a risk inherent in international transactions, and the courts will not afford CMS any protection from the price of doing business abroad.

Accordingly, the Court should enter judgment against CMS without hesitation.

## ARGUMENT

### I.   CMS'S DEFAULT IN ANSWERING THE WRIT OF GARNISHMENT WAS NOT CURED BY THE NOTICE OF REMOVAL

In response to the clear mandate of 10 *Del. C.* § 3509 that a garnishee must file timely a verified answer following service of a writ of attachment, CMS argues that the notice of removal it served on the same day the answer to the writ was due somehow operated to extend under Federal Rule of Civil Procedure 81(c) the time within which CMS had to file its answer. CMS is wrong. Rule 81(c) provides only that upon removal, the Federal rules "govern procedure after removal," and the Delaware garnishment procedures are substantive, not procedural. *See Cooper's Home Furnishings, Inc. v. Lolly*, 270 A.2d 676, 678 (Del. Super. Ct. 1970).

In particular, it is well-settled that the federal district courts are without authority to preside over attachment proceedings unless given such power by statute. "[G]arnishment is a statutory remedy," and therefore the District Courts have no inherent power and "may not

2

proceed in attachment unless the power is given by statute." *U.S. v. Pacific Forwarding Co.*, 8 F. Supp. 647, 650 (D.C. Wa. 1934) (citing *United States v. Bailey*, 52 F.2d 286, 287 (D. Ga. 1931)). Furthermore, under Rule 69 of the Federal Rules of Civil Procedure, proceedings supplementary to and in aid of a judgment are conducted "in accordance with the practice and procedure of the state in which the district court is held," absent a controlling federal statute. Fed. R. Civ. P. 69(a); *Schreiber v. Kellogg,* 50 F.3d 264, 267 (3d Cir. 1995); *Arnold v. Blast Intermediate Unit 17*, 843 F.2d 122, 125 (3d Cir. 1988).

In other words, state laws and rules regarding enforcement of judgments, specifically those relating to garnishment proceedings, are substantive. *See Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993) (holding that state enforcement proceedings apply in federal court and reference in Rule 69(a) to governing statutes of the United States refers to federal statutes <u>expressly governing execution,</u> but not the rules of federal procedure or of evidence). *See also General Electric Capital Corp. v. Jane R. Her Engines*, 2000 WL 825679 (E.D. La. June 23, 2000) (specific articles within Louisiana Code of Civil Procedure addressing garnishment proceedings making specific provisions for service apply pursuant to Rule 69(a)) (attached as Exhibit A hereto).

Since, under Rule 69(a), the substantive law of Delaware in these garnishment proceedings applies, CMS's argument is merely an attempt to excuse its failure to file a verified answer according to Section 3509 and is without merit. *Schreiber,* 50 F.3d at 267. Accordingly, CMS is in default in the garnishment action and summary judgment should be entered in favor of Af-Cap.

## II.  CMS'S DEFENSES ARE BARRED UNDER THE DOCTRINE OF COLLATERAL ESTOPPEL

The central defenses CMS raises against entry of judgment for Af-Cap are not new.  As explained below, CMS raised them already before the Fifth Circuit and they were rejected in *Af-Cap, Inc. v. Republic of Congo and CMS Oil and Gas Co., et al.*, 383 F.3d 361 (5th Cir. 2004).  CMS, therefore, cannot raise them again here.

The doctrine of collateral estoppel bars a party from re-litigating issues if:

> (1) [T]he identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issues in question.

*Board of Trustees v. Centra*, 983 F.2d 495, 505 (3d Cir. 1995) (citing *Temple Univ. v. White*, 941 F.2d 201, 212 (3d Cir. 1991) *cert. denied* 502 U.S. 1032 (1992)).  In particular, CMS is collaterally estopped from arguing that: (1) the oil royalty obligation is not subject to garnishment (CMS Br. at 18), and (2) the "Act of State Doctrine" purportedly bars the requested relief (CMS Br. at 30) precisely because, with respect to these assertions, the Fifth Circuit has definitively and finally concluded that (1) the Congo's royalty obligation was not immune from attachment and execution under the FSIA; and (2) the situs of the debt, *i.e.*, where it is subject to attachment, is located wherever CMS (i.e., the debtor) is located in the United States.  *Id.* at 370-371.

