# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 825679 (E.D.La.)
**(Cite as: 2000 WL 825679 (E.D.La.))**

Page 1

C
Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
GENERAL ELECTRIC CAPITAL CORPORATION
v.
THE JANE R. HER ENGINES, Tackle, Apparel, Furniture, etc., in Rem, and Arnoult Equipment & Construction, Inc., Guilford J. Acosta and James, Sr., in Personam
**No. CIV. A. 97-1176.**

June 23, 2000.

PORTEOUS, District J.

***1** Before the Court is a Motion to Execute Against Garnishee, Signal Companies, Inc., filed on behalf of the plaintiff, General Electric Capital Corporation ("GECC"). This matter was set for hearing on June 21, 2000. The parties waived oral argument and the matter was submitted on the briefs. The Court, having considered the arguments of counsel, the evidence submitted, the law and applicable jurisprudence, is fully advised in the premises and ready to rule.

ORDER AND REASONS

A judgment was rendered on October 28, 1997, in favor of GECC and against Guilford J. Acosta for $656,625.00, together with interest in the amount of $90,217.18 and penalties in the amount of $44,812.24, through October 4, 1997, with interest accruing thereafter at the rate of $209.87 per day, plus attorney's fees and all costs of the proceeding. The Judgment has not been satisfied and has been made executory. GECC sought to have Signal Companies, Inc. ("Signal") answer garnishment interrogatories concerning the assets of the judgment debtor.

GECC contends that Signal has failed to timely respond to the interrogatories served upon it by GECC; therefore, according to Louisiana Code of Civil Procedure ("C.C.P.") Article 2413, Signal is now indebted directly to GECC for the full unpaid judgment amount rendered. Signal, however, submits that GECC's motion must be denied as the garnishment interrogatories were not served properly. Service of process was effected on Donald J. Arnoult on April 19, 2000. Mr. Arnoult however is not, and never has been, agent for service of process for Signal, nor is he shown on the records for the Secretary of State as an officer of Signal. In response to Signal's opposition, GECC contends that service was proper in accordance with Federal Rules of Civil Procedure 4 and 4.1.

Federal Rule of Civil Procedure ("Fed. R. Civ.Pr.") 69(a) provides:

> Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.

As such, it is clear that Louisiana law governs the garnishment proceedings. However, the language in Fed. R. Civ. Pr. 69 which states "except that any statute of the United States governs to the extent that it is applicable" raises the issue for this Court to resolve, namely, whether service must be effected in accordance with the Federal Rules of Civil Procedure or the state law provisions for service.

The Louisiana Code of Civil Procedure has specific articles which address garnishment proceedings in articles 2411 through 2413. Article 2412 address the method of service in such a proceeding and subsection C provides that service of garnishment interrogatories "shall be made in the manner provided for the service of citation". C.C.P. 2412(C). Service of citation upon a domestic or foreign corporation is "made by personal service on any one of its agents for service of process." C.C.P. 1261(A). As Signal's exhibit 1 shows that Stephen R. Edwards is the registered agent for service, service effected upon Donald J. Arnoult was not proper under state law.

***2** The plaintiff relies on the case of *United States v. Pauly* 725 F.Supp. 923 (W.D.Mich.1989) to support its position that the Federal Rules for service are applicable. In that case, the issue concerned whether service had to be effected by the United States Marshals or whether local sheriffs could effect service of process. The Court ruled that the federal provisions on service were to be applied as the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 825679 (E.D.La.)
**(Cite as: 2000 WL 825679 (E.D.La.))**

"Michigan Court Rules relates to service of process *in general and does not specifically to supplementary proceedings.*" *Id.* (emphasis added). This case is clearly distinguishable. The specific state code provisions for garnishment proceedings make specific provisions for service, it is not a situation where the *general state* service rules were employed over the *general federal* rules for service.

Moreover, this interpretation is further supported by the case of *Apostolic Pentecostal Church v. Colbert* 169 F.3d 409 (6th Cir.1998) which abrogated the ruling in *Pauly.* In this case service was effected by an agent of Apostolic rather than a United States Marshal. The Court analyzed Federal Rules 69(a), and 4, as well as 28 U.S.C. § 566 in making its decision. The Court stated that "it is a traditional maxim of interpretation that specific rules control over general rules." *Id.* As such, it ruled that as service was "in accordance with the practice and procedure of the state in which the district court is held" service of process was proper.

The Fifth Circuit also considered the issue of service effected by a state county sheriff rather than a United States Marshal in *United States v. St. Paul Mercury Ins. Co.*, 361 F.2d 838 (5th Cir.1966). The Court was of the opinion that Rule 4(c) governed the service of writs of garnishment issued in a proceeding in federal court rather than the state rule for service "*which is not a rule peculiarly applicable to service of writs of garnishment.* " *Id.* (emphasis added). Again, as in *Pauly,* this case is distinguishable, as the Louisiana provisions for garnishment proceedings set forth a process for service specific to this situation.

Plaintiff mentions in a footnote that service on Signal's registered agent for service of process, Stephen Edwards, will be difficult; if this is the case, the applicable state provision specifically provides for alternative means for service upon certification that due diligence to serve the designated agent has been made. C.C.P. 1261. There has been no such certification made in this case. As such, it is the ruling of this Court that the state rules regarding service in garnishment proceedings apply. Because service was not effected in accordance with those provisions, plaintiff's motion is without merit.

Accordingly,

IT IS ORDERED that the Motion to Execute Against Garnishee Signal Companies, Inc., be and the same is hereby DENIED.

Not Reported in F.Supp.2d, 2000 WL 825679 (E.D.La.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 413395 (Del.Super.)
**(Cite as: 1995 WL 413395 (Del.Super.))**

Page 1

C
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.
UMS PARTNERS, LTD., a Delaware corporation
Plaintiff,
v.
Martin F. JACKSON, Defendant.
**Nos. 94J-12-159H-17-076, 95E-01-043.**

Submitted: March 17, 1995.
Decided: June 15, 1995.

Upon Plaintiff's Motion for an Order of Public Sale--Denied.

Edward M. McNally, and Matthew J. O'Toole, Wilmington, for plaintiff.

Elizabeth M. McGeever, and Particia A. Pyles, Wilmington, for defendant.

OPINION AND ORDER

BABIARZ, Judge.

*1 Before the Court is a Motion for an Order of Public Sale Pursuant to 8 Del.C. § 324. The motion was filed by plaintiff UMS Partners, Ltd. ("UMS") in an effort to collect on a judgment against defendant Martin F. Jackson ("Jackson"). The underlying judgment, in amount of $25,766.00, was entered in favor of UMS and against Jackson by a Pennsylvania court in October 1994. In December 1994, UMS filed the Pennsylvania judgment with the Prothonotary of New Castle County for purposes of enforcement in Delaware under the Uniform Enforcement of Foreign Judgments Act, 10 Del.C. § § 4781-87. UMS contends that it has properly attached certain property belonging to Jackson in the State of Delaware and requests that this Court issue an order permitting the public sale of such property to the highest bidder in order to satisfy the judgment. In opposing the motion, Jackson argues that this Court lacks jurisdiction to enforce the UMS judgment because Jackson is a resident of Ohio and because he owns no property within the State of Delaware.

The property at issue in this case consists of shares of stock in L'Nard Restorative Concepts, Inc. ("L'Nard"), a Delaware corporation which no longer exists because it was merged with and into another Delaware corporation, Restorative Care of America, Incorporated ("RCA"). [FN1] Immediately prior to the merger, which took effect on December 2, 1994, Jackson owned 224.5 shares of L'Nard stock. Under the terms of the merger agreement, RCA became obligated to pay Jackson $673.76 for each share of L'Nard stock that he owned at the time of the merger (the "merger consideration"). Thus, Jackson became entitled to receive a total of $151,259.12 for his 224.5 shares of L'Nard stock. Rather than accept the merger consideration, Jackson timely sent RCA a written demand for appraisal of his L'Nard shares, thereby perfecting his statutory right to appraisal under Delaware's General Corporation Law ("GCL"). *See* 8 Del. C. § 262(d).

FN1. Plaintiff UMS and individual stockholders of UMS own a controlling interest in RCA.

Having perfected his statutory appraisal rights, Jackson possessed, for a limited period of time, two mutually exclusive rights in connection with his L'Nard shares: (1) he could accept the merger consideration for his shares, or (2) he could initiate an appraisal action by filing a petition with the Court of Chancery under 8 Del.C. § 262. Jackson's time was limited because § 262(e) requires appraisal actions to be initiated within 120 days of the effective date of the underlying merger. On March 30, 1994, Jackson timely filed a petition in the Court of Chancery for appraisal of his L'Nard shares. [FN2] Because more than 60 days have elapsed since the effective date of the merger, Jackson now lacks the ability to withdraw from the appraisal action without the approval of both RCA (in writing) and the Court of Chancery. *See* 8 Del.C. § 262(k); *see also* *Alabama By-Products Corp. v. Cede & Co.*, Del.Supr., 657 A.2d 254, 259-61 (1995) ("*Alabama By-Products*"). It follows that Jackson no longer has the right to unilaterally accept the merger consideration for his L'Nard shares; Jackson's rights with respect to the L'Nard shares are limited to his statutory appraisal rights under 8 Del.C. § 262.

FN2. Court of Chancery C.A. No. 14166.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***2** It should be noted that Jackson's interest in the L'Nard shares is subject to a federal tax lien against Jackson. The parties do not agree on the amount of the tax lien. UMS states that the tax lien amounts to $357,086.81; Jackson asserts that the tax lien approximates $528,000.00. The discrepancy is of no relevance, because the existence of the tax lien has no effect on the Court's decision in this matter.

Section 169 of the GCL makes Delaware the situs of ownership of capital stock in all corporations existing under Delaware law. It provides as follows:

> For all purposes of title, action, attachment, garnishment and jurisdiction of all courts held in this State, but not for purposes of taxation, the situs of the ownership of the capital stock of all corporations existing under the laws of this State, whether organized under this chapter or otherwise, shall be regarded as in this State.

8 Del.C. § 169. Section 324 of the GCL provides that shares of stock may be attached and sold at public sale in order to satisfy a debt. It states in pertinent part:

> (a) The shares of any person in any corporation with all the rights thereto belonging ... may be attached for debt, or other demands. So many of the shares ... may be sold at public sale to the highest bidder, as shall be sufficient to satisfy the debt, or other demand, interest and costs, upon an order issued therefor by the court from which the attachment process issued, and after such notice as is required for sales upon execution process.

8 Del.C. § 324.

In order to dispose of this motion, the Court must determine whether Jackson's L'Nard shares are subject to attachment and public sale in the State of Delaware under 8 Del.C. § 324. Prior to considering this question, two preliminary matters should be addressed.

First, it should be noted that Jackson does not question the validity of the Pennsylvania judgment which plaintiff seeks to enforce. Under the Full Faith and Credit Clause of the United States Constitution, U.S. Const. art. IV, § 1, a valid in personam judgment of one state is enforceable in all other states. *Shaffer v. Heitner*, 433 U.S. 186, 210 (1977); *see also* Uniform Enforcement of Foreign Judgments Act, 10 Del.C. § § 4781-87. Since its validity has not been challenged by Jackson, the Pennsylvania judgment is enforceable in the State of Delaware.

Second, so long as Jackson owns property which is subject to attachment in Delaware, the Pennsylvania judgment will be enforceable in this State regardless of whether Jackson is subject to personal jurisdiction in Delaware. This is so because UMS is not attempting to obtain an in personam judgment against Jackson; rather, UMS is seeking to collect, through attachment of Jackson's Delaware property, on a judgment it has already obtained against Jackson. The issue of whether this Court can assert personal jurisdiction over Jackson is, therefore, irrelevant. In *Shaffer v. Heitner*, the United States Supreme Court addressed this issue as follows:

> ***3** Once it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff, there would seem to be no unfairness in allowing an action to realize on that debt in a State where the defendant has property, *whether or not that State would have jurisdiciton to determine the existence of the debt as an original matter.*

433 U.S. 186, 210 n. 36 (emphasis supplied). This passage accurately describes the context in which the instant proceeding arises. A court of competent jurisdiction, the Pennsylvania court, has already awarded UMS an in personam judgment against defendant Jackson. In this action, UMS is merely attempting to collect on that judgment by forcing a public sale of Jackson's Delaware property. The Supreme Court's decision in *Shaffer v. Heitner* makes clear that UMS is entitled to proceed in this fashion regardless of whether this Court can assert personal jurisdiction over Jackson. *Id.* at 210 n. 36.

