# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
RS
DEC 2 2 2005

Michael N. Milby, Clerk

| | | |
|---|---|---|
| FG HEMISPHERE ASSOCIATES, L.L.C. | § | |
| Plaintiff, | § | |
| v. | § | |
| REPUBLIQUE DU CONGO | § | CIVIL ACTION No. H-02-4261 |
| Defendant, | § | |
| and | § | |
| | § | |
| CMS OIL AND GAS COMPANY, et. al., | § | |
| | § | |
| Putative Garnishees. | § | |

## MOTION OF CMS NOMECO CONGO INC., THE NUEVO CONGO COMPANY, AND NUEVO CONGO LTD. TO TRANSFER TO THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Garnishees CMS Nomeco Congo Inc. (now known as CMS Nomeco Congo LLC) ("CMS Nomeco"), The Nuevo Congo Company (now known as The Nuevo Congo LLC), and Nuevo Congo Ltd. (collectively "Garnishees") respectfully submit this Motion to Transfer to the Western District of Texas, Austin Division. Specifically, in light of this Court's Order of December 5, 2005 permitting intervention in this case by Af-Cap, Inc. ("Af-Cap"), a transfer of this case to the Western District is required under the "first-filed rule," to allow the Western District to determine whether this case should be consolidated with Af-Cap's earlier-filed litigation seeking the same relief in the Western District, or stayed, or permitted to proceed separately.

### I.

### INTRODUCTION AND SUMMARY OF ARGUMENT

For almost five years, Af-Cap, Inc. ("Af-Cap") and its predecessor-in-interest, Connecticut Bank of Commerce, have pursued claims in the United States District Court for the

Western District of Texas, Austin Division, seeking from Garnishees royalties to which the Congo is entitled under a Convention between Garnishees, the Congo, and the Congo's state-owned oil company, SNPC, relating to the production of oil in the Congo. Af-Cap sought that relief in its effort to collect a judgment against the Congo that it allegedly holds as the sixth assignee of that debt. Garnishees are working interest owners under the Convention and are innocent third parties with no involvement in the underlying debt transaction on which Af-Cap's claim against the Congo is based.

To satisfy the judgment, Af-Cap asked the Western District to order that Garnishees pay the Congo's royalties to Af-Cap. Af-Cap's request placed Garnishees between a rock and a hard place and created serious risk of termination of Garnishees' own valuable concession rights in the Congo.

The Convention is governed by Congolese law, and the royalty oil, which is the subject of Af-Cap's garnishment actions, is produced, stored, and taken by the Congo in Congolese waters. Garnishees are operating in the Congo and are subject to the Congo's laws and have no choice but to comply with Congolese government directives. Therefore, as Garnishees pointed out to the Western District as early as the Spring of 2001, a U.S. court order requiring Garnishees to divert the Congo's royalty to a judgment creditor of the Congo, against the direct mandates of the Congo, would put Garnishees at substantial risk of contract termination.

As this Court knows, Garnishees have been subjected to Congo court orders in December 2004 and again in July 2005 compelling Garnishee CMS Nomeco, as operator of the storage terminal, to deliver royalty oil and working interest oil to SNPC, notwithstanding U.S. court orders and writs of garnishment. Garnishees have also been directed by the Congolese government to transfer their working interests under the Convention to a Congolese company in

2

compliance with the OHADA treaty (Organisation for the Harmonisation in Africa of Business Law (Organization pour l'Harmonisation en Afrique du Droit des Affaires)) and related Uniform Acts. The President of Garnishee CMS Nomeco was recently informed that the Congo was becoming extremely irritated at the Garnishees' continuing failure to obey the OHADA laws and that certain people within the Ministry of Hydrocarbons were accusing Garnishees of acting in collusion with the judgment creditors in an attempt to deprive the Congo of its oil.[1]

In the Western District litigation, Garnishees have incurred enormous expense defending themselves over the past five years all while attempting to protect their multi-million dollar investment in the Congo from termination by the Congo. In February 2005, after protracted litigation, Garnishees finally obtained a dismissal of Af-Cap's garnishment action against them. Notwithstanding that dismissal, Af-Cap continued to seek relief against Garnishees in the Western District by attempting to enforce against Garnishees a turnover order entered against the Congo. Even though the court had dismissed the garnishment action against Garnishees, Af-Cap claimed that the turnover order and an instruction letter signed by the clerk of the Western District required Garnishees to pay the Congo's royalties in cash into the registry of the court for the benefit of Af-Cap.

In July 2005, Af-Cap filed a motion asking the court to hold Garnishees in contempt for failing to pay the Congo's royalty in cash into the registry of the court. Without awaiting a response from Garnishees, the Western District denied the relief Af-Cap sought. Af-Cap appealed that order, but the appeal has not yet been docketed by the Fifth Circuit.

Now, having failed to obtain the relief it seeks from the court in the Western District, Af-Cap has intervened in this case, pursuing the same relief it sought in Austin. Specifically, Af-Cap asks this Court to declare that, by virtue of the turnover order against the Congo and

---

[1] See Declaration of Maryse Bernard attached hereto as Exhibit A.

3

instruction letter issued by the clerk in the Western District, Af-Cap has a valid interest in the Congo's royalties and is entitled to payment from Garnishees. That is the same relief Af-Cap is seeking in the Western District litigation.

Af-Cap is also asking this Court to determine that the garnishment writs issued in its favor in the Western District litigation are valid and effective and take priority over those of other judgment creditors, even though the invalidity and ineffectiveness of the garnishment writs has already been determined in the litigation in the Western District, and Af-Cap's appeal of that court's order dissolving the writs and dismissing the case is currently pending in the Fifth Circuit.

Fifth Circuit authority makes it clear that where, as here, there is substantial overlap in the issues in cases pending in different districts, the second-filed court is required to transfer the case to the first-filed court to allow the first-filed court to determine whether the cases should be consolidated, or whether the second case should be stayed or permitted to proceed separately. The rule is designed to avoid inconsistent results and to promote the fair administration of justice. Its use is particularly appropriate in preventing a party from attempting to use another district court as a "super-appellate" court with regard to issues decided by a district court in an earlier-filed case. Having failed to obtain the relief it desires in the Western District and with appeals of that court's decisions pending, Af-Cap has chosen to simply move to a different court to seek the same relief. These are the precise circumstances that the "first-filed rule" is designed to address. That rule requires a transfer of this case to the Western District.

