# EXHIBIT A

CONNECTICUT BANK OF COMMERCE

Plaintiff,                                **MONEY JUDGMENT**

-against-

THE REPUBLIC OF CONGO

Defendant.

——————————————————————X

STATE OF NEW YORK )
                  )ss:
COUNTY OF KINGS   )

1.  Plaintiff, CONNECTICUT BANK OF COMMERCE, by its attorneys, GOLDBERG & COHN, LLP., LOCAL COUNSEL to the FIRM OF WILLIAMS & CONNOLLY, having moved by Motion for Summary Judgment in Lieu of Complaint dated for an Order that a Money Judgment be granted to Plaintiff in the sum of Ten Million Three Hundred Seventy Five Thousand Two Hundred Forty Four Dollars and Eighty Three ($10,375,244.83) DOLLARS plus interest and such costs and disbursements as are fixed by the Court; and

2.  The Defendant having defaulted by failing to put in any Response to said motion and the matter having come before Hon. Irving Aronin on November 17, 1999 and Justice Aronin having granted Plaintiff's Motion for a Money Judgment of Ten Million Three Hundred Seventy Five Thousand Two Hundred Forty Four Dollars and Eighty Three ($10,375,244.83) Cents and directing Plaintiff to settle an Order on Notice and Plaintiff having settled said Order on Notice to Defendant, and this Order having been signed by Justice Aronin on February 1, 2000 and having been duly entered by the County Clerk, Kings County on March 10, 2000, *granting that*

FILED
PROTHONOTARY
2005 AU 30 AM 9: 2

a Money Judgment be _____ against Defendant, The Republic of Congo in the sum

of Ten Million Three Hundred Seventy Five Thousand Two Hundred Forty Four Dollars and Eighty

Three ($10,375,244.83) Cents plus interest from November 15, 1996 of _____ _____

_____ and now on the Motion of

GOLBERG & COHN, LLP., LOCAL COUNSEL to the FIRM OF WILLIAMS & CONNOLLY

it is;

ADJUDGED that Plaintiff, CONNECTICUT BANK OF COMMERCE residing at and with

a principal place of business at 612 Bedford Street, Stamford, Connecticut 06901 have Judgment

against and do recover of the Defendant, The Republic of Congo, a sovereign foreign entity with a

principal residence in the United States at its Embassy located in 4891 Colorado Avenue, Northwest,

Washington, D.C., (202) 726-0825 the sum of $10,375,244.83, plus interest in the amount

$3,252,650.28 and _____ _____ plus costs and disbursement

in the amount of $445.00, making a total sum of

$13,628,340.11 and the plaintiff shall have execution

therefor.

*Wilbur A. Levin*

CLERK
SUPREME COURT, KINGS COUNTY

FILED
KINGS COUNTY CLERK'S OFFICE

2000 MAY -9 PM 12: 46

FILED

FILED
PROTHONOTARY
2006 AUG 30 AM 9: 30

№ 7861

All which we have caused by these Presents to be exemplified, and the seal of our said Court for said County to be hereunto affixed.

WITNESS, HON.    **HON. HOWARD RUDITZKY**
**JUSTICE N.Y.S. SUPREME COURT**
A Justice of our Supreme Court in and for the Second Judicial District of said State,
this                         day of        JUL 7 2003        19

*Wm. C. Levin*  Clerk.

I    **HON. HOWARD RUDITZKY**
**JUSTICE N.Y.S. SUPREME COURT**                     a Justice of the Supreme Court
of the State of New York in and for the Second Judicial District thereof, do hereby certify, that    WILBUR A. LEVIN, whose name is subscribed to the preceding exemplification, is the Clerk of the County of Kings, and Clerk of the Supreme Court in and for said County, and that full faith and credit are due to his official acts.

I FURTHER CERTIFY, that the Seal affixed to said exemplification is the proper Seal of said Court for said County, and that the attestation thereof is in due form of law and by the proper officer.

WITNESS my hand at the Borough of Brooklyn, this
7TH day of    JULY                in the year    2003.

*Howard A. Ruditzky*
A Justice of the Supreme Court of the State of New York
in and for the Second Judicial District.

*Wm. C. Levin*  Clerk.

STATE OF NEW YORK, }
COUNTY OF KINGS,      } ss.:

I, WILBUR A. LEVIN, Clerk of the County of Kings, and also of the Supreme Court of said County in and for the Second Judicial District of said State (said Court being a Court of Record), do hereby certify, that Hon.    **HON. HOWARD RUDITZKY**
**JUSTICE N.Y.S. SUPREME COURT**
whose name is subscribed to the foregoing certificate, is a Justice of the Supreme Court of said State in and for the Second Judicial District, duly elected and sworn, and that the signature of said Justice to said Certificate is genuine.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the Seal of said County and Court, this                day of    JUL 7 2003        19



*Wm. C. Levin*  Clerk.

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

SHARON D. AGNEW
PROTHONOTARY, NEW CASTLE COUNTY

NEW CASTLE COUNTY COURT HOUSE
500 N  KING STREET
LOWER LEVEL 1, STE#500
WILMINGTON DE 19801-3746
(302) 255-0800

JUDGMENTS DEPARTMENT
500 N KING STREET
1ST FLOOR, STE#1500
WILMINGTON DE 19801-3704
(302) 255-0556

NOTICE OF ENTRY OF JUDGMENT

TO: AF-CAP, INC
    C/O HWR SERVICES LIMITED
    CRAIGMUIR CHAMBERS
    P O BOX 71
    ROAD TOWN, TORTOLA
    BRITISH VIRGIN ISLANDS

**CONNECTICUT BANK OF COMMERCE, Plaintiff (s)**
**vs.**
**THE REPUBLIC OF CONGO, Defendant(s)**

You are hereby notified that on the 30TH DAY OF AUGUST a judgment
was entered in Superior Court, New Castle County, against you the
defendant(s) and in favor of:

                     AF-CAP, INC, ASSIGNEE OF:
                     CONNECTICUT BANK OF COMMERCE
                     C/O HWR SERVICES LIMITED
                     CRAIGMUIR CHAMBERS-POB 71
                     ROAD TOWN, TORTOLA
                     BRITISH VIRGIN ISLANDS
Whose attorney is:  or Pro Se:

                     PAUL D BROWN, ESQUIRE
                     1000 WEST ST, STE#1540
                     WILMINGTON  DE 19801
This Judgment is a result of proceedings that were held in the
State of NEW YORK.

The Judgment number in this Court is **05J-08-826 J-22-165**

DATE: AUGUST 30, 2005

                              Sincerely,

                              Jay Eltamin
                              Judgments Case Manager

C:\userdata\word 97 docs\FOREIGNJUDGMENT.doc

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

SHARON D. AGNEW
PROTHONOTARY, NEW CASTLE COUNTY

NEW CASTLE COUNTY COURT HOUSE
500 N  KING STREET
LOWER LEVEL 1, STE#500
WILMINGTON DE 19801-3746
(302) 255-0800

JUDGMENTS DEPARTMENT
500 N KING STREET
1ST FLOOR, STE#1500
WILMINGTON DE 19801-3704
(302) 255-0556

## NOTICE OF ENTRY OF JUDGMENT

TO: REPUBLIC OF CONGO
    CAISSE CONGOLAISE D' AMORTISSEMENT
    C/O HEAD OF MINISTRY OF FOREIGN AFFAIRS
    RODOLPHE ADADA
    BP 98
    BRAZZAVILLE
    CONGO

**CONNECTICUT BANK OF COMMERCE, Plaintiff (s)**
**vs.**
**THE REPUBLIC OF CONGO, Defendant(s)**

You are hereby notified that on the 30TH DAY OF AUGUST a judgment was entered in Superior Court, New Castle County, against you the defendant(s) and in favor of:

                    AF-CAP, INC, ASSIGNEE OF:
                    CONNECTICUT BANK OF COMMERCE
                    C/O HWR SERVICES LIMITED
                    CRAIGMUIR CHAMBERS-POB 71
                    ROAD TOWN, TORTOLA
                    BRITISH VIRGIN ISLANDS

Whose attorney is:  or Pro Se:

                    PAUL D BROWN, ESQUIRE
                    1000 WEST ST, STE#1540
                    WILMINGTON  DE 19801

This Judgment is a result of proceedings that were held in the State of NEW YORK.

The Judgment number in this Court is **05J-08-826 J-22-165**

DATE: AUGUST 30, 2005

                    Sincerely,

                    Jay El-amin
                    Judgments Case Manager

C:\userdata\word 97 docs\FOREIGNJUDGMENT.doc

http://courts.state.de.us/superior

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

SHARON D. AGNEW
PROTHONOTARY, NEW CASTLE COUNTY

NEW CASTLE COUNTY COURT HOUSE
500 N  KING STREET
LOWER LEVEL 1, STE#500
WILMINGTON DE 19801-3746
(302) 255-0800

JUDGMENTS DEPARTMENT
500 N KING STREET
1ST FLOOR, STE#1500
WILMINGTON DE 19801-3704
(302) 255-0556

### NOTICE OF ENTRY OF JUDGMENT

TO: REPUBLIC OF CONGO
    CAISSE CONGOLAISE D' AMORTISSEMENT
    BP 2090
    BRAZZAVILLE
    CONGO


**CONNECTICUT BANK OF COMMERCE, Plaintiff (s)**
**vs.**
**THE REPUBLIC OF CONGO, Defendant(s)**


You are hereby notified that on the 30TH DAY OF AUGUST a judgment
was entered in Superior Court, New Castle County, against you the
defendant(s) and in favor of:

                    AF-CAP, INC, ASSIGNEE OF:
                    CONNECTICUT BANK OF COMMERCE
                    C/O HWR SERVICES LIMITED
                    CRAIGMUIR CHAMBERS-POB 71
                    ROAD TOWN, TORTOLA
                    BRITISH VIRGIN ISLANDS

Whose attorney is:  or Pro Se:

                    PAUL D BROWN, ESQUIRE
                    1000 WEST ST, STE#1540
                    WILMINGTON  DE 19801

This Judgment is a result of proceedings that were held in the
State of NEW YORK.

