IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------X
:
CONNECTICUT BANK OF COMMERCE,
:
      Plaintiff,
:
  - against -                                      :  Civil Action No. 05-762 SLR

THE REPUBLIC OF CONGO,
:
      Defendant,
:
CMS NOMECO CONGO INC.,
:
      Garnishee.
:
---------------------------------------------------------------------X

**OPENING BRIEF IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION
FOR AN ORDER TO SHOW CAUSE FOR AN ORDER OF CONTEMPT,
ORDER OF SEQUESTRATION, AND INJUNCTIVE RELIEF**

| | |
|---|---|
| GREENBERG TRAURIG, LLP<br>Donald J. Detweiler (No. 3087)<br>Dennis A. Meloro (No. 4435)<br>The Nemours Building<br>1007 North Orange Street, Suite 1200<br>Wilmington, Delaware 19801<br>(302) 661-7000 | GREENBERG TRAURIG, LLP<br>Ronald W. Kleinman<br>Sanford M. Saunders, Jr.<br>Kenneth P. Kaplan<br>800 Connecticut Avenue, N.W., Suite 500<br>Washington, D.C. 20006<br>(202) 331-3100<br><br>GREENBERG TRAURIG, LLP<br>James W. Perkins<br>Stephanie R. Feldman<br>200 Park Avenue<br>New York, New York 10166<br>(212) 801-9200 |

Dated: January 10, 2007

238216104v5

## NATURE AND STAGE OF PROCEEDINGS

On August 30, 2005, Plaintiff Af-Cap., Inc. ("Af-Cap") filed this action in the Delaware Superior Court to enforce a long-outstanding money judgment it duly obtained in a United States court against the defendant Republic of Congo ("Congo").[1] Garnishee CMS Nomeco Congo, Inc. ("CMS"), then a Delaware corporation, is a venture partner with Congo under a Convention dated May 25, 1979, that grants CMS the right to extract oil from Congolese territory, but further requires CMS to pay Congo royalties and taxes and pay distributions to its venture partners (which include the Congo and Congo's oil agency/instrumentality SNPC). (Affidavit of James W. Perkins, hereinafter the "Perkins Aff." Exhibit ("Ex.") D.)

By order dated September 30, 2005, the Superior Court directed the Prothonatary to issue a Writ of Garnishment in Af-Cap's favor against Congo's property held by CMS, including Congo's right under the Convention to receive royalties owing from, and to be paid by, CMS. (*See* Order of Hon. Judge Silverman attached to the Perkins Aff. Ex. J.) Af-Cap served the Writ of Garnishment on CMS through its registered agent. (*See* the "Af-Cap Writ" attached to Perkins Aff. as Ex. K.) On November 1, 2005, CMS removed the case to this Court, and filed an unverified answer to the Af-Cap Writ, but this procedure was one day out of time and without leave of Court. Af-Cap filed Exceptions to CMS Answer.[2] Af-Cap and CMS cross-moved for summary judgment, respectively for liability on, or to dissolve, the Af-Cap Writ; however, by order dated July 20, 2006, this Court denied the cross-motions, and directed that discovery proceed and trial occur in July 2007. Thus, the Af-Cap Writ remains in full force and effect.

---

[1] In a companion case, *Walker Holdings Int'l, Ltd v. The Republic of Congo*, C.A. No. 05-156, Walker Holdings International, Ltd. ("Walker") filed a separate action on August 31, 2005 to enforce a $26,093,251.00 plus interest judgment it has against Congo. Walker has requested a writ of garnishment, but this Court has not yet ruled on the application. Contemporaneously with this motion Walker has filed a motion for issuance of a writ of garnishment, for an order of sequestration and for injunctive relief. Af-Cap respectfully requests that this motion be heard in conjunction with Walker's motion.

[2] Af-Cap also filed a Motion to Remand, which this Court denied.

