# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONNECTICUT BANK OF COMMERCE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-762-SLR |
| THE REPUBLIC OF CONGO, | ) ) ) | |
| Defendant; | ) ) | |
| CMS NOMECO CONGO INC., | ) ) | |
| Garnishee. | ) | |

## CMS NOMECO CONGO INC.'S PRELIMINARY ANSWERING BRIEF IN OPPOSITION TO AF-CAP'S EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE FOR AN ORDER OF CONTEMPT, ORDER OF SEQUESTRATION, AND INJUNCTIVE RELIEF

OF COUNSEL:

Guy S. Lipe
Jason M. Powers
VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin Street, Suite 2300
Houston, TX 77002-6760
(713) 758-2222

Dated: January 17, 2007

M. Duncan Grant (Del. Bar No. 2994)
James C. Carignan (Del. Bar No. 4230)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500

Attorneys for Garnishee CMS Nomeco Congo Inc.

PRELIMINARY STATEMENT ................................................................................ 1

   Fatal Legal Obstacles................................................................................................ 1

   False Statements and Omissions in the Emergency Motion, Brief, and Supporting Affidavit .. 3

NATURE AND STAGE OF PROCEEDINGS .......................................................... 7

ARGUMENT ........................................................................................................... 12

   I.    CMS Nomeco is Not In Contempt of the Garnishment Writ....................... 12

   II.   Af-Cap Is Not Entitled to a Sequestration Order ........................................ 28

   III.  Af-Cap Is Not Entitled to Injunctive Relief ............................................... 31

CONCLUSION ........................................................................................................ 39

# TABLE OF AUTHORITIES

## CASES

Af-Cap, Inc. v. Republic of Congo,
  383 F.3d 361 (5th Cir. 2004) ...............................................................4, 14, 15, 16

Af-Cap, Inc. v. Republic of Congo,
  462 F.3d 417 (5th Cir. 2006) .........................................................3, 10, 20, 21, 22

Argentine Republic v. Amerada Hess Shipping Corp.,
  488 U.S. 428 (1989).................................................................................................16

Banco Nacional de Cuba v. Sabbatino,
  376 U.S. 398 (1964)................................................................................................27

Callejo v. Bancomer, S.A.,
  764 F.2d 1101 (5th Cir. 1985) .............................................................................16

Cooper's Home Furnishings, Inc. v. Lolly,
  270 A.2d 676 (Del. Super. 1970).........................................................................18

D'Angelo v. Petroleos Mexicanos,
  378 F. Supp. 1034 (D. Del. 1974).........................................................................31

FG Hemisphere Associates LLC v. Republique du Congo,
  455 F.3d 575 (5th Cir. 2006) ............................................2, 9, 14, 15, 16, 22, 31, 37

Gordon v. Michel,
  297 A.2d 420 (Del. Ch. 1972)...............................................................................30

Hughes Tool Co. v. Fawcett Publications, Inc.,
  290 A.2d 693 (Del. Ch. 1972)...............................................................................30

Hughes v. Tobacco Institute, Inc.,
  278 F.3d 417 (5th Cir. 2001) ...............................................................................10

John Julian Construction Co. v. Monarch Builders, Inc.,
  306 A.2d 29 (Del. Super. 1973)...........................................................................20

LNC Investments, Inc. v. Republic of Nicaragua,
  No. 01-134-JJF (D. Del. 2002), 2002 WL. 32818644 ...................................3, 23, 24,
                                                                                                   25

McNeilly v. Furman,
  95 A.2d 267 (Del. 1953) ....................................................................................3, 21

Philippine National Bank v. United States District Court,
  397 F.3d 768 (9th Cir. 2005) .......................................................27, 28

Reebok Intern. Ltd. v. McLaughlin, 49 F.3d 1387 (9th Cir. 1995) .........................................26, 27

Rush-Presbyterian-St. Luke's Medical Ctr. v. Hellenic Republic,
  877 F.2d 574 (7th Cir.1989) .......................................................28, 29

Sands v. Lefcourt Realty Corp.,
  117 A.2d 365 (Del. 1955) ...........................................................30

Trans World Airlines v. Hughes,
  185 A.2d 762 (Del. Ch. 1962)......................................................30

Underhill v. Hernandez,
  168 U.S. 250 (1897).................................................................27

United States Steel Corp. v. United Mine Workers of America, District 20,
  598 F.2d 363 (5th Cir. 1979) ......................................................29

United States v. Rylander,
  460 U.S. 752 (1983)................................................................29

W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International,
  493 U.S. 400 (1990).................................................................27

Weitzel v. Weitzel,
  27 Ariz. 117, 230 P. 1106 (Ariz. 1924) .............................................24

West v. Baker,
  510 P.2d 731 (Ariz. 1973)..........................................................24

Wilmington Trust Co. v. Barron,
  470 A.2d 257 (Del. 1983) ..............................................3, 18, 19, 20, 32, 33

World Wide Minerals, Ltd. v. Republic of Kazakhstan,
  296 F.3d 1154 (D.C. Cir. 2002)......................................................28

## STATUTES

Fed. R. Civ. P. 81(c) ......................................................................12

10 Del. C. §366 ..........................................................................29, 30

Del. C. § 3508 ...........................................................................21, 30

Del. Sup. Ct. R. Civ. P. 5(aa)(2) ................................................................22

Restatement (Third) of Foreign Relations Law of the United States  Section 441.................25, 26

Rule 5(aa)(2)  ........................................................................................22

CMS Nomeco Congo Inc. ("CMS Nomeco") files this Preliminary Answering Brief in Opposition to Plaintiff's Emergency Motion for an Order to Show Cause for an Order of Contempt, Order of Sequestration, and Injunctive Relief.

## PRELIMINARY STATEMENT

On January 10, 2007, Af-Cap, Inc. ("Af-Cap") filed an "Emergency Motion," seeking a contempt order and extraordinary relief, including a preliminary injunction against CMS Nomeco.  In essence, Af-Cap's motion falsely asserts that CMS Nomeco disregarded the writ of garnishment that is the subject of this case, paid $27 million in royalties to the Congo in April 2006 in alleged violation of that writ, and is now attempting to avoid liability on the writ by dissolving itself in Delaware and reincorporating in the Bahamas.

In making these baseless allegations, Af-Cap flagrantly misrepresents the facts and fails to disclose critically significant facts that demonstrate that Af-Cap's contentions are frivolous.  Additionally, Af-Cap ignores legal obstacles that are fatal to Af-Cap's claims for relief in this case.

### Fatal Legal Obstacles

The fatal legal obstacles to Af-Cap's claims and requests for emergency relief include:

- The writ issued by the Delaware Superior Court, on its face, is void *ab initio* under the Fifth Circuit Court decision in *FG Hemisphere Associates LLC v. Republic du Congo*, 455 F.3d 575 (5th Cir. 2006).  That case held that under the Foreign Sovereign Immunities Act ("FSIA"), the court order authorizing the writ must include factual findings on the essential elements of the FSIA and on the amenability to garnishment under state law of the foreign state's property, based on the circumstances existing at the time the order is issued.  In

the absence of such findings, the order and resulting writ are void *ab initio*. The Superior Court issued the writ in this case without making any such findings, thus rendering it void *ab initio*.

- The Fifth Circuit held in *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006) ("*Af-Cap III*") that the Congo's royalty, which it takes "in-kind," not in cash, is not subject to garnishment as a matter of state garnishment law because only monetary obligations are subject to garnishment. The same rule applies under the Delaware garnishment statute, as evidenced by the Delaware Supreme Court's decision in *McNeilly v. Furman*, 95 A.2d 267, 271 (Del. 1953), in which the Court construed the terms "rights" and "credits" as used in the Delaware garnishment statute as "import[ing] a fixed monetary obligation."

- At the time of service of the writ and as of the answer date, the Congo and its state owned oil company, SNPC, were in a combined over-lifted position with regard to oil liftings, and under the relevant agreements, the Congo was not entitled to receive any oil. Under the Delaware Supreme Court's decision in *Wilmington Trust Co. v. Barron*, 470 A.2d 257, 263 (Del. 1983), Af-Cap, as garnishor, can have no greater rights than the Congo, precluding any recovery on the writ.

- Judge Farnan's decision in *LNC Investments v. Republic of Nicaragua*, No. 01-134-JJF, 2002 WL 32818644 (D. Del. 2002), appeal dism'd, 396 F.3d 342 (3d Cir. 2005), establishes that a garnishment writ must be quashed if the garnishee may not be protected from double liability on an obligation owed to a foreign government under that foreign government's law. The Congo has taken its royalty oil under compulsion of Congo court orders that expressly hold that Congolese law requires that CMS Nomeco allow the Congo to take its oil in its own territory, notwithstanding writs of garnishment issued in the United States. Af-Cap's motion and brief do not address the double liability issue, or Judge Farnan's decision in *LNC Investments*. In

fact, as discussed below, Af-Cap does not even mention the Congo court orders and the Congo's use of public force to insure compliance with those orders, withholding facts critical to the Court's consideration of the issues raised by the motion and instead attempting to create the false impression that CMS Nomeco has flagrantly and intentionally violated the writ at issue in this case.

- By virtue of the Congo's actions in seeking and obtaining Congo court orders compelling CMS Nomeco to permit it to take its oil in its own territory, principles of foreign state compulsion and the act of state doctrine preclude relief in this case. While not mentioning the Congo court orders, Af-Cap misrepresents to this Court that the Fifth Circuit, in *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir. 2004) ("*Af-Cap II*"), "definitively and finally held that, irrespective of the efforts of the government of Congo or its courts to interfere with the enforcement of these United States judgments, CMS cannot claim any defense under the theory of sovereign compulsion or act of state." Op. Br. at 2. That is a blatant misstatement; the Congo went to court in the Congo for the first time in December 2004, months *after* the Fifth Circuit's decision in *Af-Cap II*, and the Court in *Af-Cap II* neither had before it nor addressed any issues concerning Congo court orders.

