EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONNECTICUT BANK OF COMMERCE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-_____ |
| THE REPUBLIC OF CONGO, | ) ) | |
| Defendant; | ) ) | |
| CMS NOMECO CONGO INC., | ) ) | |
| Garnishee. | ) | |

## DECLARATION OF MARYSE BERNARD

I, Maryse Bernard, declare:

    1.    My name is Maryse Bernard. I am President of CMS Nomeco Congo LLC, which was formerly known as CMS Nomeco Congo Inc. ("CMS Nomeco") I have held that position since 19 October 2004 and I have personal knowledge concerning the facts set out in this declaration.

    2.    CMS Nomeco, The Nuevo Congo LLC, Nuevo Congo Ltd. and Société Nationale des Pétroles du Congo ("SNPC," the Congolese state-owned oil company) are the current working interest owners under a Convention for oil production in Congolese waters originally entered into in May 1979 ("the Convention"). A true and correct copy of the Convention, in both French and English, is attached hereto as Exhibit 1. CMS Nomeco is the current operator under the Convention. CMS Nomeco has no business activities, no officers, no directors, no employees, and no physical offices in the United States. The business activity of CMS Nomeco is focused on the oil production activities that are ongoing in the Congo.

3.     The Convention entitles the Congo to receive royalties.  Under Article 7 of the Convention, the Congo may elect to receive royalties in cash or in-kind.  As stated in the Amendment to Lifting Agreement, a true and correct copy of which (in both French and English) is attached as Exhibit 2, in 1999, the Congo changed its election to an in-kind election and has not changed its election since that time.

4.     The Convention was executed in the Congo and is governed by Congolese law. The oil is extracted from the submerged seabed adjacent to the Congo's coast, in areas within the Congo's exclusive jurisdiction under Congolese and international law.  The oil flows through a subsurface pipeline system to a storage vessel, known as the "Conkouati," in Congolese coastal waters.  A lifting occurs when oil is offloaded from the Conkouati onto a vessel nominated by the buyer of the oil.  CMS Nomeco and the other private working interest owners take liftings of oil stored on the Conkouati for their own account, and sell 100% of the oil so lifted for their own account.

5.     CMS Nomeco, as operator, calculates the effect of liftings on the over- or under-lifted position of SNPC and the Congo, on a barrel basis, and records that effect on an "over/under statement."  As described in the Amendment to Lifting Agreement attached hereto as Exhibit 2, once the combined under-lifted position of SNPC and the Congo reaches at least 275,000 barrels, SNPC may schedule and take a lifting of oil for itself and the Congo.  When SNPC takes a lifting, SNPC sells, for its own and the Congo's account, all the barrels that it lifts. The SNPC lifting satisfies the Congo's in-kind royalty and puts SNPC into an over-lifted position.  CMS Nomeco and the other private working interest owners take liftings until the combined under-lifted position of SNPC and the Congo again exceeds 275,000 barrels, when

2

SNPC may schedule, take, and sell another lifting oil for itself and the Congo, again satisfying the Congo's in-kind royalty and again putting SNPC into an over-lifted position.

6.    On December 28, 2004, a court sitting in the Congo, upon applications by the Congo and SNPC, entered two orders requiring that CMS Nomeco, as operator of the storage terminal, deliver working interest oil and royalty oil to SNPC. True and correct copies of the December 28, 2004 Congo court orders, with English translations thereof, are attached hereto as Exhibits 3 and 4. I was in Brazzaville, Congo on December 28, 2004 to inform government officials of the decision to not allow a lifting of oil in light of writs of garnishment issued by U.S. courts, and I was informed that public force would be used if the lifting of oil by SNPC was not allowed to take place. The Director General of the Congo's Ministry of Hydrocarbons showed me copies of the Congo court orders and told me that I would be detained until the lifting of oil was completed. Based on these events, I authorized CMS Nomeco's operations manager to give instructions to permit the lifting of oil. On December 28-29, 2004, SNPC took a lifting of 550,032 barrels of oil, which included SNPC working interest oil as well as the Congo's royalty oil.

7.    Attached hereto as Exhibits 5 and 6 are true and correct copies of an Order and Judgment signed by Judge of the Western District of Texas dated February 4, 2005.

8.    Attached hereto as Exhibit 7 is a true and correct copy of a letter sent by the Congo to the Western District of Texas.

9.    The clerk of the Western District of Texas sent instruction letters signed by the clerk to Mr. Guy Lipe, the attorney who had represented CMS Nomeco and the other working interest owners in the garnishment action that had been dismissed in February 2005. Mr. Lipe

3

was not authorized by CMS Nomeco to receive royalty elections or other notices under the
Convention.

10.    On July 4, 2005, a Congo court in Point Noire, Congo, upon applications filed by
the Congo and SNPC, issued orders against CMS Nomeco directing CMS Nomeco to deliver the
Congo's royalty oil and SNPC's working interest oil to SNPC. True and correct copies of those
orders, including English translations thereof, are attached hereto as Exhibits 8 and 9.

11.    On July 11, 2005, Af-Cap and Walker filed a lawsuit against CMS Nomeco in
Delaware Chancery Court, claiming that CMS Nomeco had violated the instruction letters
described in paragraph 9 above by failing to pay royalty into the registry of the Court in the
Western District of Texas.

12.    On July 26, 2005, the court in the Western District of Texas entered an order, a
true and correct copy of which is attached as Exhibit 10. On August 17, 2005, the Western
District of Texas entered an order, a true and correct copy of which is attached as Exhibit 11.

13.    On September 7, 2005, SNPC took a lifting of the Congo's royalty oil and
SNPC's working interest oil totaling 605,006 barrels, leaving SNPC in an over-lifted position
with regard to its working interest oil and extinguishing the Congo's royalty entitlement. As
discussed above, SNPC is entitled to take a lifting of royalty oil of the Congo and its own
working interest oil only when the combined under-lifted position of the Congo with regard to
royalty oil and SNPC with regard to working interest oil exceeds 275,000 barrels. The
garnishment writ in this case was served on October 12, 2005, and on that date, on the date the
answer to the October 12, 2005 writ was filed, and at all times in between, neither the Congo nor
SNPC had any right to take a lifting of oil, as the Congo and SNPC were in a combined over-
lifted position during that time period. Attached hereto as Exhibit 12 is a true and correct copy

4

of the current over/under statement which confirms this fact. It is currently anticipated that SNPC will not have any right to take another lifting of the Congo's royalty oil and SNPC's working interest oil until sometime in 2006.

14.    I declare under penalty of perjury, under the laws of the United States of America, that the foregoing statements are true and correct.

EXECUTED on the 14th day of December, 2005, in Paris, France.

_____
Maryse Bernard

5

# EXHIBIT 1

# FRENCH

congo # 6.1.2 (b)

## CONVENTION

- La République Populaire du Congo
- Congolese Superior Oil Company
- Cities Service Congo Petroleum Corporation
- Canadian Superior Oil Ltd.
- Société Nationale de Recherches et
  d'Exploitation Pétrolières "HYDRO-CONGO"

le 25 mai 1979

GAR 00001

**EXHIBIT 1**

FRENCH
Copied from

## INDEX

1. Table des matières.

2. Convention.

3. Annexe I:    Décret attributif du permis "Marine 1".

4. Annexe ÏI.

5. Annexe III:  Taux d'amortissements applicables aux
               SOCIETES.

6. Annexe IV:   Paiement de la redevance et de l'impôt sur
               les sociétés.

7. Annexe V:    Modèle de lettre de garantie.

8. Appendice.

GAR 00002

## CONVENTION

ENTRE

La République Populaire du Congo (ci-après désignée le "CONGO") représentée aux présentes par Monsieur Rodolphe Adada, Ministre des Mines et de l'Energie,

d'une part,

ET

Congolese Superior Oil Company (ci-après parfois désignée "SUPERIOR"), société de l'Etat du Nevada, Etats-Unis d'Amérique, dont le siège est à Houston, Texas, Etats-Unis d'Amérique, 26th Floor, First City National Bank Building, représentée par Monsieur Diego O. Giordano-Echegoyen, dûment autorisé à cet effet,

Cities Service Congo Petroleum Corporation (ci-après parfois désignée "CITIES SERVICE"), société de l'Etat du Delaware, Etats-Unis d'Amérique, dont le siège est à Dover, Delaware, Etats-Unis d'Amérique, 306 South State Street, représentée par Antoine Saadi, dûment autorisé aux fins des présentes,

Canadian Superior Oil Ltd. (ci-après parfois désignée "CANADIAN"), société constituée au Canada, dont le siège est à Calgary, Three Calgary Place, 355 4th Avenue S.W., Province d'Alberta, Canada, représentée par Robert C. Schrader, dûment autorisé à cet effet,

Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" (ci-après parfois désignée "HYDRO-CONGO"), société nationale ayant son siège à Brazzaville, agissant par Monsieur Alphonse M'Boudo-Nesa, dûment autorisé à cet effet,

ci-après désignées collectivement les "SOCIETES" ou individuellement "l'une des SOCIETES" ou la "SOCIETE",

d'autre part,

### EXPOSE PRELIMINAIRE

Le CONGO désire promouvoir et réaliser dans les meilleures conditions d'efficacité la recherche et le développement

**GAR 00004**

## TABLE DES MATIERES

                                                           Page

1.  Définitions ............................................. 2
2.  Objet ................................................... 4
3.  Entrée en vigueur – Durée – Permis d'exploitation ...... 4
4.  Bénéficiaires ........................................... 4
5.  Garanties ............................................... 5
6.  Charges fiscales ........................................ 6
   6.03  Etablissement de l'impôt sur les sociétés de
        chacune des SOCIETES ............................. 7
7.  Redevance minière ....................................... 8
8.  Changes ................................................. 10
9.  Paiements forfaitaires .................................. 11
10. Disposition des HYDROCARBURES ........................... 12
11. Emploi et formation du personnel ....................... 13
12. Fournisseurs congolais .................................. 15
13. Mise à disposition des informations .................... 15
14. Transport et traitement des produits ................... 16
15. Force majeure ........................................... 16
16. Déclaration et paiement d'impôts ....................... 17
17. Arbitrage ............................................... 18
18. Droit applicable ........................................ 18
19. Avis .................................................... 18
20. Avenants ................................................ 20
21. Garantie par société mère .............................. 20

ANNEXE I
   Copie du décret accordant le PERMIS

ANNEXE II

ANNEXE III
   Taux d'amortissements applicables aux SOCIETES

ANNEXE IV
    I - Paiement de la redevance
   II - Paiement de l'impôt sur les sociétés

ANNEXE V
   Modèle de lettre de garantie

(i)

GAR 00003

2.

des ressources du CONGO en hydrocarbures liquides et/ou gazeux afin d'assurer par la suite leur exploitation dans les meilleures conditions possibles.

