ANNEXE III

TAUX D'AMORTISSEMENTS APPLICABLES AUX SOCIETES

| Nature des immobilisations à amortir | Taux annuel |
|---|---|

**TRAVAUX SOUTERRAINS ET SONDAGES**

| | |
|---|---|
| Sondes improductives | 50,0% |
| Sondes productives: fixé en fonction de la durée probable de production de la sonde. | |
| En cas d'indétermination | 12,5% |

**MATERIEL DE TRANSPORT**

| | |
|---|---|
| Pipe-lines intérieurs | 10,0% |
| Pipe-lines extérieurs | 7,5% |

**MATERIEL DE FORAGE** (en général:     10,0%)

| | |
|---|---|
| Tiges de forage | 20,0% |
| Outillage de forage | 20,0% |
| Moteur diesel | 20,0% |
| Outillage de derricks, transmissions | 20,0% |

**IMMOBILISATIONS INCORPORELLES**

| | |
|---|---|
| Frais de recherches géologiques et géophysiques | 20,0% |

**CONSTRUCTIONS**

| | |
|---|---|
| Immeubles et constructions en dur pour ateliers, bureaux, magasins, garages, laboratoires, apprentissage, logements, services sociaux et sportifs, cantines, hospitalisation, salles de réunion | 3,1/3% |
| Bâtiments à charpentes métalliques | 3,1/3% |
| Constructions légères semi-fixes sans fondations | 10,0% |
| Cases et tous bâtiments de chantier démontables ou transportables | 10,0% |
| Aménagements intérieurs des ateliers | 10,0% |

GAR 00040

ANNEXE III

TAUX D'AMORTISSEMENTS APPLICABLES AUX SOCIETES

| Nature des immobilisations à amortir | Taux annuel |
|---|---|
| **TRAVAUX SOUTERRAINS ET SONDAGES** | |
| Sondes improductives | 50,0% |
| Sondes productives: fixé en fonction de la durée probable de production de la sonde. | |
| En cas d'indétermination | 12,5% |
| **MATERIEL DE TRANSPORT** | |
| Pipe-lines intérieurs | 10,0% |
| Pipe-lines extérieurs | 7,5% |
| **MATERIEL DE FORAGE** (en général: | 10,0%) |
| Tiges de forage | 20,0% |
| Outillage de forage | 20,0% |
| Moteur diesel | 20,0% |
| Outillage de derricks, transmissions | 20,0% |
| **IMMOBILISATIONS INCORPORELLES** | |
| Frais de recherches géologiques et géophysiques | 20,0% |
| **CONSTRUCTIONS** | |
| Immeubles et constructions en dur pour ateliers, bureaux, magasins, garages, laboratoires, apprentissage, logements, services sociaux et sportifs, cantines, hospitalisation, salles de réunion | 3,1/3% |
| Bâtiments à charpentes métalliques | 3,1/3% |
| Constructions légères semi-fixes sans fondations | 10,0% |
| Cases et tous bâtiments de chantier démontables ou transportables | 10,0% |
| Aménagements intérieurs des ateliers | 10,0% |

2.

```
Machines de bureau                                      15,0%
Mobilier de bureau ou autre                             10,0%
Téléphone                                               15,0%
```

## INSTALLATIONS DE CHARGEMENT ET STOCKAGE

```
Installation de stockage                                10,0%
  A l'exception des parcs à tubes et des conduites      20,0%
Môles de chargement                                     3,1/3%
Installations de chargement                             10,0%
Conduites flottantes                                    20,0%
```

## VEHICULES ET VOIES D'ACCES

```
Engins de génie civil                                   30,0%
Véhicules automobiles et leurs remorques                33,0%
  A l'exception des camions-incendie,
  camions-ateliers, camions-cimentation                 20,0%
```

## TRANSPORTS FLUVIAUX

```
Pinasses                                                15,0%
Remorques, pousseurs, chalands-citernes, barges         10,0%

Voies d'accès aux travaux de géophysique et aux
  sondes improductives                                  50,0%
Voies d'accès aux sondes productives                    25,0%
```

## AUTRES IMMOBILISATIONS

```
Distribution d'eau                                      10,0%
Distribution d'air comprimé                             10,0%
Distribution d'électricité                              10,0%
```

## LIGNES DE TRANSPORT DE FORCE

```
Pylônes                                                 3,1/3%
Autres éléments                                         5,0%
```

## TRANSFORMATEURS

```
Bâtiments et outillage fixe                             5,0%
Outillage mobile                                        10,0%
```

## MACHINES FIXES

```
Compresseurs                                            10,0%
Compresseurs en mer                                     20,0%
Moteurs et pompes diverses à terre                      10,0%
Moteurs et pompes diverses en mer                       20,0%
Machines-outils à terre                                 10,0%
Machines-outils en mer                                  20,0%
Petit outillage                                         15,0%
```

GAR 00042

3.

| | |
|---|---|
| Matériel fixe de laboratoire | 10,0% |
| Matériel mobile de laboratoire | 20,0% |
| Matériel de topographie | 10,0% |
| Matériel de campement en mer | 50,0% |
| Matériel de campement à terre | 20,0% |

MATERIEL SPECIFIQUE OFF-SHORE

| | |
|---|---|
| Barges de forage | 20,0% |
| Plate-formes de forage et de production | 15,0% |
| Equipements de puits en mer | 20,0% |
| Câbles sous-marins de transport d'énergie | 20,0% |
| Bouées d'amarrage | 25,0% |
| Equipements sur plate-forme | 20,0% |
| Têtes de puits sous-marines et support de têtes de puits | 20,0% |
| Lignes de collecte entre puits et stations de stockage | 20,0% |
| Lignes principales | 10,0% |
| Lignes de chargement sous-marines | 20,0% |

Les frais accumulés par les SOCIETES pour les TRAVAUX
DE RECHERCHES seront traités de la manière suivante: ceux de
ces frais correspondant à la création d'immobilisations seront
amortis, à compter du premier exercice qui dégagera des revenus
imposables, suivant les taux d'amortissement ci-dessus. Les
autres constitueront des frais de premier établissement, dont
l'amortissement pourra à ce titre être pratiqué, au choix de
chaque SOCIETE, sans limite de temps.

GAR 00043

## ANNEXE IV

### I- PAIEMENT DE LA REDEVANCE

Lorsque la redevance est payée en espèces, chaque SOCIETE fera, au plus tard le 20 de chaque mois, une déclaration des quantités d'HYDROCARBURES enlevées par elle durant le mois calendaire précédent.

Quatre-vingt-cinq pour cent (85%) de la redevance due pour ledit mois précédent de chaque trimestre seront versés lors de la déclaration mensuelle correspondante. Le solde de la redevance due pour chaque trimestre sera calculé et payé en même temps que la déclaration mensuelle faite au cours du deuxième mois suivant la fin du trimestre en question.

### II- PAIEMENT DE L'IMPOT SUR LES SOCIETES

Chaque SOCIETE procédera au versement d'acomptes sur l'impôt sur les sociétés de la manière suivante:

(a)  Au cours du premier trimestre, chaque SOCIETE fera une estimation de l'impôt qui sera dû par elle au titre de l'année en cours.

(b)  Un montant correspondant à 8/120e de cette estimation sera versé au plus tard le 20 de chacun des mois d'avril, mai, juin, juillet, août et septembre.

(c)  Au cours du troisième trimestre, chaque SOCIETE reverra, en fonction du résultat effectif du premier semestre, l'estimation faite par elle de l'impôt annuel.

(d)  Un montant correspondant à 8/120e de la nouvelle estimation sera versé au plus tard le 20 de chacun des mois d'octobre, novembre, décembre, et janvier, février et mars de l'année suivante, le versement du mois d'octobre étant toutefois ajusté de manière à ce que le montant total des acomptes versés le 20 octobre corresponde à 56/120e de la nouvelle estimation.

(e)  Le solde de liquidation de l'impôt sur les sociétés sera payé lors du dépôt de la déclaration, et les excédents éventuels seront traités conformément à l'article 126 bis du Code Général de Impôts.

## ANNEXE IV

### I- PAIEMENT DE LA REDEVANCE

Lorsque la redevance est payée en espèces, chaque SOCIETE fera, au plus tard le 20 de chaque mois, une déclaration des quantités d'HYDROCARBURES enlevées par elle durant le mois calendaire précédent.

Quatre-vingt-cinq pour cent (85%) de la redevance due pour ledit mois précédent de chaque trimestre seront versés lors de la déclaration mensuelle correspondante. Le solde de la redevance due pour chaque trimestre sera calculé et payé en même temps que la déclaration mensuelle faite au cours du deuxième mois suivant la fin du trimestre en question.

### II- PAIEMENT DE L'IMPOT SUR LES SOCIETES

Chaque SOCIETE procédera au versement d'acomptes sur l'impôt sur les sociétés de la manière suivante:

(a) Au cours du premier trimestre, chaque SOCIETE fera une estimation de l'impôt qui sera dû par elle au titre de l'année en cours.

(b) Un montant correspondant à 8/120e de cette estimation sera versé au plus tard le 20 de chacun des mois d'avril, mai, juin, juillet, août et septembre.

(c) Au cours du troisième trimestre, chaque SOCIETE reverra, en fonction du résultat effectif du premier semestre, l'estimation faite par elle de l'impôt annuel.

(d) Un montant correspondant à 8/120e de la nouvelle estimation sera versé au plus tard le 20 de chacun des mois d'octobre, novembre, décembre, et janvier, février et mars de l'année suivante, le versement du mois d'octobre étant toutefois ajusté de manière à ce que le montant total des acomptes versés le 20 octobre corresponde à 56/120e de la nouvelle estimation.

(e) Le solde de liquidation de l'impôt sur les sociétés sera payé lors du dépôt de la déclaration, et les excédents éventuels seront traités conformément à l'article 126 bis du Code Général de Impôts.

GAR 00045

ANNEXE V

MODELE DE LETTRE DE GARANTIE

GARANTIE

ATTENDU QUE la République Populaire du Congo (ci-après désignée le "CONGO"), et Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd. et la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" ont passé une convention en date du 25 mai 1979 pour la recherche et l'exploitation des ressources en hydrocarbures liquides et gazeux en mer au large du Congo (ci-après désignée la "CONVENTION"), et

ATTENDU QUE /nom de la société mère / (ci-après désignée la "SOCIETE MERE") agissant en tant que titulaire, directement ou indirectement, de toutes les actions représentant le capital de /nom de la société affiliée_/ (ci-après désignée la "SOCIETE AFFILIEE") désire assurer au CONGO l'exécution des obligations de la SOCIETE AFFILIEE au titre de la CONVENTION.

EN CONSEQUENCE,

La SOCIETE MERE accepte et s'engage par la présente à fournir ou à faire tenir à la disposition de la SOCIETE AFFILIEE les fonds qui lui seront nécessaires pour satisfaire à ses obligations résultant de la CONVENTION.

Signé à _____, le _____ 1979.

Pour (nom de la SOCIETE MERE)

_____
(Titre)

GAR 00046

ANNEXE V

MODELE DE LETTRE DE GARANTIE

GARANTIE

ATTENDU QUE la République Populaire du Congo (ci-après désignée le "CONGO"), et Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd. et la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" ont passé une convention en date du 25 mai 1979 pour la recherche et l'exploitation des ressources en hydrocarbures liquides et gazeux en mer au large du Congo (ci-après désignée la "CONVENTION"), et

ATTENDU QUE /nom de la société mère_/ (ci-après désignée la "SOCIETE MERE") agissant en tant que titulaire, directement ou indirectement, de toutes les actions représentant le capital de /nom de la société affiliée_/ (ci-après désignée la "SOCIETE AFFILIEE") désire assurer au CONGO l'exécution des obligations de la SOCIETE AFFILIEE au titre de la CONVENTION.

EN CONSEQUENCE,

La SOCIETE MERE accepte et s'engage par la présente à fournir ou à faire tenir à la disposition de la SOCIETE AFFILIEE les fonds qui lui seront nécessaires pour satisfaire à ses obligations résultant de la CONVENTION.

Signé à _____, le _____ 1979.

Pour (nom de la SOCIETE MERE)

_____
(Titre)

GAR 00047

<u>A P E N D I C E</u>

GAR 00048

2.

## CONGOLESE SUPERIOR OIL COMPANY
P. O. Box 1521
HOUSTON, TEXAS 77001

Monsieur le Ministre des
Finances
Ministère des Finances
                                            Houston, le 17 mai 1979

BRAZZAVILLE

Monsieur le Ministre,

Notre société et les sociétés Cities Service Congo Petroleum
Corporation et Canadian Superior Oil Ltd. signons le 25 mai
1979 avec la République Populaire du Congo, représentée par
le Ministre des Mines et de l'Energie, une Convention rela-
tive à la recherche et à l'exploitation d'hydrocarbures sur
le permis dit MARINE 1.  A cette occasion, nous aimerions
recevoir de vous un éclaircissement sur les points suivants :

1.  Les travaux relatifs à la mise en valeur de ce permis
nous amèneront, en qualité d'Opérateur de l'Association,
et peuvent amener dans une moindre mesure nos partenaires
non congolais dans l'Association, à envoyer au Congo un
personnel spécialisé pour des périodes temporaires mais qui
pourront durer quelques années.

(a) Les employés expatriés pourront amener avec eux des
biens meubles, véhicules automobiles personnels, et effets
personnels et de ménage destinés à leur usage personnel
pendant la durée de leur séjour au Congo.  Ces biens
pourront-ils être importés et réexportés en fin de séjour
en franchise de droit ou taxe ?

(b) L'expatriation au Congo pourra entraîner pour ces em-
ployés des frais exceptionnels qui seront la conséquence
directe de leur détachement : maintien d'une double rési-
dence, scolarisation particulière des enfants et, en l'ab-
sence d'une convention particulière fiscale entre la Répu-
blique Populaire du Congo et les Etats-Unis d'Amérique,
double imposition éventuelle à l'impôt sur le revenu des

**GAR 00049**

3.

Monsieur le Ministre des    -2-          le 17 mai 1979
Finances

personnes physiques.  L'envoi de ce personnel au Congo
nous amènera probablement à verser à ce personnel une
indemnité destinée à rembourser les frais de cette na-
ture.  Une telle indemnité sera-t-elle assujettie à l'im-
pôt congolais sur le revenu des personnes physiques, en
sus de l'impôt applicable à la rémunération du personnel,
déduction faite de l'abattement de 30 % de droit commun
pour frais professionnels ?

2.   Au cas où l'Association serait amenée pour des raisons
de force majeure à interrompre l'exploitation pour une du-
rée appréciable, les participants à l'Association pourraient-
ils obtenir le remboursement de trop-versés éventuels au ti-
tre de l'impôt sur les sociétés ?

