CONGO

cc - D. *...*
*...* File
14-12-81 *...*

①

PERMIS "MARINE 1"

o  o  o  o  o

ACCORD PARTICULIER

IEDC (Congo) Ltd.

11 décembre 1981

GAR 00124



Amoco Congo Exploration Company
Amoco Congo Petroleum Company
200 East Randolph Drive,
Chicago,
Illinois 60680,
U.S.A.

le 29 juin 1984

Monsieur Auxence Ickonga,
Directeur Général-Président,
Hydro-Congo,
Brazzaville

Monsieur le Directeur Général-Président,

Lors de nos récents entretiens à Brazzaville au sujet de
la cession en notre faveur de certains intérêts dans la Con-
vention et l'Accord d'Association du Permis Marine I, nous
vous avons fait connaître notre désir de recevoir sur certains
points importants des clarifications ou des confirmations
de la part d'Hydro-Congo ou des services administratifs
Congolais éventuellement compétents. Ces points sont les
suivants:

1.    Hydro-Congo étant une société entièrement controlée
      par la Republique Populaire du Congo, Amoco s'inquiete
      de la généralité de l'Article 18.03 du Contrat d'Associ-
      ation.

      A cet égard, Amoco désirerait qu'Hydro-Congo lui con-
      firme qu'elle ne considérera pas que des actes de la
      puissance publique affectant Hydro-Congo seule mais
      non les autres parties au Contrat d'Association, peuv-
      ent constituer des événements de force majeure dans
      le cadre du Contrat d'Association.

2.    Arbitrage

      Le permis de recherche de type "A" dit permis "Marine
      1" figure en annexe 1 à la Convention. Il ne semble
      pas clair à Amoco que cela implique nécessairement
      que le permis et la Convention doivent  être lus en-
      semble.

      Amoco désirerait obtenir confirmation  du fait que
      l'Article 17 de la Convention, qui traite de l'arbit-
      rage, autoriserait bien une partie à la Convention
      à invoquer le cas échéant la clause d'arbitrage dans
      le cadre de contestations portant sur le permis (ou
      sur tout permis d'exploitation qui pourrait en result-
      er) dans les mêmes conditions que pour des contestat-
      ions portant sur la Convention elle-même.

-1-                          GAR 00125



3. Amoco désirerait obtenir confirmation du fait que la loi N°23/82 du 7 juillet 1982 faisant référence au Code Minier n'a pas de raison de s'appliquer au permis "Marine 1" (ou à l'u.. quelconque des permis d'exploit-ation qui pourrait en résulter) ou à la Convention, et que l'Article 19.03 de la Convention exclut l'appli-cation tant de l'Article 20 de la loi N°29-62 du 20 juin 1962 que de la loi N°35-65 du 12 août 1965, de telle sorte qu'il ne peut être question pour l'Etat Congolais d'acquérir une participation dans toute suc-cursale créée, ou dans toute société constituée par Amoco pour les besoins de ses activités au Congo dans le cadre du permis "Marine 1".

4. <u>Impôt sur les Sociétés</u>

Amoco désirerait obtenir confirmation que les points suivants concernant la fiscalité lui seront applicables:

(A) Conformément au paragraphe 4.A (A) du procès-verbal signé le 8 mars 1984:

I. Les modalités fiscales applicables au pour-centage de participation qu'Amoco doit acquérir de Cities Service seront identiques à celles qui étaient applicables au pour-centage de participation de Cities Service dans le cadre de la Convention du 25 mai 1979. En particulier, le taux de l'impôt sur les sociétés applicable aux revenus D'Amoco en provenance du pourcentage de participation achetée à Cities sera de 55 pour cent, et les taux de redevance applic-ables à ce pourcentage de participation seront de 14 1/2 pour cent pour les hydrocar-bures liquides et de 9 pour cent pour le gaz naturel.

II. Les modalités fiscales applicables aux pour-centages de participation qu'Amoco doit acquérir de Braspetro, IEDC et KUFPEC seront identiques à celles qui étaient incluses dans la Convention du 25 mai 1979, à l'ex-ception de la redevance minière pour les hydrocarbures liquides, qui sera de 16 2/3 pour cent au lieu de 14 1/2 pour cent, et du taux de l'impôt sur les sociétés appli-cable a ce pourcentage de participation, qui sera de 65 pour cent au lieu de 55 pour cent. A tout autre point de vue, ce sont les modalités fiscales d'origine de la Con-vention du 25 mai 1979 qui s'appliqueront.

-2-

GAR 00126



(B)   La mention dans l'Article 6.03.2 de la Convention
du "taux de l'impôt du Congo" se réfère au taux
général d'impôt sur les sociétés qui s'applique
à toutes les sociétés qu'elles poursuivent des
activités pétrolières ou bien d'autres activités
industrielles et commerciales.

(C)   Au cas où une production commerciale d'hydro-
carbures serait obtenue, il a été convenu qu'Amoco
paierait une Portion du Bénéfice Net (PBN) à
Cities Service et à Braspetro,  qui  n'auront
plus alors de réprésentation permanente au Congo.
Ces versements seront faits après paiement des
impôts congolais. Amoco voudrait avoir la confirm-
ation qu'il ne sera pas appliqué sur ces verse-
ments aucune autre retenue à la source ou impôt
congolais sur les sociétés, dans la mesure où
ces versements seraient faits hors du Congo et
prélevés par Amoco sur des bénéfices qui auront
déjà été asujettis aux impôts congolais.

(D)   Amoco voudrait avoir la confirmation que les
versements de PBN faits par Amoco à Cities
Service et à Braspetro pourront être payés à
l'étranger par Amoco en devises sur les fonds
conservés à l'étranger par Amoco.

(E)   Amoco bénéficiera entièrement, pour le calcul
de sa charge d'impôt sur les sociétés, de tous
les frais et charges encourus par Cities Service
et Braspetro avant la date d'entrée en vigueur
de la cession par celles-ci de leurs pourcentages
de particiption respectifs en faveur d'Amoco.

(F)   Amoco désire obtenir confirmation de ce que sa
comptabilité visée à l'Article 6.03.4 de la Con-
vention peut être tenue en dollars des Etats-
Unis, et que cette même comptabilité constituera
la base sur laquelle sera calculé l'impôt sur
les sociétés du par Amoco.

5.   Remboursement des avances par Hydro-Congo

Conformément au paragraphe 4.A(C) du procès-verbal,
Amoco désirerait qu'il lui soit confirmé que, du fait
des cessions envisagées, le "compte-avance" (visé à
l'Article 9.01 du Contrat d'Association) établi au
nom de Cities Service et de Braspetro et qui reprend
toutes les avances faites par ces sociétés avant la
date de la cession sera transmis à Amoco et qu'Amoco

-3-

GAR 00127



se verra en conséquence autorisée à recevoir le rem-
boursement complet par Hydro-Congo de ces comptes-
avances conformément à l'Article 9.02 du Contrat
d'Association.

Nous vous prions, Monsieur le Directeur Général-Président,
d'agréer l'expression de nos sentiments respectueux.

T.J. Gorton
Vice Président

TJG/ed

-4-

GAR 00128


Letter 3 of 29th June 1984

Mr. Auxence Ickonga,
Chairman and Managing Director
Hydro-Congo
Brazzaville

Dear Sir,

At our recent meetings in Brazzaville on the subject of the assignment in our favour of certain interests in the Convention and the Partnership Agreement of the Marine 1 Permit, we informed you of our desire to receive clarifications or confirmations from Hydro-Congo or the competent Congolese administrative departments on certain important points. The points in question are the following:

1.    Hydro-Congo being a company that is wholly controlled by the People's Republic of the Congo, Amoco is concerned about the general nature of Article 18.03 of the Partnership Agreement.

With regard to this, Amoco would like Hydro-Congo to confirm to it that it will not consider governmental acts which only affect Hydro-Congo but not the other parties to the Partnership Agreement as constituting instances of force majeure under the Partnership Agreement.

2.    <u>Arbitration</u>

The type "A" research permit known as permit "Marine 1" appears in appendix 1 of the Convention. It does not seem clear to Amoco that it necessarily implies that the permit and the Convention must be read together.

Amoco wishes to obtain confirmation of the fact that Article 17 of the Convention, which deals with arbitration, would authorize a party to the Convention to invoke, where necessary, the arbitration clause under the disputes procedure relating to the permit (or any operating permit which might result from it) under the same conditions as disputes relating to the Convention itself.

3.    Amoco wishes to obtain confirmation of the fact that Law No. 23/82 of 7th July 1982 referring to the Mining Code does not apply to the "Marine 1" permit (or to any operating permit which may result from it) or to the Convention, and that Article 19.03 of the Convention excludes the application of Article 20 of Law No. 29-62 of 20th June 1962 and of Law No. 35-65 of 12th August 1965, so that there is no question of the Congolese State acquiring a share in any subsidiary created or in any company formed by Amoco for the purposes of its activities in the Congo under permit "Marine 1".

GAR 00129



4.  Company Tax

Amoco wishes to obtain confirmation that the following points concerning tax matters will be applicable to it:

(A)  In accordance with paragraph 4.A (A) of the minutes signed on 8th March 1984:

I.  The tax procedures applicable to the percentage share that Amoco is to acquire from Cities Service will be identical to those which were applicable to the percentage share of Cities Service under the Convention of 25th May 1979. In particular, the rate of the company tax applicable to Amoco income resulting from the percentage share purchased from Cities will be 55 percent, and the rate of royalty applicable to this percentage share will be 14 1/2 percent for liquid hydrocarbons and 9 percent for natural gas.

II.  The tax procedures applicable to the percentage shares that Amoco is to purchase from Braspetro, IEDC and KUFPEC will be identical to those which were included in the Convention of 25th May 1979, with the exception of mineral royalty for liquid hydrocarbons, which will be 16 2/3 percent instead of 14 1/2 percent, and the rate of company tax applicable to this percentage share, which will be 65 instead of 55 percent. In every other respect, the original tax procedures of the Convention of 25th May 1979 will apply.

(B)  The words in Article 6.03.2 of the Convention of the "rate of the tax of the Congo" refers to the general rate of company tax which applies to all companies pursuing oil activities or other industrial and commercial activities.

(C)  In the event of commercial production of hydrocarbons being achieved, it has been agreed that Amoco would pay a portion of the net profit (PBN) to Cities Service and Braspetro, which would no longer have a permanent representation in the Congo. These payments will be made after payment of Congolese taxes. Amoco wishes to have confirmation that no other deduction at source or Congolese company tax will be applied to these payments, in so far as these payments will be made outside the Congo and deducted by Amoco from the profits which will have already been subject to Congolese taxes.

(D)  Amoco whishes to have confirmation that these PBN payments made by Amoco to Cities Service and to Braspetro may be paid abroad by Amoco in currencies on the funds held abroad by Amoco.

GAR 00130



(E)    Amoco will benefit fully, for the calculation of its company tax burden, from all the costs and charges incurred by Cities Service and Braspetro prior to the date of the assignment by the latter of their respective percentage shares in favour of Amoco coming into force.

(F)    Amoco wishes to obtain confirmation that its accounts as referred to in Article 6.03.4 of the Convention may be kept in United States Dollars, and that the same accounts will constitute the basis on which the company tax owed by Amoco will be calculated.

5.    Repayment of Advances by Hydro-Congo

In accordance with paragraph 4.A (C) of the minutes, Amoco would like to receive confirmation that, by reason of the assignments envisaged, the "advance account" (referred to in Article 9.01 of the Partnership Agreement) established in the name of Cities Service and Braspetro and which covers all the advances made by these companies prior to the date of assignment will be transferred to Amoco and that Amoco will consequently be authorized to receive the full repayment by Hydro-Congo of these advance accounts in accordance with Article 9.02 of the Partnership Agreement.

Yours sincerely,


T.J. Gorton
Vice President

TJG/ed


GAR 00131



SOCIETE NATIONALE
DE
RECHERCHE ET D'EXPLOITATION
PETROLIERES

# HYDRO-CONGO

Capital : 710.000.000 F. CFA
R. C. : 83 B 931

Siège Social : Brazzaville

N° 130/100-21/DGP/HC

REPUBLIQUE POPULAIRE DU CONGO

Brazzaville, le    29  JUIN  1984.-

*Le Directeur Général Président.*

A

Amoco Congo Exploration Company
et    Amoco Congo Petroleum Company
1 Stephen Street
Tottenham Court Road
London W1 2AU
Royaume-Uni

Messieurs,

Par lettre en date du 29 Juin 1984, vous nous avez
soumis plusieurs questions relatives au statut du Permis "Marine 1"
et aux effets des cessions de pourcentages de participation
actuellement détenus par Cities Service Congo Petroleum Corporation,
Petrobras Internacional S.A. -- BRASPETRO, IEDC (Congo) Ltd. et
Kuwait Foreign Petroleum Exploration Company K.S.C. La plupart de
ces questions concernant l'Etat, nous les avons transmises à notre
autorité de tutelle qui les considère et vous fera connaître sa
position directement. La présente lettre ne porte donc que sur vos
questions numérotées 1 et 5.

### 1. Question numéro 1 : Force majeure

HYDRO-CONGO est une Société Nationale de droit Congolais
dont les organes de gestion sont indépendants des services de l'Etat,
et notamment du Ministère des Mines et de l'Energie. HYDRO-CONGO
estime donc ne pas être en mesure de vous donner la confirmation
demandée. HYDRO-CONGO tient toutefois à préciser qu'elle n'invoquera
les dispositions de l'article 18.03 du Contrat d'Association que
de manière raisonnable et sans abuser du droit qui lui est reconnu.

.../...

GAR 00132

B. P. 2008 - Brazzaville — Tél. : 81.41.26 — Télex : 5215 KG/5232 KG/5300 KG



.../...

( 2 )

## 2. Question numéro 5 : Remboursement des Avances

HYDRO-CONGO admet que les avances qui lui ont été consenties par les Sociétés cédantes conformément à l'article 9 du Contrat d'Association et qui ont été inscrites aux comptes avances sous le nom des Sociétés cédantes seront bien transmises à vos deux Sociétés du fait des cessions. A ce titre, et conformément aux dispositions de l'article 9 précité du Contrat d'Association, la ou les Sociétés cessionnaires seront autorisées à recevoir les sommes versées par HYDRO-CONGO à titre de remboursement desdites avances.

Veuillez agréer, Messieurs, l'expression de nos salutations distinguées.

