debtor's unliquidated breach of contract claim against it, there is certainly no basis for forcing such a valuation in the context of a judgment debtor's rights under a contract not even breached.

Af-Cap first responds to Garnishees' summary judgment motion by claiming Garnishees lack standing to bring their motion because "a Garnishee has no standing to contest the underlying claim between the judgment creditor and judgment debtor." Af-Cap's Resp. to Mot. for Part. Summ. J. at 3. This argument has no merit since Garnishees' motion in no way addresses the merits of Af-Cap's claim against the Congo.

Af-Cap also argues there are material facts in dispute that preclude the Court's granting Garnishees' motion. Specifically, Af-Cap claims there is a dispute over whether the Congo has elected to take its royalty in kind as opposed to in cash. However, Garnishees have submitted the text of the 1979 Convention, which gives the Congo the right to elect how it takes its royalty, as well as the "Amendment to Lifting Agreement," which recites the Congo has elected to take its royalty in kind since 1999. Garnishees' Mot. for Partial Summ. J., Exs. A-1 at GAR00066 & A-2 at GAR03439. Af-Cap has submitted no evidence to suggest the election has since changed.[4]

Af-Cap next asserts it is entitled to change the Congo's election and convert Garnishees' in-kind royalty obligation into one for cash. Af-Cap argues that as the plaintiff in garnishment, it

---

[4] Af-Cap suggests it would be able to generate a genuine issue of material fact on the question of the Congo's election if permitted to take additional discovery. In a footnote, it states, "If the Court agrees with the motion, Af-Cap requests the opportunity to depose Garnishees' Declarant, Mr. Marquez, in Austin, Texas, and to take such other discovery as is necessary based upon that deposition. *See* Fed. R. Civ. P. 56(f)." Af-Cap's request, notwithstanding its citation to Rule 56(f), does not meet the requirement for the granting of a continuance under the rules, which require a party seeking such a continuance to make a filing with the court setting forth the reasons it cannot present the facts necessary to oppose the motion for summary judgment. FED. R. CIV. P. 56(f).

stands in the shoes of the judgment debtor and is entitled to enforce whatever rights the Congo has with respect to Garnishees. Assuming Texas law would authorize this novel application of the principal that a garnishment plaintiff "stands in the shoes" of its judgment debtor, Garnishees point out the Congo's right to change its election is not unconstrained. The Convention clearly entitles the Garnishees to three months' notice prior to any change of the method by which the Congo elects to receive its royalty. Garnishees' Mot. for Partial Summ. J., Ex. A-1 at GAR00066. Thus, even the Congo would not have the power to change the in-kind nature of the Garnishees' obligation to it with respect to any obligations that accrued during the garnishment period.

Finally, Af-Cap argues Texas law authorizes the garnishment of non-monetary obligations. First, it contends the Fifth Circuit definitively decided this question in its favor in its most recent appeal. Af-Cap is simply incorrect. Although the Fifth Circuit concluded this Court previously erred when it found the Garnishees' royalty obligations were immune from attachment under the FSIA, it did not purport to consider any issues raised by Texas garnishment law.

Second, Af-Cap cites a number of cases for the unremarkable proposition that a garnishment action can be used to reach the "effects" of the debtor which are in the garnishee's possession. It is clear a garnishee can be made to: (1) pay debts owed in money over to a plaintiff in garnishment, and (2) deliver to the court effects that it possesses which belong to the debtor (e.g., goods it holds as the debtor's bailee). However, Af-Cap has failed to cite a single case, or even make an argument, that would demonstrate a non-monetary obligation to deliver goods can ever be garnished *as a debt*. Rather, the only authorities presented to the Court, as indicated above,

-16-

suggest only debts in money are subject to garnishment. Persuaded by the Garnishees' position that Texas garnishment law does not authorize the garnishment of a non-monetary obligation, the Court holds the Garnishees' obligations to deliver oil to the Congo are not garnishable as debts under Texas law.

## 2.     Royalty Obligations Viewed as "Effects"

On the other hand, the Fifth Circuit's opinion remanding the case back to this Court suggested the Garnishees' royalty obligations are themselves property possessed by the Garnishees. Specifically, in concluding the royalty obligations satisfied the FSIA's situs requirements, the Fifth Circuit held the obligations were "property" in the United States. *Af-Cap, Inc.*, 383 F.3d at 371–73. In so holding, the court looked to various cases in which courts have held there is in rem jurisdiction over a garnishee owing a debt in the state where he or she is found because the debt follows the debtor. *Id.*

Notwithstanding the Fifth Circuit's holding that an obligation to pay money is "property" located at the situs of a garnishee in the specific context of the FSIA, it is clear Texas garnishment proceedings do not contemplate such obligations as garnishable "effects." For instance, the procedure for garnishment of effects belonging to a judgment debtor and in possession of a garnishee contemplates a court-ordered sale of such effects. TEX. R. CIV. P. 672. Given "the peculiar character of the intangible obligations" at issue in this case, *see In re Af-Cap, Inc.*, 04-51357, slip. op. at 2 (5th Cir. Dec. 20, 2004), a judicial sale would appear to be problematic. The Court finds it difficult to imagine being able to attract many buyers willing to pay any money

-17-

at all in exchange for an obligation to deliver oil to the Congo. Even if the Congo's right to receive

its royalty is construed as the relevant garnishable property however, (which—even though it is the

only way to envision the procedure for a judicial sale in a way that is not utter nonsense—is not

how the Fifth Circuit conceived of the "property" in reaching its FSIA holding), Garnishees simply

do not have the capacity to *deliver*[5] the Congo's contract rights to the Court for the purpose of

facilitating a sale as contemplated by the rules.[6] TEX. R. CIV. P. 669. Af-Cap has not advocated

a judicial sale of the Congo's royalty rights. Rather, Af-Cap's position appears to be that the

royalty obligation is a garnishable *debt*, in satisfaction of which, the Garnishees should be subjected

to a money judgment in Af-Cap's favor.[7] For the reasons already stated, however, the royalty

obligation is not garnishable as a debt.

---

[5] Although it may be fairly easy to conceive of a situation in which Garnishees were directed to deliver *oil* (or make a cash payment) to some entity or person who came to "purchase" the Congo's royalty rights at a judicial sale, such a procedure could hardly be said to involve any act by the Garnishees of delivery of the Congo's intangible property rights for the purpose of a judicial sale.

[6] Moreover, as Garnishees' point out, it makes no sense to construe an ongoing and accruing obligation as a personal effect of an obligor in the possession of his or her obligee under Texas law. To do so in the garnishment context would contravene the conclusion of the Texas courts that "the policy of the law [is] to impound existing debts, rather than future accruing debts." *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 163 (Tex. App.–Houston [14 Dist.] 1996, writ denied) (quoting *Consolidated Gasoline Co. v. Jarecki Mfg. Co.*, 72 S.W.2d 351, 353 (Tex. App.–Eastland 1934), *opin. adopted*, 105 S.W.2d 663 (Tex. 1937)); *see also Daniels v. Pecan Valley Ranch, Inc.*, 831 S.W.2d 372, 383 (Tex. App.–San Antonio 1992, writ denied) (holding turnover relief, rather than garnishment, is the appropriate form of relief with respect to future rights to payment). If an ongoing obligation owed by a garnishee could be construed as an effect of the judgment debtor in the garnishee's hands, plaintiffs in garnishment could easily evade the prohibition on the garnishment of future debts by simply re-labeling such debts as presently garnishable effects.

[7] It may be that Af-Cap's position is the oil itself constitutes the "effects" which are garnishable under Texas law. That position, however, is flawed for at least two reasons. First, there is no basis on which to conclude the oil possessed by the Garnishees "belongs" to the Congo prior to its delivery. Af-Cap has not suggested the Congo owns anything prior to the oil's delivery other than the right to have its royalty interest paid. Second, the entire basis of the Fifth Circuit's conclusion the disputed property in this case is located in the United States is that the obligation to deliver oil, rather than the oil itself, constitutes the property to be garnished. *Af-Cap, Inc.*, 383 F.3d at 371–72 & n.13.

-18-

In light of the fact Garnishees have not admitted to owing any debts or possessing any property belonging to the Congo subject to garnishment, the Garnishees are entitled to have the writs issued against them dissolved. Accordingly, the Court need not reach the issues raised in their Motion to Quash Writs of Garnishment [#164], which the Court dismisses as moot.

