# EXHIBIT 9



ROLE CIVIL N°547
ANNÉE:2005

REPERTOIRE N°476
DU 04-07-05

F°251

RÉPUBLIQUE DU CONGO
AU NOM DU PEUPLE CONGOLAIS

L'an deux mil cinq;
Et le quatre du mois de juillet;

Par-devant nous,Norbert ELENGA,Président du Tribunal de Grande Instance de Pointe-Noire,tenant audience publique des référés en notre Cabinet sis au Palais de Justice de cette ville;

Assisté de Maître Marc ETIKI,Greffier en Chef des Chambres Civiles audit Tribunal;

(/u la requête en date à Pointe-Noire du 02 Juillet 2005 de la Société Nationale des Pétroles du Congo(SNPC),ayant pour conseils Maître Irène Josiane OKOKO, Hervé OBONGUI NGUIE et Nadia MACOSSO,Avocats à la Cour B.P 5137 Pointe-Noire;

Attendu qu'à l'appui de sa requête,elle expose:Que se prévalant de ce qu'elles ont été saisies par la société AF CAP(titulaire d'une créance sur la République du Congo suivant une décision de la Cour Suprême de l'État de New York,du 9 Mai 2000) par les décisions des 4 et 22 février 2005 de la Cour du District de l' Ouest du Texas,Division Austin,États-Unis d'Amérique,les sociétés CMS Nomeco Inc. Nuevo Congo Company et Nuevo Congo Limited entendent ne pas permettre l'enlèvement des parts de pétrole brut correspondant aux redevances dues à la République du Congo au titre de la convention pour la production d'hydrocarbures du 25 Mai 1979;

Que les décisions des 4 et 22 février 2005 prévoient le contrôle de la Cour sur les redevances fiscales dues à la République du Congo,le versement desdites redevances en numéraire au Greffe de la Cour en faveur de la créance de AF CAP en règlement de la créance de celle-ci sur la République du Congo ainsi que toute somme supplémentaire que la Cour ordonnera.Ces décisions interdisent également la République du Congo et toute personne ayant connaissance de ces décisions de transférer ,dissimuler ou de disposer des intérêts de la République du Congo;

Que dans une lettre en date du 16 mai 2005,la société CMS Nomeco Inc declare que les décisions américaines sont également applicables aux parts de pétrole brut revenant à la SNPC au titre de la convention du 25 Mai 1979;

Mais que ces décisions ne pourraient être exécutées en République du Congo;

Qu'en effet,une décision de Justice rendue par une juridiction étrangère,même en présence de la renonciation par le débiteur de son immunité de juridiction et d'exécution ne peut pas s'exécuter de plein droit en territoire étranger qu' elle doit,pour recevoir exécution,être soumise à la procédure d'exequatur telle que prévue par l'article 299 du Code de Procédure Civile,Commerciale,Administrative et Financière selon lequel,"sauf conventions diplomatiques contraires,les jugements rendus par les Tribunaux étrangers et les actes reçus par les Officiers publics ou ministériels étrangers ne sont susceptibles d'exécution sur le territoire congolais qu'après avoir été déclarés exécutoires par une juridiction Congolaise qui aurait été compétente"ratione materiae"pour en connaître";

Qu'en l'occurrence,les décisions américaines des 4 et 22 février 2005 n'ont pas été notifiées à la SNPC et que ni la société AF CAP,prétendue créancière de la République du Congo,ni les sociétés CMS Nomeco Inc,Nuevo Congo Company et Nuevo Congo Limited,tiers saisis,n'ont formulé devant les Tribunaux Congolais une demande d'exequatur des mêmes décisions américaines;

Que l'article 50 de l'Acte Uniforme sur les Procédures Simplifiées de Recouvrement et des Voies d'Exécution dispose que les biens déclarés insaisissables par la loi nationale de chaque État Partie ne sont pas susceptibles de saisie alors même qu'ils seraient détenus par des tiers;

Que la saisie ordonnée par la juridiction américaine est contraire à la législation en vigueur en République du Congo;l'article 77 de la loi N°13/81 du 14 ~~xxxxxxxxxxx~~ mars 1981 instituant la charte des Entreprises d'État dispose que les biens de

...///...

**EXHIBIT 9**

-2-

l'entreprise d'Etat sont insaisissables;

Qu'ainsi,il sied,la question de livraison des parts de pétrole brut de la SNPC détenues par les sociétés CMS Nomeco Inc,Nuevo Congo Company et Nuevo Congo Limited étant urgente et composant un péril certain,d'ordonner sur minute que ces sociétés livrent à la SNPC ses parts de pétrole brut;

Qu'en conséquence de ce qui précède la SNPC sollicite que par décision de référé d'heure à heure,soit constaté que les tribunaux congolais ne sont saisis d' aucune décision rendue par une juridiction américaine et portant saisie des parts de pétrole brut de la SNPC au titre de la convention du 25 mai 1979;-dit que les décisions de la Cour du District de l'Ouest du Texas du 25 mai 1979;-dit 2005 ou qu'une décision d'une juridiction étrangère ne peut s'exécuter sur le territoire congolais sans avoir préalablement fait l'objet de la procédure d' exaquatur devant les Cours et Tribunaux Congolais;-constaté que les décisions des 4 et 22 février 2005 sont contraires à l'ordre public et ne sauraient être déclarées exécutoires par une juridiction congolaise;-ordonné aux sociétés CMS Nomeco Nuevo Congo Company et Nuevo Congo Limited de livrer à la SNPC les parts de pétrole brut lui revenant, conformément aux dispositions de la convention du 25 mai 1979;-ordonné l'exécution de droit de la décision à intervenir nonobstant toutes voies de recours;-statué ce que de droit sur les dépens;

Attendu que par écritures en date du 02 Juillet 2005,la société CMS NOMECO Congo Inc,ayant pour conseil Maître Sylvie Nicole MOUYECKET, a réagi en ces termes;

Que un certain nombre de juridictions Américaines ont rendu des décisions ordonnant l'immobilisation des parts de pétrole brut revenant à la Société Nationale des Pétroles du Congo entre les mains de la Société CMS NOMECO Congo Inc;

Que si la société CMS NOMECO Congo Inc est condamnée à livrer ces parts de pétrole brut à la Société Nationale des Pétroles du Congo en dépit du contenu de la décision d'une Cour Américaine, celle-ci risque de se trouver sous la contrainte d'une double obligation de paiement;

Que la société CMS Nomeco Congo Inc a introduit des requêtes de non lieu auprès de plusieurs cours américaines au motif que sa livraison des parts de pétrole bruts à la Société Nationale des Pétroles du Congo serait obligatoire en Droit Congolais nonobstant l'existence d'une décision contraire émanant d'une juridiction Américaine et que l'une de ces Cours a rejeté cette requête,les autres ne s'étant pas prononcées sur le sujet;

Qu'enfin,compte tenu du fait que la société CMS NOMECO CONGO INC est une Société Américaine et que les procédures en cours sont des procédures Américaines,une décision émanant d'une juridiction Congolaise obligeant la Société CMS NOMECO Congo Inc à livrer des parts de pétrole brut à la SNPC exposerait la société CMS NOMECO CONGO INC au risque d'effectuer un double paiement;

Qu'en effet,si tel était le cas,la Société CMS NOMECO CONGO INC serait contrainte de livrer des parts de pétrole brut à la SNPC en conformité avec la décision du Tribunal de Grande Instance tout en courant le risque de devoir également effectuer un paiement aux Etats-Unis afin de se conformer à la décision de la Cour Américaine;

Que la Société NOMECO CONGO INC étant manifestement un tiers aux procédures mentionnées ci-dessus,elle ne devrait pas devoir à subir de telles conséquences;

Que l'article 299 du CPCCAF dispose:"Sauf conventions diplomatiques contraires les jugements rendus par les tribunaux étrangers et les actes reçus par les officiers publics ou ministériels étrangers ne sont susceptibles d'exécution sur le territoire Congolais qu'après avoir été déclarés exécutoires par une juridiction Congolaise qui aurait été compétente"rations materiæ" pour en connaître";

Qu'il ressort de ce texte que l'exaquatur n'est requis que pour les décisions des juridictions étrangères exécutées sur le territoire Congolais;

Que or les décisions de la Cour de District des Etats-Unis,District de l'Ouest



-3-

du Texas, ont été rendues, signifiées et exécutées et exécutées aux Etats-Unis;

