**EXHIBIT "E"**

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 1/12
DEC-06-2002 12:58 ANADARKO CONGO COMPANY 281 261 0192 P.01/12

AMENDMENT TO LIFTING AGREEMENT

BETWEEN THE UNDERSIGNED :

The Société Nationale des Pétroles du Congo ("SNPC"), successor to the Société Nationale de Recherche et d'Exploitation Pétrolières (Hydro-Congo), represented by its Chairman, Mr. Bruno J.R. ITOUA.

On one part,

AND:

On the other hand,

The corporations CMS NOMECO Congo, Inc. successor to Walter International Inc., itself successor to Amoco Congo Exploration ("CMS Congo"), represented by its Chairman, Mr. Jon Ozturgut.

The Nuevo Congo Company successor to Amoco Congo Petroleum Co. ("Nuevo Congo"), represented by its Senior Vice-President, Mr. Robert M. King.

and NUEVO Congo Ltd successor to Kufpec (Congo) Limited) ("Nuevo Ltd."), represented by its Senior Vice-President, Mr. Robert M. King.

jointly referred to hereinafter as the "Parties" and individually as the "Party", with CMS Congo, Nuevo Congo and Nuevo Ltd. being sometimes hereinafter collectively referred to as the "International Oil Companies" or "IOC's".

WHEREAS:

1. Per the decree № 79/253 of the 16th of May 1979, the Government of the Republic of Congo ("the Government") has granted to the Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO) an Exploration Permit known as "Marine I".

2. On May 25, 1979 the predecessors to the present Parties and the Government executed a Convention relating to the Marine I area (the "Convention");

GAR 03437

Received 12/06/2002 11:17AM in 05:34 on line (7) for GL0607 * Pg 2/12
DEC-06-2002 12:50 ANADARKO CONGO COMPANY 281 261 0192 P.02/12

3. On May 25, 1979, the predecessors to the present Parties executed an Association Contract (the "JOA"), regulating the petroleum operations on the Marine I area;

4. On the 15th of March 1989, the Government, via Decree № 89/211, granted to the Société Nationale de Recherche et d'Exploitation Pétrolières (HYDRO-CONGO), the Field known as the Yombo-Masseko-Youbi, the currently productive area covered by the said permit being hereinafter referred to as "Yombo Field";

5. In June 1991, the predecessors to the Parties commenced production of crude oil from the Yombo Field, after the commissioning of the offshore installations, the said production having to be routed through a network of subsea pipelines up to a central offshore tank that is a floating storage vessel intended to the production, storage and unloading of the said crude (hereinafter referred as the "Storage Vessel");

6. On September 20, 1991 the predecessors to the Parties entered into a Lifting Agreement which defined the procedures, priorities and rules applicable in order to implement the methodical and efficient lifting of the crude oil from the Storage Vessel onto the Lifting Vessel;

7. The Government has enacted the following decrees (hereinafter collectively referred to as the "Decrees") regarding SNPC;

- Decree No 99-51 dated April 9, 1999 transferred to SNPC all the petroleum assets and direct and indirect taxes of whatever kind, formerly held by Hydro-Congo, in all the activities relating to the exploration, the exploitation, the processing and transformation of the hydrocarbons and the derivative or related substances.

- Decree No 99-171 dated September 18, 1999 transferred to the Société Nationale des Pétroles du Congo the assets, rights and participating interests held directly by the Government on the permits and petroleum contracts;

8. On October 14, 1991, The Republic of Congo and the National Union Fire Insurance Company of Pittsburgh and the American International Group entered into a Settlement Agreement (the "Settlement Agreement") settling a law suit entitled National Union Fire Insurance Company of Pittsburgh ("NUFI") vs. The People's Republic of Congo, Case № 91 C 3172, then pending in the United States District Court for the Northern District of Illinois (the "NUFI Litigation").

