IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------X
 :
CONNECTICUT BANK OF COMMERCE, :
 :
                Plaintiff, :   Civil Action No. 05-762 SLR
 :
      - against - :
 :
THE REPUBLIC OF CONGO. :
 :
                Defendant, :
 :
CMS NOMECO CONGO INC., :
 :
                Garnishee. :
 :
---------------------------------------------------------------------X

**AFFIDAVIT OF JAMES W. PERKINS IN SUPPORT OF AF-CAP, INC.'S
EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE FOR AN ORDER OF
CONTEMPT, ORDER OF SEQUESTRATION AND PRELIMINARY INJUNCTION**

STATE OF NEW YORK    )
                                ) ss.:
COUNTY OF NEW YORK )

        JAMES W. PERKINS, being duly sworn, deposes and says:

        1.     I am a shareholder of the law firm of Greenberg Traurig, LLP, counsel to Af-Cap, Inc. ("Af-Cap"), the plaintiff herein. I submit this affidavit pursuant to Federal Rule of Civil Procedure 69, as incorporating Delaware Chancery Court Rule 4(db)(1), and Federal Rule of Civil Procedure 70 in support of Af-Cap's Emergency Motion for an Order to Show Cause for an Order of Contempt, Order of Sequestration of defendant Republic of Congo's ("Congo") rights to royalty payments under an Oil Convention, dated May 25, 1979 (the "Convention"), with CMS Nomeco Congo, Inc. ("CMS") as its venture partner, and Preliminary Injunction, enjoining CMS from making any further royalty payments to Congo or taking any further steps to remove

238248212v3

its royalty obligations from this Court's jurisdiction. The factual statements made herein are based upon my personal knowledge obtained as counsel for the plaintiff in this action.

**Background**

2. This is an action to enforce a $13,628,340.11, plus interest, money judgment (the "Judgment") that is registered in this District in favor of plaintiff and against Congo, as judgment debtor. (A true and correct copy of the Judgment is attached hereto as Exhibit A.)

3. Upon information and belief, Congo is a foreign sovereign with over $5 billion in oil revenues per annum. Congo possesses great oil wealth and, upon information and belief, the royalty payment obligations of CMS under the Convention alone are valued at an amount in the tens to hundreds of millions of dollars, well above amounts required to satisfy Congo's debt obligations to plaintiff as a result of the Judgment. The royalties paid to Congo annually under the Convention fluctuate with the price of oil, but conservatively exceed the value of the Judgment. (A true and correct copy of an Over/Under Index prepared by SNPC, Congo's oil agency/instrumentality, which shows the amount of oil lifted is attached hereto as Exhibit B.)

4. From the 1970's, until November 21, 2006, garnishee CMS was a Delaware corporation. CMS is an oil production company that is now wholly owned by the Perenco Group, a multibillion dollar conglomerate based in London, England. (A true and correct copy of the press release of Perenco, dated September 17, 2002, is attached hereto as Exhibit C.) Upon information and belief, CMS is now incorporated in the Bahamas.

5. Under the Convention, CMS is granted the right to extract oil from Congolese territory in exchange for CMS's obligation to make royalty and other payments to Congo. The Convention also requires CMS to pay taxes and distributions to its venture partners (which include the Congo and SNPC). (*See* Convention at Section 7 *et seq.*, a true and correct copy of

which is attached hereto as Exhibit D.) (*See also* Joint Operating Agreement at Art. 10, a true and correct copy of which is attached hereto as Exhibit E.)

6. Plaintiff Af-Cap is the successor-in-interest to the lender under a commercial loan agreement made to the Congo by a British Bank, Equator Bank Limited (the "Loan Agreement"). To obtain the Loan, Congo pledged as collateral all of its assets and properties, wherever located, expressly waived any claim of sovereign immunity either from suit, attachment or execution on its property, and agreed that it would not take any action to oppose or defend against any such action. (*See* Loan Agreement at ¶¶ 19(C), 19(D), a true and correct copy of which is attached hereto as Exhibit F.) Congo secured the Loan to obtain financing for roadworks in the Congo.

7. Congo defaulted under the Loan Agreement. On May 9, 2000, Connecticut Bank of Commerce, the predecessor of Af-Cap, obtained the Judgment against Congo in the Supreme Court for the State of New York, County of Kings, in the amount of $13,628,340.11, plus interest.