### A.  The Fifth Circuit Has Ruled That The Royalty Obligation Is Subject To Execution

CMS argues that because the Congolese oil giving rise to the royalty obligation is a sovereign asset, the royalty obligation is not subject to attachment under the Foreign Sovereign Immunities Act.  It made this same argument before the Fifth Circuit -- and it has definitively

and finally lost this issue.   After a detailed analysis, the Fifth Circuit held that the royalty

obligations were used for "commercial activity" in the United States because the same stream of

revenue had been used by the Congo to pay a litigation settlement in the United States.   The

Circuit Court concluded that "it is difficult to say that execution on this obligation would be so

unusual that it would shock and disrupt the public affairs of the Congo."   *Id.* at 370-371.   As

such, the Fifth Circuit concluded that the assets at issue here *were not* immune from garnishment

under the Foreign Sovereign Immunities Act, or any other body of law applicable in U.S. courts..

**B.**     **The Fifth Circuit Has Ruled Against CMS And Held That The Royalty Obligation Is In The United States**

CMS further argues that under the Foreign Sovereign Immunities Act, the situs of CMS'

debt to the Congo is somewhere other than the United States.  (CMS. Br. at 20 (D.I. 15)).  The

Fifth Circuit has expressly, definitively and finally  rejected this argument as well.  *See Af-Cap,*

*Inc. v. Republic of the Congo*, 383 F.3d 361, 371 *modified* 389 F.3d 503 (5th Cir. 2004) *cert.*

*denied* 125 S. Ct. 1735 (2005).  In *Af-Cap*, the Fifth Circuit held that the "[w]e think a 'common

sense appraisal of the requirements of justice and convenience' in this particular context yields

the conclusion that the situs of these royalty obligations is the United States—the situs of the

Garnishees" and that, therefore, the debt is located in the United States wherever the CMS is

located. *Id.* at 371.

CMS argues that since CMS purportedly was "formed and headquartered" in the United

States only up through 2003, the Fifth Circuit's ruling is no longer applicable because CMS "no

longer has any physical offices, directors, officers or activities in the United States." (CMS Br,

Ex. A ¶ 2).  This argument is unavailing.  The plain language of the Fifth Circuit's decision

states that the situs of the royalty obligations is in the United States wherever the garnishee is

located for the purpose of being subject to suit.  CMS admits that it is incorporated in Delaware.

(*See* CMS Answer at 5, 16, 17 (D.I. 2)).   It is, thus, subject to suit in Delaware and "doing business" in Delaware.  *See UMS Partners, Ltd. v. Jackson*, 1995 WL 413395, *5 (Del. Super. Ct. Jun 15, 1995) (business incorporated under Delaware law may be brought before Delaware courts as a garnishee) (attached as Exhibit B hereto).   CMS is therefore present in Delaware as a matter of law and, accordingly, subject to suit in Delaware as a garnishee.  *Id.*; *see also, e.g.*, *D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034, 1038-39 (D. Del. 1977) (garnishee was qualified to do business in Delaware and therefore subject to suit there); *Netter Bros. v. Stoeckle*, 56 A. 604 (Del. Super. Ct. 1903) (holding judgment creditor has jurisdiction over garnishee when garnishee was subject to suit in Delaware).   CMS cites no case to the contrary, leaving intact and operative this long line of case law confirming that the situs of this debt remains in Delaware.

### C.    The Fifth Circuit Has Ruled Against CMS And Held That The Act of State Doctrine Does Not Apply

CMS asserts that the "act of state" doctrine prohibits the Court from issuing the requested writ of attachment (CMS Br. at 30-32 (D.I. 15)).   Again, the Fifth Circuit has definitively and finally ruled against CMS on this very issue.   In particular, the Fifth Circuit held:

> The Congo Defendants [defined to include CMS] also argue that the act of state doctrine would apply; this means that the situs of foreign debt obligations must be the foreign country because a contrary conclusion would improperly "antagonize the foreign government." However, the act of state doctrine is inapplicable in this context. As the Supreme Court, and this court, have made clear, the act of state doctrine applies only when the dispute implicated the legitimacy of a public act undertaken by a sovereign nation. . . .Because this case does not involve such a public act, but rather a mere dispute over the payment of a debt the Congo does not dispute that it owes, <u>the act of state doctrine does not apply.</u>

*Af-Cap*, 383 F.3d at 372 n. 14 (emphasis added) (citing rulings against application of act of state doctrine defense in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S. Ct. 923

(1964) and *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1112-24 (5th Cir. 1985)).[1]  In *Af-Cap*, the Congo Defendants, including CMS, sought certiorari, but the Supreme Court denied the application.  Since *Af-Cap* represents a final judgment on the merits, CMS may not raise the issue again here.  CMS is barred from asserting the act of state doctrine as a defense to this action.  *See Centra* 983 F.2d at 505.

## III.    CMS'S ARGUMENT OF "DOUBLE LIABILITY" FAILS AS A MATTER OF LAW

CMS also asserts that summary judgment should not be granted because it may be subject to "double liability" based upon certain orders issued by Congolese courts (CMS Br. at 11 (D.I. 15)).  This argument is also without merit.  Courts have considered and routinely rejected a defense of double liability in international transactions.

The circumstances in which a United States court will recognize or give effect to a foreign court decree depend entirely upon the doctrine of comity.  *Banco Nacional de Cuba v. Sabbatino*, 84 U.S. 923, 931, 76 U.S. 298 (1964) (following *Hilton v. Guyot*, 159 U.S. 113 (1895)).  And, as a matter of comity, a "foreign court's decree restraining a party to a contract cannot excuse a performance [of a contract which was] to take place in the United States. . . . [The foreign decree] will [only] excuse a performance to take place within that court's jurisdiction."  *RSB Manufacturing Corp. v. Bank of Baroda*, 15 B.R. 650, 654 (S.D.N.Y. 1981) (citing 6A Corbin on Contracts § 1351).  *See also All Service Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A., New York Branch*, 1990 WL 170343 (S.D.N.Y. Oct. 31, 1990) *affirmed* 921 F.2d 32 (2d Cir. 1990) (attached as Exhibit C hereto).  Here, there is no

---

[1] The cases cited by CMS do not, in any event, support a different result.  In *Philippine National Bank v. United States District Court*, 397 F.3d 768 (9th Cir. 2005), the Ninth Circuit found as a matter of law that the assets were not subject to the "commercial activity" exception to the FSIA and the action was one initiated by the Philippine government pursuant to its "statutory mandate to recovery property allegedly stolen from the treasury."  Similarly, in *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002), on appeal no argument was made as to whether or not the "commercial activity" exception to the FSIA applied.

dispute that, under the terms of the orders issued by the Westerrn District of Texas, CMS has

been ordered to perform payment of all royalties in the United States. As a matter of U.S. law,

CMS cannot avoid the effect of these straightforward and incontrovertible circumstances.

The *All Service* case is instructive. The plaintiff, All Service, a Brazilian company,

entered into a contract with the New York branch of a Brazilian bank (Banco) for the sale of a

quantity of black beans from M.M., a company ultimately owned by the Peoples Republic of

China. All Service obtained from Banco at its home office in Brazil an irrevocable negotiable

letter of credit in favor of M.M. The letter of credit called for the presentation of payment by the

bank's branch in New York. All Service sought and was granted an order by a New York state

court (prior to removal) temporarily restraining M.M. from paying the letter of credit. Upon

motion of M.M. to vacate the restraining order, one of the arguments asserted by Banco against

the vacatur was that Banco was already subject to an order of injunction issued by a Brazilian

court, restraining the same funds, and therefore the restraining order should be kept in effect

pending the Brazilian court's proceedings involving the underlying transaction. The District

Court rejected this argument:

> Banco stresses that it is in an awkward position because of pending
> proceedings in Brazil and an order of injunction issued by a
> Brazilian court. While this court is not unsympathetic, the answer
> must be that having entered the New York letter of credit market of
> its own free will, Banco is bound by the prevailing law of that
> forum. In reaching that conclusion, this Court does no violence ot
> appropriate principles of comity between sovereign nations.