Having addressed these preliminary matters, the Court must now consider the question presented by this motion: whether GCL § § 169 and 324 apply to shares of stock which are the subject of an appraisal proceeding under 8 Del.C. § 262 ("appraisal shares"). An appraisal action is a statutory remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the fair value of their shares. *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 542 A.2d 1182, 1186 (1988) ("*Cede & Co.*"). Our Supreme Court has described the characteristics of an appraisal proceeding as follows:

> in a section 262 appraisal action the only litigable issue is the determination of the value of the appraisal petitioners' shares on the date of the merger, the only party defendant is the surviving corporation and the only relief available is a judgment against the surviving corporation for the fair value of the dissenters' shares.

*Id.* at 1187.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to UMS, Jackson's L'Nard shares continue to exist during the pendency of the appraisal proceeding and, therefore, remain subject to attachment and public sale in Delaware under § § 169 and 324. No Delaware Court has directly addressed this question. In support of its assertion that the L'Nard shares continue to exist, UMS relies upon the Court of Chancery's opinion in *Huffington v. Enstar Corp.*, Del.Ch., C.A. Nos. 7802, 7857 & 7864, Hartnett, V.C., (Apr. 16, 1985) ("*Huffington* "), where the court stated that appraisal shares "no longer represent a claim on the equity of the corporation--instead they *represent* the former shareholder's status as a creditor of the corporation." *Id.* at 5 (emphasis supplied). UMS contends that so long as the L'Nard shares exist, they are present in Delaware under 8 Del.C. § 169 and are subject to attachment under 8 Del.C. § 324.

In this Court's view, *Huffington* actually undermines UMS's contention that Jackson's L'Nard shares are subject to attachment under 8 Del.C. § 324. [FN3] In *Huffington,* Vice-Chancellor (now Justice) Hartnett held that "the cause of action in appraisal may be transferred *even though the shares themselves are non-negotiable.*" *Huffington,* letter op. at 5 (emphasis supplied). The *Huffington* court also held that such shares should be stamped "Not Negotiable" in order "to protect possible subsequent purchasers who otherwise would have no notice of this proceeding." [FN4] *Id.* Rather than support UMS's contention that appraisal shares should be treated as ordinary shares of stock for purposes of attachment under § 324, *Huffington*--in holding that appraisal shares are not transferable--supports the proposition that appraisal shares are not subject to attachment under § 324.

FN3. For purposes of this discussion, the Court assumes *arguendo* that 8 Del.C. § 169 makes Delaware is the situs of ownership of appraisal shares in a Delaware corporation.

FN4. Presumably, the court was acting pursuant to GCL § 262(g) which provides in pertinent part that "[t]he Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings...." 8 Del.C. § 262(g).

*4 Case law provides further support for the view that appraisal shares are not subject to attachment under 8 Del.C. § 324. Under Delaware law, appraisal shares are treated differently from ordinary shares of stock in numerous significant ways. For example, the owner of appraisal shares lacks standing to prosecute a shareholder's derivative suit. *Cede & Co. v. Technicolor,* Del.Ch., C.A. Nos. 7129 & 8358, slip. op. at 9-10, Allen, C. (Jan. 13, 1987), *rev'd in part on other grounds,* Del.Supr., 542 A.2d 1182 (1988); *Braasch v. Goldschmidt,* Del.Ch., 199 A.2d 760, 767 (1964) ( "*Braasch* "). Moreover, once a shareholder perfects his appraisal rights in accordance with § 262(d), he *loses* the traditional benefits of stock ownership: the right to vote such shares, the right to receive payment of dividends on such shares and the right to receive other distributions on such shares. *See* 8 Del.C. § 262(k); *see also Alabama By-Products,* 657 A.2d at 258-59; *Southern Production Co. v. Sabath,* Del.Supr., 87 A.2d 128, 134 (1952) ("*Sabath* "); *Braasch,* 199 A.2d at 766. Accordingly, the Supreme Court has instructed that "once a petitioner has perfected his right to an appraisal, he *relinquishes* his status as a shareholder *and assumes the role of a quasi-creditor with a purely monetary claim against the [surviving] corporation.*" *Alabama By-Products,* 657 A.2d at 266 (emphasis supplied); *see also* Sabath, 87 A.2d at 134; *Kaye v. Pantone, Inc.,* Del.Ch., 395 A.2d 369, 375 (1978) ("*Kaye* "); *Braasch,* 199 A.2d at 766. Additionally, the Supreme Court has opined that once appraisal rights are perfected, the shareholder undergoes a "change in status from equity owner to corporate *creditor.*" *Alabama By-Products,* 657 A.2d at 266 (emphasis supplied). Thus, appraisal shares--unlike ordinary shares of stock--do not represent a claim against the equity of a corporation. *Huffington,* letter op. at 5.

The foregoing establishes that appraisal shares resemble ordinary shares of capital stock in form only, not in substance. In the Court's view, it would contradict established case law to hold that appraisal shares should be treated as ordinary shares of stock for purposes of attachment and public sale under GCL § 324. In particular, the notion that appraisal shares could be attached and sold for satisfaction of a debt under 8 Del.C. § 324 directly conflicts with the Court of Chancery's determination in *Huffington* that appraisal shares are not negotiable. *See Huffington,* letter op. at 5. Accordingly, the Court concludes that appraisal shares cannot be attached and sold at public sale in order to satisfy a debt under 8 Del.C. § 324.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Alternatively, UMS contends that Jackson's appraisal rights can be attached and sold at public sale as rights "belonging" to the L'Nard shares under § 324. *See* 8 Del.C. § 324 ("[t]he shares of any person in any corporation with all the rights thereto belonging ... may be attached for debt, or other demands.") Section 324 permits the attachment of shares "with" all the rights thereto belonging. It does not authorize the attachment of shares "or" all the rights thereto belonging. Therefore, in the Court's view, § 324 does not authorize the attachment of "rights" belonging to shares of stock which themselves are not subject to attachment. In other words, § 324 permits attachment of rights "belonging" to shares only where the "shares" themselves are subject to attachment. In the instant case, Jackson's L'Nard shares are appraisal shares, which are not transferable, *Huffington,* letter op. at 5, and, consequently, are not subject to attachment under § 324. It follows that the appraisal rights "belonging" to Jackson's L'Nard shares cannot be attached under GCL § 324.

***5** Finally, UMS contends that Jackson's appraisal rights can be attached as a debt of a Delaware corporation, i.e., RCA. Thus, the Court is called upon to consider whether the cause of action in appraisal can be attached, as distinct from the appraisal shares themselves. For the reasons which follow, the Court concludes that the cause of action in appraisal against a Delaware corporation can be attached in the State of Delaware through conventional garnishment.

Garnishment is the attachment of a defendant's property in the hands of a third party. *Pauley Petroleum, Inc. v. Continental Oil Co.,* Del.Supr., 235 A.2d 284, 291 (1967) ("*Pauley Petroleum* "). The Supreme Court has described the procedure as follows:

> when the property attached is not to be physically seized, but is in the possession or control of another, or if the thing to be attached is not such property as is susceptible of seizure, such as rights and credits, the sheriff must summon the person who has the goods, chattels, rights, credits, money or effects of the defendant in his possession, who is termed the garnishee, to appear at the court to which the writ is returnable, and declare what property of the defendant he has in his hands.

*Wilmington Trust Co. v. Barron,* Del.Supr., 470 A.2d 257, 263 (1983). "The test of the right to garnish is whether or not the garnishee has funds in his hands belonging to the debtor for which the debtor could bring suit." *K-M Auto Supply, Inc. v. Reno,* Del.Supr., 236 A.2d 706, 707 (1967).

Unlike appraisal shares, which are not assignable, the cause of action in appraisal is transferable, *Huffington,* letter op. at 5, and is regarded as a creditor's claim against the surviving corporation. *Alabama By-Products,* 657 A.2d at 266. The indebtedness of a Delaware corporation has its situs in Delaware. *Weinress v. Bland,* Del.Ch., 71 A.2d 59, 63-64, 66 (1950); *D'Angelo v. Petroleos Mexicanos,* D.Del., 378 F.Supp. 1034, 1038 (1974); *Jacobs v. Tenney,* D.Del., 316 F.Supp. 151, 166 (1970). Under Delaware law, a debt owed by a third party is subject to conventional garnishment. *See* *Pauley Petroleum,* 235 A.2d at 290.

In the instant case, Jackson's appraisal rights consist of nothing more than the right to receive from RCA a sum of money equal to the fair value of Jackson's L'Nard shares as of the date of the merger. *See* *Cede & Co.,* 542 A.2d at 1182. In other words, Jackson's appraisal claim constitutes a debt of RCA. Thus, RCA possesses funds belonging to Jackson, who has already brought suit to recover such funds by filing a petition with the Court of Chancery for appraisal of his L'Nard shares. As a Delaware corporation, RCA may be summoned as a garnishee. 10 Del.C. § 3502. Additionally, 10 Del.C. § 3508 provides that "[g]oods, chattels, rights, credits, moneys, effects, lands and tenements may be attached" under Delaware law. In the Court's view, Jackson's right to receive from RCA the fair value of his L'Nard shares falls within the broad scope of property susceptible to attachment under 10 Del.C. § 3508.

***6** Jackson suggests that his cause of action in appraisal should not be subject to garnishment because it represents a claim for unliquidated damages. In *McNeilly v. Furman,* Del.Supr., 95 A.2d 267, 271 (1953), our Supreme Court held that an unliquidated tort claim is not subject to attachment or garnishment under Delaware law. The Court based its decision in part on the "speculative nature" of such claims and noted that "an unliquidated tort claim is an asset of dubious value." *Id.* at 271-72. Still, the *McNeilly* Court recognized that its decision was in effect an exception to a "steady trend of the law to make all species of property, so far as possible, freely alienable and subject to the demands of the owner's creditors." *See id.* at 271.

In this Court's view, *McNeilly* does not prohibit garnishment of Jackson's appraisal claim. The instant case does not involve a tort claim; it involves a statutory claim for the fair value of Jackson's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

L'Nard shares. A cause of action in appraisal is not speculative in the same sense as an ordinary tort claim because an appraisal action involves no uncertainty regarding the surviving corporation's liability to the petitioner. For example, in the instant case it is beyond dispute that RCA is liable to pay Jackson the fair value of his L'Nard shares as of the merger's effective date. Thus, the scope of the appraisal proceeding is duly limited to determining that value. *Cede & Co.,* 542 A.2d at 1187. In addition, the *McNeilly* Court indicated that "demands readily capable of liquidation," particularly claims arising out of contract, may be susceptible to attachment or garnishment under Delaware law. *McNeilly,* 95 A.2d at 271. Being "entirely a creature of statute," *Cede & Co.,* 542 A.2d at 1186 (quoting *Kaye,* 395 A.2d at 374), the cause of action in appraisal is analogous to a cause of action in contract. *See Meade v. Pacific Gamble Robinson Co.,* Del.Ch., 51 A.2d 313, 318 (1947) (describing the appraisal statute as a "part of the stockholder's contract"), *aff'd* Del.Supr., 58 A.2d 415 (1948). Finally, it is well-recognized that the Court of Chancery has developed an "expertise" in handling appraisal actions. *In re Appraisal of Shell Oil Co.,* Del.Supr., 607 A.2d 1213, 1219 (1992). Thus, in this Court's view, an appraisal claim is readily capable of liquidation and, accordingly, is susceptible to attachment through garnishment.

UMS contends that it has already done all that is necessary to summon RCA as garnishee and requests that this Court enter an order authorizing a public sale under 8 Del.C. § 324 so that UMS may complete the execution. This request must be denied because, as discussed earlier, § 324 does not apply to appraisal shares or appraisal rights and, therefore, provides no authority for this Court to order the public sale of a cause of action in appraisal. It follows that UMS's instant motion must be denied.

For the foregoing reasons, UMS's Motion for an Order of Public Sale Pursuant to 8 Del.C. § 324 is hereby DENIED. IT IS SO ORDERED.

Not Reported in A.2d, 1995 WL 413395 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 170343 (S.D.N.Y.)
**(Cite as: 1990 WL 170343 (S.D.N.Y.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
ALL SERVICE EXPORTACAO, IMPORTACAO COMERCIO S.A., Plaintiff,
v.
BANCO BAMERINDUS DO BRAZIL, S.A., NEW YORK BRANCH,
and
First Chicago International Bank, Defendants,
and
M.M. International Ltd., Intervenor.
**No. 90 Civ. 6797.**

Oct. 31, 1990.