Under the Fifth Circuit cases, it is not within the province of the second-filed court to make the determination of whether cases presenting substantially overlapping issues should be consolidated, stayed, or permitted to proceed separately. Once the second-filed court decides

that there might be a substantial overlap of issues, the required action is a transfer of the case to the first-filed court for such a determination.

By virtue of the substantial overlap of issues in the Western District litigation and this litigation resulting from Af-Cap's intervention in this case, Garnishees move the Court to transfer this case to the Western District of Texas, Austin Division, to allow that court to determine whether this case should be consolidated with the Western District litigation, stayed, or permitted to proceed separately.

## II.

## FACTS[2]

A.    **Garnishees and the Congo's State-Owned Oil Company are the Working Interest Owners under a Convention for the Production of Oil in the Congo.**

Garnishees and Société Nationale des Pétroles du Congo ("SNPC," the Congolese state-owned oil company) are the current working interest owners under a Convention for oil production in Congolese waters ("the Convention"). CMS Nomeco is the current operator under the Convention.

B.    **Under the Convention, the Congo is Entitled to Lift its In-kind Royalty Oil, Which is Produced, Stored, and Lifted in Congolese Territorial Waters.**

The Convention entitles the Congo to receive royalties. Under Article 7, the Congo may elect to receive royalties in cash or in-kind. In 1999, the Congo changed its election to an in-kind election and has not changed its election since that time.

The Convention was executed in the Congo in 1979 and is governed by Congolese law. The oil is extracted from the submerged seabed adjacent to the Congo's coast, in areas within the

---

[2] The facts stated herein that relate to agreements and operations in the Congo are established by the declaration of Maryse Bernard attached hereto as Exhibit A. The facts relating to the *Af-Cap* litigation in the Western District are established by the Declaration of Guy Lipe and the exhibits referenced therein, which declaration is attached hereto as Exhibit B.

Congo's exclusive jurisdiction under Congolese and international law. The oil flows through a subsurface pipeline system to a storage vessel floating in Congolese coastal waters, known as the "Conkouati." A lifting occurs when oil is offloaded from the Conkouati onto a vessel nominated by the buyer of the oil. Garnishees take liftings of oil stored on the Conkouati for their own account, and sell 100% of the oil so lifted for their own account.

CMS Nomeco, as operator, calculates the effect of liftings, on a barrel basis, on the over- or under-lifted position of SNPC and the Congo, and records that effect on an "over/under statement." Once the combined under-lifted position of SNPC and the Congo reaches at least 275,000 barrels, SNPC may schedule and take a lifting of oil for itself and the Congo. When SNPC takes a lifting, SNPC sells, for its own and the Congo's account, all the barrels that it lifts. The SNPC lifting satisfies the Congo's in-kind royalty and puts SNPC into an over-lifted position. Garnishees take liftings until the combined under-lifted position of SNPC and the Congo again exceeds 275,000 barrels, when SNPC may again schedule, take, and sell another lifting of oil for itself and the Congo, again satisfying the Congo's in-kind royalty and again putting SNPC into an over-lifted position.

**C.    In January 2001, Af-Cap's Predecessor Files a Garnishment Action Against Garnishees.**

In January 2001, Connecticut Bank of Commerce ("the Bank"), Af-Cap's predecessor-in-interest, filed a garnishment action in Texas state court, as the purported assignee of a default judgment rendered against the Congo by a court in England and converted to a U.S. judgment by default in New York state court. The Congo and Garnishees removed the garnishment action to federal court in the Western District of Texas, and the garnishment case was assigned Case No. A-01-CA-100-SS ("the 100 Case"). The Congo and Garnishees moved to dismiss the action under the Foreign Sovereign Immunities Act ("FSIA"), arguing that the Congo's in-kind royalty

6

and taxes owed to the Congo were immune from garnishment under the FSIA. True and correct copies of the garnishment application (without exhibits), the notice of removal (without exhibits), and the motion to dismiss (without exhibits) are attached hereto as Exhibits C, D, and E.

**D.    The Western District Dissolves the January 2001 Writs on FSIA grounds, and the Western District and the Fifth Circuit Deny Stay Motions.**

In March 2001, the court in the Western District granted the motion to dismiss the 100 Case under the FSIA. A true and correct copy of the district court's dismissal order is attached hereto as Exhibit F. The Bank sought a stay of the dissolution of the writs both in the district court and in the Fifth Circuit, arguing that a stay was necessary because, if the Congo took a lifting of royalty oil while the writs were dissolved, Garnishees could not be held liable on the writs. Garnishees argued in response that if a stay was granted, Garnishees would be exposed to possible asset seizure by the Congo. A true and correct copy of Garnishees' response to the stay motion filed in the 100 Case is attached hereto as Exhibit G. Both the district court and the Fifth Circuit denied the Bank's stay motions. A true and correct copy of the Western District's Order denying the Bank's motion for stay pending appeal is attached hereto as Exhibit H.

**E.    The Congo Removes the Judgment Case to the Western District**

In May 2001, the Congo removed to the Western District the underlying state court case in which the Bank had filed its judgment against the Congo. A true and correct copy of that notice of removal (without exhibits) is attached as Exhibit I. The judgment case was assigned Case No. A-01-CA-321-SS ("the 321 Case"). On August 3, 2001, the Western District denied the Bank's motion to remand the 321 Case to state court. A true and correct copy of the Order denying the motion to remand the 321 Case is attached as Exhibit J.

**F.    The Bank Appeals the Dismissal of the 100 Case, and in July 2002, the Fifth Circuit Remands for Further Proceedings.**

The Bank appealed the Western District's order dismissing the 100 Case, and in July 2002, the Fifth Circuit rejected most of the Bank's legal arguments but remanded the case for further consideration of the FSIA statutory criteria. The Fifth Circuit concluded that the district court improperly focused on how the property at issue was generated instead of considering what it was "used for." *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002).