The Judgment number in this Court is **05J-08-826 J-22-165**

DATE: AUGUST 30, 2005


                    Sincerely,

                    Jay El-amin
                    Judgments Case Manager

C:\userdata\word 97 docs\FOREIGNJUDGMENT.doc


http://courts.state.de.us/superior

# EXHIBIT B

SNPC OVER/UNDER CHECK

| date of BL | Bling n° | M/T Vessel | Selling price | BL Qty | ACTIVITIES | BL1 | O/U SNPC | O/U GOV |
|---|---|---|---|---|---|---|---|---|
| 28-nov-02 | 110 | ALTAIR VOYAGER | $23,6380 | 762 408 | LR 110 remainder | 656 808 | 86 982 | |
| | | | | | 110 royalty | | | 86 982 |
| | | | | | | | | -4 972 |
| 18-janv-03 | 111 | VIRGO VOYAGER | $31,2184 | 615 524 | Tax maritime (LR 110) | 1 672 | 75 821 | |
| | | 18-janv-03 | | | LR 111 | 614 655 | | |
| | | | | | 111 royalty | | | 76 573 |
| | | | | | | | | -3 456 |
| 03-mars-03 | 112 | KYEEMA SPIRIT | $31,5730 | 734 694 | Tax maritime (LR 111) | 3 456 | 91 327 | |
| | | 05-mars-03 | | | LR 112 | 739 617 | | |
| | | | | | 112 royalty | | | 89 606 |
| | | | | | 4 th Qt 02 royalty | | | 15 821 |
| | | | | | Tax maritime (LR 112) | 4 067 | | -4 067 |

█████████████████████████████████████

| 20-06-2003 | 114 | VIRGO VOYAGER | $25,0400 | 862 770 | LR 114 | 803 901 | 101 100 | |
| | | 26-juin-03 | | | 114 royalty | | | 104 326 |
| | | | | | Tax maritime (LR 114) | 5 048 | | -5 048 |

█████████████████████████████████████

| | 116 | ALBAHURIA | $25,7937 | 811 437 | LR 116 | 766 420 | 84 920 | |
| | | 03-oct-03 | | | 116 royalty | | | 93 807 |
| | | | | | 3rd qtr 03 royalty | | | 10 732 |
| | 117 | HARMONY | $26,0976 | 688 416 | LR 117 | 683 782 | 86 473 | -5 494 |
| | | 25-nov-03 | | | 117 royalty | 5 494 | | 81 033 |
| | | | | | Tax maritime (LR 117) | 4 634 | | -4 634 |

█████████████████████████████████████

| | 119 | STELLAR VOYAGER | $23,3896 | 678 975 | LR 119 | 627 604 | 78 451 | |
| | | 18-mars-04 | | | 119 royalty | | | 30 063 |
| | 120 | STELLAR VOYAGER | $29,5189 | 686 990 | Tax maritime (LR 119) | 660 089 | 81 269 | -5 064 |
| | | 09-mai-04 | | | LR 120 | | | 77 683 |
| | | | | | 120 royalty | | | 28 913 |
| | | | | | 1 st Qt 04 royalty | | | |
| | | | | | Tax maritime (LR 120) | | | -3 641 |

█████████████████████████████████████

| | 122 | SEBAROK SPIRIT | $27,2221 | 879 053 | LR 122 | 809 771 | 70 946 | |
| | | 19-août-04 | | | 122 royalty | | | 73 723 |
| | | | | | 2nd qtr 04 royalty - estimation | | | 39 290 |
| | 123 | MT BRITISH HOLLY | $27,4730 | 854 577 | Tax maritime (LR 122) | 854 577 | 91 835 | -3 615 |
| | | 27-sept-04 | | | LR 123 | | | 78 372 |
| | | | | | 123 royalty | | | -4 170 |
| | 124 | MT GENMAR NESTOR | $26,5506 | 809 019 | Tax maritime (LR 123) | 809 918 | 92 602 | 37 990 |
| | | 23-nov-04 | | | 3rd qtr 04 royalty | | | |
| | | | | | LR 124 | | | 59 310 |
| | | | | | 124 royalty | | | -3 458 |
| | | | | | Tax maritime (LR 124) | 3 458 | | 22 975 |
| | | | | | mrgt T/U | | | |

█████████████████████████████████████

| | 126 | MT OLYMPIC FLAIR | $31,80 | 439 973 | LR 126 | 439 973 | 54 697 | |
| | | 19-févr-05 | | | 126 royalty | | | 54 016 |
| | | | | | 4th qtr 04 royalty | | | -2 269 |
| | 127 | HARMONY | $37,6608 | 296 467 | Tax maritime (LR 126) | 296 467 | 31 883 | 22 806 |
| | | 19-mars-05 | | | LR 127 | | | 29 633 |
| | | | | | 127 royalty | | | -1 212 |
| | 128 | ADAR | $40,3129 | 342 399 | LR 128 | 342 399 | 42 824 | |
| | | 21-avr-05 | | | 128 royalty | | | 39 266 |
| | | | | | 1st qtr 05 royalty | | | -1 466 |
| | 129 | GENMAR TRUST | $42,0877 | 132 403 | LR 129 | 132 403 | 16 580 | 16 277 |
| | | 23-juin-05 | | | 129 royalty | | | 14 600 |
| | | | | | Tax maritime (LR 129) | | | -844 |
| | 130 | HS CONCORD | $43,9038 | 435 029 | LR 130 | 435 029 | 54 379 | |
| | | 03-août-05 | | | 130 royalty | | | 49 669 |
| | | | | | Tax maritime (LR 130) | | | -1 728 |
| | | | | | 2nd qtr 05 royalty | | | 12 002 |

█████████████████████████████████████

| | 132 | HELLESPONT | $58,2260 | 670 359 | LR 132 | 670 359 | 83 790 | |
| | | 29-nov-05 | | | 132royalty | | | 78 474 |
| | | | | | 3rd qtr 05 royalty | | | -2 333 |
| | 133 | STAVRONIS | $59,3360 | 418 916 | LR 133 | 418 916 | 51 877 | 23 999 |
| | | 31-déc-05 | | | 133 royalty | | | 48 639 |
| | | | | | Tax maritime (LR 132) | | | -1 443 |
| | 134 | IASONAS | $60,8732 | 400 056 | 4nd qtr 05 royalty | 400 056 | 50 087 | 26 057 |
| | | 09-févr-06 | | | LR 134 | | | 48 668 |
| | | | | | 134 royalty | | | -1 371 |
| | | | | | Tax maritime (LR 132) | | | |

█████████████████████████████████████

| | 135 | OLYMPIC SPIRIT II | $50,5732 | 628 957 | 1st qtr 06 royalty | 629 957 | 79 746 | 7 341 |
| | | 26-juin-06 | | | LR 135 | | | |
| | | | | | 136 royalty | | | 89 434 |
| | | | | | Tax maritime (LR 136) | | | -2 166 |
| | | | | | | -599 418 | 134 938 | 28 621 |

CMSN 1713

over_under réunion 080811

CNSNI 1714

## TABLEAU REVISE DES PREVISIONS/REALISATIONS DE PRODUCTION NETTE (En baril) DE 2005 A 2008

## TABLEAU COMPARATIF DE LA PRODUCTION COMMERCIALISABLE
### ANNEES 2005 ET 2006 (En tonnes métriques)

## EXPORTATIONS ET COURS MOYEN DU BARIL EN 2006

# C.M.S. NOMECO CONGO INC.

| FACTORS | DRY | WET | COND. |
|---|---|---|---|
| API @ 60 | 18,10 | 17,50 | 49,90 |
| Scm/bbl | 0,15892 | 0,15892 | 0,15889 |
| Bbl/L.Tonne | 6,698 | 6,698 | 8,213 |

**August, 31th 2006**
OPENING STOCK @ 06:00 August 01
CLOSING stock @06:00 JSeptember 01

| Days in Month | 31 |
|---|---|

**Prior Month Closing INVENTORY - GSV**

| DRY OIL STORAGE CLOSING INVENTORY | | | | | | |
|---|---|---|---|---|---|---|
| Tank | | GSV | | GSV | | |
| 1C | 98,0 | 110 381 | 0,9847 | 108 694 | Dry Oil | 515 965 |
| 3C | 100,5 | 135 652 | 0,9837 | 133 441 | Wet Oil 2C/4C/P | 16 725 |
| 5C | 97,5 | 127 756 | 0,9849 | 125 830 | Cond | 8 831 |
| 1P | 91,6 | 84 236 | 0,9874 | 83 170 | **LIFTINGS** | |
| 1S | 91,0 | 85 456 | 0,9876 | 84 395 | | |
| 3P | 79,4 | 65 929 | 0,9922 | 65 417 | | |
| 3S | 79,5 | 72 282 | 0,9922 | 71 718 | | |
| 5P | 87,7 | 51 419 | 0,9889 | 50 849 | **GROSS FUEL USED** | |
| 5S | 97,0 | 69 387 | 0,9851 | 68 355 | Crude | 11 544 |
| Total Dry Storage | | 802 498 | | 791 871 | Cond. | 3 460 |

| WET OIL STORAGE CLOSING INVENTORY | | | | | | |
|---|---|---|---|---|---|---|
| 2C | 83,0 | 0 | 35,00% | 0 | 0,9880 | 0 |
| 4C | 98,8 | 30 033 | 35,00% | 19 822 | 0,9879 | 19 582 |
| PS | 97,2 | 1 099 | 35,00% | 714 | 0,9880 | 706 |
| Total Wet Storage | | 31 132 | 57,52% | 20 536 | 0,9902 | |

| CONDENSATE STORAGE CLOSING INVENTORY | | | | | | |
|---|---|---|---|---|---|---|
| S/SLP | 86,0 | 15 894 | 35,00% | 10 490 | 0,8776 | 9 206 |
| Total Cond Storage | | 9 835 | 0,00% | 9 835 | 0,8776 | 9 206 |

| INVENTORY SUMMARY - STANDARD BARRELS @ 60 F | | | | | | |
|---|---|---|---|---|---|---|
| Dry Crude | 791 871 | 515 965 | 275 906 | 11 544 | 0 | 287 450 |
| Wet Crude | 20 288 | 16 725 | 3 563 | 0 | 0 | 3 563 |
| Cond. | 9 206 | 8 631 | 575 | 3 460 | 0 | 4 035 |
| Total | 821 364 | 541 321 | 280 043 | 15 004 | 0 | 295 047 |

| MONTHLY PRODUCTION SUMMARY | STANDARD BARRELS | CUBIC METERS | METRIC TONNES |
|---|---|---|---|
| Crude Inventory Change | 279 468 | 44 413 | 41 724 |
| Condensate Inventory Change | 575 | 91 | 70 |
| Crude Fuel Consumption | 11 544 | 1 835 | 1 723 |
| Cond. Fuel Consumption | 3 460 | 550 | 421 |
| Lifted Volume | 0 | 0 | 0 |

| | STANDARD BARRELS | CUBIC METERS | METRIC TONNES |
|---|---|---|---|
| Crude and Condensate production | 295 047 | 46 889 | 43 939 |
| Crude Production | 291 012 | 46 248 | 43 448 |
| Dry Crude for sale (produced to dry tanks exc fuel inc reproc | 275 906 | | |

| | STANDARD BARRELS | CUBIC METERS | METRIC TONNES |
|---|---|---|---|
| Average Daily Crude and Cond. Production | 9 518 | 1 513 | 1 417 |
| Average Daily Crude Production | 9 387 | 1 492 | 1 402 |
| Average Daily Crude Prodn Excluding Fuel | 9 015 | 1 433 | 1 346 |
| Average Daily Dry Crude For Sale (Excluding Fuel) | 8 900 | | |