On April 15, 2006, in violation of the Af-Cap Writ, CMS made royalty payments to Congo in excess of $27 million. (*See* Deposition of Roland Fox, dated November 30, 2006 at 144:14 -156:24 ("Fox Depo.") (annexed to the Perkins Aff. as Ex. L).) In further disregard of the Af-Cap Writ, on or about November 21, 2006, CMS purported to dissolve itself in Delaware and reform in the Bahamas. (Perkins Aff. ¶ 23 and Ex. Q.) At a deposition in this matter, held November 30, 2006, CMS's representative Roland Fox, testified that a purpose in moving from Delaware to the Bahamas was to avoid any further writs of garnishment being issued against its obligations to the Congo. (Fox Depo. at 250:3-5 & 19-25.) Nonetheless, CMS concedes that this Court continues to have jurisdiction over it. (*Id*. 250:12-15, 19-21.)

In separate litigation, the Court of Appeals for the Fifth Circuit held that, for purposes of the Foreign Sovereign Immunities Act, 28 U.S.C. §1602 et seq., CMS's obligation to make the royalty payments is located wherever CMS is found and may be garnished or otherwise executed against in those states. *See Af-Cap v. Republic of Congo*, 383 F.3d 361, 371 (5th Cir. 2004) (a copy is annexed to the Perkins Aff. as Ex. M). This is the same rule followed in Delaware. *See Harris v. Balk*, 198 U.S. 215 (1905). Since the Af-Cap Writ was issued and levied upon CMS in Delaware, and CMS does not otherwise contest jurisdiction, CMS is "found" in Delaware, even though CMS has purported to leave the state. In addition, in the Texas litigation, the Fifth Circuit has definitively and finally held that, irrespective of the efforts of the government of Congo or its courts to interfere with the enforcement of these United States judgments, CMS cannot claim any defense under the theory of sovereign compulsion or the Act of State Doctrine. *See Af-Cap v. Republic of Congo*, 383 F.3d 361, 372 n.14 (5th Cir. 2004). These issues are now *res judicata* and are not subject to re-opening in this proceeding.

During the proceedings in Texas, CMS colluded with Congo to purport to restructure the form and location of payment of the royalties from cash paid in the United States to oil delivered in Congo, all expressly for the purpose of defeating or hindering Af-Cap's ability to collect on its judgment. (Perkins Aff. ¶¶ 20-25.) In addition, CMS further announced its intention to restructure itself in order to transfer the Convention, including the royalty payment obligations, outside of the United States. (*Id.*, Ex. O.) Until recently, this proposed restructuring was enjoined by order of the United States District Court for the Southern District of Texas. (*Id.* Ex. M.) However, in light of rulings by the United States Court of Appeals for the Fifth Circuit, that the Texas State garnishment statute did not reach intangibles such as the royalty payment obligation, on October 24, 2006, the Southern District of Texas dissolved its order.[3]

Even though the Af-Cap Writ against CMS remains in effect and the underlying judgment remains unsatisfied, CMS has admitted that it has paid royalties in the interim and continues to hold tens, if not hundreds, of millions of dollars in royalties owed to Congo. It has done so in complete disregard and contempt of the Af-Cap Writ, and without undertaking *any* step to obtain relief from that Writ. Nor has CMS provided any notice to the Court whatsoever of (1) the royalty payments it has made to Congo; or (2) its purported dissolution in Delaware and reformation in the Bahamas.

## PRELIMINARY STATEMENT

By this motion, Af-Cap seeks three types of relief. First, Af-Cap seeks an order holding CMS in contempt for violating the Af-Cap Writ. Manifestly, and without authorization, on or about April 15, 2006, CMS violated the Writ by the payment of royalties covered by the Writ in

---

[3] As explained below, Delaware garnishment law recognizes attachment of intangibles and contingent rights. *See*, e.g., *U.S. Industries, Inc. v. Gregg*, 540 F.2d 142, 146 (3d Cir. 1976) (following *Weinress v. Bland*, 31 Del. Ch. 269, 71 A.2d 59 (1950) ("That an interest is contingent does not make it nonsequestrable.")) Significantly, the Texas Supreme Court has not ruled on this question. In a subsequent appeal that is pending before the Fifth Circuit, Af-Cap has requested that the Fifth Circuit certify this uniquely state law issue to the Texas Supreme Court.

a total amount exceeding $27 million.[4] CMS has also purported to remove the Convention, including the royalty payment obligation, outside of the reach of this Court, an act Delaware garnishment law does not, and this Court should not, allow.