<u>False Statements and Omissions in the Emergency Motion, Brief, and Supporting Affidavit</u>

With regard to the factual allegations made in support of the motion, the most notable among the many false statements and material omissions in *Af*-Cap's brief and supporting affidavit are its allegations regarding CMS Nomeco's purported "disregard" of the writ of garnishment in making "royalty payments." Specifically, Af-Cap asserts that on April 15, 2006, "CMS made royalty payments to Congo in excess of $27 million" and that it did so "in complete disregard and contempt of the Af Cap Writ." Af-Cap Emergency Motion at 2-3. It

seeks millions of dollars in contempt sanctions for CMS Nomeco's alleged actions in "disregarding" the writ of garnishment. Af-Cap also asks for an injunction prohibiting CMS Nomeco from making any further "royalty payments" to the Congo. By those allegations and requests for relief, Af-Cap attempts to create the impression with the Court that CMS Nomeco intentionally and flagrantly violated the writ of garnishment issued in this case by making substantial royalty payments to the Congo that the writ purportedly prohibited, and that CMS Nomeco intends to continue to make further royalty payments to the Congo in violation of the writ.

The undisputed facts, hidden from this Court by Af-Cap in its motion, demonstrate the opposite. Long ago, in 1999 (before Af-Cap or any other judgment creditor of the Congo filed any garnishment action against CMS Nomeco), the Congo elected to take its royalty "in-kind," that is, in oil, not dollars, in its own territory. Af-Cap failed to inform this Court in its Emergency Motion, brief, and affidavit that (1) CMS Nomeco wrote to the Congo authorities on several occasions notifying them that in the light of U.S. writs and orders in various litigation matters brought by judgment creditors of the Congo, delivery of Congo's own oil would not be made, and (2) in December 2004, September 2005, and again in April 2006, the Congo went to a Congolese court and obtained court orders ordering CMS Nomeco to permit the Congo to take its oil in its own territory, notwithstanding U.S. writs of garnishment and turnover orders, which the Congo court held unenforceable under Congolese law (which governs CMS Nomeco's concession agreement with the Congo). The Congo threatened to terminate CMS Nomeco's oil concession if it were not allowed to take its oil in its own territory.

The Congo court orders compelling CMS Nomeco to permit the Congo to take its oil provided for the use of public force of Congolese authorities in the event of non-compliance.

CMS Nomeco was subjected to threats of use of public force, and in connection with the December 2004 government oil lifting taken under compulsion of the Congo court's orders, CMS Nomeco's president was threatened with the use of military force and detention in the Congo if she did not direct the crew members on the storage tanker to proceed with the lifting in accordance with the Congo court order.  In connection with the April 2006 government oil lifting, which specifically is the subject of Af-Cap's motion, CMS Nomeco's resistance to the Congo's efforts to take its oil, even in the face of the Congolese court orders, led to the boarding of the storage vessel by armed Congolese police to insure that CMS Nomeco complied with the Congo court's orders.  *See* Declarations of Maryse Bernard (President of CMS Nomeco) and Bernard Castanet (safety director and acting general manager) (Exhibits A and B).

Af-Cap's counsel received copies of those declarations long ago, including the attached correspondence and Congo court order relating to the April 2006 government oil lifting, and Af-Cap is fully aware of all of the relevant facts, yet Af-Cap failed to disclose those facts to this Court.  Instead, Af-Cap's brief and supporting affidavit outrageously attempt to create the false impression that CMS Nomeco made voluntary royalty payments to the Congo in April 2006 in conscious "disregard" of the Af-Cap writ of garnishment and that CMS Nomeco should be sanctioned for "violating" the writ and enjoined from making further "payments."

What Af-Cap is asking this Court to do is order CMS Nomeco to resist the Congo's efforts to take its oil in its own territory, supported by existing Congolese court orders, and thereby subject CMS Nomeco and its personnel to all of the risks associated with the use of public force against CMS Nomeco in the Congo.  Af-Cap also is asking this Court to hold that CMS Nomeco should be required to pay the value of the oil owned and taken by the Congo in its own territory, both in the past and in the future, to Af-Cap and other judgment creditors of the

Congo, even though the concession agreement between the Congo and CMS Nomeco, which is governed by Congolese law, contractually obligates CMS Nomeco to permit the Congo to take its oil, notwithstanding U.S. court orders and writs. While not revealed in its motion, Af-Cap has affirmatively taken the position in its discovery responses in this case that this Court should require CMS Nomeco to pay the Congo's debts and be left to pursue reimbursement from the Congo through legal proceedings in other jurisdictions, effectively shifting risk of non-collection of the Congo's debts to CMS Nomeco. In essence, Af-Cap argues that CMS Nomeco, merely by virtue of doing business with the Congo in its territory, should become the guarantor of the Congo's bad debts. By its Emergency Motion, Af-Cap asks this Court to impose such an obligation on CMS Nomeco now.

In the face of the legal obstacles to Af-Cap's claims, and considering all of the facts, including those not disclosed by Af-Cap, there is no basis whatsoever for any of the relief that Af-Cap seeks. CMS Nomeco is pursuing discovery from Af-Cap on the factual allegations purportedly supporting its Emergency Motion, including the deposition of the affiant who signed an 11 page Affidavit purportedly supporting Af-Cap's motion, and the deposition of the corporate representative of Af-Cap. Those depositions have been noticed for January 19 and January 23 respectively. CMS Nomeco will more fully respond to Af-Cap's Emergency Motion promptly after completion of those depositions. Nevertheless, in order to promptly inform the Court of Af-Cap's blatant misrepresentations and omissions in its motion and to demonstrate to the Court the facial invalidity of Af-Cap's legal arguments, CMS Nomeco submits this Preliminary Response to the Emergency Motion.

## NATURE AND STAGE OF PROCEEDINGS

The Texas Litigation.  For more than five years, CMS Nomeco has defended, at multi-million dollar expense, litigation filed against it in Texas by judgment creditors of the Congo, seeking to garnish the Congo's in-kind royalty that the Congo is periodically entitled to take in its own territory under the concession agreement between the Congo and CMS Nomeco. During the course of that litigation, CMS Nomeco was subjected to claims by the judgment creditors that CMS Nomeco had the obligation to defy Congo court orders issued by a Congolese court holding that U.S. writs of garnishment and turnover orders were unenforceable under Congolese law and that ordered CMS Nomeco to permit the Congo to take its oil, with the public force of the Congo to be utilized in the event of non-compliance.  That litigation exposed CMS Nomeco to significant risk of double liability and termination of its concession by the Congo.

In 2005, the Western District of Texas dissolved the Texas garnishment writs issued by that court, holding that the Congo's in-kind royalty was not subject to garnishment as a matter of state garnishment law, and it dismissed the claims against CMS Nomeco.  Af-Cap appealed.  However, the Western District thereafter issued a turnover order against the Congo in favor of Af-Cap.  The Western District also subsequently issued a turnover order in favor of Walker International Holdings Limited (another creditor of the Congo), which on its face stated that it would not come into effect until the Af-Cap turnover order was satisfied.

The Congo refused to comply with the turnover orders, informing the Western District of Texas, through its foreign minister, that it did not recognize the jurisdiction of a U.S. court to order it to turnover its rights to its own natural resources in its own territory.  The Western District imposed monetary sanctions against the Congo for failing to comply with the turnover order, and the Congo appealed both the Af-Cap turnover order and the monetary sanctions order.

While the appeals were pending, Af-Cap sought to hold CMS Nomeco in contempt for not paying the royalty in cash into the registry of the Court in Austin pursuant to the Af-Cap turnover order, notwithstanding the fact that a Congolese court had held in July 2005 that the turnover order was unenforceable under Congolese law and had ordered CMS Nomeco to permit the Congo to take its oil in Congolese waters.  The Western District rejected Af-Cap's arguments, holding that turnover orders issued against the Congo relating to the in-kind royalty were not directed to CMS Nomeco and could not be used to adjudicate CMS Nomeco's substantive rights and obligations under the concession agreement, which required analysis of applicable Congolese law.  Af-Cap appealed those orders.

In the meantime, another judgment creditor of the Congo, FG Hemisphere Associates LLC, was pursuing garnishment litigation against CMS Nomeco in the Southern District of Texas.  That court issued garnishment writs in October 2004 and December 2004, and collateral order appeals were filed, raising sovereign immunity under the FSIA.  In July 2006, the Fifth Circuit reversed the Southern District's orders authorizing the October and December 2004 writs, holding that those orders were void *ab initio*, based on the absence of findings on the required elements for an exception to immunity under the FSIA and based on the lack of findings that the Congo's right to take its oil in its own territory was subject to garnishment as a matter of state law. *FG Hemisphere Associates LLC v. Republique du Congo*, 455 F.3d 575 (5th Cir. 2006).  The Fifth Circuit ordered the Southern District to dissolve its writs of garnishment.