A cet effet, le CONGO désire obtenir la coopération de sociétés pétrolières qualifiées et réputées pour qu'elles fournissent à HYDRO-CONGO l'aide nécessaire à la réalisation, dans le cadre d'une association, de certains travaux de recherche d'hydrocarbures, et de développement et d'exploitation des gisements découverts sur le permis de recherches du type "A" dit "Marine 1" accordé à HYDRO-CONGO et plus amplement décrit ci-après, et sur les permis d'exploitation qui peuvent être accordés sur ce permis de recherches.

Les SOCIETES exerceront leurs activités de recherche et d'exploitation en conformité avec les principes de la politique pétrolière du CONGO tels que repris dans la présente Convention.

EN CONSEQUENCE, IL EST CONVENU CE QUI SUIT:

1. Définitions

Aux fins de la présente Convention, les termes et expressions suivants auront la signification indiquée ci-dessous.

1.01. Convention: La présente Convention entre le CONGO et les SOCIETES.

1.02 Association: L'association constituée par le contrat d'opérations en association pour l'exécution des travaux pétroliers, tel que ce terme est défini au sous-paragraphe 1.10 ci-dessous.

1.03 Contrat d'association: Le contrat d'opérations en association pour la recherche et l'exploitation d'hydrocarbures conclu entre les SOCIETES pour la recherche et l'exploitation éventuelle de gisements d'hydrocarbures sur le permis, tel que ce terme est défini au sous-paragraphe 1.04 ci-après.

1.04 Permis: Le permis de recherches de type "A" dit "Marine 1" visé en tête de la CONVENTION attribué à HYDRO-CONGO pour le bénéfice de l'ASSOCIATION par le décret dont copie est jointe en Annexe I à la Convention, avec toutes ses prorogations, modifications, variations ou renouvellements éventuels, ainsi que tous les permis d'exploitation qui pourront être accordés sur une partie quelconque de sa surface.

1.05 Opérateur: La SOCIETE qui est chargée, au nom des membres de l'ASSOCIATION, des travaux pétroliers -- tel que ce terme est défini au sous-paragraphe 1.10 ci-dessous -- sur le PERMIS, conformément aux dispositions du CONTRAT D'ASSOCIATION.

GAR 00005

3.

   1.06 <u>Hydrocarbures</u>: Les hydrocarbures solides, liquides et/ou gazeux découverts et/ou exploités sur le PERMIS.

   1.07 <u>Gaz naturel</u>: Tous les HYDROCARBURES gazeux produits par les SOCIETES sur le PERMIS, à l'exception des condensats qui sont séparés et récupérés sous forme liquide par utilisation des méthodes normales de récupération au champ.

   1.08 <u>Hydrocarbures liquides</u>: Les HYDROCARBURES produits par les PARTIES sur le PERMIS, à l'exception du GAZ NATUREL.

   1.09 <u>Société affiliée</u>:

      1.09.1    Toute société dans laquelle plus de 50% des droits de vote dans les assemblées générales ordinaires sont détenus directement ou indirectement par l'une des SOCIETES;

      1.09.2    Toute société qui détient, directement ou indirectement, plus de 50% des droits de vote dans les assemblées générales ordinaires de l'une des SOCIETES;

      1.09.3    Toute société dont les droits de vote dans les assemblées générales ordinaires sont détenus pour plus de 50% par une société qui détient elle-même, directement ou indirectement, plus de 50% des droits de vote dans les assemblées générales ordinaires de l'une des SOCIETES;

      1.09.4    Toute société dans laquelle plus de 50% des droits de vote dans les assemblées générales ordinaires sont détenus directement ou indirectement par plusieurs SOCIETES ou par plusieurs sociétés telles que décrites aux paragraphes 1.09.1 à 1.09.3 ci-dessus.

   1.10 <u>Travaux pétroliers</u>: L'ensemble des activités, où qu'elles s'exercent, relatives à la recherche, au développement, à l'exploitation, au transport, au stockage et à la disposition des HYDROCARBURES au CONGO ou à l'exportation.

   1.11 <u>Travaux de recherche</u>: Ceux des TRAVAUX PETROLIERS réalisés dans le but de découvrir un gisement d'HYDROCARBURES, y compris le forage de découverte et les travaux d'appréciation, réalisés jusqu'à la date à laquelle le Comité de Direction prévu au CONTRAT D'ASSOCIATION aura déterminé, conformément à l'article 5 du CONTRAT D'ASSOCIATION, qu'une découverte est commercialement exploitable.

   1.12 <u>Travaux de développement et d'exploitation</u>: Tous TRAVAUX PETROLIERS autres que les TRAVAUX DE RECHERCHE, y compris le transport des HYDROCARBURES jusqu'au point d'enlèvement par les SOCIETES.

   1.13 <u>Sociétés étrangères</u>: Les SOCIETES, à l'exception d'HYDRO-CONGO.

**GAR 00006**

4.

1.14 <u>Franc CFA</u>:    Monnaie définie au titre II de la Con-
vention de Coopération Monétaire entre les Etats membres de la
Banque des Etats d'Afrique Centrale (B.E.A.C.) et la République
Française, signée à Brazzaville le 23 novembre 1972.

2. <u>Objet</u>

2.01  La CONVENTION et ses annexes ont pour objet de
définir les conditions dans lesquelles les SOCIETES
participeront aux TRAVAUX PETROLIERS sur le PERMIS dans le
cadre de l'ASSOCIATION.

3. <u>Entrée en vigueur - Durée - Permis d'exploitation</u>

3.01  La CONVENTION sera approuvée par un acte ayant force
de loi.  Elle entrera en vigueur lors de la publication de cet
acte au Journal Officiel du CONGO.

3.02  La CONVENTION est conclue pour la durée du PERMIS.

3.03  Chaque permis d'exploitation aura une durée de trente
(30) ans.

4. <u>Bénéficiaires</u>

4.01  Les dispositions de la CONVENTION s'appliquent de
plein droit aux SOCIETES et à tout cessionnaire des droits de
chaque SOCIETE sur le PERMIS, ainsi qu'à toute société à
laquelle les SOCIETES ou l'une d'entre elles se seront asso-
ciées en lui cédant tout ou partie de leurs droits et obli-
gations sur le PERMIS.  Cependant, toute cession devra être
soumise préalablement à son entrée en vigueur à l'approbation
du Ministre de tutelle.

Si la décision du Ministre de tutelle n'intervient pas
dans un délai d'un (1) mois à compter de la signification de la
cession qui doit être soumise à son approbation, celle-ci sera
considérée comme étant tacitement rejetée.

4.01.1  Si le cessionnaire proposé est une société
entièrement contrôlée par le cédant ou par la société mère de
son groupe, l'autorisation du Ministre de tutelle est de droit
et, dans ce cas, nonobstant les dispositions du paragraphe 4.01
ci-dessus, l'autorisation sera réputée donnée un (1) mois
après le dépôt de la demande.  Si le cessionnaire proposé est
une SOCIETE AFFILIEE, l'autorisation du Ministre de tutelle ne
sera pas refusée sans raison et de manière discrétionnaire.

4.01.2    Tout acte ultérieur ayant pour effet de
faire perdre au cessionnaire le caractère de société entière-
ment contrôlée par le cédant ou par la société mère de son
groupe ou le caractère de SOCIETE AFFILIEE sera considéré comme
une nouvelle cession soumise à l'approbation préalable du
Ministre du tutelle dans les mêmes conditions.

**GAR 00007**

5.

      4.01.3    Conformément à la politique pétrolière du CONGO, HYDRO-CONGO ne cédera pas sa participation dans l'ASSO-CIATION à moins que le cessionnaire ne soit entièrement con-trôlé par le CONGO.

## 5.  Garanties

    5.01  Sous réserve des dispositions du sous-paragraphe 5.01.3 ci-dessous, le CONGO garantit aux SOCIETES, pour la durée de la CONVENTION, la stabilité des conditions juridiques, financières, minières et économiques dans lesquelles les SOCIETES exerceront leurs activités au CONGO, telles que ces conditions résultent de la législation et de la réglementation en vigueur à la date de signature de la CONVENTION et des modalités de la CONVENTION.

      5.01.1    En conséquence, les SOCIETES ne seront soumises en quelque domaine que ce soit à aucune mesure aggravante par rapport au régime défini au paragraphe 5.01 ci-dessus.

      5.01.2    En particulier, devra être considérée comme aggravante, au sens du sous-paragraphe 5.01.1 ci-dessus, toute mesure ayant pour effet soit de diminuer les profits nets des activités exercées dans le cadre de la CONVENTION en limitant les recettes ou en augmentant les charges d'exploitation des SOCIETES, soit, en général, de compromettre l'exécution ou la conduite des TRAVAUX PETROLIERS par des restrictions apportées aux droits des SOCIETES.

      5.01.3    Toutefois, les modifications apportées à la législation du travail, de la sécurité et de la protection de l'environnement et à l'impôt sur le revenu des personnes physiques seront applicables de plein droit aux SOCIETES et à leur personnel, sauf si elles comportent des restrictions aux droits des SOCIETES concernant la propriété de leurs biens ou la libre disponibilité des HYDROCARBURES leur revenant au sens de l'article 10 ci-dessous.

      5.01.4    En outre, les SOCIETES ne seront soumises, notamment en ce qui concerne le régime des biens et des per-sonnes, à aucune mesure discriminatoire de droit ou de fait à leur encontre.