3.   En ce qui concerne l'ensemble des frais accumulés pen-
dant la période de recherche, nous avons compris que les
règles fiscales du Congo conduiraient à les traiter de la
manière suivante : ceux de ces frais correspondant à la
création d'immobilisations seront amortis, à compter du
premier exercice qui dégagera des revenus imposables, sui-
vant les taux d'amortissement figurant en annexe à la con-
vention susvisée.  Les autres constitueront des frais de
premier établissement, dont l'amortissement pourra à ce
titre être pratiqué, au choix du contribuable, sans limite
de temps.  Nous vous serions reconnaissants de bien vouloir
nous confirmer qu'il en est bien ainsi.

Nous vous prions d'agréer, Monsieur le Ministre, l'expression
de notre considération distinguée.

Diego O. Giordano
Vice-Président

**GAR 00050**

République Populaire du Congo

**CONFIDENTIEL**

Ministère des Finances

Le Ministre     2 5 MAI 1979

Messieurs,

En réponse à votre lettre du 17 mai 1979, nous avons l'honneur de vous indiquer ce qui suit :

1. (a) Le mobilier et les effets personnels et de ménage peuvent être importés et réexportés en franchise, quelle que soit la durée du séjour, tant que leur usage est limité à l'usage personnel des employés expatriés. Les véhicules automobiles personnels ne peuvent être importés en franchise que pour une période de six (6) mois.

1. (b) Les indemnités décrites dans votre lettre ayant le caractère de remboursement de frais réels de nature exceptionnelle, différents par nature des frais que l'abattement de droit commun a pour objet de couvrir, ne seront pas comprises dans le revenu imposable des intéressés, sous réserve bien entendu de la production des justificatifs appropriés.

2. L'interruption d'exploitation dans les circonstances décrites dans votre lettre peut être interprétée comme une cessation d'activité entraînant l'application des dispositions de l'article 126 bis (4) du Code Général des Impôts.

3. Nous vous confirmons que votre description de l'amortissement des frais accumulés pendant la période de recherche est bien exacte. Ce point est d'ailleurs réglé dans des termes identiques par le dernier alinéa de l'Annexe III à la Convention que votre Société et les sociétés Cities Service Congo Petroleum Company et Canadian Superior Oil Ltd. signent ce jour avec la République Populaire du Congo et Hydro-Congo.

Je vous prie d'agréer, Messieurs, l'expression de mes sentiments distingués.

CONGOLESE SUPERIOR OIL COMPANY

26 th Floor

Brazzaville, le 25 mai 1979

- La République Populaire du Congo,

- Congolese Superior Oil Company,

- Cities Service Congo Petroleum Corporation,

- Canadian Superior Oil Ltd., et

- Société Nationale de Recherches et d'Exploitation
  Pétrolières "Hydro-Congo",

signent ce jour une convention ayant pour objet de définir les
conditions dans lesquelles les parties feront des travaux de
recherche et éventuellement d'exploitation d'hydrocarbures sur
le permis marin dit "Marine 1".

   Cette convention est rédigée et signée en français.
En cas de difficulté d'interprétation, il sera fait référence à
la traduction anglaise ci-jointe, dans un but de clarification.

Pour la République Populaire
du Congo:

Rodolphe ADADA,
Ministre des Mines et de l'Energie

Pour Congolese Superior            Pour Société Nationale de Recherche
Oil Company                        et d'Exploitation Pétrolières
                                   "HYDRO-CONGO"

Diego V. Giordano-Echegoyen,       Alphonse Mª Boudo-Nesa,
Vice-President                     Directeur Général

Pour Cities Service Congo          Pour Canadian Superior Oil Ltd.
Petroleum Corporation

Antoine Saadi,                     Robert C. Schrader,
Vice-President                     Vice-President,
                                   International Contracts

GAR 00052

Amendment No. 1
to the May 25, 1979
"Marine I" Convention

December 11, 1981

French version not in our files.

GAR 00053

**AVENANT N°2 A LA CONVENTION DU 25 MAI 1979**
**PORTANT SUR LE PERMIS MARINE-1**

**ENTRE**

- La République du Congo, ci-après désignée « Le Congo »), représentée par Monsieur Nguila MOUNGOUNGA NKOMBO, son Ministre de l'Economie, des Finances et du Plan chargé de la Prospective,

      **d'une part**

**ET**

- La société Nationale de Recherche et d'Exploitation Pétrolières « Hydro-Congo », ci-après désignée « Hydro-Congo », entreprise publique ayant son siège social à Brazzaville République du Congo, représentée par Monsieur **Bernard OKIORINA**, son       Directeur Général Président,

- CMS NOMECO Congo Inc., ci-après désignée « NOMECO », société légalement constituée ayant son siège à Pointe-Noire, République du Congo,  représentée par Monsieur **K. CHARSINSKY**, son Directeur Général,

- Kuwait Foreign Petroleum Exploration Co. k.s.c. société légalement constituée selon les lois du Kuwait, ayant son siège à Kuwait, PO Box 5291, Safat 13053, Kuwait, représentée par Monsieur **Mahmoud A. AL RAHMANI**, son Président Directeur Général, pour le compte de KUFPEC (Congo) Limited, ci-après désignée « KUFPEC »,

- ~~The NUEVO Congo Company, ci-après désignée « NUEVO », société légalement constituée~~ ayant son siège à Houston (TEXAS), représentée par Monsieur **Michael D. WATFORD**, son Président,

      ci-après désignées collectivement « les Sociétés » ou individuellement « la Société »,

Etant précisé que la République du Congo, d'une part, Hydro-Congo, Nomeco, Kufpec et Nuevo d'autre part, sont collectivement désignées ci-après « les Parties », ou individuellement « la Partie ».

      **d'autre part,**

**ETANT PREALABLEMENT EXPOSE CE QUI SUIT:**

Les Sociétés sont les ayant-droits des signataires de la Convention Marine-I en date du 25 mai 1979, ci-après désignée « la Convention », laquelle définit  en son article 7.01 l'assiette de la redevance minière proportionnelle.

Les Parties ayant constaté leurs divergences d'interprétation de l'article 7.01 de la Convention , ont convenu d'en clarifier et harmoniser la rédaction.

**IL A ETE CONVENU CE QUI SUIT:**

**Article 1:** Définitions

Les définitions contenues dans la Convention s'appliqueront au présent Avenant, sauf si le contexte du présent Avenant indiquait clairement le contraire.

      **GAR 00054**



<u>Article 2</u> De l'article 7.01 de la Convention

L'article 7.01 de la Convention se lit comme suit:

« L'assiette de la redevance minière proportionnelle payée en espèce ou en nature est égale pour chaque Société à la valeur des Hydrocarbures enlevés par celle-ci et calculée sur la base du prix déterminé conformément à l'Annexe II à la Convention ou à toute autre méthode sur laquelle les Parties s'accorderaient, diminuée des frais de transport intérieur, traitement, stockage et chargement tels que ces frais apparaissent dans les comptes de ladite Société.

Ne sont pas déductibles de l'assiette de la redevance minière proportionnelle, tous les frais autres que ceux rappelés au paragraphe ci-dessus, notamment les charges d'amortissement et les frais financiers relatifs aux investissements.

La redevance minière proportionnelle n'est pas due sur les quantités d'Hydrocarbures utilisées pour les besoins des travaux pétroliers ou perdues ».

<u>Article 3</u> Autres dispositions

Toutes les autres dispositions de la Convention et ses avenants demeurent en conséquence inchangées et pleinement applicables.

<u>Article 4</u> Prise d'effet

Le présent Avenant prend effet rétroactivement le 1er janvier 1994 et sera approuvé par une loi selon les formes requises.

Fait à Paris, en cinq (5) exemplaires, le 25 janvier 1997

Pour la République du Congo
le Ministre de l'Economie, des Finances
et du Plan, chargé de la Prospective

Nguila MOUNGOUNGA NKOMBO

Pour la Société Nationale de Recherche et
d'Exploitation Pétrolières "Hydro-Congo"
le Directeur Général Président

Bernard OKIORINA

Pour CMS Nomeco Congo
le Directeur Général

K. CHARSINSKY

Pour The NUEVO Congo Company
le Président

Michael D. WATFORD

Pour Kuwait Foreign Petroleum Exploration Co. k.s.c.
pour le compte de KUFPEC (Congo) Limited
le Président Directeur Général

Mahmoud A. AL-RAHMANI

GAR 00055

# ENGLISH

#3305-A

## CONVENTION

- The People's Republic of Congo
- Congolese Superior Oil Company
- Cities Service Congo Petroleum Corporation
- Canadian Superior Oil Ltd.
- Société Nationale de Recherches et
  d'Exploitation Pétrolières "HYDRO-CONGO"

May 25, 1979

ENGLISH
TRANSLATION

Copied from
ORIGINALS File

GAR 00056

## INDEX

1.  Table of contents

2.  Convention

3.  Exhibit I:     Decree granting the "Marine 1" permit.

4.  Exhibit II.

5.  Exhibit III:   Depreciation rates applicable to the
                   COMPANIES.

6.  Exhibit IV:    Payment of the royalty and of the
                   corporate tax.

7.  Exhibit V:     Model of letter of guarantee.

8.  Appendix.

GAR 00057

Page

1. Definitions ............................................. 2
2. Purpose ............................................... 4
3. Effective Date - Term - Exploitation Permit ........... 4
4. Beneficiaries ......................................... 4
5. Warranties ............................................ 5
6. Taxes ................................................. 6
   6.03 Computation of the corporate tax on each of the
        COMPANIES ........................................ 7
7. Mining royalty ........................................ 8
8. Foreign exchange ...................................... 9
9. Lump sum payments ..................................... 11
10. Disposition of HYDROCARBONS .......................... 11
11. Employment and training of personnel ................. 13
12. Congolese suppliers .................................. 14
13. Provision of information ............................. 15
14. Transport and treatment of products .................. 15
15. Force majeure ........................................ 16
16. Tax declaration and payment .......................... 17
17. Arbitration .......................................... 17
18. Applicable law ....................................... 18
19. Notices .............................................. 18
20. Amendments ........................................... 19
21. Guarantee by parent company .......................... 20

EXHIBIT I
  Copy of Decree Granting the PERMIT

EXHIBIT II

EXHIBIT III
  Depreciation Rates Applicable to the COMPANIES

EXHIBIT IV
  I - Payment of Royalty
  II - Payment of Corporate Tax

EXHIBIT V
  Model of Letter of Guarantee

(i)

GAR 00058

TRANSLATION

## CONVENTION

BETWEEN

The People's Republic of the Congo (hereinafter referred to as the "CONGO"), represented for the purposes hereof by its Minister of Mining and Energy Mr. Rodolphe Adada,

on the one hand,

AND

Congolese Superior Oil Company (hereinafter sometimes referred to as "SUPERIOR"), a Nevada (U.S.A.) corporation with registered offices at 26th Floor, First City National Bank Building, Houston, Texas 77001, United States of America, represented by Mr. Diego O. Giordano-Echegoyen, duly authorized for this purpose,

Cities Service Congo Petroleum Corporation (hereinafter sometimes referred to as "CITIES SERVICE") a Delaware (U.S.A.) corporation with registered offices at 306 South State Street, Dover, Delaware, United States of America, represented by Mr. Antoine Saadi, duly authorized for this purpose,

Canadian Superior Oil Ltd. (hereinafter sometimes referred to as "CANADIAN"), a corporation incorporated under the laws of Canada, with registered offices at Three Calgary Place, 355 4th Avenue S.W., Calgary, Alberta, Canada, represented by Mr. Robert C. Schrader, duly authorized for this purpose,

Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" (hereinafter sometimes referred to as "HYDRO-CONGO"), a société nationale with registered offices at Brazzaville, represented by Mr. Alphonse M'Boudo-Nesa, duly authorized for this purpose,

hereinafter collectively referred to as the "COMPANIES", and individually "one of the COMPANIES" or the "COMPANY",

on the other hand.

GAR 00059

PREAMBLE:

WHEREAS, the CONGO wishes to promote and conduct, under the best conditions of effectiveness, exploration and development of its liquid and/or gaseous hydrocarbon resources so as to enable thereafter exploitation of these resources on the best possible terms; and

WHEREAS, for this purpose, the CONGO wishes to obtain the cooperation of qualified and well-known oil companies in order to have them provide HYDRO-CONGO, within the framework of a joint venture, with assistance necessary for the implementation of certain hydrocarbon exploration and the development and exploitation of petroleum deposits discovered on the type "A" permit known as "Marine 1" granted to HYDRO-CONGO, which is more fully described below, and on the exploitation permits which may be granted in respect of such exploration permit; and

WHEREAS, the COMPANIES shall carry out their exploration and production activities in accordance with the principles of the petroleum policy of the CONGO as incorporated in this Convention.

NOW, THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

1. Definitions

For the purpose of this Convention, the terms and expressions set forth below shall have the following meanings:

1.01 Convention: This Convention between the CONGO and the COMPANIES.

1.02 Joint Venture: The joint venture organized by the joint operating agreement for the petroleum works as this term is hereinafter defined in sub-paragraph 1.10 below.

1.03 Joint Operating Agreement: The joint operating agreement for the exploration and exploitation of hydrocarbons entered into among the COMPANIES for the exploration and possible exploitation of hydrocarbon deposits on the permit as this term is hereinafter defined in sub-paragraph 1.04 below.

1.04 Permit: The type "A" exploration permit known as "Marine 1", referred to in the preamble to the CONVENTION, granted to HYDRO-CONGO for the benefit of the JOINT VENTURE by the Decree, a copy of which is attached as Exhibit I to the CONVENTION, and all its extensions, amendments, variations or renewals, if any, as well as any exploitation permit which may be granted over any part of its surface.

1.05 Operator: The COMPANY which is entrusted, on behalf of the members of the JOINT VENTURE, with the petroleum works -- as this term is hereinafter defined in sub-paragraph 1.10 below -- on the PERMIT, in accordance with the provisions of the JOINT OPERATING AGREEMENT.

GAR 00060

1.06  <u>Hydrocarbons</u>:  Solid, liquid and/or gaseous hydrocarbons discovered and/or produced on the PERMIT.

1.07  <u>Natural Gas</u>:  Gaseous HYDROCARBONS produced by the COMPANIES on the PERMIT, but excluding condensate which by normal field methods of processing is separated and recovered as a liquid.

1.08  <u>Liquid Hydrocarbons</u>:  HYDROCARBONS produced by the COMPANIES on the PERMIT, but excluding NATURAL GAS.

1.09  <u>Affiliated Company</u>:

1.09.1    Any company in which more than 50% of the voting rights in ordinary shareholders' meetings are held directly or indirectly by one of the COMPANIES;

1.09.2    Any company which holds, directly or indirectly, more than 50% of the voting rights in the ordinary shareholders' meetings of one of the COMPANIES;

1.09.3    Any company whose voting rights in ordinary shareholders' meetings are subject to more than 50% control by a company which itself holds, directly or indirectly, more than 50% of the voting rights in the ordinary shareholders' meetings of one of the COMPANIES;

1.09.4    Any company in which more than 50% of the voting rights in ordinary shareholders' meetings are held directly or indirectly by several COMPANIES or by several companies as described in sub-paragraph 1.09.1 to 1.09.3 above.