Le Directeur Général,
Président du Conseil d'Administration
d' HYDRO-CONGO,

A. TCHONGA

cc : Ministère des Mines et de l'Energie.

GAR 00133



from the Chairman and Managing Director
Hydro-Congo

No. 130/100-21/DGP/HC

29th June 1984

to   Amoco Congo Exploration Company
and  Amoco Congo Petroleum Company
     1, Stephen Street,
     Tottenham Court Road,
     London W1 2AU
     United Kingdom

Dear Sirs,
     In your letter of 29th June 1984 you have submitted to us several
questions regarding the status of the "Marine 1" Permit and the
effects of the assignments of the percentage shares presently held
by Cities Service Congo Petroleum Corporation, Petrobras
Internacional S.A. — BRASPETRO, IEDC (Congo) Ltd. and Kuwait
Foreign Petroleum Exploration Company K.S.C. The majority of these
questions concern the State and we have forwarded them to our higher
authority, which will consider them and inform you of its position
directly. Consequently, this letter only deals with your questions
numbered 1 and 5.

## 1. Question Number 1:   Force Majeure

     HYDRO-CONGO is a National Company incorporated under Congolese
law whose administrative bodies are independent of the State
departments and, in particular of the Ministry of Mines and Energy.
HYDRO-CONGO therefore considers that it is not in a position to give
you the confirmation requested. HYDRO-CONGO undertakes nevertheless
to state that it will only invoke the provisions of Article 18.03 of
the Partnership Agreement in a reasonable manner and without abusing
the right which is accorded it.

GAR 00134







2. Question Number 5:    Repayment of Advances

HYDRO-CONGO acknowledges that the advances which have been granted it by the assigning companies in accordance with Article 9 of the Partnership Agreement and which have been entered in the advance accounts under the name of the assigning companies will be transferred to your two companies by virtue of the assignments. In this regard, and in accordance with the provisions of Article 9 referred to above of the Partnership Agreement, the assignee company or companies will be authorized to receive the sums paid by HYDRO-CONGO by way of repayments of the said advances.

Yours sincerely,

The Managing Director,
Chairman of the Board of Directors
of HYDRO-CONGO

A. ICKONGA

cc: Ministry of Mines and Energy

GAR 00135

REPUBLIQUE POPULAIRE DU CONGO
Travail ·:· Démocratie ·:· Paix
―oOo―

**MINISTERE DES MINES
ET DE L'ENERGIE**

CABINET

B.P. 2120 — Tél : 81-12-81

N°――――――/ MME · CAB.

002385

*Brazzaville, le* .....29 juin 1984...................

*Le Ministre des Mines
et de l'Energie*

à

Amoco Congo Exploration Company

et

Amoco Congo Petroleum Company
1 Stephen Street

Tottenham Court Road

LONDON W1 2AH
Royaume – Uni

Messieurs,

J'ai pris bonne note de votre lettre du 29 juin 1984 adressée à la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" dans laquelle vous posez certaines questions qui sont du ressort des services de l'Etat et que le Directeur Général - Président d'HYDRO-CONGO m'a soumises.

Il ressort de cette lettre que vos sociétés désirent reprendre en tant que cessionnaires, tout ou partie des pourcentages de participation actuellement détenus par Cities Service Congo Petroleum Corporation, Petrobras Internacional S. A. — BRASPETRO, IEDC (Congo) Ltd. et Kuwait Foreign Petroleum Exploration Company K. S. C.

La présente lettre a pour objet de vous apporter, lorsque cela est possible, les précisions que vous demandez.

1. Question numéro 2 : Arbitrage

La Convention du 25 mai 1979 relative au permis "Marine 1" (La "Convention"), vise expressément dans paragraphe 1.04 le permis en question, lequel figure de plus en annexe 1 à ladite Convention. Toutefois celui-ci constitue un acte administratif unilatéral adopté avant l'entrée en vigueur de la Convention et dont la validité ne pourrait être remise en cause par une décision arbitrale.

..../...

GAR 00136

2.  Question numéro 3 : Code Minier

Il me semble ressortir des dispositions de la Conven-
tion que les droits et obligations des parties à cette Conven-
tion en matière minière restent régis par la loi n° 35-65 du
12 août 1965.

En ce qui concerne la deuxième partie de votre ques-
tion, l'article 19.03, in fine, de la Convention prévoit
clairement que :

"Par dérogation à l'article 20 de la loi n° 29-62
du 16 juin 1962, tel que modifié, les SOCIETES ne seront pas
requises de constituer une Société filiale de droit congolais".

3.  Question numéro 4 : Fiscalité

Votre paragraphe 4 comporte plusieurs questions que
j'aborderai successivement :

A - Dans le cadre des cessions envisagées, la Société
cessionnaire bénéficie des droits et obligations de la Société
cédante au titre de la Convention.

B - La référence faite par le sous-paragraphe 6.03.2
de la Convention à "l'impôt sur les sociétés" vise bien l'impôt
de ce nom prévu par le Code Général des Impôts du Congo et appli-
cable d'une manière générale à toutes les entreprises industriel-
les et commerciales établies au Congo et dotées de la personna-
lité morale. Le taux de cet    impôt est actuellement de 49 %.

C - Les versements faits par Amoco Congo Exploration
Company à Cities Service Congo Petroleum Corporation et par
Amoco Congo Petroleum Company à Braspetro consistant en une dis-
tribution hors du Congo de bénéfices nets d'impôts congolais
réalisés dans le cadre des travaux pétroliers, ces sommes sont
exonérées de tout impôt par application de ladite Convention.

D - Je vous rappelle les dispositions suivantes de
la Convention :

"8.01.1 - Le CONGO n'impose pas aux SOCIETES d'obliga-
tion de rapatriement du produit de la vente à l'ex-
portation d'HYDROCARBURES.

8.01.6 - Les SOCIETES pourront rapatrier du CONGO vers
les pays extérieurs à la zone franc les capitaux
provenant de ces pays investis au CONGO dans le
cadre des TRAVAUX PETROLIERS, et transférer dans les
mêmes conditions leurs produits éventuels. Le CONGO
garantit aux SOCIETES qu'elles obtiendront des moyens
de règlement sur les pays extérieurs à la zone franc
nécessaires à la réalisation des opérations visées à
la CONVENTION. "

...../...            GAR 00137

3. -

E - Veuillez vous référer à la réponse que j'ai appor-
tée sous la lettre A ci-dessus.

F - Je vous rappelle les dispositions du sous para-
graphe 6.03.4 de la Convention :

"6.03.4 - Afin de permettre le calcul de l'impôt
sur les Sociétés (...) chaque SOCIETE devra (...)
tenir une comptabilité conforme aux règles fixées
par le Code Général des Impôts".

Veuillez agréer, Messieurs, l'expression de ma
considération distinguée.

Pour le Ministre des Mines et de l'Energie,
le Ministre de l'Industrie et de la Pêche,

J.  I T A D I

cc : HYDRO-CONGO

GAR 00138



From  The Minister of Mines and Energy

29th June 1984

To      Amoco Congo Exploration Company
and     Amoco Congo Petroleum Company
        1 Stephen Street,
        Tottenham Court Road
        London W1 2AU
        UK

Dear Sirs,
        I have taken note of your letter of 29th June 1984 addressed to
the Societe Nationale de Recherches et d´Exploitation Petrolieres
"HYDRO-CONGO" in which you raise several questions which are the
province of Government departments and which the Chairman and
Managing Director of HYDRO-CONGO has submitted to me.

        It appears from this letter that your companies wish to assume as
assignees all or part of the percentage shares presently held by
Cities Service Congo Petroleum Corporation, Petrobras Internacional
S.A. — BRASPEIRO, IEDC (Congo) Ltd. and Kuwait Foreign Petroleum
Exploration Company K.S.C.

        The purpose of the present letter is to give you, where possible,
the answers you requested.

        1. Question Number 2:    Arbitration

        Paragraph 1.04 of the Convention of 25th May 1979 concerning the
"Marine 1" Permit (The "Convention") expressly refers to the Permit
in question, which is also referred to in Appendix 1 to the said
Convention. However, this constitutes a unilateral administrative
act adopted prior to the Convention coming into force and the
validity of it cannot be affected by an arbitration decision.

        2. Question Number 3:    Mining Code

        It seems clear to me from the provisions of the Convention that
the rights and obligations of the parties to this Convention with
regard to mining questions remain governed by law No. 35-65 of 12th
August 1965.

        In so far as the second part of your question is concerned,
Article 19.03, in fine, of the Convention, clearly lays down that:

        "Notwithstanding Article 20 of law 29-62 of 16th June 1962, as
amended, the COMPANIES will not be required to incorporate a
subsidiary company under Congolese law".



3. Question Number 4: Tax

Your paragraph 4 contains several questions which I will deal with in turn:

A – Under the assignments envisaged, the assignee company enjoys the rights and obligations of the assigning company by virtue of the Convention.

B – The reference made by sub-paragraph 6.03.2 of the Convention to "the company tax" clearly refers to the tax of this name laid down by the General Code of Taxes of the Congo and applicable, in a general manner, to all industrial and commercial enterprises established in the Congo with a legal entity. The rate of this tax is at present 49%.

C – The payments made by Amoco Congo Exploration Company to Cities Service Congo Petroleum Corporation and by Amoco Congo Petroleum Company to Braspetro consisting of a distribution made outside the Congo of profits net of Congolese taxes realized within the framework of oil works are exempted from any tax by application of the said Convention.

D – I would draw your attention to the following provisions of the Convention:

"8.01.1 – The CONGO does not impose on the COMPANIES the obligation of repatriating the proceeds of the sale of HYDROCARBON exports.

"8.01.6 – The COMPANIES may repatriate from the CONGO to countries outside the Franc zone capital originating from these countries invested in the CONGO under the framework of OIL WORKS, and transfer under the same conditions their possible proceeds. The CONGO guarantees the COMPANIES that they will obtain the means of settlement in countries outside the Franc zone necessary for the realization of the transactions referred to in the CONVENTION."

E – Please refer to the answer I made to A above.

F – I would draw your attention to the provisions of sub-paragraph 6.03.4 of the Convention:

"6.03.4 – in order to permit the calculation of the company tax (...) each COMPANY will (...) keep accounts in accordance with the rules laid down by the General Code of Taxes."

Yours sincerely

For the Minister of Mines and Energy
The Minister of Industry and Fisheries

J. I T A D I

cc: HYDRO-CONGO

GAR 00140



██████████ (hereinafter the "Congo") represented for the purposes hereof by Mr. Nguila MOUNGOUNGA NKOMBO its Minister of the Economy, Finances and Planning

on the one hand,

and

████████████████████████████ Pétrolière "Hydro-Congo" (hereinafter "Hydro-Congo") a national company with registered offices at Brazzaville, Republic of the Congo, represented by Mr. BERNARD OKIORINA, its General Manager,

██████████████ (hereinafter "NOMECO") a legally constituted company with registered offices at Pointe-Noire, Republic of the Congo, represented by Mr. K. Charsinsky, its General manager,



Kuwait Foreign Petroleum Exploration Co. Inc., a legally constituted company under the name of Kuwait with registered offices in Kuwait at P.O. Box 5291, Safat 13053, Kuwait, represented by Mr. MAHMOUD A. AL RAHMANI, its President and General Manager, on behalf of KUFPEC (Congo) Limited (hereinafter "KUFPEC"),

██████████████████ (hereinafter "NUEVO"), a legally constituted Company with registered offices at Houston, Texas, represented by Mr. Michael D. Watford, its President

█████████████████████████ "COMPANIES", or individually as

on the other hand,

In this respect the Republic of the Congo on the one hand, Hydro-Congo, NOMECO, KUFPEC and NUEVO on the other hand, are jointly referred to hereinafter as the "Parties" or individually as the "Party".

PREAMBLE:

Whereas the Companies' predecessors in right entered into a Convention Marine I dated 25 May 1979, hereinafter referred to as the "Convention", which defines in its Article 7.01 the calculation basis of the proportional mining royalty.

**GAR 00141**



The Parties having noted their differing opinions in the interpretation of Article 7.01 of the Convention, have agreed to clarify and harmonize its wording.

IT HAS BEEN AGREED AS FOLLOWS:

<u>Article 1</u> **Definitions**

The definitions contained in the Convention will apply to this Amendment, except if the context of this Amendment indicates clearly the contrary.



The following are not deductible from the calculation basis of the proportional mining royalty: all costs other than those set forth in the above paragraph, notably the charges of depreciation and financial costs relative to the investments.

The proportional mining royalty will not be levied on quantities of hydrocarbons utilized in petroleum operations or lost."

<u>Article 3</u> **Other Terms**

Consequently, all other terms of the Convention and its amendments remain unchanged and fully applicable.

<u>Article 4</u> **Effective Date**

This Amendment shall be effective retroactive to January 1, 1994 and shall be approved by legislation in accordance with required form.

Executed in Paris, in five (5)
originals on January 25, 1997

GAR 00142



For the Republic of the
Congo, the Minister of the
Economy, Finances and
Planning

For the Société Nationale de
Recherches et d'Exploration
Pétrolières "Hydro-Congo",
the President and General Manager

_____
Nguila MOUNGOUNGA NKOMBO

_____
Bernard OKIORINA


For CMS NOMECO Congo,
the General Manager

For The NUEVO Congo Company,
the President

_____
K. Charsinsky

_____
Michael D. Watford


For Kuwait Foreign Petroleum
Exploration Co. k.s.c. on behalf
of KUFPEC (Congo) Limited,
the President and General Manager

_____
Mahmoud A. AL-RAHMANI

GAR 00143

# EXHIBIT 2

# FRENCH

Received 12/06/2002 10:18AM in 05:50 on line (10) for GLO607 * Pg 1/11

DEC-06-2002  11:51      ANADARKO CONGO COMPANY         281 261 0192    P.01/11

## AVENANT I A L'ACCORD D'ENLEVEMENT

### ENTRE LES SOUSSIGNES :

La Société Nationale des Pétroles du Congo (« SNPC »), venue aux droits de la Société Nationale de Recherche et d'Exploitation Pétrolières (Hydro-Congo), représentée par son Président Directeur Général, Mr. Bruno J.R. ITOUA,

D'une part,

### ET :

D'autre part,

Les compagnies CMS NOMECO Congo, Inc, venue aux droits de Walter International, Inc., elle même venue aux droits de Amoco Congo Exploration) ("CMS Congo"), représentée par son Président Directeur Général, Mr. Jon M. Ozmargut,

The Nuevo Congo Company, venue aux droits de Amoco Congo Petroleum Co. ("Nuevo Congo"), représenté par son Vice-Président Senior, Mr. Robert M. King,

et NUEVO Congo Ltd, venue aux droits de Kufpec (Congo) Limited) ("Nuevo Ltd."), représentée par son Vice-Président Senior, Mr. Robert M. King,

ensemble désignées aux termes des présentes par les "Parties" et individuellement par la "Partie". CMS Congo, Nuevo Congo and Nuevo Ltd. étant parfois collectivement désignés aux termes des présentes comme les "Compagnies Pétrolières Internationales" ou "CPIs".