### C.    Af-Cap's Motion for Turnover Order

By this motion, filed in the 321 case, Af-Cap seeks a turnover order pursuant to Rule 69(a) of the Federal Rules of Civil Procedure[8] and § 31.002 of the Texas Civil Practice and Remedies Code. Specifically, Af-Cap asks this Court to issue a turnover order whereby a receiver would prepare letters of instruction addressed to Garnishees which would: (1) assign the Congo's right to royalty payments under the Convention to the receiver until Af-Cap's judgment is fully paid; and (2) direct the Garnishees to make such payments monthly in cash, rather than through periodic liftings of oil in kind. Af-Cap has also filed an "Emergency Request for Stay Pending Ruling on its Motion for Turnover Order or Appeal" [#189] in the 100 case. Because the Court will today enter an order on Af-Cap's motion for turnover order, the request for a stay is moot.

### 1.    Texas Turnover Statue

Under the Texas turnover statute, a judgment creditor is entitled to aid from a court in order to reach property to satisfy a judgment. TEX. CIV. PRAC. & REM. CODE § 31.002. The Texas turnover statute provides in part:

---

[8] A federal court may enforce a money judgment "in accordance with the practice and procedure of the state in which the district court is held." FED. R. CIV. P. 69(a).

(a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:

(1) cannot readily be attached or levied on by ordinary legal process; and

(2) is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

b) The court may:

(1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, to a designated sheriff or constable for execution;

(2) otherwise apply the property to the satisfaction of the judgment; or

(3) appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment.

TEX. CIV. PRAC. & REM. CODE § 31.002. The statute is "'the procedural device by which judgment creditors may reach assets of a debtor that are otherwise difficult to attach or levy on by ordinary legal process.'" *Resolution Trust Corp. v. Smith*, 53 F.3d 72, 77 (5th Cir.1995) (quoting *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 224 (Tex. 1991)).[9] It allows a court to reach assets owned and subject to the control of a judgment debtor. *Norsul Oil & Mining Ltd. v. Commercial Equip. Leasing Co.*, 703 S.W.2d 345, 349 (Tex. App.–San Antonio 1985, no writ).

### 2.    Personal Jurisdiction

The Congo's primary objection to the entry of a turnover order is that this Court lacks personal jurisdiction. As the Congo correctly points out, the FSIA provides the exclusive basis for

---

[9] However, "[n]either the statute nor the case law provides a . . . requirement that the judgment creditor demonstrate that other methods of collecting the judgment have failed." *Resolution Trust*, 53 F.3d at 78. *See also Hennigan v. Hennigan*, 666 S.W.2d 322, 323 (Tex. App.–Houston [14th Dist.] 1984, writ ref'd n.r.e.) (former turnover statute did not require judgment creditor to "first exhaust his legal remedies of attachment, execution, garnishment, etc., prior to seeking relief").

the exercise of personal jurisdiction over a foreign state. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). Under the provisions of the FSIA, personal jurisdiction over a foreign state exists where: (1) subject matter jurisdiction is present under 42 U.S.C. §§ 1605–1607; and (2) the foreign state has been properly served with process pursuant to § 1608. 42 U.S.C. § 1330; *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548–49 n.11 (D.C. Cir. 1987); *see also Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981) (under the FSIA "subject matter jurisdiction plus service of process equals personal jurisdiction").

The first question then is whether there is subject matter jurisdiction for an action against the Congo under the FSIA. Although the lawsuit in this case consists solely of the registry of a foreign judgment for the purposes of execution in accordance with Texas law, the requirements for obtaining personal jurisdiction over the Congo must still be satisfied. *See Flatow v. Alavi Found.*, No. 99-2409, 2000 WL 1012956, at *4 (4th Cir. July 24, 2000) (holding the requirements of the FSIA must be satisfied in an action solely for execution pursuant to Rule 69(a) of the Federal Rules of Civil Procedure). Af-Cap's sole argument is that the Congo has waived its right to assert its sovereign immunity as a defense. 42 U.S.C. § 1605(a)(1) (a foreign state may waive its immunity from suit in the United States district courts, either implicitly or explicitly).

Af-Cap contends the Congo has waived its sovereign immunity against suits brought to collect amounts due under an underlying loan agreement in this case under the plain terms of the agreement, which include the following:

-21-

(19)  Law and Jurisdiction

    (A)    This Agreement shall be governed by the laws of England. The Borrower hereby irrevocably agrees that any suit, action or proceeding against the borrower arising out of or in connection with this Agreement may be brought in the High Court of Justice in England, Federal Courts sitting in, and the State Courts of, New York, New York U.S.A. and the Courts of the People's Republic of Congo and irrevocably submits to the jurisdiction of each such court, but nothing shall preclude the Lender from bringing any proceeding arising out of or in connection with this agreement in the courts of any other competent jurisdiction, and proceedings in one jurisdiction shall not preclude proceedings in another jurisdiction whether concurrent or not.

                  \* \* \*

    (C)    The Borrower consents generally in respect of any suit, action or proceedings arising out of or in connection with this Agreement to the giving of any relief, or the issuance of any process in connection with such suit, action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment that may be made or given in such action or proceedings.

Af-Cap's Mot. for Permission to Execute [#58], Ex. 95.

    The Congo argues the loan agreement provisions do not prevent it from asserting its sovereign immunity in this action because the plain language of the agreement provides a consent to the jurisdiction of courts sitting in the state of New York, not Texas. The Congo is correct as far as an express waiver of immunity is concerned. However, under § 1605(a)(1), a waiver of immunity may also be implied. *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 376–77 (7th Cir. 1985). Among the cases in which courts have found an implicit waiver of sovereign immunity to be present are those "involving contracts in which a foreign state has agreed

-22-

to arbitrate disputes [in a foreign country] without specifying jurisdiction in a particular country or forum." *Id.* Since a foreign state's consent to arbitration in an unspecified location outside of its own territory is sufficient to create an implicit waiver of sovereign immunity in the federal courts, a foreign state's consent to be sued in a specific federal court within the United States even more clearly operates as a general, implicit waiver of sovereign immunity.

The Congo also maintains the effect of the contractual immunity waiver has already been decided by the Fifth Circuit, which has stated the provisions of the Loan Agreement are not in themselves sufficient to establish jurisdiction. *Af-Cap, Inc.*, 383 F.3d at 367; *Conn. Bank of Commerce*, 309 F.3d at 247. The holdings cited by the Congo are limited, however, to the question of sovereign immunity as it relates to a foreign state's property under § 1610(c). Since the issue raised here concerns subject matter jurisdiction over an action against the Congo *personally*, the governing statute and the relevant requirements are different. In the opinions cited by the Congo, the Fifth Circuit merely confirmed this Court's earlier conclusion, based on the text of § 1610(c), that property is not subject to execution unless it is located in the United States and "used for a commercial activity in the United States," even though an explicit waiver of sovereign immunity may be present. *Af-Cap, Inc.*, 383 F.3d at 367; *Conn. Bank of Commerce*, 309 F.3d at 247. The plain language of § 1605(a)(1), on the other hand, imposes no additional threshold requirements for a finding of subject matter jurisdiction beyond a finding of express or implied waiver of sovereign immunity by the foreign state. 42 U.S.C. § 1605(a)(1).

The second prong of the personal jurisdiction inquiry relates to service of process. The FSIA requires that for personal jurisdiction to exist, service of process must be made on the foreign state according to the provisions of 28 U.S.C. § 1608. 28 U.S.C. § 1330. Section 1608(a) authorizes service through a number of means including "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." *Id.* Af-Cap argues service has been properly made because the Congo waived its right to have service accomplished in any other manner. Af-Cap's Reply to Congo's Opp. [#115] at 2; Notice of Filing of Proof of Service [#21]. A close reading of the letter waiving service reveals that the Congo only waived its objections to what it once contended were defective attempts at service; it does not establish effective service ever occurred. Nonetheless, the Congo has not argued since Af-Cap's predecessor filed its Notice of Filing of Proof of Service [#21] that an effective service of process is lacking in this case. Since there is no question the Congo has received the underlying pleadings in this case, and since the Congo has explicitly waived its right to be served according to the provisions of § 1608(a)(2)–(4), the Court holds the Congo has effectively accepted service "in accordance with [a] special arrangement for service between [it and] the plaintiff." Because the Court finds subject matter jurisdiction exists over this action under § 1605 and service of process has been made under § 1608, the Court may appropriately exercise personal jurisdiction over the Congo.