Que seuls les effets de cette exécution opérée aux Etas-Unis sont ressentis au Congo à travers la Société CMS NOMECO CONGO INC;

Que la Société Nationale des Pétroles du Congo ne saurait rapporter la preuve d'un quelconque acte d'exécution accompli au Congo par la Société Américaine AF-CAP

Que la SNPC sous-tend en outre sa demande par l'immunité de saisie dont elle bénéficie de la loi, notamment des articles 50 de l'Acte Uniforme OHADA portant Organisation des Procédures Simplifiées de Recouvrement des Créances et des Voies d'Exécution et 77 de la Charte des Entreprises d'Etat;

Que or, il a été rappelé supra que la société CMS NOMECO Congo Inc n'est que" tiers-détenteur" des parts de pétrole brut querellées entre la société Américaine AF-CAP Inc et la SNPC suite aux décisions Américaines en dates respectives du 04 et 22 Février 2005;

Que le fait pour la société CMS NOMECO Congo Inc d'avoir immobilisé ces parts de pétrole brut, suite aux décisions des juridictions Américaines, ne signifie pas que la Société CMS NOMECO Congo Inc revêt la qualité de saisissant;

Que la société CMS NOMECO Congo Inc ne saurait opiner sur cette question d'immunité de saisie qui intéresse les principales parties au litige, notamment la Société Américaine AF-CAP Inc et la SNPC;

Que le Juge saisi, constatera que un certain nombre de juridictions Américaines ont rendu des décisions ordonnant l'immobilisation des parts de pétrole brut revenant à la République du Congo entre les mains de la Société CMS NOMECO CONGO INC, que la Société CMS NOMECO CONGO INC n'est que"tiers-détenteur" des parts de pétrole brut immobilisées; dira que seuls les effets de cette exécution sont ressentis au Congo à travers la Société CMS NOMECO CONGO INC, constatera l'absence d'un quelconque acte d'exécution accompli sur le territoire Congolais;

Qu'en conséquence, il dira n'y avoir lieu à ordonner la livraison des parts de pétrole brut sollicitée par la République du Congo; Condamnera la République du Congo aux dépens;

### SUR QUOI, NOUS JUGE DES REFERES

Attendu qu'il résulte de l'examen des pièces du dossier; Que la Société Nationale des pétroles du Congo SNPC, est une entreprise d'Etat; Qu'à ce titre elle bénéficie de l'immunité de saisie prévue à l'article 77 de la charte nationale des entreprises d'Etat qui dispose que"les biens de l'entreprise d'Etat sont insaisissables sauf les cas prévus par la procédure de liquidation de l'entreprise";

Attendu que dans ces conditions, il y a lieu de faire application des dispositions de l'article 30 de l'Acte Uniforme portant Procédures Simplifiées de Recouvrement et des Voies d'Exécution de l'OHADA;

Qu'en effet l'article 30 de l'Acte Uniforme sur les Procédures Simplifiées de Recouvrement et des Voies d'Exécution de l'OHADA qui dispose que"l'exécution forcée et les mesures conservatoires ne sont pas applicables aux personnes qui bénéficient d'une immunité d'exécution";

Attendu qu'en l'espèce, la SNPC est une entreprise d'Etat et bénéficie de l'immunité d'exécution;

Qu'il y a lieu de lui appliquer les dispositions de l'article 30 de l'Acte Uniforme sur les Procédures Simplifiées de Recouvrement et des Voies d'Exécution de l'OHADA;

Attendu également que les décisions des Tribunaux Américains dont exécution, ne sont pas encore exéquaturées;

Attendu en effet que l'article 299 du Code de Procédure Civile, Commerciale, Administrative et Financière(CPCCAF) dispose que " Sauf conventions diplomatiques con-

...../...

traires,les jugements rendus par les tribunaux étrangers et les actes reçus par les officiers publics ou ministériels étrangers ne sont susceptibles d'exécution sur le territoire congolais qu'après avoir été déclarés exécutoires par une juridiction congolaise qui aurait été compétente "ratione materiae" pour en connaître";

Attendu qu'à ce jour,ni le bénéficiaire desdits jugements,ni la société NOMECO n'ont saisi la juridiction congolaise pour solliciter l'exequatur desdites décisions;

Attendu en conséquence qu'il n'y a lieu donc à exécution desdites décisions américaines rendues;

Attendu qu'au regard de ce qui précède,il y a lieu de dire que la requête de la société SNPC est donc régulière et recevable;

Attendu au fond qu'elle est fondée;

Qu'il y a lieu d'y faire droit;

Attendu qu'il y a lieu de rejeter purement et simplement tous les arguments développés par la société NOMECO;

Attendu que la société NOMECO CONGO INC a succombé au procès;

Qu'il y a lieu de mettre les dépens à sa charge conformément à l'article 57 du Code de Procédure Civile,Commerciale,Administrative et Financière;

## PAR CES MOTIFS

Statuant publiquement,contradictoirement,en référé,en matière d'exécution et en premier ressort;

Au principal; Renvoyons les parties à mieux se pourvoir ainsi qu'elles en aviseront;

Mais dès à présent,vu l'urgence et par provision;

Constatons que la SNPC est bénéficiaire de l'immunité d'exécution;

Constatons que les décisions judiciaires américaines rendues en la matière ne sont pas encore exéquaturées au Congo;

Constatons que lesdites décisions sont contraires à l'ordre public;

En conséquence;

Ordonnons aux sociétés CMS NOMECO,Nuevo Congo Company et Nuevo Congo Limited de livrer les parts de pétrole brut revenant à la SNPC conformément aux dispositions de la convention du 25 Mai 1979;

Disons que la présente ordonnance sera exécutée en cas de résistance avec l'aide de la Force Publique;

Ordonnons l'exécution provisoire de la présente ordonnance nonobstant toutes voies de recours;

Mettons les dépens à la charge de la société CMS NOMECO CONGO INC;

...../.....

-5-

Et avons signé notre Ordonnance avec le Greffier,/-

Suivent les signatures (e) illisibles
du Président et du Greffier
suit la mention d'enregistrement
Enregistré à Pointe-Noire le 04 Juillet 2005
Pour expédition collectionnée
certifiée conforme à l'original
établie en ................ 01 Pages,
POINTE-NOIRE, le 05 Juillet 2005
Le Greffier en Chef

En conséquence la République du Congo
mande et ordonne à tous huissiers sur ce
requis de mettre ledit jugement à exécution
aux Procureurs Généraux et aux Procureurs
de la République Près les Cours et Tribunaux
de Grande Instance d'y tenir la main à tous
Commandants et officiers de la force publique
de prêter main forte lorsqu'ils en seront
légalement requis.

En foi de quoi la présente expédition
a été signée et scellée par Monsieur le
Greffier en chef du tribunal de Grande
Instance de POINTE-NOIRE et par
lui-même sous forme de scellé

Par délégation
Le Greffier

Me R. KOUD-OKOUO
Gréffier en Chef

**EXECUTION COPY**

F No. 251

CIVIL LIST No. 547
YEAR: 2005

**REPUBLIC OF THE CONGO**
ON BEHALF OF THE CONGOLESE PEOPLE

REGISTER No. 476
OF JULY 4, 2005

In the year two thousand five;
And on the fourth day of July;

Before us, Norbert Elanga, Presiding Judge of the Pointe-Noire Court of First Instance, holding an urgent public hearing in our Chambers in the Courthouse of said city;

With assistance from Marc Etiki, Attorney, Head Registrar of the Civil Sections of said Court;

With reference to a motion dated July 2, 2005 in Point Noire from Société Nationale des Pétroles du Congo (SNPC), with Irène Josiane Okoko, Hervé Obongui Nguie and Nadia Macosso as Legal Counsel, Attorneys at Law, B.P. 5137, Pointe-Noire;

Whereas in support of its motion, it stated: whereas AF CAP (which held a claim against the Republic of the Congo according to a decision of the Supreme Court of the State of New York of May 9, 2000) carried out an attachment against Nuevo Congo Company and Nuevo Congo Limited, based on the decisions of February 4 and 22, 2005 of the District Court, Western District of Texas, Austin Division, United States of America, CMS Nomeco Inc., Nuevo Congo Company and Nuevo Congo Limited do not intend to allow the removal of the shares of crude oil that correspond to the royalties owed to the Republic of the Congo under the hydrocarbons production agreement of May 25, 1979;