9. On December 5, 1991, the Tribunal in the NUFI Litigation, in accordance with the terms of the Settlement Agreement, has issued an Amended Turnover Order (the "Turnover Order") directing Amoco Congo Exploration Company and Amoco Congo Production Company (since renamed CMS NOMECO Congo, Inc. and The Nuevo Congo Company) to pay to NUFI 50% of the mining royalty (the "Royalty") as that term is defined in the

GAR 03438

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 3/12
DEC-06-2002 12:51 ANADARKO CONGO COMPANY 281 261 0192 P.03/12

Turnover Order and Settlement Agreement, due to the Republic of Congo, under the Convention and JOA, interests included.

10. On December 9, 1991, the Secretary of State for the Budget of the Republic of Congo similarly directed Amoco Congo Exploration Company and Amoco Congo Production Company to pay 50% of the mining royalty due to the Republic of Congo under the Convention and JOA, to NUFI. Consequently CMS NOMECO Congo, Inc and The NUEVO Congo Company have since paid fifty percent (50%) of the Government's share of corresponding mining royalty to NUFI.

11. On October 30, 1999, SNPC was notifying CMS Congo, Operator of Yombo Field, that in accordance with the provisions of the Decrees and the Convention and JOA, it intended to market itself its share of crude oil available from Yombo Field. The Parties met informally and agreed in principle to the timing and methods by which SNPC would take its crude oil entitlement in kind. CMS confirmed those understandings by a letter dated November 26, 1999.

For your information, it is reminded that the procedures concerning these arrangements and repeated in the article 1.1 hereunder have been applied since the lifting № 82. The details of the lifting since the lifting № 82 until the effective date of the present Agreement, as well as the actual balance states of Over-Under-Lifting for the SNPC and the IOC's are enclosed in the Annex 1 and incorporated in the present Agreement.

12. The Parties now wish to formalize their agreement in principle on the procedures and conditions by which SNPC will exercise its right to take in kind and separately market its share of crude oil available in kind.

This Amendment completely explain the duties and obligations regarding its rights to take its own share of crude oil in kind and, cancel and replace the letter of November 26, 1999.

Capitalized terms shall have the meaning ascribed to them in definitions within this Amendment, the Lifting Agreement, the Convention or JOA.

NOW THEREFORE the Parties agree to the following terms and conditions which hereby amend the terms and conditions of the Lifting Agreement into these relevant provisions.

## ARTICLE 1 - LIFTING NOMINATIONS

The procedures defined by the Parties during their meetings of the month of November 1999 are adopted as said hereafter:

1.1 The IOC's will initially have priority to nominate and lift all the Available Oil whereas the SNPC will nominate no Available Oil but will progressively accrue a resulting

GAR 03439

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 4/12
DEC-06-2002 12:51 ANADARKO CONGO COMPANY 281 261 0192 P.04/12

Underlift balance. The SNPC will nominate the Available Oil and will take in kind and separately market the next lifting after the lifting at which SNPC's Underlift balance exceeds 275,000 barrels that is to say one-half of what historically has been an average load during liftings at the Yombo Terminal.

As used herein, the term "Available Oil" shall mean all the oil that has been processed and is in storage on the Storage Vessel except for quantities of such crude oil processed and used by the Operator for production operations and to maintain the ballast of the Storage Vessel as well as any stocks of Wet Crude (defined herein below).

1.2 As a result of its lifting, SNPC will incur an Overlift balance equal to the number of barrels actually lifted reduced by its cumulative Underlift balance resulting from its previous lifting, reduced by the number of barrels representing its entitlement from this lifting.

1.3 IOC's will build-up a corresponding Underlift balance. Thereafter, the IOC's will again nominate and lift all the Available Oil until the SNPC's Underlift balance reaches against275,000 barrels, a quantity bringing this one in the position to carry out the next lifting.

1.4 (1) Within the ten days following the end of each month, the Operator will provide the following information:

(a) Total production of the month.
(b) For each party,
   1. The share of available oil,
   2. The crude production,
   3. The autoconsumption.
(c) Quantity of refunding oil.
(d) Position of each party's stock at the end of each month.

(2) Within fifteen (15) days from each lifting, the Operator will communicate to the parties the current accounts of the Underlift or Overlift balances.