8. On December 9, 2000, the New York Supreme Court also entered an Order, authorizing execution under Section 1610(c) of the Foreign Sovereign Immunities Act (18 U.S.C. § 1610(c), the "FSIA") against "any assets or other property of the Congo of any nature, irrespective of the use or intended use of such property…including any…payments or obligations due to the Congo from any oil and gas exploration and development companies…." (A true and correct copy of the Order Granting Permission to Execute on Judgment, entered by the New York Supreme Court, is attached hereto as Exhibit G.)

9. On August 30, 2005, in view of CMS's presence in this jurisdiction, and in order to enforce the Judgment against the Congo, Af-Cap commenced this action in the Delaware Superior Court. CMS has appeared in the action, but Congo, which has been duly served in

accordance with the FSIA, has failed to appear. (*See* Certificate of Service upon Congo, a true and correct copy of which is attached hereto as Exhibit H.)

10. On August 30, 2005 the Superior Court entered the Judgment in the Delaware court records. (A true and correct copy of the Notice of Entry of Judgment dated August 30, 2005 and served by the Clerk of the Delaware Superior Court, is attached hereto as Exhibit I.)

11. By order dated September 30, 2005, the Superior Court issued an Order directing the Prothonatary to issue a Writ of Garnishment in Af-Cap's favor against Congo's property held by CMS, including Congo's right to receive royalties owing from, and to be paid by, CMS. (A true and correct copy of the Order of Hon. Judge Silverman directing the issuance of the Writ of Garnishment is attached hereto as Exhibit J.) CMS did not oppose Af-Cap's request for a Writ of Garnishment.

12. On October 12, 2005, the Office of the Sheriff served the Writ of Garnishment issued on October 4, 2005 on CMS, through its registered agent in Delaware. (A true and correct copy of the Writ of Garnishment (the "Af-Cap Writ") is attached hereto as Exhibit K.) In its Answer to the Af-Cap Writ, CMS acknowledged service upon it, noting that its "registered agent in Delaware was served with the [Af-Cap] writ of attachment issued by the Superior Court on October 12, 2005." *See* CMS Answer to Writ of Garnishment, dated November 2, 2005, at 20 ¶ 4. Af-Cap filed exceptions to CMS's Answer.

13. Af-Cap and CMS each cross-moved for summary judgment, respectively for liability on, or to dissolve, the Af-Cap Writ. By order dated July 20, 2006, this Court denied the cross-motions, and directed that discovery proceed and trial occur in July 2007. The Af-Cap Writ, however, remains in place.

14.  In April, 2006, and notwithstanding the Af-Cap Writ, CMS made royalty payments to Congo in excess of $27 million. (*See* excerpts of the transcript of the deposition of Roland Fox, held November 30, 2006, at 161:25 - 162:25, 165:12 - 167:3 and 167:3 - 184:2-6, a true and correct copy of which is attached hereto as Exhibit L.)  Since the commencement of this action, CMS has paid to Congo or its alter ego, SNPC, between approximately $25.9 and $63.0 million dollars in oil under the Convention. (*See* Exhibit B, SNPC Over/Under Chart.)

**The Texas Litigation**

15.  Af-Cap has also pursued collection efforts against the Congo in Texas.  On January 11, 2001, Af-Cap registered the Judgment with the U.S. District Court for the Western District of Texas (*Af-Cap, Inc. v. Republic of Congo*, Index No. A-01-CA-321-SS), and in a separately-captioned garnishment action, obtained writs of garnishment against CMS (*Af-Cap, Inc. v. Republic of Congo and CMS Oil and Gas Co.*, Index No. A-01-CA-100-SS).

16.  On appeal from issuance of the writs of garnishment, the Fifth Circuit ruled that the CMS royalty payment obligation under the Convention is not immune from execution by Congo's creditors and may be reached through proceedings occurring wherever CMS is located, including Delaware, as CMS's then state of incorporation. *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, 371 (5th Cir. 2004) *clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004) *cert. denied*, 544 U.S. 962 (2005).  As the Court held, the "situs of these royalty obligations is the United States--the situs of the Garnishees" and the "tax and royalty obligations therefore are not protected by sovereign immunity.  It follows that the district court erroneously dismissed Af-Cap's cause of action and dissolved the writs of garnishment obtained by Af-Cap against the Garnishees." *Id*.