*Id.* at *3. The Second Circuit affirmed the District Court's findings:

> Banco stresses it is in an awkward position because of pending
> proceedings in Brazil. Banco has been advised by its Brazilian
> attorneys that if it honors the draft in contravention of the Brazilian
> injunction, it could lose its substantive rights to recover against All
> Service. But, [the District Court] properly concluded that Banco,
> having entered the New York letter of credit market on its own free
> will, was bound by the prevailing law of that forum.

8

*All Serivce Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A., New York Branch*, 921 F.2d 32, 36 (2d Cir. 1990).

The case of *Banco de Vizcaya, S.A. v. First National Bank of Chicago*, 514 F. Supp. 1280 (7th Cir. 1981) is also on point. There, the court rejected claims by the defendant bank, which had issued a letter of credit out of its Abu Dhabi branch, that it would be subject to a risk of inconsistent obligations arising from the issuance of an injunction by an Abu Dhabi court. The Seventh Circuit found:

> By doing business in Abu Dhabi, defendant not only reaps the benefits of the trade there but also incurs the attendant risks. The current dispute, which in defendant's view is the result of the peculiarities of Islamic law, could fairly be characterized as a cost of doing business under a foreign sovereign. To rule otherwise would shift the risk of doing business in Abu Dhabi to a party which had relatively little involvement with that forum. Plaintiff recognized the risks of conducting business in Abu Dhabi and sought to avoid them by bargaining for the right to be reimbursed in dollars in Chicago. Defendant's branch assumed these risk [sic] by agreeing to the reimbursement terms.

*Id.* at 1285-1286. In addition, the Seventh Circuit rejected the judgment of the Abu Dhabi court where such judgment was clearly against United States public policy, holding that the enforcement of the letter of credit "is vital to international commerce and to Illinois which provides a forum for international transaction. . . . to follow the Abu Dhabi ruling would not only compromise the public interest of this state, but would violate the recognized conventions of international trade." *Id.* at 1286-1287 (internal citations omitted).

District courts have made similar rulings. In *Irving Trust Company v. Mamidakis*, No. 78 Civ. 0265-CLB (S.D.N.Y. Oct. 19, 1978), the plaintiff "sought to enforce a Greek citizen's guaranties covering the obligations of Panamanian and Cyrian companies of which he was a principal." *Bank Leumi Trust Co. v. Wulkan*, 735 F. Supp. 72, 77 (S.D.N.Y. 1990) (explaining

9

*Irving Trust*). Upon the assertion by the defendant that it would be subject to criminal penalties

in Greece should it abide by a judgment against it in the U.S. courts:

> It is not clearly shown that the mere entry of a judgment in this
> Court, and its enforcement against [the defendant's] assets in
> whatever place the judgment may be entitled to full faith and
> credit, would of itself subject defendant to criminal penalties in
> Greece, but assuming that it does, it is doubtful that the New York
> courts would permit a borrower-guarantor from a New York bank
> in an international transaction having sufficient contacts with New
> York to justify exercise of its jurisdiction, avoid his commercial
> obligation so easily.   <u>To do so would impede international
> financial transactions of precisely the sort present here.</u>

*Irving Trust*, *supra*, (*quoted in Bank Leumi Trust*, 735 F. Supp. at 77) (emphasis added).

Therefore, the possibility of a party facing liability both in the U.S. courts and in a

foreign jurisdiction does not give rise to any cognizable defense of "double liability". This risk

has been held to be inherent in any U.S. party's participation in a an international financial

transaction. *See Irving Trust*, *supra*; *Banco de Vizcaya*, *supra*. It is beyond dispute that CMS is

a U.S. party and that it has voluntarily participated in international transactions. To hold

otherwise would allow Congo (which is in contempt of court in Texas) to defeat its contractual

and judicial obligations merely by arrogating power to itself: If this were allowed, any sovereign

faced with this situation would be able to threaten the garnishee with penalties under the

sovereign's law as a way to avoid enforcement under the laws of the U.S. *See Canadian

Imperial Bank of Commerce v. Pamukbank*, 166 Misc.2d 647, 632 N.Y.S.2d 918 (Sup. Ct. N.Y.