Dechert Price & Rhoads, New York City, for plaintiff; Robert A. Cohen, of counsel.

Reboul, Macmurray, Hewett Maynard & Kristol, New York City, for defendant Banco Bamerindus Do Brazil, S.A.; Robert L. Sills, of counsel.

Sidley & Austin, New York City, for intervenor; Alan M. Unger, of counsel.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

*1 Plaintiff All Service Exportacao, Importacao Comercio S.A. ("All Service") commenced this action in New York State Supreme Court, New York County, to enjoin defendants Banco Bamerindus Do Brazil, S.A., New York Branch ("Banco") and First Chicago International Bank ("First Chicago") from paying out under a letter of credit procured by All Service from Banco in favor of M.M. International Ltd. ("M.M."). The underlying transaction involves a contract for the sale of a quantity of black beans between M.M. as seller and All Service as buyer. The state court (Hon. Ira Gammerman, J.) entered a temporary restraining order. Banco removed the case to this Court under 28 U.S.C. § 632. This Court granted M.M.'s motion to intervene as of right under Rule 24(a)(2).

The Court heard oral argument on October 26, 1990. M.M. contends that the temporary restraining order should be vacated. All Service and Banco resist that application. All Service argues that the restraining order should be kept in effect pending proceedings involving the underlying transaction in the Courts of Brazil. Banco argues that the restraining order should be kept in effect pending proceedings involving the underlying transaction in the Courts of Brazil. Banco argues that the restraining order should be kept in effect pending an expedited evidentiary hearing in this Court.

I.

All Service entered into a contract to buy from M.M. 15,000 metric tons of "black beans" for a price of $8,250,000 (including freight). All Service is a Brazilian company. M.M. is a Grand Cayman Corporation ultimately owned by the Peoples Republic of China. The Beans were shipped from Tianjin, China to Rio de Janeiro, Brazil.

To pay for the beans, All Service obtained from Banco at its home office in Brazil an irrevocable negotiable letter of credit in favor of M.M. in the amount of $8,250,000, calling for payment upon presentation of designated documents. First Chicago was the advising bank.

The beans were shipped from China in June 1990 and arrived in Brazil in early October. The letter of credit called for presentation of documents to and payment by Banco's branch New York City. It is not disputed that in late August, First Chicago presented to Banco's New York office M.M.'s draft, which Banco's New York Branch marked "Accepted." Payment on the draft was to be made on October 29, 1990. To enjoin that payment, All Service commenced its action in the state court.

All Service alleges fraud in the underlying transaction by M.M. M.M. denies any fraud; but, more pertinent to the present motions, it contends that Banco having accepted M.M.'s draft, it is too late to enjoin payment under the letter of credit on the basis of fraud in the transaction.

II.

All Service relies upon § 5-114 of the Uniform Commercial Code, which provides that when fraud taints the underlying transaction, a court may enjoin

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2
Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 170343 (S.D.N.Y.)
**(Cite as: 1990 WL 170343 (S.D.N.Y.))**

the honoring of a letter of credit unless "honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course ..." § 5-114(2)(a), (b).

***2** M.M. contends that § 4-303 of the Uniform Commercial Code controls. That section provides that legal process served upon a payor bank seeking to terminate the bank's duty to pay an item "comes too late" if the legal process is received or served after the bank has "accepted or certified the item." § 4-303(1)(a). M.M. relies upon *First Commercial Bank v. Gotham Originals Inc.*, 64 N.Y.2d 287, 486 N.Y.2d 715 (1985).

M.M.'s reliance is justified. In *First Commercial Bank* the New York Court of Appeals squarely held that where the issuing bank has accepted a draft drawn upon a letter of credit, the limited exception to the contractual independence of a letter of credit provided in § 5-114 of the Uniform Commercial Code has no office to perform. After analyzing the structure of the Code, the Court of Appeals said at 64 N.Y.2d 298, 486 N.Y.S.2d 720:

Accordingly, section 4-303, by its terms, supersedes section 5-114 and when Bank Leumi accepted the drafts on September 24, 1981 it became directly, primarily, and unconditionally obligated to the holder to pay them at maturity.... Because the restraining order was served on it on October 30, 1981, 36 days after the act of acceptance, it came "too late" to prevent payment to petitioner.

Given that analysis, the Court of Appeals declined to entertain an allegation that the underlying transaction was tainted by fraud. The court reiterated its holding in *First Commercial Bank* in *Supreme Merchandise Co. Inc. v. Chemical Bank*, 70 N.Y.2d 348, 520 N.Y.S.2d 734 (1987).

All Service contends that *First Commercial Bank* and *Supreme Merchandise* are distinguishable because the banks demanding payment under the letters of credit in those cases had negotiated the drafts, and accordingly were holders in due course. This is a distinction without legal significance. In *First Commercial Bank* the Court of Appeals explicitly declined to base its opinion upon the petitioning bank's status as a holder in due course. That issue did not arise, since the petitioning bank "does not claim to be a holder in due course ..." Rather, the petitioning bank asserted

That section 4-303 prevails in the case of conflict and that because the drafts were accepted before the restraining order was issued or served on Bank Leumi, its rights became fixed and are paramount to Gotham's *notwithstanding its status* and the statutory authorization to enjoin payment found in section 5-114. 64 N.Y.2d 297, 486 N.Y.S.2d 720 (emphasis added).

Having thus thrown down the gauntlet and invited the Court of Appeals to do its worst, the petitioning bank in *First Commercial Bank* prevailed on its argument of statutory construction. There is accordingly no basis under controlling New York law to accept the factual distinction urged upon me by All Service in the case at bar. All Service relies upon *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 392 N.Y.S.2d 265 (1976), but that case is not in point because the draft had not been accepted by the issuing bank prior to the action to enjoin payment.

***3** Banco stresses that it is in an awkward position because of pending proceedings in Brazil and an order of injunction issued by a Brazilian court. While this Court is not unsympathetic, the answer must be that having entered the New York letter of credit market of its own free will, Banco is bound by the prevailing law of that forum. In reaching that conclusion, this Court does no violence to appropriate principles of comity between sovereign nations.

M & M's motion to vacate the temporary restraining order is granted. The motions of All Service and Banco are denied.

I exercise my discretion under Rule 62(c), Fed.R.Civ.P., and stay the effect of this order for fifteen (15) from the date of its entry so that any party may, if so advised, seek an expedited appeal from the United States Court of Appeals for the Second Circuit. Any further stay of this Order must come from the Court of Appeals.

It is SO ORDERED.

Not Reported in F.Supp., 1990 WL 170343 (S.D.N.Y.)

**Motions, Pleadings and Filings** **(Back to top)**

• 1:90cv06797 (Docket) (Oct. 22, 1990)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1990 WL 170343 (S.D.N.Y.)
**(Cite as: 1990 WL 170343 (S.D.N.Y.))**

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

LOAN AGREEMENT

THIS LOAN AGREEMENT dated 13 December, 1984 is made between The People's Republic of the Congo (the "Borrower") and Equator Bank Limited (the "Lender").

WHEREAS

(A) By an agreement dated 23rd January 1984 (the "Contract") between the Ministry of Building and Public Works of The People's Republic of the Congo (hereinafter called the "Ministry") and Sovis International Limited of 10-13 Heathfield Terrace, Chiswick, London W4 4JE, England (the "Contractor"), the Contractor agreed to manage, to organise, to supervise and to secure the execution of certain building works for the construction of the Brazzaville - Mayama - Kindamba highway (the "Highway") in The People's Republic of the Congo.

(B) At the request of the Borrower the Lender is willing to grant to the Borrower on the terms of this Agreement a loan of up to U.S. $6,500,000 in order to assist it in financing payment of local costs of the construction of the Highway.

NOW IT IS AGREED AS FOLLOWS:

1. Certain Definitions - In this Agreement

a "banking day" means a day on which banks and foreign exchange markets are open in London, New York and Nassau for business of the type required for the purposes of this Agreement;

"Commitment" means the obligation of the Lender to make the Loan during the period from the date hereof until December 31, 1984 in an aggregate principal amount of up to U.S. $6,500,000 in accordance with the terms of this Agreement;

"Congolese Public Entity" means The People's Republic of the Congo or an agency, authority, department, ministry or other instrumentality of The People's Republic of the Congo and any person directly or indirectly controlled or wholly owned by The People's Republic of the Congo or by a Congolese Public Entity;

"dollars," "U.S. $" and the sign "$" mean the lawful currency of the United States of America;

"Interest Date" means each date falling at the end of each successive period of six months after the date of this Agreement or, if any such date is not a banking day, the next date that is a banking day;

the "Loan" means the loan made or to be made to the Borrower under the terms of this Agreement or such part thereof as is from time to time outstanding;

CERTIFIED A TRUE COPY
Allen & Overy
ALLEN & OVERY
DATED: 21/7/99

a "potential" Event of Default is any condition, event or act that with the giving of notice and/or the lapse of time and/or the fulfillment of any other requirement would constitute an Event of Default;

"relevant debt" means debt in respect of monies borrowed or raised or the deferred price of goods or services or under guarantees or similar undertakings or under finance leases;

"tax" includes any present or future tax, impost, levy, duty, charge, fee, deduction or withholding of any nature;

2. The Facility

(A) The Loan - Subject to the terms of this Agreement, the Lender agrees to make the Loan to the Borrower in two advances of U.S. $3,250,000 each, both on or before December 31, 1984.

(B) Disbursement - The Contractor may present to the Lender disbursement claims totalling the amount of the Loan for payment of amounts due from the Borrower for local costs of the construction of the Highway under the Contract. The Lender shall, subject to the other provisions of this Agreement, meet the first U.S.$3,250,000 of the Contractor's claims by making the first advance. The Lender shall not be obliged to make the first advance to meet the claims unless they (a) are received in time for disbursement on or before December 31, 1984 and (b) are substantially in the form of Exhibit A, duly completed and signed by all persons whose signature is provided for in that Exhibit. On or before December 31, 1984 the Lender shall, subject to the other provisions of this Agreement, make the second advance by depositing the second U.S.$3,250,000 in the account of the Borrower on the books of the Lender. The funds constituting the second advance as aforesaid shall be paid out of the Borrower's account only to meet additional claims from the Contractor. The Lender shall not be obliged to make payments to the Contractor from the Lender's account as aforesaid unless those claims are substantially in the form of Exhibit A, duly completed and signed by all persons whose signature is provided for in that Exhibit. The Lender shall make the first advance and all subsequent payments required by this Agreement to be made to the Contractor by causing dollars to be credited to the account of the Contractor with a Bank in the United Kingdom mentioned in the disbursement claim.

(C) Contract - The Borrower hereby acknowledges (for the avoidance of doubt) that its liability to perform this Agreement in accordance with its terms is in no way conditional upon performance of the Contract by the Contractor or the validity of any disbursement claim made under the Contract and that the Borrower's liability shall be in no way affected by any claim that it may have or may consider it has against the Contractor.

3. Interest

(A) Interest Periods - Interest shall accrue on the Loan during successive periods ("Interest Periods") and the Borrower shall on the last day of each such Interest Period pay to the Lender the amount of interest so accrued. The first Interest Period as to each advance shall begin on that date on which the advance is made and shall end on the first Interest Date thereafter. Subsequent Interest Periods shall (subject to sub-clause (C) of this clause) begin on the expiry of the preceding Interest Period and end on the next succeeding Interest Date.

(B) Rate of Interest - The rate of interest applicable to the Loan during any Interest Period shall (subject to sub-clause (C) of this clause) be the rate per annum determined by the Lender to be the sum of two percent (2%) per annum (the "Margin") and the arithmetic mean (rounded upwards to the nearest whole multiple of one-sixteenth of one percent (1/16%)) of the rate at which, on the second banking day before the beginning of that Interest Period, the Lender is offered by prime banks in the London Interbank Eurocurrency Market dollar deposits in amounts equal to the Loan and for a term equal to that of the Interest Period. If the Borrower fails to pay any sum under this Agreement on the date on which it falls due it shall (without prejudice to any other rights of the Lender) pay to the Lender interest on that sum from the date on which it fell due until the date of actual payment to the Lender (as well after as before any judgment) at a rate (the "Default Rate") equal, in respect of each successive period of such duration as the Lender may select, to the sum of (x) one percent (1%) per annum and (b) the rate that would have applied to that period if it had been an Interest Period and if the defaulted sum had been the Loan, provided that, if the Lender determines that sub-clause (C) of this clause 3 would have applied to the defaulted sum during any such period if that period had been an Interest Period and if the defaulted sum had been the Loan the rate of interest payable on the defaulted sum during that period shall be the higher of (1) the Default Rate and (2) the sum of (x) one percent (1%) per annum and (y) the Margin and (z) the rate determined by the Lender to represent its cost of funding the defaulted amount (whether in dollars or otherwise) during that period. The Borrower shall pay such interest on the earlier of the last day of the period by reference to which it is calculated and the date of actual payment of the sum on which it has accrued.