**G.    On Remand from the Fifth Circuit, the Western District Again Dismisses on FSIA grounds.**

On remand, Af-Cap – which by then had received an assignment from the Bank to become the sixth owner of the claims at issue in the Western District litigation – was substituted as plaintiff. After discovery, the Western District, on April 7, 2003, again concluded that the Congo's in-kind royalty and the tax obligations were immune from garnishment under the FSIA because they were not used for commercial activities, and dismissed the 100 Case. It also denied Af-Cap's motion for issuance of new garnishment writs filed in the 321 Case. True and correct copies of the Western District's Order and Judgment are attached as Exhibits K and L.

**H.    The Fifth Circuit Reverses and Remands for Further Proceedings.**

Af-Cap appealed, and the Fifth Circuit reversed and remanded for further proceedings, holding that the Congo's royalty had been used in the past for commercial activity and was "in the United States" based on its conclusion that, according to the record presented, Garnishees had their "situs" in the United States. *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir.), *modified on rehearing*, 389 F.3d 503 (5th Cir. 2004), *cert. denied* 125 S.Ct. 1735 (2005). Thus,

the Fifth Circuit determined that the Western District had improperly concluded in April 2003

that the royalty was immune under the FSIA.

**I.      On Remand Following *Af-Cap*, the Western District Did Not Reinstate the 2001 Garnishment Writs But Issued New Writs in November 2004.**

On remand, Af-Cap filed a motion in the 321 Case seeking an order for reinstatement of

the January 2001 garnishment writs and for issuance of new garnishment writs.  A true and

correct copy of that motion (without exhibits) is attached as Exhibit M.  The district court

refused to reinstate the January 2001 garnishment writs, stating:

> By virtue of this Court's dissolution of all of the writs and dismissal of all of the cases in 2001, and this Court's and the Fifth Circuit's denial of Connecticut Bank's motion for stay pending appeal in 2001, any royalty obligations that were owed pursuant to the subsequently dissolved writs were extinguished by the delivery of royalty oil to the Congo in August 2001.  *See Matter of Bohart*, 743 F.2d 313, 321 (5th Cir. 1984) (holding there was no obligation on a garnishee to continue holding property subject to writ of garnishment for the benefit of judgment creditor after the writ of garnishment had been dissolved but before all appeals of the case had been resolved).

In that same order, however, the district court authorized issuance of new garnishment writs, and

writs issued that day.  Although the district court recognized that Af-Cap's request for new writs

was filed in the 321 Case (to which Garnishees were not parties), the district court ordered that

the new writs be issued using the case number of the 100 Case.  A true and correct copy of the

Western District's Order is attached as Exhibit N.

**J.      Based on *Af-Cap*, Other Judgment Creditors of the Congo Obtain Garnishment Writs against Garnishees.**

After the decision in *Af-Cap*, other judgment creditors of the Congo sought and obtained

garnishment writs against Garnishees.  Specifically, FG Hemisphere sought and obtained writs in

the Southern District in Houston, and NUFI sought and obtained writs from a state court in

Dallas.[3]  Now, despite having no involvement in the underlying debt transactions, Garnishees

were forced, at great expense, to respond to and defend against garnishment actions in Austin,

Houston, and Dallas.

**K.   The Fifth Circuit Denies Af-Cap's Mandamus Petition.**

Af-Cap filed a mandamus petition challenging the district court's refusal to reinstate the

2001 writs.  A true and correct copy of the mandamus petition, without exhibits, is attached as

Exhibit O.  The Fifth Circuit denied the petition, recognizing the "difficulties" that the district

court faced in implementing the Court's mandate, and stating that the Court was making "no

suggestion whatsoever concerning the ultimate outcome of the garnishment proceedings."  A

true and correct copy of the Fifth Circuit's order denying the mandamus petition is attached as

Exhibit P.

**L.   The Congo Threatens Termination of the Convention If It is Prevented from Lifting Royalty Oil.**

By letter dated October 22, 2004, CMS Nomeco gave formal notice to the Congo of the

*Af-Cap* decision and of the court orders and writs issued in other U.S. proceedings.  A true and

correct copy of that letter is attached as Exhibit Q.  The Congo's Minister of Hydrocarbons

responded by letter dated November 4, 2004, threatening termination of the Convention if the

Congo was not allowed to lift its royalty oil.  A true and correct copy of that letter is attached

hereto as Exhibit R.

**M.   Garnishees Raise Numerous Defenses to the November 2004 writs and File Dispositive Motions.**

In response to the November 2004 writs, Garnishees filed a Rule 12 motion to dismiss,

arguing that because Garnishees had no offices, no directors, no officers, no employees, and no

---

[3] The Dallas writs were issued by a state court, but the garnishment action and the judgment case were removed to the Northern District, where they were consolidated.

business activities in the United States in November 2004: (1) the property sought to be garnished was not located in Texas, depriving the court of in rem jurisdiction over the property sought to be garnished; (2) Garnishees were not subject to personal jurisdiction in Texas, and (3) the property was not properly characterized as being "in the United States," as required by the FSIA. The motion was based on evidence that the European-based Perenco group of companies, at two different points in time, acquired the stock of Garnishees and other companies with operations in seven countries and moved the operations of those companies to Europe. A true and correct copy of the motion to dismiss (without exhibits) is attached as Exhibit S.

Garnishees also filed a motion to quash and a summary judgment motion, arguing that (1) Congolese law required that the Congo could take its royalty oil, notwithstanding the U.S. proceedings, and Garnishees could not be protected from double liability, and (2) as a matter of Texas garnishment law, non-monetary obligations are not subject to garnishment. Garnishees also filed an answer to the writs, averring, among other defenses, that because SNPC had no right to take a lifting of oil until late December 2004, the Congo was not entitled to take in-kind royalty as of the service date and answer date for the writs. True and correct copies of the motion to quash (without exhibits), the motion for summary judgment (without exhibits), and the answer (without exhibits) are attached hereto as Exhibits T, U, and V.