CMSN 1715

**CMS NOMECO**
**Pricing Schedule**

**Pricing based on New York HARBOR N° 6.1**

| août-06 | Date | Min | Max | Average |
|---|---|---|---|---|
| | 1-août | 51,300 | 51,500 | 51,400 |
| | 2-août | 52,000 | 52,200 | 52,100 |
| | 3-août | 51,850 | 52,050 | 51,950 |
| | 4-août | 51,250 | 51,450 | 51,350 |
| 5-août | | | | |
| 6-août | | | | |
| | 7-août | 52,450 | 52,650 | 52,550 |
| | 8-août | 51,950 | 52,150 | 52,050 |
| | 9-août | 52,700 | 52,900 | 52,800 |
| | 10-août | 51,450 | 51,650 | 51,550 |
| | 11-août | 51,650 | 51,850 | 51,750 |
| 12-août | | | | |
| 13-août | | | | |
| | 14-août | 50,700 | 50,900 | 50,800 |
| | 15-août | 50,300 | 50,500 | 50,400 |
| | 16-août | 50,150 | 50,350 | 50,250 |
| | 17-août | 49,100 | 49,300 | 49,200 |
| | 18-août | 49,850 | 50,050 | 49,950 |
| 19-août | | | | |
| 20-août | | | | |
| | 21-août | 50,750 | 50,950 | 50,850 |
| | 22-août | 50,550 | 50,750 | 50,650 |
| | 23-août | 49,600 | 49,800 | 49,700 |
| | 24-août | 49,600 | 49,800 | 49,700 |
| | 25-août | 49,600 | 49,800 | 49,700 |
| 26-août | | | | |
| 27-août | | | | |
| | 28-août | 47,850 | 48,050 | 47,950 |
| | 29-août | 47,100 | 47,300 | 47,200 |
| | 30-août | 46,650 | 46,850 | 46,750 |
| | 31-août | 46,650 | 46,850 | 46,750 |
| | | | Total | 1 157,3500 |
| | | | Nbre de jours | 23 |
| | | | Moyenne | 50,3196 |

CMSN 1716

# EXHIBIT C



# PERENCO

17th September 2002

## PERENCO COMPLETES CMS ACQUISITION

Perenco has completed the acquisition of CMS Oil and Gas Company which owns oil and gas producing properties in USA, Republic of Congo, Cameroon, and Tunisia and an exploration permit in Eritrea. The acquisition of CMS' interests in Venezuela is the subject of a separate transaction for which certain approvals are still pending, and completion is anticipated in October.

Perenco is a European exploration and production company with operations in Latin America, West Africa, Turkey and USA. Following the closing of this transaction, Perenco's total operated production is expected to be 190,000 bopd with Perenco's net share over 140,000 bopd.

Further information can be found at www.perenco.com or contact
Paddy Spink +44 20 7376 5250.

Perenco PLC  100 Sydney Street London SW3 6NJ UK.  Tel: +44 (0)20 7376 5250  Fax: +44 (0)20 7376 4290  Reg. in England 4006589  VAT No. 503 4305 94

# EXHIBIT D

# 3303·A

## CONVENTION

- The People's Republic of Congo
- Congolese Superior Oil Company
- Cities Service Congo Petroleum Corporation
- Canadian Superior Oil Ltd.
- Société Nationale de Recherches et
  d'Exploitation Pétrolières "HYDRO-CONGO"

May 25, 1979

ENGLISH
TRANSLATION

Copied from
ORIGINALS File

GAR 00056

## INDEX

1. Table of contents

2. Convention

3. Exhibit I:    Decree granting the "Marine 1" permit.

4. Exhibit II.

5. Exhibit III:  Depreciation rates applicable to the
   COMPANIES.

6. Exhibit IV:   Payment of the royalty and of the
   corporate tax.

7. Exhibit V:    Model of letter of guarantee.

8. Appendix.

GAR 00057

Page

1. Definitions ............................................... 2
2. Purpose .................................................. 4
3. Effective Date – Term – Exploitation Permit ........... 4
4. Beneficiaries ............................................ 4
5. Warranties .............................................. 5
6. Taxes ................................................... 6
   6.03  Computation of the corporate tax on each of the
         COMPANIES ......................................... 7
7. Mining royalty .......................................... 8
8. Foreign exchange ........................................ 9
9. Lump sum payments ...................................... 11
10. Disposition of HYDROCARBONS ........................... 11
11. Employment and training of personnel ................. 13
12. Congolese suppliers ................................... 14
13. Provision of information .............................. 15
14. Transport and treatment of products .................. 15
15. Force majeure .......................................... 16
16. Tax declaration and payment ........................... 17
17. Arbitration ........................................... 17
18. Applicable law ........................................ 18
19. Notices ................................................ 18
20. Amendments ............................................ 19
21. Guarantee by parent company .......................... 20

EXHIBIT I
   Copy of Decree Granting the PERMIT

EXHIBIT II

EXHIBIT III
   Depreciation Rates Applicable to the COMPANIES

EXHIBIT IV
   I – Payment of Royalty
   II – Payment of Corporate Tax

EXHIBIT V
   Model of Letter of Guarantee

(i)

GAR 00058

<u>TRANSLATION</u>

<u>CONVENTION</u>

BETWEEN

 The People's Republic of the Congo (hereinafter referred to as the "CONGO"), represented for the purposes hereof by its Minister of Mining and Energy Mr. Rodolphe Adada,

            on the one hand,

 AND

 Congolese Superior Oil Company (hereinafter sometimes referred to as "SUPERIOR"), a Nevada (U.S.A.) corporation with registered offices at 26th Floor, First City National Bank Building, Houston, Texas 77001, United States of America, represented by Mr. Diego O. Giordano-Echegoyen, duly authorized for this purpose,

 Cities Service Congo Petroleum Corporation (hereinafter sometimes referred to as "CITIES SERVICE") a Delaware (U.S.A.) corporation with registered offices at 306 South State Street, Dover, Delaware, United States of America, represented by Mr. Antoine Saadi, duly authorized for this purpose,

 Canadian Superior Oil Ltd. (hereinafter sometimes referred to as "CANADIAN"), a corporation incorporated under the laws of Canada, with registered offices at Three Calgary Place, 355 4th Avenue S.W., Calgary, Alberta, Canada, represented by Mr. Robert C. Schrader, duly authorized for this purpose,

 Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" (hereinafter sometimes referred to as "HYDRO-CONGO"), a <u>société nationale</u> with registered offices at Brazzaville, represented by Mr. Alphonse M'Boudo-Nesa, duly authorized for this purpose,

hereinafter collectively referred to as the "COMPANIES", and individually "one of the COMPANIES" or the "COMPANY",

         on the other hand.

GAR 00059

PREAMBLE:

WHEREAS, the CONGO wishes to promote and conduct, under the best conditions of effectiveness, exploration and development of its liquid and/or gaseous hydrocarbon resources so as to enable thereafter exploitation of these resources on the best possible terms; and

WHEREAS, for this purpose, the CONGO wishes to obtain the cooperation of qualified and well-known oil companies in order to have them provide HYDRO-CONGO, within the framework of a joint venture, with assistance necessary for the implementation of certain hydrocarbon exploration and the development and exploitation of petroleum deposits discovered on the type "A" permit known as "Marine 1" granted to HYDRO-CONGO, which is more fully described below, and on the exploitation permits which may be granted in respect of such exploration permit; and

WHEREAS, the COMPANIES shall carry out their exploration and production activities in accordance with the principles of the petroleum policy of the CONGO as incorporated in this Convention.

NOW, THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

1. <u>Definitions</u>

For the purpose of this Convention, the terms and expressions set forth below shall have the following meanings:

1.01  <u>Convention:</u>  This Convention between the CONGO and the COMPANIES.

1.02  <u>Joint Venture:</u>  The joint venture organized by the joint operating agreement for the petroleum works as this term is hereinafter defined in sub-paragraph 1.10 below.

1.03  <u>Joint Operating Agreement:</u>  The joint operating agreement for the exploration and exploitation of hydrocarbons entered into among the COMPANIES for the exploration and possible exploitation of hydrocarbon deposits on the permit as this term is hereinafter defined in sub-paragraph 1.04 below.

1.04  <u>Permit:</u>  The type "A" exploration permit known as "Marine 1", referred to in the preamble to the CONVENTION, granted to HYDRO-CONGO for the benefit of the JOINT VENTURE by the Decree, a copy of which is attached as Exhibit I to the CONVENTION, and all its extensions, amendments, variations or renewals, if any, as well as any exploitation permit which may be granted over any part of its surface.

1.05  <u>Operator:</u>  The COMPANY which is entrusted, on behalf of the members of the JOINT VENTURE, with the petroleum works -- as this term is hereinafter defined in sub-paragraph 1.10 below -- on the PERMIT, in accordance with the provisions of the JOINT OPERATING AGREEMENT.

**GAR 00060**

1.06  Hydrocarbons:  Solid, liquid and/or gaseous hydrocarbons discovered and/or produced on the PERMIT.

1.07  Natural Gas:  Gaseous HYDROCARBONS produced by the COMPANIES on the PERMIT, but excluding condensate which by normal field methods of processing is separated and recovered as a liquid.

1.08  Liquid Hydrocarbons:  HYDROCARBONS produced by the COMPANIES on the PERMIT, but excluding NATURAL GAS.

1.09  Affiliated Company:

1.09.1  Any company in which more than 50% of the voting rights in ordinary shareholders' meetings are held directly or indirectly by one of the COMPANIES;

1.09.2  Any company which holds, directly or indirectly, more than 50% of the voting rights in the ordinary shareholders' meetings of one of the COMPANIES;

1.09.3  Any company whose voting rights in ordinary shareholders' meetings are subject to more than 50% control by a company which itself holds, directly or indirectly, more than 50% of the voting rights in the ordinary shareholders' meetings of one of the COMPANIES;

1.09.4  Any company in which more than 50% of the voting rights in ordinary shareholders' meetings are held directly or indirectly by several COMPANIES or by several companies as described in sub-paragraph 1.09.1 to 1.09.3 above.