Second, the Court should enter an order of sequestration in favor of Af-Cap leaving no doubt in CMS's (and Congo's) mind that the royalty obligation cannot be transferred outside of Delaware, no matter the extent of corporate manipulation in which CMS (in concert with Congo) may engage. Congo has not appeared in this action, but CMS's appearance makes Congo's right to royalty payments by CMS subject to execution here.

Third, Af-Cap seeks the entry of a preliminary injunction, (a) enjoining CMS from further making any royalty payments to Congo under the Convention, and (b) preventing CMS from otherwise removing from this Court's jurisdiction CMS's obligations to make royalty payments to the Congo under the Convention, pending a determination of plaintiff's right to execute on those royalty obligations.

This Court should grant the requested relief now because, as shown below, CMS's recent acts have been designed specifically to avoid CMS's obligations to pay Congo's royalties to Af-Cap and other creditors of the Congo. This Court should not stand by while a rogue government co-opts its all-too-willing business partner CMS into hindering, delaying or defrauding its creditors.

---

[4] In addition, after CMS was served with this lawsuit, it paid Congo an oil royalty in September 2006 exceeding $27 million and has held property belonging to the Congo while Af-Cap's writ is pending despite answering that it holds no property. (Perkins Aff., Ex. L.) In total, since Af-Cap commenced this case, CMS has paid Congo between $25.9 and $63.0 million dollars. (Perkins Aff., Ex. B.) It has paid the Court and Af-Cap nothing.

## STATEMENT OF FACTS

**The Parties**

1. <u>Af-Cap</u> is the successor-in-interest to a loan made to Congo by a British Bank, Equator Bank Limited. To obtain the loan, Congo pledged as collateral all of its assets and properties, wherever located, expressly waived any claim of sovereign immunity either from suit, attachment or execution on its property and agreed that it would not take any action to oppose or defend against any such action. (Perkins Aff., Ex. F at ¶¶ 19(C), 19(D)).

After Congo defaulted on its loan payment obligations, Af-Cap's predecessor, Connecticut Bank of Commerce, obtained a judgment in the United Kingdom and in a New York state court in the amount of $13,628,340.11, plus interest. The New York court also entered an order of attachment, authorizing execution against "any assets or other property of the Congo of any nature, irrespective of the use or intended use of such property…including any…payments or obligations due to the Congo from any oil and gas exploration and development companies…." (Perkins Aff., Ex. G.)

Thereafter, Af-Cap registered that judgment in Texas (the "Af-Cap Judgment") and obtained writs of garnishment against CMS there. On February 24, 2005, after appellate decisions in the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court's denial of Congo's petition for a writ of certiorari (Perkins Aff. ¶ 16), the Western District of Texas (to which the action had been removed from state court) entered a turnover order against Congo. The Af-Cap turnover order was later vacated by the Fifth Circuit on the finding that the lower court never established jurisdiction over Congo, even though the case had been ongoing for five years and personal jurisdiction attached at the "first filing"; and, in any case, Congo had, in the loan agreement, waived its right to contest the action. *See Af-Cap,*

*Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006); *see also* Perkins Aff., Ex. ¶¶ 19(C), 19(D).

    2.    <u>CMS</u> is an oil production company that is ultimately owned by the Perenco S.A., a multibillion dollar conglomerate based in London, England. Under the Convention it entered into with Congo, CMS is authorized to exploit oil reserves in Congo in exchange for CMS's obligation to make royalty and other payments to Congo. (Perkins Aff., Ex. D.) The Fifth Circuit has ruled that the CMS royalty payment obligation under the Convention is not immune from execution by Congo's creditors through proceedings occurring wherever CMS is located (including Texas and Delaware, its state of original incorporation). *See Af-Cap v. Republic of Congo, supra*, 383 F.3d at 370-71.