At the time of the Fifth Circuit's decision in the *FG* case, the appeals in the Western District litigation were still pending in the Fifth Circuit.  The Fifth Circuit consolidated Af-Cap's appeal of the dissolution of the garnishment writs with the Congo's appeals of the turnover order and monetary sanctions order.  The United States filed an *amicus curiae* brief in

support of the Congo, arguing that under the FSIA, the district court had no authority to issue a

monetary sanctions order against the Congo.  Although the United States filed its *amicus* brief in

the appeal relating to the monetary sanctions order against the Congo, it addressed the turnover

order in that brief as well, stating:

> Foreign nations that have statutes governing sovereign immunity do not
> permit a court to enter an injunction against a foreign state, and the foreign state
> may expect the United States to extend to it the same respect and courtesy.  The
> potential for affront may be particularly acute where the district court issues an
> injunction, such as the turnover order in this case, that purports to control the
> foreign state's conduct within its borders. . . .  Were a foreign court to assert the
> same power over the United States Government that the district court has asserted
> in this litigation over the Republic of Congo, ordering the United States
> Government to turn over assets within this country to a foreign plaintiff in direct
> contravention of our nation's foreign policy, it would undoubtedly lead to great
> public outcry.

Brief of the United States as *Amicus Curiae* in Support of Defendant - Appellant Republic of

Congo, Case No. 05-51168 (5th Cir.).

In August 2006, the Fifth Circuit issued a decision in the appeals in the Af-Cap

Texas litigation that definitively rejected the relief sought by the judgment creditors in the Texas

litigation.  Specifically, the Fifth Circuit held that (1) the Congo's in-kind royalty is not subject

to garnishment as a matter of state garnishment law, affirming the Western District's dissolution

of the garnishment writs, and (2) the district court lacked jurisdiction to enter a turnover order

against the Congo with regard to its in-kind royalty, vacating the turnover order.  *Af-Cap, Inc. v.

Republic of Congo*, 462 F.3d 417 (5th Cir. 2006) ("*Af-Cap III*").[1]

---

[1] Af-Cap asserts in its motion that it has asked the Fifth Circuit to certify the question of Texas garnishment law to the Texas Supreme Court.  It did not disclose to this Court that such a request was made in their rehearing petition to the Fifth Circuit with regard to the Fifth Circuit's August 2006 decision.  That rehearing petition was denied.  Af-Cap has now renewed its request for Texas Supreme Court certification in a separate Fifth Circuit appeal that does not even raise that state law issue, arguing that the Fifth Circuit's decision in August 2006 was wrong.  That attempt to seek certification of an issue to the Texas Supreme Court in an effort to overturn a prior Fifth Circuit panel decision is in direct contravention of the established Fifth Circuit rule that certification is not "a proper avenue to change our binding precedent." *Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 425 (5th Cir. 2001) (citations omitted).  "Once a panel of this Court has settled on the state law to be applied in a diversity case, the precedent

        This Litigation.  In this garnishment action (like Af-Cap's unsuccessful action

against CMS Nomeco in the Western District of Texas), Af-Cap seeks to garnish the Congo's in-

kind oil royalty that the Congo periodically is entitled to take under its concession agreement

with CMS Nomeco.

        Even though it was fully aware of the Congo court's actions described above,

holding that U.S. garnishment writs and turnover orders are not enforceable under Congolese law

and do not affect the Congo's right to take its royalty oil under the concession agreement, and

without disclosure of the existence of the Congo court orders or of the prior dismissal by the

United States District Court for the Western District of Texas of its earlier garnishment action

against CMS Nomeco, Af-Cap sought and obtained from the Delaware Superior Court a writ of

garnishment directed to CMS Nomeco and served it on CMS Nomeco's registered agent in

Delaware on October 12, 2005.  In seeking to enforce a writ of garnishment against CMS

Nomeco, in the face of the Congo court orders holding that the Congo is entitled to take the in-

kind royalty notwithstanding U.S. garnishment writs, Af-Cap is attempting to impose double

liability on CMS Nomeco, which has no choice but to permit the Congo to take its royalty oil

that is produced, stored, and taken in Congolese waters.  Af-Cap has never suggested how CMS

Nomeco could deliver oil for the benefit of Af-Cap against the dictates of the Congo, or how

CMS Nomeco could persuade a third party to purchase oil from CMS Nomeco for the benefit of

Af-Cap when the Congo claims ownership of that oil.  It is instructive that Af-Cap itself has

never offered to send its own hired tanker into Congolese waters to take delivery of the oil.  Af-

Cap offers no explanation as to what CMS Nomeco could do or could be expected to do under

---

should be followed by other panels without regard to any alleged existing confusion in state law, absent a
subsequent state court decision or statutory amendment which makes this Court's decision clearly wrong." *Id.*  Af-
Cap's improper certification request is simply one more example of its abuse of the judicial process.

the circumstances and how, in practice, it could sell and physically deliver oil which is owned by the Congo and located in the Congo against the express instructions of the Congo and the courts of the Congo who have threatened to use, and have actually used, public force to ensure compliance with what the Congo considers to be its lawful rights.

On November 1, 2005, CMS Nomeco removed the garnishment action to this Court (D.I. 1), and in compliance with the time requirements for filing its answer in this removed action under Fed. R. Civ. P. 81(c), it filed and served its Answer to the Writ of Garnishment (D.I. 2) the next day, November 2, 2005. In that answer, CMS Nomeco denied that it owed any royalty to the Congo or held its property as of the service date and answer date for the writs. The Congo had taken a lifting of royalty oil in September 2005, prior to service of the writ in October 2005, and under the terms of the agreements, the Congo was not entitled to take any oil at that time and would not become entitled to take any oil until months later, after CMS Nomeco had taken a series of oil liftings for its own account. Thus, inasmuch as Af-Cap, as garnishor, was attempting to step into the shoes of the Congo and enforce the Congo's rights to take oil by virtue of the garnishment writ, the writ gave Af-Cap no rights, since the Congo had no such rights as of service and answer dates for the writs. As a result, the writ captured nothing, even if Delaware law otherwise permitted garnishment of the Congo's in-kind royalty, and even if Af-Cap could defeat the other affirmative defenses.

Thereafter, Af-Cap filed exceptions to CMS Nomeco's Answer, and the parties filed cross-motions for summary judgment, which the Court denied without prejudice to renewal following discovery. The Court entered a scheduling order providing for completion of discovery by January 26, 2007, filing of dispositive motions in February 2007, a hearing on those motions in March 2007, and, if the case is not resolved by the motions, trial in July 2007.

On January 10, 2007, Af-Cap filed an Emergency Motion, seeking an order of contempt against CMS Nomeco, an order of sequestration against the Congo's in-kind royalty, and a preliminary injunction against CMS Nomeco against further "royalty payments" to the Congo. For the reasons set out herein, Af-Cap's Emergency Motion should be denied.

## ARGUMENT

### I.    CMS Nomeco is Not In Contempt of the Garnishment Writ

Af-Cap argues that the garnishment writ issued by the Superior Court constitutes an order of a court that, upon violation, subjects CMS Nomeco to contempt sanctions. Af-Cap argues CMS Nomeco violated the writ served in October 2005 by making "royalty payments" in April 2006 in "disregard" of the writ. As shown below, the writ issued by the Delaware Superior Court that was served in October 2005 was void at inception, did not cover the April 2006 oil lifting, and provides no legal basis for any contempt finding. Furthermore, Af-Cap's assertions that CMS Nomeco "disregarded" the writ by making "royalty payments" in April 2006, without disclosing to this Court the facts surrounding the April 2006 oil lifting, including the Congo court order that compelled that oil lifting, CMS Nomeco's resistance of that order, and the Congo's use of public force to enforce compliance by way of an armed boarding of the storage vessel by police, can only be characterized as an effort by Af-Cap to mislead the Court.

For all of the reasons set out below, Af-Cap's motion to hold CMS Nomeco in contempt should be denied.

### A.    The Garnishment Writ is Void Ab Initio and Violates the FSIA Under the Fifth Circuit's Decision in FG

Af-Cap acknowledges in its brief filed in support of its motion that a threshold requirement for a contempt order is a finding that the order in question was validly issued. Op. Br. at 9. As this Court has already held in its Order denying Af-Cap's motion to remand, a

threshold requirement in a garnishment action that relates to the property of a foreign state is that the property falls within an exception to immunity from execution under the FSIA.

In its motion, Af-Cap represents to this Court that the "Fifth Circuit has ruled that the CMS royalty payment obligation under the Convention is not immune from execution by Congo's creditors through proceedings occurring wherever CMS is located (including Texas and Delaware, its state of incorporation)." Motion at 6. That allegation is demonstrably false, as it is directly contradicted by the Fifth Circuit's recent decision in *FG Hemisphere Associates LLC v. Republique du Congo*, 455 F.3d 575 (5th Cir. 2006), not disclosed in Af-Cap's motion, in which the Fifth Circuit ruled precisely to the contrary.

In *FG*, the Fifth Circuit held that writs of garnishment directed to the Congo's in-kind royalty that were issued by a Houston federal district court in October and December 2004 were issued in violation of the FSIA and were void *ab initio*, due the absence of any findings by the district court that the Congo's in-kind royalty was "in the United States," as required by the FSIA, based on the circumstances existing at the time the court authorized the writs, and also due to the absence of findings concerning the amenability to garnishment of the property in question as a matter of state garnishment law. 455 F.3d at 580, 588-591, 594, 596.

In addressing the FSIA issues with regard to the Congo's in-kind royalty, *FG* held that *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir. 2004) ("*Af-Cap II*") (relied on heavily by Af-Cap in its motion filed in this Court) did not decide the issues pertinent to resolution of the FSIA issues with regard to writs issued in the *FG* case in October and December 2004. *Id.* at 585-590. The *FG* Court distinguished *Af-Cap II*, noting that on the *Af-Cap II* record (which related to facts in early 2003 and previously), "it was undisputed that Texas was the locus from which the garnishees had supervised, directed, and financed the activities that

gave rise to their obligations to make royalty payments to the Congo" and that at that time, the Garnishees had a "continuous presence in Texas," but that "[b]y July 2004, none of the Garnishees had operations, officers, or a physical presence in the United States." *Id.* at 582, 586.