    5.02  Le CONGO garantit aux SOCIETES pour la durée de la CONVENTION que les conditions fiscales de l'exercice de leurs activités au CONGO au titre de la CONVENTION, en ce qui con-cerne l'impôt sur les sociétés visé à l'article 6 ci-dessous, seront régies par le Code Général de Impôts du CONGO et les textes législatifs ou réglementaires modifiant ledit Code et par la CONVENTION. En conséquence, les SOCIETES ne seront soumises, pour leurs activités au CONGO au titre de la CON-VENTION, à aucune mesure fiscale discriminatoire par rapport au droit commun applicable aux sociétés congolaises ou étrangères autres que celles résultant de la CONVENTION.

**GAR 00008**

6.

5.03  Le CONGO garantit aux SOCIETES pour la durée de la CONVENTION, en application du Code Général des Impôts, que la redevance minière versée au CONGO sur les quantités d'HYDROCARBURES revenant aux SOCIETES aux termes du CONTRAT D'ASSOCIATION sera fixée au taux de quatorze et demi pour cent (14 1/2%) pour les HYDROCARBURES LIQUIDES, et de neuf pour cent (9%) pour le GAZ NATUREL.

6.  Charges fiscales

6.01  Pour les TRAVAUX PETROLIERS, chacune des SOCIETES sera assujettie à la redevance minière visée au paragraphe 5.03 ci-dessus et à l'article 7 ci-dessous, et à l'impôt sur les sociétés visé aux articles 106 à 126 du Code Général des Impôts du CONGO, à l'exclusion de toute autre imposition.

6.02  En conséquence, chacune des SOCIETES est exonérée pour les TRAVAUX PETROLIERS et pour la durée de la CONVENTION de tous autres impôts et taxes. Cette exonération comprend notamment:

6.02.1  L'exonération de tous droits de douanes et de toutes taxes ou cautions à l'importation pour tous les biens d'équipements, matières et fournitures consommables et pièces de rechange de biens d'équipements destinés aux TRAVAUX PETRO-LIERS, qu'ils soient importés par la SOCIETE directement, ou indirectement par l'OPERATEUR au nom de la SOCIETE ou par l'intermédiaire de fournisseurs et d'entreprises sous-traitantes.

6.02.2  L'exonération de tous droits ou taxes à l'exportation applicables aux biens d'équipement et pièces de rechange pour lesdits biens d'équipement lorsque ceux-ci ont été importés en franchise de tout droit, conformément au sous-paragraphe 6.02.1 ci-dessus, ainsi qu'aux HYDROCARBURES produits sur le PERMIS appartenant à la SOCIETE conformément à l'article 10 ci-dessous.

6.02.3  L'exonération de l'impôt sur le chiffre d'affaires intérieur, de la taxe unique, de la taxe sur les transactions et tous autres impôts indirects, relatifs à la fourniture des biens (matériels, équipements, pièces de rechange, etc.), services et travaux de toute espèce relatifs aux TRAVAUX PETROLIERS prévus à la CONVENTION, que la fourniture soit faite par la SOCIETE, par l'OPERATEUR ou par des entrepreneurs de travaux, des fournisseurs et prestataires de services travaillant directement ou indirectement pour le compte de la SOCIETE.

6.02.4  L'exonération des droits d'enregistrement relatifs à tous les actes de toute nature auxquels la SOCIETE ou l'OPERATEUR au nom de la SOCIETE peut être partie dans le cadre des TRAVAUX PETROLIERS sur le PERMIS, à toutes trans-missions de propriété ou de jouissance à la SOCIETE de biens

**GAR 00009**

mobiliers ou immobiliers pour la réalisation des TRAVAUX PETRO-
LIERS, ou relatifs aux contrats d'assurance auxquels la SOCIETE
ou l'OPERATEUR en son nom peut être partie et qui concernent
les TRAVAUX PETROLIERS.

6.02.5    L'exonération de tout droit ou impôt relatif
au paiement d'intérêts ou de dividendes par la SOCIETE.

6.03   Etablissement de l'impôt sur les sociétés de chacune
des SOCIETES

6.03.1    A l'exception de celles précisées au présent
paragraphe 6.03, les règles de l'assiette et du recouvrement de
l'impôt sur les sociétés sont celles fixées par le Code Général
des Impôts du CONGO.

6.03.2    Chacune des SOCIETES sera soumise à l'impôt
sur les sociétés, conformément aux dispositions du Code Général
des Impôts du CONGO, et, si le taux de l'impôt sur les sociétés
fixé par le Code Général des Impôts du CONGO est inférieur à
cinquante cinq pour cent (55%), à un impôt additionnel calculé
en appliquant au bénéfice imposable un pourcentage égal à la
différence entre le taux de l'impôt sur les sociétés et
cinquante cinq pour cent (55%).

6.03.3    L'assiette de l'impôt sur les sociétés
applicable à chacune des SOCIETES au titre de ses activités
exercées dans le cadre de la CONVENTION sera calculée sur la
base des prix tels que définis à l'annexe II jointe à la CON-
VENTION. Les amortissements seront calculés par chacune des
SOCIETES conformément aux règles posées par le Code Général des
Impôts du CONGO; toutefois, chacune des SOCIETES appliquera les
taux élément par élément figurant au tableau joint à la
CONVENTION en annexe III.

6.03.4    Afin de permettre le calcul de l'impôt sur
les sociétés dû par chacune des SOCIETES au titre de ses
activités exercées dans le cadre de la CONVENTION, chaque
SOCIETE devra, à compter de la date d'entrée en vigueur et
pendant la durée de la CONVENTION, tenir une comptabilité con-
forme aux règles fixées par le Code Général des Impôts du CONGO.

6.03.5    Les dispositions de l'article 109 du Code
Général des Impôts du CONGO ne seront pas applicables aux
SOCIETES.

6.03.6    Par dérogation à l'article 116 du Code
Général des Impôts du CONGO, les SOCIETES ne sont pas
autorisées à déduire de leur bénéfice imposable à l'impôt sur
les sociétés les intérêts et agios payés sur des emprunts
éventuellement réalisés pour le financement des TRAVAUX PETRO-
LIERS auprès de SOCIETES AFFILIEES. A partir de la date à
laquelle le Comité de Direction prévu au CONTRAT D'ASSOCIATION
aura déterminé, conformément au CONTRAT D'ASSOCIATION, qu'une

**GAR 00010**

8.

découverte est commercialement exploitable, chaque SOCIETE sera admise à déduire de son bénéfice imposable les intérêts et agios payés sur des emprunts réalisés pour le financement des TRAVAUX DE DEVELOPPEMENT ET D'EXPLOITATION auprès d'organismes financiers indépendants des SOCIETES, moyennant présentation par la SOCIETE emprunteuse aux autorités fiscales de certificats émanant desdits organismes financiers.

6.03.7    La redevance minière visée à l'article 7 ci-dessous est déductible du résultat imposable et elle ne peut en aucun cas être traitée comme une avance sur l'impôt sur les sociétés.

6.03.8    La limite de dix pour cent (10%) posée par le deuxième alinéa de l'article 20.I.6º, du Code Général des Impôts du Congo, tel que modifié par l'article 5 de la loi nº 30/74, ne sera pas applicable aux SOCIETES.

6.04   Les rémunérations et salaires versés au personnel des SOCIETES en service au CONGO pour la réalisation des TRAVAUX PETROLIERS seront soumis aux impôts afférents à ces revenus conformément aux dispositions du Code Général des Impôts du CONGO.

6.05  L'impôt sur les sociétés fait l'objet du versement d'acomptes mensuels provisoires suivant les modalités fixées à l'annexe IV jointe à la CONVENTION.

7.  Redevance minière

7.01  L'assiette de la redevance minière acquittée en espèces ou en nature est égale, pour chaque SOCIETE, à la valeur des HYDROCARBURES enlevés par elle, calculée sur la base du prix déterminé conformément à l'annexe II jointe à la CONVENTION, diminuée des frais de transport intérieur, traitement, stockage et chargement, tels que ces frais résultent de la comptabilité de la SOCIETE et  constituent des charges fiscalement déductibles.  La redevance n'est pas due sur les quantités d'HYDROCARBURES utilisées pour les besoins des TRAVAUX PETROLIERS, ou perdues.

7.02  La redevance minière prévue au présent article 7 est payée en espèces ou en nature au choix du CONGO.

7.03  L'OPERATEUR communiquera à l'autorité compétente du CONGO la date prévue pour la première exportation d'HYDRO-CARBURES au moins six (6) mois à l'avance, afin que cette autorité puisse faire connaître à la SOCIETE ou à l'OPERATEUR, dans un délai de cinq (5) mois après la réception de ladite communication, le mode de règlement de la redevance minière choisi par l'Administration.  L'Administration pourra toujours modifier le mode de règlement ainsi choisi, sauf à en notifier la SOCIETE ou l'OPERATEUR en son nom au moins trois (3) mois à l'avance.  Toutefois, l'Administration est réputée avoir opté

**GAR 00011**

9.

initialement pour le paiement en espèces de la redevance minière.

Si, à un moment où l'Administration prélève la redevance minière en espèces, les SOCIETES ont la possibilité de prendre des engagements de ventes pour une période de plus de trois (3) mois, lesquels ne pourraient être satisfaits au cas où l'Administration déciderait de prélever la redevance en nature, les SOCIETES pourront soumettre le projet de contrat de vente au Ministre de tutelle, qui pourra à sa discrétion l'approuver ou non. En cas d'approbation, la redevance continuera d'être perçue en espèces pendant la durée dudit contrat.

7.04    La quantité d'HYDROCARBURES sur laquelle s'applique la redevance minière est mesurée au point de livraison décrit au sous-paragraphe 10.02.1. Les méthodes de mesure utilisées seront agréées par l'autorité congolaise compétente qui devra être tenue au fait du déroulement des opérations afin de pouvoir se faire représenter et de procéder, si elle l'estime nécessaire, à toute mesure de contrôle.

Dans le mois qui suit la fin de la période pour laquelle la redevance minière est due, chaque SOCIETE, ou l'OPERATEUR en son nom, transmettra à l'autorité congolaise compétente un relevé des quantités d'HYDROCARBURES assujetties à la redevance minière, accompagné de toutes justifications utiles.