1.10  <u>Petroleum Works</u>:  All the activities, wherever carried out, relating to exploration, development, exploitation, transportation, storage and disposition of HYDROCARBONS in the CONGO or for export.

1.11  <u>Exploration Work</u>:  That part of the PETROLEUM WORKS which is undertaken with the goal of discovering HYDROCARBON deposits, including the discovery well and appraisal works, undertaken until the day on which the Operating Committee provided for in the JOINT OPERATING AGREEMENT decides, pursuant to Article 5 of the JOINT OPERATING AGREEMENT, that a discovered deposit is commercially exploitable.

1.12  <u>Development and Exploitation Works</u>:  All PETROLEUM WORKS other than EXPLORATION WORKS, including transportation of HYDROCARBONS to the point of lifting by the COMPANIES.

1.13  <u>Foreign Companies</u>:  The COMPANIES, except HYDRO-CONGO.

1.14  <u>CFA Franc</u>:  Currency defined in Title I: of the "Convention de coopération monétaire" between the member States of the Banque des Etats de l'Afrique Centrale (B.E.A.C.) and the French Republic, as signed in Brazzaville on November 23, 1972.

GAR 00061

## 2. Purpose

2.01  The purpose of the CONVENTION and of the Exhibits hereto is to define the conditions of the participation of the COMPANIES in the PETROLEUM WORKS on the PERMIT within the framework of the JOINT VENTURE.

## 3. Effective Date – Term – Exploitation Permit

3.01  The CONVENTION shall be approved by an act having the force of law and shall come into force upon the publication of such act in the Official Journal of the CONGO.

3.02  The CONVENTION is entered into for the term of the PERMIT.

3.03  Each exploitation PERMIT shall have a duration of thirty (30) years.

## 4. Beneficiaries

4.01  The provisions of the CONVENTION shall apply as a matter of law to the COMPANIES and to any assignee of the rights of each COMPANY on the PERMIT, as well as to any company to which the COMPANIES or one of the COMPANIES shall have decided to associate by assigning to such company all or part of their rights and obligations on the PERMIT. However, any assignment must be submitted to the Minister in charge for approval prior to its coming into force.

If the decision of the Minister in charge is not rendered within one (1) month from the notification of the assignment, which approval to the assignment must be sought, such approval shall be deemed not to have been granted.

4.01.1  If the proposed assignee is a company wholly-controlled by the assignor or by the parent company of its group, the authorization of the Minister in charge shall be automatically granted and, in this case, notwithstanding the provisions of paragraph 4.01 above, the authorization shall be deemed granted one (1) month after the request is made. If the proposed assignee is an AFFILIATED COMPANY, the authorization of the Minister in charge shall not be withheld unreasonably or in a discretionary manner.

4.01.2  Any subsequent action which would result in modifying the qualification of the assignee as a company wholly-controlled by the assignor or as an AFFILIATED COMPANY shall be considered as a new assignment and shall be subject, under the same conditions, to the prior authorization of the Minister in charge.

**GAR 00062**

4.01.3    In accordance with the petroleum policy of the CONGO, HYDRO-CONGO shall not assign its participating interest in the JOINT VENTURE unless the assignee is wholly-controlled by the CONGO.

## 5. Warranties

5.01    Subject to the provisions of sub-paragraph 5.01.3 below, the CONGO warrants to the COMPANIES for the term of the CONVENTION, stable legal, financial, mining and economic conditions within which the COMPANIES will perform their activities in the CONGO, as such conditions arise from the laws and regulations in effect on the date of execution of the CONVENTION, and from the terms and conditions of the CONVENTION.

5.01.1    Therefore, the COMPANIES shall not be subject in any area whatsoever to any measure that would represent an aggravation of the situation described in paragraph 5.01 above.

5.01.2    In particular, any measure which would have the effect of either reducing net profits from the activities performed within the framework of the CONVENTION by decreasing gross income or by increasing the operating expenses of the COMPANIES, or generally jeopardizing the execution or the conduct of the PETROLEUM WORKS by restricting the COMPANIES' rights, shall be deemed to constitute an aggravation of the situation for the purpose of sub-paragraph 5.01.1 above.

5.01.3    Nonetheless, changes in labor, safety and environmental protection legislation and income taxation of individuals shall be applicable as a matter of law to the COMPANIES and to their staff, except if such legislation includes restrictions on the COMPANIES' rights concerning the ownership of their property or the free disposal of HYDROCARBONS to which they are entitled under Article 10 of the CONVENTION.

5.01.4    In addition, the COMPANIES shall not be subject to any discriminatory measures, in law or in fact, particularly with respect to the regulation of property or individuals.

5.02    The CONGO warrants to the COMPANIES for the term of the CONVENTION that, with respect to the corporate tax referred to in Article 6 of the CONVENTION, the tax conditions of the performance of their activities in the CONGO pursuant to the CONVENTION shall be governed by the Code Général des Impôts du CONGO, by amendments and regulations thereto and by the CONVENTION. Therefore, the COMPANIES shall not be subject, with respect to their activities in the CONGO under the CONVENTION, to any discriminatory tax measure in relation to the standard provisions applicable to Congolese or foreign companies, except those resulting from the CONVENTION.

GAR 00063

5.03  The CONGO warrants to the COMPANIES for the term of the CONVENTION that, pursuant to the Code Général des Impôts du CONGO, the mining royalty paid to the CONGO on the quantities of HYDROCARBONS to which the COMPANIES are entitled pursuant to the JOINT OPERATING AGREEMENT shall be fourteen and one half percent (14 1/2%) for LIQUID HYDROCARBONS and nine percent (9%) for NATURAL GAS.

## 6.  Taxes

6.01  For PETROLEUM WORKS, each of the COMPANIES shall be subject only to the mining royalty referred to in paragraph 5.03 and in Article 7 of the CONVENTION and to the corporate tax referred to in Articles 106 to 126 of the Code Général des Impôts du CONGO, to the exclusion of any other levy.

6.02  Consequently, each of the COMPANIES shall be exempt, for the PETROLEUM WORKS and for the term of the CONVENTION, from all other taxes and imposts.  This exemption includes among others:

6.02.1    The exemption from any customs duty and any importation tax or deposit for all pieces of equipment, material and supplies and spare parts destined for the PETROLEUM WORKS, whether imported directly by the COMPANY or indirectly by the OPERATOR in the name of the COMPANY or through suppliers or subcontractors.

6.02.2    The exemption from any export duties or taxes applicable to equipment and spare parts for such equipment when such equipment and spare parts have been imported tax-free in accordance with sub-paragraph 6.02.1 above as well as to HYDROCARBONS produced on the PERMIT and belonging to the COMPANY in accordance with Article 10 below.

6.02.3    The exemption from the internal turnover tax, the taxe unique, the tax on transactions and all other indirect taxes relating to the furnishing of goods (material, equipment, spare parts, etc.), services and work of any kind relating to the PETROLEUM WORKS provided for in the CONVENTION, whether such goods, services or work are furnished by the COMPANY, by the OPERATOR, or by contractors, or by suppliers and entities providing such services, working directly or indirectly for the COMPANY.

6.02.4    The exemption from any registration tax (droit d'enregistrement) relating to any deed or instrument of any nature whatsoever to which the COMPANY, or OPERATOR on behalf of the COMPANY, may be a party within the scope of the PETROLEUM WORKS on the PERMIT; relating to any conveyance of ownership or transfer of use to the COMPANY of movables or immovables for the carrying out of the PETROLEUM WORKS; or relating to the insurance contracts to which the COMPANY or OPERATOR on its behalf may be a party, and concerning the PETROLEUM WORKS.

GAR 00064

6.02.5    The exemption from any tax or impost relating to the payment of interest or dividend by the COMPANY.

6.03    Computation of the corporate tax on each of the COMPANIES

6.03.1    Except for the rules stipulated in this paragraph 6.03, the rules governing the basis and collection of the corporate tax are those fixed by the Code Général des Impôts du CONGO.

6.03.2    Each of the COMPANIES shall be subject to the corporate tax, in accordance with the provisions of the Code Général des Impôts du CONGO, and if the corporate tax rate prescribed in the Code Général des Impôts du CONGO is less than fifty-five percent (55%), to an additional tax equal to the taxable income multiplied by the excess between fifty-five percent (55%) over said corporate tax rate.

6.03.3    The basis for computation of the corporate tax for each of the COMPANIES for its activities performed within the framework of the CONVENTION shall be computed on the basis of the prices set forth in Exhibit II to the CONVENTION. Depreciation shall be computed by each of the COMPANIES in accordance with rules set forth by the Code Général des Impôts du CONGO; nonetheless, each of the COMPANIES shall apply, item by item, the rates set forth in the table attached hereto as Exhibit III.

~~6.03.4    In order to permit the computation of the~~ corporate tax owed by each of the COMPANIES for its activities performed within the framework of the CONVENTION, each COMPANY shall, from the effective date and for the term of the CONVENTION, maintain accounting books in accordance with the rules set forth by the Code Général des Impôts du CONGO.

6.03.5    The provisions of Article 109 of the Code Général des Impôts du CONGO shall not apply to the COMPANIES.

6.03.6    By exception to Article 116 of the Code Général des Impôts du CONGO, the COMPANIES shall not be authorized to deduct from their taxable income for the purpose of the corporate tax interest or agios paid on loans which may be made for the financing of the PETROLEUM WORKS from AFFILIATED COMPANIES. From the date on which the Operating Committee provided for in the JOINT OPERATING AGREEMENT shall have determined, in accordance with the JOINT OPERATING AGREEMENT, that a commercially exploitable discovery has been made, each COMPANY shall be permitted to deduct from its taxable income interest or agios paid on loans made for the financing of DEVELOPMENT AND EXPLOITATION WORKS by financial institutions independent from the COMPANIES, upon presentation by the borrowing COMPANY to the tax authorities of certificates issued by such financial institutions.



GAR 00065

8.

6.03.7    The mining royalty referred to in Article 7 below is deductible from taxable Income and can in no case be treated as an advance payment toward the corporate tax.

6.03.8    The ten per cent (10%) limit set by the second paragraph of Article 20.1.6° of the Code Général des Impôts du Congo, as amended by Article 5 of Law No. 30/74, shall not be applicable to the COMPANIES.

6.04    Remunerations and wages paid to the COMPANIES' personnel based in the CONGO for the performance of the PETROLEUM WORKS shall be subject to taxes on income in accordance with the provisions of the Code Général des Impôts du CONGO.

6.05    The corporate tax is paid by provisional monthly installments in accordance with the procedure set forth in Exhibit IV to the CONVENTION.

7.    Mining royalty

7.01    The basis of computation of the mining royalty paid in cash or in kind is equal, for each COMPANY, to the value of the HYDROCARBONS lifted by such COMPANY, computed on the basis of the price determined in accordance with Exhibit II to the CONVENTION, less domestic transportation, processing, storage and loading charges as said charges appear from the COMPANY's accounts and constitute tax deductible expenses. The royalty is not due on those quantities of HYDROCARBONS lost or used for the PETROLEUM WORKS.

7.02    The mining royalty provided for in this Article 7 is payable in cash or in kind, at the option of the CONGO.

7.03    The OPERATOR shall communicate to the competent authority of the CONGO the expected date for the first exportation of HYDROCARBONS at least six (6) months in advance, so that this authority can advise the COMPANY or the OPERATOR within five (5) months following receipt of such notification, of the manner of payment of the mining royalty chosen by the Government. The Government shall always be able to modify the manner of payment so elected by notifying the COMPANY, or the OPERATOR acting on its behalf, at least three (3) months in advance. However, the Government shall be deemed to have initially opted for cash payment of the mining royalty.

If, at any time while the Government is taking the mining royalty in cash, the COMPANIES have the opportunity to enter into sales commitments extending beyond a three (3) month period, which commitment could not be satisfied if the Government should decide to take the mining royalty in kind, the COMPANIES may submit the draft of the sales contract to the Minister in charge, who will, at his discretion, approve it or not. If the draft contract is so approved, the mining royalty shall continue to be taken in cash for the duration of said contract.

GAR 00066

9.

7.04  The quantity of HYDROCARBONS to which the mining royalty applies shall be measured at the point of delivery, as described in sub-paragraph 10.02.1.  The methods for measurements to be used shall be approved by the competent authority of the CONGO which shall be advised of the progress of such operations so as to be able to be represented thereat and to exercise any control it may deem necessary.

Within one month from the end of the period for which the mining royalty is due, each COMPANY, or the OPERATOR on behalf of the COMPANY, shall provide the competent authority of the CONGO with a statement of the quantities of HYDROCARBONS to which the mining royalty applies, including any appropriate supporting documents.

7.05  The mining royalty, whether in cash or in kind, shall be computed and paid on a quarterly basis, in accordance with the conditions set forth below:

7.05.1  The payment in kind of the mining royalty shall be made to HYDRO-CONGO for the account of the CONGO pursuant to the terms set forth in paragraph 4.11 and in Articles 9 and 10 of the JOINT OPERATING AGREEMENT for the allocation to HYDRO-CONGO of the portion of production to which it is entitled.  The quantities of HYDROCARBONS to which the CONGO is entitled pursuant to this Article 7 shall be delivered to HYDRO-CONGO during the month following that for which the mining royalty is due.

7.05.2  The payment in cash of the mining royalty shall be made during the month following the end of the calendar quarter for which the mining royalty in cash is due.

7.06  When the mining royalty is elected to be paid in cash, monthly declarations and provisional payments shall be made in accordance with the terms set forth in Exhibit IV to the CONVENTION.

7.07  By virtue of the special characteristics of NATURAL GAS the parties hereto shall consult, in the event NATURAL GAS is discovered, to settle upon the terms for payment in kind of the mining royalty on NATURAL GAS pursuant to the principles set forth in this Article 7.

8.  Foreign exchange

8.01  The CONGO warrants, for the term of the CONVENTION, to the COMPANIES, to all individuals duly employed by them and to all individuals or entities entrusted by them with implementing or financing the PETROLEUM WORKS or with marketing the HYDROCARBONS that:

GAR 00067

10.

8.01.1    The CONGO shall not require the COMPANIES to repatriate the funds arising from export sales of the HYDROCARBONS.

8.01.2    The COMPANIES may pay contractors, suppliers and lenders abroad in foreign currency, using funds maintained abroad by them, in execution of contracts entered into for the performance of the PETROLEUM WORKS.

8.01.3    The COMPANIES may borrow abroad all amounts which they may require to carry out the PETROLEUM WORKS.

8.01.4    The COMPANIES may transfer to suppliers residing outside of the franc zone all amounts owing thereto.

8.01.5    The COMPANIES may freely repatriate from the CONGO to member countries of the franc zone capital originating from these countries invested in the CONGO within the scope of the PETROLEUM WORKS, and may transfer, under the same conditions, the return on such capital, if any.