### IL A ETE PREALABLEMENT EXPOSE CE QUI SUIT:

1. Par décret n° 79/253 du 16 Mai 1979, le Gouvernement de la République du Congo ("le Gouvernement") a attribué à la Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO), un Permis d'Exploration dénommé Marine I.

2. Le 25 Mai 1979, les prédécesseurs aux Parties actuelles et le Gouvernement sont partie à une Convention relative à la zone Marine I (la "Convention");

EXHIBIT
Garnishee 5
129-2 CJ

AJ-Cap
v. The Republic of Congo, et al.
A-01-CA-331-SS
Plaintiff Exhibit 12

GAR 03426

## EXHIBIT 2



Received 12/06/2002 10:18AM in 05:50 on line [10] for GL0607 * Pg 2/11

DEC-06-2002  11:51       ANADARKO CONGO COMPANY                    281 261 0192      P.02/11

3.  Le 25 Mai 1979, les prédécesseurs aux Parties actuelles sont partie à un contrat d'Association (le "JOA"), régissant les opérations pétrolières de la zone Marine I;

4.  Le 15 mars 1989, le Gouvernement a, par Décret n° 89/211, attribué à la Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO), le Gisement dit Yombo-Masseko-Youbi, la zone en cours de production couverte par ledit permis étant désignée aux termes des présentes comme le "Gisement Yombo";

5.  En Juin 1991, les prédécesseurs aux Parties actuelles avaient commencé la production de pétrole brut à partir du Gisement Yombo, après la mise en service des installations pétrolières marines, ladite production devant être acheminée au moyen d'un réseau de pipeline sous-marine jusqu'à un réservoir central offshore lequel est un navire de stockage flottant destiné à la production, au stockage et au déchargement (ci-après désigné le "Navire de Stockage");

6.  Le 20 Septembre 1991, les prédécesseurs aux Parties ont conclu un Accord d'Enlèvement définissant les procédures, les priorités et les règles applicables aux fins de mettre en oeuvre l'enlèvement méthodique et efficace du pétrole brut à partir du Navire de Stockage jusqu'au Navire d'Enlèvement;

7.  Le Gouvernement a pris les décrets suivants (ensemble désignés aux termes des présentes "Décrets") concernant la SNPC:

   ▪ Le Décret n° 99-51 du 9 Avril 1999 portant transfert à la SNPC de l'ensemble des actifs pétroliers et des droits directs et indirects, de quelque nature que ce soit, détenus initialement par la société Hydro-Congo, dans toutes les activités relatives à la recherche, à l'exploitation, au traitement et à la transformation des hydrocarbures et des substances dérivées ou connexes.

   ▪ Le Décret n° 99-171 du 18 Septembre 1999 portant transfert des actifs, des droits et des participations détenus directement par l'Etat sur les permis et les contrats pétroliers à la société nationale des pétroles du Congo;

8.  Le 14 Octobre 1991, la République du Congo et National Union Fire Insurance Company de Pittsburgh et American International Group ont conclu un Accord de Règlement (l'"Accord de Règlement") en résolution du litige intitulé National Union Fire Insurance Company de Pittsburgh ("NUFI") e/. la République Populaire du Congo, Cause N°. 91 C 3172, alors en attente de règlement à la Cour de Justice américaine du district de l'Illinois (le "Litige NUFI").

9.  Le 3 Décembre 1991, le Tribunal dans le Litige NUFI , en conformité avec les termes de l'Accord de Règlement, émis un Amendement à l'Arrêté sur Chiffre d'Affaires (l'"Arrêté sur Chiffre d'Affaires") ordonnant à Amoco Congo Exploration Company et Amoco Congo Production Company (devenus CMS NOMECO Congo, Inc. et The Nuevo Congo Company) de payer à NUFI, 50% de la redevance minière (la "Redevance") tel que ce

2

GAR 03427

Received 12/06/2002 10:18AM in 05:50 on line (10) for GL0607 * Pg 3/11
DEC-06-2002   11:52        ANADARKO CONGO COMPANY                    281 261 0192      P.03/11

terme est défini par l'Arrêté sur Chiffre d'Affaires et l'Accord de Règlement) due à la
République du Congo en vertu de la Convention et du JOA, intérêts compris.

10.  Le 9 Décembre 1991, le Secrétaire d'Etat au Budget de la République du Congo
ordonnait parallèlement à Amoco Congo Exploration Company et Amoco Congo
Production Company de payer à NUFI 50% de la redevance minière due à la République
du Congo en vertu de la Convention et du JOA. Depuis lors, CMS NOMECO Congo, Inc
et The NUEVO Congo Company ont conséquemment payé cinquante pour cent (50%) de
la redevance minière du Gouvernement à NUFI.

11.  Le 30 Octobre 1999, la SNPC notifia CMS Congo, l'Opérateur du Gisement Yombo, en
vertu des dispositions des Décrets, de la Convention et du JOA, son intention de
commercialiser elle-même sa quote-part de part de pétrole brut disponible du Gisement
Yombo. Les Parties ont tenu des réunions informelles et se sont accordées sur le timing et
les méthodes permettant à la SNPC d'enlever sa quote-part de pétrole brut en nature. Par
courrier en date du 26 Novembre 1999, CMS confirma ces arrangements.

Il est rappelé, à titre d'information, que les procédures correspondant à ces arrangements
et reprises à l'article 1.1 ci-dessous ont été mises en pratique depuis l'enlèvement no 82.
Les détails des enlèvements depuis l'enlèvement 82 jusqu'à la date d'effet du présent
Accord ainsi que les états courants des soldes de Sur/Sous-Enlèvement de la SNPC et des
CPIs sont joints en Annexe et incorporés au présent Accord.

12.  Les Parties souhaitent maintenant formaliser leur accord de principe sur les procédures et
les conditions par lesquelles la SNPC exercera ses droits d'enlever et de commercialiser
séparément sa quote-part de pétrole brut disponible en nature.

Le présent Avenant expose complètement les devoirs et obligations en ce qui concerne
ses droits d'enlever sa quote-part de pétrole brut en nature et, annule et remplace la lettre
du 26 Novembre 1999.

Les termes en lettres capitales doivent avoir la signification qui leur est conférée par les
définitions aux termes de cet Avenant, de l'Accord d'Enlèvement, de la Convention ou du JOA.

En conséquence, les Parties acceptent les termes et conditions suivants, qui amendent les termes
et conditions de l'Accord d'Enlèvement, en ses dispositions concernées.

## ARTICLE 1 - APPELS D'ENLEVEMENT

Les procédures définies par les Parties au cours de leurs réunions de Novembre 1999 sont
adoptées comme il est dit ci-après.

1.1  Les CPIs auront initialement la priorité d'appeler et enlèveront tout le Pétrole Disponible
tandis que la SNPC ne fera aucun appel d'enlèvement du Pétrole Disponible mais,
progressivement, se constituera un solde de Sous-Enlèvement. La SNPC fera l'appel

3

GAR 03428

Received 12/06/2002 10:18AM in 05:50 on line (10) for GL0607 * Pg 4/11
DEC-06-2002  11:53        ANADARKO CONGO COMPANY              281 261 0192   P.04/11

d'enlèvement du Pétrole Disponible et enlèvera en nature et commercialisera séparément l'enlèvement succédant celui au cours duquel son solde de Sous-Enlèvement SNPC dépassera 275,000 barils, soit la moitié de ce qui aura historiquement été le chargement moyen au cours des enlèvements au Terminal Yombo.

Aux termes des présentes, l'expression "Pétrole Disponible" désigne le brut qui a été traité et stocké dans le Navire de Stockage à l'exclusion des quantités de pétrole brut traité et utilisé par l'Opérateur pour les opérations de production et de maintien des ballasts du Navire de Stockage, et des stocks de Pétrole Hydraté (défini ci-dessous).

1.2    En reprenant ses enlèvements, la part de solde de Sur-Enlèvement de la SNPC sera égale à sa part proportionnelle de solde de Sous-Enlèvement résultant de ses précédents enlèvements, diminué du nombre de barils représentant ses droits pour le présent enlèvement.

1.3    Les CPIs se continueront un solde de Sous-Enlèvement correspondant. Par la suite, les CPIs feront l'appel d'enlèvement et enlèveront à nouveau tout le Pétrole Disponible jusqu'à ce que le solde de Sous-Enlèvement de la SNPC atteigne à nouveau les 275,000 barils, quantité mettant la SNPC en position de prendre le prochain enlèvement.

1.4    (1) Dans les dix jours qui suivent la fin de chaque mois, l'Opérateur fournira aux parties les informations ci-après :

(a) Production totale du mois,
(b) Pour chaque partie,
  1. La quote-part de pétrole disponible
  2. La production brute,
  3. L'autoconsommation.
(c) Quantité de pétrole de remboursement,
(d) Position de stock de chaque partie à la fin du mois.

(2) Dans les quinze (15) jours à compter de chaque enlèvement, l'Opérateur communiquera aux parties les états courants des soldes de Sous-Enlèvement ou de Sur-Enlèvement.

## ARTICLE 2    AVIS ET DEFAUT D'ENLEVEMENT

2.1    Nonobstant les dispositions de l'Article 2 de l'Accord d'Enlèvement, chaque Partie devra donner 25 jours de préavis aux autres Parties de son intention d'effectuer un enlèvement de pétrole brut et préciser une Date Intervalle de 5 jours.

Cette Partie devra alors désigner un Navire d'Enlèvement à 14 jours de la Date Intervalle et donner les 3 jours de Date Intervalle obligatoire conformément aux dispositions de l'Article 2.6 de l'Accord d'Enlèvement.

4

GAR 03429

Received 12/06/2002 10:18AM in 05:50 on line (10) for GL0607 * Pg 5/11
DEC-06-2002    11:53    ANADARKO CONGO COMPANY    281 261 0192    P.05/11

La Partie ayant la charge d'enlever devra fournir l'effort de communiquer à l'Opérateur la date précise de commencement de l'Enlèvement afin de permettre à l'Opérateur de faire les arrangements relatifs aux remorqueurs et au personnel. Les Navires d'Enlèvement devront conduire les opérations d'enlèvement en stricte conformité avec les règlements portuaires du Terminal Pétrolier de Yombo, amendements compris.

En vertu de l'Article 2.6 de l'Accord d'Enlèvement, la Partie ayant la charge d'enlever doit fournir toute information que l'Opérateur pourrait raisonnablement demander. En moins de 24 heures après la réception de l'appel d'enlèvement et des informations obligatoires, l'Opérateur informera la Partie concernée si le Navire d'Enlèvement proposé est acceptable ou non.

Si le Navire n'est pas acceptable, la Partie doit désigner un Navire d'Enlèvement de rechange dans un délai de 72 heures.

2.2    Si cet avis n'est pas donné à temps, le Navire d'Enlèvement n'est pas désigné à temps, ou si le chargement n'a pas lieu comme programmé, alors, conformément aux dispositions de l'Article 5 de l'Accord d'Enlèvement, l'Opérateur pourra faire d'autres arrangements pour procéder à l'enlèvement et à la commercialisation du pétrole brut en conformité avec les dispositions de l'article 5.2 de l'Accord d'enlèvement.

La Partie ainsi en défaut d'enlèvement supportera en conséquence les coûts et les frais associés au chargement réellement encourus, tels que ceux liés aux remorqueurs, au personnel, aux amarrages ou pilotage, aux inspecteurs gouvernementaux, au temps d'accostage, sans que cette liste n'ait un caractère limitatif.

## ARTICLE 3    TRAITEMENT DE L'HUILE

La procédure de traitement du pétrole brut Yombo à bord du Navire de Stockage pour le rendre commercialisable comme pétrole brut N°.6, engendre des quantités résiduelles de pétrole brut ayant une teneur élevée en soufre, en eau et en sédiments, et doit être commercialisé séparément du Yombo N°. 6 (ci-après "Pétrole Hydraté"). Les Parties conviennent de ce que CMS Congo en tant qu'Opérateur se chargera de l'enlèvement et de la commercialisation du Pétrole Hydraté, et reversera aux Parties les produits de cette vente y compris la part de redevance revenant à NUFL.

## ARTICLE 4    ACCORDS DE COMMERCIALISATION

4.1    Les Parties acceptent que pour le calcul de la redevance minière, y compris la part de redevance revenant à NUFL, le prix effectif de l'Opérateur issu du contrat de vente en vigueur entre l'Opérateur et l'Acheteur servira de base de calcul aussi longtemps qu'un tel contrat garantira les ventes à un prix concurrentiel et à une entité non affiliée.

En cas de ventes à une filiale de l'Opérateur, la redevance minière sera calculée sur la base d'un prix moyen des ventes internationales identiques de pétrole brut de qualité, de

5

GAR 03439

Received 12/06/2002 10:18AM in 05:58 on line [10] for GL0607 * Pg 6/11

DEC-06-2002   11:54          ANADARKO CONGO COMPANY                      281 261 8192      P.06/11

gravité et de coûts de transport équivalents. Le calcul de la redevance stipulé aux termes des présentes remplacent les provisions de l'Annexe II de la Convention.

4.2  Les quantités de pétrole à enlever en nature, enlevées conformément aux stipulations du présent Accord d'Enlèvement tel qu'amendé et, commercialisées séparément par la SNPC ("Droits à Huile de la SNPC") désignent (I) la quote-part de pétrole brut libre du Gouvernement et/ou de la SNPC aux termes de l'Articles 9.02 et (II) de la redevance minière enlevée en nature aux termes de l'article 4.11 du JOA et de leur droit à la redevance minière conformément aux Articles 5.03 et 7 de la Convention telle qu'amendée, déduction faite de la part de la redevance revenant à NUFI jusqu'à la liquidation de la dette correspondante.