-24-

### 3.    Permissibility of Injunctive Relief Under the FSIA

The Congo next contends a turnover order is impermissible under the FSIA because such orders are, in effect, "in personam injunctions compelling that property be turned over and sometimes requiring other facilitating actions." Congo's Opp. to Af-Cap's Mot. for Turnover Order at 4; *Schultz v. Fifth Judicial Dist. Ct. of App. at Dallas*, 810 S.W.2d 738, 741 (Tex. 1991) (holding a turnover order operates "as a mandatory injunction against the judgment debtor"), *abrogated on other grounds by In re Sheshtawy*, No. 03-0766, 2004 WL 3019232, at *6–7 (Tex. Dec. 31, 2004). According to the Congo, the FSIA limits the forms of post-judgment relief a Court may order to "attachment arrest and execution" under §§ 1610 and 1611, none of which is broad enough to include a turnover order. Congo's Opp. to Af-Cap's Mot. for Turnover Order at 5 (relying on the text of § 1609).

The Congo's position, however, ignores the legislative history of the FSIA. "The term 'attachment in aid of execution' [in 28 U.S.C. § 1610] is intended to include attachments, garnishments, and supplemental proceedings available under applicable Federal or State law to obtain satisfaction of a judgment. See [R]ule 69, F.R. Civ. P." H.R. REP. NO. 94-1487, at 28 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6627. The purpose of the turnover order Af-Cap has requested is to facilitate and enable attachment of the royalty obligation. *See* TEX. CIV. PRAC. & REM. CODE § 31.002(a) ("judgment creditor is entitled to aid from the court . . . to reach property to obtain satisfaction on the judgment."). *See also Bowers v. Transportes Navieros Ecuadorianos*, 719 F. Supp. 166, 171 (S.D.N.Y. 1989) (holding order requiring interim payments

-25-

did not violate the FSIA, because order is not injunction drawing upon court's equitable powers, but rather merely enforces a statutory right). Thus, turnover orders appear to be precisely the type of relief Congress envisioned the FSIA would make available to judgment creditors.

Moreover, there is no basis for concluding Congress intended to impose any special exceptions for injunction-based relief to the broad panoply of remedies it sought to make available under the FSIA. As to a claim not barred by sovereign immunity, the FSIA provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances" except that punitive damages are barred. 28 U.S.C. § 1606. The legislative history indicates the broad scope of liability is intended to encompass post-judgment injunctive relief in an appropriate case: "Section 1606 makes clear that if the foreign state, political subdivision, agency or instrumentality is not entitled to immunity from jurisdiction, liability exists as it would for a private party under like circumstances. . . . Consistent with this section, a court could, when circumstances were clearly appropriate, order an injunction or specific performance." H.R. REP. NO. 94-1487, at 22 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6621.

### 4.    Procedural Prerequisites to Turnover Relief

The Congo contends turnover relief is not appropriate in this case because such orders are "appropriate only when property 'cannot readily be attached or levied on by ordinary legal process.'" Congo's Opp. to Af-Cap's Mot. for Turnover Order at 6; TEX. CIV. PRAC. & REM. CODE § 31.002(a)(1). Because it assumes the property at issue is subject to garnishment, the Congo suggests other means of attachment besides turnover relief are readily available. However, the

-26-

Court has already concluded the intangible property in this case involves future obligations not capable of being garnished. These are precisely the kind of obligations to which the Texas turnover statute was intended to apply. Thus, the Congo's argument is facially defective. Moreover, as the Court has already noted, Af-Cap need not make any special showing that other forms of execution have been exhausted before it may obtain turnover relief.

The Congo also contends because turnover relief is a kind of injunction, the Court must be satisfied the turnover order is workable before granting it. The relief sought by Af-Cap fails the workability requirement, the Congo argues, because the Court would be unable to supervise the signing of letters of instruction by foreign officials who are physically located outside the United States. Although the Court agrees workability concerns are ordinarily quite relevant in determining the appropriateness of injunctive relief, the concerns raised by the Congo are insufficient to demonstrate the sought-after relief is inappropriate. First, the turnover order sought by Af-Cap would not entail any extraordinary supervisory efforts by the Court. The proposed order calls for the Congo to do nothing more than execute appropriate letters of instruction, which are to be prepared in advance by a receiver appointed by this Court, and cause those letters to be delivered to three companies. Thus, aside from its supervision of the proposed receiver, the turnover order requires the Court to supervise only two acts: (1) the Congo's signing of the letters of instruction; and (2) its delivery of them.

Second, the Congo's argument the Court is unable to supervise actions to be taken by the Congo's officials proves too much. If an injunction compelling a foreign state's officials to

-27-

perform two simple, ministerial acts is outside the Court's power to grant injunctive relief, there would be nothing left of such power. The workability argument would preclude injunctive relief in every case brought pursuant to the FSIA. Since the Court has already concluded Congress intended injunctive relief to be available under the FSIA, the Congo's workability argument is not a sound basis for denying a turnover order in this case.[10]

Finally, the Congo argues a turnover order would improperly interfere with the priority rights to the intangible property at issue in this case belonging to parties that have obtained garnishment writs in other courts. However, as the Court has already noted, Garnishees in this case are entitled to three months' advance notice before an election by the Congo to take its royalty in cash can become effective. The Garnishees' right to advance notice would necessarily be reflected in the issuance of any turnover relief as the Congo can be expected to turn over no greater payment

---

[10] Similarly without merit is the Congo's contention that, because it would compel certain Congolese government officials to perform a pair of ministerial acts, a turnover order should be rejected as "a grave affront to the Congo's sovereignty." Congo's Opp. to Af-Cap's Mot. for Turnover Order at 8. Like its workability argument, the sovereignty objection fails since it would be available to every foreign state defendant in an action brought pursuant to the FSIA—a result foreclosed by Congress' clear intent to make such relief available to plaintiffs under the FSIA.

Additionally, the Congo's sovereignty argument is foreclosed by the law of this case. The Congo attempts to couch its position in terms of an objection to the particular form of relief Af-Cap now seeks. *Id.* (suggesting injunctive relief is a particular affront to a foreign state's sovereignty). However, its argument is nothing more than a transparent attempt to reassert the act of state doctrine, a tactic already specifically rejected by the Fifth Circuit in this case:

> The Congo Defendants also argue that the act of state doctrine should apply; this means that the situs of foreign debt obligations must be the foreign country because a contrary conclusion would improperly "antagonize the foreign government." However, the act of state doctrine is inapplicable in this context. As the Supreme Court, and this court, have made clear, the act of state doctrine applies only when the dispute implicates the legitimacy of public acts undertaken by a sovereign nation. Because this case does not involve such a public act, but rather a mere dispute over the payment of a debt the Congo does not dispute that it owes, the act of state doctrine does not apply.

*Af-Cap, Inc.*, 383 F.3d at 372 n.14 (internal citations omitted).

-28-

rights than it actually possesses. Accordingly, any future royalty obligations captured by a turnover order issued by this Court will fall outside the service-and-answer period for garnishment actions instituted prior to the date of this Order, which could capture obligations accruing over no more than the next 27 days. *See* TEX. R. CIV. P. 659 (stating a garnishee's answer to a writ of garnishment is due "the Monday next following the expiration of twenty days from the date the writ was served").

Having concluded Af-Cap has established the propriety of turnover relief in this case and finding the Congo's objections to be unavailing, the Court holds Af-Cap is entitled to a turnover order under § 31.002 of the Texas Civil Practice and Remedies Code. The Court declines, however, to enter the turnover order in the form proposed by Af-Cap. That order, which calls for the appointment of a receiver, would unnecessarily require the Court to inject a third party into litigation that has proved to be exceedingly contentious and drawn-out. Rather than subject any independent party to that responsibility, the Court deems it appropriate to make Af-Cap responsible for its own collection and enforcement efforts.[11]

More importantly, the turnover statute does not require the appointment of a receiver. Rather, it specifically authorizes the Court generally to order the judgment debtor to "otherwise apply the property to the satisfaction of the judgment." TEX. CIV. PRAC. & REM. CODE § 31.002(b)(2); *Ross v. 3D Tower Ltd.*, 824 S.W.2d 270, 272 (Tex. App.–Houston [14th Dist.]

---

[11] The Court notes the Congo previously paid off the "NUFI debt"—which served as the basis for the Fifth Circuit's "commercial use" determination in this case—pursuant to a turnover order that did not make use of a receiver. Af-Cap's Mot. for Turnover Order at 1.