Whereas the decisions of February 4 and 22, 2005 provide for the Court's control over the tax royalties owed to the Republic of the Congo, the payment of said royalties in cash to the Registrar of the Court in favor of AF CAP as payment of AF CAP's claim against the Republic of the Congo and of any additional sum the Court may order. These decisions also prohibit the Republic of the Congo and any person with knowledge of these decisions from conveying, concealing or alienating the Republic of the Congo's interests;

Whereas in a letter dated May 16, 2005, CMS Nomeco Inc. represented that the U.S. decisions are applicable as well to the shares of crude oil due to the SNPC under the agreement of May 25, 1979;

But whereas these decisions could not be executed in the Republic of the Congo;

Whereas, actually, a court decision handed down by a foreign jurisdiction, even when the obligor has renounced its immunity of jurisdiction and execution, cannot be executed *ipso jure* in a foreign country; whereas, to be executed, it must be submitted to the procedure for authorizing execution as provided for by Article 299 of the Code of Civil, Commercial, Administrative and Financial Procedure (CPCCAF), according to which: "unless there are diplomatic conventions that stipulate otherwise, decisions handed down by foreign courts and instruments received by foreign public or ministerial officers can be executed in the territory of the Congo only after having been declared enforceable by a Congolese jurisdiction that had *ratione materiae* jurisdiction to take cognizance thereof;"

Whereas in this case, the SNPC was not notified of the U.S. decisions of February 4 and 22, 2005, and whereas neither AF CAP, alleged obligee of the Republic of the Congo, nor CMS Nomeco Inc., Nuevo Congo Company and Nuevo Congo Limited, third parties garnished, filed a motion with the Congolese Courts for the authority to execute the same U.S. decisions;

Whereas Article 50 of the Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution stipulates that property declared not subject to garnishment by the national law of each State that is a Party may not be garnished even though it may be held by third parties;

Whereas the garnishment ordered by the U.S. jurisdiction is in conflict with the laws in effect in the Republic of the Congo; Article 77 of Law No. 13/81 of March 14, 1981, creating the Charter of Government Corporations, provides that the property of Government Corporations is not subject to garnishment;

Whereas, therefore, since the issue of the delivery of the SNPC's shares of crude oil held by CMS Nomeco Inc., Nuevo Congo Company and Nuevo Congo Limited is urgent and contains a certain peril, it is important to immediately order these companies to deliver to the SNPC its shares of crude oil ;

Whereas consequently, based on the foregoing, the SNPC is requesting that, by urgent decision, the Court: - find that the Congolese Courts have not received any decision from a U.S. jurisdiction and on the garnishment of the SNPC's shares of crude oil under the agreement of May 25, 1979; - find that the decisions of the District Court, Western District of Texas, of February 4 and 22, 2005 or that a decision from a foreign jurisdiction cannot be executed in Congolese territory without first having been the subject of the procedure of authority to execute before the Courts and Tribunals of the Congo; - find that the decisions of February 4 and 22, 2005 conflict with the public order and could not be declared enforceable by a Congolese jurisdiction; - order CMS Nomeco, Nuevo Congo Company and Nuevo Congo Limited to deliver the shares of crude oil to the SNPC, which is owed those shares in accordance with the provisions of the agreement of May 25, 1979; - order the *ipso jure* execution of the decision to be handed down notwithstanding any appeals; - rule on the costs as required by law;

Whereas in documents dated July 2, 2005, CMS Nomeco Congo Inc., with Sylvie Nicole Mouyecket as Legal Counsel, reacted as follows:

Whereas a certain number of U.S. jurisdictions have handed down decisions ordering the immobilization of shares of crude oil owed to Société Nationale des Pétroles du Congo held by CMS Nomeco Congo Inc;

Whereas if CMS Nomeco Congo. Inc. is ordered to deliver these shares of crude oil to Société Nationale des Pétroles du Congo despite the content of the decision of a U.S. Court, the SNPC may find itself under the constraint of a dual obligation for payment;

Whereas CMS Nomeco Congo. Inc. filed motions to have the proceedings terminated with several U.S. courts on the grounds that the delivery of the shares of crude oil to Société Nationale des Pétroles du Congo would be compulsory under Congolese law, notwithstanding the existence of a decision to the contrary from a U.S. jurisdiction, and whereas one of the Courts has dismissed this motion, and the others have not ruled on the subject;

Whereas finally, in view of the fact that CMS Nomeco Congo Inc. is a U.S. company, and that the proceedings in progress are U.S. proceedings, a decision from a Congolese jurisdiction requiring CMS Nomeco Congo Inc. to deliver shares of crude oil to the SNPC would render CMS Nomeco Congo Inc. liable to the risk of remitting double payment;

Whereas in fact, if such were the case, CMS Nomeco Congo Inc. would be forced to deliver shares of crude oil to the SNPC in accordance with the decision of the Court of First Instance and would run the risk of also having to remit a payment to the United States to be in compliance with the decision of the U.S. Court;

Whereas Nomeco Congo Inc. was obviously a third party to the proceedings mentioned above, it should not have to be subjected to such consequences;

[stamp: POINTE-NOIRE COURT OF FIRST INSTANCE Head Registrar]

3

Whereas Article 299 of the CPCCAF provides that: "Unless there are diplomatic conventions that stipulate otherwise, judgments handed down by foreign courts and official instruments by foreign public or ministerial officers may not be executed in the Congo until they have been declared enforceable by a Congolese jurisdiction that has *ratione materiae* jurisdiction to take cognizance thereof;"

Whereas from this text it emerges that authority to execute is required only for decisions of foreign jurisdictions executed in Congolese territory;

Whereas the decisions of the District Court of the United States, Western District of Texas, were handed down, served and executed in the United States;

Whereas only the effects of this execution, carried out in the United States, are felt in the Congo through CMS Nomeco Congo Inc.;

Whereas Société Nationale des Pétroles du Congo could not provide evidence of any instrument of execution whatsoever carried out in the Congo by AF-CAP, the U.S. company;

Whereas the SNPC further supports its motion by the immunity from garnishment it enjoys under the law, in particular from Article 50 of the OHADA Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution and Article 77 of the Charter of Government Corporations;

Whereas, however, it was noted above that CMS Nomeco Congo Inc. is only "a third party holder" of the shares of crude oil disputed by AF-CAP Inc., the U.S. Company, and the SNPC, due to the U.S. decisions dated February 4 and 22, 2005, respectively;

Whereas the fact that CMS Nomeco Congo Inc. has immobilized these shares of crude oil due to the decisions of the U.S. jurisdictions does not mean that CMS Nomeco Congo Inc. is a party effecting a garnishment;

Whereas CMS Nomeco Congo Inc. could not agree on this issue of immunity of garnishment that involves the main parties to the dispute, particularly AF-CAP Inc., the U.S. company, and the SNPC;

Whereas the Judge before whom the matter was brought shall find that a certain number of U.S. jurisdictions have handed down decisions ordering the immobilization of the shares of crude oil owed to the Republic of the Congo, now held by CMS Nomeco Congo Inc., whereas CMS Nomeco Congo Inc. is only a "third party holder" of the immobilized shares of crude oil; shall find that only the effects of this execution are felt in the Congo through CMS Nomeco Congo Inc., shall find that no execution whatsoever has been carried out in Congolese territory;

Whereas consequently, the Court shall find that that there is no reason to order the delivery of the shares of crude oil requested by the Republic of the Congo; and shall order the Republic of the Congo to pay the costs;

## BASED UPON WHICH, WE, THE JUDGE FOR URGENT MATTERS

Whereas the examination of the exhibits in the file shows that Société Nationale des Pétroles du Congo SNPC is a Government Corporation; whereas consequently it enjoys the immunity from garnishment stipulated in Article 77 of the National Charter of Government Corporations that provides that "the property of government corporations may not be garnished except in cases provided for by the procedure for the liquidation of the corporation;"

Whereas under these conditions, there is reason to apply the provisions of Article 30 of the OHADA Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution;"

[stamp: POINTE-NOIRE COURT OF FIRST INSTANCE Head Registrar]

Whereas Article 30 of the OHADA Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution provides that "enforcement and precautionary measures are not applicable to persons that enjoy immunity from execution;"