ARTICLE 2 - NOTICE AND FAILURE TO LIFT

2.1 Notwithstanding the provisions of Article 2 of the Lifting Agreement, each Party shall give 25 days advance notice to the other Parties of its intent to conduct a lifting of crude oil and specify a five-day Date Range.

This Party must then nominate a Lifting Vessel within 14 days of the start of the Date Range and give the required three-day Date Range as per the provisions of Article 2.6 of the Lifting Agreement.

The lifting Party shall make the effort to communicate to the Operator a precise date for commencement of the Lifting to allow the Operator to arrange for tugs and personnel. The Lifting Vessels shall conduct lifting operations in strict observance of the Yombo Oil Terminal regulations, including the amendments.

The lifting Party must provide, as per Article 2.6 of the Lifting Agreement, any information that the Operator could reasonably request. Within 24 hours of receiving the lifting nomination and the required information, the Operator will inform the relevant Party if the nominated Lifting Vessel is acceptable or not.

If the Vessel is not acceptable, the Party must nominate an alternate Lifting Vessel within 72 hours.

2.2 If this notice is not timely given, the Lifting Vessel is not timely nominated, or if a lifting is not carried out as scheduled, then, in accordance with the provisions of Article 5 of the Lifting Agreement, the Operator may make other arrangements to carry out the lifting and marketing of the crude oil, in accordance with the provisions of article 5.2 of the Lifting Agreement

The Party that defaults lifting in this way will consequently bear all the costs and expenses really incurred, associated with the loading, as those tied to tugboats, personnel, mooring or piloting, governmental inspectors, berthing time, without being a closed list.

## ARTICLE 3 - OIL PROCESSING

The process of treating Yombo crude oil on the Storage Vessel to make it marketable as No. 6 crude oil, generates certain quantities of residual crude oil having high sulfur, sediment and water content and must be marketed separately from Yombo No. 6 (hereinafter "Wet Oil"). The Parties agree that CMS Congo as Operator shall be responsible for causing the Wet Oil to be lifted and marketed and it will pay back to the Parties the proceeds of this sale including the Royalty share coming to NUFL

## ARTICLE 4 - MARKETING AGREEMENTS

4.1 The Parties agree that for the purpose of calculating mining royalty, including the NUFL Royalty , the actual price of the Operator, stemming from the current sales contract in force between the Operator and the Purchaser, shall be used as calculation base so long as such contract will guarantee competitive price and has a non affiliated entity.

In the event of sales to an affiliate of the Operator, the mining royalty will be calculated, based on the average price of identical international sales of crude oil of equivalent

quality and gravity and transportation costs. The royalty calculation provided herein shall be in lieu of the provisions of Annex II of the Convention.

4.2 Quantities of oil to be taken in kind, in accordance with this Lifting Agreement as amended and, separately marketed by the SNPC ("SNPC Oil Entitlement") will correspond (i) to the Government's and/or SNPC's share of crude oil that is free under Article 9.02 of the JOA and (ii) mining royalty taken in kind under 4.11 of the JOA and their share entitlement to the mining royalty under Articles 5.03 and 7 of the Convention, as amended, decreased by the NUFI royalty share until the settlement of the corresponding debt

4.3 For the SNPC's liftings, the IOC's will pay cash the royalty share that comes to NUFI, on the volume base lifted by the SNPC. These advances as payment of the NUFI royalty share shall be charged into the SNPC advance account, in accordance with the Article 9 of the JOA and shall be recouped by the IOC's on the future sales of hydrocarbons in accordance with the Article 9.02 of the JOA. The payments to the NUFI will continue until the refund of the amounts due under the Settlement Agreement and Turnover Order.

## ARTICLE 5 - LIFTING AND RELATED COSTS

5.1 The SNPC will incur certain costs associated with its liftings.

Those costs include, and are not limited to those tied to the tugs, the personnel, the mooring operations and the costs of transportation to the terminal (collectively referred hereinafter as "Lifting Costs").

If the SNPC does not pay its lifting costs, the Parties agree that the IOC's will bear and pay SNPC's Lifting Costs, subject to reimbursement in the form of the receipt and marketing of a portion of SNPC's Oil Entitlement, representing the economic equivalent of the said Lifting Costs of the SNPC borne by the IOC's.