17.  Moreover, the Fifth Circuit held that the royalty obligation of the Congo was used for commercial activity in the United States and, thus, subject to attachment and execution under

the Foreign Sovereign Immunities Act (the "FSIA"). *Id.* at 370-1 ("[W]e disagree with [the District Court's] legal conclusion that these tax and royalty obligations were not used for commercial purposes. Instead, we think that the facts relating to the past and present use of these obligations, examined broadly and in context, establish the opposite… [W]e conclude that these tax and royalty obligations are used for commercial purposes for purposes of § 1610(a) of the FSIA."). The Circuit Court further held that irrespective of the efforts of the government of Congo or its courts to countermand efforts to enforce the United States judgments, CMS could not claim any defense under the theory of sovereign compulsion or the Act of State Doctrine. *Id.* at 372 n.14 ("Because this case does not involve such a public act, but rather a mere dispute over the payment of a debt the Congo does not dispute that it owes, the act of state doctrine does not apply.") (A true and correct copy of the Fifth Circuit's decision, dated September 17, 2004, is attached hereto as Exhibit M.)

18.   On remand, however, the Western District of Texas declared, and the Fifth Circuit later affirmed, that the non-monetary obligations owed by the CMS companies were not subject to garnishment in Texas under the Texas garnishment statue. Rather, on February 24, 2005, the Western District of Texas (to which the Congo had removed the action from state court) entered a Turnover Order against Congo, which required the Congo to pay the royalty payments into Court.

19.   On appeal, by decision and order dated August 23, 2006, the Fifth Circuit vacated the Af-Cap Turnover Order on the finding that the lower court never established jurisdiction over Congo, even though the case had been ongoing for five years and personal jurisdiction attached at the "first filing"; and, in any case, Congo had, in the loan agreement, waived its right to contest the action. *See Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006). The

Fifth Circuit also held that Texas law does not permit the garnishment of intangibles. *Id.* at 424. Af-Cap has requested Supreme Court review of the Fifth Circuit's ruling. In a subsequent appeal, Af-Cap has asked the Fifth Circuit to certify to the Supreme Court of Texas the question of Texas state law whether intangibles are subject to attachment.

**CMS's Efforts To Thwart Enforcement Of The Judgment**

20. After plaintiff commenced its enforcement proceedings in Texas, CMS has, in response, vigorously defended those proceedings on behalf of itself and Congo, and taken a series of steps to attempt to remove itself beyond the reach of courts in the United States. In March 2005, CMS relocated its headquarters from Houston, Texas to London. (A true and correct copy of CMS's application for withdrawal as filed with the Texas Secretary of State, listing CMS's London office as the location for receipt of service of process, is attached hereto as Exhibit N.)

21. In July 2005, immediately before the commencement of this action, in a document entitled "Notice of CMS Nomeco Congo Inc., the Nuevo Congo Company, Nuevo Congo Ltd. of Anticipated Sale and Transfer of Working Interests" (the "Transfer Notice"), filed by CMS in a parallel action before the District Court for the Southern District of Texas, CMS announced its intention:

> to convey [its] working interests [i.e., oil royalties]. The purchasers will be companies to be formed under Congolese law. <u>The consideration to be paid for the sales will be cash</u>. Upon closing of the conveyances, the working interests under the Convention will be owned by the Congolese purchasers of the working interests, and the rights and obligations under the Convention and Joint Operating Agreement previously held and owed by the Working Interest Owner Garnishees [,including CMS,] will be held and owed by the Congolese purchasers and not the Working Interest Owner Garnishees.

(A true and correct copy of the Transfer Notice, dated July 18, 2005 and filed in the matter of *FG Hemisphere Assocs., LLC v. Republique du Congo, et al.*, Civil Action No. H02-4261, is attached hereto as Exhibit O.)

22. On or about November 16, 2006, CMS advised Af-Cap, through counsel, that it intended to "convert to a non-Delaware entity." Counsel further advised that, however, CMS "will not use that conversion as a basis for challenging the jurisdiction of the federal court in Delaware." (A true and correct copy of an email from Guy Lipe, counsel for CMS, to Kenneth Kaplan, counsel for Af-Cap, dated November 16, 2006, is attached hereto as Exhibit P.)

23. On November 21, 2006, notwithstanding the entry of the Af-Cap Writ, and without notice to this Court, CMS purported to dissolve itself as a Delaware corporation. (A true and correct copy of the corporate records of the Delaware Secretary of State concerning CMS's dissolution are attached hereto as Exhibit Q.)

24. According to CMS representative Roland Fox, after CMS's dissolution, CMS immediately reformed itself in the Bahamas. (*See* excerpts of the transcript of Mr. Fox's deposition held November 30, 2006, a true and correct copy of which is attached hereto as Exhibit L.) Mr. Fox further admitted that CMS left Delaware to avoid any further writs of garnishment being issued against its obligations to the Congo. (Fox Deposition at 249:21 - 250:5 and 250:16 - 250:25.)