Cty. 1994) (rejecting defendant's contention that complaint must be dismissed under doctrine of

comity in face of Turkish court order and foreign court order given no effect where the Turkish

court's decree could only excuse performance of a contract to take place in its own jurisdiction,

not in the U.S.).

10

CMS's reliance on *LNC Investment, Inc. v. Republic of Nicaragua*, No. 01-134-JJF (D. Del. Dec. 18, 2002) (attached to CMS Br. at Ex. C), is misplaced. In contrast to the present matter, in *LNC* Nicaragua had not waived its sovereign immunity for purposes of execution; nor had it agreed to enforcement of the judgment upon which LNC sought the writ. In addition, the court found the garnishee's statements that it held no goods or assets belonging to the Republic of Nicaragua to be persuasive.[2] Here, in contrast, the Fifth Circuit has already ruled that CMS holds an asset of the Congo that is subject to execution and, of course, Congo has expressly committed itself to allowing enforcement in any U.S. court against any of its assets, including these assets. (*See* Af-Cap Loan Agreement at ¶ 19) (attached as Exhibit D hereto).

Finally, CMS's assertion of a defense of "double liability" fails as a matter of law if there is collusion, negligence or fraud. Again, CMS has failed to note to this Court that its conduct has already been so characterized by the Southern District of Texas. (*See* Order, *FG Hemisphere Assocs., L.L.C. v. Republic of Congo*, No. H-02-4261 (Ellison, J.) (S.D. Tx. Sept. 19, 2005) (extending injunction order against CMS upon finding that "the proposed sale appeared by more than a preponderance of the evidence to be a fraudulent transfer")) (attached as Exhibit E hereto). And, as the Fifth Circuit observed in *Af-Cap*, 383 F.3d at 369 n.8, "In this analysis [regarding the manner in which assets of Congo are to be addressed for garnishment purposes], we also think it would be appropriate for a court to consider whether the use of the property in question was being manipulated by a sovereign nation to avoid being subject to garnishment under the FSIA." CMS has voluntarily joined with the Congo in (so far unsuccessfully) opposing the issuance of writs of garnishment and the grant of other enforcement mechanisms in the United States courts.

---

[2] CMS's reliance upon *Weitzel v. Weitzel*, 27 Ariz. 117 (Ariz. 1924) and *West v. Baker*, 510 P.2d 710, 734 (Ariz. 1973) is equally unavailing. (CMS Br. at 25-26 (D.I. 15)). Neither case arises under the FSIA or Delaware law. *Weitzel*, in particular, addresses a situation where a spouse sought to garnish her ex-husband's wages for services that were all rendered in Mexico and were paid entirely in Mexico, and the garnishee had no connection to Arizona. Here, CMS is a Delaware-registered entity.

CMS's assertion that it would face "double liability" from a party with whom they have routinely aligned is unpersuasive. *See Parker, Peebles & Know v. Nat'l Fire Ins. Co.*, 150 A. 313 (Conn. 1930) (finding defense of double liability only applies absent collusion, fraud or negligence). As is clear from this rule, CMS must show that its conduct was free from collusion, a test that (in light of the rulings in the Southern District of Texas) it cannot meet.

Moreover, it would be a miscarriage of justice for this Court to lend its imprimatur to the efforts of the Congo to avoid its legitimate debt obligations. For years the Congo has, at every turn, endeavored at every turn to escape these obligations. For this Court to allow the courts of the very sovereign which has flaunted debt collection efforts to legitimize those actions by threatening a garnishee with liability would stand reason on its head. This is especially true where, as here, the party invoking such court actions as a defense has submitted passively to the entry of those orders, has failed to appeal those orders to higher Congolese courts, has failed to appeal those orders to internationally available courts (in particular under the OHADA Treaty), and failed to challenge Congo's action under the Convention's international arbitration clause.

This Court should rule emphatically that it will not countenance the efforts of the Congo—through any of its governmental agencies—to defy the laws of this country which authorize the attachment of contractual obligations.