(C) Alternative Rate of Interest - Notwithstanding the foregoing provisions of this clause, if with respect to any Interest Period (a) the Lender determines that by reason of circumstances affecting the London Interbank Eurocurrency Market fair and adequate means do not or will not exist for ascertaining a rate of interest applicable to the Loan during that Interest Period or (b) the Lender is unable to obtain dollar deposits in amounts or for a term necessary to fund the Loan for that Interest Period or that the interest rate during that Interest Period does not, after deducting the Margin, reflect the cost to the Lender of funding the Loan during that Interest Period, the Lender shall so notify the Borrower and, notwithstanding anything else in this Agreement:

(x) if the Interest Period would have been the first in relation to an Advance, that Advance shall not be made unless within one month from

AH

the day that would otherwise have been the first day of that Interest Period the Borrower and the Lender agree in writing that that advance will be made on terms different (as to rate of interest, currency or otherwise) from those that would otherwise apply (an "alternative basis") and as to such other matters as may be necessary in order to implement that agreement;

(y) in any other case, the duration of the Interest Period shall be one month and the rate of interest applicable to it shall be the sum of the Margin and the rate that expresses as a rate per annum the cost to the Lender (as determined by it) of funding (whether in dollars or otherwise) the Loan during that Interest Period;

(z) if, where the circumstances are those set out in paragraph (y), the Borrower and the Lender fail to agree in writing on an alternative basis on which the Loan is to be maintained after the end of the Interest Period mentioned in that paragraph, the Borrower shall prepay the Loan on the last day of that Interest Period.

4. Repayment and Prepayment

(A) Repayment - The Borrower shall repay the Loan in ten consecutive instalments, each equal to one tenth of the amount of the Loan. The first such instalment shall be payable on the first Interest Date and the remaining instalments shall be payable one on each of the nine succeeding Interest Dates.

(B) Voluntary Prepayment - The Borrower may prepay the Loan in full (but not in part) on the last day of any Interest Period if it has given to the Lender at least one month's prior written notice of its intention to do so, and by giving any such notice shall become liable to make the prepayment on the date to which it refers.

(C) Other Prepayments - If the Borrower has become obliged to indemnify the Lender under clause 14 it may by one month's prior written notice prepay the Loan in full (but not in part) on any banking day (without prejudice to its obligation to indemnify the Lender in accordance with clause 14). Any such prepayment and any such prepayment made pursuant to clause 7(f) shall reduce ratably each remaining repayment instalment.

(D) Provisions Generally Applicable - The Borrower may not make any repayment or prepayment except as expressly provided in this Agreement and may not reborrow any amount repaid or prepaid. The Borrower shall, at the same time as any repayment or prepayment is made to the Lender under any provision of this Agreement, pay all interest accrued on the amount repaid or prepaid and all other amounts then payable under this Agreement.

5. Fees and Expenses

(A) Fees - The Borrower shall pay to the Lender (a) a management fee of U.S.$121,875 which fee shall be payable on or before the date of the first advance under this Agreement; and (b) a legal fee of U.S.$10,000 payable on or before the date of the first advance under this Agreement.

(B) Expenses – The Borrower shall on request reimburse to the Lender against production of relevant invoices (a) all expenses and taxes thereon incurred by the Lender in connection with the negotiation, preparation and execution of this Agreement, except that all legal expenses in connection with the preparation of this Agreement shall be deemed included in the legal fee specified in clause 5(A)(c); (b) all other expenses and taxes thereon incurred by the Lender in connection with any amendment or variation of or waiver given in connection with this Agreement and (c) all expenses (including legal fees) and taxes thereon incurred by the Lender for the enforcement or preservation of any rights under this Agreement.

6. Taxes – All payments to be made by the Borrower to the Lender under this Agreement, including under this clause, shall be made free and clear of and without any deduction or withholding on account of tax unless a deduction or withholding is required by law, in which event the Borrower shall (i) promptly pay or cause to be paid to the appropriate authority the amount of the withholding or deduction, (ii) produce to the Lender not later than thirty (30) days after that payment a receipt of that authority evidencing that it has received the proper amount from the Borrower and (iii) pay such further sums as may be necessary so that, after the deduction or withholding, the Lender receives on the due date the amount it would have received had no such deduction or withholding been required. Without prejudice to the preceding provisions of this clause 6, the Borrower shall (a) on demand indemnify the Lender against any liability to make any payment in respect of tax on or in relation to any sum payable under this Agreement otherwise than in respect of tax levied on its overall net income in the jurisdiction in which its principal office or lending office is located and (b) pay (and indemnify the Lender against any liability to pay) any stamp, registration or similar taxes or duties that may be or become payable with respect to this Agreement.

7. Conditions Precedent – The Lender shall not be obliged to make the Loan if (A) an Event of Default or potential Event of Default has occurred or will occur by reason of the Loan being made or (B) the Borrower has not paid such fees mentioned in clause 5 as have then fallen due. The Lender shall not be obliged to make payments to the Contractor from the Borrower's account as provided in clause 2 (B) if the Lender has not received before the date on which the payment is to be made:

41 words omitted
2 words added

(a) ~~a copy certified as true and correct by the Minister of Finance of The People's Republic of the Congo or a person duly authorised by him of~~ (i)[a] documents evidencing the authority of the person who has executed this Agreement for the Borrower ~~including, without limitation, an authorisation ("plains pouvoirs")~~ granted by the President of The People's Republic of the Congo, ~~appropriate representative of and of the persons who will (until replaced by other duly empowered persons) sign any other documents in connection with this Agreement,~~ and (ii) an undertaking of the "Direction Generale du Credit et de Relations Financieres", acting by delegation from the Minister of Finances of the People's Republic of the Congo, whereby the said "Direction" undertakes to grant, as and when necessary, all authorisations necessary to enable the Borrower to acquire dollars at such times and in such amounts as to enable it to meet on due date its payment obligations under this Agreement, all such documents to be satisfactory in form and substance to the Lender;

AM

(b) documents evidencing:

(i) the appointment of The Law Debenture Trust Corporation p.l.c. as process agent in London for the purposes of this Agreement, and its acceptance of that appointment, substantially in the form of Exhibit B;

(ii) the appointment of United States Corporation Company as process agent in New York and its acceptance of that appointment, in the form of Exhibit C;

(c) an opinion of the President of the Supreme Court of The People's Republic of the Congo, or his duly authorized representative, in the form of a French text corresponding substantially to the English text set out in Exhibit D;

(d) a copy of the Contract, certified as true and correct by the Central Commercial Director of State Contracts of The People's Republic of the Congo or a person duly authorised by him and evidence satisfactory to the Lender that the Contract has entered into force in accordance with Clause 8.1 of the "General Conditions of Contract" forming part of the Contract or will, immediately upon any portion of the Loan being made, enter into force;

(e) certified copies of evidence of the authority and specimen signatures of (i) the person who will sign the disbursement claims on behalf of the Contractor and (ii) the person who will countersign the disbursement claims on behalf of Caisse Congolaise d'Amortissement;

(f) an opinion of a Congolese lawyer selected by the Lender, in form and substance satisfactory to the Lender.

8. Representations and Warranties - The Borrower represents and warrants to the Lender that:

(A) Power - Under the laws of The People's Republic of the Congo it has full legal right, authority and power to enter into and to perform this Agreement and has taken all necessary action to authorise the execution and performance of this Agreement.

4

AR

(B) Binding Obligations - All the obligations expressed to be assumed by the Borrower under this Agreement are legal, valid and binding as obligations of The People's Republic of the Congo, enforceable in accordance with their respective terms.

(C) No Breach - The Borrower will not by entering into or performing this Agreement breach any agreement or any order of a court or any law, regulation, decree or other instrument in The People's Republic of the Congo.

(D) Authorisations - All approvals or authorisations (including exchange control authorisations) necessary in connection with this Agreement in The People's Republic of the Congo have been obtained and are in full force and effect.

(E) Registration - No registration, notarisation or similar formality is required in connection with this Agreement in The People's Republic of the Congo except (a) for (i) registration for the purposes of documentary registration tax which, unless exempted, will be assessed at a fixed nominal amount and (ii) registration in connection with proceedings brought under this Agreement in The People's Republic of the Congo which, unless exempted, will give rise to a proportional registration tax; all of which aforementioned taxes will, unless exempted, be paid by the Borrower in accordance with clause 6, and (b) that this Agreement should be approved by the "Commission Centrale des Marches et Contracs de l'Etat."

(F) Default - No Event of Default or potential Event of Default has occurred or will occur by reason of the Loan being made.

(G) Commercial Act - Execution and performance of this Agreement by the Borrower constitute private and commercial rather than public or governmental acts.

(H) No Litigation - No litigation, arbitration or administrative proceeding is in process or, to the best of the knowledge of the Borrower, threatened against the Borrower or any other Congolese Public Entity that is reasonably likely to have a material adverse effect on the interests of the Lender under this Agreement.

(I) Form - This Agreement is in proper form for enforcement in The People's Republic of the Congo.

(J) Ranking - There is, at the date of this Agreement, nothing to prevent any claim under this Agreement from ranking as a general obligation of the Borrower at least pari passu with the claims of all other creditors of the Borrower. Except as disclosed in writing to the Lender prior to the date hereof, as at the date of this Agreement there is in existence no mortgage, pledge, security or similar preferential arrangement over any assets or revenues of the Borrower or of any other Congolese Public Entity.

(K) Proceedings - The obligations of the Borrower under this Agreement may be enforced in the courts of The People's Republic of the Congo and the Borrower would not be entitled in any proceedings brought in those courts for enforcement of any such obligation to any immunity of jurisdiction.

APh

(L) I.M.F. - The Borrower is a member in good standing of the International Monetary Fund ("I.M.F.").

(M) The Borrower is not aware of the existence of any fact or circumstance that has not been disclosed to the Lender and that could reasonably be expected adversely to affect the decision of the Lender to lend to the Borrower.

9. Undertakings - The Borrower undertakes

(A) To furnish to the Lender, as and when produced, copies of such reports and documents concerning the financial position of the Borrower as are from time to time publicly available and to provide to the Lender such other information relevant to this Agreement or to the Contract as the Lender may reasonably request;

(B) To obtain promptly from time to time all such approvals and authorisations (including exchange control authorisations) and to effect all such registrations and similar formalities as may be or become necessary or advisable in connection with this Agreement and to comply with the terms of all such approvals, authorisations and registrations as have been or may be obtained or effected;

(C) Promptly to notify to the Lender from time to time the occurrence of any Event of Default or potential Event of Default of which it has knowledge;

(D) To procure that the claims of the Lender under this Agreement will rank as general obligations of The People's Republic of the Congo at least pari passu in right and priority of payment with the claims of all other creditors of The People's Republic of the Congo and not to create or to allow to subsist any mortgage, pledge or other security or other preferential arrangement over any of the assets or revenues of The People's Republic of the Congo or of any Congolese Public Entity in favour of any creditor; and

(E) To procure that the Ministry makes payment to the Contractor, no later than the date on which the disbursement claim referred to in sub-clause 2(B) is presented to the Lender, of all amounts payable under clause 8.1 of the "General Conditions" forming part of the Contract that are not financed by the Loan.