**N.    The Western District Dissolves the November 2004 writs.**

Because SNPC was entitled to take a lifting of oil in late December 2004, Garnishees sought expedited consideration of their dispositive motions. On December 23, 2004, the district court dissolved the November 2004 writs, noting that Af-Cap had not traversed Garnishees' answer, which averred that the Congo was not entitled to lift royalty oil on the service date and answer date for the writs, and holding that the November 2004 writs did not capture any

11

obligation in light of the undisputed answer.  A true and correct copy of the Western District's

December 23, 2004 Order is attached as Exhibit W.

**O.      Congo Court Orders Require that CMS Nomeco, as Operator of the Storage Terminal, Deliver the Oil to SNPC.**

The garnishment writs in the *FG Hemisphere* and *NUFI* cases were not dissolved as of

the time that the lifting of oil was scheduled to take place in late December 2004, and CMS

Nomeco informed the Congo and SNPC that, due to the writs, the lifting would not be permitted.

On December 28, 2004, a court sitting in the Congo, upon applications by the Congo and SNPC,

entered two orders requiring that CMS Nomeco, as operator of the storage terminal, deliver

working interest oil and royalty oil to SNPC.  True and correct copies of the December 28 Congo

court orders are attached as Exhibits X and Y.

CMS Nomeco's president was in Brazzaville, Congo on December 28, 2004 to inform

government officials of the decision to not allow a lifting of oil in light of writs issued by U.S.

courts.[4]  She was informed that public force would be used if the lifting of oil by SNPC was not

allowed to take place.  The Director General of the Congo's Ministry of Hydrocarbons showed

CMS Nomeco's president copies of the Congo court orders and told her that she would be

detained until the lifting of oil was completed.  Based on these events, CMS Nomeco's president

authorized the operations manager to give instructions to permit the lifting of oil.  On December

28-29, 2004, SNPC took a lifting of 550,032 barrels of oil, which included SNPC working

interest oil as well as the Congo's royalty oil, thereby extinguishing any in-kind royalty arguably

subject to the November 2004 writs issued by the Western District.

---

[4] Although the writs in the *Af-Cap* case were dissolved on December 23, writs issued in the Houston *FG Hemisphere* and the Dallas *NUFI* cases had not been dissolved.  Additionally, the court in the *FG Hemisphere* case had issued writs on December 23, 2005 that also covered SNPC's working interest oil.

**P.     The Western District Withdraws its December 23, 2004 Order and Grants Summary Judgment in Favor of Garnishees in the 100 Case on the Grounds that Non-monetary Obligations are Not Subject to Garnishment under Texas law.**

Without seeking leave of the district court, Af-Cap filed a "Traverse" of Garnishees' answer and sought a stay of the district court's dissolution of the writs pending an appeal of that decision. On February 4, 2005, the district court entered an order concluding that even if Af-Cap's traverse was assumed to be timely, the writs did not capture the in-kind royalty because, under Texas garnishment law, non-monetary obligations are not subject to garnishment. A true and correct copy of the Western District's order granting Garnishees' motion for summary judgment is attached as Exhibit Z. That same day, the district court entered a final judgment dissolving the writs and dismissing the garnishment action. A true and correct copy of the final judgment is attached as Exhibit AA.

**Q.     The Western District Enters a Turnover Order against the Congo in the 321 Case.**

In the same Order granting summary judgment to Garnishees in the 100 Case, the Western District granted Af-Cap's motion in the 321 Case for a turnover order against the Congo.[5] A true and correct copy of Af-Cap's motion for turnover order filed in the 321 Case is attached hereto as Exhibit BB. On February 22, 2005, the Western District entered the turnover order, a true and correct copy of which is attached as Exhibit CC, which ordered the Congo to sign an instruction letter directed to the Garnishees under the Convention, in favor of Af-Cap. Under the instruction letter the Congo was ordered to sign, the Congo would have (1) elected to take its royalty in cash, and (2) directed Garnishees to pay the allegedly cash royalty into the registry of the court for the Western District. The Congo refused to sign the instruction letters

---

[5] While a single order, the order bore the captions of both cases. It is undisputed that the turnover order motion was filed in the 321 Case, not the 100 Case.

and sent a letter to the district court explaining its reasons for that refusal. A true and correct copy of that letter, including an English translation thereof, is attached hereto as Exhibit DD.

**R.    In April 2005, the Western District Authorizes the Clerk to Sign the Instruction Letter on Behalf of the Congo.**

In April 2005, the Western District issued an order in the 321 Case, directing the court clerk to sign the instruction letter on behalf of the Congo and to send it to Mr. Guy Lipe, the attorney who had represented Garnishees in the 100 Case which had been dismissed in February 2005. A true and correct copy of the Western District's Order authorizing the clerk to send the instruction letter is attached as Exhibit EE. A true and correct copy of the instruction letter is attached as Exhibit FF.

**S.    In July 2005, the Congo and SNPC Obtain New Congo Court Orders against Garnishees Requiring Delivery of Oil in Congolese Waters.**

On July 4, 2005, a Congo court in Point Noire, Congo, again upon applications filed by the Congo and SNPC, issued orders against CMS Nomeco holding that under Congolese law, the Congo's royalty oil and SNPC's working interest oil could not be subject to attachment and that the Western District turnover order and other orders relating to the Congo's oil issued in other U.S. proceedings brought by judgment creditors of the Congo violated the Congo public order and were not enforceable in the Congo. The Congo court held that CMS Nomeco was obligated to deliver the Congo's royalty oil and SNPC's working interest oil to SNPC, notwithstanding the U.S. court proceedings and orders issued in those proceedings. True and correct copies of the July 2005 Congo court orders, including English translations thereof, are attached hereto as Exhibits GG and HH.

14

**T.    Af-Cap Seeks Contempt Sanctions Against CMS Nomeco in the Western District for Failure to Pay the Royalty in Cash into the Registry of the Court.**

On July 21, 2005, Af-Cap filed a motion in the 321 Case for issuance of a show cause order against Garnishees, claiming that their failure to pay the royalty in cash into the registry of the court on July 20, 2005 (the date Af-Cap contended to be the first royalty payment date after the effective date of the instruction letter) violated the Western District's turnover order and instruction letter and was a contempt of court. Af-Cap also sought an order prohibiting Garnishees from consummating the sale of their working interests noticed on July 17, 2005. A true and correct copy of Af-Cap's motion for show cause order is attached as Exhibit II.