1.10  Petroleum Works:  All the activities, wherever carried out, relating to exploration, development, exploitation, transportation, storage and disposition of HYDROCARBONS in the CONGO or for export.

1.11  Exploration Work:  That part of the PETROLEUM WORKS which is undertaken with the goal of discovering HYDROCARBON deposits, including the discovery well and appraisal works, undertaken until the day on which the Operating Committee provided for in the JOINT OPERATING AGREEMENT decides, pursuant to Article 5 of the JOINT OPERATING AGREEMENT, that a discovered deposit is commercially exploitable.

1.12  Development and Exploitation Works:  All PETROLEUM WORKS other than EXPLORATION WORKS, including transportation of HYDROCARBONS to the point of lifting by the COMPANIES.

1.13  Foreign Companies:  The COMPANIES, except HYDRO-CONGO.

1.14  CFA Franc:  Currency defined in Title II of the "Convention de coopération monétaire" between the member States of the Banque des États de l'Afrique Centrale (B.E.A.C.) and the French Republic, as signed in Brazzaville on November 23, 1972.

GAR 00061

## 2.  Purpose

2.01  The purpose of the CONVENTION and of the Exhibits hereto is to define the conditions of the participation of the COMPANIES in the PETROLEUM WORKS on the PERMIT within the framework of the JOINT VENTURE.

## 3.  Effective Date – Term – Exploitation Permit

3.01  The CONVENTION shall be approved by an act having the force of law and shall come into force upon the publication of such act in the Official Journal of the CONGO.

3.02  The CONVENTION is entered into for the term of the PERMIT.

3.03  Each exploitation PERMIT shall have a duration of thirty (30) years.

## 4.  Beneficiaries

4.01  The provisions of the CONVENTION shall apply as a matter of law to the COMPANIES and to any assignee of the rights of each COMPANY on the PERMIT, as well as to any company to which the COMPANIES or one of the COMPANIES shall have decided to associate by assigning to such company all or part of their rights and obligations on the PERMIT. However, any assignment must be submitted to the Minister in charge for approval prior to its coming into force.

If the decision of the Minister in charge is not rendered within one (1) month from the notification of the assignment, which approval to the assignment must be sought, such approval shall be deemed not to have been granted.

4.01.1    If the proposed assignee is a company wholly-controlled by the assignor or by the parent company of its group, the authorization of the Minister in charge shall be automatically granted and, in this case, notwithstanding the provisions of paragraph 4.01 above, the authorization shall be deemed granted one (1) month after the request is made. If the proposed assignee is an AFFILIATED COMPANY, the authorization of the Minister in charge shall not be withheld unreasonably or in a discretionary manner.

4.01.2    Any subsequent action which would result in modifying the qualification of the assignee as a company wholly-controlled by the assignor or as an AFFILIATED COMPANY shall be considered as a new assignment and shall be subject, under the same conditions, to the prior authorization of the Minister in charge.



**GAR 00062**

4.01.3    In accordance with the petroleum policy of the CONGO, HYDRO-CONGO shall not assign its participating interest in the JOINT VENTURE unless the assignee is wholly-controlled by the CONGO.

5.  Warranties

5.01    Subject to the provisions of sub-paragraph 5.01.3 below, the CONGO warrants to the COMPANIES for the term of the CONVENTION, stable legal, financial, mining and economic conditions within which the COMPANIES will perform their activities in the CONGO, as such conditions arise from the laws and regulations in effect on the date of execution of the CONVENTION, and from the terms and conditions of the CONVENTION.

5.01.1    Therefore, the COMPANIES shall not be subject in any area whatsoever to any measure that would represent an aggravation of the situation described in paragraph 5.01 above.

5.01.2    In particular, any measure which would have the effect of either reducing net profits from the activities performed within the framework of the CONVENTION by decreasing gross income or by increasing the operating expenses of the COMPANIES, or generally jeopardizing the execution or the conduct of the PETROLEUM WORKS by restricting the COMPANIES' rights, shall be deemed to constitute an aggravation of the situation for the purpose of sub-paragraph 5.01.1 above.

5.01.3    Nonetheless, changes in labor, safety and environmental protection legislation and income taxation of individuals shall be applicable as a matter of law to the COMPANIES and to their staff; except if such legislation includes restrictions on the COMPANIES' rights concerning the ownership of their property or the free disposal of HYDROCARBONS to which they are entitled under Article 10 of the CONVENTION.

5.01.4    In addition, the COMPANIES shall not be subject to any discriminatory measures, in law or in fact, particularly with respect to the regulation of property or individuals.

5.02    The CONGO warrants to the COMPANIES for the term of the CONVENTION that, with respect to the corporate tax referred to in Article 6 of the CONVENTION, the tax conditions of the performance of their activities in the CONGO pursuant to the CONVENTION shall be governed by the Code Général des Impôts du CONGO, by amendments and regulations thereto and by the CONVENTION. Therefore, the COMPANIES shall not be subject, with respect to their activities in the CONGO under the CONVENTION, to any discriminatory tax measure in relation to the standard provisions applicable to Congolese or foreign companies, except those resulting from the CONVENTION.

GAR 00063

5.03  The CONGO warrants to the COMPANIES for the term of the CONVENTION that, pursuant to the Code Général des Impôts du CONGO, the mining royalty paid to the CONGO on the quantities of HYDROCARBONS to which the COMPANIES are entitled pursuant to the JOINT OPERATING AGREEMENT shall be fourteen and one half percent (14 1/2%) for LIQUID HYDROCARBONS and nine percent (9%) for NATURAL GAS.

6.   Taxes

6.01  For PETROLEUM WORKS, each of the COMPANIES shall be subject only to the mining royalty referred to in paragraph 5.03 and in Article 7 of the CONVENTION and to the corporate tax referred to in Articles 106 to 126 of the Code Général des Impôts du CONGO, to the exclusion of any other levy.

6.02  Consequently, each of the COMPANIES shall be exempt, for the PETROLEUM WORKS and for the term of the CONVENTION, from all other taxes and imposts.  This exemption includes among others:

6.02.1    The exemption from any customs duty and any importation tax or deposit for all pieces of equipment, material and supplies and spare parts destined for the PETROLEUM WORKS, whether imported directly by the COMPANY or indirectly by the OPERATOR in the name of the COMPANY or through suppliers or subcontractors.

6.02.2    The exemption from any export duties or taxes applicable to equipment and spare parts for such equipment when such equipment and spare parts have been imported tax-free in accordance with sub-paragraph 6.02.1 above as well as to HYDROCARBONS produced on the PERMIT and belonging to the COMPANY in accordance with Article 10 below.

6.02.3    The exemption from the internal turnover tax, the taxe unique, the tax on transactions and all other indirect taxes relating to the furnishing of goods (material, equipment, spare parts, etc.), services and work of any kind relating to the PETROLEUM WORKS provided for in the CONVENTION, whether such goods, services or work are furnished by the COMPANY, by the OPERATOR, or by contractors, or by suppliers and entities providing such services, working directly or indirectly for the COMPANY.

6.02.4    The exemption from any registration tax (droit d'enregistrement) relating to any deed or instrument of any nature whatsoever to which the COMPANY, or OPERATOR on behalf of the COMPANY, may be a party within the scope of the PETROLEUM WORKS on the PERMIT; relating to any conveyance of ownership or transfer of use to the COMPANY of movables or immovables for the carrying out of the PETROLEUM WORKS; or relating to the insurance contracts to which the COMPANY or OPERATOR on its behalf may be a party, and concerning the PETROLEUM WORKS.

GAR 00064

6.02.5    The exemption from any tax or impost relating to the payment of interest or dividend by the COMPANY.

6.03    Computation of the corporate tax on each of the COMPANIES

6.03.1    Except for the rules stipulated in this paragraph 6.03, the rules governing the basis and collection of the corporate tax are those fixed by the Code Général des Impôts du CONGO.

6.03.2    Each of the COMPANIES shall be subject to the corporate tax, in accordance with the provisions of the Code Général des Impôts du CONGO, and if the corporate tax rate prescribed in the Code Général des Impôts du CONGO is less than fifty-five percent (55%), to an additional tax equal to the taxable income multiplied by the excess between fifty-five percent (55%) over said corporate tax rate.

6.03.3    The basis for computation of the corporate tax for each of the COMPANIES for its activities performed within the framework of the CONVENTION shall be computed on the basis of the prices set forth in Exhibit II to the CONVENTION. Depreciation shall be computed by each of the COMPANIES in accordance with rules set forth by the Code Général des Impôts du CONGO; nonetheless, each of the COMPANIES shall apply, item by item, the rates set forth in the table attached hereto as Exhibit III.

6.03.4    In order to permit the computation of the corporate tax owed by each of the COMPANIES for its activities performed within the framework of the CONVENTION, each COMPANY shall, from the effective date and for the term of the CONVENTION, maintain accounting books in accordance with the rules set forth by the Code Général des Impôts du CONGO.

6.03.5    The provisions of Article 109 of the Code Général des Impôts du CONGO shall not apply to the COMPANIES.

6.03.6    By exception to Article 116 of the Code Général des Impôts du CONGO, the COMPANIES shall not be authorized to deduct from their taxable income for the purpose of the corporate tax interest or agios paid on loans which may be made for the financing of the PETROLEUM WORKS from AFFILIATED COMPANIES. From the date on which the Operating Committee provided for in the JOINT OPERATING AGREEMENT shall have determined, in accordance with the JOINT OPERATING AGREEMENT, that a commercially exploitable discovery has been made, each COMPANY shall be permitted to deduct from its taxable income interest or agios paid on loans made for the financing of DEVELOPMENT AND EXPLOITATION WORKS by financial institutions independent from the COMPANIES, upon presentation by the borrowing COMPANY to the tax authorities of certificates issued by such financial institutions.

GAR 00065

8.

6.03.7    The mining royalty referred to in Article 7 below is deductible from taxable income and can in no case be treated as an advance payment toward the corporate tax.

6.03.8    The ten per cent (10%) limit set by the second paragraph of Article 20.1.6° of the Code Général des Impôts du Congo, as amended by Article 5 of Law No. 30/74, shall not be applicable to the COMPANIES.

6.04    Remunerations and wages paid to the COMPANIES' personnel based in the CONGO for the performance of the PETROLEUM WORKS shall be subject to taxes on income in accordance with the provisions of the Code Général des Impôts du CONGO.

6.05    The corporate tax is paid by provisional monthly installments in accordance with the procedure set forth in Exhibit IV to the CONVENTION.