At the time Af-Cap began its enforcement efforts in the United States, CMS based its operations in Houston, Texas. Thereafter, CMS has taken a series of steps designed to remove itself beyond the reach of courts in the United States, including in March 2005, by moving its headquarters to London, and on November 21, 2006, by purporting to dissolve as a Delaware corporation and reform in the Bahamas. (Deposition of Roland Fox, dated November 30, 2006, ("Fox Depo."), at 249:21-250:25, attached to the Perkins Aff. as Ex. L.) CMS's efforts to remove itself from Texas were not disclosed to the courts in which CMS was a garnishee in proceedings to enforce judgments against Congo until after the transfers had occurred. (Perkins Aff. ¶ 24.)

**<u>Proceedings Against CMS In Delaware</u>**

After CMS absconded from Texas, Af-Cap and Walker initiated an action in the Delaware Court of Chancery, seeking relief under Delaware's Fraudulent Transfer Act and the common law arising from CMS's actions to move the royalty payment obligation beyond the reach of CMS's creditors. (Perkins Aff. ¶ 25.) Plaintiff also commenced this garnishment action

in Superior Court, and Walker commenced its action in this Court. (*Id.*) In July 2005, immediately before the commencement of this action, CMS advised Af-Cap, Walker and other Congo creditors that it intended to remove the royalty obligations from Delaware and Texas. (*Id.* ¶ 21.) This announcement was made through a document entitled Notice of CMS Nomeco Congo Inc., the Nuevo Congo Company, Nuevo Congo Ltd. of Anticipated Sale and Transfer of Working Interests (the "Transfer Notice"), indicating that CMS intended:

> to convey [its] working interests [i.e., basis for oil royalty obligation]. The purchasers will be companies to be formed under Congolese law. <u>The consideration to be paid for the sales will be cash</u>. Upon closing of the conveyances, the working interests under the Convention will be owned by the Congolese purchasers of the working interests, and the rights and obligations under the Convention and Joint Operating Agreement previously held and owed by the Working Interest Owner Garnishees [,including CMS,] will be held and owed by the Congolese purchasers and not the Working Interest Owner Garnishees.

(Perkins Aff., Ex. O.)

According to the records of the Delaware Secretary of State, on November 21, 2006 notwithstanding the entry of the Af-Cap Writ, and without notice to this Court, CMS purported to dissolve itself as a Delaware corporation. (Perkins Aff., Ex. Q.) After dissolution, CMS immediately reformed itself in the Bahamas. According to CMS representative Roland Fox one reason for CMS leaving Delaware was to evade Congo's creditors. (Fox Depo. at 250:19-25.) CMS has further stated, however, that "it will not use that conversion as a basis for challenging the jurisdiction of the federal court in Delaware." (Perkins Aff., Ex. P.). As explained below, since the Af-Cap Writ was in place at the time, and CMS does not contest the jurisdiction of this Court over it, CMS's move has no impact on this Court's ability to seize and, thereafter, order execution of judgment against the Convention royalty obligation.

## ARGUMENT

### POINT I

### CMS SHOULD BE HELD IN CONTEMPT OF THE AF-CAP WRIT

Under Rule 70 of the Federal Rules of Civil Procedure, the Federal courts are empowered to enforce compliance with their lawful orders through civil contempt. FED. R. CIV. P. 70. In addition, 18 U.S.C. § 401 provides that "[a] court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority," for, *inter alia*, "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3). Moreover, a District Court has the inherent authority to require obedience and to punish contempt of its lawful orders and decrees. *See First Sec. Nat. Bank & Trust Co. v. U. S.*, 86 S.Ct. 157, 382 U.S. 34 (1965); *In re Orthopedic 'Bone Screw' Products Liability Litigation*, 132 F.3d 152 (3d Cir. 1997) (courts have authority to punish contempt whether sanctioned conduct is before court or beyond it.).

A party is in civil contempt when it "violates an order of [the] court which requires that person in specific and definite language to do or refrain from doing an act or series of acts." *Lichtenstein v. Lichtenstein*, 425 F.2d 1111, 1113 (3d Cir. 1970) (citing *In re Rubin*, 378 F.2d 104, 108 (3d Cir. 1967)). Contempt will be appropriate as long as the violating party has been given "specific notice of the norm to which they must pattern their conduct" and, thereafter, violate the norm. *Harris v. City of Philadelphia*, 47 F.3d 1342, 1349 (3d Cir. 1995) (citing Supreme Court cases).