The *FG* Court held that under the FSIA's "in the United States" requirement, a district court is required to determine the situs of the foreign state's property on which execution is sought each time that execution is authorized, based on the circumstances existing when execution is authorized. *Id.* at 588-591, 594 n. 3, 596. The Court recognized that "exemption from executional immunity during one situs snapshot does not mean that, during another situs snapshot, the property is not immune from execution." *Id.* at 594 n. 3. The Court held that the property sought to be executed "must be in the United States when the district court authorizes execution" and that it was improper for the district court to resolve the "in the United States" issue with regard to the writs issued in October 2004 without making a fresh determination of the location of the Congo's in-kind royalty based on the facts and circumstances existing at that time. *Id.* at 580, 588-591, 594 n.3, 596. The Court noted that such a rule best prevents disruption of foreign sovereigns' public acts by not executing on property that was but is no longer in the United States. *Id.* at 589. The Court held that a district court is jurisdictionally required to make fact findings on the relevant issues under the FSIA, based on the circumstances then existing, in support of any order authorizing garnishment. *Id.* at 590-591, 594, 596. In the absence of such fact findings, an order authorizing garnishment is void *ab initio*. *Id.* at 590-591. Because the district court did not make the required findings, the Fifth Circuit found it unnecessary to address the question of whether mere incorporation in Delaware would be sufficient connection to the United States to make the property properly subject to being

characterized as "in the United States" for purposes of the FSIA's "in the United States" requirement.  *Id.*

The fatal defect in the writs of garnishment issued by the Southern District of Texas that were the subject of the Fifth Circuit's *FG* decision applies equally to the writ that is the subject of this case.  The Superior Court order that authorized issuance of the writ made no findings concerning the "in the United States" or "commercial activity" requirements of the FSIA, nor did it make any findings concerning the amenability to garnishment of the Congo's property under state law.  *See* Exhibit C.  In fact, Af-Cap's motion filed in the Superior Court made no effort to make any such showing.  Under the rationale of the decision in *FG*, the authorizing order for the writ that is the subject of this case is void *ab initio* and invalid, and the writ issued pursuant thereto likewise is void *ab initio* and invalid.  As such, there is a fatal, threshold obstacle to Af-Cap's contempt motion and to Af-Cap's case as a whole.

Like in *FG*, the absence of required findings under the FSIA in the Superior Court's authorizing order makes it unnecessary for this Court to determine whether mere incorporation in Delaware of CMS Nomeco is sufficient to satisfy the "in the United States" requirement of the FSIA, since the writ is void *ab initio*.  455 F.3d at 590.  But if the Court were to consider that question, there is no legitimate basis for such a conclusion.  The international relations policy concerns implicated by the FSIA's limitations on execution mandate that a single, "true situs" of  property be identified to insure that U.S. courts are not reaching outside of U.S. territory and interfering with the foreign state's property rights outside of U.S. territory.  *See Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1122 (5th Cir. 1985) (court must discern the "true situs" of intangible property where an "overriding national concern" is implicated); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989) ("in the United States"

requirement as used in a jurisdictional provision in the FSIA evinced legislative intent to preclude reach outside of U.S. territorial jurisdiction). Enforcement of a writ of garnishment against the Congo's in-kind royalty would constitute interference by the U.S. courts with the Congo's entitlement to receive its in-kind royalty oil in its own territory, under an agreement performable wholly in Congolese waters and governed by Congolese law. Under these circumstances, there is no rational basis for concluding that the "true situs" of the in-kind royalty is "in the United States" for purposes of the FSIA based merely on the operator's Delaware incorporation.

> B.      *Even if the Writ Issued by the Clerk is an "Order" for Purposes of This Court's Exercise of its Contempt Powers, CMS Nomeco Did Not Violate the Terms of the Writ*

Af-Cap argues that the writ of garnishment issued by the clerk of the Superior Court pursuant to the authorizing order of the Superior Court constitutes an "order" of the court for purposes of contempt. Even if that is assumed to be true, CMS Nomeco has done nothing that violates the terms of the writ.

The writ, quoted by Af-Cap in its motion, only required CMS Nomeco to:

> inform [plaintiff's counsel] of all money, goods, credits and effects, stock, bonds, personal property and/or real estate *belonging to the defendant you currently possess. As the Garnishee, you are to retain the items stated by you in response to the above. You are to hold these items* until another order of this Court releases you from this obligation.

(emphasis added). By its very terms, the writ required an answer as to property belonging to the Congo that CMS Nomeco currently possessed at the time of service of the writ, and it directed CMS Nomeco to "retain the items stated by you in response" and "hold these items" pending further order of the Court. Thus, by its terms, the writ only imposed restrictions with regard to property of the Congo that was stated in CMS Nomeco's answer to be in its possession. By virtue of the fact that the Congo had no right to take any oil as of the service date and answer

date for the writ (discussed in more detail below), CMS Nomeco properly answered that it had

no property of the Congo as of those dates.  Because the writ only imposed restrictions with

regard to items of property identified by CMS Nomeco in its answer, and because CMS Nomeco

answered that it held no such property, the prohibitions in the writ are inapplicable.

   C.  *The Garnishment Writ Captured No Royalty*

    Even if the narrow language of the writ is ignored, the undisputed facts

demonstrate that the writ did not capture any of the Congo's in-kind royalty.

    Under Delaware law, a garnishment writ captures only an obligation owed as of

the service date of the writ of garnishment and the answer date.  *See Cooper's Home*

*Furnishings, Inc. v. Lolly*, 270 A.2d 676 (Del. Super. 1970) ("Delaware law contemplates

attaching property which comes into the hands of the garnishee subsequent to the serving of the

attachment upon the garnishee until the garnishee makes his answer.").  Furthermore, the

garnishment writ gives the garnishor no greater rights against the garnishee than those held by

the debtor against the garnishee which are enforceable by an action at law.  As the Delaware

Supreme Court held in *Wilmington Trust Co. v. Barron*, 470 A.2d 257, 263 (Del. 1983):

> [A] creditor's right to recover from the garnishee is derived from, and no
> greater than, the debtor's right to recover from the garnishee in an action at
> law. . . .  An attaching creditor stands in no better position than the
> defendant in the judgment, as to the collection of a debt due to the latter
> from the garnishee.  The right of such creditor to recover from the
> garnishee depends upon the subsisting rights between the garnishee and
> the debtor in the attachment; and the test of the garnishee's liability is that
> he has funds, property or credits in his hands belonging to the debtor, for
> which the latter would have a right to sue.  The garnishee stands in every
> respect in the same position as if the suit had been brought by his own
> creditor.

    Under these rules, the writ served in October 2005 captured nothing.  As

mandated by the Delaware Supreme Court in *Barron*, Af-Cap can claim no rights under the

garnishment writ if CMS Nomeco did not have "funds, property or credits in [its] hands

belonging to the [Congo], for which the latter would have a right to sue" when the writ was served and answered. *Id.* As shown below, the Congo had no rights to receive royalty oil on October 12, 2005, when the writ was served, on November 2, 2005, when the writ was answered, or at any time in between.

As shown by the Declaration of Maryse Bernard attached hereto as Exhibit D, SNPC (the Congo's state-owned oil company which owns a working interest in the concession) is entitled to take a lifting of the Congo's royalty oil and its own working interest oil only at the next lifting after the combined under-lifted position of the Congo (with regard to royalty oil) and SNPC (with regard to working interest oil) exceeds 275,000 barrels. Ex. D hereto, ¶5. The Amendment to Lifting Agreement confirms that the Congo has no right to take oil until the next lifting after the combined 275,000 under-lift threshold is exceeded. See Exhibit E, paragraphs 1.1 and 4.2. On September 7, 2005, SNPC took a lifting of the Congo's royalty oil and SNPC's working interest oil totaling 605,006 barrels, leaving SNPC in an over-lifted position with regard to its working interest oil and extinguishing the Congo's royalty entitlement. Ex. D, ¶13 and Ex. 12 thereto. On October 12, 2005, when the writ of garnishment was served, on the date the answer was filed, and at all times in between, the Congo and SNPC were in an over-lifted position and had no right to take a lifting of oil during that time period. *Id.* Under the terms of the agreements, the government did not become entitled to take an oil lifting until April 2006, following several liftings by CMS Nomeco. *See* Exhibit A.

These facts are not disputed. In fact, in responses to Requests for Admissions, Af-Cap has admitted that at no time from the service date of October 12, 2005 through the answer date of November 2, 2005 were the Congo and SNPC in a combined under-lifted position

of at least 275,000, a contractual condition to any right on the part of the Congo to take oil. *See* response to Request for Admission No. 10 (Exhibit F).

Under the Delaware Supreme Court's decision in *Barron*, Af-Cap's rights under the garnishment writ, if any, are "derived from, and no greater than, the [Congo's] right to recover from [CMS Nomeco] in an action at law." 470 A.2d at 263. Af-Cap "stands in no better position than the [Congo], as to the collection of a debt due to the latter from [CMS Nomeco]." *Id.* CMS Nomeco can have no liability on the garnishment writ because as of the service and answer dates for the writ, there were no "funds, property or credits in [CMS Nomeco's] hands belonging to the [Congo], for which the latter would have a right to sue." *Id.* The Congo had no right to recover anything from CMS Nomeco during the period from service date to answer date of the writ. Under the rules stated in *Barron*, the absence of any right on the Congo's part to take oil during the period from service of the writ to answer date of the writ mandates the conclusion that the writ captured nothing, and CMS Nomeco cannot be held in contempt.