7.05    La redevance minière, qu'elle soit en nature ou en espèces, sera liquidée et versée trimestriellement dans les conditions visées ci-après:

7.05.1    Le paiement en nature de la redevance minière sera effectué au profit d'HYDRO-CONGO agissant pour le compte du CONGO selon les modalités arrêtées au paragraphe 4.11 et aux articles 9 et 10 du CONTRAT D'ASSOCIATION pour la remise à HYDRO-CONGO de la part de production lui revenant. Les quantités d'HYDROCARBURES dues au CONGO au titre du présent article 7 seront livrées à HYDRO-CONGO au cours du mois suivant celui au titre duquel la redevance minière proportionnelle est due.

7.05.2    Le paiement en espèces de la redevance minière se fera au cours du mois qui suit la fin du trimestre calendaire au titre duquel la redevance minière en espèces est due.

7.06    La redevance minière, lorsqu'elle est payée en espèces, fait l'objet de déclarations et de versements provi-soires mensuels suivant les modalités figurant dans l'annexe IV jointe à la CONVENTION.

GAR 00012

10.

7.07  En raison du caractère particulier du GAZ NATUREL, les parties se consulteront en cas de découverte de GAZ NATUREL pour préciser les modalités de règlement en nature de la rede-vance minière sur le GAZ NATUREL conformément aux principes énoncés au présent article 7.

## 8.  Changes

8.01  Le CONGO garantit pour la durée de la CONVENTION, aux SOCIETES, aux personnes physiques régulièrement employées par elles et aux personnes physiques ou morales chargées par elles de réaliser ou financer les TRAVAUX PETROLIERS ou la commer-cialisation des HYDROCARBURES que:

8.01.1   Le CONGO n'impose pas aux SOCIETES d'obli-gation de rapatriement du produit de la vente à l'exportation d'HYDROCARBURES.

8.01.2   Les SOCIETES pourront payer à l'étranger en devises, en utilisant les fonds conservés par elles à l'étranger, les entreprises, fournisseurs et prêteurs en exécution des contrats conclus pour l'exécution des TRAVAUX PETROLIERS.

8.01.3   Les SOCIETES pourront emprunter à l'étranger toutes les sommes qui peuvent leur être nécessaires pour réaliser les TRAVAUX PETROLIERS.

8.01.4   Les SOCIETES pourront transférer en faveur des fournisseurs résidant hors de la zone franc toutes les sommes dues à ces derniers.

8.01.5   Les SOCIETES pourront librement rapatrier du CONGO vers les pays membres de la zone franc les capitaux provenant de ces pays investis au CONGO dans le cadre des TRAVAUX PETROLIERS, et transférer dans les mêmes conditions leurs produits éventuels.

8.01.6   Les SOCIETES pourront rapatrier du CONGO vers les pays extérieurs à la zone franc les capitaux provenant de ces pays investis au CONGO dans le cadre des TRAVAUX PETRO-LIERS, et transférer dans les mêmes conditions leurs produits éventuels.  Le CONGO garantit aux SOCIETES qu'elles obtiendront des moyens de règlement sur les pays extérieurs à la zone franc nécessaires à la réalisation des opérations visées à la CON-VENTION.

8.01.7   Les SOCIETES pourront exporter librement du CONGO à destination des pays membres de la zone franc toutes les sommes dont elles pourront être débitrices envers les four-nisseurs, affréteurs et autres prestataires de services, ainsi qu'envers leurs actionnaires qui résident en zone franc et, d'une manière générale, toutes les sommes dont les SOCIETES pourront être débitrices à un titre quelconque pendant la durée de la CONVENTION.

**GAR 00013**

11.

8.01.8    Les membres du personnel ressortissant des pays membres de la zone franc régulièrement employés par les SOCIETES pourront exporter librement du CONGO à destination des pays de la zone franc leurs économies sur salaire.

8.01.9    Les SOCIETES pourront exporter du CONGO à destination des pays extérieurs à la zone franc toutes les sommes dont elles pourront être débitrices envers les fournisseurs, affréteurs et autres prestataires de services, ainsi qu'envers leurs actionnaires qui résident dans ces pays.

8.01.10    Les membres du personnel ressortissant des pays extérieurs à la zone franc régulièrement employés par les SOCIETES pourront exporter du CONGO à destination de ces pays leurs économies sur salaire.

8.02    Tout transfert de devises à destination ou en provenance de la zone franc effectué conformément aux sous-paragraphes 8.01.4, 8.01.6, 8.01.9 et 8.01.10 ci-dessus sera réalisé sous le contrôle du Bureau des relations financières avec l'étranger ("B.R.F.E.") conformément à la réglementation en vigueur au CONGO et relative à la zone franc.

8.03    Les transactions visées aux sous-paragraphes 8.01.4, 8.01.6, 8.01.9 et 8.01.10 ci-dessus ne seront pas rendues plus onéreuses pour les SOCIETES qu'elles ne le sont pour d'autres acheteurs et vendeurs de devises en matière commerciale par imposition d'un taux différent ou de taxes ou commissions spéciales.

## 9.    Paiements forfaitaires

9.01    La SOCIETE nommée Opérateur par le CONTRAT D'ASSOCIATION paiera au CONGO au nom et pour le compte des SOCIETES ETRANGERES les montants forfaitaires suivants:

9.01.1    Deux cent cinquante millions (250.000.000) de FRANCS CFA lorsque la production journalière d'HYDROCARBURES LIQUIDES sur le PERMIS aura atteint trente mille (30.000) barils par jour et se sera maintenue pendant une période de cent vingt (120) jours consécutifs à une moyenne de trente mille (30.000) barils par jour; et

9.01.2    Six cent vingt cinq millions (625.000.000) de FRANCS CFA lorsque la production journalière d'HYDROCARBURES LIQUIDES sur le PERMIS aura atteint soixante quinze mille (75.000) barils par jour et se sera maintenue pendant une période de cent vingt (120) jours consécutifs à une moyenne de soixante quinze mille (75.000) barils par jour.

9.01.3    Les montants forfaitaires visés aux sous-paragraphes 9.01.1 et 9.01.2 ci-dessus deviendront exigibles trente (30) jours après l'expiration de chacune des périodes de cent vingt (120) jours visées auxdits sous-paragraphes.

**GAR 00014**

12.

9.02  Les montants visés aux sous-paragraphes 9.01.1 et 9.01.2 ci-dessus pourront donner lieu à constitution d'immobilisations amortissables fiscalement dans les comptes des SOCIETES ETRANGERES.

## 10.  Disposition des HYDROCARBURES

10.01  Chaque SOCIETE aura le droit d'enlever librement la part d'HYDROCARBURES qui lui revient au titre du CONTRAT d'ASSOCIATION.

Elle pourra librement vendre, céder, transporter, consommer ou exporter, directement ou indirectement, ladite part.

10.02  Toutefois, et par dérogation au principe posé par le paragraphe 10.01 ci-dessus, chaque SOCIETE pourra être tenue, à la demande du CONGO, d'affecter en priorité les HYDROCARBURES provenant de son exploitation à la satisfaction des besoins de l'industrie congolaise aux conditions définies ci-après, à condition: (a) que la part de production revenant à HYDRO-CONGO ait été utilisée pour satisfaire les besoins de l'industrie congolaise; (b) que le maximum de la part de production de chacune des SOCIETES ETRANGERES ainsi affectée à la satisfaction des besoins de l'industrie congolaise n'excède pas trente pour cent (30%) des HYDROCARBURES qui lui reviennent.

10.02.1  La livraison des quantités d'HYDROCARBURES revenant au CONGO, y compris les HYDROCARBURES LIQUIDES destinés à la Raffinerie de Pointe Noire, sera faite soit à la tête de puits, soit à la sortie du centre de collecte si les parties au CONTRAT D'ASSOCIATION décident, conformément aux dispositions du CONTRAT D'ASSOCIATION, d'en construire un.  Au cas où les livraisons d'HYDROCARBURES LIQUIDES au CONGO au titre du présent sous-paragraphe 10.02.1 excèderaient la part revenant au CONGO au titre de la redevance minière conformément au paragraphe 5.03 ci-dessus, le prix de vente de cet excédent sera le prix moyen réalisé par les SOCIETES pour les ventes à des acheteurs non affiliés conclues au cours du mois calendaire précédant celui au cours duquel a lieu la vente d'HYDROCARBURES LIQUIDES au CONGO.

10.02.2  L'engagement de chaque SOCIETE de céder une part de sa production d'HYDROCARBURES provenant du PERMIS dans les conditions définies au paragraphe 10.02 ci-dessus et au prix défini au sous-paragraphe 10.02.1 ci-dessus est limité, pour chaque année calendaire, à la fraction des besoins de l'industrie congolaise en HYDROCARBURES de la qualité requise par l'industrie congolaise qui est égale au rapport entre la part de la production d'HYDROCARBURES de cette qualité revenant à la SOCIETE au titre du CONTRAT D'ASSOCIATION et la production totale d'HYDROCARBURES de ladite qualité issue du territoire du CONGO pour cette même année calendaire.  Le CONGO notifiera à la SOCIETE, avant le début de chaque année calendaire, les tonnages requis par elle pour cette même année calendaire au titre de l'engagement ci-dessus.

**GAR 00015**

13.

dans la mesure où l'OPERATEUR détermine que cela est possible dans le cadre des opérations visées par la CONVENTION, l'OPERATEUR tentera de fournir au CONGO les différentes qualités que le CONGO peut demander.

10.02.4    Les quantités d'HYDROCARBURES cédées en application des dispositions du présent article 10 seront payées par le CONGO dans un délai de quinze (15) jours à compter de la fin du mois calendaire de livraison, sur présentation de la facture correspondante par chacune des SOCIETES.

10.03  En cas de découverte de GAZ NATUREL, les parties se réuniront dans les plus brefs délais pour envisager les aménagements qui devront être éventuellement apportés au présent article 10 pour appliquer les principes de la CONVENTION à une telle exploitation.

10.03.1   L'exploitation éventuelle des gisements de GAZ NATUREL se fera conformément aux principes qui régissent les rapports entre les membres de l'ASSOCIATION.

10.03.2   Si l'utilisation du GAZ NATUREL découvert sur le PERMIS n'est pas jugée rentable par les membres de l'ASSOCIATION conformément aux dispositions du CONTRAT D'ASSO-CIATION, le CONGO aura la possibilité, directement ou par l'intermédiaire d'HYDRO-CONGO, d'utiliser le GAZ NATUREL et ceci à ses frais.