8.01.6    The COMPANIES may repatriate from the CONGO to countries outside of the franc zone any capital originating from these countries invested in the CONGO within the scope of the PETROLEUM WORKS, and may transfer, under the same conditions, the return on such capital, if any.  The CONGO warrants to the COMPANIES that they shall obtain the means of payment to countries outside of the franc zone necessary to carry out the operations contemplated by the CONVENTION.

8.01.7    The COMPANIES may freely export from the CONGO to member countries of the franc zone all amounts which they may owe to suppliers, shippers and other entities providing services, as well as to their shareholders residing in the franc zone, and in general, all amounts which the COMPANIES may owe in any respect whatsoever during the term of the CONVENTION.

8.01.8    Staff members who are nationals of member countries of the franc zone duly employed by the COMPANIES may freely export from the CONGO to countries of the franc zone any portion of their salaries they have saved.

8.01.9    The COMPANIES may export from the CONGO to countries outside of the franc zone all amounts which they may owe to suppliers, shippers and other entities offering services, as well as to their shareholders residing in these countries.

8.01.10    Staff members who are nationals of the countries outside of the franc zone duly employed by the COMPANIES may export from the CONGO to such countries any portion of their salaries they have saved.

GAR 00068

11.

8.02  All currency transfers to or from the franc zone made pursuant to sub-paragraphs 8.01.4, 8.01.6, 8.01.9 and 8.01.10 above shall be carried out under the supervision of the <u>Bureau des Relations Financières avec l'Etranger /Bureau of Financial Relations with Foreign Countries / ("B.R.F.E.")</u> in accordance with the rules in effect in the CONGO pertaining to the franc zone.

8.03  All transactions contemplated by sub-paragraphs 8.01.4, 8.01.6, 8.01.9 and 8.01.10 above shall not be made more onerous for the COMPANIES, through the imposition of different rates or special taxes or commissions, than for other purchasers and sellers of currency in commercial transactions.

9.  <u>Lump sum payments</u>

9.01  The COMPANY appointed as OPERATOR by the JOINT OPERATING AGREEMENT shall make the following lump sum payments to the CONGO on behalf of the FOREIGN COMPANIES:

9.01.1   Two hundred and fifty million (250,000,000) CFA FRANCS when the daily production of LIQUID HYDROCARBONS on the PERMIT shall have reached thirty thousand (30,000) barrels per day and thereafter averaged thirty thousand (30,000) barrels per day for a period of one hundred and twenty (120) consecutive days;  and

9.01.2   <u>Six hundred and twenty five million</u> (625,000,000) CFA FRANCS when the daily production of LIQUID HYDROCARBONS on the PERMIT shall have reached seventy five thousand (75,000) barrels per day and thereafter averaged seventy five thousand (75,000) barrels per day for a period of one hundred and twenty (120) consecutive days.

9.01.3   The lump sum amounts set forth in sub-paragraphs 9.01.1 and 9.01.2 above shall become due thirty (30) days following the expiration of each one of the one hundred and twenty (120) day periods referred to in said sub-paragraphs.

9.02  The amounts set forth in sub-paragraphs 9.01.1 and 9.01.2 above may be capitalized and depreciated for tax purposes by the FOREIGN COMPANIES.

10.  <u>Disposition of HYDROCARBONS</u>

10.01  Each COMPANY shall have the right to take freely the portion of the HYDROCARBONS to which it is entitled pursuant to the JOINT OPERATING AGREEMENT. It may freely sell, transfer, transport, consume or export, directly or indirectly, such portion.

10.02  Nonetheless, and by derogation to the principle set forth in paragraph 10.01 above, each COMPANY shall, at the request of the CONGO, affect by priority to the satisfaction of the needs of the Congolese industry, under the conditions

GAR 00069

defined hereinafter, the HYDROCARBONS derived from its
exploitation, provided that: (a) HYDRO-CONGO's share of
production shall have been first used to satisfy the needs of
the Congolese industry; and (b) the maximum of the share of
production of each FOREIGN COMPANY so affected to satisfy the
needs of the Congolese industry shall not exceed thirty percent
(30%) of all HYDROCARBONS to which each FOREIGN COMPANY is
entitled.

      10.02.1   Delivery of the quantities of HYDROCARBONS
to which the CONGO is entitled, including the LIQUID
HYDROCARBONS destined for the Pointe-Noire refinery, shall be
made either at well head or at the gathering point, should the
parties to the JOINT OPERATING AGREEMENT decide to build one in
accordance with the provisions of said JOINT OPERATING
AGREEMENT.  In the event deliveries of LIQUID HYDROCARBONS to
the CONGO pursuant to this paragraph exceed the CONGO's mining
royalty share as provided in paragraph 5.03 above, the sales
price of such excess shall be the weighted average of the
prices actually realized by the COMPANIES in sales to
non-affiliated purchasers concluded during the calendar month
preceding the month during which such LIQUID HYDROCARBON sale
to the CONGO took place.

      10.02.2   The commitment of each COMPANY to sell a
part of its production of HYDROCARBONS from the PERMIT as
described in paragraph 10.02 above and at the price defined in
sub-paragraph 10.02.1 above is limited for each calendar year
to the share of the needs of the Congolese industry for the
HYDROCARBONS of the quality required by the Congolese industry
equal to the ratio of the portion of the production of
HYDROCARBONS of this quality to which the COMPANY is entitled
pursuant to the JOINT OPERATING AGREEMENT and the total
production of HYDROCARBONS of such quality from the territory
of the CONGO for the same calendar year.  The CONGO shall
notify the COMPANY, before the commencement of each calendar
year, of the tonnage required by it for such calendar year
pursuant to the commitment set forth hereinabove.

      10.02.3   The CONGO may choose the quality which is
the most appropriate to its needs among those qualities
available, and to the extent to which the OPERATOR determines
that it is possible within the framework of the operations
contemplated by the CONVENTION, the OPERATOR shall endeavor to
furnish to the CONGO the various qualities which the CONGO may
request.

      10.02.4   The quantities of HYDROCARBONS sold pursuant
to the provisions of this Article 10 shall be paid for by the
CONGO within fifteen (15) days from the end of the calendar
month in which delivery is effected, upon presentation of the
pertinent invoice by each COMPANY.

     10.03   In the event NATURAL GAS is discovered, the parties
hereto shall meet as soon as possible to work out the changes,
if any, which may have to be made to this Article 10 to apply
the principles of the CONVENTION to the exploitation of such
deposits.

**GAR 00070**

13.

10.03.1   The exploitation, if any, of NATURAL GAS deposits shall be carried out pursuant to the principles which govern the relationship between the members of the JOINT VENTURE.

10.03.2   If the use of NATURAL GAS discovered on the PERMIT is not judged profitable by the members of the JOINT VENTURE pursuant to the provisions of the JOINT OPERATING AGREEMENT, the CONGO shall have the right, directly or through HYDRO-CONGO, to use this NATURAL GAS at its own expense.

In the event the CONGO exercises its right to use NATURAL GAS for its own benefit as contemplated hereinabove, HYDRO-CONGO shall provide at its own expense facilities necessary for the development, exploitation, transportation and processing, including but not limited to, separation, compression or liquefaction, of the NATURAL GAS from the first separator after the point of production, and of sufficient capacity to handle NATURAL GAS.  The COMPANIES agree to provide, on terms and conditions to be agreed at that time, such technical assistance and cooperation as may be required by HYDRO-CONGO for the development and exploitation of NATURAL GAS deposits, and for the laying out, construction, operation and maintenance of these facilities.  In no event shall the aforesaid activities interfere with the PETROLEUM WORKS of the JOINT VENTURE.

10.03.3   All NATURAL GAS produced on the PERMIT and not used directly for the PETROLEUM WORKS or pursuant to sub-paragraph 10.03.2 hereinabove, may be burnt off.

11.  Employment and training of personnel

11.01  In accordance with sub-paragraph 5.01.3 hereinabove, each of the COMPANIES shall be subject to the labor legislation and regulations embodied in the laws relating in particular to general working conditions, the regulation of pay and the prevention of work accidents and work-related illnesses and indemnification therefor, as well as to the laws relating to professional associations and labor organizations.  On its part, the CONGO shall not apply to any COMPANY or its personnel any labor and welfare regulation in a manner which may be considered discriminatory in relation to the laws regulating other companies exercising their activity in the CONGO.

11.02  Each one of the COMPANIES agrees to undertake, jointly with other members of the JOINT VENTURE and in proportion to the percentage of its participation in the JOINT VENTURE, for the training, technically and administratively, of the Congolese supervisory employees, foremen and personnel required for the exploitation activities, by organizing apprenticeship programs in the CONGO or abroad, by payment of scholarships for study abroad and by the establishment of professional training centers in the CONGO, in a way commensurate with the magnitude of such activities.

GAR 00071

11.02.1   The professional training programs and the budgets therefor shall be approved by the Operating Committee referred to in the JOINT OPERATING AGREEMENT after consultation with the Congolese Government.

11.02.2   Each of the COMPANIES shall jointly with the other members of the JOINT VENTURE, give priority in employment in its facilities and installations to equally qualified Congolese personnel. Each COMPANY shall assure the professional and technical training of said Congolese personnel so as to facilitate their access, at all levels, to jobs commensurate with their abilities.

11.02.3   On the production work sites situated outside or near cities and towns, the COMPANIES shall provide jointly lodging for the workers in normal conditions of hygiene and cleaniless, and shall create, if necessary, the medical, scholastic, athletic and cultural infrastructure corresponding to the normal needs of the workers and their families.

11.02.4   The means provided jointly by the COMPANIES for the application of the provisions of this Article 11 purport to permit the gradual replacement of foreign personnel of the COMPANIES assigned to the PETROLEUM WORKS by Congolese personnel.  Therefore, the COMPANIES shall use their best efforts so that, at the expiration of the tenth year from the beginning of the DEVELOPMENT AND EXPLOITATION WORKS, the personnel used by the OPERATOR for the PETROLEUM WORKS in the CONGO include one hundred per cent (100%) of laborers and clerks, eighty percent (80%) of foremen and technicians, and fifty percent (50%) of management and supervisory employees, of Congolese citizenship.

11.02.5   The personnel of Congolese citizenship used by the OPERATOR for PETROLEUM WORKS in the CONGO shall be recruited by the OPERATOR and hired, at his request, by HYDRO-CONGO which will assign such personnel to the OPERATOR for purposes of being trained by the OPERATOR and, at the end of the professional training period, of employment in the PETROLEUM WORKS.  From the end of such professional training period, those members of such personnel whom the OPERATOR will have decided to retain for the PETROLEUM WORKS shall be the OPERATOR's employees for the entire duration of their assignment to the OPERATOR.

12.  Congolese suppliers

12.01  In carrying out the PETROLEUM WORKS, the COMPANIES or the OPERATOR on their behalf shall give priority to Congolese companies in the acquisition of goods and services where such companies offer quality, quantity, terms of sale, conditions of delivery and related services equal to those available for the acquisition of goods and services abroad.

GAR 00072

12.02  Notwithstanding the foregoing, and subject to
conditions of general applicability which the CONGO may impose,
the COMPANIES, or the OPERATOR on their behalf, may freely
choose the charterers and ships of any registry for their use
for whatever purpose.  To the extent available, the COMPANIES
shall use the Congolese merchant fleet during the term of the
CONVENTION if the rates and other conditions offered by such
fleet are no less favorable than those offered on the
international market.

## 13.  Supply of information

13.01  The COMPANIES shall supply the CONGO with all
information in their possession required to be communicated by
the Mining Code.  On its part, the CONGO may communicate to the
COMPANIES information, particulary of a technical nature, which
may be useful in the PETROLEUM WORKS.  The COMPANIES agree not
to divulge this information and these documents to third
parties, except as required for the PETROLEUM WORKS, provided
that, in this case, a commitment be obtained from the recipient
to treat such information and documents as confidential.

13.02  In addition to the information the COMPANIES are
required to communicate pursuant to the Mining Code, they
shall, without charge, place at the disposition of the CONGO
all geological information which may be useful in the
exploration for and exploitation of mineral substances within
the PERMIT other than HYDROCARBONS.  The COMPANY which acts as
OPERATOR must notify to the competent Congolese authorities all
discoveries made on the PERMIT of mineral substances other than
HYDROCARBONS; the COMPANIES shall consult to evaluate the
possibility, in view of technical and economic factors, of
participating jointly in the exploitation of said mineral
substances.  The COMPANIES agree not to divulge this
information to third parties.  The CONGO may freely use any
information received under this paragraph if the COMPANIES
express their lack of interest or fail to submit within four
(4) months from the receipt of the information a proposal
acceptable to the CONGO for a specific exploration or
exploitation permit covering said mineral substance or
substances.

13.03  At the request of the Minister in charge, the
COMPANIES will consider all available information concerning
possibilities for the exploration for mineral substances in any
part of the Congolese territory indicated to them by said
authority and shall consult to evaluate the possibility, in
view of technical and ecomomic factors, of participating
jointly in the exploration for the said mineral substances.

## 14.  Transport and treatment of products

14.01  The Minister in charge may request the COMPANIES to
participate with other producers in the CONGO in the joint

**GAR 00073**

16.

installation or use of facilities or pipelines to pump out all or part of the production of HYDROCARBONS, on the condition that (i) the installation of such facilities or pipelines is technically feasible under normal economic conditions, and (ii) that their use does not jeopardize directly or indirectly the economic profitablilty of the deposits discovered.

14.01.1  After consultation with the competent Congolese authority, transport rates for pumping out the production shall be established by the companies exploiting the deposits.

14.02  In the event that production permits and a market for finished products is assured, the CONGO may ask the COMPANIES to consult and evaluate, in view of economic conditions and forecasts of profitability, the possibility of constructing a HYDROCARBON refinery in the CONGO jointly with the CONGO and/or other partners approved by the CONGO.

15.  Force majeure

15.01  In the event that the CONGO or one or several of the COMPANIES finds it impossible, either partially or totally, to perform one or more of their obligations contemplated by the CONVENTION, or arising therefrom, by reason of force majeure, an unforeseeable circumstance (cas fortuit) or an occurrence which may be considered as similar to force majeure (hereinafter collectively referred to as "FORCE MAJEURE"), the party invoking FORCE MAJEURE shall inform the other parties as soon as possible.

15.02  Said notification shall be addressed in writing either by telex confirmed by letter or by registered letter, return receipt requested, and shall set forth those circumstances which establish FORCE MAJEURE.

15.03  All occurrences independent of the will or control of one or the other party, which the parties cannot reasonably overcome or avoid and whose consequence is to prevent partially or totally or to delay significantly the performance of the obligations of the parties, shall be considered as events of FORCE MAJEURE.  For the purpose of the CONVENTION, FORCE MAJEURE shall include but not be limited to: war, serious civil disturbances, insurrection, national strikes and any strikes of a general nature, earthquake, fire, explosion, other catastrophes and all hindrances which result directly or indirectly from orders or prohibitions of a government authority.