4.3  Pour les enlèvements SNPC, les CPIs paieront cash la part de la redevance revenant à NUFI sur la base du volume enlevé par la SNPC. Ces avances au titre de paiement de la redevance revenant à NUFI seront imputées au compte avance de la SNPC conformément aux dispositions de l'Article 9 du JOA et seront récupérées par les CPIs sur les ventes futures d'hydrocarbures conformément aux dispositions de l'Article 9.02 du JOA. Les versements à NUFI continueront à courir jusqu'au remboursement des sommes dues aux termes de l'Accord de Règlement et de l'Arrêté sur le Chiffre d'Affaires.

## ARTICLE 5    COUTS ET FRAIS ASSOCIES

5.1  La SNPC supportera certains coûts associés à ses enlèvements.

Ces coûts comprennent, et ce de manière non exhaustive, ceux liés aux remorqueurs, personnel, aux opérations d'arrimage et aux frais de transport en terminal (globalement désignés aux termes des présentes "Coûts d'Enlèvement").

Si la SNPC n'acquitte pas ses coûts d'enlèvement, les Parties conviennent de ce que les CPIs supportent et payent les Coûts d'Enlèvement de la SNPC, sous réserve de remboursement sous la forme de livraison et commercialisation d'une fraction des Droits à Huile de la SNPC, représentant l'équivalent économique des Coûts d'Enlèvement de la SNPC supportés par les CPIs.

5.2  En sus de la conservation des dossiers requis par l'Accord d'Enlèvement, l'Opérateur créera et conservera dans ses livres un compte (« le compte Sur et Sous Enlèvements») dans lequel les Coûts d'Enlèvements de la SNPC payés par les CPIs pour le compte de la SNPC au titre de ses enlèvements seront enregistrés comme dettes de la SNPC vis à vis des CPIs.

La dette de la SNPC vis à vis des CPIs sera remboursée sur la quote-part de la production de pétrole brut revenant à la SNPC.

6

GAR 03431

Received 12/06/2002 10:18AM in 05:50 on line [10] for OL0607 * Pg 7/11
DEC-06-2002    11:54    ANADARKO CONGO COMPANY    281 261 0192    P.07/11

Au prochain enlèvement succédant celui de la SNPC, les CPIs enlèveront et commercialiseront ce nombre de barils au prix contractuel suffisant pour rembourser leur créance sur la SNPC.

L'Opérateur conservera un dossier dans ses livres afin de comptabiliser les barils équivalents enlevés et commercialisés par les CPIs pour couvrir les Coûts d'Enlèvement de la SNPC. Les barils ainsi vendus diminueront les droits au Pétrole Disponible de la SNPC ainsi que sa Position de Stock comme stipulés dans l'Article 1.4 ci-dessus.

En conformité avec la procédure comptable du JOA, le présent Avenant ne modifie ni ne restreint les droits de la SNPC en tant que non-Opérateur, à faire vérifier les états tenus dans ces livres.

5.3    La SNPC pourra choisir de payer ses coûts d'enlèvement et faire ses arrangements pour les remorqueurs, personnel, les amarrages ou pilonges, les inspecteurs gouvernementaux, etc..., en donnant à l'Opérateur par écrit, un préavis de 30 jours avant l'enlèvement.

Cependant, toutes sommes dues par la SNPC enregistrées au compte Sur/Sous dans les livres de l'Opérateur, au titre de ses précédents enlèvements seront payés conformément aux dispositions de l'article 5.2 ci-dessus.

En cas de défaut de paiement par la SNPC de ses coûts d'enlèvement après avoir communiqué son intention de les supporter, les CPIs, par conséquent, acquitteront lesdits coûts, à charge pour l'Opérateur d'inscrire les montants correspondants au compte Sur/Sous Enlèvement de la SNPC. Ces montants seront remboursés suivant les dispositions du présent article 5.

5.4    La SNPC fera son affaire de la Taxe Maritime associée à ses propres enlèvements. En conséquence, les CPIs sont affranchies de toute responsabilité au regard des obligations d'acquittement de la Taxe Maritime relative aux enlèvements réalisés par la SNPC.

## ARTICLE 6    APPROBATIONS

A l'exception des amendements apportés aux termes des présentes, les Parties réaffirment et ratifient l'Accord d'Enlèvement y compris les stipulations du JOA qui y sont incorporées ou citées en référence, et acceptent d'y être liées et de se conformer à ses clauses y compris, sans se limiter aux, dispositions relatives aux enlèvements et livraisons, aux états fournis par l'Opérateur, au démarrage, au chargement et à l'amarrage, aux mesurages, au risque de perte, au règlement définitif, et autres.

7

GAR 03432



Received 12/06/2002 10:18AM in 05:50 on line (10) for GL0607 * Pg 9/11
DEC-06-2002   11:55        ANADARKO CONGO COMPANY                    281 261 8192    P.09/11



OVER/(UNDER) LIFT CALCULATION
YOMBO FIELD LIFTING

| DATE | LIFTING | TOTAL QUANTITY SOLD | DESCRIPTION | FOREIGN PARTNERS ACTIVITY | FOREIGN PARTNERS BALANCE | SNPC ACTIVITY | SNPC BALANCE |
|---|---|---|---|---|---|---|---|

*(Table data is too faded/illegible to transcribe reliably.)*

GAR 03434

# ENGLISH

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 1/12
DEC-06-2002  12:58        ANADARKO CONGO COMPANY                    281 261 0192    P.01/12

# AMENDMENT TO LIFTING AGREEMENT

## BETWEEN THE UNDERSIGNED :

The Société Nationale des Pétroles du Congo ("SNPC"), successor to the Société Nationale de Recherche et d'Exploitation Pétrolières (Hydro-Congo), represented by its Chairman, Mr. Bruno J.R. ITOUA.

On one part,

## AND:

On the other hand,

The corporations CMS NOMECO Congo, Inc. successor to Walter International Inc., itself successor to Amoco Congo Exploration ("CMS Congo"), represented by its Chairman, Mr. Jon Ozturgut.

The Nuevo Congo Company successor to Amoco Congo Petroleum Co. ("Nuevo Congo"), represented by its Senior Vice-President, Mr. Robert M. King.

and NUEVO Congo Ltd successor to Kafpec (Congo) Limited) ("Nuevo Ltd."), represented by its Senior Vice-President, Mr. Robert M. King.

jointly referred to hereinafter as the "Parties" and individually as the "Party", with CMS Congo, Nuevo Congo and Nuevo Ltd. being sometimes hereinafter collectively referred to as the "International Oil Companies" or "IOC's".

## WHEREAS:

1.  Par the decree № 79/253 of the 16th of May 1979, the Government of the Republic of Congo ("the Government") has granted to the Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO) an Exploration Permit known as "Marine I".

2.  On May 25, 1979 the predecessors to the present Parties and the Government executed a Convention relating to the Marine I area (the "Convention");

1

GAR 03437

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 2/12
DEC-06-2002  12:58          ANADARKO CONGO COMPANY                    281 261 0192     P.02/12

3.   On May 25, 1979, the predecessors to the present Parties executed an Association Contract (the "IOA"), regulating the petroleum operations on the Marine I area;

4.   On the 15th of March 1989, the Government, via Decree № 89/211, granted to the Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO), the Field known as the Yombo-Masseko-Youbi, the currently productive area covered by the said permit being hereinafter referred as "Yombo Field";

5.   In June 1991, the predecessors to the Parties commenced production of crude oil from the Yombo Field, after the commissioning of the offshore installations, the said production having to be routed through a network of subsea pipelines up to a central offshore tank that is a floating storage vessel intended to the production, storage and unloading of the said crude (hereinafter referred as the "Storage Vessel");

6.   On September 20, 1991 the predecessors to the Parties entered into a Lifting Agreement which defined the procedure, priorities and rules applicable in order to implement the methodical and efficient lifting of the crude oil from the Storage Vessel onto the Lifting Vessel;

7.   The Government has enacted the following decrees (hereinafter collectively referred to as the "Decrees") regarding SNPC;

   • Decree No 99-51 dated April 9, 1999 transferred to SNPC all the petroleum assets and direct and indirect taxes of whatever kind, formerly held by Hydro-Congo , in all the activities relating to the exploration, the exploitation, the processing and transformation of the hydrocarbons and the derivative or related substances.

   • Decree No 99-171 dated September 18, 1999 transferred to the Société Nationale des Pétroles du Congo the assets, rights and participating interests held directly by the Government on the permits and petroleum contracts;

8.   On October 14, 1991, The Republic of Congo and the National Union Fire Insurance Company of Pittsburgh and the American International Group entered into a Settlement Agreement (the "Settlement Agreement") settling a law suit entitled National Union Fire Insurance Company of Pittsburgh ("NUFI") vs. The People's Republic of Congo, Case № 91 C 3172, then pending in the United States District Court for the Northern District of Illinois (the "NUFI Litigation").

9.   On December 5, 1991, the Tribunal in the NUFI Litigation, in accordance with the terms of the Settlement Agreement, has issued an Amended Turnover Order (the "Turnover Order") directing Amoco Congo Exploration Company and Amoco Congo Production Company (since renamed CMS NOMECO Congo, Inc. and The Nuevo Congo Company) to pay to NUFI 50% of the mining royalty (the "Royalty ") as that term is defined in the

2

GAR 03438

Received 12/06/2002 11:17AM in 05134 on line [7] for GL0607 * Pg 3/12
DEC-06-2002  12:51     ANADARKO CONGO COMPANY                291 261 0192    P.03/12

Turnover Order and Settlement Agreement, due to the Republic of Congo, under the Convention and JOA, interests included.

10. On December 9, 1991, the Secretary of State for the Budget of the Republic of Congo similarly directed Amoco Congo Exploration Company and Amoco Congo Production Company to pay 50% of the mining royalty due to the Republic of Congo under the Convention and JOA, to NUPL. Consequently CMS NOMECO Congo, Inc and The NUEVO Congo Company have since paid fifty percent (50%) of the Government's share of corresponding mining royalty to NUPL.

11. On October 30, 1999, SNPC was notifying CMS Congo, Operator of Yombo Field, that in accordance with the provisions of the Decrees and the Convention and JOA, it intended to market itself its share of crude oil available from Yombo Field. The Parties met informally and agreed in principle to the timing and methods by which SNPC would take its crude oil entitlement in kind. CMS confirmed these understandings by a letter dated November 26, 1999.

For your information, it is reminded that the procedures concerning these arrangements and repeated in the article 1.1 hereunder have been applied since the lifting No E2. The details of the lifting since the lifting No E2 until the effective date of the present Agreement, as well as the actual balance states of Over-Under-Lifting for the SNPC and the IOC's are enclosed in the Annex 1 and incorporated in the present Agreement.

12. The Parties now wish to formalize their agreement in principle on the procedures and conditions by which SNPC will exercise its right to take in kind and separately market its share of crude oil available in kind.

This Amendment completely explain the duties and obligations regarding its rights to take its own share of crude oil in kind and, cancel and replace the letter of November 26, 1999.

Capitalized terms shall have the meaning ascribed to them in definitions within this Amendment, the Lifting Agreement, the Convention or JOA.

NOW THEREFORE the Parties agree to the following terms and conditions which hereby amend the terms and conditions of the Lifting Agreement into these relevant provisions.

ARTICLE 1 - LIFTING NOMINATIONS

The procedures defined by the Parties during their meetings of the month of November 1999 are adopted as said hereafter:

1.1 The IOC's will initially have priority to nominate and lift all the Available Oil whereas the SNPC will nominate no Available Oil but will progressively accrue a resulting

3

GAR 03439

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 4/12
DEC-06-2002  12:51      ANADARKO CONGO COMPANY                    281 261 0192    P.04/12

Underlift balance. The SNPC will nominate the Available Oil and will take in kind and separately market the next lifting after the lifting at which SNPC's Underlift balance exceeds 275,000 barrels that is to say one-half of what historically has been an average load during liftings at the Yombo Terminal.

As used herein, the term "Available Oil" shall mean all the oil that has been processed and is in storage on the Storage Vessel except for quantities of such crude oil processed and used by the Operator for production operations and to maintain the ballast of the Storage Vessel as well as any stocks of Wet Crude (defined herein below).

1.2    As a result of its lifting, SNPC will incur an Overlift balance equal to the number of barrels actually lifted reduced by its cumulative Underlift balance resulting from its previous lifting, reduced by the number of barrels representing its entitlement from this lifting.

1.3    IOC's will build-up a corresponding Underlift balance. Thereafter, the IOC's will again nominate and lift all the Available Oil until the SNPC's Underlift balance reaches again 275,000 barrels, a quantity bringing this one in the position to carry out the next lifting.

1.4    (1) Within the ten days following the end of each month, the Operator will provide the following information:

      (a)  Total production of the month.
      (b)  For each party,
          1. The share of available oil,
          2. The crude production,
          3. The autoconsumption.
      (c)  Quantity of refunding oil,
      (d)  Position of each party's stock at the end of each month.

(2) Within fifteen (15) days from each lifting, the Operator will communicate to the parties the current accounts of the Underlift or Overlift balances.

## ARTICLE 2 - NOTICE AND FAILURE TO LIFT

2.1  Notwithstanding the provisions of Article 2 of the Lifting Agreement, each Party shall give 25 days advance notice to the other Parties of its intent to conduct a lifting of crude oil and specify a five-day Date Range.

This Party must then nominate a Lifting Vessel within 14 days of the start of the Date Range and give the required three-day Date Range as per the provisions of Article 2.6 of the Lifting Agreement.

4

GAR 03440

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 5/12
DEC-06-2002   12:52          ANADARKO CONGO COMPANY                       281 261 0192      P.05/12

The lifting Party shall make the effort to communicate to the Operator a precise date for commencement of the Lifting to allow the Operator to arrange for tugs and personnel. The Lifting Vessels shall conduct lifting operations in strict observance of the Yombo Oil Terminal regulations, including the amendments.

The lifting Party must provide, as per Article 2.6 of the Lifting Agreement, any information that the Operator could reasonably request. Within 24 hours of receiving the lifting nomination and the required information, the Operator will inform the relevant Party if the nominated Lifting Vessel is acceptable or not.

If the Vessel is not acceptable, the Party must nominate an alternate Lifting Vessel within 72 hours.