1992, writ denied). Therefore, the Court ORDERS that Af-Cap shall prepare a proposed form of

turnover order that does not call for the appointment of a receiver. Similarly, Af-Cap shall prepare

and file for the Court's approval proposed letters of instruction to be signed by the Congo's

authorized representative(s), whereby the Congo would (1) elect to take its royalty interest from

CMS Nomeco Congo Inc., the Nuevo Congo Company, and Nuevo Congo, Ltd. in cash; and (2)

direct each of those companies to direct all royalty payments into the registry of this Court from

the time the Congo's in-cash election becomes effective until the time Af-Cap's judgment is fully

satisfied.

## III.    Conclusion

In accordance with the foregoing:

IT IS ORDERED that Garnishees' Motion to Dismiss [#153 in A-01-CA-100-SS]

is DENIED as to Rules 12(b)(1), 12(b)(2), and 12 (b)(6);

IT IS FURTHER ORDERED that Garnishees' Motion to Dismiss [#153 in

A-01-CA-100-SS] is DISMISSED AS MOOT as to Rule 12(b)(5);

IT IS FURTHER ORDERED that Garnishee's Motion for Partial Summary

Judgment [#169 in A-01-CA-100-SS] is GRANTED;

IT IS FURTHER ORDERED that the writs of garnishment issued on Garnishees

on November 5, 2004 in A-01-CA-100-SS are DISSOLVED;

IT IS FURTHER ORDERED that Af-Cap's Motion for Issuance of New

Garnishment Writs [#160 in A-01-CA-100-SS] is DENIED;

IT IS FURTHER ORDERED that Garnishees' Motion for Expedited Consideration of Motion to Quash Writs of Garnishment [#163], Garnishees' Motion to Quash Writs of Garnishment [#164], Garnishees' Emergency Motion for Expedited Consideration of Garnishees' Dispositive Motions [#168], and Af-Cap's Emergency Request for Stay Pending Ruling on its Motion for Turnover Order or Appeal [#189] (all of which are docketed in A-01-CA-100-SS) are DISMISSED AS MOOT; and

IT IS FINALLY ORDERED that Af-Cap's Motion for Turnover Order [#110 in A-01-CA-321-SS] is GRANTED.

SIGNED this the 4th day of February 2005.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

# EXHIBIT 6

Received 02/    2005 03:26PM in 01:14 on line [6] for GL06L    Pg 2/2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2005 FE -4  PM 2: 06

AF-CAP, INC.,
          **Plaintiff,**

vs.

**REPUBLIC OF CONGO,**
          **Defendant,**

and

**CMS OIL AND GAS COMPANY, et al.,**
          **Garnishees.**

**Case No. A-01-CA-100-SS**

---

## JUDGMENT

BE IT REMEMBERED on this the _4_ day of February 2005, the Court entered an order

granting Garnishees CMS Nomeco Congo Inc., the Nuevo Congo Company, and Nuevo Congo, Ltd.'s

("Garnishees") Motion for Partial Summary Judgment [#169], and hereafter enters the following judgment:

      IT IS ORDERED, ADJUDGED, and DECREED that Plaintiff Af-Cap, Inc. TAKE

NOTHING in this cause against Garnishees and Defendant Republic of Congo, that the Writs of

Garnishments in the above-styled cause of action issued on November 5, 2004 are DISSOLVED,

and that Garnishees and Defendant Republic of Congo go hence without delay and with their

costs, for which let execution issue against Plaintiff.

SIGNED this the _4_ day of February 2005.

                              _Sam Sparks_

                    SAM SPARKS
                    UNITED STATES DISTRICT JUDGE

197

**EXHIBIT 6**

# EXHIBIT 7



# KERN

**Global Language Services**
Translations · Interpreting
DTP · Localization

KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169

Tel. (212) 953 2070
Fax (212) 953 2073
kern.ny@kerntranslations.com

**www.e-kern.com**

State of :     New York

County of:     New York

ss.:

## CERTIFICATE OF ACCURACY

*IT IS HEREBY CERTIFIED, that KERN Corporation, a corporation organized and
existing under the laws of the State of New York, is professionally engaged in the
rendering of foreign language translation services; that it has translated the following
document(s)*

### LETTER DATED MARCH 3, 2005 REGARDING
### AF-CAP, INC. V. REPUBLIC OF CONGO

*from the FRENCH language into the ENGLISH language
and that the said translation is a true and correct rendering of the said document to the
best of our knowledge and belief.*

Signed by: _____

(The Signatory)
for
KERN

Kern Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169
Tel: 212-953-2070
Fax: 212-953-2073

Subscribed to before me this ____7____

Day of ___March___ 2005

Notary Public

JOY N. WILTERMUTH
NOTARY PUBLIC, State of New York
No. 01WI - 6093589
Qualified in New York County
My Commission Expires June 2, 2007

**EXHIBIT 7**

San Francisco: The Russ Building · 235 Montgomery Street, Suite 946 · San Francisco, CA 94104
Tel. (415) 433 5376 · Fax (415) 433 5377 · kern.sf@kerntranslations.com

London: Tel. 011 44 (20) 78 31 56 00 · Frankfurt: Tel. 011 49 (69) 75 60 73-0 · Berlin: Tel. 011 49 (30) 247 212 50 · Paris: Tel. 011 33 (1) 53 93 85 20
Zurich: Tel. 011 41 (1) 2 61 11 60 · Hong Kong: Tel. 011 (852) 28 50 44 55 · Amsterdam: Tel. 011 31 (20) 6 39 01 19 · Lyon: Tel. 011 33 (4) 783 783 73

MINISTER OF FOREIGN AFFAIRES
AND FRANCOPHONY

REPUBLIC OF CONGO
Unité - Travail - Progrès

-----------

CABINET

-------

MAEF 0744 CAB.SP.

Brazzaville, 03 March 2005

MINISTER OF STATE

Re: Republic of Congo v. Af-Cap, Inc.

Dear Judge:

I refer to the order issued by this court on 22 February 2005 (the "Turnover Order"), which provides, *inter alia*:

- "The Court hereby takes possession and control of all future royalty obligations owed to the Congo under the Convention [for the production of oil and gas in the Congo dated May 25, 1979] and this Order shall constitute a judgment lien upon the Congo's property interests in, and its rights to receive payment of, its royalty share" from oil companies operating in the Congo under a concession granted by the Congo in the Convention;

- "The Court further orders the Congo to turn over such royalty payments into the registry of the Court and to execute . . . [a] letter of instruction . . . to the parties who pay royalties under the Convention to the Congo revoking prior instructions regarding payment of the royalty . . . ."

This suit was initiated over four years ago with a view to persuading United States courts to authorize seizure of the Congo's rights to mining royalties, which it collects within its own territory, in satisfaction of a debt purchased by a creditor without any right to said mining royalties. The Congo has strongly objected to this litigation, which is unfounded. It is premised on the erroneous notion that an American court may transfer the right of a sovereign nation—the Republic of Congo—to dispose of its resources within its own borders. The Republic of Congo has thus far endeavored to cooperate with United States judicial authorities in the hope that United States courts would recognize their obligation to respect the Congo's sovereignty, as is mandated not only under Congolese and international law, but under United States law as well.

In light of the judgments of this Court and the Court of Appeals for the Fifth Circuit, the Congo is constrained to protest in the strongest possible terms the failure to

1

respect its sovereign rights and the resulting judicial measures that purport to dispossess the Congo of economic rights comprising its national patrimony and principal source of export revenue. It is an established principle of the law of nations that every state exercises full and permanent sovereignty over its natural resources and exclusive authority to control the economic exploitation thereof. The Congo's rights to the mining royalties within its territory are subject to its exclusive jurisdiction and sovereignty, which cannot be subordinated to the judicial measures of another state.

The Turnover Order issued by this Court is a clear violation by the United States of international law which recognizes the right for any sovereign State to exercise authority and control over its natural resources within its national territory. Such actions impact negatively on the relations between the United States and the Congo, undermining the concerted mutual efforts of both nations to encourage private United States entities to invest in the Congo, in particular in the oil sector. This unfortunate development requires the Congo to reassess its relations with the United States, particularly where other sources of trade and investment such as Canada, Europe, India and China continue to respect the sovereignty of the countries with which they maintain an economic relationship.

The Turnover Order is unenforceable in the Congo, and cannot supersede the Congo's sovereign authority to prescribe and enforce its own laws within its own territory. Regretfully, the Congo must hereby advise the Court that, for the reasons stated, the Congo will not implement the Turnover Order.

Please accept, Your Honor, the expression of my most distinguished consideration.