Whereas in this instance, the SNPC is a Government Corporation and enjoys immunity from execution;

Whereas there is reason to apply to it the provisions of Article 30 of the OHADA Uniform Act Organizing Simplified Recovery Procedures and Measures of Execution;

Whereas furthermore, the decisions of the U.S. courts, including execution, have not yet been authorized for execution;

Whereas in fact Article 299 of the Code of Civil, Commercial, Administrative and Financial Procedure (CPCCAF) provides that "Unless there are diplomatic conventions that stipulate otherwise, judgments handed down by foreign courts and official instruments by foreign public or ministerial officers may not be executed in the Congo until they have been declared enforceable by a Congolese jurisdiction that has *ratione materiae* jurisdiction to take cognizance thereof;"

Whereas as of today, neither the beneficiary of said decisions nor Nomeco have come before the Congolese courts to solicit the authority to execute said decisions;

Whereas consequently, there is therefore no reason to execute said U.S. decisions that have been handed down;

Whereas with regard to the foregoing, there is reason to find that the SNPC's motion is in order and admissible;

Whereas, in substance, it is grounded;

Whereas there is reason to accept it;

Whereas there is reason to unconditionally dismiss all the arguments made by Nomeco;

Whereas Nomeco Congo Inc. has lost the proceedings;

Whereas there is reason to require that it pay the costs in accordance with Article 57 of the Code of Civil, Commercial, Administrative and Financial Procedure;

<u>NOW THEREFORE</u>

Ruling in public based on the arguments of both parties on an urgent basis in a civil matter in the first instance;

<u>On the merits</u>, we refer the parties to enter an appeal as they shall advise;

But at this time, given the urgency and by way of advance;

We find that the SNPC does enjoy immunity from execution;

We find that the decisions of the U.S. Courts handed down in this matter have not yet been authorized for enforcement in the Congo;

We find that said decisions are in conflict with the public order;

Consequently;

[stamp: POINTE-NOIRE COURT OF FIRST INSTANCE Head Registrar]

5

We order CMS Nomeco, Nuevo Congo Company and Nuevo Congo Limited to deliver the shares of crude oil that are owed to the SNPC in accordance with the provisions of the agreement of May 25, 1979;

We require that this order be executed, and with the assistance of the law enforcement authorities in the event there is resistance;

We order the provisional execution of this order notwithstanding any appeals;

We order CMS Nomeco Congo Inc to pay the costs.

And we have signed our Order with the Clerk,

The illegible signatures of the Presiding Judge and the Registrar follow.
The recording follows.
Recorded in Pointe-Noire on July 4, 2005
Certified true execution copy, checked against the original, 5 pages
Pointe-Noire, July 5, 2005
Head Registrar

In consequence thereof: the Republic of the Congo orders its registrars, based upon this application, to execute said judgment with the Attorneys General and Prosecuting Attorneys of the Appeals Courts and Courts of First Instance and to assist all commanders and law enforcement agencies and to assist them when they are required by law to do so.

In witness whereof, this execution copy has been signed and sealed by the Head Registrar of the Pointe-Noire Court of First Instance and delivered by him in the form of an execution copy.

[signed]

By the Court
Document Checked against the Original
The Head Registrar

R. Koud-Okouo, Attorney
Head Registrar

[stamp: POINTE-NOIRE COURT OF FIRST INSTANCE Head Registrar]

# EXHIBIT 10

Received 07/26/2005 05:02PM in 04:40 on line [12] for GL0607 * Pg 2/8

**FILED**

**2005 JUL 26 PM 1:42**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
       DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

AF-CAP, INC.

        **Plaintiff,**

-vs-                           **Case No. A-01-CA-321-SS**

THE REPUBLIC OF CONGO,
        **Defendant.**

---

### O R D E R

BE IT REMEMBERED on the 26th day of July 2005, the Court reviewed the file in the above-styled cause, and specifically, Plaintiff Af-Cap, Inc.'s ("Af-Cap") "Emergency Motion for Issuance of a Show Cause Order Against CMS Entities" [#162] filed on July 21, 2005. Having considered the motion, the relevant law, and the case file as a whole, the Court now enters the following opinion and order.

#### Background

This judgment collection action was instituted by a predecessor-in-interest of Af-Cap as part of an ongoing effort to collect a judgment against Defendant Republic of Congo ("the Congo"). Although this case has a long history, the Court here focuses its attention on a handful of recent developments. On February 22, 2005, this Court entered an order pursuant to the Texas Turnover Statute, TEX. CIV. PRAC. & REM. CODE § 31.002, and Rule 69 of the Federal Rules of Civil Procedure,[1] ordering the Congo to turn over certain royalty payments owed to it under a Convention

---

[1] Rule 69 provides that "[t]he procedure on execution, in proceedings supplementary to and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held . . . ." FED. R. CIV. P. 69(a).

*163*

**EXHIBIT 10**

Received 07/26/2005 05:02PM in 04:40 on line [12] for GL0607 • Pg 3/8

for the production of oil and gas in the Congo dated May 25, 1979 ("the Convention"). Order of Feb. 22, 2004 ¶ 3. To effectuate this order, the Court directed the Congo to execute certain letters of instruction to the parties that owe it the royalty payments under the Convention—namely, CMS Nomeco Congo, Inc., The Nuevo Congo Company, and Nuevo Congo Ltd. (collectively, "the CMS Entities")—that would direct each to begin paying its respective royalty obligations in cash into the registry of the Court. *Id.* The order also stated, "Until such time as the executed letters of instruction are filed and served as directed above, the Congo and all persons acting in concert with it, together with all persons having actual knowledge of this Order, are restrained and enjoined from transferring, concealing, or otherwise disposing of the Congo's interest in the property." *Id.* ¶ 4.

To date, the Congo has not executed the letters of instruction. Accordingly, on April 6, 2005, the Court entered an order pursuant to Rule 70 of the Federal Rules of Civil Procedure appointing the Clerk of the Court to execute the letters. Order of Apr. 6, 2005 at 4; *see* FED. R. CIV. P. 70 ("If a judgment directs a party to execute a conveyance of land or to deliver deeds or other documents or to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party."). On July 1, 2005, the Court imposed a set of additional sanctions against the Congo including a $10,000 per day fine against the Congo for its continuing contempt.

Af-Cap has advised the Court that the CMS Entities, to whom the letters of instruction were directed, have not paid into the registry of the Court the first set of royalty payments to come due under the Convention since their receipt of the Clerk's instruction letters. Furthermore, the CMS Entities have given Af-Cap notice of their intention to sell their interests in the Convention to a

-2-

Received 07/26/2005 05:02PM in 04:40 on line [12] for GL0607 * Pg 4/8

company formed under the laws of the Congo. Af-Cap seeks the issuance of an order directing the CMS Entities to show cause why they should not be held in this Court's contempt as well as an order restraining them from making the proposed sale of their interests in the Convention. Af-Cap also asks the Court to order the CMS Entities to pay, as a sanction, all of the royalties they owe to the Congo, up to the amount of Af-Cap's unsatisfied judgment, directly to Af-Cap in cash. Finally, Af-Cap asks the Court to order the CMS Entities to post a bond in the entire amount of its unsatisfied judgment against the Congo to secure the CMS Entities' compliance with Af-Cap's other proposed directives.

### Analysis

It cannot be gainsaid that a party cannot be held in contempt of court unless they are in actual violation of a court order. *Doe, 1–13 ex rel. Doe Sr. 1–13 v. Bush*, 261 F.3d 1037, 1058 (11th Cir. 2001). Here, in deciding whether a show cause order should issue, the threshold question for the Court is whether Af-Cap's allegations are sufficient to support a finding the CMS Entities are in violation of any of the Court's orders. In support of their motion, Af-Cap advances two theories. First, Af-Cap contends the CMS Entities are in violation of their obligations under the letters of instruction, which were issued by the Clerk of the Court at the Court's direction. Second, Af-Cap contends that by attempting to sell their royalty interests, the CMS Entities are acting "in active concert" with the Congo in its efforts to violate the Court's turnover order. The Court considers each of these arguments in turn.