5.2 In addition to maintaining records required under the Lifting Agreement, the Operator shall create and maintain on its books an accounting ("Over and Under Account") in which SNPC's Lifting Costs paid by the IOC's on behalf of the SNPC on its liftings shall be registered as debts from the SNPC to IOC's.

The debt from SNPC to the IOC's will be repaid out of SNPC's share of the production of crude oil.

At the next lifting succeeding a SNPC lifting, the IOC's will lift and market this number of barrels at the contract price sufficient to reimburse their claim from the SNPC.

The Operator shall maintain a record in its accounting books in order to register the equivalent quantities of crude, lifted and sold by the IOC's to defray SNPC's Lifting Costs. The barrels sold this way will reduce SNPC's entitlement to Available Oil as well as its Stock Position as mentioned in Article 1.4 above.

In accordance with the accounting procedure of JOA, this Amendment does not change nor restrict the rights of the SNPC as a non-Operator, to have the statements kept in these books audited.

5.3 The SNPC may elect to pay its own lifting costs and make its own arrangements for tugs, personnel, mooring or piloting, governmental inspectors, etc. by giving 30 days written notice in advance of its lifting to the Operator.

However any amounts owed by SNPC entered in the Operator's Over and Under account for its previous liftings will be paid in accordance with the terms of Article 5.2 above.

In the event of non-payment by the SNPC of its lifting costs after having given notice of its intent to bear same, the IOC's will consequently pay such costs, subject for the Operator to enter the corresponding amounts to the Over and Under Account of the SNPC. These amounts will be refunded in accordance with the provisions of this article 5.

5.4 The SNPC will settle the Maritime Tax associated to its own liftings. Consequently, the IOC's will be discharged of any liability concerning the obligations to settle the Maritime Tax relating to liftings carried out by the SNPC.

## ARTICLE 6 - APPROVALS

Except for the amendments brought hereby, the Parties re-affirm and ratify the Lifting Agreement, including the provisions from the JOA which are incorporated or quoted as reference and agree to be bound by and to comply with its clauses including, without limitation, the provisions relating to liftings and deliveries, to the statements provided by the Operator, demurrage, loading and mooring, measurements, risk of loss, final settlement, and the like.

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 8/12
DEC-06-2002 12:53 ANADARKO CONGO COMPANY 281 251 0192 P.08/12

This Amendment cancels and replaces the letter of November 26, 1999 mentioned in point 11 of the preamble, in its provisions contrary to the provisions hereby.

Made in Pointe Noire, on the 4th of July 2001

In as many copies as parties:

Société Nationale des Pétroles du Congo

By: ______________________
Chairman

CMS NOMECO Congo, Inc.

By: ______________________
Chairman

The Nuevo Congo Company

By: ______________________
Senior Vice-President

NUEVO Congo Ltd.

By: ______________________
Senior Vice-President

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 9/12
DEC-06-2002 12:54 ANADARKO CONGO COMPANY 281 261 0152 P.09/12

Le présent Avenant annule et remplace la lettre du 26 novembre 1999 visée au point 11 du préambule, en ses dispositions contraires aux présentes.

Fait à Pointe Noire le, 4 Juillet 2001.

En autant d'exemplaires originaux que de parties.

Société Nationale des Pétroles du Congo

Par: Bruno J.R. ITOUA
Président Directeur Général

CMS NOMECO Congo, Inc.

Par:
Président Directeur Général

The Nuevo Congo Company

Par:
Vice-Président Sénior

NUEVO Congo Ltd.