25. On July 11, 2005, Af-Cap initiated a separate action in the Delaware Court of Chancery, seeking relief under Delaware's Fraudulent Transfer Act and the common law arising from CMS's efforts to hinder and delay creditors, including moving the royalty payment obligation beyond the reach of CMS's creditors. That action (CA No. 1488-N) is pending before Vice Chancellor Strine.

**CMS Should Be Preliminarily Enjoined From Making Further Royalty Payments Or Otherwise Attempting to Remove the Royalty Obligations**

26. To date, Congo has refused to comply with any part of the Judgment, and the Judgment remains unsatisfied. For its part, CMS has acted to protect Congo and taken steps to move the royalty right beyond the reach of Congo's creditors. As Af-Cap satisfies the standard for entry of a preliminary injunction, CMS should be enjoined from taking further steps to impair Af-Cap's rights.

27. First, Af-Cap has a reasonable likelihood of success on the merits of this enforcement proceeding. Congo is indisputably a judgment creditor of Af-Cap. CMS admits to holding property -- payment of a royalty right -- that belongs to Af-Cap's judgment debtor. (*See* CMS Answer to Writ of Garnishment at 19, 20 ¶ 4.) In addition, under the Fifth Circuit's decision in *Af-Cap v. Republic of Congo*, 383 F.3d at 371, (and CMS is estopped from arguing otherwise) the royalty obligation is subject to execution wherever CMS is located. *See id.* at 371 ("We think a common sense appraisal of the requirements of justice and convenience in this particular context yields the conclusion that the situs of these royalty obligations is the United States--the situs of the Garnishees.") Finally, as explained in the accompanying brief, there is no question Delaware law permits sequestration of, and execution upon intangible contingent debt obligations such as royalty payments. Thus, this Court has the power to order satisfaction of the Judgment from CMS's royalty obligations to Congo.

28. Second, Af-Cap will be irreparably harmed if CMS is successful in moving the asset outside of the United States. In that circumstance, Af-Cap's recovery in the United States (as well as that of other judgment creditors) would be foreclosed since the payment obligation would be beyond the reach of United States courts. Thus, unless CMS is enjoined, Af-Cap will likely have no remedy of execution in the United States.

29.     Third, the balancing of the harms favors Af-Cap. Preserving the *status quo* pending disposition of this case would do nothing more than leave CMS in the position it has been in for decades. CMS, and its predecessors, have been incorporated in Delaware since the 1970's and have held the Convention rights since 1979. CMS did not purport to remove the Convention rights outside of the United States until after Af-Cap obtained and served its Writ upon CMS. And, CMS has no legitimate interest in taking any further steps to block plaintiff's debt recovery efforts, as CMS's steps have the effect of hindering and delaying Congo's creditors.

30.     Fourth, the public interest weighs in favor of granting the injunction. As stated above, CMS's efforts to remove itself and its assets from Delaware are designed solely to frustrate Congo's creditors. CMS's withdrawal is precisely the type of conduct that an injunction is intended to protect against because it would otherwise result in compromising the Court's ability to render a full, complete and final adjudication of the pending issues. CMS should not be rewarded for its evasive conduct.

31.     Recently, on January 8, 2007, counsel for CMS advised that CMS intends to make a lifting of royalty oil to Congo sometime between February 10 and 15. Thus, this application has urgency in order to prevent Congo's royalties from being paid to Congo notwithstanding the Af-Cap Writ. (A true and correct copy of the email message from Guy Lipe, counsel for CMS, to Kenneth Kaplan, counsel for Af-Cap, is attached hereto as Exhibit R.)

32. Wherefore, on behalf of plaintiff Af-Cap, I respectfully request that the Court grant Af-Cap's Motion, and: (a) hold CMS in contempt, fining it the value of the royalty payments made while the Af-Cap Writ was in place or the value of the Judgment, whichever is greater; (b) enter an order of sequestration of the royalty payment obligation pending satisfaction of the Judgment; and (c) enter an order of preliminary injunction, enjoining CMS from making further royalty payments to Congo or otherwise attempting to remove the royalty obligation beyond this Court's jurisdiction.

_____
James W. Perkins

Sworn to before me this
9th day of January, 2007

_____
Notary Public

CHRISTY SCHAEFFER
Notary Public, State of New York
No. 31-4769958
Qualified in New York County
Commission Expires August 31, 2010