## IV.  THERE IS NO OTHER IMPEDIMENT TO THIS ENFORCEMENT PROCEEDING

### A.  When Dissolving Writs In Texas, The Texas District Court Judge Applied Texas, Not Delaware Garnishment Law

CMS argues that Af-Cap is somehow collaterally estopped from seeking garnishment under Delaware law based on the Texas district court ruling applying Texas statutory law. This is nonsense.

12

It is well-settled that collateral estoppel does not preclude litigation of an issue *unless both the facts and the legal standard* used to assess them are the same in both proceedings. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir. 1992) *cert. denied* 508 U.S. 952, 113 S. Ct. 2445 (1993) (doctrine of collateral estoppel inapplicable where issues not identical and legal standards governing resolution are significantly different); *Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415 (5th Cir. 1995) (collateral estoppel does not preclude litigation of issue unless both facts and legal standard used to assess them are same in both proceedings). Accordingly, the application of different state law standards in a decision bars the application of the doctrine of collateral estoppel. In fact, no court, except the Delaware Superior Court, has ruled on the question of garnishment of the asset at issue here under *Delaware law* and the court held that this very asset was subject to attachment. (*See Connecticut Bank of Commerce v. Republic of Congo*, No. 26671/99 (Del. Super. Ct. Sept. 30, 2005)) (attached to Motion for Summary Judgment as Ex. D). *See also Supra Medical Corp. v. Baker*, 1996 WL 571544 (D. Del. Sept. 26, 1996) (holding doctrine of collateral estoppel inapplicable where prior suit based upon alleged violations of federal securities law and Delaware corporate law and present action addressed RICO claims only) (attached as Exhibit F hereto). *See also Guild Trust v. Union Pacific Land Resources Corp.*, 682 F.2d 208 (10th Cir. 1982) (holding doctrine of collateral estoppel inapplicable where Colorado case relied upon by plaintiffs decided under law of Colorado and present case to be decided under law of Wyoming).

## B.   The Timing Of The Lifting Is Irrelevant To The Garnishment Of The Royalty Obligation

CMS plays the shell game when arguing that even though it has the contractual obligation to pay royalty to the Congo pursuant to the Convention, since a lifting of the Congo's royalty oil

will not occur "until sometime in 2006," Af-Cap cannot garnish CMS's contractual obligations to the Congo. (CMS Br. at 22-23. (D.I. 15)) CMS is wrong again.

The Fifth Circuit and one Texas District Court have already rejected CMS's argument and held that the royalty obligation is subject to attachment. *See Af-Cap*, 383 F.3d at 370 and 372 n.13 ("[I]t is difficult to say that execution on this obligation would be so unusual that it would shock and disrupt the public affairs of Congo . . . Here, Af-Cap is not seeking to attach any of the Congo's physical property . . . but instead seeks to attach *obligations* to pay royalties owed by the Garnishees [CMS]."); *FG Hemisphere v. Republique du Congo*, No. H-02-4261 (S.D. Tx. Sept. 14, 2005) (finding "royalty obligations constitute property of the Congo and SNPC located in the United States, which has [sic] been used for commercial activity in the United States" and granting application for writs of garnishment in favor of FG Hemisphere and against CMS as garnishee) (attached as Exhibit G hereto). Even the Western District of Texas recognized in *Af-Cap, Inc. v. Congo,* that "the original writs were erroneously dissolved." (CMS Br. at 7 (D.I. 15))

Delaware also recognizes that  intangibles *are* subject to attachment.  Under Chapter 35 of Title 10 of the Delaware Code, "[g]oods, chattels, rights and credits, moneys, effects, lands and tenements" are subject to attachment.  10 *Del. C.* § 3508.  "This includes debts owed the judgment debtors by the garnishee." *LNC Investments, Inc. v. Democratic Republic of Congo*, 69 F. Supp. 2d 607, 611 (citing *McNeilly v. Furman*, 95 A.2d 267, 271 (Del. 1953) (noting that section 3508 has been construed to apply to contract obligations that are liquidated or readily capable of liquidation).  A garnishment under Delaware law "attaches at the time the garnishee is served and continues upon all moneys which accrue *to the debtor's credit* until the garnishment is answered." *Cooper's Home Furnishings, Inc. v. Lolly*, 270 A.2d 676, 678 (Del. Super. Ct.