10. Acceleration - The Lender shall not be obliged to make the Loan or any portion thereof and shall be entitled by notice to the Borrower to require the Loan to be repaid immediately or on the date specified in the notice (together with accrued interest and all other amounts payable under this Agreement) if any of the following events ("Events of Default") occur:

(A) The Borrower fails to pay when due any amount payable under this Agreement;

(B) Any representation or statement made by the Borrower in or in connection with this Agreement or made in any document provided under this Agreement proves to have been incorrect in any material respect when made or (except in respect of clauses 8(E) and 8(F) of this Agreement) would be

AR

incorrect in any material respect if repeated at any time during the term of this Agreement with respect to the circumstances then existing;

(C) The Borrower fails to perform any of its obligations under clause 9(C), 9(D) or 9(E) of this Agreement;

(D) The Borrower fails to perform any obligation under this Agreement (other than an obligation mentioned in sub-clause (A) or (C) above) and the failure, if capable of remedy, is not remedied within thirty (30) days after a requirement to that effect made by the Lender;

(E) The Borrower or any other Congolese Public Entity defaults in the payment when due of any relevant debt (arising otherwise than under this Agreement) or any condition, event or act occurs that causes any relevant debt of the Borrower or of any other Congolese Public Entity to become due prior to its specified due date or entitles the creditor to whom it is owed (or any agent for that creditor) to declare it due prior to its specified due date;

(F) (i) The Borrower or any other Congolese Public Entity is unable to pay its debts generally as they fall due or takes any steps with a view to a readjustment or a rescheduling of its debts or of any category of its debts or suspends or declares its intention of suspending payment of its debts generally or of any category of debt or of any amount payable under this Agreement or (ii) any Congolese Public Entity is the subject of proceedings under any bankruptcy law, law for the relief of debtors or law otherwise affecting creditors' rights generally or takes an assignment for the benefit of or enters into any composition or arrangement with creditors or any class of creditors or (iii) a receiver, intervenor or similar officer is appointed with respect to any Congolese Public Entity or a substantial part of its respective assets or revenues or (iv) execution, distress, attachment or other legal process is levied on any substantial part of the assets or revenues of the Borrower or of any Congolese Public Entity and is not discharged within thirty (30) days;

(G) Any approval, authorisation or registration required in connection with this Agreement is withdrawn, suspended, limited or ceases to be in full force and effect;

(H) The Contract is set aside, suspended or terminated for any reason whatsoever or otherwise ceases to be in full force and effect or action is initiated by any person with a view to any of the foregoing;

(I) Any event occurs or circumstances arise that may have a material adverse effect on the ability of the Borrower to perform its obligations under this Agreement;

(J) The People's Republic of the Congo ceases to be a member in good standing of the I.M.F. or ceases to be eligible to use the resources of the I.M.F. under the Articles of Association of the I.M.F.

11. Payments

(A) Adjustment of Dates - If the date for payment of any sum under this Agreement is not a banking day, the date for payment shall be postponed to the next banking day.

(B) Dollar Payments - The dollar is the currency of account and of payment under this Agreement. All payments to be made by the Borrower under this Agreement shall be made in dollars and in same day funds (or such other form of dollar funds as may at the time of payment be customary for the settlement of international dollar transactions in New York City) through the New York Clearing House Interbank Payments System not later than 11 a.m. (New York time) on the date for payment to account No. 00-016618-01 of the Lender at The Hongkong and Shanghai Banking Corporation, Five World Trade Center, New York, New York 10048 U.S.A. or such other account as the Lender may from time to time designate by notice in writing to the Borrower.

(C) No Set-off - Without prejudice to clause 6, all payments to be made by the Borrower under this Agreement shall be made without deduction for or on account of any set-off or counterclaim.

12. Indemnities - The Borrower shall on demand pay to the Lender amounts sufficient to indemnify the Lender:

(A) Against any loss (including loss of Margin), premiums, penalties or expense (including without limitation those incurred in liquidating deposits or re-employing funds taken or borrowed to fund the Loan) that the Lender determines it has sustained as a consequence of (i) payment of any amount on which interest accrues otherwise than on the last day of the period by reference to which interest is calculated, (ii) the failure by the Borrower to fulfil its obligations under this Agreement, (iii) the Loan not being made for any reason other than the negligence or wilful default of the Lender or (iv) the acceleration of the Loan under clause 10;

(B) Against any loss or expense that the Lender determines it has sustained by reason of any discrepancy between (a) the rate of exchange (which expression includes any premium and costs of exchange) at which a sum payable in one currency (the "first currency") under this Agreement has been converted into any other currency (the "second currency") for the purpose of making or of filing a claim against the Borrower or of obtaining an order or judgment of any court against the Borrower or of enforcing any such order or judgment and (b) the rate of exchange at which the Lender is able to purchase the first currency with the second currency on the first day on which such purchase is practicable after receipt by the Lender of any amount of the second currency paid in satisfaction (in whole or in part) of the claim, order or judgment. Any amount payable by the Borrower under this sub-clause (3) shall be a separate debt the liability for which shall not be affected by judgment being obtained for any other amount payable by the Borrower under this Agreement.

13. Calculations and Determinations

(A) Basis of Computation - All interest and commitment fees shall accrue from day to day and be computed on the basis of the actual number of days elapsed and as if the year were composed of three hundred and sixty (360) days.

(B) Determinations - Whenever this Agreement provides for the determination by the Lender of any matter or thing, that determination shall be conclusive, in the absence of manifest error.

14. Increased Costs - If the Lender determines that the result of the introduction of or any change in, or in the interpretation of, any instrument having the force of law or compliance with any directive or request from any central bank or fiscal, monetary or other relevant authority (whether or not having the force of law) is (a) to increase the cost to it of making or agreeing to make available or funding the Loan or (b) to reduce the amount of any payment receivable by it under this Agreement or to require it to forgo any amount payable under this Agreement, the Borrower shall (except to the extent that it is liable to indemnify the Lender therefor under clause 6) on demand from time to time pay to such amounts as the Lender may determine to be necessary to indemnify it against the increased cost mentioned in (a) or against the reduction or requirement mentioned in (b).

15. Change in Circumstances - If the Lender determines that it has become unlawful for it to make or to maintain the Loan or that, in light of any directive or request from any central bank or fiscal, monetary or other relevant authority (whether or not having the force of law) it would be impracticable for it to do so, it shall promptly so notify the Borrower, whereupon it shall be released from all obligation to make the Loan and, if the Loan has been advanced, the Borrower shall repay the Loan on demand by the Lender.

16. Assignment - This Agreement shall be binding upon the Borrower and its successors and assigns and shall inure to the benefit of the Lender and its successors and assigns. The Borrower may not assign any of its rights under this Agreement without the consent of the Lender. The Lender may assign any of its rights and obligations under this Agreement to any bank or lending institution and may maintain the Loan out of such office as it may from time to time select and notify to the Borrower.

17. Set-off - The Borrower authorises the Lender (i) to set-off any credit balance to which the Borrower is entitled on any account of the Borrower (irrespective of currency) against any unpaid amounts due and payable by the Borrower under this Agreement and (ii) to apply any non-dollar balances on such accounts toward the purchase of dollars, in exercise of any such right of set-off.

18. Notices - All notices or other communications shall be given at the respective addresses set forth at the end of this Agreement or at such other address as either party may designate as its address by notice from time to time to the other party. Notices or communications to the Borrower shall be deemed to have been received, in the case of telexes, on the day on which sent (or, if that day is not a working day in the place where the telex is

AB<

4

received, on the next working day in that place), in the case of letters thirty days after having been put in the post (airmail if addressed to another country) postage prepaid and in the case of telegrams, fifteen days after despatch.

19. Law and Jurisdiction

(A) This Agreement shall be governed by the laws of England. The Borrower hereby irrevocably agrees that any suit, action or proceeding against the Borrower arising out of or in connection with this Agreement may be brought in the High Court of Justice in England, Federal Courts sitting in, and the State Courts of, New York, New York U.S.A. and the Courts of The People's Republic of the Congo and irrevocably submits to the jurisdiction of each such court, but nothing shall preclude the Lender from bringing any proceedings arising out of or in connection with this Agreement in the courts of any other competent jurisdiction, and proceedings in one jurisdiction shall not preclude proceedings in another jurisdiction whether concurrent or not.

(B) The Borrower hereby irrevocably appoints The Law Debenture Trust Corporation p.l.c., Estates House, 66 Gresham Street, London EC2B 7HX England and United States Corporation Company, 70 Pine Street, New York, New York 10270 U.S.A. as its agents for service of process in any such suit, action or proceedings in England and New York, respectively, provided that if at any time The People's Republic of the Congo maintains an Embassy or Consulate in London or New York, any process relating to proceedings arising out of or in connection with this Agreement may be validly served on the Borrower if served on the Ambassador or Consul-General for the time being of The People's Republic of the Congo in London or, as the case may be, New York.

(C) The Borrower consents generally in respect of any suit, action or proceedings arising out of or in connection with this Agreement to the giving of any relief, or the issuance of any process in connection with any such suit, action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment that may be made or given in such action or proceedings.

(D) To the extent that the Borrower may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed) the Borrower agrees not to claim and waives such immunity to the fullest extent permitted by the laws of that jurisdiction intending, in particular, that in any proceedings taken in New York the foregoing waiver of immunity shall have effect under and be construed in accordance with the United States Foreign Sovereign Immunities Act of 1976.

20. Language - This Agreement is being executed in English and French versions. In the event of any discrepancy between the two versions, the English version shall for all purposes prevail. All notices, communications and other documents to be delivered under this Agreement by the Borrower

shall in French or in English.

21. No Waiver - No failure to exercise nor any delay in exercising on the part of the Lender any right or remedy under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy. The rights and remedies provided for in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

22. Severability - The invalidity, illegality or unenforceability of any provision of this Agreement in any relevant jurisdiction shall not affect the validity, legality or enforceability of any other provision of this Agreement, nor that of the former provision in any other relevant jurisdiction.

IN WITNESS WHEREOF the parties have caused this Agreement to be executed the day and year first above written.

SIGNATORIES

THE PEOPLE'S REPUBLIC OF THE CONGO

Etienne NOTE
Directeur Général
Caisse Congolaise d'Amortissement
B.P. 2090 - Télex 5294 KG
BRAZZAVILLE

By______________________________

Name: Etienne Note
Title: Directeur General de la Caisse Congolaise d'Amortissement
Address: Brazzaville
The People's Republic of the Congo

CCA - B.P. 2090 telex 5294 KG CACONAM.

EQUATOR BANK LIMITED

By______________________________

Name: Alionne P. Ndao
Title: Attorney-in-Fact
Address: Norfolk House
Frederick Street
P. O. Box SS-6273
Nassau, N.P., Bahamas

EXHIBIT A

FORM OF DISBURSEMENT CLAIM

To: Equator Bank Limited
Norfolk House
Frederick Street
P. O. Box SS-6273
Nassau, N.P., Bahamas

We refer to (i) the Contract (as defined in the Loan Agreement hereinafter referred to) between the Ministry of Building and Public Works of The People's Republic of the Congo and Bovis International Limited and (ii) the agreement dated ____________ 1984 (the "Loan Agreement") between The People's Republic of the Congo, as borrower (the "Borrower") and Equator Bank Limited.

We hereby claim payment of the equivalent in pounds sterling of U.S. $__________ (at your prevailing rate of exchange on the date of payment to us) in respect of all or a part of the ________________ referred to in the Contract, and confirm that the amount so claimed is now due and owing to us under the Contract.

Please credit the amount claimed to our Account No. (______________) with (________________________).

Bovis International Limited

By________________________________
Name:
Title:
Date:______________________198

We refer to the above disbursement claim and hereby request that the Loan be made under the Loan Agreement there referred to in accordance with the procedures described therein.

Caisse Congolaise d'Amortissement

By________________________________
Name:
Title:
Date:______________________198

EXHIBIT B

PRIVATE AND CONFIDENTIAL

The Law Debenture Trust Corporation p.l.c.
Estates House
66 Gresham Street
London EC2V 7HX
ENGLAND

Dear Sirs:

We refer to the Loan Agreement dated ____ December, 198 a brief summary of which appears in the record sheet attached hereto. We write to record the terms upon which you have agreed to be appointed by us in the Loan Agreement to receive on our behalf service of process in the Courts of England in respect of any legal action or proceedings arising out of or in connection with the Loan Agreement.

1. Upon receipt of any service of process issued out of the Courts of England addressed to us and arising out of or in connection with the Loan Agreement, you will on our behalf accept such service and will notify us by telex or cable at the number or address shown in the record sheet attached hereto (or such other number or address as may from time to time be specified by us in writing) to the effect that you have accepted service of process on our behalf. Such notification need only inform us of the name of the party issuing the proceedings, the date upon which you accepted service of process and the date (if any) by which action must be taken to avoid judgment being entered against us in default of appearance before the Court. The notification need not include any details of the nature or substance of the claim or claims made by the issuing party. You shall, however, ask us the names of our London solicitors (if any) to whom copies of the relevant documents should be sent.