**U.    The Western District Denies Af-Cap's Contempt Motion against Garnishees.**

On July 26, 2005, the Western District denied Af-Cap's motion for a show cause order, finding that the turnover order was not directed to Garnishees and could not adjudicate the substantive rights and obligations of Garnishees under the Convention. The Western District also denied Af-Cap's request for relief with regard to the noticed sale transaction. A true and correct copy of the July 26, 2005 Order is attached as Exhibit JJ. In the July 26 Order, the Western District held that the Texas Turnover Statute does not apply to third-party non-judgment debtors like Garnishees and that "[b]y seeking an order that would require the [Garnishees] to pay the amount of the Congo's judgment directly to it, [Af-Cap] seeks the exact same relief expressly prohibited to it by binding precedents interpreting the Texas Turnover Statute." The Western District also held that the turnover order and instruction letter did not have the effect of determining the substantive rights of Garnishees. With regard to the noticed sale of working interests, the Western District held that "there is no evidence the proposed sale [of Garnishees' working interests under the Convention] is an act 'in active concert' with the Congo, nor is there

any reason to believe the [Garnishees] sale of their interests in the Convention would be an act in furtherance of the Congo's noncompliance with the turnover order in this case."

**V.  Af-Cap seeks an Order from the Western District Authorizing the Issuance of New Writs of Garnishment Against the Garnishees.**

On August 4, 2005, Af-Cap filed a motion in the 321 Case seeking issuance of new writs against Garnishees, arguing that the turnover order was effective against Garnishees and converted the Congo's in-kind royalty to a cash royalty, entitling Af-Cap to garnish the allegedly cash royalty to satisfy its judgment. A true and correct copy of Af-Cap's motion seeking new garnishment writs is attached as Exhibit KK. Af-Cap's motion seeking new garnishment writs was denied by the court in the Western District of Texas, by Order dated August 17, 2005, a true and correct copy of which is attached as Exhibit LL. In that Order, the Western District noted that Garnishees had potential jurisdictional defenses and substantive defenses to Af-Cap's contentions that the turnover order and instruction letter effectively converted the Congo's in-kind royalty to a cash royalty and that the issuance of new writs was not justified.

**W.  Af-Cap Appeals the Order Denying its Show Cause Motion against Garnishees and its Motion for Issuance of New Writs Against Garnishees.**

In late August and early September 2005, Af-Cap filed notices of appeal, appealing to the Fifth Circuit the Western District's Orders denying its show cause motion against Garnishees and its motion for issuance of new writs. True and correct copies of the notices of appeal are attached as Exhibits MM and NN.

**X.  Having Failed in its Efforts to Enforce the Turnover Order against Garnishees in the Western District and to Prohibit the Sale of the Working Interests, Af-Cap Moves to Intervene in this Case, Seeking (As it Did in the Western District) to Enforce the Turnover Order Against Garnishees.**

On October 5, 2005, Af-Cap filed its Complaint in Intervention, which this Court permitted by Order dated December 5, 2005. A true and correct copy of Af-Cap's Complaint in

Intervention is attached as Exhibit OO. In its Complaint in Intervention, Af-Cap alleges that "[p]ursuant to the Turnover Order [issued by the Western District], Af-Cap accedes to the Congo's position under the Convention related to collecting CMS Garnishees' oil royalty obligation and, thus, has the right to receive monthly royalty payments due from CMS Garnishees . . . CMS Garnishees' first payment was due on July 20, 2005. Rather than make that payment to the Western District registry, . . . CMS Garnishees instead initiated efforts to fraudulently transfer its assets (i.e., the rights to exploit oil reserves in the Yombo Field) to a related non-U.S. entity." Complaint in Intervention ¶8.

These allegations are identical to those made in the show cause motion filed in the 321 Case in the Western District that was denied. In the "Causes of Action" section of Af-Cap's Complaint in Intervention, Af-Cap states that it "seeks to invoke the Court's inherent equitable powers to enforce the judgment lien and Turnover Order that Af-Cap obtained against the Congo in the Western District," and it "asks the Court to declare (1) that Af-Cap has a current and valid interest in the royalties or other obligations owed by the CMS Garnishees . . . to the Congo . . . as a result of Af-Cap's judgment lien and Turnover Order; and (2) declare the proper distribution of the royalties in the possession of CMS Garnishees between FGH and Af-Cap until the Congo's respective debts to them are paid, based upon, among other things, the judgments and orders granted and/or entered in this proceeding, the Western District, and in other related actions." Af-Cap also "asks the Court to declare that Af-Cap's Turnover Order, writs of garnishment, and judgment lien have priority over those obtained by FGH and/or other creditors."

These allegations and claims for relief are identical to the relief that Af-Cap sought in the Western District, and there is direct and substantial overlap between the issues raised in the Western District litigation and the issues raised by the claims in Af-Cap's Complaint in

Intervention filed in this Court. Under the controlling Fifth Circuit authority set out below, the substantial overlap of issues requires that this case be transferred to the first-filed court, the Western District, for determination of whether this case should be consolidated with the *Af-Cap* litigation in the Western District, or stayed, or allowed to proceed separately.

## ARGUMENT

**A.    Under the "First-Filed Rule," Fifth Circuit Authority Requires that the Second-Filed Court Transfer its Case to the First-Filed Court If There Is a Substantial Overlap of Issues, So the First-Filed Court May Determine Whether the Second Case Should Be Consolidated with the First, Stayed, or Allowed to Proceed Separately**

As stated in *Save Power Limited v. Syntek Finance Corp.*, 121 F.3d 947, 950 (5th Cir. 1997), "[t]he Fifth Circuit adheres to the general rule that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." "The "first to file" rule is grounded in principles of comity and sound judicial administration," as "[t]he federal courts long have recognized that the principle of comity requires federal district courts--courts of coordinate jurisdiction and equal rank--to exercise care to avoid interference with each other's affairs." *Id.* (quoting *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir.1985)). Courts use this rule to maximize judicial economy and minimize embarrassing inconsistencies by prophylactically refusing to hear a case raising issues that might substantially duplicate those raised by a case pending in another court. *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 604 (5th Cir. 1999) "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Save Power*, 121 F.3d at 950 (quoting *West Gulf*, 751 F.2d at 729.