7.    Mining royalty

7.01    The basis of computation of the mining royalty paid in cash or in kind is equal, for each COMPANY, to the value of the HYDROCARBONS lifted by such COMPANY, computed on the basis of the price determined in accordance with Exhibit II to the CONVENTION, less domestic transportation, processing, storage and loading charges as said charges appear from the COMPANY's accounts and constitute tax deductible expenses.  The royalty is not due on those quantities of HYDROCARBONS lost or used for the PETROLEUM WORKS.

7.02    The mining royalty provided for in this Article 7 is payable in cash or in kind, at the option of the CONGO.

7.03    The OPERATOR shall communicate to the competent authority of the CONGO the expected date for the first exportation of HYDROCARBONS at least six (6) months in advance, so that this authority can advise the COMPANY or the OPERATOR within five (5) months following receipt of such notification, of the manner of payment of the  mining royalty chosen by the Government.  The Government shall always be able to modify the manner of payment so elected by notifying the COMPANY, or the OPERATOR acting on its behalf, at least three (3) months in advance.  However, the Government shall be deemed to have initially opted for cash payment of the mining royalty.

If, at any time while the Government is taking the mining royalty in cash, the COMPANIES have the opportunity to enter into sales commitments extending beyond a three (3) month period, which commitment could not be satisfied if the Government should decide to take the mining royalty in kind, the COMPANIES may submit the draft of the sales contract to the Minister in charge, who will, at his discretion, approve it or not.  If the draft contract is so approved, the mining royalty shall continue to be taken in cash for the duration of said contract.

GAR 00066

9.

7.04  The quantity of HYDROCARBONS to which the mining royalty applies shall be measured at the point of delivery, as described in sub-paragraph 10.02.1.  The methods for measurements to be used shall be approved by the competent authority of the CONGO which shall be advised of the progress of such operations so as to be able to be represented thereat and to exercise any control it may deem necessary.

Within one month from the end of the period for which the mining royalty is due, each COMPANY, or the OPERATOR on behalf of the COMPANY, shall provide the competent authority of the CONGO with a statement of the quantities of HYDROCARBONS to which the mining royalty applies, including any appropriate supporting documents.

7.05  The mining royalty, whether in cash or in kind, shall be computed and paid on a quarterly basis, in accordance with the conditions set forth below:

7.05.1    The payment in kind of the mining royalty shall be made to HYDRO-CONGO for the account of the CONGO pursuant to the terms set forth in paragraph 4.11 and in Articles 9 and 10 of the JOINT OPERATING AGREEMENT for the allocation to HYDRO-CONGO of the portion of production to which it is entitled.  The quantities of HYDROCARBONS to which the CONGO is entitled pursuant to this Article 7 shall be delivered to HYDRO-CONGO during the month following that for which the mining royalty is due.

7.05.2    The payment in cash of the mining royalty shall be made during the month following the end of the calendar quarter for which the mining royalty in cash is due.

7.06  When the mining royalty is elected to be paid in cash, monthly declarations and provisional payments shall be made in accordance with the terms set forth in Exhibit IV to the CONVENTION.

7.07  By virtue of the special characteristics of NATURAL GAS the parties hereto shall consult, in the event NATURAL GAS is discovered, to settle upon the terms for payment in kind of the mining royalty on NATURAL GAS pursuant to the principles set forth in this Article 7.

8.  Foreign exchange

8.01  The CONGO warrants, for the term of the CONVENTION, to the COMPANIES, to all individuals duly employed by them and to all individuals or entities entrusted by them with implementing or financing the PETROLEUM WORKS or with marketing the HYDROCARBONS that:

GAR 00067

10.

8.01.1    The CONGO shall not require the COMPANIES to repatriate the funds arising from export sales of the HYDROCARBONS.

8.01.2    The COMPANIES may pay contractors, suppliers and lenders abroad in foreign currency, using funds maintained abroad by them, in execution of contracts entered into for the performance of the PETROLEUM WORKS.

8.01.3    The COMPANIES may borrow abroad all amounts which they may require to carry out the PETROLEUM WORKS.

8.01.4    The COMPANIES may transfer to suppliers residing outside of the franc zone all amounts owing thereto.

8.01.5    The COMPANIES may freely repatriate from the CONGO to member countries of the franc zone capital originating from these countries invested in the CONGO within the scope of the PETROLEUM WORKS, and may transfer, under the same conditions, the return on such capital, if any.

8.01.6    The COMPANIES may repatriate from the CONGO to countries outside of the franc zone any capital originating from these countries invested in the CONGO within the scope of the PETROLEUM WORKS, and may transfer, under the same conditions, the return on such capital, if any.  The CONGO warrants to the COMPANIES that they shall obtain the means of payment to countries outside of the franc zone necessary to carry out the operations contemplated by the CONVENTION.

8.01.7    The COMPANIES may freely export from the CONGO to member countries of the franc zone all amounts which they may owe to suppliers, shippers and other entities providing services, as well as to their shareholders residing in the franc zone, and in general, all amounts which the COMPANIES may owe in any respect whatsoever during the term of the CONVENTION.

8.01.8    Staff members who are nationals of member countries of the franc zone duly employed by the COMPANIES may freely export from the CONGO to countries of the franc zone any portion of their salaries they have saved.

8.01.9    The COMPANIES may export from the CONGO to countries outside of the franc zone all amounts which they may owe to suppliers, shippers and other entities offering services, as well as to their shareholders residing in these countries.

8.01.10    Staff members who are nationals of the countries outside of the franc zone duly employed by the COMPANIES may export from the CONGO to such countries any portion of their salaries they have saved.

GAR 00068

11.

8.02  All currency transfers to or from the franc zone made pursuant to sub-paragraphs 8.01.4, 8.01.6, 8.01.9 and 8.01.10 above shall be carried out under the supervision of the <u>Bureau des Relations Financières</u> avec l'Etranger /Bureau of Financial Relations with Foreign Countries / ("B.R.F.E.") in accordance with the rules in effect in the CONGO pertaining to the franc zone.

8.03  All transactions contemplated by sub-paragraphs 8.01.4, 8.01.6, 8.01.9 and 8.01.10 above shall not be made more onerous for the COMPANIES, through the imposition of different rates or special taxes or commissions, than for other purchasers and sellers of currency in commercial transactions.

9.  Lump sum payments

9.01  The COMPANY appointed as OPERATOR by the JOINT OPERATING AGREEMENT shall make the following lump sum payments to the CONGO on behalf of the FOREIGN COMPANIES:

9.01.1   Two hundred and fifty million (250,000,000) CFA FRANCS when the daily production of LIQUID HYDROCARBONS on the PERMIT shall have reached thirty thousand (30,000) barrels per day and thereafter averaged thirty thousand (30,000) barrels per day for a period of one hundred and twenty (120) consecutive days;  and

9.01.2   Six hundred and twenty five million (625,000,000) CFA FRANCS when the daily production of LIQUID HYDROCARBONS on the PERMIT shall have reached seventy five thousand (75,000) barrels per day and thereafter averaged seventy five thousand (75,000) barrels per day for a period of one hundred and twenty (120) consecutive days.

9.01.3   The lump sum amounts set forth in sub-paragraphs 9.01.1 and 9.01.2 above shall become due thirty (30) days following the expiration of each one of the one hundred and twenty (120) day periods referred to in said sub-paragraphs.

9.02  The amounts set forth in sub-paragraphs 9.01.1 and 9.01.2 above may be capitalized and depreciated for tax purposes by the FOREIGN COMPANIES.

10.  Disposition of HYDROCARBONS

10.01  Each COMPANY shall have the right to take freely the portion of the HYDROCARBONS to which it is entitled pursuant to the JOINT OPERATING AGREEMENT.  It may freely sell, transfer, transport, consume or export, directly or indirectly, such portion.

10.02  Nonetheless, and by derogation to the principle set forth in paragraph 10.01 above, each COMPANY shall, at the request of the CONGO, affect by priority to the satisfaction of the needs of the Congolese industry, under the conditions

GAR 00069

defined hereinafter, the HYDROCARBONS derived from its exploitation, provided that: (a) HYDRO-CONGO's share of production shall have been first used to satisfy the needs of the Congolese industry; and (b) the maximum of the share of production of each FOREIGN COMPANY so affected to satisfy the needs of the Congolese industry shall not exceed thirty percent (30%) of all HYDROCARBONS to which each FOREIGN COMPANY is entitled.

10.02.1    Delivery of the quantities of HYDROCARBONS to which the CONGO is entitled, including the LIQUID HYDROCARBONS destined for the Pointe-Noire refinery, shall be made either at well head or at the gathering point, should the parties to the JOINT OPERATING AGREEMENT decide to build one in accordance with the provisions of said JOINT OPERATING AGREEMENT.  In the event deliveries of LIQUID HYDROCARBONS to the CONGO pursuant to this paragraph exceed the CONGO's mining royalty share as provided in paragraph 5.03 above, the sales price of such excess shall be the weighted average of the prices actually realized by the COMPANIES in sales to non-affiliated purchasers concluded during the calendar month preceding the month during which such LIQUID HYDROCARBON sale to the CONGO took place.

10.02.2    The commitment of each COMPANY to sell a part of its production of HYDROCARBONS from the PERMIT as described in paragraph 10.02 above and at the price defined in sub-paragraph 10.02.1 above is limited for each calendar year to the share of the needs of the Congolese industry for the HYDROCARBONS of the quality required by the Congolese industry equal to the ratio of the portion of the production of HYDROCARBONS of this quality to which the COMPANY is entitled pursuant to the JOINT OPERATING AGREEMENT and the total production of HYDROCARBONS of such quality from the territory of the CONGO for the same calendar year.  The CONGO shall notify the COMPANY, before the commencement of each calendar year, of the tonnage required by it for such calendar year pursuant to the commitment set forth hereinabove.

10.02.3    The CONGO may choose the quality which is the most appropriate to its needs among those qualities available, and to the extent to which the OPERATOR determines that it is possible within the framework of the operations contemplated by the CONVENTION, the OPERATOR shall endeavor to furnish to the CONGO the various qualities which the CONGO may request.

10.02.4    The quantities of HYDROCARBONS sold pursuant to the provisions of this Article 10 shall be paid for by the CONGO within fifteen (15) days from the end of the calendar month in which delivery is effected, upon presentation of the pertinent invoice by each COMPANY.

10.03  In the event NATURAL GAS is discovered, the parties hereto shall meet as soon as possible to work out the changes, if any, which may have to be made to this Article 10 to apply the principles of the CONVENTION to the exploitation of such deposits.

GAR 00070

13.