In this Circuit, there are two elements necessary to hold a person in contempt of a court order. First, "it must be proved that the alleged contemnor had knowledge of the order which he is said to have violated." Second, "the order which is said to have been violated must be specific and definite." *In re Rubin*, 378 F.2d 104, 108 (3d Cir.1967). *See also Winterland Concessions*

*Co. v. MacIntosh*, 1992 WL 170897 (E.D. Pa. Jul. 14, 1992) (following *In re Rubin, supra*) (holding defendant in contempt of court order on ground that defendant had actual knowledge of order, which was specific and definite as to its terms). The first element is satisfied by the issuance of a valid order by the court, while the second is satisfied upon proof of mailing or service of the court order, even if the defendant refuses to acknowledge receipt thereof. *See, e.g., Residential Reroofers Local v. Rynk Roofing*, 848 F.Supp. 590, 592 (E.D. Pa. 1994) (finding party had knowledge of order when plaintiffs mailed copies of order and contempt motion to him, and copy of order to show cause was served upon person at party's address who refused to sign his name).

A writ of garnishment is a court order, the disobedience of which is punishable by contempt. *See* FED. R. CIV. P. 70; *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000) ("...Under Fed. R. Civ. P. 70, a party may be held in civil contempt for violating a garnishment order"); *Juneau Spruce Corp. v. International Longshoremen's and Warehousemen's*, 131 F.Supp. 866, 872-3 (D.C. Hawaii 1955) (violation of writ of garnishment is grounds for contempt sanction). *See also U.S. v. McMahon*, 104 F.3d 648 (4th Cir. 1997) (court may find party who violates sequestration order to be in contempt of court). As the District Court held in *Juneau Spruce Corp.*: "The fact that a clerk of the court signed a writ of garnishment made it no less a judicial process." *Id.* at 872. *See also, Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 61 F.3d 94 (1st Cir. 1995) (attachment order requiring garnishee to pay obligation to debtor into Court did not give garnishee discretion to decide that other creditor had prior claim to funds or to pay funds to other creditor in preference to court; garnishee's proper course was to pay money into court and then litigate any question regarding priority of rights of attaching creditor).

Here, the Af-Cap Writ provided clear instruction to CMS, providing:

> "**To defendant's garnishee who is served this paper**: The Superior Court...requires you to inform [plaintiff's counsel] of all money, goods, credits and effects, stock, bonds, personal property and/or real estate belonging to the defendant you currently possess. As the Garnishee, you are to retain the items stated by you in response to the above. You are to hold these items until another order of this Court releases you from this obligation."

(Perkins Aff., Ex. K (emphasis in original).) Moreover, there is no dispute that CMS was served with, and, thereby, received notice of the Af-Cap Writ, all before it made royalty payments to Congo. The Af-Cap Writ was served on CMS on October 12, 2005. Yet, CMS made royalty payments to Congo in April 2006. *See* CMS Answer to Writ of Garnishment at 19, 20 ¶ 4. Moreover, CMS has admitted that even though it had notice of this case since August 30, 2005, it paid Congo a royalty in September 2005. In particular, it states that "[i]n September 2005, SNPC...took a lifting of oil for the Congo and SNPC." *Id.* at ¶ 3. CMS has conveyed to Af-Cap's counsel its intention to take a lifting of royalty oil between February 10 and 15. (*See* Perkins Aff., Ex. F.)

Accordingly, CMS should be sanctioned, and ordered to pay plaintiffs, the amount of royalties paid Congo during the time the Af-Cap Writ has been in effect plus the legal fees and costs incurred in bringing this motion. *See* Writ at 1. *See, e.g., Richard Y. Johnson, Inc. v. Just-In Const., Inc.*, 2006 WL 75308 (Del. Ch. Jan. 6, 2006) (sanctioning parties for contempt and requiring defendants to reimburse plaintiff for its reasonable attorneys' fees incurred in connection with proceeding; defendants violated court order where had actual notice of order and knew or had reason to know that order required them to preserve the proceeds of public sale in trust for the benefit of the persons named in order). *See also Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union, Nat. Capital Local Div. 689*, 531 F.2d 617 (D.C. Cir. 1976) (sanctions in a civil contempt proceeding are proper to compensate the

complainant for losses sustained); *Raymor Ballroom Co. v. Buck*, 110 F.2d 207 (1st Cir. 1940) (ordering judgment debtor to pay fine to clerk of court in favor of judgment creditor in the amount of the judgment for which levy was made).