D.    *The Garnishment Writ Does Not Apply to Non-Monetary Obligations*

Af-Cap seeks to garnish the Congo's in-kind royalty as a "debt" or "obligation" of CMS Nomeco to Congo. However, non-monetary obligations are not subject to garnishment, meaning that the writ does not apply to the Congo's in-kind royalty.

In August 2006, the Fifth Circuit expressly held that the Texas garnishment statute and rules do not permit garnishment of the Congo's in-kind royalty. *Af-Cap III,* 462 F.3d at 423-425. The Fifth Circuit affirmed the Western District of Texas' dissolution of the writs of garnishment directed to the Congo's in-kind royalty, holding that Texas garnishment law precludes garnishment of non-monetary obligations. *Id.* As discussed below, the rationale of the Fifth Circuit's decision in holding that the Congo's in-kind royalty is not subject to garnishment under Texas law applies equally under Delaware garnishment law.

The Fifth Circuit began its analysis by noting that garnishment is a harsh remedy, bringing a garnishee into a dispute in which it is a stranger, and that the garnishment statute therefore must be "strictly construed." *Id.* at 424. The same is true of garnishment in Delaware. *See John Julian Constr. Co. v. Monarch Builders, Inc.*, 306 A.2d 29, 33 (Del. Super. 1973) (in the context of garnishment, "[a]ttachment is a summary process in derogation of the common law and, therefore, the statute is to be strictly construed in favor of the party against whom the proceedings is employed, both as to the subject matter of the attachment and the method of enforcing the remedy").

The Fifth Circuit then analyzed the Texas garnishment statute and rules and concluded that they did not allow garnishment of non-monetary obligations. The court noted that the Texas garnishment rules provide for a monetary judgment against the garnishee "for the amount found to be due to the defendant from the garnishee," contemplating that only *monetary* debts are subject to garnishment. 462 F.3d at 424. The Fifth Circuit also noted that the portion of the Texas garnishment statute permitting garnishment of "effects" (which a garnishee is required to "deliver" to a sheriff for sale) applies only to property of the debtor that has a physical existence and that is in the possession of the garnishee and capable of delivery, rendering it inapplicable to intangible obligations. *Id.*

This rationale also applies under the Delaware garnishment statute and rules. The Delaware statute limits the categories of property subject to garnishment to "[g]oods, chattels, rights, credits, moneys, effects, lands and tenements." 10 *Del. C.* § 3508. With regard to the language in Section 3508 that potentially reaches obligations, i.e., "rights" and "credits," the Delaware Supreme Court has held that "'it is well settled that not all rights are subject to attachment'" *McNeilly v. Furman*, 95 A.2d 267, 271 (Del. 1953) (citations omitted). The Court

emphasized that "[h]istorically attachment was strictly confined to a 'debt', that is, a liquidated claim," and that "[t]he word 'rights' is bracketed with the word 'credits', *which imports a fixed monetary obligation*." *Id.* (emphasis added).  Thus, the Delaware Supreme Court has already held that the type of obligation that is subject to garnishment in Delaware is a "fixed monetary obligation." *Id.*

Analysis of the Delaware procedural rules dealing with garnishment also compels the conclusion that non-monetary obligations are not subject to garnishment.  Superior Court Civil Rule 5(aa)(2) provides that a garnishee is discharged upon delivery to the sheriff of the property of the debtor that is in the garnishee's possession, and that a failure by the garnishee to deliver the property to the sheriff will result in a judgment against the garnishee for the value of the property that the garnishee failed to deliver to the sheriff.  Del. Sup. Ct. R. Civ. P. 5(aa)(2).  Implicit in this rule is the requirement that property subject to garnishment must be capable of delivery to the sheriff.  CMS Nomeco cannot deliver to a sheriff in Delaware the Congo's rights to take in-kind royalty oil in the Congo, nor can CMS Nomeco deliver the oil itself to a sheriff in Delaware.[2]  Being incapable of delivery to a sheriff in Delaware, the Congo's right to take oil in the Congo simply is not a type of property interest that is within the scope of garnishable property under Delaware law.

In an apparent effort to avoid the fact that the royalty is non-monetary, Af-Cap alleges that "[d]uring the proceedings in Texas, CMS colluded with Congo to purport to restructure the form and location of payment of the royalties from cash paid in the United States to oil delivered in Congo, all expressly for the purpose of defeating or hindering Af Cap's ability to collect on its judgment."  Op. Br. at 3.  That is a blatant misrepresentation.  The Congo

---

[2] It is undisputed that the oil itself is not garnishable in Delaware, as it is located in the Congo and outside the jurisdiction of a court sitting in Delaware.

unilaterally elected to take its royalty oil in kind in 1999, and the Fifth Circuit so held in its

decisions relating to the Congo's royalty. *FG*, 455 F.3d at 581 ("since 1999, the Congo has

elected to receive the payments in-kind"); *Af-Cap III*, 462 F.3d at 422 ("since 1999, the Congo

has opted to receive 100 percent of its payments "in kind").  It is undisputed that the Congo took

its first "in-kind" oil lifting long before any Texas garnishment proceedings were filed.  See the

Over/Under Statement attached as Exhibit 12 to Exhibit D (showing an in-kind government oil

lifting in March 2000), and the Amendment to Lifting Agreement (Exhibit E) at recital 11, page

3, and Annex thereto (reciting the facts concerning the Congo's 1999 election and listing the

liftings taken following the in-kind election).  Af-Cap's allegation that the in-kind election was

part of "collusion" with the Congo "during the proceedings in Texas" (which were not filed until

2001) is a demonstrably false statement, contrary to the irrefutable facts and the Fifth Circuit's

decisions.

>        E.    *Double Liability Principles Render the Writ of Garnishment Unenforceable*

As noted in the Preliminary Statement above, Af-Cap chose to not disclose to this

Court in its motion, brief, and supporting affidavit the facts surrounding the Congo court orders,

including the latest Congo court order that compelled the April 2006 oil lifting that is the primary

subject of Af-Cap's motion.  The Congo enforced that latest order by boarding the storage vessel

with armed gendarmes in response to CMS Nomeco's resistance to the Congo court order that

was directed to the April 2006 lifting.  *See* Exhibit B.  The Congo has taken that lifting and the

associated royalty oil, but Af-Cap still seeks to enforce the writ that it alleges captured the

Congo's right to take that lifting.  As discussed above, the October 2005 garnishment writ did

not capture the Congo's right to take the April 2006 lifting, for a variety of reasons.

Nevertheless, even if the fatal defects in Af-Cap's claims discussed above are ignored, the fact

that the Congo has taken its royalty under compulsion of Congo court orders definitively

establishes that the relief sought in this case (an order requiring CMS Nomeco to pay the value of the royalty oil taken by the Congo) would impose double liability on CMS Nomeco. Such a result is precluded by this Court's decision in *LNC Investments, Inc. v. Republic of Nicaragua*, No. 01-134-JJF (D. Del. 2002), 2002 WL 32818644, appeal dism'd, 396 F.3d 342 (3d Cir. 2005).

In *LNC Investments*, this Court analyzed the propriety of enforcing a writ of garnishment in a case involving an attempt by a creditor, LNC Investments, to recover a debt owed by a foreign sovereign, the Republic of Nicaragua ("Nicaragua"), by serving a writ of attachment on Megatel, a garnishee indebted to Nicaragua. Concluding that Nicaraguan law would not recognize the garnishment writ as a defense to Megatel's payment obligation to the Nicaraguan government, and based on Megatel's exposure to double liability, the court issued an order granting the motion to quash the writ. *Id.* This Court applied authorities from another jurisdiction involving comparable circumstances holding that writs of garnishment cannot be enforced in such circumstances. *See Weitzel v. Weitzel*, 27 Ariz. 117, 230 P. 1106 (Ariz. 1924) (upholding dissolution of writs of garnishment of debts owed in a foreign country because writs would not be recognized as defense to performance of obligations in foreign country); *West v. Baker*, 510 P.2d 731, 734 (Ariz. 1973) (finding dissolution of writs of garnishment proper when court "cannot insure that [the garnishee] will not incur double liability").

These principles are fully applicable here. Af-Cap takes the position that even though the Congo took its oil under compulsion of Congo court orders, CMS Nomeco is required to pay the full value of that oil and pursue reimbursement from the Congo. *See* Af-Cap's Answer to Interrogatory No. 7, Exhibit G hereto (asserting that "[i]f Congo, or SNPC on Congo's behalf, took oil, then CMS has the option to bring a separate proceeding against Congo"). Thus, Af-Cap is attempting to force CMS Nomeco to pay the Congo's debts,

notwithstanding the requirements of Congolese law (which governs the concession agreement) and the compulsion of Congo court orders requiring that CMS Nomeco permit the taking of the oil by the Congo, effectively converting CMS Nomeco into guarantor of the Congo's debts.

The relief that Af-Cap seeks is entirely inconsistent with the principles of *LNC Investments* and garnishment generally. Garnishment is grounded on the Court's ability to protect the garnishee, an innocent third party to the underlying transaction, from having to pay twice. While the full faith and credit clause typically provides such protection in the context of domestic garnishment, full faith and credit has no application to obligations arising under foreign law and subject to enforcement elsewhere, raising significant issues of double liability. In this case, Af-Cap is specifically asking this Court to impose double liability on CMS Nomeco. Principles requiring protection of a garnishee against the imposition of double liability preclude enforcement of the garnishment writ in this case, even if it is assumed that the writ captured the Congo's in-kind royalty (an invalid assumption for the reasons set out above).