Si le CONGO exerce son droit d'utiliser le GAZ NATUREL pour son propre usage comme prévu ci-dessus, les installations nécessaires au développement, à la production, au transport et au traitement, y compris notamment la séparation, la compres-sion ou la liquéfaction du GAZ NATUREL, depuis le premier séparateur après le point de production, et d'une capacité suffisante pour traiter le GAZ NATUREL, seront fournies à ses frais par HYDRO-CONGO. Les SOCIETES conviennent de fournir, à des conditions qui seront convenues alors, telle assistance et telle coopération techniques dont HYDRO-CONGO peut avoir besoin pour le développement et l'exploitation des gisements de GAZ NATUREL, et pour l'élaboration, la construction, la gestion et l'entretien de ces installations. En aucun cas lesdites acti-vités ne pourront interférer avec les TRAVAUX PETROLIERS de l'ASSOCIATION.

10.03.3    Tout GAZ NATUREL produit sur le PERMIS et non utilisé directement pour les TRAVAUX PETROLIERS ou conformément au sous-paragraphe 10.03.2 ci-dessus pourra être brûlé en torche.

11.  Emploi et formation du personnel

11.01  Conformément au sous-paragraphe 5.01.3 ci-dessus, chacune des SOCIETES sera soumise à la législation et à la réglementation du travail, telles qu'elles résultent des textes

GAR 00016

14.

relatifs notamment aux conditions générales de travail, au régime des rémunérations, à la prévention et aux réparations des accidents du travail et des maladies professionnelles, ainsi qu'aux associations professionnelles et aux syndicats. De son côté, le CONGO n'édictera à l'égard de chaque SOCIETE ainsi que du personnel de celle-ci en matière de législation du travail et des lois sociales, aucune mesure qui puisse être considérée comme discriminatoire par rapport à celles qui seraient imposées aux autres entreprises exerçant leur activité au CONGO.

11.02   Chacune des SOCIETES s'engage à prendre en charge, conjointement avec les autres membres de l'ASSOCIATION et proportionnellement à son pourcentage de participation au sein de l'ASSOCIATION, la formation, tant sur le plan technique qu'administratif, des cadres, agents de maîtrise et employés congolais nécessaires aux activités d'exploitation, par l'organisation, dans des limites correspondant à l'importance des activités en question, de stages au CONGO ou à l'étranger, l'attribution de bourses d'études à l'étranger et la création de centres de formation professionnelle au CONGO.

11.02.1   Les programmes et les budgets de formation professionnelle devront être approuvés par le Comité de Direction prévu au CONTRAT D'ASSOCIATION après consultation avec l'Administration congolaise.

11.02.2   Chacune des SOCIETES, conjointement avec les autres membres de l'ASSOCIATION, emploiera en priorité, à qualification égale, dans ses établissements et installations, du personnel congolais. Elle s'engage à assurer la formation professionnelle et technique dudit personnel afin de faciliter à tous les niveaux son accession à des emplois en rapport avec ses capacités.

11.02.3   Sur les chantiers d'exploitation situés en dehors des agglomérations ou dans leur voisinage, les SOCIETES assureront conjointement le logement des travailleurs dans des conditions normales d'hygiène et de salubrité et créeront, si nécessaire, l'infrastructure médicale, scolaire, sportive et culturelle correspondant aux besoins normaux des travailleurs et de leurs familles.

11.02.4   Les moyens mis en oeuvre conjointement par les SOCIETES pour l'application des dispositions du présent article 11 ont pour objet de permettre le remplacement progressif du personnel étranger des SOCIETES affecté aux TRAVAUX PETROLIERS par un personnel congolais.  A cet effet, les SOCIETES s'engagent à faire de leur mieux pour qu'à l'expiration de la dixième année après le début des TRAVAUX DE DEVELOPPEMENT ET D'EXPLOITATION, le personnel utilisé par l'OPERATEUR pour les TRAVAUX PETROLIERS au CONGO comprenne cent pour cent (100%) d'ouvriers et d'employés, quatre vingt pour cent (80%) d'agents de maîtrise et de techniciens, et cinquante pour cent (50%) de cadres, de nationalité congolaise.

15.

11.02.5   Le personnel de nationalité congolaise
utilisé par l'OPERATEUR pour les TRAVAUX PETROLIERS au CONGO
sera recruté par l'OPERATEUR et engagé, à sa demande, par
HYDRO-CONGO qui le détachera auprès de l'OPERATEUR pour être
formé par celui-ci puis, à l'issue de la période de formation,
pour être affecté aux TRAVAUX PETROLIERS.  A compter de la fin
de ladite période de formation, les employés d'HYDRO-CONGO que
l'OPERATEUR aura décidé de retenir pour les TRAVAUX PETROLIERS
seront, pendant toute la durée de leur détachement auprès de
l'OPERATEUR, les employés de ce dernier.

## 12.   Fournisseurs congolais

12.01  Les SOCIETES, ou l'OPERATEUR en leur nom, donneront
la priorité pour la réalisation des TRAVAUX PETROLIERS aux
fournitures et aux services fournis par des sociétés de droit
congolais à égalité de qualité, de quantité, de conditions de
vente, de délais de livraison et de services annexes, avec les
fournitures et services disponibles à l'étranger.

12.02  Toutefois, les SOCIETES, ou l'OPERATEUR en leur nom,
pourront choisir librement les armateurs et les pavillons des
navires utilisés par elles à quelque titre que ce soit, sous
réserve des restrictions d'application générale que le CONGO
peut édicter.  Les SOCIETES utiliseront la flotte marchande
congolaise qui pourrait être disponible pendant la durée de la
CONVENTION, dans la mesure où les tarifs et les autres
conditions offertes ne seront pas moins favorables que celles
offertes sur le marché international.

## 13.   Mise à disposition des informations

13.01  Les SOCIETES mettront à la disposition du CONGO tous
les renseignements en leur possession qu'elles doivent
communiquer aux termes du Code Minier.  De son côté, le CONGO
pourra communiquer aux SOCIETES les informations, notamment de
caractère technique, susceptibles d'être utilement employées
dans la conduite des TRAVAUX PETROLIERS.  Les SOCIETES
s'engagent à ne pas divulguer ces renseignements et documenta-
tions à des tiers, sauf dans la mesure requise par les TRAVAUX
PETROLIERS et à condition, dans ce cas, qu'un engagement soit
obtenu du récipiendaire de traiter ces renseignements et
documentations comme confidentiels.

13.02  Outre les renseignements qu'elles doivent lui
communiquer aux termes des dispositions du Code Minier, les
SOCIETES devront mettre gratuitement à la disposition du CONGO
toutes les informations géologiques qui seront susceptibles
d'être utilisées pour la recherche et l'exploitation des sub-
stances minérales autres que les HYDROCARBURES sur le PERMIS.
La SOCIETE qui agit en qualité d'OPERATEUR doit déclarer aux
autorités congolaises compétentes toute découverte de sub-
stances minérales autres que des HYDROCARBURES réalisée sur le
PERMIS; les SOCIETES se consulteront en vue d'apprécier l'op-
portunité, compte tenu des données techniques et économiques,

**GAR 00018**

16.

de s'associer pour l'exploitation desdites substances minérales. Les SOCIETES s'engagent à ne pas divulguer ces informations à des tiers. Le CONGO pourra librement utiliser toute information reçue au titre du présent paragraphe si les SOCIETES expriment leur absence d'intérêt ou ne parviennent pas, dans un délai de quatre (4) mois à compter de la réception de ces informations, à faire une proposition acceptable au CONGO pour un permis de recherches ou d'exploitation concernant la ou lesdites substances minérales.

13.03  A la demande du Ministre de tutelle, les SOCIETES examineront toutes les informations disponibles concernant les possibilités de recherche de substances minérales dans toute partie du territoire congolais qui leur sera indiquée par ladite autorité, et se consulteront entre elles en vue d'apprécier l'opportunité, compte tenu des données techniques et économiques, de s'associer pour la recherche desdites substances minérales.

## 14.  Transport et traitement des produits

14.01  Le Ministre de tutelle pourra demander aux SOCIETES de s'associer avec d'autres exploitants au CONGO en vue de réaliser ou d'utiliser en commun des installations ou des canalisations pour évacuer tout ou partie de la production d'HYDROCARBURES, à condition, d'une part, que la réalisation desdites installations ou canalisations soit techniquement possible dans des conditions économiques normales, et, d'autre part, que leur utilisation ne porte pas atteinte directement ou indirectement au rendement économique des gisements découverts.

14.01.1  Les tarifs de transport à l'évacuation de la production seront établis par les sociétés exploitantes, après consultation de l'autorité congolaise compétente.

14.02  Dans le cas où la production le permettrait et où les produits finis seraient assurés d'un écoulement certain, le CONGO pourrait demander aux SOCIETES de se consulter en vue d'apprécier l'opportunité, compte tenu des conditions économiques et des prévisions de rentabilité, de la réalisation par les SOCIETES, en association avec le CONGO et/ou avec les partenaires agréés par le CONGO, d'une unité de traitement d'HYDROCARBURES au CONGO.

## 15.  Force majeure

15.01  Si le CONGO ou l'une ou plusieurs des SOCIETES se trouve dans l'impossibilité, partielle ou totale, d'exécuter l'une ou plusieurs de ses obligations prévues à la CONVENTION ou en découlant par suite d'une force majeure, d'un cas fortuit ou d'un événement assimilé à la force majeure (ci-après collectivement désignés "FORCE MAJEURE"), la partie qui invoque la FORCE MAJEURE devra en informer les autres parties dans les plus brefs délais.

**GAR 00019**

17.

15.02  Ladite notification sera adressée par écrit soit par télex confirmé par lettre, soit par lettre recommandée avec demande d'avis de réception et devra faire état des éléments de nature à établir la FORCE MAJEURE.

15.03  Seront considérés comme FORCE MAJEURE tous les événements indépendants de la volonté ou échappant à la maîtrise de l'une des parties et ayant pour conséquence d'empêcher totalement ou partiellement, ou de retarder notablement, l'exécution des obligations des parties sans qu'ils aient pu être raisonnablement maîtrisés ou évités.  Aux fins de ce n'est CONVENTION, seront notamment considérés comme FORCE MAJEURE: la guerre, les troubles civils graves, l'insurrection, les grèves nationales et toutes grèves d'ordre général, le tremblement de terre, l'incendie, l'explosion, les autres catastrophes et tous les empêchements qui résultent directe—ment ou indirectement des commandements ou des prohibitions de la puissance publique.