15.04  FORCE MAJEURE shall nonetheless not be validly invoked if the events, acts or occurrences in question were reasonably foreseeable or could have been remedied by the exercise of reasonable diligence.  FORCE MAJEURE will exist if necessary equipment cannot be found, or can be found only at a prohibitive price.  Lack of funds shall not constitute FORCE MAJEURE.

GAR 00074

15.05  Time periods for the performance of the obligations of each COMPANY affected by the event of FORCE MAJEURE shall be extended automatically for a term equal to the delay caused by said FORCE MAJEURE; it being understood (i) that all such extensions shall not give rise to any penalty to the party responsible for performing these obligations, and (ii) that obligations other than those affected by FORCE MAJEURE shall continue to be fulfilled in accordance with the provisions of the CONVENTION.

15.06  In all cases, the party affected shall take, in agreement with the other parties, all appropriate measures to assure the normal resumption of the performance of the obligations affected by FORCE MAJEURE.  If, following FORCE MAJEURE, one of the parties is not able to perform its obligations as contemplated by the CONVENTION for a period of three (3) months following the notification contemplated hereinabove, the parties shall meet as soon as possible to examine the consequences of the occurrences in question and in particular the consequences on the time periods for performance of their respective obligations.  Should the parties not reach an agreement on said consequences, they shall submit their dispute to arbitration in accordance with the provisions of Article 17 below.

16.  Tax declaration and payment

Each COMPANY shall be responsible for its declaration to the CONGO's tax authorities and for the payment of its taxes arising from its participation in the activities of the JOINT VENTURE in the CONGO on the basis of its net income from all of its activities covered by the CONVENTION.

17.  Arbitration

17.01  All disputes arising in connection with the CONVENTION between the CONGO on the one hand and any COMPANY on the other hand which cannot be resolved otherwise amicably shall be finally settled by arbitration in accordance with the rules then in effect of the International Center for the Settlement of Investment Disputes (the "Center") created by the Convention on the Settlement of Investment Disputes between States and Nationals of other States to which the CONGO became a party on October 14, 1966.

17.02  Each party to a dispute shall be entitled to appoint one arbitrator and the arbitrators so appointed shall agree on another arbitrator, if necessary, to achieve an odd number of arbitrators.  In the event that agreement upon another arbitrator cannot be reached, such arbitrator shall be appointed by the President of the Center.

17.03  Arbitration shall take place in Geneva, Switzerland.  The award which will be rendered in English and French with both texts having equal validity shall be final and

GAR 00075

binding upon the parties to the arbitration. Judgment upon the
award rendered may be entered in any court or other authority
having jurisdiction, or application may be made to said court
or other authority for a judicial acceptance of the award and
an order of enforcement, as the case may be.

17.04  The Center's fees for arbitrating a dispute shall be
borne equally by the disputants.

17.05  Any dispute which may arise among the COMPANIES
shall be settled in accordance with the arbitration clause of
the JOINT OPERATING AGREEMENT.

18.  Applicable law

The CONVENTION shall be governed by Congolese law.

19.  Notices

19.01  All notices shall be validly given by mail, cable or
telex, addressed to the other party or parties at the address
indicated below:

(a)        for the CONGO:

           Minister of Mines and Energy
           Ministry of Mines and Energy
           Brazzaville
           People's Republic of the Congo

           attention:
           The Minister

(b)        for SUPERIOR:

           Congolese Superior Oil Company
           P.O. Box 1521
           Houston, Texas 77001
           United States of America

           Telex:  0775369

           attention:
           Vice-President Exploration

(c)        for CITIES SERVICE:

           Cities Service Congo Petroleum Corporation
           P.O. Box 642
           Houston, Texas 77001
           United States of America

GAR 00076

19.

```
          Telex:  762056

          attention:
          Vice-President Operations

(d)       for CANADIAN:

          Canadian Superior Oil Ltd.
          Three Calgary Place
          355 4th Avenue S.W.
          Calgary, Alberta T2P OJ3

          Telex:  03826640

          attention:
          Vice-President Exploration

(e)       for HYDRO-CONGO:

          Société Nationale de Recherches
            et d'Exploitation--HYDRO-CONGO
          B.P. 2008
          Brazzaville
          République Populaire du Congo

          Telex:  5220

          attention:
          The General Manager
```

All formal notices will be sent by registered mail, return receipt requested, or, if sent by cable or telex, confirmed by registered mail, return receipt requested.

19.02  Each of the parties may change the above address by advising the other parties in writing in accordance with the provisions of this Article 19.

19.03  During the exploration stage, each of the COMPANIES shall designate a representative in the CONGO to whom all formal notices may be validly given.  If a commercially exploitable discovery is made, each of the COMPANIES shall establish a branch in the CONGO, duly registered with the Registry of Commerce.  By derogation to Article 20 of Law No. 29/62 of June 16, 1962, as amended, the COMPANIES shall not be required to organize a subsidiary company formed under Congolese law.

20.  Amendments

Amendments may be made to one or several provisions of the CONVENTION, at a party's request, by mutual agreement of the parties.

GAR 00077

20.

## 21. Guarantee by parent company

       The obligations of the COMPANIES pursuant to this CONVENTION are guaranteed by the parent companies of their respective groups, if the case arises, pursuant to letters of guarantee, a form of which is annexed hereto as Exhibit V.

Done at Brazzaville, on May 15, 1979.

For the People's Republic of
the Congo

_____
Rodolphe Adada,
Minister of Mining and Energy

For Congolese Superior                          For Société Nationale de
Oil Company                                     Recherches et d'Exploitation
                                                Pétrolières "HYDRO-CONGO"




_____                         _____
Diego O. Giordano-Echegoyen,                    Alphonse M'Boudo-Nesa,
Vice-President                                   General Manager


For Cities Service Congo                        For Canadian Superior
Petroleum Corporation                           Oil Ltd.




_____                         _____
Antoine Saadi,                                  Robert C. Schrader,
Vice-President                                   Vice-President,
                                                 International Contracts

**GAR 00078**

<u>EXHIBIT I</u>

<u>COPY OF DECREE GRANTING THE PERMIT</u>

GAR 00079

EXHIBIT I

COPY OF DECREE GRANTING THE PERMIT

GAR 00080

TRANSLATION

DECREE N° 292/79 of May 16, 1979, granting
to HYDRO-CONGO a type "A" hydrocarbons exploration permit
(known as "Marine 1")

The President of the Central Committee of the Parti Congolais
du Travail, President of the Republic, Chief of State,
President of the Council of Ministers,

- Having reviewed Act N° 028/PCT/CC of March 30, 1979, establishing, orga-
nizing and regulating Public Institutions;

- Having reviewed Decree N° 79/154 of April 4, 1979 appointing the Prime
Minister;

- Having reviewed Decree N° 79/155 of April 4, 1979 appointing the Members
of the Council of Ministers;

- ~~Having reviewed Law N° 28/62 of June 16, 1962 enforcing the Mining Law~~

- Having reviewed Law N° 34/62 of June 16, 1962 setting the rates and
rules for the payment of duties on mining titles;

- Having reviewed Law N° 25/62 of August 12, 1962 completing the provisions
of the Mining Code;

- Having reviewed Decree N° 62/347 of August 17 1962 setting forth the
conditions of application of Law N°25/62 referred to above;

- Having reviewed Government Order N° 14/73 of June 4, 1973 deciding
the creation of Hydro-Congo;

- Having reviewed the permit application introduced by Hydro-Congo
on January 15, 1979 under N° 022/HC/DGA/DGA/DAFM/MH;

- Having reviewed Decree N° 79/111 of March 10, 1979 granting the
"Autorisation personnelle minière" to Hydro-Congo;

After consultation with the Council of Ministers;

D E C R E E S:

Article 1

It is hereby granted to Hydro-Congo pursuant to the conditions
listed in the present Decree a type "A" exploration permit, known as
"Marine 1", valid for liquid and gaseous hydrocarbons, and the surface of
which is located equal to 1,430 (one thousand four hundred and thirty km²)
square kilometers, and is shown on the map attached hereto as Exhibit 1;
this surface is included within the perimeter defined by:

GAR 00081

1. a. The straight lines joining the points 1
   and 2, 2 and 3, 3 and 4, 4 and 5, 5 and
   6, 6 and 7, 7 and 8, 8 and 9, 9 and 10;
   these lines are reportedly coincident with
   the limit separating the renewed "Madingo
   Maritime (Λ)" permit and the "Marine 1"
   permit.

   b. The straight line joining the points 10
   and 11; this straight line being repor-
   tedly partially coincident in part with the
   limit separating the renewed "Madingo
   Maritime (Λ)" permit and in part with the
   limit separating the "Loango East" conces-
   sion and the "Marine 1" permit.

   c. The straight lines joining the points 11
   and 12, 12 and 13, 13 and 14, 14 and 15,
   15 and 16, and 16 and 17; these straight
   lines reportedly coincide with the limit
   separating the "Loango East" concession
   and the "Marine 1" permit.

   d. The straight lines joining the points 17
   and 18, and 18 and 19; these straight
   lines reportedly coincide with the limit
   separating the "Loango West" concession
   and the "Marine 1" permit.

   e. The straight lines joining the points 19
   and 20, 20 and 21, 21 and 22, 22 and 23,
   23 and 24, 24 and 25; these straight lines
   are reportedly coincident with the limit
   separating the renewed "Pointe-Noire Grands

GAR 00082

Fonds (A)" permit and the "Marine 1"
permit.

f. The straight line joining the points 25
and 26; this straight line reportedly
coincides with the limit separating the
"Mer Profonde" permit and the "Marine 1"
permit.

g. The straight line joining the points 26
and 1, i.e., a section of the straight
line passing on the intersection of the low-
tide mark and the limit of the territories
of Congo and Gabon in a geographic azimuth
of 212°; this straight line is reportedly
coincident with the limit separating the
territorial waters of Congo and Gabon.

2. The points 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24,
25 and 26 are defined as follows:

(see next page).

GAR 00083

| | Coordonnées Géographiques Ellipsoïde de Clarke 1880 | | Coordonnées U.T.M. (Clarke 1880) Fuseau 32-Mér: 9°E. | |
|---|---|---|---|---|
| :ints | Longitude EAST | Latitude SOUTH | EAST | NORTH |
| | Point located at 38 km from the low-tide mark on the straight line defined in paragraph 1.g. above. | | | |
| | 10°58'14"240 | 4°14'54"550 | 723.332 | 9.530.170 |
| 2 | 11°02'31''663 | 4°18'29''055 | 726.652 | 9.523.560 |
| 3 | 11°05'15''851 | 4°15'11''228 | 731.714 | 9.529.624 |
| 4 | 11°09'50''804 | 4°15'10''466 | 740.214 | 9.529.624 |
| 5 | 11°09'51''271 | 4°17'56''970 | 740.214 | 9.524.508,561 |
| 6 | 11°15'05''727 | 4°17'56''058 | 749.914 | 9.524.508,561 |
| 7 | 11°15'05''241 | 4°15'09''563 | 749.914 | 9.529.624 |
| 8 | 11°23'36''921 | 4°15'08''018 | 765.700 | 9.529.624 |
| 9 | 11°27'26''845 | 4°18'20''070 | 772.775 | 9.523.700 |
| :0 | 11°27'28''782 | 4°28'12''323 | 772.775 | 9.505.500 |
| :1 | 11°16'15''217 | 4°28'14''496 | 752.000 | 9.505.500 |
| :2 | 11°16'15''066 | 4°27'25''678 | 752.000 | 9.507.000 |
| :3 | 11°15'10''219 | 4°27'25''878 | 750.000 | 9.507.000 |
| :4 | 11°15'09''972 | 4°26'04''513 | 750.000 | 9.509.500 |
| :5 | 11°14'21''337 | 4°26'04''661 | 748.500 | 9.509.500 |
| :6 | 11°14'21''191 | 4°25'15''841 | 748.500 | 9.511.000 |
| :7 | 11°10'40''712 | 4°25'16''499 | 741.700 | 9.511.000 |
| : | 11°09'55''210 | 4°24'38''710 | 740.000 | 9.512.400 |
| : | 11°09'55''600 | 4°26'54''240 | 740.000 | 9.508.000 |
| : | 11°07'32''384 | 4°26'54''636 | 736.500 | 9.508.000 |
| : | 11°07'53''139 | 4°31'15''025 | 736.500 | 9.500.000 |
| : | 11°04'54''774 | 4°31'15''544 | 731.000 | 9.500.000 |
| : | 11°04'54''312 | 4°28'32''796 | 731.000 | 9.505.000 |
| : | 11°00'46''128 | 4°28'33''491 | 723.346,900 | 9.505.000 |
| | Intersection of Longitude East 11°00'46''944 meridian and straight line J-K of the original "Pointe Noire Grand Fonds" permit, as defined in Decree No. 68-270/ M CAEIM of October 17, 1968. | | | |
| | Point located 65 km from the low-tide mark on the straight line defined in paragraph 1.g. above. | | | |

## ARTICLE 2

The minimum work program to be performed on the exploration permit described in Article 1 above is defined in Exhibit 2 hereto.

## ARTICLE 3

Hydro-Congo is hereby authorized to become a party in association with the companies executing a convention with the People's Republic of the Congo, for the implementation of the exploration permit described in Article 1 above as well as any exploitation and transportation permits which may derive therefrom.

## ARTICLE 4

The exploration permit described in Article 1 above may be renewed for a period of three (3) years in accordance with the conditions set forth in the Mining Code ("Code Minier").

The minimum work program to be conducted within the initial period and the renewal period as well as the areas to be relinquished on the exploration permit described in Article 1 above, are set forth in Exhibit 2 hereto.

## ARTICLE 5

In the event a discovery of an exploitable reservoir is made on the area of the exploration permit described in Article 1 above, Hydro-Congo shall request an exploitation permit for hydrocarbons, which shall be granted as a matter of law.

**GAR 00085**

Each hydrocarbons exploitation permit is valid for thirty (30) years. The hydrocarbons exploitation permit may not be renewed.

All matters not defined by the present Decree regarding the hydrocarbons exploitation permit derived from the exploration permit described in Article 1 above are governed by the provision of the Mining Code relating to concessions.

## ARTICLE 6

The sub-contractors hired by Hydro-Congo or by any company associated with Hydro-Congo shall comply with the Mining Code.

## ARTICLE 7

The Minister of Mines and Energy is hereby entrusted with the implementation hereof which shall be registered, communicated wherever necessary and published in the Official Journal of the People's Republic of the Congo.

Done in Brazzaville on May 15, 1979.