2.2    If this notice is not timely given, the Lifting Vessel is not timely nominated, or if a lifting is not carried out as scheduled, then, in accordance with the provisions of Article 5 of the Lifting Agreement, the Operator may make other arrangements to carry out the lifting and marketing of the crude oil, in accordance with the provisions of article 5.2 of the Lifting Agreement

The  Party that defaults lifting in this way will consequently bear all the costs and expenses really incurred, associated with the loading,   as those tied to tugboats, personnel, mooring or piloting, governmental inspectors, berthing time, without being a closed list.

## ARTICLE 3 -   OIL PROCESSING

The process of treating Yombo crude oil on the Storage Vessel to make it marketable as No. 6 crude oil, generates certain quantities of residual crude oil having high sulfur, sediment and water content and must be marketed separately from Yombo No. 6  (hereinafter "Wet Oil"). The Parties agree that CMS Congo as Operator shall be responsible for causing the Wet Oil to be lifted and marketed and it will pay back to the Parties the proceeds of this sale  including the Royalty share coming to NUFI.

## ARTICLE 4 -   MARKETING AGREEMENTS

4.1    The Parties agree that for the purpose of calculating mining royalty, including the NUFI Royalty , the actual price of the Operator, stemming from the current sales contract in force between the Operator and the Purchaser, shall be used as calculation base so long as such contract will guarantee competitive price and has a non affiliated entity.

In the event of sales to an affiliate of the Operator, the mining royalty will be calculated, based on the average price of identical international sales of crude oil of equivalent

GAR 03441

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 6/12
DEC-06-2002   12:52      ANADARKO CONGO COMPANY                    201 261 0192      P.06/12

quality and gravity and transportation costs. The royalty calculation provided herein shall be in lieu of the provisions of Annex II of the Convention.

4.2   Quantities of oil to be taken in kind, in accordance with this Lifting Agreement as amended and, separately marketed by the SNPC ("SNPC Oil Entitlement") will correspond (I) to the Government's and/or SNPC's share of crude oil that is free under Article 9.02 of the JOA and (II) mining royalty taken in kind under 4.11 of the JOA and their share entitlement to the mining royalty under Articles 5.03 and 7 of the Convention, as amended, decreased by the NUPI royalty share until the settlement of the corresponding debt

4.3   For the SNPC's liftings, the IOC's will pay cash the royalty share that comes to NUPI, on the volume base lifted by the SNPC. These advances as payment of the NUPI royalty share shall be charged into the SNPC advance account, in accordance with the Article 9 of the JOA and shall be recouped by the IOC's on the future sales of hydrocarbons in accordance with the Article 9.02 of the JOA. The payments to the NUPI will continue until the refund of the amounts due under the Settlement Agreement and Turnover Order.

## ARTICLE 5 - LIFTING AND RELATED COSTS

5.1   The SNPC will incur certain costs associated with its liftings.

Those costs include, and are not limited to those tied to the tugs, the personnel, the mooring operations and the costs of transportation to the terminal (collectively referred hereinafter as "Lifting Costs").

If the SNPC does not pay its lifting costs, the Parties agree that the IOC's will bear and pay SNPC's Lifting Costs, subject to reimbursement in the form of the receipt and marketing of a portion of SNPC's Oil Entitlement, representing the economic equivalent of the said Lifting Costs of the SNPC borne by the IOC's.

5.2   In addition to maintaining records required under the Lifting Agreement, the Operator shall create and maintain on its books an accounting ("Over and Under Account") in which SNPC's Lifting Costs paid by the IOC's on behalf of the SNPC on its liftings shall be registered as debts from the SNPC to IOC's.

The debt from SNPC to the IOC's will be repaid out of SNPC's share of the production of crude oil.

6

GAR 03442

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 7/12
DEC-06-2002   12:53    ANADARKO CONGO COMPANY    201 261 0192    P.07/12

At the next lifting succeeding a SNPC lifting, the IOC's will lift and market this number of barrels at the contract price sufficient to reimburse their claim from the SNPC.

The Operator shall maintain a record in its accounting books in order to register the equivalent quantities of crude, lifted and sold by the IOC's to defray SNPC's Lifting Costs. The barrels sold this way will reduce SNPC's entitlement to Available Oil as well as its Stock Position as mentioned in Article 1.4 above.

In accordance with the accounting procedure of JOA, this Amendment does not change nor restrict the rights of the SNPC as a non-Operator, to have the statements kept in these books audited.

5.3   The SNPC may elect to pay its own lifting costs and make its own arrangements for tugs, personnel, mooring or piloting, governmental inspectors, etc. by giving 30 days written notice in advance of its lifting to the Operator.

However any amounts owed by SNPC entered in the Operator's Over and Under account for its previous liftings will be paid in accordance with the terms of Article 5.2 above.

In the event of non-payment by the SNPC of its lifting costs after having given notice of its intent to bear same, the IOC's will consequently pay such costs, subject for the Operator to enter the corresponding amounts to the Over and Under Account of the SNPC. These amounts will be refunded in accordance with the provisions of this article 5.

5.4   The SNPC will settle the Maritime Tax associated to its own liftings. Consequently, the IOC's will be discharged of any liability concerning the obligations to settle the Maritime Tax relating to liftings carried out by the SNPC.

## ARTICLE 6 - APPROVALS

Except for the amendments brought hereby, the Parties re-affirm and ratify the Lifting Agreement, including the provisions from the JOA which are incorporated or quoted as reference and agree to be bound by and to comply with its clauses including, without limitation, the provisions relating to liftings and deliveries, to the statements provided by the Operator, demurrage, loading and mooring, measurements, risk of loss, final settlement, and the like.

7

GAR 03443

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 8/12
DEC-06-2002   12:53     ANADARKO CONGO COMPANY       281 261 0192    P.08/12

This Amendment cancels and replaces the letter of November 26, 1999 mentioned in point 11 of the preamble, in its provisions contrary to the provisions hereby.

Made in Pointe Noire , on the 4th of July 2001

In as many copies as parties:

**Société Nationale des Pétroles du Congo**


By: _____
        Chairman

**CMS NOMECO Congo, Inc.**


By: _____
        Chairman

**The Nuevo Congo Company**


By: _____
        Senior Vice-President

**NUEVO Congo Ltd.**


By: _____
        Senior Vice-President

GAR 03444

Received 12/06/2002 11:17AM in 05:34 on line [7] for GLD607 * Pg 9/12
DEC-06-2002   12:54     ANADARKO CONGO COMPANY     281 261 0192    P.09/12

Le présent Avenant annule et remplace la lettre du 26 novembre 1999 visée au point 11 du préambule, en ses dispositions contraires aux présentes.

Fait à Pointe Noire le, 4 Juillet 2001.

En autant d'exemplaires originaux que de parties.

Société Nationale des Pétroles du Congo

Par:    _Bruno J.R. ITOUA_
       Président Directeur Général

CMS NOMECO Congo, Inc.

Par:                
       Président Directeur Général

The Nuevo Congo Company

Par:                
       Vice-Président Senior

NUEVO Congo Ltd.

Par:                
       Vice-Président Senior

8

GAR 03445



Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 10/12
DEC-06-2002  12:54    ANADARKO CONGO COMPANY    281 261 0192    P.10/12

## OVER/(UNDER) LIFT CALCULATION
## YOMBO FIELD LIFTING

The table content of this fax is too degraded to transcribe reliably.

GAR 03446


Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 11/12

DEC-06-2002  12:54    ANADARKO CONGO COMPANY    281 261 0192    P.11/12

GAR 03447

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 12/12
DEC-06-2002  12:55    ANADARKO CONGO COMPANY    281 261 0192    P.12/12

## SNPC OVER/UNDER CHECK

| ACTIVITIES | SALE | O/U SNPC | O/U SCK |
|---|---|---|---|
| LB 82 | 600,691 | 62,910 | |
| 82 royalty | | | 28,200 |
| LB 83 | 549,499 | 67,967 | |
| 83 royalty | | | 31,539 |
| LB 85 | 594,445 | 74,309 | |
| 85 royalty | | | 34,191 |
| 4 qtr 00 royalty | | | 18,791 |
| LB 86 (engr) | 602,859 | (423,089) | (104,491) |
| 86 royalty | | | 34,608 |
| LB 87 lift cost | 78,639 | | |
| LB 87 remainder | 434,308 | 64,276 | |
| 87 royalty | | | 29,785 |
| LB 88 | 538,784 | 66,734 | |
| 88 royalty | | | 31,085 |
| 1 qtr 00 royalty | | | 12,912 |
| LB 89 | 632,162 | 66,646 | |
| 89 royalty | | | 31,899 |
| LB 90 | 598,712 | 73,589 | |
| 90 royalty | | | 35,120 |
| 2 qtr 00 royalty | | | 10,185 |
| LB 91 | 604,743 | 63,093 | |
| 91 royalty | | | 28,955 |
| LB 92 (engr) | 545,222 | (282,405) | (214,984) |
| 92 royalty | | | 31,980 |
| LB 93 lift cost | 67,639 | | |
| LB 93 remainder | 456,990 | 80,449 | |
| 93 royalty | | | 32,400 |
| 3 qtr 00 royalty | | | 17,249 |
| LB 94 | 656,182 | 82,020 | |
| 94 royalty | | | 34,488 |
| 4 qtr 00 royalty | | | 9,791 |
| 2000 final roy | | | (199) |
| Tax machines (LB 70-95) | 100,046 | | (100,046) |
| LB 96 remainder | 600,363 | 82,535 | |
| 96 royalty | | | 38,095 |
| 1 qtr 01 royalty | | | 6,885 |
| LB 96 | 600,361 | 78,044 | |
| Tax machines (LB 96) | 4,980 | | (4,980) |
| 96 royalty | | | 35,909 |
| LB 97 Sedra | 600,670 | 78,094 | |
| Tax machines (LB 97) Sedra | 4,318 | | (4,318) |
| 97 royalty Sedra | | | 36,298 |
| | 197,781 | 136,761 | 326,813 Total Over/Under |

GAR 03448

# EXHIBIT 3

RÉPERTOIRE    N° 1131 /

DU 28 ...CE.BRE. 2004.-

REPUBLIQUE DU CONGO

AU NOM DU PEUPLE CONGOLAIS

- R'D O N N A N C E -

GROSSE

A F F A I R E :

REPUBLIQUE DU CONGO
MINISTÈRE DES HYDROCARBURES, Département du
KOUILOU (Me MISSIE)

C O N T R E :

C M S NOMECO INT CONGO

OBJET :    REFERE D'HEURE A ASURE...

L'AN DEUX MIL QUATRE ;

ET, LE VINGT HUIT DU MOIS DE DECEMBRE ;

PAR DEVANT NOUS, Norbert ELENGA, Président du
Tribunal de Grande Instance de Pointe-Noire, tenant audience publi-
que des référés en notre Cabinet sis au Palais de Justice de cette
ville ;

A    C O M P A R U

Le République du Congo, Ministère des Hydrocarbu-
res agissant aux dilligences de son représentant légal ;

Qu'elle a été saisie par les créanciers américain
de l'Etat Congolais, la société NOMECO qui devait lui livrer une
cargaison de 550.000 barils de pétrole, refuse de s'exécuter au mo-
tif que cette cargaison fait l'objet d'une saisie suivant la déci-
sion du Tribunal de l'Etat de Texas du 17 Septembre 2004, rendant
possible la saisie attributive de la dite cargaison ;

Or une décision de justice rendue par une juridic
tion étrangère, même en présence de la renonciation par le débiteur
de son immunité de juridiction et d'exécution ne peut pas s'exécuter
de plein droit en territoire étranger qu'elle doit, pour recevoir
exécution, être soumise à la procédure d'exéquature telle que pré-
vue par l'article 299 du code de procédure civile, commerciale ad-
ministrative et financière selon lequel : "Sauf conventions diplo-
matiques contraires, les jugements rendus par les tribunaux étran-
gers et les actes par les officiers publics ou ministériels étran-
gers ne sont susceptibles d'exécution sur le territoire congolais
qu'après avoir été déclarés exécutoires par une juridiction congo-
lais qui aurais été compétente "ratione matériae " pour en connaî-
tre :

Qu'en l'espèce et sans qu'il soit nécessaire de
débattre du bien fondé ou on de l'action en saisie des créanciers
d'origine américaine, il y a lieu de relever que la décision sur
laquelle se fonde la société NOMECO n'a jamais été exéquaturée et ,
pire, les tribunaux congolais ne sont pas encore saisis d'une de-
mande en ce sens ;

Qu'il conciant donc, la question de l'enlèvement du
la cargaison détenue par NOMECO étant urgente et comportant un péril
certain, d'ordonner sur minute que la NOMECO livre à tout opérateur
que lui désignera la SNPC ladite cargaison ;    .../...

**EXHIBIT 3**

SUR QUOI, NOUS JUGE DES REFERES

Attendu qu'il resulte de l'examen des pièces du dossier que la société NOMECO a fait application d'un jugement américain rendu dans l'Etat du Texas en date du 17 Septembre 2004 à l'encontre de l'Etat Congolais ;

Attendu que ledit jugement n'a jamais été exéquaturé par les juridictions congolaises ;

Que dans ces conditions, ledit jugement ne satisfait aux dispositions légales notamment l'article 290 du code de procédure civile, commerciale, administrative et financière Congolais qui dispose que "sauf conventions diplomatiques contraires, les jugements rendus par les Tribunaux étrangers et les actes reçus par les officiers publics ou ministériels étrangers ne sont susceptibles d'exécution sur le territoire congolais qu'après avoir été déclarés exécutoires par une juridiction congolaise qui aurait été compétente "ratione materiae " pour en connaître ;

Attendu dès lors que la requête de l'Etat Congolais est donc regulière et recevable en outre de l'article 207 du code de Procédure civile, commerciale, administrative et financière ;

Attendu au fond qu'elle est fondée ;

Qu'il y a lieu d'y faire droit ;

Qu'il échet d'ordonner à la société NOMECO à livrer sans delais à tout opérateur que lui designera la SNPC toutes les quantités d'hydrocarbures lui appartenant et detenue par elle en vertu de leur contrat de partenariat ;

Attendu que la société NOMECO regulièrement convoquée a comparu par le biais du représentant du Directeur Général, Monsieur Benoît DE LA FOUCHARDIERE, Directeur des opérations ;

Qu'il y a lieu de lui donner acte ;

Attendu que la société NOMECO a succombé au procès ;

Qu'il y a lieu de mettre les dépens à sa charge conformément à l'article 57 du code de procédure civile, commerciale administrative et financière ;


PAR   CES   MOTIFS

Statuant publiquement, contradictoirement, en référé en matière civile, en premier ressort ;

AU  PRINCIPAL

Renvoyons les parties à mieux se pourvoir ainsi qu' elles en aviseront ;

MAIS DES A PRESENT, VU L'URGENCE ET PAR PROVISION

Constatons que le jugement du 17 Septembre 2004 n' est pas été encore exéquaturé par les juridictions congolaises ;

Constatons que ledit jugement n'a jamais été signi- fié à l'Etat Congolais ;
                              .../...