[seal:    Minister of Foreign Affaires and
          Francophony
          Cabinet
          Republic of Congo]

[signature]

Rodolphe Adada

**Hon. Sam Sparks**
**United States District Judge**
**United States District Court for**
**   The Western District of Texas**
**Austin, Texas**

**U.S.A.**

copy: Hon. William H. Taft, IV
         United States Department of State

2

MINISTERE DES AFFAIRES ETRANGERES
ET DE LA FRANCOPHONIE

République du Congo
Unité – Travail - Progrès

## CABINET

MAEF __0 7 4 ͕__/CAB.SP.-

Brazzaville, le **0 3 MARS 2005**

### LE MINISTRE D'ETAT,

**Objet** : République du Congo c. Af-Cap.Inc

Monsieur le Juge,

Je me réfère à l'Ordonnance de votre tribunal rendue le 22 février 2005 (the « Turnover Order », qui décide notamment :

- « The Court hereby takes possession and control of all future royalty obligations owed to the Congo under the Convention [for the production of oil and gas in the Congo dated May 25, 1979] and this Order shall constitute a judgment lien upon the Congo's property interests in, and its rights to receive payment of, its royalty share" from oil companies operating in the Congo under a concession granted by the Congo in the Convention ;

- "The Court further orders the Congo to turn over such royalty payments into the registry of the Court and to execute...[a] letter of instruction ...to the parties who pay royalties under the Convention to the Congo revoking prior instructions regarding payment of the royalty...

Cette procédure a été initiée par les demandeurs il y a plus de quatre ans dans le but de  convaincre les tribunaux américains d'autoriser la saisie des droits du Congo sur la redevance minière qu'elle perçoit sur son propre territoire, en paiement de droits d'un créancier au titre d'une dette du Congo sans rapport avec un droit quelconque sur cette redevance minière. Le Congo a vigoureusement contesté cette action judiciaire, laquelle est sans aucun fondement. Elle repose sur l'hypothèse erronée qu'un tribunal américain pourrait aliéner le droit d'un Etat souverain, la République du Congo, de disposer de ses ressources à l'intérieur de son propre territoire. La République du Congo a jusqu'à présent coopéré avec les autorités judiciaires américaines dans l'espoir que les tribunaux américains admettraient leur obligation de respecter la souveraineté du Congo, comme le leur impose le droit international, le droit congolais ainsi que le droit des Etats-Unis d'Amérique.

Compte tenu des jugements rendus par votre tribunal et par la Court of Appeals for the Fifth Circuit, le Congo se voit contraint de protester vigoureusement contre le non-respect de ses droits souverains et contre les mesures judiciaires qui visent à le déposséder de droits économiques qui font partie de son patrimoine national et qui constituent sa principale source de revenus à l'exportation. Le droit international public établit clairement le principe selon lequel chaque Etat a le droit d'exercer une souveraineté entière et permanente sur ses ressources naturelles, et dispose du droit exclusif d'en contrôler l'utilisation économique. Les droits du Congo sur la redevance minière à l'intérieur de son territoire sont du ressort de sa souveraineté exclusive, laquelle ne peut en aucun cas faire l'objet de mesures judiciaires de la part d'un autre Etat.

Le Turnover Order émis par votre tribunal constitue une violation patente de la part des Etats-Unis du droit international, lequel consacre le droit pour chaque Etat souverain de gérer ses ressources naturelles à l'intérieur de son territoire national. De telles actions affectent négativement les relations entre les Etats-Unis et le Congo et les efforts mutuels de ces deux nations pour encourager les sociétés américaines à investir au Congo, en particulier dans le domaine pétrolier. Ce regrettable développement met le Congo dans l'obligation de réexaminer ses relations économiques avec les Etats-Unis en tenant compte notamment que d'autres pays partenaires commerciaux, au Canada, en Europe, en Inde et en Chine respectent la souveraineté des pays avec lesquels ils entretiennent des relations économiques.

Le Turnover Order est de nul effet au Congo et ne saurait prévaloir sur l'autorité souveraine de notre pays d'appliquer ses propres lois sur son territoire. J'ai donc le regret de vous informer que, pour les raisons indiquées dans la présente lettre, la République du Congo rejette le Turnover Order.

Veuillez agréer, Monsieur le Juge, l'expression de ma considération distinguée.

Rodolphe ADADA

**Hon. Sam Sparks**
**United States District Judge**
**United States District Court for**
**  The Western District of Texas**
**Austin, Texas**

**U.S.A.**

Copie : Hon. William H. Taft, IV
         United States Department of State

# EXHIBIT 8



ROLE CIVIL N°546
ANNEE:2005

REPERTOIRE N°477
DU 04-07-05

REPUBLIQUE DU CONGO

AU NOM DU PEUPLE CONGOLAIS

L'an deux mil cinq
Et le quatre du mois de juillet;

Par-devant nous,Norbert ELENGA,Président du Tribunal de Grande Instance
de Pointe-Noire,tenant audience publique des référés en notre Cabinet sis
au Palais de Justice de cette ville;

Assisté de Maître Marc ETIKI,Greffier en Chef des Chambres Civiles audit
Tribunal;

(/u la requête en date à Pointe-Noire du 02 Juillet 2005 de la République
du Congo,Ministère des Hydrocarbures,ayant pour conseils,Maîtres Irène Jé-
siane OKOKO,Hervé OBONGUI NGUIE et Nadia MACOSSO,Avocats à la Cour B,P5137
Pointe-Noire;

Attendu qu'elle expose à l'appui de sa requête;que se prévalant de ce
qu'elles ont été saisies par la société AF CAP(titulaire d'une créance sur
la République du Congo suivant une décision de la Cour Suprême de l'Etat d
New York du 9 mai 2000) par les décisions des 4 et 22 février 2005 de la
Cour du District de l'Ouest du Texas,Division Austin,Etats-Unis d'Amérique
,les sociétés CMS Nomeco Inc,Nuevo Congo Company et Nuevo Congo Limited
entendent ne pas permettre l'enlèvement des parts de pétrole brut corres-
pondant aux redevances fiscales dues à la République du Congo au titre de
la convention pour la production d'hydrocarbures du 25 mai 1979;

Que les jugements des 4 et 22 février 2005 prévoient le contrôle de la
Cour sur les redevances fiscales,le versement des redevances fiscales en
numéraire au Greffe de la Cour en faveur de AF CAP en règlement de la
créance de celle-ci sur la République du Congo ainsi que toute somme sup-
plémentaire que la Cour ordonnera,Ces décisions interdisent également la
République du Congo et toute personne ayant connaissance de ces décisions
de transférer,dissimuler ou de disposer des intérêts de la République du
Congo;
Mais que ces décisions ne pourraient être exécutées en République du Con-
go;

Qu'en effet,une décision de justice rendue par une juridiction étrangère
,même en présence de la renonciation par le débiteur de son immunité de
juridiction et d'exécution ne peut pas s'exécuter de plein droit en terri-
toire étranger qu'elle doit,pour recevoir exécution,être soumise à la pro-
cédure d'exequatur telle que prévue par l'article 299 du Code de Procédure
Civile,Commerciale,Administrative et Financière selon lequel sauf conven-
tions diplomatiques contraires,les jugements rendus par les Tribunaux étran
gers ne sont susceptibles d'exécution sur le territoire congolais qu'après
avoir été déclarés exécutoires par une juridiction congolaise qui aurait
été compétente rations matériae pour en connaître;

Qu'en l'occurence,les décisions américaines des 4 et 22 février 2005 n'
ont pas été notifiées à la République du Congo et que ni la société AF CAP,
prétendue créancière de la République du Congo,ni les sociétés CMS Nomeco
Inc,Nuevo Congo Company et Nuevo Congo Limited,tiers saisis,n'ont formulé
devant les Tribunaux Congolais une demande d'exequatur des mêmes décisions
américaines;

Que l'article 50 de l'Acte Uniforme sur les procédures simplifiées de
recouvrement et des voies d'exécution dispose que les biens déclarés in-
saisissables par la loi nationale de chaque Etat Partie ne sont pas suscep-
tibles de saisie alors même qu'ils seraient détenus par des tiers;

Que la saisie ordonnée par la juridiction américaine est contraire à l'
ordre public international et à la souveraineté de la République du Congo
en ce qu'elle vise des redevances fiscales,par nature insaisissables,et
porte atteinte à la République du Congo dans l'exercice de sa souveraineté
fiscale;