Af-Cap first alleges the CMS Entities have violated the terms of the instruction letters that were sent to them by the Clerk pursuant to Rule 70. On this basis, Af-Cap contends the CMS Entities should be held in contempt. The most basic problem with Af-Cap's theory is that the

-3-

Received 07/26/2005 05:02PM in 04:40 on line [12] for GL0607 * Pg 5/8

Clerk's instruction letters are not orders of this Court. Although they were executed and sent by the Clerk of the Court pursuant to a court order, the letters themselves do not independently have the force and effect of a court order. Rather, by the plain terms of the Court's April 6, 2005 Order, the letters are to have the same effect -- no more, no less—as instruction letters executed and sent by the Congo itself. Order of Apr. 6, 2005 at 4.

The Court is also convinced it would be inappropriate to treat the Clerk's letters as having the force and effect of court orders. The Texas Turnover Statute, under which Af-Cap has sought relief from the Court in this case, only permits a turnover order to issue against the judgment debtor itself. *Resolution Trust Corp. v. Smith*, 53 F.3d 72, 77 (5th Cir. 1995) ("Texas courts do not apply the turnover statute to non-judgment debtors."); *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 227 (Tex. 1991) (same); *see also Parks v. Parker*, 957 S.W.2d 666, 668 (Tex. App.--Austin 1997, no writ). Although the Court may order the judgment debtor—here, the Congo—to turn over any property subject to its control no matter who possesses the property, the Court may not issue a turnover order to a third party, even if that party is in actual possession of the judgment debtor's property. *Parks*, 957 S.W.2d at 668.

What Af-Cap seeks, in effect, is to do an end-run around this particular limitation of Texas turnover law. Af-Cap has already essentially acknowledged the limitations of the Texas Turnover Statute by initially constraining its request for turnover relief to an order against the Congo itself. However, by now seeking an order that would require the CMS Entities to pay the amount of the Congo's judgment directly to it, it seeks the exact same relief expressly prohibited to it by binding precedents interpreting the Texas Turnover Statute. The policy behind the prohibition on non-judgment debtor turnover orders is that the turnover statute is "purely procedural in nature . . .

-4-

Received 07/26/2005 05:02PM in 04:40 on line [12] for GL0607 * Pg 6/8

[and it] does not provide for the determination of the substantive rights of the parties." *Resolution Trust Corp.*, 53 F.3d at 77 (quoting *Cross, Kieschnick & Co. v. Johnston*, 892 S.W.2d 435, 439 (Tex. App.–San Antonio 1994, no writ)). That policy is equally applicable here. The letters the Court ordered to be signed by the Clerk and sent to the CMS Entities presupposed the existence of a binding contractual obligation on the CMS Entities to pay the Congo. As already stated, the execution of the instruction letters by the Clerk was to have like effect as if it were done by the Congo. No determination of what that particular "effect" is can be made without reference to the Congo's and the CMS Entities' substantive rights and obligations under the Convention. The making of such a determination would fall outside the appropriate scope of the turnover proceedings under which Af-Cap has sought relief. Although the Texas Turnover Statute entitles Af-Cap to a turnover order against the Congo, as well as appropriate supplemental relief *as against the Congo*, the Court holds Af-Cap is not entitled to turnover relief against entities that are not themselves judgment debtors. Likewise, the Court declines to construe its prior orders or the letters of instruction issued by the Clerk as having the effect of an injunction against the CMS Entities.

Af-Cap also contends the CMS Entities should be held in this Court's contempt because they have "acted in concert with the Congo by agreeing to sell [the CMS Entities'] working interest in the Convention to a Congolese company to aid and abet the Congo's contempt of this Court's orders." Pl.'s Emergency Mot. for Issuance of a Show Cause Order at 4. Pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, injunctions are binding, not only with respect to the parties against whom they are issued, but also against "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." FED. R. CIV. P. 65(d). There is no question

-5-

Received 07/26/2005 05:02PM in 04:40 on line [12] for GL0607 * Pg 7/8

the CMS Entities have received notice of this Court's turnover order against the Congo. Accordingly, if the CMS Entities' proposed sale is an act "in active concert" with the Congo made for the purpose of defeating the effectiveness of this Court's orders, they may be held in contempt and enjoined from proceeding with the sale.

The problem here, however, is that there is no evidence the proposed sale is an act "in active concert" with the Congo, nor is there any reason to believe the CMS Entities' sale of their interests in the Convention would be an act in furtherance of the Congo's noncompliance with the turnover order in this case. After all, the turnover order is directed solely at the Congo. It requires *the Congo* to execute instruction letters to cause its royalty interests to be paid into the registry of the Court. It also prohibits *the Congo* from transferring its own interests in the Convention royalties until after the Court's other orders have been complied with. The turnover order does not, by its terms, prohibit the CMS Entities from transferring their interests under the Convention.

Nor is it clear that a transfer would do anything to facilitate the Congo's present refusal to execute and send the letters of instruction, which is open and ongoing. The letters of instruction appended to the turnover order clearly indicate they are intended to bind the "successors and assigns" of the CMS Entities. The Court has no trouble in holding that the Congo's obligation to execute and send the instruction letters will continue with equal force and effect no matter who holds the CMS Entities' interests under the Convention. Accordingly, there is no reason to believe a transfer would be an act in furtherance of the Congo's present refusal to sign and execute the letters.

The cases cited by Af-Cap in support of its motion are inapposite. *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 75–77 (1st Cir. 2002); *Waffenschmidt v. MacKay*, 763 F.2d 711, 714–15 (5th Cir. 1985). In both *Goya Foods* and *Waffenschmidt*, the courts upheld contempt

-6-

Received 07/26/2005 05:02PM in 04:40 on line [12] for GL0607 * Pg 8/8

sanctions against parties that aided and abetted enjoined parties in disposing of the assets of the enjoined parties themselves. *Goya Food*, 290 F.3d at 75–77; *Waffenschmidt*, 763 F.2d at 714–15. Neither case supports the proposition that a third party may be held in contempt for disposing of its own assets when the only outstanding court order is directed to the assets of the actual party to the action.

A related problem with Af-Cap's motion is that, under the cases on which it relies, the Court must find the CMS Entities' actions were taken "for the benefit of, or to assist, a party subject to the decree." *Goya Foods*, 290 F.3d at 75. Af-Cap has not alleged the existence of any evidence the CMS Entities' proposed sale is being pursued to aid or benefit the Congo. In fact, every bit of the evidence produced by Af-Cap would suggest these entities are merely attempting to cut their own losses, which years of litigation surrounding their interests in the Convention have produced.

### Conclusion

Because the Court is not satisfied Af-Cap has alleged any conduct on the part of the CMS Entities that could be construed as a violation of any of its orders, the issuance of a "show cause" order against the CMS Entities would not be appropriate here.

Accordingly,

IT IS ORDERED that Af-Cap's "Emergency Motion for Issuance of a Show Cause Order Against CMS Entities" [#162] is DENIED.

SIGNED this the 26th day of July 2005.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

-7-

# EXHIBIT 11

Aug-18-05   09:39am   From-US Clerk ▪▪▪▪in                    512 916 5894        T-045   P.002/008   F-732

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2005 AUG 18   AM 9: 06

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

AF-CAP, INC.,

                    **Plaintiff,**

-vs-                                                      **Case No. A-01-CA-321-SS**

**THE REPUBLIC OF CONGO,**
                    **Defendant.**

---

## O R D E R

BE IT REMEMBERED on the 17th day of August 2005, the Court reviewed the file in the above-styled cause, and specifically, Plaintiff Af-Cap, Inc.'s ("Af-Cap") Emergency Motion for Order Authorizing Issuance of Garnishment Writs [#168]. Having considered the motion, the response, the relevant law, and the case file as a whole, the Court now enters the following opinion and order.

### Background

This judgment collection action was originally filed in state court by a predecessor-in-interest of Af-Cap as part of an ongoing effort to collect a judgment against Defendant Republic of Congo ("the Congo"). Around the time the judgment action was filed, Af-Cap's predecessor-in-interest also filed a number of individual garnishment actions by which it sought to garnish the obligations of several companies that owed royalties to the Congo under a Convention for the production of oil and gas in the Congo dated May 25, 1979 ("the Convention").

Each of these actions were eventually removed to this Court. Based on its initial conclusions that the royalty obligations at issue were immune from attachment and execution under the Foreign

**EXHIBIT 11**

SS
AP

Sovereign Immunities Act ("FSIA"), the Court entered an order dissolving the writs of garnishment in the first of the garnishment actions ("the 100 case"). *Conn. Bank of Commerce v. Republic of Congo*, No. A-01-CV-100-SS, slip op. at 9 (W.D. Tex. Mar. 16, 2001).