Par:
Vice-Président Sénior

GAR 03445

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 10/12
DEC-06-2002 12:54 ANADARKO CONGO COMPANY 281 261 0192 P.10/12

OVER/(UNDER) LIFT CALCULATION
YOMBO FIELD LIFTING

| DATE | LIFTING | TOTAL QUANTITY (BBLS) | DESCRIPTION | FOREIGN PARTNERS ACTIVITIES | FOREIGN PARTNERS BALANCE | SNPC ACTIVITIES | SNPC BALANCE |
|---|---|---|---|---|---|---|---|
| 11/1/99 | | | BEGINNING BALANCE | | 0 | | 0 |
| 11/26/99 | 82 | 500,891 | BARRELS LIFTED | 500,891 | | 0 | |
| | | | ENTITLEMENT | 457,[illegible] | | 42,340 | |
| | | | OVER/(UNDER) LIFT | [illegible] | 42,340 | ([illegible]) | ([illegible]) |
| | | | ROYALTIES IN KIND | 25,[illegible] | [illegible] | ([illegible]) | ([illegible]) |
| 12/21/99 | 83 | 543,[illegible] | BARRELS LIFTED | 543,[illegible] | | 0 | |
| | | | ENTITLEMENT | 475,[illegible] | | 67,[illegible] | |
| | | | OVER/(UNDER) LIFT | 67,[illegible] | [illegible] | ([illegible]) | ([illegible]) |
| | | | ROYALTIES IN KIND | 24,[illegible] | [illegible] | ([illegible]) | ([illegible]) |
| | 4QTR 99 | | ROYALTIES IN KIND | [illegible] | [illegible] | ([illegible]) | ([illegible]) |
| 1/26/00 | 84 | [illegible] | BARRELS LIFTED | [illegible] | | 0 | |
| | | | ENTITLEMENT | [illegible] | | 74,[illegible] | |
| | | | OVER/(UNDER) LIFT | [illegible] | 376,441 | ([illegible]) | ([illegible]) |
| | | | ROYALTIES IN KIND | 24,[illegible] | 366,[illegible] | ([illegible]) | ([illegible]) |
| 3/[illegible]/00 | 85 | [illegible] | BARRELS LIFTED | 0 | | [illegible] | |
| | | | ENTITLEMENT | [illegible] | | 71,[illegible] | |
| | | | OVER/(UNDER) LIFT | ([illegible]) | ([illegible]) | [illegible] | 214,[illegible] |
| | | | ROYALTIES IN KIND | 24,[illegible] | (163,[illegible]) | ([illegible]) | [illegible] |
| | | | LIFT COST | [illegible] | ([illegible]) | [illegible] | [illegible] |
| 4/7/00 | 87 | 78,029 | BARRELS LIFTED | 78,[illegible] | | 0 | |
| | | | ENTITLEMENT | 86,[illegible] | | 8,[illegible] | |
| | | | OVER/(UNDER) LIFT | 1,[illegible] | ([illegible]) | ([illegible]) | 163,[illegible] |
| | 87 | 434,208 | BARRELS LIFTED | 434,208 | | 0 | |
| | | | ENTITLEMENT | [illegible] | | 34,[illegible] | |
| | | | OVER/(UNDER) LIFT | 34,[illegible] | (125,[illegible]) | ([illegible]) | 126,371 |
| | | | ROYALTIES IN KIND | 36,[illegible] | [illegible] | ([illegible]) | [illegible] |
| | 1ST QTR 00 | | ROYALTIES IN KIND | [illegible] | ([illegible]) | ([illegible]) | 87,[illegible] |
| | 88 | 425,794 | BARRELS LIFTED | 425,794 | | 0 | |
| | | | ENTITLEMENT | [illegible] | | 85,724 | |
| | | | OVER/(UNDER) LIFT | [illegible] | (21,[illegible]) | ([illegible]) | 21,330 |
| | | | ROYALTIES IN KIND | 31,[illegible] | 9,715 | ([illegible]) | ([illegible]) |
| | 89 | 433,142 | BARRELS LIFTED | [illegible] | | 0 | |
| | | | ENTITLEMENT | [illegible] | | [illegible] | |
| | | | OVER/(UNDER) LIFT | [illegible] | 70,[illegible] | ([illegible]) | ([illegible]) |
| | | | ROYALTIES IN KIND | 21,[illegible] | 106,[illegible] | ([illegible]) | (136,[illegible]) |
| | 2ND QTR 00 | | ROYALTIES IN KIND | 16,[illegible] | 119,[illegible] | ([illegible]) | (114,[illegible]) |
| | 90 | 388,712 | BARRELS LIFTED | 388,712 | | 0 | |
| | | | ENTITLEMENT | [illegible] | | 73,[illegible] | |
| | | | OVER/(UNDER) LIFT | 73,[illegible] | [illegible] | ([illegible]) | ([illegible]) |
| | | | ROYALTIES IN KIND | [illegible] | [illegible] | ([illegible]) | ([illegible]) |
| | 91 | 504,749 | BARRELS LIFTED | 504,749 | | 0 | |
| | | | ENTITLEMENT | 421,[illegible] | | 83,[illegible] | |
| | | | OVER/(UNDER) LIFT | [illegible] | 304,[illegible] | ([illegible]) | ([illegible]) |
| | | | ROYALTIES IN KIND | 30,[illegible] | [illegible] | ([illegible]) | ([illegible]) |
| | 92 | 545,222 | BARRELS LIFTED | 0 | | 545,222 | |
| | | | ENTITLEMENT | 477,[illegible] | | 68,[illegible] | |

```
                                                Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 11/12
DEC-06-2002  12:54         ANADARKO CONGO COMPANY                              281 261 0192    P.11/12
```