14

1970) (emphasis added). "Thus, Delaware law contemplates attaching property which comes into the hands of the garnishee subsequent to the serving of the attachment upon the garnishee until the garnishee makes his answer." *Id.*

The matter of *D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034, 1038-39 (D. Del. 1977), directly answers CMS's argument. In *D'Angelo*, the plaintiff brought an action against an agency of the Republic of Mexico "for an order requiring the defendant to account to the plaintiff for oil produced from wells in Mexico" in which the plaintiff claimed to "have royalty or participation interests." *Id.* at 1035. Specifically, the plaintiff claimed entitlement to "certain oil royalties and participation rights in certain of the properties so expropriated by the Mexican government." *Id.* Upon Mobil Oil Corporation's motion to vacate the sequestration, the Court ruled that the plaintiff creditor was entitled to attach Mobil's obligation to pay oil royalties to the Mexican government's agency since the debt which Mobil owed to the defendant Mexican government agency "gave rise to a transitory cause of action for which the defendant could have sued and served Mobil in Delaware . . and was, therefore, subject to sequestration." *Id.* at 1039.

As in *D'Angelo*, CMS's obligation to make royalty payments to the Congo exists pursuant to its contractual obligations under the Convention.[3]    CMS has admitted in its answer that that it is "the current owner[s] of working interests in a convention for the production of oil in the Republic of Congo. . . ." (CMS Answer at 19, at ¶ 1 (D.I. 2)). CMS also admits that under its deal with Congo that "the Congo is entitled to royalty." (*Id.*) Furthermore CMS admits that it paid Congo a royalty during the pendency of this action. In particular, it states that "[i]n September 2005, SNPC . . . took a lifting of oil for the Congo and SNPC." (*Id.* at ¶ 3).

---

[3] CMS asserts that in *D'Angelo* "the debt sequestered . . . was a monetary debt owed by Mobil on an 'open account'" and therefore did not involve garnishment of an in-kind royalty "or any other non-monetary obligation." (CMS Br. at 24 (D.I. 15)). CMS's reading of *D'Angelo* is wrong. In addition, the remaining cases cited by CMS in support of its assertion that the royalty obligations are not subject to garnishment are inapposite to the present case.

Significantly, Congo's royalty right accrues when the oil is extracted from the ground, not when it is lifted.[4] Moreover, the Congo, by court executed letter of instruction, has elected to take the royalty in cash.

Since CMS has admitted that it has a contractual obligation to pay the royalty to the Congo, as the Fifth Circuit recognized, the royalty obligations of CMS are subject to garnishment. This is also true under Delaware law. *D'Angelo*, 378 F. Supp. at 1038-39.

Further, CMS's argument against the "practicality" of the physical transfer of oil as preventing the garnishment of CMS's indebtedness is disingenuous. (CMS Br. at 22 (D.I.___)). As CMS well knows, the ability or inability of Af-Cap to take oil out of the actual wells of the Congo has been rejected by the Fifth Circuit and is irrelevant to the question whether CMS's obligation to pay royalties is subject to garnishment. As the Fifth Circuit held:

> [CMS] thus essentially contend[s] that the property at issue here is actually the oil stored in a tanker in Congolese waters. Because this oil is located in the Congo, they argue that the Congo is the situs of these tax and royalty obligations. This contention is flawed for two principal reasons. First, it cannot be squared with the facts surrounding the use of these tax and royalty obligations; as we have previously noted, under the NUFI settlement, for nearly half of the Convention's existence, is least half of these obligations were diverted in the form of cash payments to the Congo's creditor. Notably, this diversion did not involve the Congo drawing oil from the tanker, selling it, and then paying fifty percent of the proceeds directly to the creditor; instead, these debt payments passed directly from the Garnishee, who resided in the United States, to the NUFI creditor, which also resided in the United States. This fact alone seems sufficient to defeat the Congo Defendants' argument that these obligations are somehow physically located in the Congo.

*Af-Cap*, 383 F.3d at 372 n.13.