2. Following such notification by telex or cable you will confirm the acceptance to us by airmail letter at the address shown in the record sheet attached hereto (or such other address as may from time to time be specified by us in writing), enclosing the documents which you have received in connection with service of such process. In the event that, at our request, you agree to provide some details of the nature or substance of the claim or claims made by the issuing party prior to the receipt by us of the relevant documents, we agree that this shall be without responsibility on your part and that we will have regard only to the relevant documents in determining our response to the legal action or proceedings.

3. You shall have no other duties whatsoever under the terms of this letter save as expressly provided in paragraphs 1 and 2 above.

AM

Y

4. In the event that in your opinion communications between the United Kingdom and The Republic of the Congo are disrupted in any way, you shall be under no responsibility if a telex, cable or letter cannot be despatched to us, but you will use your best endeavours to inform us of this fact by telephone and shall despatch such telex, cable or letter, as the case may be, as soon as it becomes reasonably practicable so to do. The despatch of a telex or cable to the number or address provided in paragraph 1 above or the despatch of a letter to the address provided in paragraph 2 above by depositing it with the postal authorities shall be a good discharge of your duties hereunder.

5. In consideration of your accepting these arrangements, we hereby agree to pay you within thirty days a fee of £______ and all costs (if any) incurred by you in the preparation of this letter (including telex and other out-of-pocket expenses) and, in addition, agree to indemnify you forthwith upon written demand by you from and against all costs, charges and expenses whatsoever incurred or sustained by you in performance of your duties hereunder (including the cost of copying and transmitting notices and documents despatched to us or to our order as required under the terms of this letter) and agree that we shall have no right of action against you for any failure to perform any of such duties, except where such failure is due to your negligence or wilful default or that of your officers or agents.

6. Upon receiving the duplicate of this letter with the Form of Acknowledgement at the foot thereof duly signed by yourselves by way of acceptance of the terms hereof, we shall notify the Lender (by delivery to it of a copy of this letter) that you have accepted the terms of this letter and that any service of process issued out of the Courts of England should be made by it quoting reference ______.

7. This appointment shall cease on the expiry of the period for the duration of the Loan Agreement as described in the record sheet attached hereto unless in the case of any extension of such period (whether by written agreement, waiver or otherwise) you agree in writing to continue this appointment (which you will normally endeavour to do upon the payment of a further fee to be agreed at such time), provided that we hereby agree that this appointment shall continue in force upon payment to you of such fee as you may agree with the Lender in the event that at the date for the final repayment under the Loan Agreement, we have not complied with (or are alleged by the Lender not to have complied with) any of the terms of the Loan Agreement.

8. The terms of this letter shall override any terms to the contrary contained in the Loan Agreement regarding your appointment and you shall only be taken to have notice of these provisions of the Loan Agreement which are contained in the record sheet.

Yours truly,

signed by

on behalf of The People's Republic of the Congo

-3-

We hereby acknowledge receipt of a letter dated ______________ from The People's Republic of the Congo of which the above is a true copy and agree to the terms of such letter and to a copy thereof being given to the financial institutions who are parties to the Loan Agreement.

Yours truly,

DIRECTOR

For and on behalf of
The Law Debenture Trust Corporation p.l.c.

ARn

THE LAW DEBENTURE TRUST CORPORATION p.l.c.
Estates House
66 Gresham Street
London EC2V 7HX

Telephone: 01-606-5451
Telex: 888347 and 8956839

SERVICE OF PROCEEDINGS - RECORD SHEET

A separate sheet must be completed by each party appointing The Law Debenture Trust Corporation p.l.c. as its agent to accept service of proceedings. The appointor must inform The Law Debenture Trust Corporation p.l.c. immediately of any alteration to the information set out below.

1. Name of Appointor: The People's Republic of the Congo

2. Address of Appointor's Registered Office or Place of Business

3. Appointor's telex number(s)

4. Appointor's telephone number(s)

5. Appointor's cable address(es)

6. Name/title/references of person to be contacted in the event of proceedings being served

7. Telex number/telephone number/cable address to be used in the event of proceedings being served

8. Name/title/reference and address of person to whom proceedings should be sent

9. Name and address of London Solicitors (if any) to whom copy proceedings should be sent

10. Any special instructions

11. Details of document(s) concerned in appointment: (Details may be continued overleaf if necessary)

ARn

Nature of Document: LOAN AGREEMENT

Parties: (1) The People's Republic of the Congo as Borrower,

(2) Equator Bank Limited
Norfolk House
Frederick Street
P. O. Box SS-6273
Nassau, N.P., Bahamas

Date: ____ December 1984
Duration: ____________

Amount Involved: U.S. Dollars 6,500,000

Jurisdiction Clause Number: Clause 19

---

Date: ____________________

______________________________
on behalf of
The People's Republic of the Congo

AR

4

EXHIBIT C

THE PEOPLE'S REPUBLIC OF THE CONGO
Brazzaville
The People's Republic of the Congo

__ December, 1984

United States Corporation Company
70 Pine Street
New York, New York 10270

Gentlemen:

We refer to the Loan Agreement (the "Agreement") dated __ December, 1984 between The People's Republic of the Congo ("Congo") and Equator Bank Limited ("Equator") providing for a loan in the maximum principal amount of U.S. $6,500,000. Unless otherwise defined herein, all capitalized terms used herein shall have the respective meanings provided therefor in the Agreement.

Congo, for itself and its successors and assigns, has submitted itself and its properties and revenues to the jurisdiction of the courts of the State of New York and to the jurisdiction of the courts of the United States of America located in the Southern District of New York for the purposes of any suit, action or other proceeding arising out of the Agreement. The final maturity date of the Loan is five years after the first Interest Date.

Congo, for itself and its successors and assigns, hereby confirms its desig- nation and appointment of the United States Corporation Company, 70 Pine Street, New York, New York 10270, as its attorney-in-fact to receive service of summons and other legal process in any action, suit or proceeding with respect to any matter as to which it has submitted to jurisdiction as set forth above, it being stipulated that service upon such attorney-in-fact shall constitute service upon Congo or its successors and assigns, all as more fully set forth in the Agreement.

Congo further agrees that (i) the sole responsibilities of the United States Corporation Company shall be to send a copy of any such summons and other legal process so received to Congo, by registered or certified mail, at Brazzaville, The People's Republic of the Congo and (ii) that the United States Corporation Company shall have no responsibility for the receipt or non-receipt by Congo of such summons and other legal process, nor for any performance or non-performance by Congo, or any other party to the Agreement or their respective successors and assigns. Congo hereby agrees to hold the United States Corporation Company harmless against all liability, loss, cost, damage or expense for any reason whatsoever, except its failure or refusal to receive or to send any summons and other legal process or notice as above set forth. Congo also hereby agrees to reimburse the United States Corporation Company for all its out-of-pocket disbursements in connection with services to Congo hereunder.

Page 2
Letter to United States Corporation Company

Please acknowledge receipt of this letter and your agreement to the terms hereof by signing and returning the enclosed copy of it. This letter shall also inure to the benefit of Equator and its successors and assigns.

THE PEOPLE'S REPUBLIC OF THE CONGO

By_______________________________
Name:
Title:

Accepted and agreed:

UNITED STATES CORPORATION COMPANY

By_______________________________
Name:
Title:

EXHIBIT D

FORM OF OPINION OF THE PRESIDENT OF THE SUPREME COURT

I the undersigned Charles ASSEMEKANG, Doctor of Law, President of the Supreme Court of The People's Republic of the Congo

Having been requested by letter No. __________ dated __________ from the Minister of Finance to issue a legal opinion with relation to the Loan Agreement entered into on ____ December, 1984 between on the one hand The People's Republic of the Congo and on the other hand Equator Bank Limited.

After having examined:

1. The Loan Agreement (the "Agreement") entered into on ____ December, 1984 between on the one hand The People's Republic of the Congo and on the other hand Equator Bank Limited, under which Equator Bank Limited (the "Lender") agrees to grant to The People's Republic of the Congo, on the terms and conditions there set out, a loan facility for a maximum amount of U.S. $6,500,000 in order to assist in financing the payment to Boris International Limited of the local costs of the construction of the Brazzaville - Kayana - Kindamba highway under a contract relative to certain road building works in The People's Republic of the Congo;

2. All other documents it has deemed necessary to examine as well as the Constitution, laws and regulations in force of The People's Republic of the Congo.

Give the following opinion (words and phrases defined in the Agreement having the same meaning herein):

1. The Agreement constitutes a charge on public funds within the meaning of the provisions of the Constitution of July 8, 1979 promulgated by Decree 79/445 of August 8, 1979.

2. Mr. Bote, Directeur General de la Caisse Congolaise d'Amortissement, is fully empowered to sign the Agreement and all other documents in connection with the Agreement on behalf of The People's Republic of the Congo.

3. The Directeur General de la Caisse Congolaise d'Amortissement signed the Agreement on ____ December, 1984.

4. In consequence the Agreement has been validly and duly signed and the obligations it creates for the "Borrower" are irrevocable and unconditional obligations of The People's Republic of the Congo, enforceable according to its terms.

5. All authorisations (including exchange control authorisation), registrations or other formalities of or with any governmental authority that are required in The People's Republic of the Congo in connection with the Agreement have been obtained and are in full force and effect.

6. The claims of the Lender on The People's Republic of the Congo arising out of the Agreement will rank pari passu with all other borrowings, guarantees and debts of The People's Republic of the Congo. There is in existence no mortgage, pledge or other security or other preferential arrangement over any assets or revenues of The People's Republic of the Congo.

7. The payments to be effected by The People's Republic of the Congo under the Agreement are not subject to any tax or duty in The People's Republic of the Congo. The Agreement is not subject in The People's Republic of the Congo to any stamp or registration or similar duty other than documentary registration tax, unless exempted, at a fixed nominal amount.

8. The Agreement satisfies the conditions of form required by Congolese law.

9. The conclusion of the Agreement by The People's Republic of the Congo constitutes a private and commercial act rather than an act carried out for public purposes or in the interests of public purposes. The People's Republic of the Congo is not entitled to claim any right of immunity, whether of jurisdiction or execution, in The People's Republic of the Congo and the waiver of immunity from jurisdiction and execution before foreign courts contained in the Agreement is valid under Congolese law.

10. So far as I am aware after making due and careful enquiry neither the Borrower nor any Congolese Public Entity is in default in the payment of any relevant debt.

11. The choice of English law to govern the Agreement is valid under Congolese law and that choice would be given effect to in any proceedings before the Courts of The People's Republic of the Congo concerning the Agreement. The submission to the jurisdiction of the English and New York courts to settle any differences arising in connection with the Agreement is valid under Congolese law. The Lender would nonetheless have the right, in the event of such differences, to bring them before the Congolese courts, which would accept jurisdiction to decide the matter.

12. A judgment given in England or New York against The People's Republic of the Congo under the Agreement would be recognized in The People's Republic of the Congo without investigation of the merits.

ABh

U

13. It is not necessary that the Lender be regist .d or authorized to carry out its activities in The People's Republic of the Congo in order for it to enforce its rights under the Agreement. It would not be created merely by reason of signature or performance of the Agreement as resident for tax purposes in The People's Republic of the Congo.

Done in Brazzaville this __________ day of ______________, 1986.