18

"This concern applies where related cases are pending before two judges in the same district, . . . as well as where related cases have been filed in different districts." *Save Power*, 121 F.3d at 950. Furthermore, "[t]he rule does not . . . require that cases be identical." *Id.* "The crucial inquiry is one of 'substantial overlap." *Id.* "Complete identity of parties is not required for dismissal or transfer of a case filed subsequently to a substantially related action." *Id.* at 951. Nor does the fact that the first-filed court has already decided the overlapping issues preclude application of the first-filed rule, as application of the rule in those circumstances furthers the rule's underlying goal of avoiding inconsistent rulings. For example, in *Save Power*, the first-filed court had declined to enjoin a party from foreclosing on another party's assets based on a determination of priority of liens. The court in a later-filed case that involved the same lien priority issue declined to transfer the case to the first-filed court. The Fifth Circuit reversed the decision of the second-filed court that denied transfer to the first-filed court, holding that "not only do the issues 'substantially overlap,' but inconsistent rulings have already resulted." *Id.* Similarly, in *Cadle Co. v. Whataburger of Alice, Inc.*, the Fifth Circuit ordered a transfer of the second-filed case to the first-filed court, even though the first-filed court had already ruled that the plaintiff did not own the claims in question and therefore lacked standing to assert them, dismissing the complaint, and even though the dismissal of the case by the first-filed court was on appeal. 174 F.3d at 602, 606. The Fifth Circuit quoted the following statement of the district court in that case in support of its holding that the case in the second-filed court should not proceed:

> There are proper appellate procedures a dissatisfied litigant can employ. This Court [the district court in the second-filed case] does not sit as a super appellate court to review orders of . . . courts in other districts, and will not be employed in a collateral attack on a decision of a sister court. This is one of the very abuses the first-to-file rule is designed to prevent, and is an illustration of why the principle of comity is so vital to our judicial system.

174 F.3d at 602 (quoting *Cadle v. Whataburger of Alice, Inc.*, No. 97-1502, slip op. at 3-4 (W.D. Tex. Mar. 16, 1998)) In approving these conclusions, the Fifth Circuit stated that "[t]he district court correctly refused to act as a 'super appellate court' by entertaining either Cadle's jurisdiction or the defendant's standing arguments and properly limited its inquiry to the potential overlap between the two cases," and that "[b]y so limiting its analysis, the district court indeed avoided trenching on the authority of its sister court, one of 'the very abuses the first-to-file rule is designed to prevent.'" *Id.* at 606 (quoting *Cadle*, No. 97-1502, slip op. at 4).

"[T]he 'first to file rule' not only determines which court may decide the merits of substantially similar cases, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated." *Sutter Corp.*, 125 F.3d 914, 920 (5th Cir. 1997). "Once the likelihood of substantial overlap between the two suits [has] been demonstrated, it [is] no longer up to the court in [the second-filed case] to resolve the question of whether both should be allowed to proceed." *Save Power*, 121 F.3d at 950 (quoting *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971). "Once the district court [in the second-filed case finds] that the issues might substantially overlap, the proper course of action [is] for the [second-filed] court to transfer the case to the [first-filed] court to determine which case should, in the interests of sound judicial administration and judicial economy, proceed." *Cadle*, 174 F.3d at 606. If there is substantial overlap in issues, the court in the second-filed case abuses its discretion if it fails to transfer the case to the first-filed court to make that determination. *Sutter Corp.*, 125 F.3d at 920.

**B.    By Virtue of Af-Cap's Intervention, The Issues in this Case Substantially Overlap With the Western District Litigation**

The issues raised by Af-Cap's Complaint in Intervention directly and substantially overlap with those raised in Af-Cap's litigation in the Western District.   As shown in this Motion's Statement of Facts and as shown by the pleadings and orders from the Western District litigation attached hereto as exhibits, Af-Cap has pursued and continues to pursue the Congo's royalty in the Western District litigation, seeking to enforce the turnover order against both the Congo and the Garnishees, and using that turnover order as a basis for claiming that Garnishees are obligated to pay an allegedly cash royalty for Af-Cap's benefit, and arguing that it has effectively garnished the royalty through its writs of garnishment.

Af-Cap's Complaint in Intervention in this case asserts precisely the same claims.  First, Af-Cap is now seeking to enforce, in this Court, the same Western District turnover order it is seeking to enforce in the Western District litigation, and as in the Western District, it is arguing that the Turnover Order obligates Garnishees to pay an allegedly cash royalty into the registry of the Court there.  In its Complaint in Intervention, Af-Cap alleges that "[p]ursuant to the Turnover Order [issued by the Western District], Af-Cap accedes to the Congo's position under the Convention related to collecting CMS Garnishees' oil royalty obligation and, thus, has the right to receive monthly royalty payments due from CMS Garnishees . . .  CMS Garnishees' first payment was due on July 20, 2005.  Rather than make that payment to the Western District registry, . . . CMS Garnishees instead initiated efforts to fraudulently transfer its assets (i.e., the rights to exploit oil reserves in the Yombo Field) to a related non-U.S. entity."  Complaint in Intervention ¶8.  In the "Causes of Action" section of Af-Cap's Complaint in Intervention, Af-Cap states that it "seeks to invoke the Court's inherent equitable powers to enforce the judgment

lien and Turnover Order that Af-Cap obtained against the Congo in the Western District," and it "asks the Court to declare . . . that Af-Cap has a current and valid interest in the royalties or other obligations owed by the CMS Garnishees . . . to the Congo . . . as a result of Af-Cap's judgment lien and Turnover Order." These allegations and claims are precisely the same as those that Af-Cap has asserted and is asserting in the Western District litigation. Not only do the issues "substantially overlap"; they are identical.