10.03.1   The exploitation, if any, of NATURAL GAS deposits shall be carried out pursuant to the principles which govern the relationship between the members of the JOINT VENTURE.

10.03.2   If the use of NATURAL GAS discovered on the PERMIT is not judged profitable by the members of the JOINT VENTURE pursuant to the provisions of the JOINT OPERATING AGREEMENT, the CONGO shall have the right, directly or through HYDRO-CONGO, to use this NATURAL GAS at its own expense.

In the event the CONGO exercises its right to use NATURAL GAS for its own benefit as contemplated hereinabove, HYDRO-CONGO shall provide at its own expense facilities necessary for the development, exploitation, transportation and processing, including but not limited to, separation, compression or liquefaction, of the NATURAL GAS from the first separator after the point of production, and of sufficient capacity to handle NATURAL GAS. The COMPANIES agree to provide, on terms and conditions to be agreed at that time, such technical assistance and cooperation as may be required by HYDRO-CONGO for the development and exploitation of NATURAL GAS deposits, and for the laying out, construction, operation and maintenance of these facilities. In no event shall the aforesaid activities interfere with the PETROLEUM WORKS of the JOINT VENTURE.

10.03.3   All NATURAL GAS produced on the PERMIT and not used directly for the PETROLEUM WORKS or pursuant to sub-paragraph 10.03.2 hereinabove, may be burnt off.

11.  Employment and training of personnel

11.01  In accordance with sub-paragraph 5.01.3 hereinabove, each of the COMPANIES shall be subject to the labor legislation and regulations embodied in the laws relating in particular to general working conditions, the regulation of pay and the prevention of work accidents and work-related illnesses and indemnification therefor, as well as to the laws relating to professional associations and labor organizations. On its part, the CONGO shall not apply to any COMPANY or its personnel any labor and welfare regulation in a manner which may be considered discriminatory in relation to the laws regulating other companies exercising their activity in the CONGO.

11.02  Each one of the COMPANIES agrees to undertake, jointly with other members of the JOINT VENTURE and in proportion to the percentage of its participation in the JOINT VENTURE, for the training, technically and administratively, of the Congolese supervisory employees, foremen and personnel required for the exploitation activities, by organizing apprenticeship programs in the CONGO or abroad, by payment of scholarships for study abroad and by the establishment of professional training centers in the CONGO, in a way commensurate with the magnitude of such activities.

GAR 00071

11.02.1   The professional training programs and the budgets therefor shall be approved by the Operating Committee referred to in the JOINT OPERATING AGREEMENT after consultation with the Congolese Government.

11.02.2   Each of the COMPANIES shall jointly with the other members of the JOINT VENTURE, give priority in employment in its facilities and installations to equally qualified Congolese personnel. Each COMPANY shall assure the professional and technical training of said Congolese personnel, so as to facilitate their access, at all levels, to jobs commensurate with their abilities.

11.02.3   On the production work sites situated outside or near cities and towns, the COMPANIES shall provide jointly lodging for the workers in normal conditions of hygiene and cleanliness, and shall create, if necessary, the medical, scholastic, athletic and cultural infrastructure corresponding to the normal needs of the workers and their families.

11.02.4   The means provided jointly by the COMPANIES for the application of the provisions of this Article 11 purport to permit the gradual replacement of foreign personnel of the COMPANIES assigned to the PETROLEUM WORKS by Congolese personnel. Therefore, the COMPANIES shall use their best efforts so that, at the expiration of the tenth year from the beginning of the DEVELOPMENT AND EXPLOITATION WORKS, the personnel used by the OPERATOR for the PETROLEUM WORKS in the CONGO include one hundred per cent (100%) of laborers and clerks, eighty percent (80%) of foremen and technicians, and fifty percent (50%) of management and supervisory employees, of Congolese citizenship.

11.02.5   The personnel of Congolese citizenship used by the OPERATOR for PETROLEUM WORKS in the CONGO shall be recruited by the OPERATOR and hired, at his request, by HYDRO-CONGO which will assign such personnel to the OPERATOR for purposes of being trained by the OPERATOR and, at the end of the professional training period, of employment in the PETROLEUM WORKS. From the end of such professional training period, those members of such personnel whom the OPERATOR will have decided to retain for the PETROLEUM WORKS shall be the OPERATOR's employees for the entire duration of their assignment to the OPERATOR.

12.  Congolese suppliers

12.01  In carrying out the PETROLEUM WORKS, the COMPANIES or the OPERATOR on their behalf shall give priority to Congolese companies in the acquisition of goods and services where such companies offer quality, quantity, terms of sale, conditions of delivery and related services equal to those available for the acquisition of goods and services abroad.

GAR 00072

12.02  Notwithstanding the foregoing, and subject to
conditions of general applicability which the CONGO may impose,
the COMPANIES, or the OPERATOR on their behalf, may freely
choose the charterers and ships of any registry for their use
for whatever purpose.  To the extent available, the COMPANIES
shall use the Congolese merchant fleet during the term of the
CONVENTION if the rates and other conditions offered by such
fleet are no less favorable than those offered on the
international market.

13.  Supply of information

13.01  The COMPANIES shall supply the CONGO with all
information in their possession required to be communicated by
the Mining Code.  On its part, the CONGO may communicate to the
COMPANIES information, particulary of a technical nature, which
may be useful in the PETROLEUM WORKS.  The COMPANIES agree not
to divulge this information and these documents to third
parties, except as required for the PETROLEUM WORKS, provided
that, in this case, a commitment be obtained from the recipient
to treat such information and documents as confidential.

13.02  In addition to the information the COMPANIES are
required to communicate pursuant to the Mining Code, they
shall, without charge, place at the disposition of the CONGO
all geological information which may be useful in the
exploration for and exploitation of mineral substances within
the PERMIT other than HYDROCARBONS.  The COMPANY which acts as
OPERATOR must notify to the competent Congolese authorities all
discoveries made on the PERMIT of mineral substances other than
HYDROCARBONS; the COMPANIES shall consult to evaluate the
possibility, in view of technical and economic factors, of
participating jointly in the exploitation of said mineral
substances.  The COMPANIES agree not to divulge this
information to third parties.  The CONGO may freely use any
information received under this paragraph if the COMPANIES
express their lack of interest or fail to submit within four
(4) months from the receipt of the information a proposal
acceptable to the CONGO for a specific exploration or
exploitation permit covering said mineral substance or
substances.

13.03  At the request of the Minister in charge, the
COMPANIES will consider all available information concerning
possibilities for the exploration for mineral substances in any
part of the Congolese territory indicated to them by said
authority and shall consult to evaluate the possibility, in
view of technical and ecomomic factors, of participating
jointly in the exploration for the said mineral substances.

14.  Transport and treatment of products

14.01  The Minister in charge may request the COMPANIES to
participate with other producers in the CONGO in the joint

GAR 00073

16.

installation or use of facilities or pipelines to pump out all or part of the production of HYDROCARBONS, on the condition that (i) the installation of such facilities or pipelines is technically feasible under normal economic conditions, and (ii) that their use does not jeopardize directly or indirectly the economic profitability of the deposits discovered.

14.01.1   After consultation with the competent Congolese authority, transport rates for pumping out the production shall be established by the companies exploiting the deposits.

14.02  In the event that production permits and a market for finished products is assured, the CONGO may ask the COMPANIES to consult and evaluate, in view of economic conditions and forecasts of profitability, the possibility of constructing a HYDROCARBON refinery in the CONGO jointly with the CONGO and/or other partners approved by the CONGO.

15.  Force majeure

15.01  In the event that the CONGO or one or several of the COMPANIES finds it impossible, either partially or totally, to perform one or more of their obligations contemplated by the CONVENTION, or arising therefrom, by reason of force majeure, an unforeseeable circumstance (cas fortuit) or an occurrence which may be considered as similar to force majeure (hereinafter collectively referred to as "FORCE MAJEURE"), the party invoking FORCE MAJEURE shall inform the other parties as soon as possible.

15.02  Said notification shall be addressed in writing either by telex confirmed by letter or by registered letter, return receipt requested, and shall set forth those circumstances which establish FORCE MAJEURE.

15.03  All occurrences independent of the will or control of one or the other party, which the parties cannot reasonably overcome or avoid and whose consequence is to prevent partially or totally or to delay significantly the performance of the obligations of the parties, shall be considered as events of FORCE MAJEURE.  For the purpose of the CONVENTION, FORCE MAJEURE shall include but not be limited to: war, serious civil disturbances, insurrection, national strikes and any strikes of a general nature, earthquake, fire, explosion, other catastrophes and all hindrances which result directly or indirectly from orders or prohibitions of a government authority.

15.04  FORCE MAJEURE shall nonetheless not be validly invoked if the events, acts or occurrences in question were reasonably foreseeable or could have been remedied by the exercise of reasonable diligence.  FORCE MAJEURE will exist if necessary equipment cannot be found, or can be found only at a prohibitive price.  Lack of funds shall not constitute FORCE MAJEURE.

GAR 00074

15.05  Time periods for the performance of the obligations
of each COMPANY affected by the event of FORCE MAJEURE shall be
extended automatically for a term equal to the delay caused by
said FORCE MAJEURE; it being understood (i) that all such
extensions shall not give rise to any penalty to the party
responsible for performing these obligations, and (ii) that
obligations other than those affected by FORCE MAJEURE shall
continue to be fulfilled in accordance with the provisions of
the CONVENTION.

15.06  In all cases, the party affected shall take, in
agreement with the other parties, all appropriate measures to
assure the normal resumption of the performance of the
obligations affected by FORCE MAJEURE.  If, following FORCE
MAJEURE, one of the parties is not able to perform its
obligations as contemplated by the CONVENTION for a period of
three (3) months following the notification contemplated
hereinabove, the parties shall meet as soon as possible to
examine the consequences of the occurrences in question and in
particular the consequences on the time periods for performance
of their respective obligations.  Should the parties not reach
an agreement on said consequences, they shall submit their
dispute to arbitration in accordance with the provisions of
Article 17 below.

16.  Tax declaration and payment

Each COMPANY shall be responsible for its declaration
to the CONGO's tax authorities and for the payment of its taxes
arising from its participation in the activities of the JOINT
VENTURE in the CONGO on the basis of its net income from all of
its activities covered by the CONVENTION.

17.  Arbitration

17.01  All disputes arising in connection with the
CONVENTION between the CONGO on the one hand and any COMPANY on
the other hand which cannot be resolved otherwise amicably
shall be finally settled by arbitration in accordance with the
rules then in effect of the International Center for the
Settlement of Investment Disputes (the "Center") created by the
Convention on the Settlement of Investment Disputes between
States and Nationals of other States to which the CONGO became
a party on October 14, 1966.