And, to the extent CMS was successful in removing its royalty obligation to Congo beyond the reach of this Court, (which, as explained below, it was not) it cannot escape this Court's power to hold CMS in contempt for violating the Af-Cap Writ. In this circumstance, as a result of CMS's unlawful conduct, Af-Cap would be deprived of the ability to execute on the royalty obligation. Thus, if this Court were to conclude the royalty obligation is no longer in Delaware, CMS should be sanctioned $10,000.00 for each day CMS fails to return the royalty rights to this jurisdiction or, alternatively, ordered to pay $13,628,340.11, reflecting the total amount of the Af-Cap judgment, plus interest.

## POINT II

## CONGO'S ROYALTY RIGHTS SHOULD BE SEQUESTERED

Although duly served, Congo has not appeared in this action. Since, as explained above, its royalty rights remain present here, Congo may be compelled to appear by an Order of Sequestration. Title 10, Section 366 of the Delaware Code empowers the Court of Chancery and, thus, this Court through FED. R. CIV. P. 69, to seize property having a situs in Delaware of a non-resident to compel his appearance in a pending action. *See Gordon v. Michel*, 297 A.2d 420, 422 n. 1 (Del. Ch. 1972). As outlined in Section 366:

> If it appears in any complaint filed in the Court of Chancery that the defendant or any one or more of the defendants is a nonresident of the State, the Court may make an order directing such nonresident defendant or defendants to appear … The Court may compel the appearance of the defendant by the seizure of all or any part of this property …

10 Del. C. § 366. Sequestration under Delaware law is analogous to a foreign attachment at law, its function to provide an equivalent procedure in equity within the Delaware courts. *Sands v. Lefcourt Realty Corp.*, 35 Del. Ch. 340, 117 A.2d 365 (1955); *Gordon*, 297 A.2d at 422.

It is well-established that, under the sequestration statute, "the word 'property' has a broad and comprehensive meaning, including legal and equitable interests in both real and personal property." *Blumenthal v. Blumenthal*, 28 Del. Ch. 1, 35 A.2d 831, 836 (1944). *See also*, *Weinress v. Bland*, 31 Del. Ch 269, 71 A.2d 59, 62 (1950) (following *Blumenthal*); *Perrine et al. v. Pennroad Corp. et al.*, 19 Del. Ch. 368, 373, 168 A. 196, 198 (1933). Accordingly, contingent property rights are subject to sequestration. *See*, *U.S. Industries, Inc. v. Gregg*, 540 F.2d 142, 146 (3d Cir. 1976) (following *Weinress v. Bland*, 31 Del. Ch. 269, 71 A.2d 59 (1950) ("That an interest is contingent does not make it nonsequestrable.")); *D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034, 1038-39 (D. Del. 1974) (debt owed to nonresident defendant by a nonresident which was subject to process in Delaware was subject to sequestration).

Here, Af-Cap seeks to sequester a contractual royalty obligation by CMS to Congo. There is no dispute that CMS holds Congo's property, the contractual right to receive an oil royalty, or that it holds oil on behalf of Congo, and it routinely pays that royalty to Congo. Indeed, since the filing of this suit, CMS has paid Congo over $27 million in royalties. This same type of obligation was held to be subject to sequestration in *D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034, 1038-39 (D. Del. 1974).

In *D'Angelo*, the plaintiff brought an action against an agency of the Republic of Mexico "for an order requiring the defendant to account to the plaintiff for oil produced from wells in Mexico" in which the plaintiff claimed to "have royalty or participation interests." *Id.* at 1035. Specifically, the plaintiff claimed entitlement to "certain oil royalties and participation rights in

certain of the properties so expropriated by the Mexican government." *Id.* Plaintiff sequestered Mobil Oil Corporation's obligation to pay oil royalties to the Mexican government agency. *Id.* at 1037. The Court denied Mobil Oil's motion to vacate the sequestration order, since the debt which Mobil owed to the defendant "gave rise to a transitory cause of action for which the defendant could have sued and served Mobil in Delaware…and was, therefore, subject to sequestration." *Id.* at 1039.