F.     *The Doctrine of "Foreign State Compulsion" Precludes Enforcement of the Writ*

Under the doctrine of "foreign state compulsion" recognized in Section 441 of the Restatement (Third) of Foreign Relations Law of the United States ("Restatement Section 441"), preference among conflicting commands of the courts of different nations is accorded to the orders of the nation in which the act is to be done or not to be done. In this case, even if the writ is considered an order that required CMS Nomeco to prevent the Congo from taking its oil in the its own territory, preference must be given to the Congo court orders because the oil is produced, stored, and lifted in the Congo.

Subsection (1)(b) of the Restatement Section 441 states, in pertinent part: "In general, a state may not require a person . . . to refrain from doing an act in another state that is required by the law of that state." Comment a to Section 441 states:

-24-

This section applies . . . to protect persons caught between
conflicting commands.  In determining preference between
conflicting exercises of jurisdiction to prescribe, this section
generally accords preference to the state in which the act is to be
done (or is not to be done).

These principles were applied on facts indistinguishable from those presented in
this case in *Reebok Intern. Ltd. v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995).  In that case, a
federal district court granted a temporary restraining order enjoining a Luxembourg bank from
transferring funds of the defendant which were in the bank's hands.  The defendant sought and
obtained an order from a Luxembourg court that instructed the bank to release the funds to the
defendant because the U.S. order was not legally valid in Luxembourg, as it had not been
registered there.  The bank released the fund, and the district court found the bank in contempt.
The Ninth Circuit reversed, relying on Restatement Section 441, concluding that the bank was
entitled to comply with the Luxembourg court order notwithstanding the U.S. temporary
restraining order, stating that "it would defy logic were we to decide that the district court could
hold [the bank] in contempt for complying with the order of the Luxembourg court," and that the
bank "was under no obligation to comply" with the U.S. order.  49 F.3d at 1392-1393.

While not mentioning the Congo court orders at all in its motion, Af-Cap
represents to this Court that "the Fifth Circuit [Court of Appeals] has definitively held that,
irrespective of the efforts of the government of Congo or its courts to interfere with the
enforcement of these United States judgments, CMS cannot claim any defense under the theory
of sovereign compulsion."  Op. Br. at 2 (citing *Af-Cap II,* 383 F.3d  at 372 n. 14).  That
allegation is blatantly false.  The *Af-Cap II* decision referenced by Af-Cap, rendered in
September 2004, predates any of Congo's efforts to obtain Congolese court orders.  That
decision makes no reference to foreign state compulsion or Restatement Section 441, and it does

-25-

not purport to render any decision on the availability of defenses to CMS Nomeco based on

Congo court orders compelling CMS Nomeco to permit the Congo to take its oil.

Under the authority of Section 441 of the Restatement and *Reebok*, the doctrine of

foreign state compulsion precludes enforcement of the writ.

G.      *The Act of State Doctrine Also Precludes Enforcement of the Writ*

In *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897), the Supreme Court said:

> Every sovereign state is bound to respect the independence of every other
> sovereign state, and the courts in one country will not sit in judgment on
> the acts of the government of another, done within its own territory.
> Redress of grievance by reason of such acts must be obtained through the
> means open to be availed of by sovereign powers as between themselves

This principle, known as the "act of state" doctrine, reflects "'the strong sense of

the judicial branch that its engagement in the task of passing on the validity of foreign acts of

state may hinder' the conduct of foreign affairs." *W.S. Kirkpatrick & Co. v. Environmental

Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Banco Nacional de Cuba v. Sabbatino*,

376 U.S. 398, 423 (1964)).

If this Court were to enforce the writ against CMS Nomeco, it necessarily would

be sitting in judgment of the conduct of the Congo and its courts within the Congo's own

territory in compelling CMS Nomeco to deliver oil to SNPC in Congolese waters.  Enforcement

of a garnishment writ in these circumstances would violate the act of state doctrine.

The validity of that conclusion is confirmed by the decision of the Ninth Circuit in

*Philippine National Bank v. United States District Court*, 397 F.3d 768 (9th Cir. 2005).  In that

case, the district court entered an injunction prohibiting transfer of assets of the Estate of

Ferdinand Marcos.  Subsequently, the Philippine Supreme Court entered an order that required

that certain funds of the estate held by the Philippine National Bank be forfeited to the Republic

of the Philippines.  The bank transferred the assets in compliance with the order of the Philippine

Supreme Court. The district court then entered a show cause order requiring that the bank show cause why it was not in contempt of the earlier injunction that enjoined transfers of assets. Prior to the show cause hearing, the bank filed a petition for writ of mandamus with the Ninth Circuit, seeking to restrain the district court from enforcing its show cause order on the grounds that the order violated the act of state doctrine. The Ninth Circuit granted the petition, vacated the show cause order, and directed the district court to refrain from further action against the bank or the funds that were the subject of the Philippine Supreme Court's order. *Id.* at 772-775. The Ninth Circuit reasoned that because the Philippine Supreme Court's order was obtained at the request of the Philippine government in furtherance of governmental interests, the act of state doctrine prevented the district court from holding the bank in contempt for transferring the funds in compliance with the Philippine Supreme Court's order. *Id.*

The same rationale applies in this case. The Congo court orders were the result of applications filed with the Congolese court by the Congo and its state-owned oil company, to obtain delivery of oil produced in the Congo's territorial waters. The Congo's rights in its natural resources are sovereign in nature because they are "'affected with the public interest,'" and "'goods in which only the sovereign may deal.'" *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir.1989)). Under the rationale of *Philippine National Bank*, the act of state doctrine precludes enforcement of a writ directed to the Congo's in-kind royalty.

Af-Cap's argument that the Fifth Circuit's decision in *Af-Cap II* precludes this defense is again baseless. The Fifth Circuit's decision came months before the first Congo court

order was issued, and the Court therefore did not address the act of state defense that is based on the Congo court orders or the Congo's applications for those orders.

The act of state doctrine precludes enforcement of the writ and any award of contempt sanctions for purportedly violating it.

H.     *The Congo Court Orders Rendered It Impossible for CMS Nomeco to Refuse to Permit the Congo to Take Its Royalty Oil*

The Congo court orders rendered it impossible for CMS Nomeco to prevent the Congo from taking its oil in April 2006.  CMS Nomeco resisted to the point of armed police boarding the storage vessel.  *See* Exhibit B.  In order to avoid risk to life and property, CMS Nomeco did not further resist at that point, and the Congo took its lifting.  *Id.*

If the Court were to interpret the writs as requiring CMS Nomeco to prevent the Congo's April 2006 oil lifting, such a requirement was impossible for CMS Nomeco to comply with under these circumstances.  The United States Supreme Court has said that "[w]here compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."  *United States v. Rylander*, 460 U.S. 752, 757 (1983).  The Fifth Circuit has recognized inability to comply as a "traditional defense" to a contempt motion.  *United States Steel Corp. v. United Mine Workers of America, District 20*, 598 F.2d 363, 368 (5th Cir. 1979).  Under the circumstances, a contempt order is wholly inappropriate, even if all of the other fatal legal defects in Af-Cap's case are ignored.

For all of the reasons set out in this Part I, Af-Cap's contempt motion is baseless and should be denied.

## II.    Af-Cap Is Not Entitled to a Sequestration Order

Af-Cap also seeks a sequestration order against the Congo's right to receive royalty, asking this Court to sequester that property under 10 Del. C. §366.  That statute, on its

-28-

face, is not applicable to this action.  In any event, Af-Cap has made no effort to make the

showings that are necessary under the FSIA to authorize seizure of the Congo's property.

A.    *Section 366 Is Inapplicable*

Section 366 is a sequestration device that by its terms only applies to

circumstances in which a party to a complaint in equity has refused to appear.  It is well-settled

that the purpose of the Delaware sequestration statute is to compel the appearance of a non-

resident in an action in the Court of Chancery.  *See, e.g., Hughes Tool Co. v. Fawcett*

*Publications, Inc.*, 290 A.2d 693, 695 (Del. Ch. 1972) ("[t]he primary purpose of 10 *Del. C.*

§ 366 is to compel the appearance in this Court of a non-resident having a seizable interest with a

situs in Delaware").

This fundamental purpose of Section 366 is further illustrated by the equally well-

settled principle that, where the owner of sequestered property enters its appearance, the property

sequestered is released.  *Trans World Airlines v. Hughes*, 185 A.2d 762, 765 (Del. Ch. 1962)

(holding that, where property is seized through sequestration, it "is generally released upon the

appearance of its owner, Title 10 Del. C. § 366, as applied"); *Sands v. Lefcourt Realty Corp.*, 117

A.2d 365, 368 (Del. 1955) ("Since the entry of a general appearance is the condition of the

release of the seized property, the object of seizure is to compel that kind of appearance");

*Gordon v. Michel*, 297 A.2d 420, 422 (Del. Ch. 1972) (" . . . upon a general appearance by a

non-resident defendant, the sequestered property is generally released").

Thus, application of section 366 is only proper where a plaintiff seeks to

command the appearance of a non-resident defendant.  This is not such an action.  Af-Cap asserts

that it already holds a judgment against the Congo and is not seeking any *in personam* relief

against the Congo in this proceeding.  In fact, this Court has already held that the Congo is not a

party to this garnishment proceeding.  Memorandum Opinion of July 20, 2006 at 9.  Under these

circumstances, there is no basis for the court to compel an "appearance" by the Congo by way of a sequestration order. Af-Cap's request for a sequestration order under this statute is merely a subterfuge designed to manufacture a purported basis for imposing monetary liability against CMS Nomeco requiring that it pay the Congo's debts.