15.04  La FORCE MAJEURE ne saurait toutefois être valablement invoquée si les cas, faits ou événements dont il s'agit étaient raisonnablement prévisibles ou s'il pouvait y être porté remède par l'exercice d'une diligence raisonnable. L'impossibilité de trouver le matériel nécessaire, si ce n'est à un prix prohibitif, constituera une FORCE MAJEURE.  Le manque de moyens financiers ne constituera pas une FORCE MAJEURE.

15.05  Les délais d'exécution des obligations de chaque SOCIETE affectées par une FORCE MAJEURE seront prorogés automatiquement d'une durée équivalente au retard entraîné par ladite FORCE MAJEURE, étant entendu que, d'une part, cette prorogation n'entraînera pas de pénalité à la charge de la partie à laquelle ces obligations incombent et que, d'autre part, les obligations autres que celles affectées par la FORCE MAJEURE devront continuer à être remplies conformément aux dispositions de la CONVENTION.

15.06  Dans tous les cas, la partie concernée devra prendre, en accord avec les autres parties, toutes dispositions utiles pour assurer la reprise normale de l'exécution des obligations affectées par la FORCE MAJEURE.  Si, par suite d'une FORCE MAJEURE, l'une des parties ne pouvait exécuter ses obligations telles que prévues à la CONVENTION pendant une période de trois (3) mois consécutifs à compter de la notification prévue ci-dessus, les parties se rencontreraient dans les plus brefs délais pour examiner les incidences des événements dont il s'agit, en particulier sur les délais d'exécution des obligations respectives de chacune des parties.  Si les parties ne peuvent se mettre d'accord sur les incidences dont il s'agit, elles soumettront leur différend à l'arbitrage conformément aux dispositions de l'article 17 ci-dessous.

16.  Déclaration et paiement d'impôts

Chaque SOCIETE sera seule responsable de ses déclarations aux autorités fiscales du CONGO, et du paiement de ses

**GAR 00020**

18.

impôts au titre de sa participation dans les activités de l'ASSOCIATION au CONGO, sur la base de son revenu imposable au titre de ses activités visées par la CONVENTION.

17. Arbitrage

17.01  Tous différends découlant de la CONVENTION, entre le CONGO d'une part et toute SOCIETE d'autre part, qui ne peuvent pas être résolus à l'amiable, seront tranchés définitivement par arbitrage conformément aux règles en vigueur du Centre International pour le Règlement des Différends relatifs aux Investissements (le "Centre") institué par la Convention pour le Règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, à laquelle le CONGO est partie depuis le 14 octobre 1966.

17.02  Chaque partie à un différend sera autorisée à nommer un arbitre et les arbitres ainsi nommés se mettront d'accord sur un autre arbitre, si nécessaire, afin d'obtenir un nombre impair d'arbitres.  Au cas où un accord sur un autre arbitre ne pourrait être obtenu, cet arbitre sera nommé par le Président du Centre.

17.03  L'arbitrage aura lieu à Genève, Suisse.  La sentence qui sera rendue en anglais et en français, les deux textes ayant la même force, sera définitive et liera les parties à l'arbitrage.  Un jugement d'exequatur pourra être rendu par tout tribunal ou toute autorité compétente ou, selon le cas, une demande pourra être introduite devant ledit tribunal ou devant ladite autre autorité pour obtenir la confirmation judiciaire de la sentence et une décision exécutoire.

17.04  Les honoraires du Centre relatifs à l'arbitrage d'un différend seront supportés de manière égale par les parties audit arbitrage.

17.05  Tous différends pouvant survenir entre les SOCIETES seront tranchés conformément à la clause d'arbitrage du CONTRAT D'ASSOCIATION.

18. Droit applicable

La CONVENTION est régie par le droit congolais.

19. Avis

19.01  Tous avis seront valablement donnés par cable, télex ou courrier adressé à l'autre ou aux autres parties à l'adresse indiquée ci-dessous.

(a)  pour le CONGO:

Monsieur le Ministre des Mines et de l'Energie
Ministère des Mines et de l'Energie
Brazzaville
République Populaire du Congo

GAR 00021

19.

à l'attention de:  Monsieur le Ministre

(b)  pour SUPERIOR:

Congolese Superior Oil Company
P.O. Box 1521
Houston, Texas 77001
Etats-Unis d'Amérique

Télex:  0775369

à l'attention de:  Vice-President Exploration

(c)  pour CITIES SERVICES:

Cities Services Congo Petroleum Corporation
P.O. Box 642
Houston, Texas 77001
Etats-Unis d'Amérique

Télex:  762056

à l'attention de:  Vice-President Operations

(d)  pour CANADIAN:

Canadian Superior Oil Ltd.
Three Calgary Place
355 4th Avenue S.W.
Calgary, Alberta T2P OJ3
Canada

Telex:  03826640

à l'attention de:  Vice-President Exploration

(e)  pour HYDRO-CONGO:

Société Nationale de Recherches
  et d'Exploitation Pétrolières --
  Hydro-Congo
B.P. 2008
Brazzaville
République Populaire du Congo

Télex:  5220

à l'attention de Monsieur le Directeur Général

**GAR 00022**

20.

Tous avis formels seront donnés par lettre recommandée
avec demande d'avis de réception ou, si ils sont donnés par
cable ou télex, confirmés par lettre recommandée avec demande
d'avis de réception.

19.02  Chacune des parties pourra modifier l'adresse
ci-dessus en avisant les autres par écrit conformément aux dis-
positions du présent article 19.

19.03  Au stade de la recherche, chacune des SOCIETES
désignera un représentant au CONGO auprès duquel tous avis
formels seront faits valablement.  En cas de découverte com-
mercialement exploitable, la SOCIETE établira au CONGO une
succursale régulièrement immatriculée au Registre du Commerce.
Par dérogation à l'article 20 de la loi n° 29-62 du 16 juin
1962, tel que modifié, les SOCIETES ne seront pas requises de
constituer une société filiale de droit congolais.

20.  Avenants

Il pourra être procédé par avenant, à la demande de
l'une des parties, à la révision d'une ou plusieurs clauses de
la CONVENTION, une telle révision ne pouvant intervenir que
d'un commun accord.

21.  Garantie par société mère

Les obligations des SOCIETES au titre de la CONVENTION
sont garanties par les sociétés mères de leurs groupes
respectifs, le cas échéant, conformément à des lettres de
garantie dont un modèle est joint en annexe V à la CONVENTION.

Fait à Brazzaville, le 25 mai 1979

Pour la République Populaire
du Congo

_____
Rodolphe Adada,
Ministre des Mines et de l'Energie

Pour Congolese Superior
Oil Company

_____
Diego O. Giordano-Echegoyen
Vice-President

Pour Cities Service Congo
Petroleum Corporation

_____
Antoine Saadi

Pour Société Nationale de
Recherches et d'Exploitation
Pétrolières "HYDRO-CONGO"

_____
Alphonse M'Boudo-Nesa,
Directeur Général

Pour Canadian Superior
Oil Ltd.

_____
Robert C. Schneider

GAR 00023

ANNEXE I

COPIE DU DECRET ACCORDANT LE PERMIS

GAR 00024

ANNEXE I

COPIE DU DECRET ACCORDANT LE PERMIS

GAR 00025

PRESIDENCE DE LA REPUBLIQUE          REPUBLIQUE POPULAIRE DU CONGO
PRESIDENCE DU CONSEIL DES            Travail + Démocratie + Paix
        MINISTRES                    -=-=-=-=-=-=-=-=-=-=-

                    DECRET N° 253    /    du 16 MAI 1979.

                    Attribuant à la Société HYDRO-CONGO un Permis de
                    recherche de type "A" pour hydrocarbures (dit
                    "Permis MARINE I").-

        LE PRESIDENT DU COMITE CENTRAL DU PARTI CONGOLAIS DU TRAVAIL
        PRESIDENT DE LA REPUBLIQUE, CHEF DE L'ETAT,
        PRESIDENT DU CONSEIL DES MINISTRES

        - Vu l'Acte n° 038/PCT/CC du 30 Mars 1979 portant fondement, organisa-
          tion et fonctionnement des Pouvoirs Publics ;
        - Vu le Décret n° 79/154 du 4 Avril 1979 portant nomination du Premier
          Ministre ;
        - Vu le Décret n° 79/155 du 4 Avril 1979 portant nomination des Membres
          du Conseil des Ministres ;
        - Vu la Loi n° 29/62 du 16 Juin 1962 portant Code Minier ;
        - Vu la Loi n° 31/62 du 16 Juin 1962 fixant les taux et règles de
          perception des droits sur les titres miniers ;
        - Vu la Loi n° 35/65 du 12 Août 1965 complétant les dispositions du
          Code Minier ;
        - Vu le Décret n° 62/247 du 17 Août 1962 déterminant certaines condi-
          tions d'application de la loi n° 29/62 susvisée ;
        - Vu l'Ordonnance n° 14/73 du 4 Juin 1973 portant création de la So-
          ciété Nationale Hydro-Congo ;
        - Vu le Décret n° 79/111 du 10 Mars 1979 accordant l'Autorisation
          Personnelle Minière à la Société Hydro-Congo ;
        - Vu la demande présentée par Hydro-Congo en date du 13 Janvier 1979
          sous le n° DRP/HC/538/252/ILJR/NM ;

              Le Conseil des Ministres entendu ;

                        D E C R E T E :

Article 1er : Il est octroyé à la Société Hydro-Congo dans les conditions
prévues par le présent Décret un Permis de recherche de type "A" dit per-
mis "MARINE I" valable pour les hydrocarbures liquides et gazeux, sous le
n° RC 1-15 dont la surface, réputée égale à 1432 (mille quatre cent tren-
deux) kilomètres carrés et représentée sur la carte jointe en annexe 1 au
présent Décret, est comprise à l'intérieur du périmètre défini par :

    1.a. Les droites joignant les points 1 et 2, 2 et 3, 3 et 4, 4 et 5,
5 et 6, 6 et 7, 7 et 8, 8 et 9, 9 et 10; ces droites étant réputées coïn-
cider avec la limite séparant le permis "MADINGO MARITIME (A)" renouvelé
et le permis "MARINE I".