President of the Central
tee of the Parti Congolais du
il, President of the Republic,
of State, President of the
il of Ministers

Prime Minister,
f the Government

(s) Denis Sassou-Nguesso
Colonel Denis Sassou-Nguesso

By the Minister of Mines

GAR 00086

EXHIBIT 1

MAP OF THE "MARINE 1" PERMIT

GAR 00087

GAR 00088

ANNEXE 2

I - Minimum Work Program

A. Initial Period

The term of the first period shall be five (5) years.

Phase I

The term of Phase I shall be three (3) years and shall consist of the following:

(a) One thousand (1000) kilometers of Marine seismic.

(b) Within six (6) months after receipt of the processed data commit to drill a pre-salt test well to be commenced within twenty-four (24) months from the date of signing the Convention with the State, but not later than thirty (30) months from such date, depending upon availability of suitable equipment at competitive rates, or relinquish the entire permit.

(c) The permit holder shall have the option to relinquish the permit at the later of the following two dates: (i) ninety (90) days after completion of the exploration well, or (ii) ninety (90) days before the end of Phase I, or proceed into Phase II.

GAR 00089

ANNEXE 2

I - *Minimum Work Program*

A. *Initial Period*

The term of the first period shall be five (5) years.

Phase I

The term of Phase I shall be three (3) years and shall consist of the following:

(a) One thousand (1000) kilometers of Marine seismic.

(b) Within six (6) months after receipt of the processed data commit to drill a pre-salt test well to be commenced within twenty-four (24) months from the date of signing the Convention with the State, but not later than thirty (30) months from such date, depending upon availability of suitable equipment at competitive rates, or relinquish the entire permit.

(c) The permit holder shall have the option to relinquish the permit at the later of the following two dates: (i) ninety (90) days after completion of the exploration well, or (ii) ninety (90) days before the end of Phase I, or proceed into Phase II.

GAR 00090

11.

2.

Phase II

The term of Phase II shall be two (2) years.

During the course of Phase II, the permit holder shall drill two (2) pre-salt exploration wells. The permit holder shall have the option to relinquish the permit upon completion of each well.

B. Renewal period

The exploration permit shall be renewed upon request from the permit holder for a three (3) year renewal period, during the course of which at least three (3) wells will be drilled. However, the permit holder shall have the right to relinquish the permit upon completion of each well.

C. For purposes of paragraphs A and B above, the obligation to drill a well shall be deemed satisfied by the permit holder when the objective depth of formation is reached, or expenses actually incurred for such well shall have reached an amount equal to one hundred and fifty percent (150 %) of the estimated cost of such well, as budgeted by the Operating Committee of the Joint Venture to be formed by the permit holder of the Convention with the People's Republic of Congo described in Article 3 of the Decree.

II - Relinquishments

The permit holder shall relinquish the original area as follows:



GAR 00091

3.

(a) An area equal to twenty-five percent (25%) of the original contract area shall be relinquished at the end of Phase I of the initial period;

(b) Another area equal to twenty-five percent (25%) of the original contract area shall be relinquished at the end of Phase II of the initial period; and

(c) The remainder of the orginal contract area shall be entirely relinquished upon termination of the renewal period, except for the area or areas of the permit which are covered by one or several exploitation permits, if any;

(d) Areas of the permit that the Operating Committee of the Joint Venture described above has determined, before the effective date of the relinquishments or the expiration of the renewal period, to cover commercial reservoirs shall be excluded from areas relinquished by the permit holder upon termination of Phase I and Phase II of the first period and upon termination of the renewal period.

GAR 00092

## EXHIBIT II

The base of calculation of the royalty and corporate income tax shall be the market value of the LIQUID HYDROCARBONS sold.

For the purpose of the royalty, the market value of the LIQUID HYDROCARBONS shall be deemed equal to the FOB Congo reference market value based on Middle East sales calculated as described below.

For the purpose of the corporate income tax, the market value of the LIQUID HYDROCARBONS shall be the realized sales price, provided however that in the case of sales to affiliated purchasers, the sales price shall not be lower than the weighted average realized sales price of the selling COMPANY from third party purchasers for the same period of reasonable quantities of LIQUID HYDROCARBONS of similar quality and gravity, or in the absence of such sales of reasonable quantities to third parties, the sales price shall not be lower than a price equal to the competitive value for the same period of LIQUID HYDROCARBONS of similar quality and gravity.

### Calculation of the FOB

### Congo Reference Market Value

The FOB Congo reference market value shall be computed by reference to the government sales price for Arab Light crude oil for the applicable period adjusted for freight, gravity, sulfur and other quality differentials.

### Definitions

1. "Arab Light" means the crude oil produced in Saudi Arabia and sold at Ras Tanura, of API gravity 34 degrees.

2. "Berri" means the crude oil produced in Saudi Arabia and sold at Ras Tanura of API gravity 39 degrees.

3. "Government Sales Price" ("GSP") means the official state sales price of the Government of Saudi Arabia for the sale of Arab Light or Berri.

4. "AFRA VLCC" and "AFRA LR2" mean the freight costs as determined by the London Tanker Brokers Panel or by any

GAR 00093

## EXHIBIT II

The base of calculation of the royalty and corporate income tax shall be the market value of the LIQUID HYDROCARBONS sold.

For the purpose of the royalty, the market value of the LIQUID HYDROCARBONS shall be deemed equal to the FOB Congo reference market value based on Middle East sales calculated as described below.

For the purpose of the corporate income tax, the market value of the LIQUID HYDROCARBONS shall be the realized sales price, provided however that in the case of sales to affiliated purchasers, the sales price shall not be lower than the weighted average realized sales price of the selling COMPANY from third party purchasers for the same period of reasonable quantities of LIQUID HYDROCARBONS of similar quality and gravity, or in the absence of such sales of reasonable quantities to third parties, the sales price shall not be lower than a price equal to the competitive value for the same period of LIQUID HYDROCARBONS of similar quality and gravity.

### Calculation of the FOB
### Congo Reference Market Value

The FOB Congo reference market value shall be computed by reference to the government sales price for Arab Light crude oil for the applicable period adjusted for freight, gravity, sulfur and other quality differentials.

### Definitions

1.  "Arab Light" means the crude oil produced in Saudi Arabia and sold at Ras Tanura, of API gravity 34 degrees.

2.  "Berri" means the crude oil produced in Saudi Arabia and sold at Ras Tanura of API gravity 39 degrees.

3.  "Government Sales Price" ("GSP") means the official state sales price of the Government of Saudi Arabia for the sale of Arab Light or Berri.

4.  "AFRA VLCC" and "AFRA LR2" mean the freight costs as determined by the London Tanker Brokers Panel or by any

GAR 00094

2.

other organization substituted therefor, for shipment in very large crude carriers and large range two tankers, respectively.

5.  "SPOT VLCC" and "SPOT LR2" mean the freight costs calculated from the <u>Average Worldscale Rates for Single Voyage Dirty Fixture</u> published monthly by H.P. Drewry Ltd., London, in their Shipping Statistics and Economics - SSE Publication and would be a weighted average of Fixtures in the 70,000 - 174,999 Cargo Size DWCT for "SPOT LR2" and 175,000 - 300,000 for "SPOT VLCC", respectively.  For the purpose of 2. and 3. hereof, the respective "SPOT VLCC" and "SPOT LR2" freights costs shall be based on the rates published for the month in which LIQUID HYDROCARBONS are lifted.

The FOB Congo reference market value shall be determined as follows:

1.  Take the GSP of one barrel of Arab Light crude oil of 34.00 -34.09 degrees gravity.

2.  Determine the freight per barrel of transporting Arab Light from Ras Tanura to Rotterdam via The Cape and returning from Rotterdam to Ras Tanura via The Cape by dividing the average of the published "AFRA VLCC" and "SPOT VLCC" freight per ton by the number of barrels of such crude oil per ton.

3.  Determine the freight per barrel of transporting LIQUID HYDROCARBONS from Pointe Noire, Congo, to Rotterdam by dividing the average of the published "AFRA LR2" and "SPOT LR2" freight per ton by the number of barrels of such crude oil per ton.  Subtract the resulting freight cost from the freight cost determined under 2 above and add the result to the GSP under 1 above.

The amount determined in accordance with the above procedure shall be adjusted upward or downward pursuant to the following quality factors which shall be computed as follows:

1.  <u>Gravity factor:</u>

    The differential for gravity will be determined as follows:

    (a)  Use 34 degrees API gravity for Arab Light.

    (b)  Deduct said gravity from the stated gravity of the LIQUID HYDROCARBONS.  Any positive result will be added to the FOB Congo reference market value; any negative result will be subtracted from the FOB Congo reference market value.

GAR 00095

3.

(c) Multiply said (b) remainder by ten and obtain a product.

(d) Multiply the product (c) by the Arab Light quoted value for gravity differential per 0.1 (one tenth) API; the result will be the gravity adjustment.

2. Sulfur factor:

   (a) Arab Light and Berri

      (i) Determine the difference in GSP between Arab Light and Berri.

     (ii) Determine the amount of (i) difference attributable to gravity by subtracting from such difference the product of the number of 1/10 degrees gravity between the two grades times the gravity differential value per 0.1 (one-tenth) degree API for the two grades.

   (iii) Deduct the product (ii) from the difference per (i).

   (iv) Divide the remainder per (iii) by the differential number of 0.1 (one-tenth) weight percent sulfur (SWT%) between the two grades. Use 1.8 SWT% for Arab Light and 1.1 SWT% for Berri until revised by mutual agreement.

   (b) Obtain the Congo sulfur adjustment by multiplying the difference in number of 0.1 SWT% between the LIQUID HYDROCARBONS sulfur content and the average of the Arab Light and Berri sulfur content by U.S. cents per 0.1 SWT% determined as set forth in sub-paragraph (a) (iv) above.

Such adjustment will increase the FOB Congo reference market value if Congo sulfur is less than said average, and reduce the FOB Congo reference market value if Congo sulfur exceeds said average.

3. Other quality factors:

   (a) Should the heavy gas oil distilled from LIQUID HYDROCARBONS (meaning that product distilled between the range of the 600 to 960 degrees Fahrenheit cut pursuant to the American Society for Testing Metals -- or any organization substituted therefor -- distillation procedure) exceed 0.5 Neutralization number (Neutralization number means the number of

GAR 00096

4.

milligrams of potassium hydroxide required to neutralize the acid contained in one (1) gram of the heavy gas oil), or

(b)   Should the heavy gas oil extracted from LIQUID HYDROCARBONS as defined in (a) above, contain over 0.24 parts per million of nickel and copper, or nickel equivalent (calculated by addition of the parts per million of vanadium divided by 4.3, plus parts per million of nickel and copper), or

(c)   Should any currently unknown quality factors of the LIQUID HYDROCARBONS appear,

the Parties hereto shall meet to agree on an equitable adjustment of the FOB Congo reference market value determined pursuant to the foregoing, to the extent those characteristics are of significance.

GAR 00097

2.

Office or other furniture
Telephone

10.0%
15.0%

LOADING AND STORAGE INSTALLATIONS

Annex III (Exhibit III)

Depreciation rates applicable to the COMPANIES

| Type of investments to be amortized | annual rate |
|---|---|
| subsurface and drilling works | |
| non-producing wells | 50 % |
| producing wells: in function with the | |
| estimated duration of production. If no estimate | 12.5% |
| | |
| Transportation Equipment | |
| interior pipelines | 10 % |
| exterior pipelines | 7.5% |
| | |
| Drilling Equipment (in general) | 10 % |
| drilling pipe | 20 % |
| drilling tools | 20 % |
| diesel engines | 20 % |
| derrick and drive machinery | 20 % |
| | |
| Intangible Costs | |
| G + G | 20 % |
| | |
| Constructions | |
| permanent buildings, offices, labs, garages, | |
| housing, etc | 3½% |
| metallic-sided buildings | 3½% |
| semi-portable construcitons without foundation | 10 % |
| portable cabins or other assembled field buildings | 10 % |
| interior workshop facilities | 10 % |

GAR 00098

2.

| | |
|---|---|
| Office or other furniture | 10.0% |
| Telephone | 15.0% |

### LOADING AND STORAGE INSTALLATIONS

| | |
|---|---|
| Storage installations | 10.0% |
| Except pipe and tube yards | 20.0% |
| Loading pier | 3.1/3% |
| Loading installations | 10.0% |
| Floating pipelines | 20.0% |

### VEHICLES AND ACCESS ROADS

| | |
|---|---|
| Civil engineering machines | 30.0% |
| Automotive vehicles and their trailers | 33.0% |
| Except fire trucks, workshop trucks, cementing trucks | 20.0% |

### RIVER TRANSPORTS

| | |
|---|---|
| Pinnaces (lighters) | 15.0% |
| Tugboats, pusher-type tugs, tank-barges, barges | 10.0% |
| Access roads to geophysical works and improductive wells | 50.0% |
| Access roads to productive wells | 20.0% |

### OTHER FIXED ASSETS

| | |
|---|---|
| Water system | 10.0% |
| Compressed air system | 10.0% |
| Electricity system | 10.0% |

### POWER LINES

| | |
|---|---|
| Pylons | 3.1/3% |
| Other elements | 5.0% |

### TRANSFORMERS

| | |
|---|---|
| Buildings and fixed plant | 5.0% |
| Portable plant | 10.0% |

### FIXED MACHINES

| | |
|---|---|
| Compressors | 10.0% |
| Compressors at sea | 20.0% |
| Miscellaneous motors and pumps on land | 10.0% |
| Miscellaneous motors and pumps at sea | 20.0% |
| Machine tools on land | 10.0% |
| Machine tools at sea | 20.0% |
| Small tools | 15.0% |
| Fixed laboratory equipment | 10.0% |

GAR 00099

3.

| | |
|---|---|
| Mobile laboratory equipment | 20.0% |
| Topography equipment | 10.0% |
| Sea camp equipment | 50.0% |
| Land camp equipment | 20.0% |

## SPECIFIC OFFSHORE EQUIPMENT

| | |
|---|---|
| Drilling barges | 20.0% |
| Drilling and production platforms | 15.0% |
| Offshore well equipment | 20.0% |
| Underwater energy transport cables | 20.0% |
| Mooring buoys | 25.0% |
| On-platform equipment | 20.0% |
| Underwater wellheads and wellhead supports | 20.0% |
| Gathering lines between wells and storage stations | 20.0% |
| Main lines | 10.0% |
| Underwater loading lines | 20.0% |

Costs and expenses accumulated by the COMPANIES in connection with EXPLORATION WORKS will be treated in the following fashion: those of such costs and expenses which relate to the creation of capitalized assets shall be amortized, beginning in the first fiscal year showing a taxable income, in accordance with the depreciation rates set forth above. The other costs and expenses shall constitute "frais de premier établissement" (costs of initial installation), which may as such be amortized, at each COMPANY's option, without time limit.

GAR 00100

## EXHIBIT IV

### I - PAYMENT OF ROYALTY

When the mining royalty is paid in cash, each COMPANY shall, at the latest on the 20th of each month, file a monthly declaration of HYDROCARBONS lifted by it during the preceding calendar month.