EN  CONSEQUENCE ;

Ordonnons à la société NOMECO de livrer sans délais
tout opérateur que lui designera la SNPC, toutes les quantités
d'hydrocarbures lui appartenant et detenue par elle en vertu de leur
contrat de partenariat ;

Ordonnons l'exécution provisoire de la présente ord:
nance nonobstant toutes voies de recours ;

Mettons les dépens à la charge de la Société NOMECO

Et, avons signé notre Ordonnance aec le Greffier./-

Ma R. KOUD-OKOKO
Gréffier en Chef

# Certification of Translation

*ATA Certified*
*Steven Sachs*

This is to certify that the following document:

Court Order in the matter of Republic of the Congo v. CMS NOMECO INC. CONGO

is an accurate and true translation prepared by the undersigned from French into English. I am a translator certified by the American Translators Association for translation from French into English.

_____               1-10-05
Steven Sachs                                                        Date
1312 Harbor Road
Annapolis, MD 21403

E-mail: steven@stevensachs.com
Ph: (301) 261-1016
Fax: (509) 461-5020

Subscribed and sworn before me on this 10th day of January of 2005

[signature] NOTARY

MY COMMISSION EXPIRES: 9/8/2008

# EXECUTION COPY

**REPUBLIC OF THE CONGO ON
BEHALF OF THE CONGOLESE PEOPLE**

<u>REGISTER No. 1131 /</u>
OF DECEMBER 28, 2004                    O R D E R

<u>IN THE MATTER OF:</u>

THE REPUBLIC OF THE CONGO

MINISTRY OF HYDROCARBONS, Department of
Kouilou (Mr. Messie, Attorney)

<u>VERSUS:</u>

CMS NOMECO INC. CONGO

<u>SUBJECT:</u> IMMEDIATE SUMMONS

| | |
|---|---|
| [stamp: EXECUTION COPY<br>Certified True Copy<br>Joachim Mitolo, Attorney at Law<br>B.P. 1384 [Tel. 94 83 28] | [stamp: EXECUTION COPY<br>Certified True Copy<br>Joachim Mitolo, Attorney at Law<br>B.P. [Tel. 94 83 28] [signature] |

IN THE YEAR TWO THOUSAND AND FOUR:

AND ON THE TWENTY-EIGHTH DAY OF THE MONTH OF DECEMBER;

BEFORE US, Norbert Elanga, Presiding Judge of the Pointe-Noire Court of First Instance, holding an urgent public hearing in our Chambers in the Courthouse of said city;

<u>THE FOLLOWING APPEARED</u>

The Republic of the Congo, Ministry of Hydrocarbons, filing through its legal representative;

Whereas it has been garnished by the American obligees of the Congolese State, NOMECO, which was to deliver to it a cargo of 550,000 barrels of oil, and refuses to do so on the grounds that said cargo has been garnished based on the decision of the Court of the State of Texas of September 17, 2004, making possible the garnishment of said cargo;

[stamp: EXECUTION COPY      [illegible signature]
Certified True Copy
Joachim Mitolo, Attorney at Law
B.P. 1384 [Tel. 94 83 28] [signature]

[seal: POINTE-NOIRE COURT OF FIRST INSTANCE]

       Yet a court decision handed down by a foreign jurisdiction, even when the obligor renounced its immunity from jurisdiction and execution, cannot be automatically executed abroad and that, to be executed, it is necessarily subject to an execution procedure as stipulated by Article 299 of the Code of Civil, Commercial, Administrative and Financial Procedure, according to which: "Unless there are diplomatic conventions that stipulate otherwise, judgments handed down by foreign courts and official instruments by foreign public or ministerial officers may not be executed in the Congo until they have been declared enforceable by a Congolese jurisdiction that has *ratione materiae* jurisdiction to take cognizance thereof;"

       That in this case and with no necessity of debating the merits or the lack thereof of the action to garnish by the U.S. obligees, there is reason to find that the decision that NOMECO is using as a basis has never been executed. Worse, the Congolese courts have not yet received an application for authority to enforce this judgment;

       That therefore, the matter of removing the cargo in the possession of NOMECO is urgent and entails a certain peril, so that it should be made enforceable immediately that NOMECO delivers said cargo to any operator that the SNPC [Société nationale des pétroles du Congo – Congo National Petroleum Company] may designate;

### BASED UPON WHICH, WE, THE JUDGE FOR URGENT MATTERS

       Whereas the examination of the exhibits in the file shows that NOMECO has applied a U.S. judgment handed down in the State of Texas on September 17, 2004 against the Congolese State;

       Whereas said judgment has never been executed by the Congolese jurisdictions;

       That under these conditions, said judgment does not satisfy the statutory provisions of Article 299 in particular of the Congolese Code of Civil, Commercial, Administrative and Financial Procedure, which stipulates that "unless there are diplomatic conventions that stipulate otherwise, the judgments handed down by foreign courts and instruments received by foreign public or ministerial officers may not be executed in the Congo until they have been declared enforceable by a Congolese jurisdiction that was given *ratione materiae* jurisdiction to take cognizance of the matter;

       Whereas since the application of the Congolese State is thus in order and admissible under Article 207 of the Code of Civil, Commercial, Administrative and Financial Procedure;

       Whereas it has merit in terms of the substance;

Republic of the Congo 1          2

[stamp: EXECUTION COPY      [illegible signature]
Certified True Copy
Joachim Mitolo, Attorney at Law
B.P. 1384 [Tel. 94 83 28] [signature]

[seal: POINTE-NOIRE COURT OF FIRST INSTANCE]

That there is reason to accept it;

That NOMECO is ordered to deliver without delay to any operator that the SNPC designates all quantities of hydrocarbons that belong to it and that are in NOMECO's possession pursuant to their partnership contract;

Whereas NOMECO, duly convened, has appeared through the representative of the Director General, Mr. Benoît de la Fouchardière, Operations Manager;

It is to be officially recorded;

Whereas NOMECO has lost the case;

That there is reason to hold NOMECO responsible for the costs in accordance with Article 57 of the Code of Civil, Commercial, Administrative and Financial Procedure;

## NOW THEREFORE

Ruling in public based on the arguments of both parties on an urgent basis in a civil matter in the first instance;

## ON THE MERITS

We refer the parties to enter an appeal as they shall advise;

## BUT AT THIS TIME, GIVEN THE URGENCY AND BY WAY OF ADVANCE

We find that the judgment of September 17, 2004 No.    has not yet been confirmed by the Congolese jurisdictions;

We find that said judgment has never been served upon the Congolese State;

CONSEQUENTLY;

We order NOMECO to deliver without delay to any operator that the SNPC designates all quantities of hydrocarbons that belong to it and in NOMECO's possession pursuant to their partnership contract;

We order the immediate execution of this order notwithstanding any appeals;

The costs shall be paid by NOMECO.

Republic of the Congo 1                    3

[stamp: EXECUTION COPY      [illegible signature]
Certified True Copy
Joachim Mitolo, Attorney at Law
B.P. 1384 [Tel. 94 83 28] [signature]

[seal: POINTE-NOIRE COURT OF FIRST INSTANCE]

And, we have signed this Order with the Registrar.
The signatures of the Presiding Judge and the Registrar follow.
The recording follows.
Recorded in Pointe-Noire on <u>December 28, 2004</u>
Certified true execution copy, checked against the original
Pointe-Noire, <u>December 28, 2004</u>
Chief Registrar

In consequence thereof: the Republic of the Congo orders its registrars, based upon this application, to execute said judgment with the Attorneys General and Prosecuting Attorneys of the Appeals Courts and Courts of First Instance to assist all commanders and law enforcement agencies to lend a hand when they are required by law to do so.

In witness whereof, this execution copy has been signed and sealed by the Head Registrar of the Pointe-Noire Court of First Instance and delivered by him in the form of an execution copy.

[signed]

By the Court
Document Checked against the Original
The Head Registrar


R. Koud-Okouo, Attorney
Head Registrar


Republic of the Congo 1       4

# EXHIBIT 4



REPUBLIQUE DU CONGO

AU NOM DU PEUPLE CONGOLAIS

- O R D O N N A N C E -

DEMANDE : LA S.N.P.C

CONTRE : LA SOCIETE NOMECO

OBJET : TOUTES D'HEURE A HEURE.-

L'AN DEUX MIL QUATRE ;

ET, LE VINGT HUIT DU MOIS DE DECEMBRE ;

PAR DEVANT NOUS, NORBERT KLENGA, Président
du Tribunal de Grande Instance de Pointe-Noire, tenant l'audience
publique des référés en notre Cabinet sis au Palais de Justice
de cette ville ;

Assisté de Maître Catherine KEDET-ISSONGO, Greffier Principal ;

A C O M P A R U

La Société Nationale des Pétroles du Congo, en
sigle SNPC, établissement public à caractère industriel et
commercial, dont le siège social à Brazzaville B.P. ..., agissant
sur diligences de son représentant légal ;

La SNPC a été saisie par les compagnies... au
sein de l'Etat Congolais NOMECO qui aurait lui livrée une car-
gaison de 950.000 barils de pétrole, raison de ... , tarif que cette cargaison fait l'objet d'une saisie pratiquée au ...
sion du Tribunal de l'Etat de Trie du 10 juin ... 2004 rendant
possible la saisie attribuable de la dite cargaison ;

Qu'une décision de justice rendu par une juri-
diction étrangère, même en présence de la Convention que le deman-
deur de son bénéfice de jurisdiction de l'obligation ... Il ... 
d'exécuter en pays étranger territoire national ... doit ...
recevoir exécution. Pour pouvoir le procédure d'exequatur
telle que prévue par l'article 299 du Code de procédure civile,
commerciale, administrative et financière ... ... sous
conventions diplomatiques contraires, les jugements rendus par
les tribunaux étrangers et les actes reçus par les officiers publics
ou ministériels étrangers ne sont susceptibles d'exécution
sur le territoire congolais qu'après avoir été déclarés exécutoi-
res par une juridiction congolaise qui aurait été compétente
ratione materiae " pour en connaître ;

Qu'en l'espèce et sans qu'il soit nécessaire
de débattre du bien fondé ou du de l'action au soutient des créan-
ciers d'origine Américaine, il y a lieu de relever que la déci-
sion sur laquelle se fonde la Société NOMECO n'a jamais été ...
gnatu re et, ptre, le tribunaux congolais ne sont pas encore sai-
sis d'une demande en ce sens ;

Qu'il convient donc, la question de l'enlève-
ment de la cargaison détenue par NOMECO étant urgente et composant
un péril certain, d'ordonner sur minute que la Société NOMECO
livre à tout opérateur que lui désignera la S.N.P.C ladite cargai-
son ;

...../....



**EXHIBIT 4**

## SUR QUOI, NOUS JUGE DES REFERES

Attendu qu'il résulte de l'examen des pièces du dossier que la société CMS NOMECO a fait application du jugement américain à l'encontre de la société CMS rendu en date du 23 Décembre 2004 ;

Attendu que ledit jugement n'est pas encore exécutoire par les juridictions congolaises ;

Que dans ces conditions, ledit jugement ne demeure pas aux dispositions légales notamment l'article 76 du code de procédure civile, commerciale, administrative et financière que " seul conventions internationales peuvent obliger au titre dus par les Tribunaux, étrangers et la mise à exécution des actes publiques ou ministériels n'emporte ni sont rendus sur le territoire congolais qu'après avoir été déclarés exécutoires par une juridiction congolaise qui aurait été compétente ratione materiae " pour en connaître ;

Attendu que ledit jugement n'a jamais été signifié à la S.N.P.C ;

Attendu que dans ces conditions, la société CMS NOMECO est donc recevable et fondée en vertu de l'article 76 du code de procédure civile, commerciale, administrative et financière ;

Attendu au fond qu'elle est fondée

Qu'il y a lieu d'y faire droit ;

Qu'il échet d'ordonner à la société NOMECO de délivrer tout opérateur que lui donnera la main, toutes les quantités d'hydrocarbures lui appartenant et détenues par elle en vertu de leur contrat de partenariat ;

Attendu que la société CMS NOMECO bien que régulièrement convoquée, a comparu par le biais de Monsieur Daniel ... et FOUCHARDIERE, Directeur des opérations, représentant le Directeur Général ;

Qu'il y a lieu de lui donner acte ;

Attendu que la société NOMECO a succombé au procès ;

Qu'il y a lieu de la condamner aux dépens conformément à l'article 77 du code de procédure civile, commerciale, administrative et financière ;

## PAR CES MOTIFS

Statuant publiquement, contradictoirement, en référé et en matière civile et en premier ressort ;

## AU PRINCIPAL

Renvoyons les parties à mieux se pourvoir ainsi qu'elles en aviseront ;

## MAIS DES A PRESENT, VU L'URGENCE ET PAR PROVISION

Constatons que le jugement américain du 23 Décembre 2004 n'est pas exécutoire par les juridictions Congolaise ;

Constatons que ledit jugement n'a pas été signifié à la société SNPC ;

.../...



# Certification of Translation

*ATA Certified*
*Steven Sachs*

This is to certify that the following document:

Court Order in the matter of SNPC v. NOMECO

is an accurate and true translation prepared by the undersigned from French into English. I am a translator certified by the American Translators Association for translation from French into English.