Qu'ainsi,il sied,la question de livraison des parts de pétrole brut de

**EXHIBIT 8**

la République du Congo détenues par les sociétés CMS NOMECO Inc, Nuevo Congo Company et Nuevo Congo Limited étant urgente et comportant un péril certain, d' ordonner sur minute que ces sociétés livrent à tout opérateur désigné par la République du Congo lesdites parts de pétrole brut;

Qu'en conséquence de ce qui précède, la République du Congo sollicite, par déci- sion de référé d'heure à heure de constater que les Tribunaux Congolais ne sont saisis d'aucune décision rendue par une juridiction américaine et portant saisie de la redevance minière due à la République du Congo au titre de la convention du 25 mai 1979;-Dire que les décisions de la Cour du District de l'Ouest du Texas des 4 et 22 février 2005 ou qu'une décision d'une juridiction étrangère ne peut s'exécuter sur le territoire congolais sans avoir préalablement fait l' objet de la procédure d'exequatur devant les cours et tribunaux congolais;-cons- tater que les décisions des 4 et 22 février 2005 sont contraires à l'ordre public et ne sauraient être déclarées exécutoires par une juridiction congolaise;-Ordon- ner aux sociétés CMS Nomeco, Nuevo Congo Company et Nuevo Congo Limited de livrer à tout opérateur désigné par la République du Congo les parts de pétrole brut lui revenant, conformément aux dispositions de la convention du 25 Mai 1979 et de la législation en vigueur;-Ordonner l'exécution de droit de la décision à intervenir nonobstant toutes voies de recours;-Statuer ce que de droit sur les dépens;

Attendu que par conclusions en date du 02 Juillet 2005, la Société CMS NOMECO CONGO Inc, ayant pour conseil, Maître Sylvie Nicole KOUISSET, Avocat à la Cour B.P 5318 Pointe-Noire, à soutenu ce qui suit;

Que un certain nombre de juridictions Américaines ont rendu des décisions or- donnant l'immobilisation des parts de pétrole brut revenant à la République du Congo entre les mains de la Société CMS NOMECO CONGO Inc;

Que si la Société CMS NOMECO CONGO INC a introduit des requêtes de non-lieu auprès de plusieurs Cours Américaines au motif que sa livraison des parts de pé- trole brut à tout opérateur désigné par la République du Congo serait obligatoire en Droit Congolais nonobstant l'existence d'une décision contraire émanant d'une Juridiction Américaine et que l'une de ces cours a rejeté cette requête, les au- tres ne s'étant pas prononcées sur le sujet;

Qu'enfin, compte-tenu du fait que la société CMS NOMECO est une société Améri- caine et que les procédures en cours sont des procédures Américaines, une décision émanant d'une juridiction congolaise obligeant la Société CMS NOMECO à livrer des parts de pétrole brut à tout opérateur désigné par la République du Congo exposerait la Société CMS NOMECO au risque d'effectuer un double paiement;

Qu'en effet, si tel était le cas, la société CMS NOMECO serait contrainte de li- vrer des parts de pétrole brut à tout opérateur désigné par la République du Con- go en conformité avec la décision du Tribunal de Grande Instance tout en courant le risque de devoir également effectuer un paiement aux Etats-Unis afin de se conformer à la décision de la Cour Américaine;

Que la Société CMS NOMECO étant manifestement un tiers aux procédures mention- nées ci-dessus sfin, elle ne devrait pas avoir à subir de telles conséquences;

Que l'article 299 du Code de Procédure Civile, Commerciale, Administrative et Financière dispose;"Sauf conventions diplomatiques contraires, les jugements ren- dus par les tribunaux étrangers et les actes reçus par les officiers publics ou ministériels étrangers ne sont susceptibles d'exécution sur le territoire Congo- lais qu'après avoir été déclarés exécutoires par une juridiction Congolaise qui aurait été compétente"ratione materiae" pour en connaître";

Qu'il ressort de ce texte que l'exequatur n'est requis que pour les décisions étrangères exécutées sur le territoire Congolais;

Que or, les décisions de la Cour de District des Etats-Unis, District de l'Ouest du Texas, ont été rendues, signifiées et exécutées aux Etats-Unis;

Que seuls les effets de cette exécution opérée aux Etats-Unis sont ressentis au



••• / •••

Congo à travers la société CMS NOMECO CONGO INC;

Que la République du Congo ne saurait rapporter la preuve d'un quelconque acte d'exécution accompli au Congo par la Société Américaine AF-CAP INC;

Que dans ces conditions, la République du Congo ne peut valablement opposer à se créancière de respecter la formalité d'exequatur comme si elle exécutait sa décision sur le territoire Congolais;

Que la République du Congo sous-tend en outre sa demande par l'immunité de saisie dont elle bénéficie de la loi, notamment des articles 50 de l'Acte Uniforme OHADA portant Organisation des Procédures Simplifiées de Recouvrement et des Voies d'Exécution et 77 de la Charte des Entreprises d'État;

Que or, il a été rappelé supra que la société CMS NOMECO CONGO INC n'est que tiers-détenteur des parts de pétrole brut querellées entre la société Américaine AF-CAP INC et la République du Congo, suite aux décisions Américaines en dates respectives du 04 et 22 Février 2005;

Que le fait pour la Société CMS NOMECO d'avoir immobilisé ces parts de pétrole brut suite aux décisions des juridictions Américaines, ne signifie pas que la Société CMS NOMECO revêt la qualité de saisissant;

Que la Société CMS NOMECO ne saurait opiner sur cette question d'immunité de saisie qui intéresse les principales parties au litige, notamment la Société Américaine AF-CAP Inc et la République du Congo;

Qu'elle sollicite:-Constater que un certain nombre de Juridictions Américaines ont rendu des décisions ordonnant l'immobilisation des parts de pétrole brut revenant à la République du Congo entre les mains de la Société CMS NOMECO;-Constater que la Société CMS NOMECO CONGO n'est que tiers-détenteur des parts de pétrole brut immobilisées;-Dire que seuls les effets de cette exécution sont ressentis au Congo à travers la Société CMS NOMECO;-Constater l'absence d'un quelconque acte d'exécution accompli sur le territoire Congolais;

Qu'en conséquence, Dire n'y avoir lieu à ordonner la livraison des parts de pétrole brut sollicitée par la République du Congo;-Condamner la République du Congo aux dépens;

## SUR QUOI, NOUS JUGE DES REFERES

Attendu qu'il résulte de l'examen des pièces du dossier que les décisions judiciaires américaines ayant ordonné la saisie du pétrole brut Congolais sont contraires à la législation Congolaise en vigueur;

Attendu en effet que la République du Congo est un État souverain donc une personne morale du droit public;

Attendu qu'il y a lieu de lui faire application des dispositions de l'article 30 de l'Acte Uniforme sur les Procédures Simplifiées de Recouvrement et des Voies d'Exécution de l'OHADA qui dispose que"l'exécution forcée et les mesures conservatoires ne sont pas applicables aux personnes qui bénéficient de l'immunité de l'exécution.Toutefois les dettes certaines,liquides et exigibles des personnes morales de droit public ou des entreprises publiques quelles qu'en soient la forme et la mission, donnent lieu à compensation avec les dettes également certaines,liquides et exigibles dont quiconque sera tenu envers elles, sous réserve de réciprocité;

Attendu également que les décisions judiciaires américaines dont saisie du pétrole brut Congolais ne sont pas encore exéquaturées;

Qu'en effet l'article 299 du Code de Procédure Civile,Commerciale,Administrative et Financière(CPCCAF) dispose que:"Sauf conventions diplomatiques contraires,les jugements rendus par les Tribunaux étrangers et les actes reçus par les Officiers publics ou ministériels étrangers ne sont susceptibles d'exécution sur le territoire Congolais qu'après avoir été déclarés exécutoires par une juridiction Congolai-

•••/•••

qui aurait été compétente"ratione materiae" pour en connaître";

Attendu en définitive qu'il n'y a donc lieu à opposer à l'Etat Congolais toutes les décisions judiciaires Américaines;

Attendu également que l'article 50 de l'Acte Uniforme Sur les Procédures Simplifiées de Recouvrement et des Voies d'Exécution(AUPSRVE) de l'OHADA dispose que"les biens déclarés insaisissables par la loi nationale de chaque Etat Partie ne sont pas susceptibles de saisie alors même qu'ils seraient détenus par des tiers";

Or attendu que les redevances pétrolières sont déclarées insaisissables par la loi Congolaise;

Attendu en définitive qu'il sied de dire que la saisie du pétrole brut Congolais ordonnée par les Tribunaux américains est contraire à l'ordre public et porte atteinte à la souveraineté de l'Etat Congolais;