     The Fifth Circuit vacated the dismissal of the 100 case and remanded, holding this Court and the parties had not made the appropriate factual inquiry in applying the "commercial use" test under the FSIA. *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 260–61 (5th Cir. 2002). On remand, this Court reexamined the question of whether the royalty obligations at issue in this case met the "commercial use" test with the benefit of the Fifth Circuit's opinion and again concluded the obligations did not satisfy the test's requirements. Accordingly, this Court entered orders dismissing both this case—the judgment action—and all of the pending garnishment actions, including the 100 case. Af-Cap appealed the Court's judgments against it in the 100 case and in this case, but it did not appeal the Court's judgment in any of the other individual garnishment actions.

     The Fifth Circuit again reversed, holding the royalty obligations met the requirements of the commercial use test under the FSIA, and hence were not entitled to immunity from execution. *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, 373 (5th Cir. 2004). On remand, Af-Cap moved the Court to reinstate the previously dissolved writs of garnishment. On November 5, 2004, this Court entered an order denying Af-Cap's request on the grounds the underlying debts had been paid. Order of Nov. 5, 2004 at 6–7. The Court did, however, authorize the issuance of new writs against the garnishees in the 100 case. *Id.* Af-Cap then filed a petition for writ of mandamus with the Fifth Circuit seeking to compel this Court to reinstate the previously dissolved writs of garnishment. The Fifth Circuit denied the petition. *In re Af-Cap, Inc.*, 04-51357, slip. op. at 2 (5th Cir. Dec. 20, 2004).

-2-

Then, on February 4, 2005, this Court entered a pair of identical orders in this case and the 100 case. The two significant aspects of those orders were that they: (1) dissolved the newly issued writs of garnishment on the grounds that the royalty obligations, though subject to execution and attachment under the FSIA, were not garnishable under Texas law; and (2) granted Af-Cap's motion for a turnover order against the Congo. *Af-Cap, Inc. v. Republic of Congo,* No. A-01-CV-321-SS, slip op. at 30–31 (W.D. Tex. Feb. 4, 2005). On the day that these orders were entered, the Court also entered a final judgment against Af-Cap in the 100 case. Af-Cap subsequently filed a notice of appeal of that judgment on March 7, 2005.

The Court has retained jurisdiction over this case, however, to enforce the turnover order against the Congo. On February 22, 2005, pursuant to the Texas Turnover Statute, TEX. CIV. PRAC. & REM. CODE § 31.002, and Rule 69 of the Federal Rules of Civil Procedure,[1] the Court entered an order against the Congo requiring it to turn over the royalty payments owed to it by the garnishees from the 100 case—namely, CMS Nomeco Congo, Inc., The Nuevo Congo Company, and Nuevo Congo Ltd. (collectively, "the CMS Entities"). Order of Feb. 22, 2005 ¶ 3. To effectuate this order, the Court directed the Congo to execute certain letters of instruction to the CMS Entities that would direct each to begin paying its respective royalty obligations in cash into the registry of the Court. *Id.*

To date, the Congo has not executed the letters of instruction. Accordingly, on April 6, 2005, the Court entered an order pursuant to Rule 70 of the Federal Rules of Civil Procedure appointing the Clerk of the Court to execute the letters. Order of Apr. 6, 2005 at 4; *see* FED. R. CIV. P. 70 ("If

---

[1] Rule 69 provides that "[t]he procedure on execution, in proceedings supplementary to and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held . . . ." FED. R. CIV. P. 69(a).

a judgment directs a party to execute a conveyance of land or to deliver deeds or other documents or to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party.'"). On July 1, 2005, the Court imposed a set of additional sanctions against the Congo including a $10,000 per day fine against the Congo for its continuing contempt.

On July 21, 2005, Af-Cap sought the issuance of a show cause order against the CMS Entities on the theory that by failing to make the payments contemplated by the Clerk's letters of instruction, they were in contempt of court. Noting that the letters of instruction were not themselves court orders (and that accordingly, the failure to comply with the demands in those letters was not the equivalent of the failure to comply with a court order), the Court denied Af-Cap's motion.

Now, Af-Cap has filed another motion in this judgment action, this time seeking the issuance of new garnishment writs in the 100 case against the CMS Entities.

### Analysis

Since the Court has already made the determination in the February 4, 2005 order (which was entered in this case and the 100 case) that the royalty obligations at issue in this suit are not garnishable under Texas law, Af-Cap faces a significant hurdle in urging the re-issuance of garnishment writs. In an effort to get around the law-of-the-case difficulties it faces, Af-Cap attempts to argue that the defects identified in the February 4, 2005 order have been cured.

In the February 4, 2005 order, the Court held that garnishment proceedings under Texas law may reach only two types of property—seizable effects and debts in money. *Af-Cap, Inc. v. Republic of Congo*, No. A-01-CV-321-SS, slip op. at 10 (W.D. Tex. Feb. 4, 2005). Since the Court concluded

-4-

that the in-kind royalty obligations owed by the CMS Entities to the Congo, which took the form of

obligations to deliver oil to the Congo, did not fit into either category, the Court granted the CMS

Entities' summary judgment motion and dissolved the writs of garnishment. *Id.* at 17–19. Af-Cap

contends that the Clerk's instruction letters to the CMS Entities have the effect of converting the

formerly in-kind royalty obligations into money debts owed by the CMS Entities to the Congo.

Accordingly, they argue the garnishment writs should reissue in the 100 case.

The most glaring problem with the Af-Cap's position is that the Court no longer has any

jurisdiction to do anything in the 100 case. A final judgment was entered months ago. Even if

Af-Cap could point to a correctable error in the judgment, its notice of appeal divested this Court of

jurisdiction. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam)

("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction

on the court of appeals and divests the district court of its control over those aspects of the case

involved in the appeal").

Moreover, it is clear that the procedurally correct way to begin new garnishment proceedings

is the initiation of a new lawsuit naming the garnishees as party defendants. *See* TEX. R. CIV. P. 659

(directing the court or the clerk to separately "docket the case in the name of the plaintiff as plaintiff

and of the garnishee as defendant"). Although the failure to require the filing of a separate action

for new garnishment proceedings is not an error of jurisdictional significance, *see Cloughly v. NBC*

*Bank-Seguin, N.A.*, 773 S.W.2d 652, 658 (Tex. App.–San Antonio 1989, writ denied) (describing

such a failure as an "irregularity in procedure" that would not affect the validity of a judgment), it

is error, and the Court sees no basis on which to permit Af-Cap to serve new garnishment writs in either this action or the 100 action.[2]

In addition to the procedural hurdles facing Af-Cap's motion, the Court also notes that there are real questions about the ultimate legal effect of the Clerk's instruction letters vis-a-vis the CMS Entities. Af-Cap simply takes the position, almost as a matter of conclusion, that the in-kind royalty obligations were converted into money debts by the letters. However, a deeper inspection of the terms of the Convention, the letters themselves (which actually direct the cash payments to be made into the registry of the Court), and the relevant law would likely be required before the Court could find affirmatively the CMS Entities owed monetary debts to the Congo.

---

[2] Af-Cap contends this Court should issue new garnishment writs in the 100 case on the same rationale that was employed when new writs were issued on November 5, 2004. As the reasoning set out in the February 4, 2005 order makes clear, however, the situation presently before the Court is distinguishable from the one with which the Court was faced when it previously issued new writs in the 100 case:

> Garnishees further argue that allowing the filing of multiple garnishment writs under a single cause number would encourage gamesmanship since would-be garnishors could always avoid the problem of losing jurisdiction by simply filing new garnishment writs in old lawsuits. Any such concern is not warranted in this case, however. Af-Cap does not seek to reopen a closed garnishment action. Rather, it seeks the issuance of writs in a case on remand from the Fifth Circuit where the original writs were erroneously dissolved. The earlier writs cannot now be reinstated because the debts they had sought to capture have been fully paid. However, to require a renewed showing of the existence of personal jurisdiction would unnecessarily frustrate the Court's power to grant appropriate relief on remand.

Order of Feb. 4, 2005 at 6–7.