[Table of lifting, entitlement, overunder/under lift, royalties in kind, and tax maritime figures by quarter and year — largely illegible due to scan quality.]

GAR 03447

Received 12/06/2002 11:17AM in 05:34 on line [7] for GL0607 * Pg 12/12
DEC-06-2002 12:55 ANADARKO CONGO COMPANY 281 261 8192 P.12/12

SNPC OVER/UNDER CHECK

| ACTIVITIES | BBLS | O/U SNPC | O/U GOV |
|---|---|---|---|
| LIR 82 | 500,061 | 62,516 | |
| 82 royalty | | | 28,200 |
| LIR 83 | 543,429 | 67,947 | |
| 83 royalty | | | 31,339 |
| LIR 85 | 594,446 | 74,306 | |
| 85 royalty | | | 34,191 |
| 4 qtr 88 royalty | | | 10,791 |
| LIR 86 (snpc) | 602,899 | (423,066) | (104,401) |
| 86 royalty | | | 34,655 |
| LIR 87 1/3 cost | 79,029 | | |
| LIR 87 remainder | 434,206 | 54,276 | |
| 87 royalty | | | 23,796 |
| LIR 88 | 525,794 | 65,724 | |
| 88 royalty | | | 31,086 |
| 1 qtr 00 royalty | | | 12,012 |
| LIR 89 | 533,162 | 66,645 | |
| 89 royalty | | | 31,696 |
| LIR 90 | 588,712 | 73,589 | |
| 90 royalty | | | 35,120 |
| 2 qtr 00 royalty | | | 10,165 |
| LIR 91 | 504,743 | 63,093 | |
| 91 royalty | | | 29,805 |
| LIR 92 (snpc) | 546,222 | (292,405) | (214,864) |
| 92 royalty | | | 31,980 |
| LIR 93 1/3 cost | 67,539 | | |
| LIR 93 remainder | 465,590 | 60,449 | |
| 93 royalty | | | 32,400 |
| 3 qtr 00 royalty | | | 17,248 |
| LIR 94 | 656,162 | 82,020 | |
| 94 royalty | | | 36,495 |
| 4 qtr 00 royalty | | | 8,781 |
| 1999 final roy | | | (188) |
| Tax maritime (LIR 70-95) | 100,046 | | (100,046) |
| LIR 95 remainder | 500,283 | 62,535 | |
| 95 royalty | | | 33,695 |
| 1 qtr 01 royalty | | | 5,663 |
| LIR 96 | 603,361 | 78,044 | |
| Tax maritime (LIR 96) | 4,900 | | (4,900) |
| 96 royalty | | | 35,606 |
| LIR 97 Exxon | 600,670 | 75,084 | |
| Tax maritime (LIR 97) Exxon | 4,316 | | (4,316) |
| 97 royalty Exxon | | | 36,290 |
| | | 197,781 | 130,781 |

328,513 Total Over/Under

JRO

GAR 03448

TOTAL P.12