---

[4] In particular, the Convention provides that The quantity of hydrocarbons to which the mining royalty applies shall be measured at the point of delivery. . . .The mining royalty, whether in case or in kind, shall be computed and paid on a quarterly basis. . . .Delivery of the quantities of hydrocarbons to which the Congo is entitled, including the liquid hydrocarbons destined for the Pointe-noire refinery, shall be made either at well head or at the gathering point. . . ." (CMS, Ex. A, Ex. 1 at ¶¶ 7.04, 7.05, 10.02.1).

## V.    CMS'S ASSERTION OF THE DOCTRINE OF "FOREIGN STATE COMPULSION" DOES NOT APPLY

Finally, CMS contends that the doctrine of "foreign state compulsion" bars issuance of the writs (CMS Br. at 28 (D.I. 15)).   The foreign state compulsion doctrine is also inapplicable.

Under the foreign compulsion doctrine, a party is allowed to avoid liability for violations of the domestic law in its nation of origin if another host country's law compelled such violations.  *See Mannington Mill, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979); *U.S. v. First Nat'l City Bank*, 396 F.2d 897, 901 (2d Cir. 1968);  *Interamerican Ref. Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1298 (D. Del. 1970).   Therefore, the question that the Court must ask in a foreign compulsion analysis is whether the alleged compulsion, valid or invalid, actually occurred and resulted in the violation of U.S. law.  *Id.*; *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 78 F.R.D. 445, 459 (D. Del. 1978). However, there is no violation of U.S. law at issue.

CMS's assertion that "preference must be given to the Congo court orders because the oil is produced, stored, and lifted in the Congo," and therefore "the doctrine of foreign state compulsion precludes enforcement of the writ," (CMS Br. at 28-29 (D.I. 15)) is not only factually but also legally erroneous.  (*See*  Sections I.A and B, *supra*).  CMS has obscured the procedural reality and purpose of these proceedings.

According to CMS, the Congolese court order compels CMS to *physically deliver* oil to SNPC.  (CMS Br., Ex. B at ¶ 3).  It does not result in the violation of U.S. law.  Here, Af-Cap seeks entry of a judgment arising from CMS's royalty obligations to the Congo under the Convention . (*See* Section IV, *infra*).  Such a money judgment does not in any way conflict with an order of the Congolese court compelling the *physical delivery* of oil.  In this respect, there is not "compulsion" – valid or invalid – which would in any way compel CMS to violate U.S. law.

The facts of *Reebok Int'l Ltd. v. McLauglin*, 49 F.3d 1387 (9th Cir. 1995), which CMS cites in support of its argument, are inapposite to the facts of the present case. In *Reebok*, the Ninth Circuit was presiding over a separate contempt proceeding brought by the plaintiff to compel the defendant—a third party garnishee in a separate action—for violation of the lower district court's temporary restraining order. *Id.* at 1388-89. The Ninth Circuit reversed the contempt order of the district court since while the district court's order enjoined the garnishee from releasing funds to the plaintiff, an order of the Luxembourg court required "[the garnishee] to release those funds immediately." *Id.* at 1392. Accordingly, the garnishee in *Reebok* was "instructed . . . to do exactly the opposite of what the TRO commanded." *Id.*

In the instant case, the Court's entry of summary judgment in Af-Cap's favor for the attachment of royalty obligations will in no way conflict with the order of the Congolese court requiring CMS to physically transfer oil to SNPC. Accordingly, foreign compulsion is not available to CMS as a defense to the entry of summary judgment.

## CONCLUSION

For the reasons set forth above, Af-Cap respectfully requests that the Court enter judgment against CMS for the full value of Af-Cap's judgment plus interest and costs.

**GREENBERG TRAURIG LLP**
Sanford M. Saunders, Jr.
Kenneth P. Kaplan
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
(202) 331-3100

**GREENBERG TRAURIG LLP**

Paul D. Brown (No. 3903)
Joseph B. Cicero (No. 4388)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801
(302) 661-7000

*Attorneys for Af-Cap, Inc.*

*Attorneys for Af-Cap, Inc.*

Dated:  December 21, 2005

DEL-FS1\152676v03

19