Ch. ASSEMEKANG
Judge

President of the Supreme Court

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
ENTERED
SEP 19 2005
Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| **FG HEMISPHERE ASSOCIATES, L.L.C.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. H – 02 – 4261** |
| | § | |
| **RÉPUBLIQUE DU CONGO,** | § | |
| | § | |
| **Defendant,** | § | |
| **And** | § | |
| **CMS OIL AND GAS COMPANY,** | § | |
| **CMS OIL AND GAS (INTERNATIONAL) COMPANY,** | § | |
| **CMS NOMECO INTERNATIONAL CONGO HOLDINGS, INC.,** | § | |
| **CMS NOMECO CONGO, INC.,** | § | |
| **CMS OIL AND GAS (HOLDINGS) LTD.,** | § | |
| **CMS OIL AND GAS (INTERNATIONAL) LTD.,** | § | |
| **CMS NOMECO CONGO LDC,** | § | |
| **CMS OIL AND GAS (CONGO) LTD.,** | § | |
| **CMS OIL AND GAS (SERVICES) COMPANY,** | § | |
| **NUEVO ENERGY COMPANY,** | § | |
| **THE NUEVO CONGO COMPANY,** | § | |
| **THE CONGO HOLDING COMPANY,** | § | |
| **NUEVO CONGO, LTD.,** | § | |
| **NUEVO INTERNATIONAL INC.,** | § | |
| **NUEVO INTERNATIONAL HOLDINGS, LTD.,** | § | |
| **PERENCO INC.,** | § | |
| **PERENCO OIL AND GAS (INTERNATIONAL) COMPANY,** | § | |
| **PERENCO INTERNATIONAL (CONGO) INS.,** | § | |
| **PERENCO OIL AND GAS (SERVICES) COMPANY,** | § | |
| **And** | § | |
| **LANKAN INC.,** | § | |
| **Garnishees.** | § | |

**MEMORANDUM AND ORDER**

On August 12, 2005, this Court granted Plaintiff FG Hemisphere Associates, L.L.C.'s ("FG Hemisphere") request for a temporary injunction prohibiting Garnishees CMS Nomeco Congo, Inc.; The Nuevo Congo Company; and Nuevo Congo Ltd. (collectively, "Garnishees") from completing a proposed sale of working interests. The Court found that the proposed sale appeared by more than a preponderance of the evidence to be a fraudulent transfer. FG Hemisphere was required to pay a $10,000 bond to secure the injunction.

On August 25, 2005, the Court entered an order extending the injunction for thirty days. FG Hemisphere now requests that the injunction be extended until a full hearing on the merits can be held. Because the proposed sale appears to be fraudulent would likely render FG Hemisphere unable to collect monies owed to it by Defendant Rėpublique du Congo and by Garnishees, FG Hemisphere's motion, Docket No. 280, is hereby **GRANTED** and the injunction extended until such time as a hearing on the merits may be held.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 19th day of September, 2005.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 571544 (D.Del.)
**(Cite as: 1996 WL 571544 (D.Del.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
SUPRA MEDICAL CORP., Plaintiff,
v.
Myron A. BAKER, Marvin Burstein, Terry L. Collier, Dennis D. Cole, Russell A. Hill, Phillip E. Loori, Richard J. Reinhart, Thomas H. Scott, Guy Zani, Jr.,
David Hill, John Hill, and White Star Management, Inc., Defendants.
**Civ. A. No. 95-556-SLR.**

Sept. 26, 1996.

Neal J. Levitsky, of Agostini, Levitsky & Isaacs, Wilmington, Delaware, attorney for plaintiff. Of counsel: Jonathan L. Rosner, of Rosner Bresler Goodman & Bucholz, New York, New York.

William O. LaMotte, III, and Karen L. Pascale, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, attorneys for defendant Phillip E. Loori. Of counsel: Richard F. Horowitz, and Joel C. Haims, of Heller, Horowitz & Feit, P.A., New York, New York. Myron A. Baker, pro se. Marvin Burstein, pro se. Of counsel: Robert S. Lewis, Nyack, New York. Terry L. Collier, pro se. Dennis D. Cole, pro se. Russell E. Hill, pro se. Richard J. Reinhart, pro se. Thomas H. Scott, pro se. Guy Zani, Jr., pro se. David Hill, pro se. John Hill, pro se.

MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 Plaintiff Supra Medical Corporation ("Supra") filed this suit on September 13, 1995 pursuant to 18 U.S.C. § 1964 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In its amended complaint ("complaint"), plaintiff seeks treble damages for violations of RICO and conspiracy to violate RICO, injunctive relief prohibiting defendants from transferring or otherwise utilizing plaintiff's proprietary biomedical technology, and the return of said technology. (D.I. 32) Defendant Phillip E. Loori has moved to dismiss the complaint, contending that plaintiff has failed to state a claim against him upon which relief can be granted. (D.I. 36) This motion has been fully briefed, and oral argument was held on September 9, 1996. For the reasons set forth below, defendant Loori's motion will be granted.

II. BACKGROUND

The allegations plaintiff has set forth in its complaint are as follows:

Plaintiff Supra was incorporated in 1985. Defendants Loori and Thomas H. Scott had control over the corporation between 1987 and 1992, during which years the company met with little financial success. (D.I. 32 at ¶ ¶ 18-21) At some point during their control of the company, plaintiff contends, defendants Loori and Scott caused Supra to obtain certain biomedical and health care technology for the purpose of artificially inflating the price of Supra's common stock. (D.I. 32 at ¶ ¶ 22-23) In 1992, defendant Loori sold his shares in Supra and resigned from its board, leaving the company, plaintiff contends, without sufficient capital to utilize the technology it had acquired. (D.I. 32 at ¶ ¶ 30-31) Plaintiff does not allege that any of defendant Loori's actions before 1992 constitute predicate acts or parts of the RICO "scheme" referred to later in the complaint.

According to plaintiff, in March or April of 1994 defendant Richard J. Reinhart devised a scheme to misappropriate Supra's biomedical and health care technology by taking over control of the corporation. (D.I. 32 at ¶ 35) Plaintiff alleges that Reinhart's first attempt to execute this scheme consisted of a merger agreement with Medhealth Imaging, Inc., whose assets were artificially inflated via a sham agreement between Medhealth Imaging and another company controlled by defendant Terry L. Collier. (D.I. 32 at ¶ ¶ 39- 41) This agreement, made without the consent of Supra's board of directors, would have placed "a group represented by defendant Myron A. Baker" in control of Supra. (D.I. 32 at ¶ 38) Supra's board later learned of and disavowed the merger agreement. (D.I. 32 at ¶ 42)

Plaintiff contends that after the board rejected the merger, defendant Reinhart

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had circuit boards, source codes, control drawings, form drawings, working drawings, instructions, blueprints, mock-ups and other documents containing proprietary details and information essential to its biomedical and health care technology surreptitiously removed from [plaintiff's] facilities and placed in his possession or under his custody and control.

***2** (D.I. 32 at ¶ 43) Reinhart then resigned his positions with Supra. Meanwhile, defendants Baker, Cole, and Guy Zani, Jr. submitted to Supra's board another proposal for a merger with Medhealth Imaging, which the board approved. (D.I. 32 at ¶ ¶ 46-48) Plaintiff contends, however, that the board's approval of the merger was based on statements which defendants Baker, Cole, and Zani knew were untrue when made. In addition, plaintiff alleges that since the agreement was made, defendants Baker, Collier, Cole, and Zani

have transmitted and caused the transmission of communications by mail and wire in interstate and foreign commerce to plaintiff ... and others to give the appearance of fulfilling the agreement to provide plaintiff ... with necessary additional capital and administrative and financial planning which in fact never was provided, while misappropriating [plaintiff's] proprietary biomedical and health care technology and name and reputation.

(D.I. 32 at ¶ 50) In this manner, plaintiff contends, defendants Baker, Cole, Zani, and Collier took control of Supra and held themselves out as its authorized representatives. (D.I. 32 at ¶ ¶ 52-84)

By early 1995, relations between Supra's board and defendants Baker, Cole, Zani, and Collier had soured. The board sent defendant Baker a memorandum terminating the merger agreement, citing specifically Medhealth Imaging's failure to secure the promised capital and "[r]eferring to eight months of documented deceit, misrepresentations, dishonored checks, exaggerations and broken promises...." (D.I. 32 at ¶ 82) Plaintiff contends that defendants Baker and Cole continued to hold themselves out, fraudulently, as President/Chief Executive Officer and Vice President/General Counsel of Supra for the purpose of soliciting investments, which they then misappropriated. (D.I. 32 at ¶ ¶ 88-91, 96) In connection with these investments, plaintiff contends that defendants Baker and Cole, along with defendant Zani and Medhealth Imaging, issued a document purporting to represent shares of preferred stock in Supra. This action was allegedly taken without the required authorization of the board. (D.I. 32 at ¶ ¶ 93-94) Plaintiff also contends that on the instruction of defendants Baker and Zani, one of Supra's Supra Ultra Sound Scanner systems was removed from its authorized location and placed under the control of Medhealth Imaging.

Plaintiff alleges no involvement by defendant Loori in any of these events until March 1995 when, according to plaintiff, defendants Baker, Collier, Cole, Russell Hill, Reinhart, Scott, Zani, and Loori "formulated a plan to solicit proxies from [Supra] shareholders and elect new Directors of [Supra] to misappropriate [Supra's] proprietary biomedical and health care technology and equipment for their benefit and conceal the misappropriation from [plaintiff's] duly elected Directors and shareholders." (D.I. 32 at 101) In furtherance of this plan, plaintiff alleges, defendants, including defendant Loori, solicited proxies from Supra's shareholders to replace the existing board members with defendants Russell Hill, Reinhart, Baker, Zani, and Cole. (D.I. 32 at ¶ ¶ 103- 04) The forms mailed in this solicitation, plaintiff contends, were false and misleading in numerous respects. (D.I. 32 at ¶ 106) [FN1]

FN1. This mailing was the subject of a separate suit filed by Supra to enjoin the solicitation. *John W. Cantwell, Evelyna Dyson-Cantwell, Niels Lauerson, George J. Stasen and John F. Brooks, Individually and on behalf of Supra Medical Corp. v. Russell A. Hill, Thomas H. Scott, Nancy Loori-Niesgard, Phillip E. Loori and Diane E. Simmons,* No. 95-390-SLR (D.Del.1995). The parties to that action reached a settlement and the case was dismissed with prejudice on August 17, 1995. As a result of the settlement, the consent forms were nullified and no further solicitation took place. (D.I. 32 at ¶ 118) As noted, the instant suit was filed on September 13, 1995.

***3** The last remaining allegation in which defendant Loori is mentioned concerns the transmission of an announcement in August 1995 to the effect that a corporation called Joe Franklin Productions, Inc. had agreed to take over the assets and technology of Medhealth Imaging, Inc. (D.I. 32 at ¶ 119) According to plaintiff, at the time of the announcement Medhealth Imaging, Inc. was in possession of assets and technology belonging to Supra. These assets were transferred to Joe Franklin Productions when Medhealth Imaging was sold. (D.I. 32 at ¶ ¶ 120-22) Plaintiff does not allege that defendant Loori played any role in the actual sale or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

announcement thereof, but only that defendant Baker on behalf of himself and defendants Terry L. Collier, Dennis D. Cole, Russell A. Hill, Phillip E. Loori, Thomas H. Scott, [and] Guy Zani, Jr., caused a statement to be transmitted by wire in interstate commerce from Clearwater, Florida, to various print media in the financial community throughout the United States announcing that Medhealth Imaging, Inc. agreed to sell one hundred percent of its assets and proprietary technology to a publicly-held corporation known as Joe Franklin Productions, Inc....

(D.I. 32 at ¶ 119)

III. DISCUSSION

A. Standard for Dismissal Under Rule 12(b)(6)

Defendant Loori has moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. In ruling on a Rule 12(b)(6) motion, the factual allegations of the complaint must be accepted as true. *Cruz v. Beto,* 405 U.S. 319, 322 (1972) (*per curiam* ). The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the complaint. *Retail Clerks International Association v. Schermerhorn,* 373 U.S. 746 (1963). Additionally, the court must resolve any ambiguities concerning the sufficiency of the claims in favor of the plaintiff. *Hughes v. Rowe,* 449 U.S. 5, 10 (1980) (*per curiam* ). The "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

B. Standard for Liability under RICO

The applicable sections of RICO provide:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

....

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(b), (d). The essential elements of a civil RICO claim are "(1) the existence of a RICO 'enterprise'; (2) the existence of 'a pattern of racketeering activity'; (3) a nexus between the defendant, the pattern of racketeering activity or the RICO 'enterprise'; and (4) resulting injury to plaintiff, in his business or property." *Klapper v. Commonwealth Realty Trust,* 657 F.Supp. 948, 953 (D.Del.1987). To establish a pattern of racketeering activity, plaintiff must allege defendant's participation in at least two predicate acts of racketeering activity. 18 U.S.C. § 1961(5). Section 1961(1) provides a list of offenses defined as racketeering activities, including mail and wire fraud and fraud in the sale of securities.