Significantly, Af-Cap also "asks the Court to declare that Af-Cap's . . . writs of garnishment . . . have priority over those obtained by FGH and/or other creditors." By virtue of this claim, Af-Cap is asking this Court to determine that the writs of garnishment issued in the Western District are valid and have priority over those obtained by the other judgment creditors. A critical and necessary issue to be determined by the court in resolving that claim is whether the writs issued in the Western District are valid. That issue has been litigated in the Western District, and the Western District decided it adversely to Af-Cap, dismissing Af-Cap's garnishment action (the 100 Case) in February 2005. Af-Cap's appeal of that dismissal has been briefed in the Fifth Circuit and is awaiting oral argument. Af-Cap's claim in its Complaint in Intervention that its Western District writs are valid and enforceable and give it priority over other creditors raises the same issues that it litigated (and lost) in the Western District and continues to pursue by way of its appeal of the Western District's dismissal order to the Fifth Circuit.

Af-Cap's Complaint in Intervention also presents claims relating to the notice of the sale transaction given by Garnishees in July 2005. Af-Cap specifically sought an order from the Western District that, if granted, would have enjoined the sale. The Western District denied Af-Cap's request. This is another overlapping issue.

22

In short, the allegations and claims that Af-Cap makes in its Complaint in Intervention are the same allegations and the same claims that are the subject of Af-Cap's earlier-filed litigation in the Western District. There can be no legitimate dispute that by virtue of the filing of Af-Cap's Complaint in Intervention in this case, there is "substantial overlap" of issues with those presented in the Western District litigation.

C.    **Fifth Circuit Authority Requires, By Virtue of the Substantial Overlap of Issues, that this Court Transfer the Case to the Western District for Determination of Whether this Case Should be Consolidated with the Western District Litigation, Stayed, or Allowed to Proceed Separately**

As noted above in Section A, the authority of the court in a second-filed case is very limited in connection with the application of the "first-filed rule." "Once the likelihood of substantial overlap between the two suits [has] been demonstrated, it [is] no longer up to the court in [the second-filed case] to resolve the question of whether both should be allowed to proceed." *Save Power*, 121 F.3d at 950 (quoting *Mann Mfg.*, 439 F.2d at 408). "Once the district court [in the second-filed case finds] that the issues might substantially overlap, the proper course of action [is] for the [second-filed] court to transfer the case to the [first-filed] court to determine which case should, in the interests of sound judicial administration and judicial economy, proceed." *Cadle*, 174 F.3d at 606. Because, in light of Af-Cap's intervention, there is substantial overlap of issues between this case and the Western District litigation, the decision on whether this case should be consolidated with the Western District litigation, or stayed, or allowed to proceed separately, must be made by the Western District, not this Court, and Fifth Circuit authority mandates that this case be transferred to the Western District for that purpose.

Af-Cap (and perhaps other judgment creditors) may argue that these principles are inapplicable here because Garnishees are not currently parties to any litigation in the Western District. Such a contention would be meritless for a number of independent reasons.

First, Garnishees are not currently parties to a garnishment action in the Western District only because the Western District dismissed the claims against Garnishees, holding that the Congo's in-kind royalty was not subject to garnishment, and Af-Cap has appealed that ruling. As is made clear in its Complaint in Intervention in this case, Af-Cap continues to contend that the writs of garnishment issued in the Western District litigation were valid and enforceable, the very issue that the Western District ruled on and that is the subject of the ongoing appeal. The Fifth Circuit has made it clear that the mere fact that the first-filed court has already resolved an overlapping issue does not preclude application of the first-filed rule; to the contrary, it presents the most compelling circumstances for its application. *See Save Power*, 121 F.3d at 951 (transfer to court that had already resolved overlapping issue was required, with Fifth Circuit noting that "not only do the issues 'substantially overlap,' but inconsistent rulings have already resulted"); *Cadle*, 174 F.3d at 602, 606 (Fifth Circuit ordered transfer of second case to first-filed court, which had already dismissed plaintiff's claims on grounds that it lacked standing, with dismissal order then being on appeal, based on the Fifth Circuit's application of the "first-to-file rule" and its conclusion that the second-filed court should not act as "super appellate court").

Second, Af-Cap has claimed that Garnishees are parties to the 321 Case, and Af-Cap has proceeded to seek affirmative relief against Garnishees in the form of a motion for show cause order, serving the motion only on Garnishees' counsel in the 100 Case, without formal service of process. Regardless of whether Af-Cap is correct in its contention that Garnishees are parties to the 321 Case, Af-Cap has affirmatively sought relief against Garnishees in that case, making the

24

same allegations and claims made in Af-Cap's Complaint in Intervention, and, without awaiting a response from Garnishees, the Western District denied the motion for a show cause order on the merits.  Garnishees were preparing a response to the show cause motion, including the assertion of personal jurisdiction objections, when their counsel learned of the Western District's ruling, obviating the necessity of filing a response.

Third, the Fifth Circuit has specifically held that "[t]he rule does not . . . require that cases be identical." *Save Power*, 121 F.3d at 950.  "The crucial inquiry is one of 'substantial overlap.'" *Id.*  "Complete identity of parties is not required for dismissal or transfer of a case filed subsequently to a substantially related action." *Id.* at 951. .  The issues presented in Af-Cap's Complaint in Intervention are identical to those presented in the Western District litigation, and the question of whether Garnishees are currently parties in the Western District is irrelevant.

In summary, by virtue of the indisputable fact that Af-Cap's intervention creates substantially overlapping issues in the Western District litigation and in this case, Fifth Circuit authority requires that this Court transfer this case to the Western District, Austin Division, to allow that court to determine whether this case should be consolidated with the *Af-Cap* litigation in the Western District, stayed, or allowed to proceed separately.  This Court has previously stated that a consolidation of the claims of various judgment creditors would make sense.  A transfer of this case to the Western District will allow the first-filed court to determine whether such a consolidation should occur, pursuant to the proper procedure mandated by the Fifth Circuit.