17.02  Each party to a dispute shall be entitled to appoint
one arbitrator and the arbitrators so appointed shall agree on
another arbitrator, if necessary, to achieve an odd number of
arbitrators.  In the event that agreement upon another
arbitrator cannot be reached, such arbitrator shall be
appointed by the President of the Center.

17.03  Arbitration shall take place in Geneva,
Switzerland.  The award which will be rendered in English and
French with both texts having equal validity shall be final and

GAR 00075

binding upon the parties to the arbitration. Judgment upon the award rendered may be entered in any court or other authority having jurisdiction, or application may be made to said court or other authority for a judicial acceptance of the award and an order of enforcement, as the case may be.

17.04  The Center's fees for arbitrating a dispute shall be borne equally by the disputants.

17.05  Any dispute which may arise among the COMPANIES shall be settled in accordance with the arbitration clause of the JOINT OPERATING AGREEMENT.

18.  Applicable law

The CONVENTION shall be governed by Congolese law.

19.  Notices

19.01  All notices shall be validly given by mail, cable or telex, addressed to the other party or parties at the address indicated below:

(a)      for the CONGO:

Minister of Mines and Energy
Ministry of Mines and Energy
Brazzaville
People's Republic of the Congo

attention:
The Minister

(b)      for SUPERIOR:

Congolese Superior Oil Company
P.O. Box 1521
Houston, Texas 77001
United States of America

Telex:  0775369

attention:
Vice-President Exploration

(c)      for CITIES SERVICE:

Cities Service Congo Petroleum Corporation
P.O. Box 642
Houston, Texas 77001
United States of America

GAR 00076

19.

Telex:  762056

attention:
Vice-President Operations

(d)     for CANADIAN:

Canadian Superior Oil Ltd.
Three Calgary Place
355 4th Avenue S.W.
Calgary, Alberta T2P OJ3

Telex:  03826640

attention:
Vice-President Exploration

(e)     for HYDRO-CONGO:

Société Nationale de Recherches
  et d'Exploitation--HYDRO-CONGO
B.P. 2008
Brazzaville
République Populaire du Congo

Telex: 5220

attention:
The General Manager

        All formal notices will be sent by registered mail,
return receipt requested, or, if sent by cable or telex,
confirmed by registered mail, return receipt requested.

    19.02  Each of the parties may change the above address by
advising the other parties in writing in accordance with the
provisions of this Article 19.

    19.03  During the exploration stage, each of the COMPANIES
shall designate a representative in the CONGO to whom all
formal notices may be validly given.  If a commercially
exploitable discovery is made, each of the COMPANIES shall
establish a branch in the CONGO, duly registered with the
Registry of Commerce.  By derogation to Article 20 of Law No.
29/62 of June 16, 1962, as amended, the COMPANIES shall not be
required to organize a subsidiary company formed under
Congolese law.

20.  Amendments

        Amendments may be made to one or several provisions of
the CONVENTION, at a party's request, by mutual agreement of
the parties.

GAR 00077

20.

21. <u>Guarantee by parent company</u>

The obligations of the COMPANIES pursuant to this CONVENTION are guaranteed by the parent companies of their respective groups, if the case arises, pursuant to letters of guarantee, a form of which is annexed hereto as Exhibit V.

Done at Brazzaville, on May 15, 1979.

For the People's Republic of
the Congo

_____
Rodolphe Adada,
Minister of Mining and Energy

For Congolese Superior
Oil Company

For Société Nationale de
Recherches et d'Exploitation
Pétrolières "HYDRO-CONGO"

_____
Diego O. Giordano-Echegoyen,
Vice-President

_____
Alphonse M'Boudo-Nesa,
General Manager

For Cities Service Congo
Petroleum Corporation

For Canadian Superior
Oil Ltd.

_____
Antoine Saadi,
Vice-President

_____
Robert C. Schrader,
Vice-President,
International Contracts

GAR 00078

## EXHIBIT I

### COPY OF DECREE GRANTING THE PERMIT

GAR 00079

EXHIBIT I

COPY OF DECREE GRANTING THE PERMIT

GAR 00080

TRANSLATION

DECREE N° 253/79 of May 16, 1979, granting
to HYDRO-CONGO a type "A" hydrocarbons exploration permit
(known as "Marine 1")

The President of the Central Committee of the Parti Congolais
du Travail, President of the Republic, Chief of State,
President of the Council of Ministers;

- Having reviewed Act N° 038/PCT/CC of March 30, 1979, establishing, organizing and regulating Public Institutions;

- Having reviewed Decree N° 79/154 of April 4, 1979 appointing the Prime Minister;

- Having reviewed Decree N° 79/155 of April 4, 1979 appointing the members of the Council of Ministers;

- Having reviewed Law N° 28/62 of June 16, 1962 enlarging the Mining Code;

- Having reviewed Law N° 34/62 of June 16, 1962 setting the rates and rules for the payment of duties on mining titles;

- Having reviewed Law N° 35/62 of August 10, 1962 completing the provisions of the Mining Code;

- Having reviewed Decree N° 62/347 of August 17 1962 setting forth various conditions of application of Law N°28/62 referred to above;

- Having reviewed Government Order N° 14/73 of June 4, 1973 deciding the creation of Hydro-Congo;

- Having reviewed the permit application introduced by Hydro-Congo on January 13, 1979 under N° DRE/EG/73C/390/BLATA/EM;

- Having reviewed Decree N° 79/111 of March 10, 1979 granting the "Autorisation personnelle minière" to Hydro-Congo;

After consultation with the Council of Ministers;

D E C R E E S:

Article 1

It is hereby granted to Hydro-Congo pursuant to the conditions set in the present Decree a type "A" exploration permit, known as "Marine 1", valid for liquid and gaseous hydrocarbons, and the surface of which is equal to 1,430 (one thousand four hundred and thirty two) square kilometers, and is shown on the map attached hereto as Exhibit 1; which surface is included within the perimeter defined by:

GAR 00081

1. a. The straight lines joining the points 1
      and 2, 2 and 3, 3 and 4, 4 and 5, 5 and
      6, 6 and 7, 7 and 8, 8 and 9, 9 and 10;
      these lines are reportedly coincident with
      the limit separating the renewed "Madingo
      Maritime (A)" permit and the "Marine 1"
      permit.

   b. The straight line joining the points 10
      and 11; this straight line being repor-
      tedly partially coincident in part with the
      limit separating the renewed "Madingo
      Maritime (A)" permit and in part with the
      limit separating the "Loango East" conces-
      sion and the "Marine 1" permit.

   c. The straight lines joining the points 11
      and 12, 12 and 13, 13 and 14, 14 and 15,
      15 and 16, and 16 and 17; these straight
      lines reportedly coincide with the limit
      separating the "Loango East" concession
      and the "Marine 1" permit.

   d. The straight lines joining the points 17
      and 18, and 18 and 19; these straight
      lines reportedly coincide with the limit
      separating the "Loango West" concession
      and the "Marine 1" permit.

   e. The straight lines joining the points 19
      and 20, 20 and 21, 21 and 22, 22 and 23,
      23 and 24, 24 and 25; these straight lines
      are reportedly coincident with the limit
      separating the renewed "Pointe-Noire Grands

Fonds (A)" permit and the "Marine 1"
permit.

f. The straight line joining the points 25
and 26; this straight line reportedly
coincides with the limit separating the
"Mer Profonde" permit and the "Marine 1"
permit.

g. The straight line joining the points 26
and 1, _i.e._, a section of the straight
line passing on the intersection of the low-
tide mark and the limit of the territories
of Congo and Gabon in a geographic azimuth
of 212°; this straight line is reportedly
coincident with the limit separating the
territorial waters of Congo and Gabon.

2. The points 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24,
25 and 26 are defined as follows:

(see next page).

| Points | Coordonnées Géographiques Ellipsoide de Clarke 1880 | | Coordonnées U.T.N. (Clarke 1880) Fuseau 32-Mér: 9°E. | |
|---|---|---|---|---|
| | Longitude EAST | Latitude SOUTH | EAST | NORTH |
| | Point located at 38 km from the low-tide mark on the straight line defined in paragraph l.g. above. | | | |
| | 10°59''44"250 | 4°14'54"560 | 748.733 | 9.520.170 |
| 2 | 11°02'31''668 | 4°18'29''055 | 726.652 | 9.523.560 |
| 3 | 11°05'15''851 | 4°15'11''228 | 731.714 | 9.529.624 |
| 4 | 11°09'50''804 | 4°15'10''466 | 740.214 | 9.529.624 |
| 5 | 11°09'51''271 | 4°17'56''970 | 740.214 | 9.524.508,361 |
| 6 | 11°15'05''727 | 4°17'56''058 | 749.914 | 9.524.508,361 |
| 7 | 11°15'05''241 | 4°15'09''563 | 749.914 | 9.529.624 |
| 8 | 11°23'36''921 | 4°15'08''018 | 765.700 | 9.529.624 |
| 9 | 11°27'26''845 | 4°18'20''070 | 772.775 | 9.523.700 |
| 10 | 11°27'28''782 | 4°28'12''323 | 772.775 | 9.505.500 |
| 11 | 11°16'15''217 | 4°28'14''496 | 752.000 | 9.505.500 |
| 12 | 11°16'15''066 | 4°27'25''678 | 752.000 | 9.507.000 |
| 13 | 11°15'10''219 | 4°27'25''878 | 750.000 | 9.507.000 |
| 14 | 11°15'09''972 | 4°26'04''513 | 750.000 | 9.509.500 |
| 15 | 11°14'21''337 | 4°26'04''661 | 748.500 | 9.509.500 |
| 16 | 11°14'21''191 | 4°25'15''841 | 748.500 | 9.511.000 |
| 17 | 11°10'40''712 | 4°25'16''499 | 741.700 | 9.511.000 |
| 18 | 11°09'55''210 | 4°24'38''710 | 740.000 | 9.512.400 |
| 19 | 11°09'55''600 | 4°26'54''240 | 740.000 | 9.509.000 |
| 20 | 11°07'32''384 | 4°26'54''636 | 736.500 | 9.508.000 |
| 21 | 11°07'53''139 | 4°31'15''025 | 736.500 | 9.500.000 |
| 22 | 11°04'54''774 | 4°31'15''544 | 731.000 | 9.500.000 |
| 23 | 11°04'54''312 | 4°28'32''796 | 731.000 | 9.505.000 |
| 24 | 11°00'46''128 | 4°28'33''491 | 723.346,900 | 9.505.000 |
| | Intersection of Longitude East 11°00'46''944 meridian and straight line J-K of the original "Pointe Noire Grand Fonds" permit, as defined in Decree No. 68-270/ M CAEIM of October 17, 1968. | | | |
| | Point Located 65 km from the low-tide mark on the straight line defined in paragraph l.g. above. | | | |

GAR 00084

ARTICLE 2

The minimum work program to be performed on
the exploration permit described in Article 1 above is
defined in Exhibit 2 hereto.