As in *D'Angelo*, CMS's obligation to make royalty payments to the Congo is subject to sequestration. CMS has admitted in its answer to the Writ that that it is "the current owner[s] of working interests in a convention for the production of oil in the Republic of Congo…." (CMS Answer to Writ of Garnishment at 19, ¶ 1). CMS further admits that under its deal with Congo that "the Congo is entitled to royalty." (*Id.*) Significantly, Congo's royalty right accrues when the oil is extracted from the ground, not when Congo or its designee removes oil from a storage vessel, and oil is extracted from the ground daily.[5] *See e.g.,* Fox Depo. 152:16-18. Thus, under Delaware law, an order of sequestration seizing Congo's ongoing rights to royalty payments should issue.

## POINT III

### PLAINTIFF MEETS THE STANDARD FOR ENTRY OF A PRELIMINARY INJUNCTION

CMS has purported to remove itself from Delaware and with it, presumably, the royalty obligation. Even though CMS has stated it will not contest jurisdiction, nonetheless, CMS's

---

[5] In particular, the Convention provides that:

> The quantity of hydrocarbons to which the mining royalty applies shall be measured at the point of delivery…. The mining royalty, whether in case or in kind, shall be computed and paid on a quarterly basis…. Delivery of the quantities of hydrocarbons to which the Congo is entitled, including the liquid hydrocarbons destined for the Pointe-noire refinery, shall be made either at well head or at the gathering point…." (Perkins Aff., Ex. D at ¶¶ 7.04, 7.05, 10.02.1).

transfer has imperiled Af-Cap's ability to collect on its judgment against CMS's delinquent business partner, the Republic of Congo. CMS should be enjoined from making further payments to Congo or taking other efforts to remove the royalty payment obligation from Delaware.

Preliminary injunctions are appropriately entered to preserve the property or rights at issue until a case has been fully decided. *See Chew v. First Prsbyterian Church*, 237 F. 219, 222 (D. Del. 1916) (granting preliminary injunction in order to preserve property rights of plaintiff and maintain *status quo* pending adjudication). The Delaware Courts have long-held that the preservation of a fund at issue to maintain the *status quo* pending the outcome of litigation is a proper basis for entering an injunction. *See Guatarri v. International Import & Export, Co.*, 100 A. 795 (Del. Ch. 1917); *see also Cooling v. Security Trust, Co.*, 49 A.2d 121, 123 (Del Ch. 1946) (affirming entry of preliminary injunction to preserve *status quo*). The decision to grant a preliminary injunction is committed to the Court's sound discretion. *Westinghouse Elec. & Mfg. Co.*, 268 F. 121 at 129 (quoting *Harriman v. Northern Secs. Co.*, 132 F. 464 (D. N.J. 1904). The Court's discretion is guided by "the nature of the controversy, the object for which the injunction is sought, and the comparative hardship or convenience to the respective parties involved in awarding or denial of the injunction." *Id.*

To obtain a preliminary injunction the moving party must demonstrate four elements: (1) that it has a "reasonable probability of success on the merits"; (2) that it will suffer irreparable injury if the injunction is not issued; (3) that granting the injunction will not cause greater harm to the non-moving party than will be caused to the moving party by the denial of relief; and (4) that granting the relief is in the public interest. *See Flowserve Corp v. Burns Int'l. Servs. Corp.*, 423 F. Supp.2d 433, 438 (D. Del. 2006) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d

153 (3d Cir. 1999). The overall purpose is "to preserve the *status quo* until the merits of the case have been decided." *Id.* (quoting *Acierno v. New Castle County*, 40 F.3d 543, 653 (3d Cir. 1994).