The case relied on by Af-Cap, *D'Angelo v. Petroleos* Mexicanos, 378 F.Supp. 1034 (D. Del. 1974), confirms that the statute is not available in this action. *D'Angelo* involved *in personam* claims in equity against Petroleos Mexicanos, and Petroleos Mexicanos did not appear. The Court held that under Section 366, Petroleos Mexicanos' appearance could be compelled by a sequestration order against a monetary debt owed to Petroleos Mexicanos by Mobil Oil Corporation. *D'Angelo* is merely an example of the appropriate use of Section 366: to compel appearance of a non-appearing defendant in an *in personam* equity action. *D'Angelo* does not stand for the proposition that Section 366 may be used purely as a judgment collection device when a judgment has already been rendered against a defendant in an action at law. Such an attempted use of Section 366 is outside the scope of the statute, by its own terms.

       B.     *Af-Cap's Request for a Sequestration Order is Improper Under the FSIA*

In FG, the Court held that any request for execution against the property of a foreign state must be authorized by a court order that makes findings concerning the requirements of the FSIA and the amenability to execution under state law. FG, 455 F.3d at 580, 588-591, 594, 596. Regardless of whether execution has issued in the past concerning the property in question, the Court must undertake a fresh analysis of the FSIA issues, based on the circumstances existing at the time the authorizing order is issued. *Id.* at 580, 588-591, 594 n.3, 596. Af-Cap has made no effort to show that based on the current circumstance, the Congo's property that it seeks to sequester is "in the United States" or "used for commercial activity in the United States," as required by the FSIA. The FSIA precludes any such order.

## III.    Af-Cap Is Not Entitled to Injunctive Relief

Af-Cap asks this Court to enter an injunction against CMS Nomeco "(a) enjoining CMS from further making any royalty payments to Congo under the Convention, and (b) preventing CMS from otherwise removing from this Court's jurisdiction CMS's obligations to make royalty payments to the Congo under the Convention, pending a determination of Plaintiff's right to execute on those royalty obligations." Af-Cap Brief at 4. For a variety of reasons, each category of injunctive relief that Af-Cap seeks should be denied.

### (1)    The Requested Injunction Against "Royalty Payments"

Af-Cap seeks an injunction against "further payments to Congo." In seeking such an injunction, Af-Cap is asking this Court to order CMS Nomeco to prevent the Congo from taking the oil lifting that the Congo is contractually entitled to receive under Congolese law and that it has nominated for lifting during the period February 10-15, 2007. It is asking this Court to make such an order, despite the Congo court's prior orders holding that the Congo is entitled to take its oil under Congolese law, despite the Congo's threatened and actual use of public force to overcome CMS Nomeco's past resistance of such orders, and despite the Congo's threats to terminate CMS Nomeco's rights under the concession if it is prevented from taking its oil in its own territory. Such relief is sought exclusively on the basis of Af-Cap's claimed rights under the garnishment writ issued in October 2005, which as shown above are non-existent.

### a.    The Requested Injunction, if Granted, Would Not Have the Effect of Preserving Any Property or Rights at Issue in the Garnishment Action

Af-Cap argues that "[p]reliminary injunctions are appropriately entered to preserve the property or rights at issue until a case has been fully decided." However, the Congo's right to take royalty oil in February 2007 does not constitute "property or rights at issue" in this case.

The Delaware Supreme Court's decision in *Barron* makes clear that the only property that the October 2005 garnishment writ could conceivably have captured (even if all other defensive issues are ignored) is the Congo's royalty rights, if any, that the Congo was entitled to enforce against CMS Nomeco in an action at law as of the service and answer dates for the October 2005 writ. *Barron*, 470 A.2d at 263. There is no basis whatsoever for any argument that the Congo's right to take a later oil lifting, in February 2007, was somehow captured by the October 2005 garnishment writ. It is undisputed that under the agreements, the Congo's right to take the oil lifting that it has nominated for February 10-15, 2007 came into existence only after the combined under-lifted position of SNPC and the Congo moved into an under-lifted position of in excess of 275,000 barrels, following CMS Nomeco liftings that occurred during 2006. The Congo had no right to pursue an action at law against CMS Nomeco for the February 2007 oil lifting when CMS Nomeco was served with the October 2005 garnishment writ. The Congo's current right to take the next oil lifting in February 2007 simply did not exist in October 2005.

Given these facts, there is no basis whatsoever for Af-Cap's contention that an injunction against the February 2007 oil lifting is necessary "to preserve the property or rights at issue until [the] case has been fully decided." Under *Barron*, the Congo's right to take the February 2007 oil lifting does not constitute the "property or rights at issue" in this case. The injunction that Af-Cap seeks is not necessary to "preserve property or rights at issue" in this case; to the contrary, the Congo's right to take royalty oil in February 2007 is simply not part of this case.

   b. <u>Af-Cap Has Not Carried and Cannot Carry its Burden of Showing the Elements for Obtaining a Preliminary Injunction</u>

Af-Cap acknowledges in its Opening Brief at 14 that is has the burden of showing the four elements for obtaining a preliminary injunction:  (1) that it has a "reasonable probability of success on the merits"; (2) that is will suffer irreparable injury if the injunction is not issued; (3) that granting the injunction will not cause greater harm to the non-moving party than will be caused to the moving party by the denial of relief; and (4) that granting the relief is in the public interest.  Af-Cap has not carried, and it cannot carry, its burden on any of these elements with regard to its request for an injunction requiring CMS Nomeco to prevent the Congo from taking its oil in its own territory.

> i.     Af-Cap Does Not Have a Reasonable Probability of Success on the Merits.

As discussed at length in Section I above, the October 2005 garnishment writ fails to give Af-Cap the right to any relief against CMS Nomeco, for a multitude of independent reasons.  CMS Nomeco will not repeat those arguments here.  Suffice it to say that the legal obstacles to Af-Cap prevailing in this case are overwhelming, precluding any injunctive relief.

> ii.    Af-Cap Has Not Shown and Cannot Show that it Will Suffer Irreparable Injury if the Congo Takes its Royalty Oil in February 2007

Af-Cap has made no effort to show that it will suffer irreparable injury in the absence of an injunction that prohibits future government oil liftings.  The irreparable injury section of Af-Cap's Opening Brief only addresses the injunctive relief relating to CMS Nomeco's conversion to a Bahamas corporation (which is addressed separately below in Part III.B).  Af-Cap has made no showing that it will suffer irreparable injury if the Congo takes its royalty oil in February 2007.  Even if Af-Cap were to prevail on its contention that its October 2005 writ is enforceable and covers the Congo's right to take oil in February 2007 (an untenable position for the reasons discussed above), Af-Cap simply would have a money damages claim for CMS Nomeco's alleged violation of the writ (which claim would be subject to all of the

defensive arguments discussed above).  Injunctive relief is not available when a damages remedy is adequate.

        iii.    Af-Cap Has Not Addressed the Risk of Harm to CMS Nomeco if the Court Enjoins it From Permitting the Congo to Take its Royalty Oil in February 2007

The Congo is contractually entitled to take its royalty oil in February 2007.  It has given proper notice of its lifting.  No U.S. court has entered any order that affects the lifting.  Even if it had, the Congo court has held that under Congolese law, any U.S. writ or order that purports to affect the Congo's right to take its own oil in its own territory is unenforceable as a matter of Congolese law and does not affect CMS Nomeco's obligations under the Convention.  As such, an order prohibiting CMS Nomeco from permitting the Congo to take its February 2007 lifting would be an order compelling CMS Nomeco to breach its contract.  The Congo has already threatened CMS Nomeco with contract termination in the event of non-compliance with Convention obligations.  *See* Exhibit A.  Furthermore, the evidence is clear that resistance to the Congo's efforts to take its own oil in its own territory have resulted in threats of detention in the Congo and threats of use and actual use of public force.  *Id.*  An oil spill also occurred in the tense circumstances of the last government oil lifting, which was carried out with armed gendarmes on board the storage vessel while the lifting was carried out.  Exhibit B.  If CMS Nomeco were to direct its operational personnel to refuse to assist in the lifting, regardless of the Congo's use of public force, there would be not only substantial risk of injury to personnel, but also a substantial risk of environmental damage.  See Exhibits B and H.

        Af-Cap's motion and Brief fail to address any of these issues.  The risk of harm to CMS Nomeco is tangible and extensive.  A weighing of the harm requires denial of Af-Cap's motion.

        iv.    The Public Interest Favors Denial of the Injunction

The United States' interest in maintenance of international relations with foreign governments will be furthered by denial of an injunction that directs CMS Nomeco to prevent the Congo from taking its oil in its own territory. The United States, in an amicus curiae brief filed in the Fifth Circuit in the *Af-Cap III* litigation, confirmed that there are international relations implications associated with an order that interferes with the exercise of a foreign government's exercise of dominion over its own assets in its own territory. That Brief of our government makes it clear that the type of order that Af-Cap seeks, i.e., an order that is designed to prevent the Congolese government from taking its own oil in its own territory, has potential for affront to foreign governments that may be particularly acute, impacting U.S. foreign relations.[3] Consideration of the public interest factor weighs against the requested injunction.

> (2)  *The Requested Injunction Against CMS Nomeco's Change in Place of Incorporation*

Af-Cap also seeks an injunction "preventing CMS from otherwise removing from this court's jurisdiction CMS's obligations to make royalty payments to the Congo under the Convention, pending a determination of plaintiff's right to execute on those royalty obligations." Because Af-Cap claims that it can garnish CMS Nomeco wherever it is located, what Af-Cap is seeking is an injunction to force CMS Nomeco to remain subject to jurisdiction of the Delaware courts for the remaining life of the concession, so that Af-Cap and other judgment creditors can file repeated garnishment actions against CMS Nomeco for the purposes of collecting, out of CMS Nomeco's pockets, the entirety of the Congo's debts owed to those judgment creditors.