                                              .../...

                        GAR 00026

- 2 -

b. La droite joignant les points 10 et 11, cette droite étant réputée coincider en partie avec la limite séparant le permis "MADINGO MARITIME (A)" renouvelé et le permis "MARINE I", et en partie avec la limite séparant la concession "LOANGO EST" et le permis "MARINE I ".

c. Les droites joignant les points 11 et 12, 12 et 13, 13 et 14, 14 et 15, 15 et 16, 16 et 17, ces droites étant réputées coincider avec la limite séparant la concession "LOANGO EST" et le permis "MARINE I".

d. Les droites joignant les points 17 et 18, 18 et 19, ces droites étant réputées coincider avec la limite séparant la concession "LOANGO OUEST" et le permis "MARINE I".

e. Les droites joignant les points 19 et 20, 20 et 21, 21 et 22, 22 et 23, 23 et 24, 24 et 25, ces droites étant réputées coincider avec la limite séparant le permis " POINTE-NOIRE GRANDS FONDS (A)" renouvelé et le permis " MARINE I".

f. La droite joignant les points 25 et 26, cette droite étant réputée coincider avec la limite séparant le permis "MER PROFONDE" et le permis " MARINE I".

g. La droite joignant les points 26 et 1, c'est-à-dire une partie de la droite passant à l'intersection de la laisse de basse-mer avec la limite des territoires du Congo et du Gabon dans un azimut géographique de 212 degrés, cette droite étant réputée coincider avec la limite des eaux respectivement sous juridiction du Congo et du Gabon.

2. Les points 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, et 26 qui sont définis comme suit :

.... / ....

| Points | Coordonnées Géographiques Ellipsoïde de Clarke 1880 | | Coordonnées U.T.M. (Clarke 1880) Fuseau 32-He : 9°E. | |
|---|---|---|---|---|
| | Longitude Est | Latitude Sud | Est | Nord |
| 1 | Point situé à 38 kms de la laisse de basse-mer sur la droite précédemment définie au paragraphe 1.g. ci-dessus. | | | |
| | 10°58'14"260 | 4°14'54"560 | 718.730 | 9.530.170 |
| 2 | 11°02'31"668 | 4°18'29"055 | 726.652 | 9.523.560 |
| 3 | 11°05'15"851 | 4°15'11"228 | 731.714 | 9.529.624 |
| 4 | 11°09'50"804 | 4°15'10"448 | 740.214 | 9.529.624 |
| 5 | 11°09'51"271 | 4°17'56"070 | 740.214 | 9.524.308,561 |
| 6 | 11°15'05"727 | 4°17'56"058 | 749.914 | 9.524.308,561 |
| 7 | 11°15'05"241 | 4°15'09"563 | 749.914 | 9.529.624 |
| 8 | 11°23'36"921 | 4°15'08"048 | 765.700 | 9.529.624 |
| 9 | 11°27'26"845 | 4°18'20"038 | 772.775 | 9.523.700 |
| 10 | 11°27'28"782 | 4°28'12"323 | 772.775 | 9.505.500 |
| 11 | 11°16'15"217 | 4°28'14"496 | 752.000 | 9.505.500 |
| 12 | 11°16'15"066 | 4°27'25"677 | 752.000 | 9.507.200 |
| 13 | 11°15'10"219 | 4°27'21"878 | 750.000 | 9.507.000 |
| 14 | 11°15'09"972 | 4°26'04"512 | 750.000 | 9.509.500 |
| 15 | 11°14'21"337 | 4°26'04"661 | 748.520 | 9.509.500 |
| 16 | 11°14'21"191 | 4°25'15"849 | 748.500 | 9.511.000 |
| 17 | 11°10'40"712 | 4°25'16"499 | 741.700 | 9.511.000 |
| 18 | 11°09'55"210 | 4°24'38"749 | 740.000 | 9.512.400 |
| 19 | 11°09'55"600 | 4°26'54"240 | 740.000 | 9.508.000 |
| 20 | 11°07'32"384 | 4°26'54"635 | 736.500 | 9.508.000 |
| 21 | 11°07'53"139 | 4°31'15"023 | 736.500 | 9.500.000 |
| 22 | 11°04'54"774 | 4°31'15"544 | 731.000 | 9.500 0 |
| 23 | 11°04'54"312 | 4°28'32"736 | 731.000 | 9.505 0 |
| 24 | 11°00'46"128 | 4°28'33"491 | 723.346.900 | 9.505 0 |
| 25 | Intersection du méridien de Longitude Est 11°00'46"944 et de la droite JK du Permis d'origine "POINTE NOIRE GRANDS FONDS" déterminée dans le Décret n° 68-270 M/CAEIH du 17 Octobre 1968. | | | |
| 26 | Point situé à 65 kms de la laisse de basse-mer sur la droite précédemment définie au paragraphe 1.G. | | | |

.../...

GAR 00028

Article 2 :

Le programme minimum de travaux à exécuter sur le permis de recherches visé à l'article 1 ci-dessus est défini en Annexe 2 au présent Décret.

Article 3 :

Hydro-Congo est autorisé à s'associer avec des sociétés signataires d'une Convention avec la République Populaire du Congo pour la mise en valeur du Permis de recherches visé à l'article 1 ci-dessus ainsi que des permis d'exploitation et de transport qui en découleront éventuellement.

Article 4 :

Le permis de recherches visé à l'article 1 ci-dessus pourra faire l'objet d'un renouvellement pour une durée de 5 ans dans les conditions prévues au Code Minier. Le programme minimum de travaux à exécuter au cours de la période initiale et de la période de renouvellement, ainsi que les réductions de la superficie du permis de recherches visé à l'article 1 ci-dessus, sont précisées dans l'Annexe 2 jointe au présent Décret.

Article 5 :

En cas de découverte d'un gisement exploitable sur la superficie du permis de recherches visé à l'article 1 ci-dessus, Hydro-Congo demandera un permis d'exploitation d'hydrocarbures, dont l'attribution est en ce cas de droit.

Chaque permis d'exploitation d'hydrocarbures est valable trente (30) ans. Le permis d'exploitation d'hydrocarbures ne fait pas l'objet de renouvellement.

Sur tous les points qui ne sont pas définis par le présent Décret, le ou les permis d'exploitation découlant du permis de recherches visé à l'article 1 sont régis par les dispositions du Code Minier relatives aux concessions.

Article 6 :

Les sous-traitants engagés par Hydro-Congo ou l'une des Sociétés auxquelles elle se sera associée devront se conformer aux dispositions applicables du Code Minier.

.../...

- 5 -

**Article 7 :**

Le Ministre des Mines et de l'Energie est chargé de l'exécution du présent Décret qui sera enregistré, diffusé partout où besoin sera et publié au Journal Officiel de la République Populaire du Congo.

Fait à Brazzaville, le 16 MAI 1979.-

Par le Président du Comité Central
du Parti Congolais du Travail;
Président de la République, Chef de
l'Etat, Président du Conseil des Ministres

Colonel Denis SASSOU-NGUESSO.-

Le Ministre des Mines et de l'Energie

Le Premier Ministre,
Chef du Gouvernement

Colonel Louis SYLVAIN-GOMA.-

Rodolphe A D A D A.-

AMPLIATIONS :

- Présidence de la Rép. ............... 1
- Premier Ministre .................. 1
- Mini-Mines et Energie ............. 1
- Secrétariat Gl aux Mines ......... 15
- Domaines ...................... 2
- Société Nat. Hydro-Congo .......... 2
- Secrétariat Gl du Gouvernement .... 1
- J.O.R.P.C. ..................... 2/25

GAR 00030

# A N N E X E 1

## CARTE DU PERMIS "MARINE I"

GAR 00031

GAR 00032

# A N N E X E 2

## I. - PROGRAMME MINIMUM DE TRAVAUX

### A. - Première Période

La première période aura une durée de cinq (5) ans.

#### Phase I

La phase I aura une durée de trois (3) ans, et se décomposera comme suit :

a) Campagne sismique de mille (1.000) kilomètres.

b) Dans les six (6) mois qui suivent la réception du traitement des données obtenues, abandon du permis, ou engagement de forer un puits dans l'antésalifère qui devra être commencé dans les vingt quatre (24) mois qui suivent la date de signature de la convention avec l'Etat, et au plus tard trente (30) mois après cette date, selon la disponibilité des équipements appropriés à des prix compétitifs.

c) Le titulaire aura l'option soit d'abandonner le permis à la plus lointaine des deux dates suivantes : (i) quatre vingt dix (90) jours après la réalisation de ce forage de recherche, ou (ii) quatre vingt dix (90) jours avant la fin de la phase I, soit de passer à la phase II.

#### Phase II

La phase II aura une durée de deux (2) ans.

Au cours de cette phase, le titulaire devra forer deux (2) puits de recherche dans l'antésalifère. Le titulaire aura le droit d'abandonner le permis après réalisation du forage de chaque puits.

### B. - Deuxième période

Le permis de recherche sera renouvelé à la demande du titulaire pour une période de renouvellement de trois (3) ans au cours de laquelle il sera foré au moins trois (3) puits. Toutefois, le titulaire aura le droit d'abandonner le permis après forage de chaque puits.

C. - Pour les besoins des paragraphes A et ci-dessus, l'obligation de forer un puits sera censée avoir été satisfaite par le titulaire lorsque l'objectif (profondeur ou formation) est atteint, ou lorsque les dépenses effectivement engagées pour la réalisation de ce forage auront atteint un montant égal à cent cinquante pour cent (150 %) du coût estimé pour le forage en question, tel que fixé par le Comité de Direction de l'Association à constituer par le titulaire avec d'autres sociétés signataires avec lui de la Convention avec la République Populaire du Congo visée à l'article 3 du Décret.