Eighty-five percent (85%) of the royalty due for such preceding month of each quarter shall be paid at the time the corresponding monthly declaration is filed. The balance of the royalty due for each quarter shall be calculated and paid at the same time as the monthly declaration made during the second month following the end of the said quarter.

### II- PAYMENT OF CORPORATE TAX

Each COMPANY will make prepayment of corporate taxes as follows:

(a) During the course of the first quarter, each COMPANY will estimate the tax it will owe for the current year.

(b) An amount equal to 8/120th of such estimate will be paid on or before the 20th of each of the months of April, May, June, July, August and September.

(c) During the course of the third quarter, each COMPANY will review, on the basis of the actual results of the first semester, the estimate made by it of the annual tax.

(d) An amount corresponding to 8/120th of the new estimate shall be paid at the latest on or before the 20th of each of the months of October, November, December, as well as January, February and March of the following year, the payment for the month of October being however adjusted in such a way that the total amount of the provisional payments paid on October 20, correspond to 56/120th of the new estimate.

(e) The balance of the corporate tax shall be paid at the time of filing of the annual declaration, and taxes paid in excess, if any, shall be treated in accordance with Article 126 of the Code Général des Impôts du Congo.

GAR 00101

EXHIBIT V

MODEL OF LETTER OF GUARANTEE

GUARANTEE

WHEREAS the People's Republic of the Congo (hereinafter referred to as the "CONGO"), Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd., and Société Nationale de Recherches et d'Exploitation Pétrolières -- "HYDRO-CONGO" entered into a Convention dated the 25th day of May 1979, for the exploration and exploitation of liquid and gaseous hydrocarbon resources offshore the CONGO (hereinafter referred to as the "CONVENTION"),

and

WHEREAS /Name of the parent company_/ (hereinafter referred to as the "PARENT COMPANY") as owner, directly or indirectly, of all of the shares representing the capital stock of /name of the affiliated company_/ (hereinafter referred to as the "AFFILIATED COMPANY") desires to assure the CONGO of the performance of the obligations of the AFFILIATED COMPANY under the CONVENTION.

ACCORDINGLY,

The PARENT COMPANY hereby agrees and undertakes to provide or cause to be provided to its AFFILIATED COMPANY the funds necessary for it to comply with its obligations under the CONVENTION.

Executed at _____, on_____ 1979

(Name of PARENT COMPANY)

By: _____
       (Title)

GAR 00102

EXHIBIT V

MODEL OF LETTER OF GUARANTEE

GUARANTEE

WHEREAS the People's Republic of the Congo (hereinafter referred to as the "CONGO"), Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd., and Société Nationale de Recherches et d'Exploitation Pétrolières -- "HYDRO-CONGO" entered into a Convention dated the 25th day of May 1979, for the exploration and exploitation of liquid and gaseous hydrocarbon resources offshore the CONGO (hereinafter referred to as the "CONVENTION"),

and

WHEREAS /Name of the parent company_/ (hereinafter referred to as the "PARENT COMPANY") as owner, directly or indirectly, of all of the shares representing the capital stock of /name of the affiliated company_/ (hereinafter referred to as the "AFFILIATED COMPANY") desires to assure the CONGO of the performance of the obligations of the AFFILIATED COMPANY under the CONVENTION.

ACCORDINGLY,

The PARENT COMPANY hereby agrees and undertakes to provide or cause to be provided to its AFFILIATED COMPANY the funds necessary for it to comply with its obligations under the CONVENTION.

Executed at _____, on_____ 1979

(Name of PARENT COMPANY)

By: _____
         (Title)

GAR 00103

# A P P E N D I X

GAR 00104

TRANSLATION

(Letterhead of Congolese Superior Oil Company)

Minister of Finances            Houston, May 17, 1979
Ministry of Finances
Brazzaville

Mr. Minister:

    Our company, together with Cities Service Congo Petroleum Corporation and Canadian Superior Oil Ltd. are signing on May 25, 1979 with the People's Republic of the Congo, represented by its Minister of Mining and Energy, a Convention relating to hydrocarbon exploration and exploitation on the permit known as "Marine 1". In this regard, we would like to request clarification with respect to following questions:

    1.  The works relating to the working of this permit will make it necessary for us, as Operator for the Joint Venture, and to a lesser extent for the other non-Congolese members of the Joint Venture, to send to the Congo specialized personnel for periods which will be limited, but may extend over several years.

    (a) The expatriate personnel may bring with them household effects, private cars and household furnishings for their personal use during their stay in the Congo. Can such goods be imported, then re-exported at the end of their stay, free of customs duties and taxes?

    (b) The transfer to the Congo may entail for such personnel additional costs which are a direct consequence of such transfer: maintenance of two residences, special education expenses for their children, and, in the absence of a tax treaty between the People's Republic of the Congo and the United States of America, double taxation of their income. It will probably be necessary for us to pay such personnel an indemnity intended to cover these additional costs. Will this indemnity be subject to Congolese personal income tax, in addition to the tax payable on their salary after deduction of the standard deduction for professional expenses?

    2.  Should the Joint Venture, for reasons of Force Majeure, discontinue the exploitation for an appreciable length of time, will the income tax payments, if any, be reimbursable?

    3.  With respect to the costs and expenses accumulated during the exploration phase, we understand that the Congolese tax law will result in treating such costs and expenses in the following manner: those of such costs and expenses which relate to the

GAR 00105

The Minister of Finances            -2-            May 17, 1979

creation of capitalized assets shall be amortized, beginning in the
first fiscal year showing a taxable income, in accordance with the
depreciation rates attached as an exhibit to the aforementioned
Convention.  The other costs and expenses shall constitute "frais de
premier établissement" (costs of initial installation), which may
as such be amortized, at the taxpayer's option, without time limit.
We would be grateful if you could confirm that this would be the case.

Very truly yours,

(s) Diego C. Giordano
Diego C. Giordano
Vice-President



GAR 00106

TRANSLATION

(Letterhead of the Ministry of Finance)

Brazzaville, May 25, 1979

[ ]olene Superior Oil Company
[ ] Floor
[ ]st City National Bank Building
[ ]ton, Texas

[ ] Sirs:

In reply to your letter of May 17, 1979, we are pleased
[ ]et you know the following:

1.(a)  Household furniture, furnishings and materials
[ ]be imported and re-exported free of customs duties and taxes,
[ ]tever the length of the stay, so long as their use is limited to
[ ]rsonal use by the expatriate personnel. Private cars can be
[ ]ported free of duties and taxes only for a period of six months.

1.(b)  Since the indemnities described in your letter
[ ] a reimbursement of exceptional costs actually incurred, diff[ ]ring
[ ] nature from the professional expenses that the standard deduction is
[ ]nded to cover, they shall not be included in the taxable income
[ ] the employees in question, subject of course to the furnishing of
[ ]oper justification.

2.  The discontinuation of exploitation in the circumstances
[ ]scribed in your letter can be interpreted as a discontinuation of
[ ]tivities, with corresponding application of the provisions of Article
[ ] bis (4) of the General Tax Code.

3.  We confirm to you that your description of the amor-
[ ]zation of costs and expenses accumulated during the exploration phase
[ ] accurate.  This matter is indeed covered in identical terms by
[ ] last sub-paragraph of Exhibit III to the Convention that your
[ ]mpany and Cities Service Congo Petroleum  Company and Canadian
[ ]perior Oil Ltd. are signing today with the People's Republic of [ ]
[ ] Congo and Hydro-Congo.

Very truly yours,

Minister of Finance

GAR 00107

REPUBLIQUE POPULAIRE DU C GO
Travail * Démocratie * P x

_ _ _ _ _ _ _

/ OI N° 60/83 / DU 11/8/198

Complétant la loi n°17/83 du
27/01/83 portant approbation *des*
Accords particuliers signés l
11 Décembre 1981 pour le Perm s
"MARINE 1" respectivement ave
BRASPETRO et I.E.D.C. (Congo)
Ltd.--

_ _ _ _ _ _

L'ASSEMBLEE NATIONALE POPULAIRE A DELIBERE ET AD PTE ;

LE PRESIDENT DU COMITE CENTRAL DU PARTI CONGOLAI DU
TRAVAIL, PRESIDENT DE LA REPUBLIQUE, CHEF DE L'E AT,
PRESIDENT DU CONSEIL DES MINISTRES, PROMULGUE LA LOI
DONT LA TENEUR SUIT :

ARTICLE 1ER.- L'article 1er de la loi n°17/83 du 27/ 1/83
portant approbation des accords particuliers signés e
11 Décembre 1981 pour l'exploitation du Permis Marin 1
est complété comme suit :

    après : sont approuvés les accords ci-après sig és le
11 Décembre 1981 pour l'exploitation du Permis Marin 1 :

    ajouter : Avenant n°1 A LA CONVENTION DU 25 MAI 1979

    Le reste sans changement.

ARTICLE 2.- La présente loi sera publiée au Journal fficiel de la République Populaire du Congo et exécutée comme
loi de l'Etat./-

                Fait à Brazzaville, le  II AOUT 19 3

                                GAR 00108

            COLONEL Denis SASSOU - NGUESSO.--

(Free) <u>Translation</u>

PEOPLE'S REPUBLIC OF THE CONGO

Work – Democracy – Peace

- - - - - - - - -
- - - - - - - - - -

Law No. 60/83 of August 11, 1983
completing Law No. 17/83 of
January 27, 1983 approving
the Accords particuliers signed
December 11, 1981 re
"the Marine I Permit" with
BRASPETRO & I.E.D.C. (Congo)
Ltd.

- - - - - - - - -
- - - - - - - - - -

The People's National Assembly has deliberated and adopted;

The President of the Central Committee and
The Congolese Worker's Party, President of
the Republic, Chief of State, President of
the Council of Ministres, promulgates the
Law the text of which follows:

<u>Article 1</u>    Article 1 of Law No. 17/83 of January 27, 1983 approving the
Accords particuliers signed December 11, 1981 for the exploitation of the
Marine I Permit is completed as follows:

After "have approved the accords below signed December 11, 1981
for the exploitation of the Marine I Permit"

Add: "Amendment No. 1 to the Convention of May 25, 1979."

The remainder is unchanged.

<u>Article 2</u>    This Law will be published in the Official Journal of the
People's Republic and executed as a law of the State.

Made in Brazzaville, August 11, 1983

COLONEL Denis SASSOU – NGUESSO

GAR 00109

ENGLISH TRANSLATION
• • • •

AMENDMENT N° 1
TO THE MAY 25, 1979
"MAPINE 1" CONVENTION

December 11, 1981

GAR 00110

ENGLISH TRANSLATION

. . . .

AMENDMENT N° 1
TO THE MAY 25, 1979
"MARINE 1" CONVENTION

BETWEEN

The People's Republic of the Congo (hereinafter referred to as the "CONGO"), represented for the purposes hereof by its Minister of Mining and Energy Mr. Rodolphe Adada,

on the one hand,

AND

Cities Service Congo Petroleum Corporation (hereinafter referred to as "CITIES SERVICE") a Delaware (U.S.A.) corporation with registered offices at 306 South State Steet, Dover, Delaware, United States of America, represented by Mr. Lewis Greenwald, duly authorized for this purpose,

Société Nationale de Recherches et d'Exploitation Pétrolières -- HYDRO-CONGO (hereinafter referred to as "HYDRO-CONGO"), a société nationale with registered offices at Brazzaville, represented by Mr. Camille Okamba, duly authorized for this purpose,

IEDC (Congo) Ltd. (hereinafter referred to as "IEDC") a Bermuda company with registered offices at 5th Floor, Bank of Bermuda Building, Hamilton, Bermuda, represented by Mr. Nordine Aït-Laoussine, duly authorized for this purpose,

Petrobras Internacional S.A. BRASPETRO (hereinafter referred to as "BRASPETRO") a Brazilian corporation with registered offices at Rio de Janeiro, Federative Republic of Brazil, represented by Mr. Joel Mendes Renno, duly authorized for this purpose,

on the other hand.

PREAMBLE

On May 25, 1979, the CONGO, HYDRO-CONGO, CITIES SERVICE, Congolese Superior Oil Company ("SUPERIOR") and Canadian Superior Oil Ltd. ("CANADIAN") signed a

GAR 00111

2.

Convention (the "CONVENTION") for the exploration and
possible exploitation of liquid and gaseous hydrocarbons
on the territory of the People's Republic of the Congo.
The CONVENTION was ratified by Government Order N° 24/79
of July 7, 1979.

HYDRO-CONGO, CITIES SERVICE, SUPERIOR and
CANADIAN also signed in Brazzaville on May 25, 1979 a
joint operating agreement (the "JOA") to carry out
petroleum works on the "Marine 1" Type "A" exploration
permit granted to HYDRO-CONGO by decree N° 79/253 of May
16, 1979.

On March 12, 1981, SUPERIOR and CANADIAN withdrew
from the joint venture organized under the JOA (the "JOINT
VENTURE"), effective immediately.

IEDC and BRASPETRO informed the Minister of
Mining and Energy of the CONGO of their interest to
participate in the operations of the JOINT VENTURE and, by
reason of these two groups' experience in petroleum
operations, the Minister of Mining and Energy of the CONGO
agreed, in Heads of Agreements signed respectively with
International Energy Development Corporation B.V. and
BRASPETRO on July 28 and August 7, 1981, that these groups
participate in the JOINT VENTURE and, as a result, that
they take part in the petroleum works on the "Marine 1"
permit.

NOW, THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

### Article 1

1.01.A.  IEDC and BRASPETRO hereby agree to and
ratify all the provisions of the CONVENTION, a copy of
which is attached hereto as an exhibit, and they become
parties thereto in replacement for SUPERIOR and CANADIAN,
respectively.  The CONGO hereby confirms all the
provisions of the CONVENTION and agrees that all such
provisions shall apply to IEDC and BRASPETRO in the same
manner as they applied to SUPERIOR and CANADIAN.

1.01.B.  The CONGO warrants to IEDC and BRASPETRO
that SUPERIOR and CANADIAN have withdrawn from the
CONVENTION effective March 12, 1981 and neither SUPERIOR
nor CANADIAN or any person claiming through or under
SUPERIOR or CANADIAN have any rights or interest
thereunder or in any HYDROCARBONS which may be produced on
the PERMIT.

The CONGO also warrants that it did not approve
any encumbrance (hypothèque, nantissement or mise en gage)
on the PERMIT.

GAR 00112

3.

1.01.C. Notwithstanding anything elsewhere contained in this Amendment N° 1, nothing herein contained shall be construed as imposing upon IEDC or BRASPETRO any liability for any failure of SUPERIOR or CANADIAN to fulfill any of their obligations or liabilities under the CONVENTION prior to the date of their withdrawal and the rights and interests of IEDC and BRASPETRO under the CONVENTION shall not be prejudiced in any way as a result of any such failure of SUPERIOR or CANADIAN.