_____                    _1-10-05_
Steven Sachs                                        Date
1512 Harbor Road
Annapolis, MD 21409

e-mail: steven@stevensachs.com
Ph: (301) 461-1016
Fax: (509) 461-9020

Subscribed and sworn before me on this 10th day of January of 2005

<span>PAMELA TOLSON<br>Notary Public<br>Anne Arundel County<br>Maryland<br>My Commission Expires 9/8/2008</span>

_Gail Surrott_
NOTARY PUBLIC

MY COMMISSION EXPIRES:   9/8/2008

**EXECUTION COPY**      F. 204          C 1212

### REPUBLIC OF THE CONGO ON
### BEHALF OF THE CONGOLESE PEOPLE

REGISTER No. 1212 /
OF DECEMBER 28, 2004          O R D E R

#### IN THE MATTER OF: SNPC

#### VERSUS: NOMECO

#### SUBJECT: IMMEDIATE SUMMONS

[stamp: EXECUTION COPY
Certified True Copy
Joachim Mitolo, Attorney at Law
B.P. 1384 [Tel. 94 83 28]     [signature]

#### IN THE YEAR TWO THOUSAND AND FOUR:

#### AND ON THE TWENTY-EIGHTH DAY OF THE MONTH OF DECEMBER;

BEFORE US, Norbert Elanga, Presiding Judge of the Pointe-Noire Court of First Instance, holding an urgent public hearing in our Chambers in the Courthouse of said city;

Assisted by Cathérine Kedet Issongo, Head Registrar;

#### THE FOLLOWING APPEARED

Société Nationale des Pétroles du Congo, (acronym: SNPC), a government-owned industrial and commercial enterprise, with headquarters at B.P. 88, Brazzaville, filing through it legal representative;

The SNPC has been garnished by the American obligees of the Congolese State, NOMECO, which was to deliver to it a cargo of 550,000 barrels of oil, and refuses to do so on the grounds that said cargo has been garnished based on the decision of the Court of the State of Texas of December 23, 2004, making possible the garnishment of said cargo;

Yet a court decision handed down by a foreign jurisdiction, even when the obligor renounced its immunity from jurisdiction and execution, cannot be automatically executed abroad and that, to be executed, it is necessarily subject to an execution procedure as stipulated by Article 299 of the Code of Civil, Commercial, Administrative

[stamp: EXECUTION COPY                [illegible signature]
Certified True Copy
Joachim Mitolo, Attorney at Law
B.P. 1384 [Tel. 94 83 28] [signature]

[seal: POINTE-NOIRE COURT OF FIRST INSTANCE]

and Financial Procedure, according to which: "Unless there are diplomatic conventions that stipulate otherwise, judgments handed down by foreign courts and official instruments by foreign public or ministerial officers may not be executed in the Congo until they have been declared enforceable by a Congolese jurisdiction that has *ratione materiae* jurisdiction to take cognizance thereof;"

That in this case and with no necessity of debating the merits or the lack thereof of the action to seize by the U.S. obligees, there is reason to find that the decision that NOMECO is using as a basis has never been executed. Worse, the Congolese courts have not yet received an application for authority to enforce this judgment;

Therefore, the matter of removing the cargo in the possession of NOMECO is urgent and entails a certain peril, so that it should be made enforceable immediately that NOMECO deliver said cargo to any operator that the SNPC [Société nationale des pétroles du Congo – Congo National Petroleum Company] may designate;

## BASED UPON WHICH, WE, THE JUDGE FOR URGENT MATTERS

Whereas the examination of the exhibits in the file shows that NOMECO has applied a U.S. judgment handed down in the State of Texas on December 23, 2004 against the SNPC;

Whereas said judgment has never been executed by the Congolese jurisdictions;

That under these conditions, said judgment does not satisfy the statutory provisions of Article 299 in particular of the Congolese Code of Civil, Commercial, Administrative and Financial Procedure, which stipulates that "unless there are diplomatic conventions to the contrary, the judgments handed down by foreign courts and instruments received by foreign public or ministerial officers may not be executed in the Congo until they have been declared enforceable by a Congolese jurisdiction that was given *ratione materiae* jurisdiction to take cognizance of the matter;

Whereas, said judgment has never been notified to the SNPC;

Whereas since the application of the SNPC is thus in order and admissible under Article 207 of the Code of Civil, Commercial, Administrative and Financial Procedure;

Whereas it has merit in terms of the substance;

That there is reason to accept it;

Republic of the Congo 3              2

[stamp: EXECUTION COPY          [illegible signature]
Certified True Copy
Joachim Mitolo, Attorney at Law
B.P. 1384 [Tel. 94 83 28] [signature]

[seal: POINTE-NOIRE COURT OF FIRST INSTANCE]

That NOMECO is ordered to deliver without delay to any operator that the SNPC designates all quantities of hydrocarbons that belong to it and that are in NOMECO's possession pursuant to their partnership contract;

Whereas NOMECO, duly convened, has appeared through the representative of the Director General, Mr. Benoît de la Fouchardière, Operations Manager;

It is to be officially recorded;

Whereas NOMECO has lost the case;

That there is reason to hold NOMECO responsible for the costs in accordance with Article 57 of the Code of Civil, Commercial, Administrative and Financial Procedure;

## NOW THEREFORE

Ruling in public based on the arguments of both parties on an urgent basis in a civil matter in the first instance;

## ON THE MERITS

We refer the parties to enter an appeal as they shall advise;

## BUT AT THIS TIME, GIVEN THE URGENCY AND BY WAY OF ADVANCE

We find that the judgment of December 23, 2004 has not yet been confirmed by the Congolese jurisdictions;

We find that said judgment has never been served upon the SNPC;

## CONSEQUENTLY;

We order NOMECO to deliver without delay to any operator that the SNPC designates all quantities of hydrocarbons that belong to it and in NOMECO's possession pursuant to their partnership contract;

We order the immediate execution of this order notwithstanding any appeals;

The costs shall be paid by NOMECO.

And, we have signed this Order with the Registrar.

Republic of the Congo 3                    3

[stamp: EXECUTION COPY
Certified True Copy                              [illegible signature]
Joachim Mitolo, Attorney at Law
B.P. 1384 [Tel. 94 83 28] [signature]

[seal: POINTE-NOIRE COURT OF FIRST INSTANCE]

The signatures of the Presiding Judge and the Registrar follow.
The recording follows.
Recorded in Pointe-Noire on <u>December 28, 2004</u>
Certified true execution copy, checked against the original
Pointe-Noire, <u>December 28, 2004</u>
Chief Registrar

In consequence thereof: the Republic of the Congo orders its registrars,
based upon this application, to execute said judgment with the Attorneys
General and Prosecuting Attorneys of the Appeals Courts and Courts of
First Instance to assist all commanders and law enforcement agencies to
lend a hand when they are required by law to do so.

In witness whereof, this execution copy has been signed and sealed by the Head Registrar
of the Pointe-Noire Court of First Instance and delivered by him in the form of an
execution copy.

[signed]

By the Court
Document Checked against the Original
The Head Registrar

R. Koud-Okouo, Attorney
Head Registrar

Republic of the Congo 3                    4

# EXHIBIT 5

RECEIVED

FEB 11 2005

GSL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2005 FE -4  PM 2: 06

AF-CAP, INC.,
    **Plaintiff,**

vs.

REPUBLIC OF CONGO,
    **Defendant,**

                                 Case No. A-01-CA-100-SS

and

CMS OIL AND GAS COMPANY, et al.,
    **Garnishees.**

_____

AF-CAP, INC.,
    **Plaintiff,**

-vs-                                    Case No.  A-01-CA-321-SS

REPUBLIC OF CONGO,
    **Defendant.**

_____

## O R D E R

BE IT REMEMBERED that on the _4th_ day of February 2005, the Court reviewed the file

in the above-styled causes and specifically Af-Cap, Inc.'s ("Af-Cap") Motion for Turnover

Order [#110 in A-01-CA-321-SS], Garnishees CMS Nomeco Congo Inc., the Nuevo Congo

Company, and Nuevo Congo, Ltd.'s ("Garnishees") Motion to Dismiss Pursuant to Rules 12(b)(1),

12(b)(2), 12(b)(5), and 12(b)(6) [#153 in A-01-CA-100-SS], Garnishees' Answer to Writs of

Garnishment [#158 in A-01-CA-100-SS], Af-Cap's Motion for Issuance of New Garnishment

## EXHIBIT 5

Writs [#160 in A-01-CA-100-SS], Garnishees' Motion for Expedited Consideration of Motion to Quash Writs of Garnishment [#163 in A-01-CA-100-SS], Garnishees' Motion to Quash Writs of Garnishment [#164 in A-01-CA-100-SS], Garnishees' Emergency Motion for Expedited Consideration of Garnishees' Dispositive Motions [#168 in A-01-CA-100-SS], Garnishees' Motion for Partial Summary Judgment [#169 in A-01-CA-100-SS], and Af-Cap's Emergency Request for Stay Pending Ruling on its Motion for Turnover Order or Appeal [#189 in A-01-CA-100-SS]. After considering the motions, responses, replies, each of the case files as a whole, and the applicable law, the Court enters the following opinion and orders.

I.    **Background**

Plaintiff Af-Cap is the sixth owner of the claims at issue in this case. Af-Cap's predecessor in interest, the Connecticut Bank of Commerce ("the Bank"), was the assignee of a judgment entered in England against Defendant Republic of Congo ("the Congo"). On January 11, 2001, the Bank brought an action in a New York state court to enforce that judgment. When the Congo did not appear, the New York court granted summary judgment in favor of the Bank and entered an order granting the Bank permission to execute pursuant to 28 U.S.C. § 1610(c) ("the New York judgment"). The Bank then filed the New York judgment in the 345th District Court of Travis County to convert it into a Texas judgment ("the judgment action"). The Bank simultaneously filed a garnishment action in the same court against CMS Oil & Gas Company, CMS Oil & Gas International Company, CMS Nomeco International Congo Holdings, Inc., CMS Nomeco Congo, Inc., CMS Oil & Gas International, Ltd., and CMS Oil & Gas (Congo), Ltd. and Nuevo Energy

-2-

Company, Congo Holding Company, Nuevo Congo Company, Nuevo Congo International, Inc., and Nuevo International Holdings, Ltd. (the garnishment action).[1] By that action, the Bank sought to prohibit the garnishees from paying debts or delivering any property to the Congo. Subsequently, the Congo and all garnishees removed the garnishment action (A-01-CA-100-SS, "the 100 case"), the judgment action (A-01-CA-321-SS, "the 321 case"), and several additional, subsequently filed garnishment actions to this Court on the basis of diversity jurisdiction.

On March 16, 2001, this Court entered an order in the 100 case dismissing the causes of action against the Congo and dissolving the writs of garnishment against the garnishees pursuant to the Foreign Sovereign Immunities Act ("FSIA"). The Court found both the tax obligations and the in-kind royalty obligations owed by the garnishees to the Congo were immune from execution and attachment by plaintiffs.[2] The Bank appealed the 100 case to the Fifth Circuit, and during the

---

[1] CMS Nomeco Congo Inc., the Nuevo Congo Company, and Nuevo Congo, Ltd. are the only garnishees presently remaining in the case.

[2] The Court has previously explained the background surrounding Garnishees' royalty obligations as follows:

In 1979, the Congo issued a permit to drill offshore to its state-owned oil company, the Societe Nationale de Petrol du Congo ("SNPC"). On May 25, 1979, in order to exploit the permit, the Congo and SNPC entered into a joint venture with various oil companies to produce oil and gas. The parties do not dispute that SNPC and the Garnishees are the current working interest owners under the Convention. Currently, CMS is the operator of the joint venture and owns a 25% working interest, while Nuevo, Nuevo Congo Ltd. and SNPC are non-operators, possessing 18.75%, 6.25%, and 50% working interests, respectively. The Congo is entitled to royalty on production from the working interest owners under the Convention, which it can elect to take in cash or in-kind.

The oil is produced at offshore wells in Congolese waters. The oil flows through a subsurface pipeline system to an offshore storage facility, a retired transport tanker called the "Conkouati," which is also located in Congolese waters. Once the Conkouati is filled with between 550,000 and 650,000 barrels of oil, CMS and Nuevo take a "lifting" and sell the oil. The Congo and Garnishees maintain the oil is always sold on the Conkouati, and therefore title passes from seller to buyer in the Congo. CMS and Nuevo keep an over/under accounting of the amount of oil they have lifted and sold, and note the

-3-

pendency of the appeal, the Bank assigned its interest in the judgment to Af-Cap. The Fifth Circuit vacated and remanded the dismissal of the garnishment action, holding this Court and the parties had not made the appropriate factual inquiry in applying the "commercial use" test under the FSIA. *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 260–61 (5th Cir. 2002). On remand, this Court reexamined the question of whether the tax and royalty obligations at issue in this case met the "commercial use" test with the benefit of the Fifth Circuit's opinion and again concluded the obligations did not satisfy the test's requirements. Af-Cap appealed the Court's judgment against it in the initial garnishment action (the 100 case) and the judgment action (the 321 case), but it did not appeal the Court's judgment in any of the other individual garnishment actions.

The Fifth Circuit again reversed, holding the royalty obligations in the case met the requirements of the commercial use test under the FSIA, and hence were not entitled to immunity from execution. *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, 373 (5th Cir. 2004). On remand, Af-Cap moved the Court to reinstate the previously dissolved writs of garnishment. On

---

Congo's royalty entitlement and SNPC's working interest entitlement under the Convention. CMS and Nuevo continue to take liftings and sell the oil until the combination of the Congo's royalty entitlement and the SNPC's working-interest entitlement exceeds 275,000 barrels—or as the Defendants put it, until they are "under-delivered" by 275,000 barrels or more. At this point, SNPC takes a lifting and sells the oil. In this way, both the Congo's in-kind royalty entitlement and SNPC's working interest are satisfied. Ordinarily, when SNPC conducts a lifting, it lifts about 550,000 to 650,000 barrels, at which point it is "over-delivered," which is accounted for in the over/under accounting described above. SNPC will not take another lifting until it is under-delivered by 275,000 barrels.

Order of Apr. 7, 2003 at 5–7 (internal citations omitted).

-4-

November 5, 2004, this Court entered an order denying Af-Cap's request on the grounds the underlying debts had been paid. Order of Nov. 5, 2004 at 6–7. The Court did, however, authorize the issuance of new writs against Garnishees. *Id.* Af-Cap then filed a petition for writ of mandamus with the Fifth Circuit seeking to compel this Court to reinstate the previously dissolved writs of garnishment. The Fifth Circuit denied the petition. *In re Af-Cap, Inc.*, 04-51357, slip. op. at 2 (5th Cir. Dec. 20, 2004). On December 23, 2004, the Court entered an interim opinion and order dissolving the new writs of garnishment that issued on November 5, 2004. The Court now withdraws that order, leaving in its place the opinion and orders contained herein.