Attendu qu'au regard de tout ce qui précède,il y a lieu de dire que la requête de l'Etat Congolais est donc régulière et recevable;

Attendu au fond que cette requête est fondée;qu'il y a lieu de faire droit à cette requête;

Qu'il échet donc de constater que les Tribunaux Congolais ne sont pas saisis d'aucune décision rendue par une Juridiction Américaine et portant saisie de la redevance pétrolière due à la République du Congo au titre de la convention du 25 Mai 1979;

Attendu qu'il y a lieu donc de rejeter purement et simplement tous les arguments développés par la Société CMS NOMECO CONGO INC;

Attendu que la Société CMS NOMECO CONGO INC a succombé au procès;

Qu'il y a lieu de mettre les dépens à sa charge conformément à l'article 57 du CPCCAF;

### PAR CES MOTIFS

Statuant publiquement,contradictoirement,en référé, en matière d'exécution et en premier ressort;

Au principal;Renvoyons les parties à mieux se pourvoir ainsi qu'elles en aviseront;

Mais dès à présent,vu l'urgence et par provision;

Constatons que les Tribunaux Congolais ne sont saisis d'aucune décision rendue par une juridiction Américaine et portant saisie de la redevance pétrolière due à la République du Congo au titre de la convention du 25 Mai 1979;

Disons que les décisions judiciaires américaines ou d'autres juridictions étrangères ne peuvent s'exécuter sur le territoire Congolais sans avoir préalablement fait l'objet de la procédure d'exéquatur devant les Cours et Tribunaux Congolais,Disons que les redevances pétrolières Congolaises sont insaisissables selon la loi Congolaise;

Constatons que les décisions judiciaires Américaines ayant ordonné la saisie du pétrole brut Congolais sont contraires à l'ordre public et portent atteinte à la souveraineté nationale de la République du Congo;

En conséquence;

Ordonnons aux sociétés CMS NOMECO,Nuevo Congo Company et Nuevo Congo limited de livrer à tout opérateur désigné par la République du Congo les parts de pétrole brut revenant à la république du Congo,conformément aux dispositions de la convention du 25 Mai 1979; et de la législation en vigueur;

...../...



Disons que la présente Ordonnance sera exécutée, en cas de résistance de la société CMS NOMECO, avec l'aide et assistance de la Force Publique;

Ordonnons l'exécution provisoire de la présente Ordonnance nonobstant toutes voies de recours;

Mettons les dépens à la charge de la société CMS NOMECO CONGO INC;

Et avons requis signé notre Ordonnance avec le Greffier,/-

Suivant les signatures (e) illisibles
du Président et du Greffier
suit la mention d'enregistrement.
Enregistré à Pointe-Noire le 0f Juillet 2005
Pour expédition collationnée
certifiée conforme à l'original
établie en..................... Pages.
POINTE-NOIRE, le ... 0.5 Juillet 2005
Le Greffier en Chef

Par consequ'ce la République au Congo
mande et ordonne à tous huissiers sur ce
requis de mettre ledit jugement ... l'exécution
aux Procureurs Généraux et aux Procureurs
de la République près les Cours et Tribu...
de Grande Instance d'y tenir la main ...
commandants et officiers de la force pu...
de prêter main forte lorsqu'ils en seront
légalement requis.

En foi de quoi la présente expédi...
ont signée et scellée par Monsieur ...
...ffier en Chef du tribunal de Gr...
...ce de PuINTE-NOIRE en la ...
...sorté aux forme de la loi.

PAR ...
...tionnaire
...Greffier

Me R. KOUD-OKOUO
Greffier en Chef

**EXECUTION COPY**

**ORDER**

F No. 251

CIVIL LIST No. 546
YEAR: 2005

**REPUBLIC OF THE CONGO**
ON BEHALF OF THE CONGOLESE PEOPLE

REGISTER No. 477
OF JULY 4, 2005

In the year two thousand five;
And on the fourth day of July;

Before us, Norbert Elanga, Presiding Judge of the Pointe-Noire Court of First Instance, holding an urgent public hearing in our Chambers in the Courthouse of said city;

With assistance from Marc Etiki, Attorney, Head Registrar of the Civil Sections of said Court;

With reference to the motion dated July 2, 2005 in Point Noire from the Republic of the Congo, Ministry of Hydrocarbons, with Irène Josiane Okoko, Hervé Obongui Nguie and Nadia Macosso as Legal Counsel, Attorneys at Law, B.P. 5137, Pointe-Noire;

Whereas in support of its motion, it stated: whereas AF CAP (which holds a claim against the Republic of the Congo according to a decision of the Supreme Court of the State of New York of May 9, 2000) based on the decisions of February 4 and 22, 2005 of the District Court, Western District of Texas, Austin Division, United States of America, CMS Nomeco Inc., Nuevo Congo Company and Nuevo Congo Limited do not intend to allow the removal of the shares of crude oil that correspond to the royalties owed to the Republic of the Congo under the hydrocarbons production agreement of May 25, 1979;

Whereas the decisions of February 4 and 22, 2005 provide for the Court's control over the tax royalties owed to the Republic of the Congo, the payment of said royalties in cash to the Registrar of the Court in favor of AF CAP as payment of AF CAP's claim against the Republic of the Congo and of any additional sum the Court may order. These decisions also prohibit the Republic of the Congo and any person with knowledge of these decisions from conveying, concealing or alienating the Republic of the Congo's interests;

But whereas these decisions could not be executed in the Republic of the Congo;

Whereas, actually, a court decision handed down by a foreign jurisdiction, even when the obligor has renounced its immunity of jurisdiction and execution, cannot be executed *ipso jure* in a foreign country; whereas, to be executed, it must be submitted to the procedure for authorizing execution as provided for by Article 299 of the Code of Civil, Commercial, Administrative and Financial Procedure, according to which: "unless there are diplomatic conventions that stipulate otherwise, decisions handed down by foreign courts and instruments received by foreign public or ministerial officers can be executed in the territory of the Congo only after having been declared enforceable by a Congolese jurisdiction that had *ratione materiae* jurisdiction to take cognizance thereof;"

Whereas in this case, the Republic of the Congo was not notified of the U.S. decisions of February 4 and 22, 2005, and whereas neither AF CAP, alleged obligee of the Republic of the Congo, nor CMS Nomeco Inc., Nuevo Congo Company and Nuevo Congo Limited, third parties garnished, filed a motion with the Congolese Courts for the authority to execute the same U.S. decisions;

Whereas Article 50 of the Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution stipulates that property declared not subject to garnishment by the national law of each Contracting State may not be garnished even though it may be held by third parties;

Whereas the garnishment ordered by the U.S. jurisdiction is in conflict with International Public Order and the Republic of the Congo's sovereignty in that it is aimed at tax royalties, by their nature not subject to garnishment, and it interferes with the Republic of the Congo's exercise of its sovereignty in matters of taxation;

Whereas, therefore, since the issue of the delivery of any operator designated by the Republic of the Congo's shares of crude oil held by CMS Nomeco Inc., Nuevo Congo Company and Nuevo Congo Limited is urgent and contains a certain peril, it is important to immediately order these companies to deliver said shares of crude oil to any operator designated by the Republic of the Congo;

Whereas based on the foregoing, the Republic of the Congo is requesting that, by urgent decision, the Court: - find that the Congolese Courts have not received any decision from a U.S. jurisdiction on the garnishment of the mining royalty owed to the Republic of the Congo's under the agreement of May 25, 1979; - find that the decisions of the District Court, Western District of Texas, of February 4 and 22, 2005 or that a decision from a foreign jurisdiction cannot be executed in Congolese territory without first having been the subject of the procedure of authority to execute before the Courts and Tribunals of the Congo; - find that the decisions of February 4 and 22, 2005 conflict with the public order and could not be declared enforceable by a Congolese jurisdiction; - order CMS Nomeco, Nuevo Congo Company and Nuevo Congo Limited to deliver the shares of crude oil to any operator designated by the Republic of the Congo, which is owed those shares in accordance with the provisions of the agreement of May 25, 1979 and the laws in effect; - order the *ipso jure* execution of the decision to be handed down notwithstanding any appeals; - rule on the costs as required by law;

Whereas in briefs dated July 2, 2005, CMS Nomeco Congo Inc., with Sylvie Nicole Mouyecket as Legal Counsel, P.O. Box 5316, Pointe-Noire, reacted as follows:

Whereas a certain number of U.S. jurisdictions have handed down decisions ordering the immobilization of shares of crude oil owed to the Republic of the Congo held by CMS Nomeco Congo Inc;