Unlike the prior situation, the Court is not now facing a situation in which it must craft an appropriate remedy to cure an error following a remand. In fact, the Court lacks jurisdiction to do anything in the 100 case at this point. Thus, there is no reason whatsoever to depart from the traditional rule that a separate action is required. *See Betzen v. Exxon Corp.*, 699 S.W.2d 352, 355 (Tex. App.–El Paso 1984, no writ) (holding that Rule 659 of the Texas Rules of Civil Procedure "requires a garnishment proceeding to be docketed separate from the main action [because] it is, in fact, an ancillary proceeding which involves a third party as garnishee.").

Af-Cap's motion makes clear that its real motivation for seeking the re-issuance of garnishment writs in the 100 case is the fact that unless the Court were able to rely on the CMS Entities' appearances in that case, it would probably not have personal jurisdiction over them. The Court is unwilling to adopt a rule, however, whereby personal jurisdiction obtained over a party in one suit, based on the facts existing at the outset of that suit, would forever subject that party to appear in all new proceedings which are in some way related to the original suit.

The Court is well aware that Af-Cap and its predecessors' efforts to collect on the judgment in this case has been plagued by a seemingly never-ending stream of obstacles. Although it is not unsympathetic to the difficulties they have faced, especially in light of the continuing intransigence of the Congo, the Court cannot grant more relief than the law will allow any more than it can make gold out of straw.

### Conclusion

In accordance with the foregoing:

IT IS ORDERED that Af-Cap's Emergency Motion for Order Authorizing Issuance of Garnishment Writs [#168] is DENIED.

SIGNED this the 17th day of August 2005.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE

-7-

# EXHIBIT 12

**EXHIBIT 12**

relevant over_under actual_forecast 30-11-2005(1).xls

## SNPC OVER/UNDER CHECK

| date of B/L | lifting n° | M/T Vessel | Selling price | B/L Qty | ACTIVITIES | BBLS | O/U SNPC | O/U SGV | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-Nov-99 | 82 | ADAMAS | $19.9635 | 500,081 | Lift 82 / 82 royalty / Lift 83 / 83 royalty | 500,081 | 62,510 | 28,200 | | | |
| 21-Dec-99 | 83 | GOLDEN DESTINY | $18.8297 | 543,499 | Lift 83 / 83 royalty | 543,499 | 67,937 | 31,339 | | | |
| 9-Jan-00 | 85 | FOUR SPRING | $20.7500 | 594,445 | Lift 85 / 85 royalty | 594,445 | 74,306 | 34,191 / 10,751 / (104,481) / 34,655 | 204,753 / 104,481 | 104,481 | |
| 8-Mar-00 | 86 | OMNI PROVIDENCE | $21.3903 | 602,899 | Lift 86 (sync) / 4 qtr 99 royalty / 86 royalty | 602,899 | (423,056) | 34,655 | | | 793,665 / 662,899 / 209,234  Overlift by SNPC |
| 7-Apr-00 | 87 | GOLDEN DESTINY | $20.2458 | 513,235 | Lift 87 rem cost / Lift 87 remainder / 87 royalty | 79,029 / 434,206 | 54,276 | 29,786 | | | |
| 19-May-00 | 88 | ADAMAS | $22.5417 | 525,794 | Lift 88 / 88 royalty | 525,794 | 65,724 | 31,666 / 12,575 | | | |
| 6-Jul-00 | 89 | ADAMAS | $26.6810 | 533,162 | Lift 89 / 89 royalty | 533,162 | 66,646 | 31,686 | | | |
| 1-Aug-00 | 90 | MARE DORICO | $23.9665 | 588,712 | Lift 90 / 90 royalty / 2 qtr 00 royalty | 588,712 | 73,589 | 35,120 / 10,185 | | | |
| 29-Aug-00 | 91 | GOLDEN DESTINY | $23.8796 | 594,743 | Lift 91 / 91 royalty | 594,743 | 63,093 | 29,655 | | | |
| 13-Oct-00 | 92 | GOLDEN DESTINY | $29.9492 | 545,222 | Lift 92 (sync) / 92 royalty | 545,222 | (262,342) | 31,300 | 323,327 / 214,727 | 214,727 | 7,168 / 545,222 / 538,054  Overlift by SNPC |
| 28-Nov-00 | 93 | GOLDEN DESTINY | $27.8073 | 541,129 | Lift 93 remainder / 93 royalty / 3 qtr 00 royalty | 57,539 / 483,590 | 60,449 | 32,400 / 17,249 | | | |
| 23-Jan-01 | 94 | MINERVA NOUNOU | $25.0921 | 656,162 | Lift 94 / 94 royalty / 4 qtr 00 royalty / 1999 final roy | 656,162 | 82,020 | 36,455 / 9,781 / (100,046) | | | |
| 16-Apr-01 | 95 | SCF CHAMPION | $22.1876 | 600,329 | Tax maritime (Lift 70-95) / 95 remainder / 95 royalty | 100,046 / 500,283 | 62,535 | 33,685 / 6,605 | | | |
| 23-May-01 | 96 | SCF STAR | $21.2400 | 605,341 | 1 qtr 01 royalty / Lift 96 / 2nd qtr 01 royalty | 600,351 / 4,990 | 75,044 | (4,990) / 35,869 / 12,164 | | | |
| 2-Jul-01 | 97 | CRUDE BALTIC | $19.1408 | 604,988 | Lift 97 / 97 royalty | 604,988 | 75,624 | 35,876 | | | |
| 9-Aug-01 | 98 | TEEKAY FULMAR | $18.0863 | 503,819 | Lift 98 (sync) / 98 royalty | 503,819 | (294,022) | (146,820) / 146,820 / 28,343 | 355,672 / 146,820 | 0  TAX MARITIME WAS PAID FOR  148,820 | 1,327 / 503,819 / 502,492  Overlift by SNPC |
| 12-Sep-01 | 99 | CRUDE OCEAN | $19.7603 | 604,965 | Lift 98 rem cost / Lift 99 / 99 royalty | 66,349 / 533,114 | 66,639 | 35,818 / (5,592) | | | |
| 26-Oct-01 | 100 | CRUDE OCEAN | $17.6196 | 600,295 | Tax maritime (Lift 99) / 2000 final roy / Lift 100 / 100 royalty | 5,502 / 5,392 / 594,903 | 74,383 | 1,068 / 35,489 / (5,392) | | | |
| 3-Dec-01 | 101 | OLYMPIC SPONSOR | $14.2922 | 543,264 | 3rd qtr 01 royalty / Lift 100 / Lift 101 / 101 royalty | 543,264 | 67,908 | 16,887 / 35,489 | | | |
| 25-Dec-01 | 102 | ALMUDAINA | $14.8737 | 728,770 | Tax maritime (Lift 101) / Lift 101 / Lift 102 / 102 royalty | 6,739 / 720,224 | 90,029 | 31,396 / (6,739) | | | |
| 10-Feb-02 | 103 | GENMAR SPIRIT | $13.6963 | 560,000 | Tax maritime (Lift 102) / Lift 103 (sync) / 103 royalty | 8,546 / 550,000 | (316,465) | 41,337 / (8,546) / (164,798) / 28,343 | 298,938 / 164,798 | 164,798 | 86,267 / 550,000 / 463,736  Overlift by SNPC  0  TAX MARITIME WAS PAID FOR  148,820 |
| 28-May-02 | 104 | GENMAR LEONIDAS | $18.9375 | 619,939 | 4th qtr 01 royalty / Lift 103 rem cost / Lift 104 / 104 royalty | 63,366 / 550,820 | 68,653 | 35,863 / (5,752) / 10,628 | | | |
| 25-May-02 | 105 | GENMAR LEONIDAS | $22.8714 | 618,891 | Lift 104 remainder / 1st qtr 02 royalty / Lift 105 / 105 royalty | 5,752 / 614,126 | 78,786 | 5,752 / 10,628 | | | |
| 2-Jul-02 | 106 | STAR OHIO | $21.6935 | 306,521 | Tax maritime (Lift 105) / 2nd qtr 02 royalty / 106 royalty | 4,765 / 306,130 | 38,766 | 37,011 / (4,765) / 2,368 | 35,752 | | |