C. Parties' Contentions

***4** Loori raises several grounds for dismissal. He contends that: 1) plaintiff has failed to plead his involvement in the requisite predicate acts of racketeering activity, thus failing to establish the required nexus; 2) the complaint does not allege that Loori obtained or maintained control of an enterprise through a pattern of racketeering activity; 3) plaintiff does not allege any injury resulting from Loori's actions; 4) plaintiff does not allege that Loori knowingly and willingly participated in the alleged scheme to misappropriate Supra's biomedical technology; 5) the complaint does not meet the specificity requirements of Fed.R.Civ.P. 9(b); and 6) plaintiff is not entitled to injunctive relief because it failed to plead that Loori is in possession or control of the technology in question. Plaintiff answers Loori's first three arguments with an assertion that Loori, as an aider and abettor and a member of a conspiracy, is liable for the predicate acts, the pattern of activity, the control of the RICO enterprise, and the damages caused by his co-conspirators, including those that occurred before he joined the conspiracy. Plaintiff also claims that the complaint clearly states that Loori knowingly and intentionally joined the scheme to defraud plaintiff, and that the complaint fully meets the specificity requirements of Rule 9(b). Plaintiff has not responded in its brief to defendant Loori's contentions that plaintiff's claims for injunctive relief must be dismissed for failure to allege that the technology is in his possession or control. [FN2]

FN2. Plaintiff alluded briefly to this issue during oral argument, stating that if Loori is not in possession of the technology, he should be willing to stipulate to that fact.

D. Co-Conspirator/Aider and Abettor Liability

According to the complaint, the predicate acts in which all defendants took part are mail and wire fraud. (D.I. 32 at ¶ 127) However, plaintiff alleges

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

actual participation on defendant Loori's part in only one of the activities alleged during the period when the "scheme" was operative--the mailing of the proxy solicitation in March 1995.

Defendant Loori contends that because the proxy solicitation was the subject of a previous lawsuit, consideration of the mailing as a predicate act is barred by *res judicata* and collateral estoppel. *Res judicata,* or claim preclusion, bars subsequent suits based on the same cause of action and between the same parties as a previous suit. Labelle Processing Co. v. Swarrow, 72 F.3d 308, 313 (3d Cir.1995). Claim preclusion applies only where 1) a final judgment was had on the merits in a previous litigation; 2) the previous suit involved the same parties or their privities; and 3) the subsequent suit is based on the same cause of action. Board of Trustees v. Centra, 983 F.2d 495, 504 (3d Cir.1992). Collateral estoppel, or issue preclusion, bars relitigation of an identical issue where "1) the identical issue was decided in a prior adjudication; 2) there was a final judgment on the merits; 3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and 4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question." *Id.* at 505.

***5** Although there is overlap between the parties to the present suit and those involved in the prior litigation, the parties are not the same. Moreover, the prior suit was based on alleged violations of federal securities regulations and Delaware corporate law. The suits were not based on the same cause of action, and the issues therein cannot be characterized as identical. Therefore, neither issue preclusion nor claim preclusion operates in this case.

Loori also argues that a deficient proxy solicitation of the sort alleged in the complaint cannot by law constitute a predicate act under RICO. In support of this argument, defendant relies on First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542 (9th Cir.1988), in which a proxy solicitation, albeit one which failed to comply with relevant securities regulations, was held not to constitute a sale of securities. Because no sale had taken place, the solicitation could not be "fraud in the sale of securities," a predicate act listed in § 1961(1). *Id.* at 546. In addition, the solicitation did not constitute mail or wire fraud because it was not done "for obtaining money or property by means of false or fraudulent pretenses," as such fraud is defined in 18 U.S.C. § 1341. In reaching this conclusion, the court relied on the reasoning of the Second Circuit in *United States v. Dixon,* 536 F.2d 1388, 1399 (2d Cir.1976):

> [O]ur research has discovered [no case] which has sustained a conviction for mail fraud on the basis of nothing more than the failure to mail a correct proxy solicitation where this was not in furtherance of some larger scheme contemplating pecuniary loss to someone or direct pecuniary gain to those who designed it.

In contrast to *Dixon* and *First Pacific Bancorp,* the complaint in this case alleges that, while the proxy solicitation itself did not solicit money or pertain to the sale of shares, it was undertaken with the purpose of obtaining control over the company so that defendants could misappropriate Supra's technology. It was, therefore, "in furtherance of some larger scheme," and, if proven, constitutes a predicate act under RICO.

Loori's participation in this mailing, however, at most constitutes a single predicate act. [FN3] Plaintiff argues that, regardless of whether Loori's participation in the proxy solicitation is itself considered a predicate act, he is responsible for the predicate acts of the other defendants as an aider/abettor and as a member of a conspiracy. A defendant who has not himself committed any predicate acts may be held liable for RICO violations if he has aided and abetted at least two predicate acts by others. *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258, 270 (3d Cir.1995). To find a defendant liable as an aider and abettor, a plaintiff must prove that 1) the predicate acts have been committed, and 2) defendant "knew of the commission of the act[s] and acted with intent to facilitate [them]." *Id.* The existence of intent may be inferred from circumstantial evidence. *Id.*

> FN3. Plaintiff states in its brief that defendant Loori participated in "more than two dozen mailings in furtherance of the scheme...." (D.I. 47 at 13) The complaint, however, describes a single communication mailed to approximately twenty-nine individuals. If plaintiff meant by its description to argue that each individual piece of mail counts as one predicate act, the court rejects this contention.

***6** Plaintiff contends that intent on the part of Loori may be inferred from the following alleged scenario: Loori acquired, in the first instance, the proprietary technology at issue merely to enhance the value of his stock. Although in control of Supra and in possession of the technology at that point, Loori

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

chose instead to sell "a substantial amount" of his stock and resign his position as an officer and director. To infer from these facts an intent, years later, to facilitate a scheme to gain control of Supra in order to misappropriate its technology has no basis in logic, let alone fact. The only allegation concerning Loori after the RICO scheme is alleged to have begun is the conclusory assertion that Loori, along with other defendants, "formulated a plan to solicit proxies from [Supra] shareholders and elect new Directors of [Supra] to misappropriate [Supra's] proprietary biomedical and health care technology and equipment for their benefit and conceal the misappropriation from [plaintiff's] duly elected Directors and shareholders." (D.I. 32 at 101) The court finds that plaintiff's conclusion that a plan was formulated is an insufficient basis upon which to infer that defendant Loori knew of the plan.

Likewise, plaintiff has failed to adequately plead conspiracy. To plead conspiracy in a RICO case, a complaint must set forth factual allegations that indicate 1) the period of the conspiracy, 2) its intended purpose, 3) the specific actions taken by the conspirators in furtherance of the conspiracy, 4) agreement to commit predicate acts, and 5) knowledge that the acts agreed upon formed part of a pattern of racketeering activity. *Glessner v. Kenny,* 952 F.2d 702, 714 (3d Cir.1991), *citing* *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1166 (3d Cir.1989). It is not enough to state in the complaint that these elements exist. "It is a longstanding rule in the Third Circuit that a mere general allegation of conspiracy is insufficient. A general averment of conspiracy or collusion without alleging the facts which constituted such conspiracy or collusion is a conclusion of law and is insufficient." *Kalmanovitz v. G. Heileman Brewing Co., Inc.,* 595 F.Supp. 1385, 1400 (D.Del.1984), *aff'd,* 769 F.2d 152 (3d Cir.1985), *citing* *Black & Yates, Inc. v. Mahogany Assoc.,* 129 F.2d 227 (3d Cir.1941), *cert. denied,* 317 U.S. 672 (1942).

According to plaintiff, the conspiracy was initiated in 1994 when defendant Reinhart devised a scheme to misappropriate plaintiff's proprietary technology. Plaintiff's only alleged involvement in the conspiracy [FN4] was his participation in the failed proxy solicitation one year later. Even if the court must draw the inference from defendant Loori's participation that he had knowledge of his co-defendants' attempt to gain control of Supra from its existing board, there are no facts alleged from which the court can infer that defendant Loori had knowledge of or himself had a bad purpose for such control.

FN4. Although plaintiff alleges as well that the August 1995 announcement regarding the transfer of Medhealth Imaging's assets was undertaken on behalf of defendant Loori, *inter alia,* there are absolutely no facts alleged to support the assertion and, therefore, the court cannot infer knowledge and intent on the part of Loori from such an event, unrelated as it is to the proxy solicitation.

*7 In the absence of factual allegations sufficient to sustain a finding of conspiracy or aider and abettor liability, plaintiff's claims against defendant Loori cannot stand. Plaintiff has alleged, at most, Loori's direct involvement in a single predicate act, which by itself cannot establish a pattern of racketeering activity. Plaintiff has failed to make any allegations that Loori himself controlled the enterprise during the relevant time period or that his single alleged predicate act caused harm to Supra. Accordingly, plaintiff's first and second claims for relief against defendant Loori will be dismissed. [FN5]

FN5. Because the court concludes that the complaint has not alleged predicate acts sufficient to sustain its RICO claim against defendant Loori, it is not necessary to address Loori's arguments concerning the sufficiency of pleading under Fed.R.Civ.P. 9(b).

E. Claims for Injunctive Relief

Plaintiff has not addressed defendant Loori's contention that injunctive relief cannot be awarded in the absence of an allegation that he possesses or controls plaintiff's property. Having reviewed the pleadings, the court concludes that the complaint fails to allege that defendant Loori has had any access to or control over plaintiff's proprietary biomedical or health care technology since terminating his relationship with the company in 1992. The complaint, therefore, fails to provide an adequate factual basis for the relief requested. Plaintiff's claims for injunctive relief against defendant Loori will be dismissed.

IV. CONCLUSION

For the reasons stated above, the court concludes that plaintiff has failed to state a claim against defendant Loori upon which relief can be granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6
Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 571544 (D.Del.)
**(Cite as: 1996 WL 571544 (D.Del.))**

Accordingly, the complaint against defendant Loori will be dismissed.

**Motions, Pleadings and Filings** **(Back to top)**

- 1:95CV00556 (Docket) (Sep. 13, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States C
Southern District o
ENTERED

SEP 15 2(

Michael N. Milby, Clerk

FG HEMISPHERE ASSOCIATES, L.L.C.
Plaintiff,
v.
REPUBLIQUE DU CONGO,
Defendant,
And
CMS OIL AND GAS COMPANY,
CMS OIL AND GAS (INTERNATIONAL) COMPANY,
CMS NOMECO INTERNATIONAL CONGO HOLDINGS, INC.,
CMS NOMECO CONGO, INC.,
CMS OIL AND GAS (HOLDINGS), LTD.,
CMS OIL AND GAS (INTERNATIONAL) LTD.,
CMS NOMECO CONGO LDC,
CMS OIL AND GAS (CONGO) LTD.,
CMS OIL AND GAS (SERVICES) COMPANY,
NUEVO ENERGY COMPANY,
THE NUEVO CONGO COMPANY,
THE CONGO HOLDING COMPANY,
NUEVO CONGO, LTD.,
NUEVO INTERNATIONAL INC.,
NUEVO INTERNATIONAL HOLDINGS, LTD.,
PERENCO INC.,
PERENCO OIL AND GAS (INTERNATIONAL) COMPANY,
PERENCO INTERNATIONAL (CONGO) INC.,
PERENCO OIL AND GAS (SERVICES) COMPANY and LANKAN INC.
Garnishees.

§ § § § § § § § § § § § § § § § § § § § § § § § § § § §

CIVIL ACTION No.: H-02-4261

**ORDER ON WRITS OF GARNISHMENT**

Before the Court is the plaintiff FG Hemisphere Associates, L.L.C.'s Emergency Opposed Second Application to Issue Writs of Garnishment (the "Application") seeking writs of garnishment against the garnishees CMS Nomeco Congo Inc., The Nuevo Congo Company, and Nuevo Congo Ltd. (collectively, the "Garnishees") with respect to the obligations owed by the Garnishees to Société Nationale de Petrol du Congo ("SNPC"). The Court has reviewed the

Application and any responses thereto and determines that a valid judgment exists against the Republique du Congo (the "Congo") that is unchallenged, that the Congo irrevocably waived immunity with respect to the obligations of the Loan Agreement, and that the waiver extends to any assets, revenues and properties that belong to the Congo and to SNPC. The Garnishees owe to the Congo certain royalty obligations under a 1979 Convention for the production of oil and owe to SNPC certain intangible obligations under agreements relating the Convention. Based on the Application and any responses thereto, the Court determines that said obligations constitute property of the Congo and SNPC located in the United States, which has been used for commercial activity in the United States, therefore, satisfying the requirements of the Foreign Sovereign Immunities Act and enabling the plaintiff to execute on said property.

Therefore, it is Ordered that the plaintiff's Application for writs of garnishment is Granted.

Signed this 14th day of ~~August,~~ September 2005.

[signature]
United States District Judge