## CONCLUSION

Garnishees respectfully request that under the "first-filed rule," this case be transferred to the United States District Court for the Western District of Texas, Austin Division, for a determination of whether it should be consolidated with the *Af-Cap* litigation, or stayed, or allowed to proceed separately. Garnishees also seek such other and further relief to which they are justly entitled.

Respectfully submitted,

Guy S. Lipe with permission by JMP
GUY S. LIPE
State Bar No. 12394600
VINSON & ELKINS, L.L.P.
2300 First City Tower
1001 Fannin
Houston, Texas 77002-6760
(713) 758-1109
(713) 615-5607 fax

**Attorneys for CMS Nomeco Congo Inc.,
The Nuevo Congo Company, and
Nuevo Congo Ltd.**

## CERTIFICATE OF CONFERENCE

On December 22, 2005, I attempted to confer with attorneys for FG Hemisphere Associates, L.L.C., Af-Cap, Inc., Walker International Holdings Limited, National Union Fire Insurance Company of Pittsburgh, P.A., and the Republic of Congo. I was informed that the Republic of Congo does not oppose this motion. I spoke with Roland Garcia, counsel for Af-Cap, Inc. and Walker International Holdings Ltd. and he informed me that he would need to consult with other attorneys before stating a position with regard to the motion. I also attempted to confer with counsel for FG Hemisphere Associates L.L.C. and National Union Fire Insurance Company of Pittsburgh, P.A., but was unable to reach counsel to discuss the motion. Accordingly, at this time, Garnishees cannot state what position is taken by FG Hemisphere, Af-Cap, Walker, and NUFI with regard to the motion. Garnishees will supplement the certificate of service when additional information is obtained.

Guy S. Lipe with permission by JMP
GUY S. LIPE

26

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was delivered to the following on December 22, 2005, in the manner indicated below:

Dillon J. Ferguson (*hand delivery*)
Phillip G. Oldham
Andrews & Kurth, L.L.P.
600 Travis, Suite 4200
Houston, Texas  77002

Danforth Newcomb (*via Federal Express*)
Shearman & Sterling
599 Lexington Avenue
New York, New York  10022

Andrew L. Jefferson, Jr. (*hand delivery*)
Attorney at Law
1314 Texas St., Suite 500
Houston, Texas  77002-3513

Ernest E. Figari (*via Federal Express*)
Dennis M. Lynch
Figari & Davenport, L.L.P.
3400 Bank of America Plaza
901 Main Street - LB 125
Dallas, Texas  75202-3796

Boaz S. Morag (*via Federal Express*)
Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza
New York, New York  10006

Mark F. Rosenberg (*via Federal Express*)
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004

Roland Garcia (*hand delivery*)
Arthur L. Schechter
L. Bradley Hancock
Greenberg Traurig, LLP
1000 Louisiana, Suite 1800
Houston, Texas  77002

Sanford M. Saunders, Jr. (*via Federal Express*)
Kenneth P. Kaplan
Greenberg Traurig LLP
800 Connecticut Ave., N.W., Suite 500
Washington, D.C.  20006

_Guy S. Lipe with permission by dmp_
GUY S. LIPE

2603070_1.DOC

27

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United State C
Southern District o
ENTERED

SEP 1 5 2(

Michael N. Milby, Clerk

| | |
|---|---|
| FG HEMISPHERE ASSOCIATES, L.L.C.<br>Plaintiff, | §<br>§ |
| v. | § |
| REPUBLIQUE DU CONGO,<br>Defendant, | §<br>§ |
| And | § |
| CMS OIL AND GAS COMPANY,<br>CMS OIL AND GAS (INTERNATIONAL)<br>COMPANY,<br>CMS NOMECO INTERNATIONAL CONGO<br>HOLDINGS, INC.,<br>CMS NOMECO CONGO, INC.,<br>CMS OIL AND GAS (HOLDINGS), LTD.,<br>CMS OIL AND GAS (INTERNATIONAL) LTD.,<br>CMS NOMECO CONGO LDC,<br>CMS OIL AND GAS (CONGO) LTD.,<br>CMS OIL AND GAS (SERVICES) COMPANY,<br>NUEVO ENERGY COMPANY,<br>THE NUEVO CONGO COMPANY,<br>THE CONGO HOLDING COMPANY,<br>NUEVO CONGO, LTD.,<br>NUEVO INTERNATIONAL INC.,<br>NUEVO INTERNATIONAL HOLDINGS, LTD.,<br>PERENCO INC.,<br>PERENCO OIL AND GAS (INTERNATIONAL)<br>COMPANY,<br>PERENCO INTERNATIONAL (CONGO) INC.,<br>PERENCO OIL AND GAS (SERVICES)<br>COMPANY and LANKAN INC.<br>Garnishees. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

CIVIL ACTION No.: H-02-4261

## ORDER ON WRITS OF GARNISHMENT

Before the Court is the plaintiff FG Hemisphere Associates, L.L.C.'s Emergency

Opposed Second Application to Issue Writs of Garnishment (the "Application") seeking writs of

garnishment against the garnishees CMS Nomeco Congo Inc., The Nuevo Congo Company, and

Nuevo Congo Ltd. (collectively, the "Garnishees") with respect to the obligations owed by the

Garnishees to Société Nationale de Petrol du Congo ("SNPC"). The Court has reviewed the

HOU:2425945.1

Application and any responses thereto and determines that a valid judgment exists against the Republique du Congo (the "Congo") that is unchallenged, that the Congo irrevocably waived immunity with respect to the obligations of the Loan Agreement, and that the waiver extends to any assets, revenues and properties that belong to the Congo and to SNPC. The Garnishees owe to the Congo certain royalty obligations under a 1979 Convention for the production of oil and owe to SNPC certain intangible obligations under agreements relating the Convention. Based on the Application and any responses thereto, the Court determines that said obligations constitute property of the Congo and SNPC located in the United States, which has been used for commercial activity in the United States, therefore, satisfying the requirements of the Foreign Sovereign Immunities Act and enabling the plaintiff to execute on said property.

Therefore, it is Ordered that the plaintiff's Application for writs of garnishment is Granted.

Signed this _14th_ day of ~~August~~ September, 2005.

_____
United States District Judge

2