ARTICLE 3

Hydro-Congo is hereby authorized to become a
party in association with the companies executing a
convention with the People's Republic of the Congo, for
the implementation of the exploration permit described
in Article 1 above as well as any exploitation and trans-
portation permits which may derive therefrom.

ARTICLE 4

The exploration permit described in Article 1
above may be renewed for a period of three (3) years in
accordance with the conditions set forth in the Mining
Code ("Code Minier").

The minimum work program to be conducted within
the initial period and the renewal period as well as the
areas to be relinquished on the exploration permit
described in Article 1 above, are set forth in Exhibit
2 hereto.

ARTICLE 5

In the event a discovery of an exploitable
reservoir is made on the area of the exploration permit
described in Article 1 above, Hydro-Congo shall request
an exploitation permit for hydrocarbons, which shall be
granted as a matter of law.

GAR 00085

Each hydrocarbons exploitation permit is valid for thirty (30) years. The hydrocarbons exploitation permit may not be renewed.

All matters not defined by the present Decree regarding the hydrocarbons exploitation permit derived from the exploration permit described in Article 1 above are governed by the provision of the Mining Code relating to concessions.

### ARTICLE 6

The sub-contractors hired by Hydro-Congo or by any company associated with Hydro-Congo shall comply with the Mining Code.

### ARTICLE 7

The Minister of Mines and Energy is hereby entrusted with the implementation hereof which shall be registered, communicated wherever necessary and published in the Official Journal of the People's Republic of the Congo.

Done in Brazzaville on May 13, 1979.

President of the Central
tee of the Parti Congolaid du
Travail, President of the Republic,
of State, President of the
Council of Ministers

(s) Denis Sassou-Nguesso
Colonel Denis SASSOU-NGUESSO

Prime Minister,
of the Government

By the Minister of Mines

Mr. Sylvain-Omar
Louis SYLVAIN-GOMA

(s) Rodolphe Adada
Rodolphe ADADA

GAR 00086

EXHIBIT 1

MAP OF THE "MARINE 1" PERMIT

GAR 00087



GAR 00088

ANNEXE 2

I - Minimum Work Program

A. Initial Period

The term of the first period shall be five (5) years.

Phase I

The term of Phase I shall be three (3) years and shall consist of the following:

(a) One thousand (1000) kilometers of Marine seismic.

(b) Within six (6) months after receipt of the processed data commit to drill a pre-salt test well to be commenced within twenty-four (24) months from the date of signing the Convention with the State, but not later than thirty (30) months from such date, depending upon availability of suitable equipment at competitive rates, or relinquish the entire permit.

(c) The permit holder shall have the option to relinquish the permit at the later of the following two dates: (i) ninety (90) days after completion of the exploration well, or (ii) ninety (90) days before the end of Phase I, or proceed into Phase II.

GAR 00089

ANNEXE 2

I - Minimum Work Program

A. Initial Period

The term of the first period shall be five (5) years.

Phase I

The term of Phase I shall be three (3) years and shall consist of the following:

(a) One thousand (1000) kilometers of Marine seismic.

(b) Within six (6) months after receipt of the processed data commit to drill a pre-salt test well to be commenced within twenty-four (24) months from the date of signing the Convention with the State, but not later than thirty (30) months from such date, depending upon availability of suitable equipment at competitive rates, or relinquish the entire permit.

(c) The permit holder shall have the option to relinquish the permit at the later of the following two dates:  (i) ninety (90) days after completion of the exploration well, or (ii) ninety (90) days before the end of Phase I, or proceed into Phase II.

GAR 00090

2.

### Phase II

The term of Phase II shall be two (2) years.

During the course of Phase II, the permit holder shall drill two (2) pre-salt exploration wells. The permit holder shall have the option to relinquish the permit upon completion of each well.

### B. Renewal period

The exploration permit shall be renewed upon request from the permit holder for a three (3) year renewal period, during the course of which at least three (3) wells will be drilled. However, the permit holder shall have the right to relinquish the permit upon completion of each well.

C. For purposes of paragraphs A and B above, the obligation to drill a well shall be deemed satisfied by the permit holder when the objective depth of formation is reached, or expenses actually incurred for such well shall have reached an amount equal to one hundred and fifty percent (150 %) of the estimated cost of such well, as budgeted by the Operating Committee of the Joint Venture to be formed by the permit holder of the Convention with the People's Republic of Congo described in Article 3 of the Decree.

### II - Relinquishments

The permit holder shall relinquish the original area as follows:



GAR 00091

3.

(a) An area equal to twenty-five percent (25%) of the original contract area shall be relinquished at the end of Phase I of the initial period;

(b) Another area equal to twenty-five percent (25%) of the original contract area shall be relinquished at the end of Phase II of the initial period; and

(c) The remainder of the orginal contract area shall be entirely relinquished upon termination of the renewal period, except for the area or areas of the permit which are covered by one or several exploitation permits, if any;

(d) Areas of the permit that the Operating Committee of the Joint Venture described above has determined, before the effective date of the relinquishments or the expiration of the renewal period, to cover commercial reservoirs shall be excluded from areas relinquished by the permit holder upon termination of Phase I and Phase II of the first period and upon termination of the renewal period.

GAR 00092

EXHIBIT II

         The base of calculation of the royalty and corporate income tax shall be the market value of the LIQUID HYDROCARBONS sold.

         For the purpose of the royalty, the market value of the LIQUID HYDROCARBONS shall be deemed equal to the FOB Congo reference market value based on Middle East sales calculated as described below.

         For the purpose of the corporate income tax, the market value of the LIQUID HYDROCARBONS shall be the realized sales price, provided however that in the case of sales to affiliated purchasers, the sales price shall not be lower than the weighted average realized sales price of the selling COMPANY from third party purchasers for the same period of reasonable quantities of LIQUID HYDROCARBONS of similar quality and gravity, or in the absence of such sales of reasonable quantities to third parties, the sales price shall not be lower than a price equal to the competitive value for the same period of LIQUID HYDROCARBONS of similar quality and gravity.

Calculation of the FOB

Congo Reference Market Value

The FOB Congo reference market value shall be computed by reference to the government sales price for Arab Light crude oil for the applicable period adjusted for freight, gravity, sulfur and other quality differentials.

Definitions

1.  "Arab Light" means the crude oil produced in Saudi Arabia and sold at Ras Tanura, of API gravity 34 degrees.

2.  "Berri" means the crude oil produced in Saudi Arabia and sold at Ras Tanura of API gravity 39 degrees.

3.  "Government Sales Price" ("GSP") means the official state sales price of the Government of Saudi Arabia for the sale of Arab Light or Berri.

4.  "AFRA VLCC" and "AFRA LR2" mean the freight costs as determined by the London Tanker Brokers Panel or by any

GAR 00093

## EXHIBIT II

The base of calculation of the royalty and corporate income tax shall be the market value of the LIQUID HYDROCARBONS sold.

For the purpose of the royalty, the market value of the LIQUID HYDROCARBONS shall be deemed equal to the FOB Congo reference market value based on Middle East sales calculated as described below.

For the purpose of the corporate income tax, the market value of the LIQUID HYDROCARBONS shall be the realized sales price, provided however that in the case of sales to affiliated purchasers, the sales price shall not be lower than the weighted average realized sales price of the selling COMPANY from third party purchasers for the same period of reasonable quantities of LIQUID HYDROCARBONS of similar quality and gravity, or in the absence of such sales of reasonable quantities to third parties, the sales price shall not be lower than a price equal to the competitive value for the same period of LIQUID HYDROCARBONS of similar quality and gravity.

### Calculation of the FOB Congo Reference Market Value

The FOB Congo reference market value shall be computed by reference to the government sales price for Arab Light crude oil for the applicable period adjusted for freight, gravity, sulfur and other quality differentials.

### Definitions

1. "Arab Light" means the crude oil produced in Saudi Arabia and sold at Ras Tanura, of API gravity 34 degrees.

2. "Berri" means the crude oil produced in Saudi Arabia and sold at Ras Tanura of API gravity 39 degrees.

3. "Government Sales Price" ("GSP") means the official state sales price of the Government of Saudi Arabia for the sale of Arab Light or Berri.

4. "AFRA VLCC" and "AFRA LR2" mean the freight costs as determined by the London Tanker Brokers Panel or by any

GAR 00094

2.

other organization substituted therefor, for shipment in very large crude carriers and large range two tankers, respectively.

5. "SPOT VLCC" and "SPOT LR2" mean the freight costs calculated from the Average Worldscale Rates for Single Voyage Dirty Fixture published monthly by H.P. Drewry Ltd., London, in their Shipping Statistics and Economics - SSE Publication and would be a weighted average of Fixtures in the 70,000 - 174,999 Cargo Size DWCT for "SPOT LR2" and 175,000 - 300,000 for "SPOT VLCC", respectively. For the purpose of 2. and 3. hereof, the respective "SPOT VLCC" and "SPOT LR2" freights costs shall be based on the rates published for the month in which LIQUID HYDROCARBONS are lifted.

The FOB Congo reference market value shall be determined as follows:

1. Take the GSP of one barrel of Arab Light crude oil of 34.00 -34.09 degrees gravity.

2. Determine the freight per barrel of transporting Arab Light from Ras Tanura to Rotterdam via The Cape and returning from Rotterdam to Ras Tanura via The Cape by dividing the average of the published "AFRA VLCC" and "SPOT VLCC" freight per ton by the number of barrels of such crude oil per ton.

3. Determine the freight per barrel of transporting LIQUID HYDROCARBONS from Pointe Noire, Congo, to Rotterdam by dividing the average of the published "AFRA LR2" and "SPOT LR2" freight per ton by the number of barrels of such crude oil per ton. Subtract the resulting freight cost from the freight cost determined under 2 above and add the result to the GSP under 1 above.

The amount determined in accordance with the above procedure shall be adjusted upward or downward pursuant to the following quality factors which shall be computed as follows:

1. **Gravity factor:**

The differential for gravity will be determined as follows:

(a) Use 34 degrees API gravity for Arab Light.

(b) Deduct said gravity from the stated gravity of the LIQUID HYDROCARBONS. Any positive result will be added to the FOB Congo reference market value; any negative result will be subtracted from the FOB Congo reference market value.

GAR 00095