In *Flowserve*, the District Court enjoined an insured from separately negotiating with plaintiffs in asbestos litigation because it would have depleted the overall settlement resources available to each of the complaining parties. The same rationale for an injunction holds true in the instant matter because, if CMS is allowed to take any further steps to move the obligation to pay royalties from Delaware to offshore, it would result in placing these royalties beyond the reach of Af-Cap and other judgment creditors. *Id.* at 439-440. *See also Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (recognizing that in granting an injunction court may take into account other interested persons who could be harmed).

Here, the facts warrant the entry of an injunction. First, Af-Cap has a reasonable likelihood of success on the merits. CMS admits to holding property -- payment of a royalty right -- that belongs to Af-Cap's judgment debtor. CMS Answer to Writ at 19. There is no dispute, and CMS is estopped from arguing otherwise, that the asset is in the United States and subject to execution wherever CMS is located. *See Af-Cap v. Republic of Congo*, 383 F.3d 361, 371 (5th Cir. 2004) ("We think a common sense appraisal of the requirements of justice and convenience in this particular context yields the conclusion that the situs of these royalty obligations is the United States--the situs of the Garnishees.") CMS is subject to jurisdiction and, thus, is present in Delaware. Moreover, as explained above, under Delaware law these very types of oil royalty obligations are subject to execution. *See D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034, 1038-39 (D. Del. 1974).

Second, Af-Cap will be irreparably harmed if CMS is successful in moving the asset outside of the United States. In that circumstance, Af-Cap's recovery (as well as that of other judgment creditors) would be foreclosed since those obligations would be beyond the reach of United States courts. Thus, unless enjoined, Af-Cap would have no legal or equitable remedy following trial.

Third, the harm to Af-Cap would be much greater than if the Court entered the injunction preserving the *status quo* while this case was making its way through the federal courts. CMS, and its predecessors, have been incorporated in Delaware since the 1970's and have held the Convention rights since 1979. CMS did not purport to remove the Convention rights outside of the United States until after Af-Cap obtained its writ and Walker had filed its application for a writ. CMS has no legitimate interest in taking any further steps to block plaintiff's debt recovery efforts, as CMS's steps are designed to hinder and delay Congo's creditors.

Fourth, the public interest weighs in favor of granting the injunction. As stated, CMS's efforts to remove itself and its assets from Delaware are designed solely to frustrate Congo's creditors. CMS should not be rewarded for this evasive conduct. And, CMS's withdrawal is precisely the type of conduct that an injunction is intended to protect against because it would otherwise result in compromising the Court's integrity to render a full, complete and final adjudication of the pending issues. *See Flowserve*, 423 F. Supp.2d at 439 (citing the All Writs Act).

## CONCLUSION

After this Court issued the Af-Cap Writ, and the Writ was duly served on CMS, CMS paid Congo at least $27 million in royalties. CMS is thus in contempt of the Af-Cap Writ and should be sanctioned, at minimum, in the amount of the Af-Cap judgment.

Moreover, CMS has recently purported to remove itself and its assets outside of Delaware. It did so with the Af-Cap Writ in place against the CMS's royalty payment obligation to Congo under the Convention. As such, CMS's purported transfer has had no effect, and the royalty payment obligation remains subject to execution in Delaware.

Moreover, in order to hail Congo before this Court to pay its debts, plaintiff seeks an order of sequestration of the royalty obligation. Likewise, CMS should be enjoined from taking any further steps to attempt to defeat the jurisdiction of this Court to enforce execution against the royalty obligation.

Finally, to the extent that CMS has somehow been successful in removing the royalty obligation from the reach of this Court, it should be held in contempt for each day it fails to deliver such right to Delaware so that Congo's creditors may execute judgment against this payment stream.

DATED: January 10, 2007  
Wilmington, Delaware

Respectfully submitted,

GREENBERG TRAURIG, LLP

_____
Donald J. Detweiler (No. 3087)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000

and

Ronald W. Kleinman
Sanford M. Saunders, Jr.
Kenneth P. Kaplan
800 Connecticut Ave., N.W., Suite 500
Washington, DC 20006
(202) 331-3100

and

James W. Perkins
Stephanie R. Feldman
200 Park Avenue
New York, New York 10166
(212) 801-9200

Attorneys for Plaintiff