In seeking this relief, Af-Cap makes allegations that CMS Nomeco "absconded" from Texas in connection with the Texas litigation, and it asserts that in November 2006, CMS

---

[3] The relevant portion of the United States' Brief is quoted in the "Nature and Course of Proceedings" section of this Brief.

Nomeco "dissolved" itself in Delaware and "reformed" in the Bahamas in order to "evade Congo's creditors." These allegations are baseless, and in any event, Af-Cap is not entitled to an injunction forcing CMS Nomeco to remain in Delaware so that it can be subjected to new, future lawsuits that are designed to force CMS Nomeco to pay the Congo's debts.

    a.    <u>Af-Cap's Factual Allegations Are Baseless</u>

    i.    CMS Nomeco Did Not "Abscond" From Texas

Af-Cap alleges that CMS Nomeco moved its headquarters to London in 2005 as part of an "attempt to remove itself beyond the reach of courts in the United States," and that it "absconded from Texas." Those allegations are baseless and are refuted by the undisputed facts reflected in the Declaration of Roland Fox attached hereto as Exhibit I, filed in Af-Cap's Western District of Texas litigation. That declaration demonstrates that CMS Nomeco's actions in moving its operations out of Texas resulted from a stock acquisition transaction by which the Perenco group of companies (headquartered in Europe) acquired, in 2002, a number of companies, including CMS Nomeco, that previously had been in the CMS Energy group of companies (headquartered in the United States), with operations in seven countries. In the *FG* case, the Fifth Circuit specifically referenced these facts as significant in holding that the writs of garnishment issued in Texas in October and December 2004 were void *ab initio*. FG, 455 F.3d at 582, 586.

    ii.    CMS Nomeco Did Not Convert to a Bahamas Corporation to "Evade the Congo's Creditors."

As shown by an email to Af-Cap's counsel dated November 16, 2006, a copy of which is attached hereto as Exhibit J, counsel for CMS Nomeco gave formal notice to Plaintiffs' counsel that "CMS Nomeco will convert to a non-Delaware entity." Plaintiffs made no response to that email notification and took no action in connection therewith, for good reason. As that

email makes clear, CMS Nomeco is not attempting to avoid the exercise of jurisdiction over CMS Nomeco with regard to this proceeding. On the other hand, CMS Nomeco is not required to remain in the United States for the benefit of the Congo's creditors so that the judgment creditors of the Congo can continue to file *new, future* U.S. lawsuits against CMS Nomeco over the remaining life of the field, in an improper attempt to force CMS Nomeco to pay the Congo's debts and cause CMS Nomeco to incur huge legal fees in protecting its position.

      b.    <u>The Requested Injunction Requiring CMS Nomeco to Remain in Delaware Is Not Necessary to Preserve the Property or Rights at Issue Until the Case Has Been Decided</u>

Af-Cap's Opening Brief attempts to justify the requested injunctive relief on the grounds that it is necessary to "preserve the property or rights at issue until a case has been fully decided." An injunction that forces CMS Nomeco to remain in Delaware for the purpose of being amenable to new, future lawsuits in Delaware, so that judgment creditors of the Congo can force CMS Nomeco to pay the Congo's debts, is not such an injunction. As CMS Nomeco's counsel informed Af-Cap's counsel on November 16, 2006, CMS Nomeco agreed that its conversion to a Bahamian corporation would not affect the jurisdiction of this Court to proceed to a judgment on the garnishment writ that is the subject of this case. An injunction purporting to force CMS Nomeco to remain in Delaware, or to return to Delaware (in light of the fact that its conversion to a Bahamian corporation already took place in November 2006, with notice to Af-Cap's counsel and no complaint from Af-Cap at the time), simply is not necessary for this Court to proceed to judgment on the garnishment writ that is the subject of this case. Af-Cap seeks a money judgment against CMS Nomeco based on the garnishment writ served in October 2005. Whether CMS Nomeco is a Delaware company or Bahamas company is irrelevant to the monetary relief that Af-Cap seeks in this case.

      c.     <u>Af-Cap Has Not Shown and Cannot Show the Elements for Issuance of a Preliminary Injunction In Connection With Its Effort to Force CMS Nomeco to Return to Delaware.</u>

For the same reasons discussed above, Af-Cap cannot show that it has a reasonable probability of success on the merits or that the public interest favors an injunction. To avoid repetition, CMS Nomeco will limit its remaining comments on the second request for injunctive relief to those relating to alleged irreparable injury and the weighing of harm.

      i.     Af-Cap Has Not Shown and Cannot Show Irreparable Injury in the Absence of an Injunction Requiring that CMS Nomeco Remain Subject to Garnishment Litigation in Delaware.

With regard to the irreparable injury requirement, Af-Cap alleges in its Opening Brief that it is entitled to injunctive relief because otherwise, "Af-Cap's recovery (as well as that of other judgment creditors) would be foreclosed since those obligations would be beyond the reach of United States courts." Af-Cap concludes that "unless [CMS Nomeco is] enjoined, Af-Cap would have no legal or equitable remedy following trial."

Af-Cap fails to explain how the conversion of CMS Nomeco to a Bahamas corporation causes Af-Cap to "have no legal or equitable remedy following trial." Af-Cap has repeatedly asserted that the relief that it is seeking in this case is a monetary judgment against CMS Nomeco, and Af-Cap has made no showing that its "remedy following trial" is affected one way or the other by the fact that CMS Nomeco is now a Bahamas corporation.

What Af-Cap really wants is to force CMS Nomeco to remain subject to the jurisdiction of the United States courts for the remaining life of the field so that all of the judgment creditors of the Congo can indefinitely subject CMS Nomeco to new, future claims asserting (as does Af-Cap) that CMS Nomeco should be required to pay millions of dollars of the Congo's bad debts. CMS Nomeco owes no legal duty to the Congo's creditors to remain in the United States for purposes of being a guarantor of the Congo's bad debts.

        ii.     Af-Cap's Opening Brief Fails to Consider the Harm to CMS Nomeco

Af-Cap's objective is to force CMS Nomeco to remain subject to claims in Delaware that may be brought in the future by all judgment creditors of the Congo. Op. Br. at 16. If the Court considers only the claims of judgment creditors who have been involved in litigation with CMS Nomeco in Texas and Delaware, the total unpaid debt of the Congo exceeds $200 million. Af-Cap takes the position that the fact that CMS Nomeco would be subjected to double liability if it has to pay the Congo's creditors is simply CMS Nomeco's problem. Thus, if CMS Nomeco is forced to remain subject to new, future lawsuits by the Congo's creditors in Delaware, until the end of the life of the field, CMS Nomeco potentially could be subjected to claims for more than $200 million on debts of the Congo in which it has had no involvement. To be clear, CMS Nomeco had absolutely no involvement with the Congo debt Af-Cap and others are seeking to collect. Af-Cap acquired such debt for mere pennies on the dollar and now seeks to have CMS Nomeco, an innocent third-party that had no connection to such debt, pay it a windfall.

Furthermore, CMS Nomeco already has been threatened with termination of its concession based on garnishment writs issued by U.S. courts. Continuation of such litigation puts at risk CMS Nomeco's investment in the Congo, which is valued in the tens of millions. Af-Cap's Opening Brief fails to address the significant risks of harm to CMS Nomeco to which it would be exposed if the Court were to grant the requested relief.

## CONCLUSION

Af-Cap's "Emergency Motion" is baseless. It ignores fatal legal defects that bar its claims as a matter of law. The motion, brief, and supporting affidavit contain numerous outrageous and false allegations, with Af-Cap failing to disclose to the Court key facts that are

critical to the analysis.  Af-Cap is entitled to none of the relief that it seeks, and the Emergency

Motion should be denied.

WHEREFORE, for the reasons set out herein, CMS Nomeco requests that the

Court deny Af-Cap's Motion for a contempt order, for a sequestration order, and for a

preliminary injunction, and that the Court grant CMS Nomeco such other and further relief to

which it may be justly entitled.


OF COUNSEL:                          /s/ M. Duncan Grant
                                     _____
                                     M. Duncan Grant (Del. Bar No. 2994)
Guy S. Lipe                          James C. Carignan (Del. Bar No. 4230)
Jason M. Powers                      PEPPER HAMILTON LLP
VINSON & ELKINS L.L.P.               Hercules Plaza, Suite 5100
First City Tower                     1313 N. Market Street
1001 Fannin Street, Suite 2300       P.O. Box 1709
Houston, TX  77002-6760              Wilmington, DE 19899-1709
(713) 758-2222                       (302) 777-6500

Dated:  January 17, 2007             Attorneys for Garnishee CMS Nomeco Congo
                                     Inc.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2007, the foregoing Answering Brief in

Opposition to Plaintiff's Motion for Order of Contempt, for Writ of Sequestration, and for

Preliminary Injunction, was electronically filed with the Clerk of the Court using CM/ECF, which

will send notification of such filing to counsel as set forth below:

> Dennis Meloro, Esq.
> Greenberg Traurig, LLP
> The Brandywine Building
> 1000 West Street, Suite 1540
> Wilmington, DE 19801

> /s/ M. Duncan Grant
> M. Duncan Grant (Del. Bar No. 2994)
> PEPPER HAMILTON LLP
> Hercules Plaza, Suite 5100
> 1313 North Market Street
> P.O. Box 1709
> Wilmington, DE  19899-1709
> (302) 777-6500