## II. - RENDUS

Le titulaire procédera à des rendus comme suit :

a) - une surface égale à vingt cinq pour cent (25 %) de la zone con-
tractuelle d'origine sera rendue à la fin de la phase I de la première
période ;

b) - une autre surface égale à vingt cinq pour cent (25 %) de la
zone contractuelle d'origine sera rendue à la fin de la phase . de la
première période, et

c) - la surface restante de la zone contractuelle d'origine sera
rendue en totalité à l'expiration de la période de renouvellement, à
l'exception de la ou des surfaces du permis couvertes par un ou plusieurs
permis d'exploitation, s'il y en a.

d) - Seront exclues des surfaces rendues par le titulaire à l'expi-
ration de la phase I et de la phase II de la première période, et à
l'expiration de la période de renouvellement, les surface du permis dont
le Comité de Direction de l'Association visée ci-dessus a déterminé,
avant la prise d'effet des rendus ou de l'expiration du permis, qu'elles
recouvreront des gisements commercialement exploitables.

## ANNEXE II

L'assiette de la redevance et de l'impôt sur les sociétés sera la valeur commerciale des HYDROCARBURES LIQUIDES vendus.

Pour la redevance, la valeur commerciale des HYDROCARBURES LIQUIDES sera réputée égale à la valeur commerciale de référence FOB Congo fondée sur les ventes au Moyen-Orient calculée comme décrit ci-dessous.

Pour l'impôt sur les sociétés, la valeur commerciale des HYDROCARBURES LIQUIDES sera le prix de vente, étant entendu toutefois qu'en cas de ventes à des acheteurs affiliés, le prix de vente ne sera pas inférieur au prix moyen pondéré des ventes de la SOCIETE venderesse à des acheteurs non affiliés pendant la même période pour des quantités raisonnables d'HYDROCARBURES LIQUIDES de qualité et de gravité similaires, ou, faute de telles ventes de quantités raisonnables à des acheteurs non affiliés, le prix de vente ne sera pas inférieur à un prix égal à la valeur de concurrence pour la même période d'HYDROCARBURES LIQUIDES de qualité et de densité similaires.

### Calcul de la valeur commerciale de référence FOB Congo

La valeur commerciale de référence FOB Congo sera calculée par référence aux prix de vente gouvernementaux de l'Arabe Léger pour la période applicable, ajustée pour tenir compte du fret, de la densité, du soufre et d'autres différentiels de qualité.

### Définitions

1. "Arabe Léger" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 34° API.

2. "Berri" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 39° API.

3. Les "Prix de Vente Gouvernementaux" (ou "PVG") désignent les prix de vente officiels du gouvernement d'Arabie Séoudite pour la vente de l'Arabe Léger ou du Berri.

4. "AFRA VLCC" et "AFRA LR2" désignent les frets tels que déterminés par le London Tanker Brokers Panel ou par toute autre organisation qui la remplacerait à cet effet, pour des livraisons par très grands pétroliers ou par pétroliers large range two respectivement.

GAR 00035

## ANNEXE II

L'assiette de la redevance et de l'impôt sur les sociétés sera la valeur commerciale des HYDROCARBURES LIQUIDES vendus.

Pour la redevance, la valeur commerciale des HYDROCARBURES LIQUIDES sera réputée égale à la valeur commerciale de référence FOB Congo fondée sur les ventes au Moyen-Orient calculée comme décrit ci-dessous.

Pour l'impôt sur les sociétés, la valeur commerciale des HYDROCARBURES LIQUIDES sera le prix de vente, étant entendu toutefois qu'en cas de ventes à des acheteurs affiliés, le prix de vente ne sera pas inférieur au prix moyen pondéré des ventes de la SOCIETE venderesse à des acheteurs non affiliés pendant la même période pour des quantités raisonnables d'HYDROCARBURES LIQUIDES de qualité et de gravité similaires, ou, faute de telles ventes de quantités raisonnables à des acheteurs non affiliés, le prix de vente ne sera pas inférieur à un prix égal à la valeur de concurrence pour la même période d'HYDROCARBURES LIQUIDES de qualité et de densité similaires.

### Calcul de la valeur commerciale de référence FOB Congo

La valeur commerciale de référence FOB Congo sera calculée par référence aux prix de vente gouvernementaux de l'Arabe Léger pour la période applicable, ajustée pour tenir compte du fret, de la densité, du soufre et d'autres différentiels de qualité.

### Définitions

1. "Arabe Léger" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 34° API.

2. "Berri" désigne le pétrole brut produit en Arabie Séoudite et vendu à Ras Tanura, ayant une densité de 39° API.

3. Les "Prix de Vente Gouvernementaux" (ou "PVG") désignent les prix de vente officiels du gouvernement d'Arabie Séoudite pour la vente de l'Arabe Léger ou du Berri.

4. "AFRA VLCC" et "AFRA LR2" désignent les frets tels que déterminés par le London Tanker Brokers Panel ou par toute autre organisation qui la remplacerait à cet effet, pour des livraisons par très grands pétroliers ou par pétroliers large range two respectivement.

GAR 00036

2.

5.  "SPOT VLCC" et "SPOT LR2" désignent le coût de transport
    calculé à partir de l'Average Worldscale Rates for Single
    Voyage Dirty Fixture publié mensuellement par H.P. Drewry
    Ltd., Londres, Royaume Uni, dans leur Shipping Statistics
    and Economics -- SSE Publication pour une cargaison moyenne
    pondérée de navires ayant une capacité de 70.000 à 174.999
    DWCT en ce qui concerne les "SPOT LR2" et pour une
    cargaison moyenne pondérée de navires ayant une capacité de
    175.000 à 300.000 DWCT ou plus en ce qui concerne le "SPOT
    VLCC". Pour les besoins des alinéas 2. et 3. ci-dessus, le
    fret sera calculé sur la base des taux publiés pour le mois
    au cours duquel les HYDROCARBURES LIQUIDES seront enlevés.

La valeur commerciale de référence FOB Congo sera déterminée
comme suit:

1.  Prendre le PVG d'un baril d'Arabe Léger d'une gravité de
    34° à 34,09°.

2.  Déterminer le fret par baril pour le transport de l'Arabe
    Léger de Ras Tanura à Rotterdam via Le Cap et retour de
    Rotterdam à Ras Tanura via Le Cap, en divisant la moyenne
    du fret publié AFRA VLCC et SPOT VLCC par tonne par le
    nombre de barils par tonne du pétrole brut en question.

3.  Déterminer le fret par baril pour le transport des
    HYDROCARBURES LIQUIDES de Pointe Noire à Rotterdam en
    divisant la moyenne du fret publié AFRA LR2 et SPOT LR2 par
    tonne par le nombre de barils par tonne du pétrole brut en
    question. Soustraire le fret correspondant du fret
    déterminé conformément au paragraphe 2 ci-dessus et ajouter
    le résultat au PVG déterminé conformément au paragraphe 1
    ci-dessus.

Le montant déterminé conformément à la procédure ci-dessus sera
ajusté en hausse ou en baisse conformément aux facteurs de
qualité suivants qui seront calculés comme suit:

1.  Facteur de densité:

    Le différentiel de densité sera déterminé comme suit:

    (a)  Prendre la densité de 34° API pour l'Arabe Léger.

    (b)  Déduire cette densité de la densité établie des
         HYDROCARBURES LIQUIDES. Tout résultat positif sera
         ajouté à la valeur commerciale de référence FOB Congo;
         tout résultat négatif sera soustrait de la valeur
         commerciale de référence FOB Congo.

    (c)  Multiplier le solde obtenu en (b) par dix pour obtenir
         un produit.

GAR 00037

3.

    (d) Multiplier le produit obtenu en (c) par la valeur cotée pour un différentiel de densité par dixième de degré API pour l'Arabe Léger; le résultat sera l'ajustement de densité.

2. Facteur de soufre:

    (a) Arabe Léger et Berri

        (i) Déterminer la différence des PVG entre l'Arabe Léger et le Berri.

        (ii) Déterminer le montant de la différence en (i) imputable à la densité en soustrayant de ladite différence le produit résultant de la multiplication du nombre de dixièmes de degré de densité entre les deux bruts par la moyenne de la valeur des différentiels de densité par dixième de degré API pour les deux bruts.

        (iii) Déduire le produit obtenu conformément à (ii) de la différence obtenue conformément à (i).

        (iv) Diviser le solde obtenu par application de (iii) par le différentiel de dixième de SWT% entre les deux bruts. Prendre comme référence 1,8 SWT% pour l'Arabe Léger et 1,1 SWT% pour le Berri, sauf accord contraire.

    .(b) Obtenir l'ajustement de soufre congolais en multipliant la différence en nombre de dixièmes de SWT% entre le contenu en soufre des HYDROCARBURES LIQUIDES et la moyenne de la teneur en soufre de l'Arabe Léger et du Berri en cents des Etats-Unis d'Amérique par un dixième de SWT% déterminé comme il est dit à l'alinéa (a) (iv) ci-dessus.

Ledit ajustement s'ajoutera à la valeur commerciale de référence FOB Congo si le soufre congolais est inférieur à ladite moyenne et sera réduit de la valeur commerciale de référence FOB Congo si le soufre congolais excède ladite moyenne.

3. Autres facteurs de qualité:

    (a) Si le gazole lourd distillé à partir des HYDROCARBURES LIQUIDES (ce produit étant distillé entre 600 et 960° Fahrenheit conformément à la procédure de distillation de l'American Society for Testing Metals, ou toute autre organisation qui la remplacerait) a un indice de neutralisation supérieur à 0,5 (indice de neutralisation signifiant le nombre de milligrammes d'hydroxyde de potassium nécessaire pour neutraliser l'acide contenu dans un grammme de gazole lourd), ou

GAR 00038

4.

    (b)  Si le gazole lourd extrait des HYDROCARBURES LIQUIDES,
tel que défini dans (a) ci-dessus, contient plus de
0,24 parties par million de parties de nickel et de
cuivre, ou d'équivalent nickel (calculé par addition
des parties par million de vanadium, divisé par 4,3,
plus les parties par million de nickel et de cuivre),
ou

    (c)  Si un quelconque autre facteur de qualité des
HYDROCARBURES LIQUIDES, inconnu à la date de la
CONVENTION, devait se révéler,

les Parties se réuniront pour se mettre d'accord sur un
ajustement équitable de la valeur commerciale de référence FOB
Congo déterminée conformément à ce qui précède; dans la mesure
où ces caractéristiques auraient une importance appréciable.

GAR 00039