1.02  For the purposes of the CONVENTION

(a) instead of "Congolese Superior Oil Company", read "IEDC (Congo) Ltd."

(b) instead of "SUPERIOR", read "IEDC";

(c) instead of "Canadian Superior Oil Ltd.", read "Petrobras Internacional S.A. BRASPETRO";  and

(d) instead of "CANADIAN", read "BRASPETRO".

1.03  For the purposes of paragraph 19.01 of the CONVENTION,

(a) amend sub-paragraph (b) of said paragraph 19.01 to read as follows:

"(b) for IEDC:

IEDC (Congo) Ltd.
5th floor
Bank of Bermuda Building
Hamilton
Bermuda

With copy to:

IEDC Services (U.K.) Ltd.
The Lower Mill
Kingston Road
Ewell, Surrey KT17 2AP
United Kingdom

Telex:  295277 IEDC (UK) - G

Attention:  Exploration Manager".

(b) Amend sub-paragraph (d) of said paragraph 19.01 to read as follows:

GAR 00113

4.

"(d) for BRASPETRO:

Petrobras Internacional S.A. BRASPETRO
Plaça Pio X, 119 Centro
20,040 Rio de Janeiro, R.J.
Brésil
(P.O. Box 2027, Rio de Janeiro, RJ, Brazil)

Télex:  2122640
        2121889

Attention:  Vice President".

### Article 2

2.01  IEDC shall provide to the CONGO the
guarantee issued by its parent company pursuant to Article
21 of the CONVENTION at the latest on December 31, 1981.

### Article 3

3.01  This amendment N° 1 shall enter into force
upon its ratification by law, but it will be retro-
actively effective as of March 13, 1981.

Done in seven originals in French,
in Brazzaville,
on December 11, 1981.

The CONGO:


By: _____
    Rodolphe Adada,
    Minister of Mines and Energy


CITIES SERVICE:                    HYDRO-CONGO:


By: _____         By: _____
    Lewis Greenwald                 Camille Okamba,
                                    General Manager


IEDC:                              BRASPETRO:


By: _____         By: _____
    Nordine Ait Laoussine            Joel Hendas Kenno,
                                    Vice-President


GAR 00114

#3303-A

PERMIS "MARINE 1"

o  o  o  o  o

ACCORD PARTICULIER
BRASPETRO

11 décembre 1981

GAR 00115

PERMIS "MARINE 1"

• • • • •

ACCORD PARTICULIER

ENTRE

La République Populaire du Congo (ci-après désignée le "CONGO"), représentée par Monsieur Rodolphe Adada, Ministre des Mines et de l'Energie,

d'une part,

ET

IEDC (Congo) Ltd. (ci-après désignée "IEDC"), une société des Bermudes dont le siège social est à Hamilton, Bermudes, 5ème étage, Bank of Bermuda Building, représentée par Monsieur Nordine Aït-Laoussine, dûment autorisé aux fins des présentes,

d'autre part.

EXPOSE PRELIMINAIRE

Le 25 mai 1979, le CONGO, HYDRO-CONGO, CITIES SERVICE, Congolese Superior Oil Company ("SUPERIOR") et Canadian Superior Oil Ltd. ("CANADIAN") ont signé une Convention (la "CONVENTION") pour la recherche et l'exploitation éventuelle d'hydrocarbures liquides et/ou gazeux sur le territoire de la République Populaire du Congo. La CONVENTION a été ratifiée par l'Ordonnance N° 24/79 du 7 juillet 1979.

HYDRO-CONGO, CITIES SERVICE, SUPERIOR et CANADIAN ont également signé à Brazzaville le 25 mai 1979 un contrat d'association (le "CONTRAT D'ASSOCIATION") pour l'exécution de travaux pétroliers sur le permis de recherche de type "A" dit Permis "Marine 1" accordé à HYDRO-CONGO par le décret N° 79/253 en date du 16 mai 1979.

GAR 00116

2.

Le 12 mars 1981, SUPERIOR et CANADIAN se sont retirées de l'association constituée aux termes du CONTRAT D'ASSOCIATION ("l'ASSOCIATION") et ce avec effet immédiat.

IEDC a fait connaître à Monsieur le Ministre des Mines et de l'Energie du CONGO son intérêt à participer aux travaux de l'ASSOCIATION, et son désir d'améliorer la situation du CONGO au sein de la CONVENTION.

CELA ETANT EXPOSE, LES PARTIES SONT CONVENUES DE CE QUI SUIT:

Article 1
Redevance Minière

Le taux de la redevance minière pour les hydrocarbures liquides prévu au paragraphe 5.03 de la CONVENTION est porté de quatorze et demi pour cent (14,5%) à seize deux-tiers pour cent (16 2/3%). Le taux de la redevance minière pour les hydrocarbures gazeux reste inchangé.

Article 2
Impôt sur les sociétés

En ce qui concerne IEDC, l'impôt sur les sociétés sera calculé au taux de soixante cinq pour cent (65%). A cet effet, si le taux de l'impôt sur les sociétés fixé par le Code Général des Impôts du CONGO est inférieur à soixante cinq pour cent (65%), IEDC sera soumise à l'impôt sur les sociétés calculé conformément aux dispositions du Code Général des Impôts du CONGO ainsi qu'à un impôt additionnel dont le montant sera calculé en appliquant au bénéfice imposable un pourcentage égal à la différence entre le taux de l'impôt sur les sociétés, tel qu'il résulte du Code Général des Impôts, et soixante cinq pour cent (65%).

Article 3
Cession à une société du groupe IEDC

En raison de la structure du groupe IEDC, le CONGO accepte que l'autorisation du Ministre de tutelle soit automatiquement accordée à toute cession par IEDC de

GAR 00117

3.

ses droits et obligations au titre de la CONVENTION et du
CONTRAT D'ASSOCIATION à un ou plusieurs de ses action-
naires ultimes, lesquels sont AZL Resources Inc., Arab
Petroleum Investments Corporation, Kuwait Petroleum
Corporation, Sulpetro Ltd. et A.B. Volvo (ou, sous réserve
d'obtenir l'accord préalable du Ministre de tutelle,
lequel accord ne sera pas refusé sans raison, à toute
filiale entièrement contrôlée par l'un quelconque desdits
actionnaires) à condition qu'IEDC reste responsable de
l'exécution de toutes les obligations et responsabilités
cédées à un tel cessionnaire et qu'IEDC représente ce
cessionnaire pour les besoins de la CONVENTION et du
CONTRAT D'ASSOCIATION.

<u>Article 4</u>
<u>Entrée en vigueur; ratification</u>

Le présent accord particulier entrera en vigueur
dès sa ratification par une loi, mais il prendra effet
rétroactivement à compter du 13 mars 1981.  Le texte
français seul fait foi, mais une traduction anglaise
approuvée par les parties y est jointe et il pourra y être
fait référence dans un but de clarification.

Fait en quatre exemplaires
à Brazzaville,
le 11 décembre 1981.

Pour le CONGO:                    Pour IEDC:

Rodolphe Adada,                   Nordine Aït-Laoussine
Ministre des Mines
et de l'Energie

GAR 00118

(Note: Agreement in same terms executed
by Bra⬤ tro ⬤ December 11, 1981)

ENGLISH TRANSLATION

"MARINE 1" PERMIT

• • • •

AD HOC

AGREEMENT

BETWEEN

The People's Republic of the Congo (hereinafter
referred to as the "CONGO"), represented for the purposes
hereof by its Minister of Mining and Energy Mr. Rodolphe
Adada,

on the one hand,

AND

IEDC (Congo) Ltd. (hereinafter referred to as
"IEDC") a Bermuda company with registered offices at 5th
Floor, Bank of Bermuda Building, Hamilton, Bermuda,
represented by Mr. Nordine Aït Laoussine, duly authorized
for this purpose,

on the other hand.

PREAMBLE

On May 25, 1979, the CONGO, HYDRO-CONGO, CITIES
SERVICE, Congolese Superior Oil Company ("SUPERIOR") and
Canadian Superior Oil Ltd. ("CANADIAN") signed a
Convention (the "CONVENTION") for the exploration and
possible exploitation of liquid and gaseous hydrocarbons
on the territory of the People's Republic of the Congo.
The CONVENTION was ratified by Government Order N° 24/79
of July 7, 1979.

HYDRO-CONGO, CITES SERVICE, SUPERIOR and CANADIAN
also signed in Brazzaville on May 25, 1979 a joint

GAR 00119

2.

operating agreement (the "JOA") to carry out petroleum works on the "Marine 1" Type "A" exploration permit granted to HYDRO-CONGO by decree N° 79/253 of May 16, 1979.

On March 12, 1981, SUPERIOR and CANADIAN withdrew from the joint venture organized under the JOA (the "JOINT VENTURE"), effective immediately.

IEDC informed the Minister of Mining and Energy of the CONGO of its interest to participate in the operations of the JOINT VENTURE and of its intention to improve the CONGO's situation under the CONVENTION.

NOW, THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

### Article 1
### Mining Royalty

The rate of the mining royalty for liquid hydrocarbons set forth in paragraph 5.03 of the CONVENTION is hereby increased from fourteen and one half percent (14.5%) to sixteen and two thirds percent (16 2/3%). The rate of the mining royalty for gaseous hydrocarbons remains unchanged.

### Article 2
### Corporate Tax

With respect to IEDC, the corporate tax shall be computed at the rate of sixty five percent (65%). Therefore, should the corporate tax rate, as set forth in the Code Général des Impôts of the CONGO, be less than sixty five percent (65%), IEDC shall be subject to the corporate tax computed in accordance with the provisions of the Code Général des Impôts of the CONGO, as well as to an additional tax the amount of which shall be determined by applying to the taxable income a percentage rate equal to the difference between the corporate tax rate, as set in the Code Général des Impôts, and sixty five per cent (65%).

### Article 3
### Assignment to a company of the IEDC group

In view of the nature of the IEDC group corporate structure, the CONGO agrees that the authorization of the

GAR 00120

3.

Minister in charge shall be automatically granted to any
assignment by IEDC of its rights and obligations under the
CONVENTION and the JOA to all or any of its ultimate
shareholders being AZL Resources Inc., Arab Petroleum
Investments Corporation, Kuwait Petroleum Corporation,
Sulpetro Ltd. and A.B. Volvo (or, subject to the
authorization of the Minister in charge, such not to be
unreasonably withheld, any wholly-owned subsidiary of any
such ultimate shareholder), provided IEDC remains
responsible for the fulfilment of all obligations and
liabilities assigned to such assignee and represents such
assignee for all purposes under the CONVENTION and the JOA.

## Article 4
### Effective date; ratification

This ad hoc agreement shall enter into force upon
of its ratification by law, but it will be retroactively
effective as of March 13, 1981. The French text governs,
but an English translation approved by the parties is
attached, to which reference may be made for the purpose
of clarification.

Done in four copies
in Brazzaville,
on December 11, 1981.

For the CONGO:                          For IEDC:


Rodolphe Adada,                         Nordine Ait-Laoussine
   Ministre des Mines et
   de l'Energie

GAR 00121

ASSESSORIA JURIDICA

Contrato: n 9       C     E       n.°:
Distribuido a:                    Data:

## PERMIS "MARINE 1"

### ACCORD PARTICULIER

**ENTRE**

La République Populaire du Congo (ci-après désignée le "CONGO"), représentée par Monsieur Rodolphe Adada, Ministre des Mines et de l'Energie,

d'une part,

**ET**

Petrobras Internacional S.A. BRASPETRO, (ci-après désignée "BRASPETRO"), société d'économie mixte de droit brésilien dont le siège est à Rio de Janeiro, République Fédérative du Brésil, représenté par Monsieur Joel Mendes Renno, dûment autorisé aux fins des présentes,

d'autre part.

### EXPOSE PRELIMINAIRE

Le 25 mai 1979, le CONGO, HYDRO-CONGO, CITIES SERVICE, Congolese Superior Oil Company ("SUPERIOR") et Canadian Superior Oil Ltd. ("CANADIAN") ont signé une Convention (la "CONVENTION") pour la recherche et l'exploitation éventuelle d'hydrocarbures liquides et/ou gazeux sur le territoire de la République Populaire du Congo. La CONVENTION a été ratifiée par l'Ordonnance N° 24/79 du 7 juillet 1979.

HYDRO-CONGO, CITIES SERVICE, SUPERIOR et CANADIAN ont également signé à Brazzaville le 25 mai 1979 un contrat d'association (le "CONTRAT D'ASSOCIATION") pour l'exécution de travaux pétroliers sur le permis de recherche de type "A" dit Permis "Marine 1" accordé à HYDRO-CONGO par le décret N° 79/253 en date du 16 mai 1979.

Le 12 mars 1981, SUPERIOR et CANADIAN se sont retirées de l'association constituée aux termes du CONTRAT D'ASSOCIATION ("l'ASSOCIATION") et ce avec effet immédiat.

BRASPETRO a fait connaître à Monsieur le Ministre des Mines et de l'Energie du CONGO son intérêt à participer aux travaux de l'ASSOCIATION, et son désir d'améliorer la situation du CONGO au sein de la CONVENTION.

GAR 00122

2.

<u>CELA ETANT EXPOSE, LES PARTIES SONT CONVENUES DE CE QUI SUIT</u>:

### Article 1
#### <u>Redevance Minière</u>

Le taux de la redevance minière pour les hydrocarbures liquides prévu au paragraphe 5.03 de la CONVENTION est porté de quatorze et demi pour cent (14,5%) à seize deux-tiers pour cent (16 2/3%). Le taux de la redevance minière pour les hydrocarbures gazeux reste inchangé.

### Article 2
#### <u>Impôt sur les sociétés</u>

En ce qui concerne BRASPETRO, l'impôt sur les sociétés sera calculé au taux de soixante cinq pour cent (65%). A cet effet, si le taux de l'impôt sur les sociétés fixé par le Code Général des Impôts du CONGO est inférieur à soixante cinq pour cent (65%), BRASPETRO sera soumise à l'impôt sur les sociétés calculé conformément aux dispositions du Code Général des Impôts du CONGO ainsi qu'à un impôt additionnel dont le montant sera calculé en appliquant au bénéfice imposable un pourcentage égal à la différence entre le taux de l'impôt sur les sociétés, tel qu'il résulte du Code Général des Impôts, et soixante cinq pour cent (65%).

### Article 3
#### <u>Entrée en vigueur; ratification</u>

Le présent accord particulier entrera en vigueur dès sa ratification par une loi, mais il prendra effet rétroactivement à compter du 13 mars 1981.

Fait en quatre exemplaires en français,
à Brazzaville,
le 11 décembre 1981.

Pour le CONGO                   Pour BRASPETRO:

Rodolphe Adada,                 Joel Mendes Rennó,
Ministre des Mines             Vice-President
et de l'Energie

GAR 00123