## II.   Analysis

### A.   Garnishees' Motion to Dismiss

#### 1.   Personal Jurisdiction

Garnishees move to dismiss the writs of garnishment on the ground they are not subject to the exercise of personal jurisdiction by this Court. However, they concede: (1) they made no objection to the Court's jurisdiction with regard to the garnishment actions initiated in 2001 by Af-Cap's predecessor-in-interest; and (2) they have twice asked for and obtained affirmative relief from this Court in the form of attorneys' fees in this action. These concessions alone are seemingly sufficient to waive Garnishees' jurisdictional objections. *Maiz v. Virani*, 311 F.3d 334, 341 & n.6 (5th Cir. 2002) (holding that a request for affirmative relief operates as a waiver of any objections to the exercise of personal jurisdiction).

-5-

Garnishees contend, however, a general appearance in this case is not, in itself, sufficient to confer jurisdiction over them. Rather, they argue each separate writ of garnishment requires a fresh inquiry into the presence of personal jurisdiction. This argument is an outgrowth of their position that each garnishment action must be filed as a new lawsuit, under a separate cause number. In support of this position, Garnishees cite two well-established propositions of garnishment law. First, an individual writ of garnishment captures only certain debts and property—those maintained by a garnishee from the time the writ is served to the deadline for filing an answer. Second, a garnishment action, which involves a unique set of parties, is ancillary to a suit in which a judgment is obtained. Neither of these propositions have any direct bearing on the question at hand, however—namely, does the issuance of multiple writs of garnishment require the filing of separate actions and the creation of new cause numbers for each? The only court apparently to have considered that narrow question expressly rejected the view advanced here by Garnishees and held the filing of multiple garnishment writs in a single garnishment action does not constitute error. *Dupree v. Quinn*, 290 S.W.2d 329, 331 (Tex. Civ. App.–Texarkana 1956), *rev'd on other grounds*, 303 S.W.2d 769 (Tex. 1957).

Garnishees further argue that allowing the filing of multiple garnishment writs under a single cause number would encourage gamesmanship since would-be garnishors could always avoid the problem of losing jurisdiction by simply filing new garnishment writs in old lawsuits. Any such concern is not warranted in this case, however. Af-Cap does not seek to reopen a closed garnishment action. Rather, it seeks the issuance of writs in a case on remand from the Fifth

-6-

Circuit where the original writs were erroneously dissolved. The earlier writs cannot now be reinstated because the debts they had sought to capture have been fully paid. However, to require a renewed showing of the existence of personal jurisdiction would unnecessarily frustrate the Court's power to grant appropriate relief on remand.

## 2.    In Rem Jurisdiction

Garnishees also contend the Court lacks subject matter jurisdiction because a Texas garnishment action has an "in-rem aspect" requiring that any property to be garnished must be located in Texas. However, as even the cases cited by Garnishees make clear, the test for in rem jurisdiction over a garnishee's obligations is satisfied so long as the court has personal jurisdiction over the garnishee. *Missouri, Tex., and Kan. Ry. Co. v. Swartz,* 115 S.W. 275, 277 (Tex. Civ. App. 1909, no writ) (relying on *Harris v. Balk,* 198 U.S. 215, 223–24 (1905)) (rejecting the view that a debt can only be garnished in the state of the garnishee's domicile). Since the Court holds it maintains personal jurisdiction over Garnishees, any debts they owe the Congo are subject to the exercise of in rem jurisdiction by this Court.

## 3.    FSIA Immunity

Garnishees further argue their tax and royalty obligations are immune from garnishment under the FSIA. As to Garnishees' tax obligations, the Court previously held Af-Cap failed to demonstrate they were ever used by the Congo for commercial purposes. The Fifth Circuit did not disturb this finding on appeal. Order of Apr. 7, 2003 at 9; *Af-Cap, Inc. v. Republic of Congo,* 03-50506, slip. op. at 3 (5th Cir. Nov. 1, 2004) ("We clarify that our opinion should not be

-7-

interpreted to permit garnishment of obligations that were not used in the past for commercial purposes in the United States. Thus, to the extent that tax obligations were not used to satisfy the NUFI debt, such obligations cannot be reached by the garnishment proceedings in this case."). Accordingly, the tax obligations are immune from garnishment.

However, as to the Garnishees' royalty obligations, the Fifth Circuit has already expressly held such obligations are not immune from execution under the FSIA because they meet the "commercial use" test's requirements and their situs is the United States. *Af-Cap, Inc.*, 383 F.3d at 373. Garnishees argue the Fifth Circuit's holding with respect to the situs of the royalty obligations is no longer binding because facts have changed since the court's opinion issued. Specifically, Garnishees argue they are no longer "formed and headquartered" in the United States—which they argue is the test for determining their location. The Garnishees' position is flawed for two reasons. First, two of the Garnishees are incorporated in Delaware. Thus, the factual basis for their claim is questionable at best.

Second, Garnishees have not properly framed the relevant legal inquiry. In determining that the situs of the Garnishees' obligations to the Congo is the United States, the Fifth Circuit applied the rule used to determine the presence of jurisdiction over a debt in a garnishment action. *Af-Cap, Inc.*, 383 F.3d at 371–72. That rule provides the situs of the debt is the same as the situs of the garnishee. *Id.* (relying on *Harris*, 198 U.S. at 223–24; *Swartz*, 115 S.W. at 277). The Fifth Circuit did not expressly set forth the criteria by which the situs of a garnishee should be determined, but it did note the garnishees in the case were "formed and headquartered in the United States."

-8-

*Af-Cap Inc.*, 383 F.3d at 372–73. However, whether the garnishees remain formed and headquartered in the United States is not determinative on the question of where the obligations are now located. The Fifth Circuit in no way indicated Garnishees' formation and headquartering in this country was a necessary and exclusive basis for holding their debt obligations are located here for FSIA purposes. Rather, the court clearly adopted the same situs-of-the-debtor rule applied in the context of the jurisdictional inquiry in garnishment proceedings. *Af-Cap. Inc.*, 383 F.3d at 371–72.

As explained above in the Court's discussion of the presence of in rem jurisdiction in this case, under both *Swartz* and *Harris*, the situs-of-the-debtor rule dictates not that a debt is located only where the debtor is domiciled, but rather, it provides that the debt follows the debtor wherever he or she goes and is subject to service of process. Accordingly, this Court holds that because Garnishees have appeared in this suit and are subject to the exercise of personal jurisdiction by this Court, any obligations they owe the Congo remain in the United States for the purposes of the FSIA.

### 4.    Service of Process

Garnishees also contend Af-Cap's service of the garnishment writs against Nuevo Congo Company and Nuevo Congo, Ltd. was improper because Af-Cap served the writs on CT Corporation. They claim neither garnishee authorized CT Corporation to act as its agent for receiving service. CMS Nomeco Congo, Inc. does not make any objections to the form of its service. The service of process defense thus applies to only two of the three garnishees. Because

-9-

all of the Garnishees have filed an answer and a motion for partial summary judgment which, as explained below, entitles each of them to the ultimate relief they seek, the Court declines to reach the service of process defense, as the resolution of the issues raised in the latter set of pleadings is a more expeditious means of resolving the issues in this case.

**B.    Garnishees' Answer and Motion for Partial Summary Judgment**

Under Texas law, a plaintiff may seek to satisfy a judgment through garnishment proceedings in two distinct ways—through the garnishment of debts owed by the garnishee to the judgment debtor, or through the garnishment of property belonging to the judgment debtor, but in the hands of the garnishee. *See* TEX. R. CIV. P. 668–69 (setting forth the separate procedures for the garnishment of debts and "effects"); *see also Baytown State Bank v. Nimmons*, 904 S.W.2d 902, 905 (Tex. App.–Houston [1st Dist.] 1995, writ denied) ("The only real issue in a garnishment action is whether the garnishee is indebted to the judgment debtor, or has in its possession effects belonging to the debtor, at the time of service of the writ on the garnishee, and at the time the garnishee files its answer."). If the garnishee is "indebted" to the judgment debtor, the plaintiff may seek to have the amount by which the garnishee is indebted reduced to a judgment in favor of the plaintiff against the garnishee. TEX. R. CIV. P. 668. Alternatively, if the garnishee is in possession of any "effects" belonging to the judgment debtor, the plaintiff may seek to have those effects delivered by the garnishee for the purpose of a court-ordered sale, the proceeds of which are applied to satisfy the plaintiff's judgment. TEX. R. CIV. P. 669.

-10-

The parties seem to agree the only thing possessed by the Garnishees potentially subject to garnishment is the above-described obligation to deliver oil to the Congo in satisfaction of its royalty interest.[3] It is not entirely clear from Af-Cap's pleadings whether it believes the royalty obligation should be characterized as a debt owed by the Garnishees to the Congo or as an effect of the Congo in the hands of the Garnishees. Not surprisingly, Garnishees take the position the royalty obligation is not garnishable, no matter how characterized.

### 1. Royalty Obligations Viewed as Debts

First, Garnishees contend the royalty obligation is not garnishable as a debt because the Congo had no right to the delivery of oil during the period between the service of the writ and the time for answer. Garnishees' Answer to the Writs of Garnishment ¶ 8. In other words, because the obligation to deliver oil was not effective during the relevant period, no debt capable of garnishment existed.

Initially, Af-Cap failed to file an affidavit to traverse Garnishees' answer as contemplated by Texas Rule of Civil Procedure 673. Thus, the Court took Garnishees' assertions as true in issuing its December interim order. *See Goodson v. Carr*, 428 S.W.2d 875, 878 (Tex. Civ. App.–Houston [14th Dist.] 1968, writ ref'd n.r.e.) ("[W]hen a verified answer which makes

---

[3] One possible point of disagreement exists with respect to Garnishees' tax obligations. Garnishees' answer mentioned only two possibly garnishable items: (1) the royalty obligation; and (2) certain tax obligations which were due to the Congo during the relevant period. Although Af-Cap's position is somewhat unclear, it may be that it persists in asserting the tax obligations are independently subject to garnishment. However, as explained above, such obligations are immune under the FSIA since Af-Cap has been unable to demonstrate they were used by the Congo for commercial purposes in the United States.

-11-

negative responses concerning indebtedness is not controverted, the answer is presumed to speak the truth and in the absence of a proper controverting affidavit made by the plaintiff in garnishment, a judgment may not be entered against a garnishee.").

The Court there noted, "a plaintiff in garnishment merely steps into the shoes of his debtor as against the garnishee, and may enforce, as against such garnishee, whatever rights the debtor could have enforced had such debtor been suing the garnishee directly." *Rowley v. Lake Area Nat'l Bank*, 976 S.W.2d 715, 719 (Tex. App.–Houston [1st Dist.] 1998, pet. denied). The Court thus concluded that just as the Congo would have had no right to seek delivery of the oil prior to the time for which it was agreed due, Af-Cap, standing in the Congo's shoes, could not be permitted to garnish this unripe obligation.

Af-Cap subsequently filed a traverse challenging Garnishees' position that their obligation to pay royalties did not accrue until the date set for delivery of the oil. Af-Cap's Traverse of Garnishee's Answer at 9–10. Af-Cap contends the royalty obligation accrues as the oil is lifted, and therefore it was owed during the relevant period. Assuming Af-Cap's position is correct, and further assuming its traverse may appropriately be considered despite its untimeliness, Af-Cap nonetheless has failed to demonstrate the in-kind royalty obligation is garnishable as a debt. Even if the Court were to construe the obligation to deliver oil to have become ripe during the relevant time period, Garnishees demonstrate in their Motion for Partial Summary Judgment that non-monetary obligations are not garnishable debts for the purposes of Texas garnishment law.

-12-

Neither party has cited a Texas case dealing expressly with the question of whether a non-monetary obligation may be construed as a garnishable debt. Nonetheless, the garnishment statute and relevant rules of civil procedure, as well as the cases cited by the parties dealing with garnishment of debts, all appear to presume garnishable debts are solely monetary. *See, e.g., Daniel v. E. Tex. Theaters,* 127 S.W.2d 240, 242 (Tex. Civ. App.–Fort Worth 1939, writ dism'd judgm't cor.) ("The effect of a writ of garnishment is to impound any monies or property held by the garnishee belonging to the defendant debtor. The writ fixes a lien, in favor of the plaintiff below, on property thus impounded, and if a debt is impounded, a money judgment may be taken against the garnishee which may be enforced like any other judgment."). For instance, the statute describing the effect of service of a writ of garnishment distinguishes debts, of which payment is forbidden, from effects, of which delivery is prohibited. TEX. CIV. PRAC. & REM. CODE § 63.003. Furthermore, the rules governing garnishment provide when a garnishee admits to being indebted to a defendant, the court is to render a judgment against the garnishee in the amount it admits to being indebted. TEX. R. CIV. P. 668. Apparently, the rules do not contemplate indebtedness as encompassing obligations other than for money, as there is no procedure for valuing such obligations.

Although the parties have cited almost no case law that is directly on point, Garnishees have directed the Court's attention to a case decided by the Alabama Supreme Court that lends some support to their position. *Jones's Adm'r v. Crews,* 64 Ala. 368 (1879). The court in that case held an obligation to deliver cotton under a contract was not a garnishable debt under the Alabama

-13-

garnishment statute as only monetary obligations were debts capable of garnishment. *Id.* at 374. The court noted Alabama's statutes authorized the garnishment of chattels belonging to the judgment debtor, but it held the cotton due to be delivered to the defendant under the contract could not be characterized as property belonging to the judgment debtor in the hands of the garnishee. *Id.* One of the reasons cited by the Alabama court for its conclusion was that a contrary result would have interfered with the rights of the parties to enter into contracts of their own making. *Id.* The court concluded it would be unfair to compel a garnishee who agreed only to deliver goods to instead make a payment in money. *Id.*

The Court also finds relevant the long-standing principal of Texas law that an unliquidated claim for breach of contract is not a garnishable debt. *Waples-Platter Grocer Co. v. Tex. & Pac. Ry. Co.*, 68 S.W. 265, 266 (Tex. 1902). The underlying policy of this rule is that a garnishee should not be made to answer for the amount in money owed to the defendant, so long as the potential value of the breach of contract claim is uncertain. *Id.* In reaching its holding, the Court in *Waples* looked, in part, to the fact the garnishment rules require the garnishee to state its indebtedness as an amount in money in its answer to the writ. *Id.* If an unliquidated claim for breach of contract is not a garnishable debt because it cannot be stated as an amount in money, then non-monetary obligations—which, by definition, cannot be stated as an amount in money—clearly are not debts to be answered for. Additionally, *Waples* clearly prohibits the imposition of any requirement that a garnishee attempt to reduce its non-monetary obligation to a dollar figure in formulating its answer. If a garnishee cannot be made to place a monetary value on a judgment

-14-