Whereas CMS Nomeco Congo. Inc. filed motions to have the proceedings terminated with several U.S. courts on the grounds that its delivery of the shares of crude oil to any operator designated by the Republic of the Congo would be compulsory under Congolese law, notwithstanding the existence of a decision to the contrary from a U.S. jurisdiction, and whereas one of the Courts has dismissed this motion, and the others have not ruled on the subject;

Whereas finally, in view of the fact that CMS Nomeco is a U.S. company, and that the proceedings in progress are U.S. proceedings, a decision from a Congolese jurisdiction requiring CMS Nomeco to deliver shares of crude oil to any operator designated by the Republic of the Congo would render CMS Nomeco liable to the risk of remitting double payment;

Whereas in fact, if such were the case, CMS Nomeco would be forced to deliver shares of crude oil to any operator designated by the Republic of the Congo in accordance with the decision of the Court of First Instance and would run the risk of also having to remit a payment to the United States to be in compliance with the decision of the U.S. Court;

Whereas CMS Nomeco is obviously a third party to the proceedings mentioned above, it should not have to be subjected to such consequences;

Whereas Article 299 of the Code of Civil, Commercial, Administrative and Financial Procedure provides that: "Unless there are diplomatic conventions that stipulate otherwise, judgments handed down by foreign courts and official instruments by foreign public or ministerial officers may not be executed in the Congo until they have been declared enforceable by a Congolese jurisdiction that has *ratione materiae* jurisdiction to take cognizance thereof;"

Whereas from this code it emerges that authority to execute is required only for decisions of foreign jurisdictions executed in Congolese territory;

[stamp: POINTE-NOIRE COURT OF FIRST INSTANCE Head Registrar]

Whereas the decisions of the District Court of the United States, Western District of Texas, were handed down, served and executed in the United States;

Whereas only the effects of this execution, carried out in the United States, are felt in the Congo through CMS Nomeco Congo Inc.;

Whereas the Republic of the Congo could not provide evidence of any instrument of execution whatsoever carried out in the Congo by AF-CAP, the U.S. company;

Whereas under these conditions, the Republic of the Congo cannot make valid use of the argument that its obligee observed the procedure for the authority to execute as though it were executing its decision in Congolese Territory;

Whereas the Republic of the Congo further supports its motion by the immunity from garnishment it enjoys under the law, in particular from Article 50 of the OHADA Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution and Article 77 of the Charter of Government Corporations;

Whereas, however, it was noted above that CMS Nomeco Congo Inc. is only "a third party holder" of the shares of crude oil disputed by AF-CAP Inc., the U.S. Company, and the Republic of the Congo, pursuant to the U.S. decisions dated February 4 and 22, 2005, respectively;

Whereas the fact that CMS Nomeco has immobilized these shares of crude oil due to the decisions of the U.S. jurisdictions does not mean that CMS Nomeco Congo Inc. is a party effecting a garnishment;

Whereas CMS Nomeco Congo Inc. could not agree on this issue of immunity of garnishment that involves the main parties to the dispute, mainly AF-CAP Inc., the U.S. company, and the Republic of the Congo;

Whereas it is requesting that the Court: - find that a certain number of U.S. jurisdictions have handed down decisions ordering the immobilization of the shares of crude oil owed to the Republic of the Congo, now held by CMS Nomeco; - find that CMS Nomeco Congo is only a "third arty holder" of the immobilized shares of crude oil; - find that only the effects of this execution are felt in the Congo through CMS Nomeco; find that there is no instrument of execution whatsoever that has been carried out in Congolese territory;

Whereas consequently, find that that there is no reason to order the delivery of the shares of crude oil requested by the Republic of the Congo; and - order the Republic of the Congo to pay the costs;

<u>BASED UPON WHICH, WE, THE JUDGE FOR URGENT MATTERS</u>

Whereas the examination of the exhibits in the file shows that the U.S. court decisions that ordered the attachment of Congolese crude oil conflict with the Congolese laws in effect;

Whereas the Republic of the Congo is indeed a sovereign State and therefore a Government Corporation and Enterprise;

Whereas there is reason to apply to it the provisions of Article 30 of the OHADA Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution which provides that "Compulsory distraint and preventive measures shall not apply to persons enjoying immunity from execution. However, any unquestionable debts due for payment belonging to public corporations or enterprises, regardless of their form and mission, may equally be compensated with unquestionable debts due for payment belonging to any person owing them, subject to reciprocity;"

[stamp: POINTE-NOIRE COURT OF FIRST INSTANCE Head Registrar]

Whereas furthermore, the decisions of the U.S. courts, including for the attachment of the Congolese crude oil, have not yet been authorized for execution;

Whereas in fact Article 299 of the Code of Civil, Commercial, Administrative and Financial Procedure (CPCCAF) provides that "Unless there are diplomatic conventions that stipulate otherwise, judgments handed down by foreign courts and official instruments by foreign public or ministerial officers may not be executed in the Congo until they have been declared enforceable by a Congolese jurisdiction that has *ratione materiae* jurisdiction to take cognizance thereof;"

Whereas ultimately, there is therefore no reason to use the decisions of the U.S. courts as arguments against the Congolese State;

Whereas, moreover, Article 50 of the OHADA Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution (UAOSRPME) provides that "property declared not subject to attachment by the national law of each Contracting State may not be attached, even if it is held by third parties;

Yet, whereas the oil royalties are declared not subject to attachment by Congolese law;

Whereas ultimately, it should be found that the attachment of the Congolese crude oil ordered by the U.S. courts is in conflict with public order and interferes with the sovereignty of the Congolese State;

Whereas with regard to the foregoing, there is reason to find that the Congolese Republic's motion is in order and admissible;

Whereas, in substance, it is grounded; whereas there is reason to accept it;

Whereas it is therefore essential to find that the Congolese Courts have not received any decision handed down by a U.S. jurisdiction on the attachment of the oil royalty owed to the Republic of the Congo under the convention of May 25, 1979;

Whereas there is reason to unconditionally dismiss all the arguments made by Nomeco;

Whereas Nomeco Congo Inc. has lost the proceedings;

Whereas there is reason to require that it pay the costs in accordance with Article 57 of the CCCAFP;

NOW THEREFORE

Ruling in public based on the arguments of both parties on an urgent basis in a civil matter in the first instance;

On the merits, we refer the parties to enter an appeal as they shall advise;

But at this time, given the urgency and by way of advance;

We find that the Congolese Courts have not received any decision handed down by a U.S. jurisdiction on the attachment of the oil royalty owed to the Republic of the Congo under the convention of May 25, 1979;

We find that the U.S. court decisions or decisions of other foreign jurisdictions may not be executed in Congolese territory without first having been the subject of the procedure of the authority to execute with the Congolese Courts and Tribunals. We find that the Congolese oil royalties cannot be attached according to Congolese law;

[stamp: POINTE-NOIRE COURT OF FIRST INSTANCE Head Registrar]

We find that the U.S. court decisions that ordered the attachment of the Congolese crude oil are in conflict with the public order and interfere with the Republic of the Congo's national sovereignty;

Consequently;

We order CMS Nomeco, Nuevo Congo Company and Nuevo Congo Limited to deliver the shares of crude oil that are owed to any operator designated by the Republic of the Congo in accordance with the provisions of the agreement of May 25, 1979 and the laws in effect;

We require that this order be executed, and with the assistance of the law enforcement authorities in the event there is resistance;

We order the provisional execution of this order notwithstanding any appeals;

We order CMS Nomeco Congo Inc. to pay the costs.

And we have signed our Order with the Clerk,

The illegible signatures of the Presiding Judge and the Registrar follow.
The recording follows.
Recorded in Pointe-Noire on July 4, 2005
Certified true execution copy, checked against the original, 5 pages
Pointe-Noire, July 5, 2005
Head Registrar

In consequence thereof: the Republic of the Congo orders its registrars, based upon this application, to execute said judgment with the Attorneys General and Prosecuting Attorneys of the Appeals Courts and Courts of First Instance and to assist all commanders and law enforcement agencies and to assist them when they are required by law to do so.

In witness whereof, this execution copy has been signed and sealed by the Head Registrar of the Pointe-Noire Court of First Instance and delivered by him in the form of an execution copy.

[signed]

By the Court
Document Checked against the Original
The Head Registrar

R. Koud-Okouo, Attorney
Head Registrar

[stamp: POINTE-NOIRE COURT OF FIRST INSTANCE Head Registrar]