12/14/2005

SNPC OVER/UNDER CHECK

| date of BL | lifting n° | M/T Vessel | Selling price | BL Qty | ACTIVITIES | BBLS | O/U SNPC | O/U SGV | |
|---|---|---|---|---|---|---|---|---|---|
| 8-Jul-02 | 107 | STAR OHIO | $22.5400 | 248,132 | Tax maritime (Lift 106) / Lift 107 / 107 royalty | 2,491 / 246,133 / 1,999 | 30,767 | (2,491) / (1,999) | |
| 16-Aug-02 | 108 | GENMAR ALTA | $24.5757 | 830,374 | Tax maritime (Lift 107) / Lift 108 / 108 royalty | 824,465 / 5,909 | 103,068 | 98,919 / (5,909) | |
| 27-Sep-02 | 109 | NORTH PACIFIC | $25.1716 | 604,883 | Tax maritime (Lift 108) / Lift 109 (Snpc) / 109 royalty / 3rd qtr 02 royalty | 5,909 / 604,883 | (253,260) | (5,909) / (276,022) / 73,060 / 39,318 | 278,022 |
| 26-Nov-02 | 110 | ALTAIR VOYAGER | $23.5380 | 752,409 | Lift 109 tm cost / Lift 110 remainder / 110 royalty | 52,981 / 695,858 | 86,982 | 89,859 / (5,572) | |
| 18-Jan-03 | 111 | VIRGO VOYAGER | $31.2164 | 618,024 | Tax maritime (Lift 110) / 111 royalty | 5,572 / 614,568 | 76,821 | 75,373 / (3,456) | |
| 3-Mar-03 | 112 | KVEEMA SPIRIT | $31.5730 | 734,584 | Tax maritime (Lift 111) / 112 royalty / 4 th Qt 02 royalty | 3,456 / 720,617 | 91,327 | 89,805 / 15,521 / (4,967) | |
| 4-Apr-03 / 11-Apr-03 | 113 | AEGEAN SPIRIT | $30.1860 | 560,026 | Lift 112 (Snpc) / 113 royalty / Lift 113 tm cost | 4,967 / 550,026 | (110,811) | (370,462) / 65,443 / 28,014 | 370,462 |
| 20-06-2003 | 114 | VIRGO VOYAGER | $35.0400 | 662,770 | Lift 114 / 114 royalty / Lift 113 tm cost | 47,923 / 608,801 | 101,100 | 104,326 / (6,046) / 27,802 | 191,737 |
| 6-Aug-03 | 115 | SGF KHIBINY | $25.2500 | 560,023 | Lift 115 (Snpc) / 115 royalty | 6,046 / 560,023 | (289,523) | (191,737) / 66,054 | 191,737 |
| 3-Oct-03 | 116 | ALMUDAINA | $25.7937 | 811,437 | 2nd qtr 03 royalty / Lift 115 tm cost / Lift 116 | 46,523 / 759,400 | 94,928 | 93,607 / 10,732 | |
| 25-Nov-03 | 117 | HARMONY | $25.9975 | 688,416 | 3rd qtr 03 royalty / Lift 116 / 116 royalty / Lift 117 / 117 royalty | 5,494 / 683,782 | 85,473 | 81,633 / (5,494) | |
| 12-Jan-04 | 118 | ASTRO SCULPTOR | $25.7450 | 600,000 | Tax maritime (Lift 117) / Lift 118 (Snpc) / 118 royalty / 4th qtr 03 royalty / Lift 118 tm cost | 4,634 / 600,003 | (255,703) | (289,300) / 70,367 / 33,946 | 289,300 |
| 19-Mar-04 | 119 | STELLAR VOYAGER | $23.3696 | 678,976 | Lift 119 / 119 royalty | 51,371 / 627,604 | 78,451 | 80,083 / (5,084) | |
| 3-May-04 | 120 | STELLAR VOYAGER | $29.8199 | 650,069 | Tax maritime (Lift 119) / 120 royalty / 1 st Qt 04 royalty | 650,069 | 81,259 | 77,063 / 28,613 / (3,844) | |
| 16-Jun-04 | 121 | GENMAR CONSTANTINE | $29.7060 | 560,022 | Lift 121 (Snpc) / 121 royalty / Lift 121 tm cost | 560,022 | (266,872) | (281,147) / 67,260 | 281,147 |
| 18-Aug-04 | 122 | SEBAROK SPIRIT | $27.2151 | 610,853 | 2nd qtr 04 royalty - estimation / Lift 122 / 122 royalty | 44,093 / 566,760 | 70,845 | 73,723 / 29,298 / (3,915) | |
| 27-Sep-04 | 123 | MT BRITISH HOLLY | $27.4730 | 654,677 | Lift 123 / 123 royalty / 3rd qtr 04 royalty | 654,677 | 81,835 | 78,372 / (4,170) / 27,980 | |
| 22-Nov-04 | 124 | MT GENMAR NESTOR | $25.5506 | 500,018 | Lift 124 / 124 royalty | 500,018 | 62,592 | 59,310 / (3,409) / 22,675 | |
| 29-dec-2004 | 125 | MOSCOW RIVER | $26.2214 | 560,032 | regul TM / Lift 125 (Snpc) / 125 royalty / Lift 125 tm cost | 560,032 | (134,154) / (4,439) / 54,997 | (347,124) / 56,513 | 347,124 |
| 19-Feb-05 | 126 | MT OLYMPIC FLAIR | $33.80 | 439,973 | 4th qtr 04 royalty / Lift 126 / 126 royalty | 4,439 / 439,973 | | 51,015 / (2,289) / 22,936 | |
| 15-Mar-05 | 127 | HARMONY | $37.0939 | 255,067 | Lift 126 tm cost / 4th qtr 04 royalty / Lift 127 / 127 royalty | 255,067 | 31,883 | 29,553 | |

54,997
(2,959)

relevant over /under actual forecast 30-11-2005 v.xls

12/14/2005

## SNPC OVERUNDER CHECK

| date of BL | lifting n° | M/T Vessel | Selling price | B/L Qty | ACTIVITIES | BBLS | O/U SNPC | O/U GOV |
|---|---|---|---|---|---|---|---|---|
| | 128 | ADAIR 21-Apr-05 | $40.3129 | 342,589 | Tax maritime (Lift 127) Lift 128 126royalty | 342,589 | 42,824 | (1,212) 39,258 (1,486) 15,277 |
| | 129 | GENMAR TRUST 23-Jun-05 | $42.6677 | 132,403 | Tax maritime (Lift 128) 1st qtr 05 royalty Lift 129 129royalty | 132,403 | 16,550 | 14,899 (544) |
| | 130 | NS CONCORD 2-Aug-05 | $47.9038 | 435,029 | Tax maritime (Lift 129) Lift 130 130royalty | 435,029 | 54,379 | 49,960 (1,726) 12,002 |
| | 131 | NS CONCEPT 7-Sep-05 | $44.9750 | 606,006 | Tax maritime (Lift 130) 2nd qtr 05 royalty Lift 131 (Snpc) 131 royalty | 606,006 | (245,225) | (284,155) 69,456 **284,155** |
| | 132 | HELLESPONT 20-Nov-05 | $50.0000 | 670,369 | Lift 131 lift cost Lift 132 132royalty Tax maritime (Lift 132) 2nd qtr 05 royalty | 3,000 670,369 | (3,000) 83,796 | 82,623 (2,333) 24,858 |
| | | | | | | | (104,512) | 174,634 |

**FORECAST**

**70,122  Total Over/Under**

**Explanation:**

1) Nomaco Lifting - bbls belong to SNPC = 12.5% of total bbls lifted    See example lift 90 above
2) Nomaco Lifting immediately After SNPC lifting - divide into two portions -> lifting cost and remainder
   a) Lifting cost calculate as ($000,000/sales proof)/12.5%    These bbls are sold to SNPC or Gov.  Recoconciliation to be done bbls received (real lifting costs)
   b) Remainder: bbls belong to SNPC = 12.5% of total bbls lifted minus lifting cost bbls calculated in (a))
   See example lift 93 above
3) Royalties - bbls belong to government = in kind royalty bbls from each royalty declaration
   See example in any of the royalty entry above.
4) SNPC Lifting separate to government and SNPC share
   a) Government share = total government O/U balance since last SNPC lifting
   b) SNPC share = ( total bbls lifted * (87.5%) less amount calculated for government in (a)
   See example lift 86 above

12/14/2005

relevant over under actual  forecast 20-11-2005t.xls