## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONNECTICUT BANK OF COMMERCE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-762-SLR |
| THE REPUBLIC OF CONGO, | ) ) | |
| Defendant; | ) ) | |
| CMS NOMECO CONGO INC., | ) ) | |
| Garnishee. | ) | |

### CMS NOMECO CONGO INC.'S OPENING BRIEF IN SUPPORT OF
### ITS MOTION FOR JUDGMENT ON THE PLEADINGS

OF COUNSEL:

| | |
|---|---|
| Guy S. Lipe | M. Duncan Grant (Del. Bar No. 2994) |
| Jason M. Powers | James C. Carignan (Del. Bar No. 4230) |
| VINSON & ELKINS L.L.P. | PEPPER HAMILTON LLP |
| First City Tower | Hercules Plaza, Suite 5100 |
| 1001 Fannin Street, Suite 2300 | 1313 N. Market Street |
| Houston, TX  77002-6760 | P.O. Box 1709 |
| (713) 758-2222 | Wilmington, DE 19899-1709 |
| | (302) 777-6500 |
| | |
| | Attorneys for Garnishee CMS Nomeco |
| Dated:  January 26, 2007 | Congo Inc. |

## <u>TABLE OF CONTENTS</u>

                                                                                          Page

PRELIMINARY STATEMENT ............................................................................... 1

NATURE AND STAGE OF PROCEEDINGS ....................................................... 3

ARGUMENT ........................................................................................................ 7

I.      The October 2005 Writ of Garnishment is Invalid Under the FSIA................................. 7

        A.     Af-Cap's Contentions that CMS Nomeco Lacks Standing to Raise the
               FSIA, and that this Court May Not Consider the FSIA's Requirements,
               Violate the Letter, Intent, and Purposes of the FSIA and Have Been
               Rejected by the Fifth Circuit, the Eighth Circuit, and the United States
               Government.........................................................................................7

               1.     The FSIA Imposes Mandatory Statutory Limitations on a United
                      States Court's Authority to Execute on a Foreign State's Assets in
                      Order to Protect Foreign Relations ............................................. 8

               2.     The FSIA's Mandatory Limitations on the Authority of a United
                      States Court to Execute on a Foreign State's Property, and the
                      Purposes Underlying Those Limitations, Apply Regardless of
                      Whether the Foreign State Has Formally Appeared ................................. 13

        B.     The Garnishment Writ is Void Ab Initio and Violates the FSIA Under the
               Fifth Circuit's Decision in FG Hemisphere ...........................................17

        C.     CMS Nomeco's Status as a Delaware Limited Liability Company at the
               Time the Writ Was Served Is Not Sufficient to Render the Congo's In-
               Kind Royalty "In the United States" For Purposes of the FSIA..........................20

        D.     The Fifth Circuit's Decision in Af-Cap II Does Not Bar CMS Nomeco's
               FSIA Arguments ...............................................................................24

II.     The Garnishment Writ Does Not Apply to Non-Monetary Obligations........................... 25

        CONCLUSION.................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*767 Third Avenue Associate v. Permanent Mission of the Republic of Zaire*, 787 F. Supp. 389 (S.D.N.Y. 1992) ...................................................................................................12

*Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361,
    *clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004),
    *cert. denied*, 125 S.Ct. 1735 (2005) ..................................................................3, 21

*Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006) ..................................3, 25, 26, 27

*Altmann v. Republic of Austria*, 541 U.S. 677 (2004) ..............................................8, 15

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989) ...................................................................................................14

*Birch Shipping Corp. v. Embassy of United Republic of Tanzania*, 507 F. Supp. 311 (D.D.C. 1980) .........................................................................................13

*Board of Trustees v. Centra*, 983 F.2d 495 (3d Cir. 1995) ...........................................26

*Braka v. Bancomer, S.N.C.*, 762 F.2d 222 (2d Cir. 1985) ......................................21, 22

*Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97 (8th Cir. 1989) ...........................15, 16

*Callejo v. Bancomer, S.A.*, 764 F.2d 1101 (5th Cir. 1985) ................................20, 21, 22

*Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002)........3, 11, 12

*D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034 (D. Del. 1974) .........................................29

*EM Ltd. v. Republic of Argentina*, __ F.3d __, 2007 WL 29978 (2d Cir. Jan. 5, 2007).........11, 12

*FG Hemisphere Associates LLC v. Republique du Congo*, 455 F.3d 575 (5th Cir. 2006) .....3, 4, 5, 14, 15, 16, 17, 18, 19, 20, 24, 25

*F. & H.R. Farman-Farmaian v. Harza*, 882 F.2d 281 (7th Cir. 1988)...................................21, 22

*Fidelity Partners, Inc. v. Philippine Export & Foreign Loan Guaranty Corp.*, 921 F. Supp. 1113 (S.D.N.Y. 1996).........................................................................13

Page(s)

*Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16 (D.D.C. 1999) ..........................................13

*Globe Nuclear Services and Supply (GNSS) Ltd. v. AO Techsnabexport*, 376 F.3d 282
  (4th Cir. 2004)......................................................................................................................23

*Hercaire International, Inc. v. Argentina*, 821 F.2d 559 (11th Cir. 1987) .....................................8

*Hughes Tool Co. v. Fawcett Publications, Inc.*, 290 A.2d 693 (Del. Ch. 1972) ..........................29

*Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417 (5th Cir. 2001) ....................................................4

*John Julian Construction Co. v. Monarch Builders, Inc.*, 306 A.2d 29 (Del. Super. 1973) .........26

*McNeilly v. Furman*, 95 A.2d 267 (Del. 1953) ......................................................................27, 30

*Pere v. Nuovo Pignone, Inc.*, 150 F.3d 477 (5th Cir. 1998) ........................................................10

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) .........................13

*Rubin v. Islamic Republic of Iran*, 408 F. Supp. 2d 589 (N.D. Ill. 2005),
  *Magistrate recommendation adopted*, 436 F. Supp. 2d 938 (N.D. Ill. 2006)....................15, 16

*Rush-Presbyterian-St. Luke's Medical Ctr. v. Hellenic Republic*, 877 F.2d 574 (7th Cir.
  1989) ....................................................................................................................................23

*Tchacosh Co. Ltd. v. Rockwell International Corp.*, 766 F.2d 1333 (9th Cir. 1985) .............21, 22

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S. Ct. 1962, 76 L. Ed. 2d
  81 (1983)...............................................................................................................................15

*Walker International Holdings Limited v. Republic of Congo*, 395 F.3d 229 (5th Cir.
  2004) ................................................................................................................................14, 16

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) ............23

## STATUTES AND RULES

28 U.S.C. § 1609..........................................................................................................................8, 11

28 U.S.C. § 1609..............................................................................................................................14

28 U.S.C. § 1610(a) ...............................................................................................................8, 9, 11,
                                                                                                                                    14, 15

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et seq*..................................................1, 11

Page(s)

10 *Del. C.* § 366 ..............................................................................................28

10 *Del. C.* § 3508 .......................................................................................27, 29

Fed. R. Civ. P. 81(c) ........................................................................................5

Del. Sup. Ct. R. Civ. P. 5(aa)(2) ...................................................................27

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6634 ...............................8

## MISCELLANEOUS

6 Am. Jur. 2d, *Attachment and Garnishment* § 111.....................................28

38 C.J.S. *Garnishment* § 105 ........................................................................28

RESTATEMENT (3D) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 460(a)(2) .........10

Pursuant to the directive of the Court at the hearing conducted on January 18, 2007, CMS Nomeco Congo Inc. ("CMS Nomeco") files this Opening Brief in support of its concurrently filed Motion for Judgment on the Pleadings, addressing the threshold legal issues that this Court ordered the parties to address. For the reasons set out below, CMS Nomeco is entitled to judgment on the pleadings dismissing this garnishment action, on two independent grounds: (1) the garnishment writ that is the subject of this case is invalid under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et seq.* ("FSIA"), and (2) the Congo's in-kind royalty is not subject to garnishment as a matter of Delaware garnishment law, because non-monetary obligations are not subject to garnishment.

## PRELIMINARY STATEMENT

Over a period of more than six years, CMS Nomeco Congo Inc. ("CMS Nomeco") has been forced to defend a series of garnishment actions filed in multiple district courts in Texas by multiple judgment creditors of the Republic of Congo ("the Congo") seeking to collect judgments against the Congo on bad debts that the judgment creditors purchased for pennies on the dollar. Although garnishees are innocent third parties not involved in the underlying debt transactions, the Congo's judgment creditors, including Af-Cap, Inc. ("Af-Cap"), have attempted by way of their Texas garnishment actions to impose monetary liability on CMS Nomeco for the Congo's debts, effectively making CMS Nomeco a guarantor of the Congo's debts merely because it does unrelated business with the Congo, in the Congo, and to force CMS Nomeco into open conflict with the government of the Congo and its courts. By virtue of garnishment writs issued in the United States directed to the Congo's right to take its own oil in its own territory, CMS Nomeco has been subjected to armed Congo police occupying their storage vessel in the Congo to enforce the Congo's right to take its own oil as mandated by

Congolese court orders, and to the threatened confiscation of their oil concession by the Congo's Hydrocarbons Ministry.

The United States Court of Appeals for the Fifth Circuit has issued four decisions in the course of the Texas garnishment actions. As a result of those decisions, the garnishment litigation against CMS Nomeco in Texas, including the case pursued by Af-Cap in the Western District of Texas, is now dead.

Having lost in Texas, Af-Cap nevertheless continues to pursue identical garnishment litigation in this Court. This litigation should suffer the same fate as Af-Cap's Texas litigation. Among other obstacles not addressed in this brief, Af-Cap must convince this Court that (1) the Fifth Circuit's interpretation of the requirements of the FSIA is wrong; and (2) either the Fifth Circuit's interpretation of state garnishment law is wrong, or the Delaware garnishment statute and rules are distinguishable from the Texas rules and statute and require a different result than that reached by the Fifth Circuit. For the reasons set out herein, Af-Cap can prevail on neither of these threshold issues. CMS Nomeco respectfully submits that this Court should enter judgment on the pleadings,[1] denying Af-Cap any recovery and dismissing this action.

---

[1] The pleadings relevant to this motion are CMS Nomeco's Answer to the writ of garnishment filed on November 2, 2005 (D.I. 2), as amended by the verification filed on July 26, 2006, (D.I. 31), Af-Cap's Exceptions to CMS Nomeco's Answer filed on November 17, 2005 (D.I. 4), and CMS Nomeco's Supplement to Answer to Writ of Garnishment filed on December 20, 2006 (D.I. 64).

## NATURE AND STAGE OF PROCEEDINGS

*The Texas Litigation*

The Western District of Texas litigation that Af-Cap has pursued against CMS Nomeco began in January 2001, when Af-Cap's alleged predecessor-in-interest filed a garnishment action in Texas against CMS Nomeco and other garnishees.  During the course of that litigation, the Fifth Circuit Court of Appeals rendered three decisions, the first in 2002, the second in 2004, and the last in August of 2006.  *See Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002) ("*Af-Cap I*"); *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, *clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004), *cert. denied*, 125 S.Ct. 1735 (2005) ("*Af-Cap II*");  *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006) ("*Af-Cap III*"). The decision in *Af-Cap III* held that the Congo's in-kind royalty was not subject to garnishment as a matter of Texas garnishment law and affirmed dismissal of Af-Cap's garnishment action against CMS Nomeco.

While Af-Cap's litigation was proceeding in Texas, another judgment creditor of the Congo, FG Hemisphere Associates LLC ("FG Hemisphere") also sought and obtained issuance from the Southern District of Texas in October 2004 and December 2004 of writs of garnishment against CMS Nomeco.  In July 2006, the Fifth Circuit ordered those writs dissolved as violative of the FSIA.  *FG Hemisphere Associates LLC v. Republique du Congo*, 455 F.3d 575 (5th Cir. 2006).  The Fifth Circuit held in *FG Hemisphere* that its FSIA decision in *Af-Cap II* (which had held that the Congo's in-kind royalty was "in the United States" for purposes of the FSIA based on circumstances existing in 2003) was not controlling on the FSIA issues raised by garnishment writs issued at FG Hemisphere's request in October 2004 and December 2004, at a time when CMS Nomeco had no physical presence in the United States as a result of a stock acquisition by which CMS Nomeco became a member of a European-headquartered group of

-3-

companies. *Id.* at 582, 585-591. The Fifth Circuit in *FG Hemisphere* held that a district court must conduct a fresh FSIA analysis each time that it authorizes issuance of writs of garnishment against a foreign state's property, based on the circumstances existing at that time, and that an authorizing court order that fails to make fact findings on the FSIA requirements for execution is void *ab initio*. 455 F.3d at 580, 588-591, 594 & n.3, 596.

       As a result of the Fifth Circuit decisions, Af-Cap's Texas garnishment litigation is over,[2] and FG Hemisphere has now abandoned its efforts to garnish the Congo's royalty, acknowledging that the only remaining substantive issues to be determined in the Southern District of Texas litigation relate to CMS Nomeco's right to recover attorneys' fees and costs.

*This Litigation*

       In this garnishment action (like Af-Cap's unsuccessful action against CMS Nomeco in the Western District of Texas), Af-Cap seeks to garnish the Congo's in-kind oil royalty that the Congo periodically is entitled to take under its concession agreement with CMS Nomeco.

       Without disclosure of the existence of Congo court orders compelling CMS Nomeco to permit the Congo to take its oil, notwithstanding writs of garnishment issued by federal courts in Texas, and without disclosure of the prior dismissal by the United States District

---

[2] Af-Cap made the point in its recently filed "Emergency Motion" that it has asked the Fifth Circuit to certify the question of Texas garnishment law to the Texas Supreme Court. It did not disclose to this Court that such a request was made in its rehearing petition to the Fifth Circuit with regard to the Fifth Circuit's August 2006 decision. That rehearing petition was denied, and the mandate has issued. Af-Cap has now renewed its request for Texas Supreme Court certification in a separate Fifth Circuit appeal that does not even raise that state law issue, arguing that the Fifth Circuit's decision in August 2006 was wrong. That attempt to seek certification of an issue to the Texas Supreme Court in an effort to overturn a prior Fifth Circuit panel decision is in direct contravention of the established Fifth Circuit rule that certification is not "a proper avenue to change our binding precedent." *Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 425 (5th Cir. 2001) (citations omitted). "Once a panel of this Court has settled on the state law to be applied in a diversity case, the precedent should be followed by other panels without regard to any alleged existing confusion in state law, absent a subsequent state court decision or statutory amendment which makes this Court's decision clearly wrong." *Id.* Af-Cap's improper certification request is simply one more example of its abuse of the judicial process.

-4-

Court for the Western District of Texas of its earlier garnishment action against CMS Nomeco,

Af-Cap sought and obtained from the Delaware Superior Court a writ of garnishment directed to

CMS Nomeco, and it then served the writ on CMS Nomeco's registered agent in Delaware on

October 12, 2005.  It did so by representing to the Superior Court that its motion was

"unopposed."  *See* Exhibit B.  In its motion seeking issuance of that writ filed with the Superior

Court, Af-Cap made no effort to show the court that the Congo's property was "in the United

States" and "used for a commercial activity in the United States," as required by the FSIA, nor

did it inform the Superior Court that such a determination was required.  *See* Exhibit A.[3]  The

authorizing court order signed by the Superior Court that authorized the issuance of the writ

made no findings concerning the requirements of the FSIA or the amenability to garnishment of

the Congo's in-kind royalty under state law (*see* Exhibit B), precisely the defects found by the

Fifth Circuit in the *FG Hemisphere* case to be fatal, rendering the writ void *ab initio*.  455 F.3d at

580, 588-591, 594 & n.3, 596.

　　　　On November 1, 2005, CMS Nomeco removed the garnishment action to this

Court (D.I. 1), and in compliance with the time requirements for filing its answer in this removed

action under Fed. R. Civ. P. 81(c), it filed and served its Answer to the Writ of Garnishment (D.I.

2) the next day, November 2, 2005.  In that answer, CMS Nomeco denied that it owed any

royalty to the Congo or held its property as of the service date and answer date for the writs, as

the Congo had no right to take any oil either at the time of service of the writ or at the answer

date for the writ.

　　　　At the conference held on January 18, 2007, this Court determined that it would

be appropriate for the parties to brief, in the context of a motion for judgment on the pleadings

---

[3] Af-Cap concedes this point in its Exceptions to CMS Nomeco's Answer.  See Af-Cap's Exceptions (D.I. 4) at 4-5, 10-11.

by CMS Nomeco and a cross-motion for partial judgment on the pleadings by Af-Cap, certain threshold legal issues:  (1) Whether the writ issued by the Superior Court is valid under the FSIA; and (2) whether non-monetary obligations are garnishable as a matter of Delaware garnishment law.  As shown below, the answer to each of these questions is "no," and this action should be dismissed.

As agreed at the January 18 conference, CMS Nomeco has now moved for judgment on the pleadings.  This is CMS Nomeco's Opening Brief in support of its motion.

## ARGUMENT

I.      **The October 2005 Writ of Garnishment is Invalid Under the FSIA.**

It is undisputed that in connection with the October 2005 garnishment writ that is at issue in this case, Af-Cap made no showing to the Superior Court, and the Superior Court made no findings, concerning the requirements for application of exceptions to immunity under the FSIA that were found crucial in the Fifth Circuit's decisions.  *See* Exhibits A and B.  There also is no basis for Af-Cap's contention that the Congo's royalty is located "in the United States" for purposes of the FSIA, based solely on CMS Nomeco's status as a Delaware limited liability company.  These defects will be discussed in detail below.  However, Af-Cap has raised a threshold issue of "standing," arguing that because the Congo has not appeared in this case to raise the FSIA, CMS Nomeco may not do so.  In effect, Af-Cap argues that in the absence of an appearance by the foreign state to assert immunity, the FSIA imposes no restrictions whatsoever on the United States courts' ability to seize the assets of a foreign state.  As shown below, Af-Cap's standing argument is contrary to the statutory language, decisions of the Fifth Circuit and Eighth Circuit, and the formal position of the United States government.

> A.      ***Af-Cap's Contentions that CMS Nomeco Lacks Standing to Raise the FSIA, and that this Court May Not Consider the FSIA's Requirements, Violate the Letter, Intent, and Purposes of the FSIA and Have Been Rejected by the Fifth Circuit, the Eighth Circuit, and the United States Government.***

As noted above, Af-Cap argues that if the foreign state fails to appear in a case to affirmatively assert its sovereign immunity from execution against its assets, the Court is free to seize those assets, regardless of any restrictions on seizure that may be imposed by the FSIA.  In order to put that argument in context, a brief overview of the provisions of the FSIA dealing with immunity from execution, and its legislative history and purposes, is instructive.

1.    **The FSIA Imposes Mandatory Statutory Limitations on a United States Court's Authority to Execute on a Foreign State's Assets in Order to Protect Foreign Relations**

The FSIA is a comprehensive regulatory statute designed to "facilitate and depoliticize litigation against foreign states and to minimize irritations in foreign relations arising out of such litigation" (H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6634 ("House FSIA Report") by codifying the modern doctrine of "restrictive" foreign sovereign immunity recognized under international law. *Altmann v. Republic of Austria*, 541 U.S. 677, 691 (2004). Specifically, with regard to immunity from jurisdiction, the FSIA was intended to adopt the theory of sovereign immunity that permits courts to exercise jurisdiction over claims against a foreign state based on its private (as opposed to sovereign) acts. *Id.* at 689. However, with regard to immunity from execution, a foreign state's immunity from attachment or execution against its property was absolute prior to passage of the FSIA, even under the "restrictive" theory of sovereign immunity. House FSIA Report at 6626. The FSIA only "partially lower[ed] the barrier of immunity from execution." *Id.* The FSIA provides the exclusive basis on which execution is permitted to satisfy a judgment against a foreign state. *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 563 (11th Cir. 1987).

Specifically, Section 1609 provides that a foreign state's property is presumptively immune from attachment, subject to statutory exceptions under Section 1610. Section 1610(a) of the FSIA addresses seven statutory exceptions to immunity from execution, including the "waiver" exception on which Af-Cap relies:

> The *property in the United States* of a foreign state, as defined in section 1603(a) of this chapter, *used for a commercial activity in the United States*, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if –

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication . . . .

28 U.S.C. § 1610(a)(1) (emphasis added).  This statutory language limits the application of the waiver exception (as well as all other exceptions identified in Section 1610(a)) to a foreign state's "property in the United States" that is "used for a commercial activity in the United States. . . ."  28 U.S.C. § 1610(a).

The legislative history makes clear these limitations on the applicability of the Section 1610(a) exceptions:

> Section 1610(a) relates to execution against property of a foreign state, including a political subdivision, agency, or instrumentality of a foreign state.  The term 'attachment in aid of execution' is intended to include attachments, garnishments, and supplemental proceedings available under applicable Federal or State law to obtain satisfaction of a judgment. . . .  *The property in question must be used for a commercial activity in the United States.  If so,* attachment in aid of execution, and execution, upon judgments entered by Federal or State courts against the foreign state would be permitted in any of the circumstances set forth in paragraphs (1) - (5) of section 1610(a).[4]

House FSIA Report at 6627 (emphasis added).  Consistent with that statement of the intent of the statute, Section 460 of the *Restatement (3d) of the Foreign Relations Law of the United States* confirms that a waiver of execution immunity is effective only as to the foreign state's property in the United States that is used for commercial activity:

> (2)  *The property in the United States* of a foreign state is subject to execution or to attachment in aid of execution of a judgment *if it is used for commercial activity in the United States, and*
>
> (a)      the state has waived its immunity from execution. . . . .

_____

[4] Congress subsequently added two additional exceptions to Section 1610(a).  There are now seven exceptions in that section of the FSIA.

RESTATEMENT (3D) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 460(a)(2) (emphasis added).

The statutory limitations on the exceptions to execution immunity reflect a recognition by Congress that involvement by courts in the United States in the seizure of assets of foreign governments has the potential for creating tension in international relations and should be limited to commercial property that is located in the United States. *See* House FSIA Report at 6626 ("attachments [of property of a foreign state] can also give rise to serious friction in United States' foreign relations"); *Pere v. Nuovo Pignone, Inc.*, 150 F.3d 477, 480-81 (5th Cir. 1998) (purpose of the FSIA is to promote harmonious international relations, as doctrine of sovereign immunity was created to effectuate comity among nations).

In short, the FSIA was intended to preclude involvement of courts in the United States in the seizure of assets of a foreign state that are not located "in the United States" or that are not "used for a commercial activity in the United States." That is precisely what Af-Cap is asking this Court to do in this case. It asserts that the writ in this case had the effect of forcing CMS Nomeco to prevent the Congo from lifting its own oil in its own territory, thereby interfering with the Congo's exercise of its sovereign rights to its own natural resources within its own borders. That type of interference is precisely the type of action that Congress feared would create friction in the United States' foreign relations and that it precluded in the FSIA.

The FSIA limitations on execution on assets of a foreign state are so important that they are applied even when the foreign state has contractually waived its sovereign immunity from execution. In fact, in the Texas litigation, Af-Cap argued that the contractual waiver of immunity in the underlying loan agreement avoided the necessity for any FSIA

analysis by the district court, but the Fifth Circuit expressly rejected that argument in *Af-Cap I.*
The Fifth Circuit said:

> The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C.
> §§ 1602-1611, provides foreign sovereigns with immunity from
> execution against their property to satisfy an adverse judgment.  28
> U.S.C. § 1609.  This statutory immunity is subject to several
> exceptions.  One exception is that, if a foreign sovereign waives its
> immunity from execution, U.S. courts may execute against
> "property in the United States . . . used for a commercial activity in
> the United States." 28 U.S.C. § 1610(a)(1).  *Even when a foreign
> state completely waives its immunity from execution, courts in the
> U.S. may execute only against property that meets these two
> statutory criteria.*

309 F.3d at 247 (emphasis added).  The Court further explained that the FSIA precludes, in the

context of execution against property of a foreign state, the typical practice by which a clerk or

sheriff issues execution against property, without court intervention.  *Id.*  "Instead, [the FSIA]

requires a court to enter the writ of execution, so that the court can determine whether the

property in question falls within one of the statutory exceptions to foreign sovereign immunity."

*Id.*

These rules are consistent with the important policies that the FSIA's limitations

on execution are designed to protect.  As noted above, seizure of a foreign state's assets can have

significant impact on the United States' international relations with other countries.  These

procedural and substantive protections, requiring not only that a court be involved in the issuance

of the writ, but that the court analyze the requirements of the FSIA before issuing the writ,

further the important policies of the FSIA in avoiding friction in the United States' relations with

foreign countries that would result from a court's seizure of a foreign state's assets that are not

located in the United States or that are used for sovereign purposes.

The Second Circuit has recently recognized these same principles.  In *EM Ltd. v.

Republic of Argentina*, __ F.3d __, 2007 WL 29978 (2d Cir. Jan. 5, 2007), the Court reviewed an

order denying attachment, by a creditor of Argentina, of bank reserves claimed to be assets of

Argentina.  Even though Argentina had signed a contractual waiver of immunity, the Second

Circuit affirmed the district court's order denying attachment, holding that "we could not

authorize the pre- or postjudgment attachment of the [bank reserves] unless we found that the

account had become property of the Republic 'used for a commercial activity in the United

States'" Id. at *13 (quoting 28 U.S.C. 1610(a) and (d)).  The Second Circuit specifically cited

and quoted with approval the Fifth Circuit's decision in *Af-Cap I* (2007 WL 29978, *13 n.19):

> Under the laws of this jurisdiction, courts may grant the
> remedies of attachment, arrest and execution against a foreign
> state's property only if the property is eligible for attachment under
> a specific provision of the FSIA.  *See, e.g., Conn. Bank of
> Commerce v. Republic of Congo*, 309 F.3d 240, 247 (5th Cir.
> 2002) ("[I]f a foreign sovereign waives its immunity from
> execution, U.S. courts may execute against 'property in the United
> States . . . used for a commercial activity in the United States.' 28
> U.S.C. 1610(a)(1).  Even when a foreign state completely waives
> its immunity from execution, courts in the U.S. may execute only
> against property that meets these two statutory criteria.")

In expressly approving the rule adopted by the Fifth Circuit in *Af-Cap I*, the

Second Circuit said that "[t]o conclude otherwise would render meaningless the provisions of

[Sections] 1610(a) & (d), which subject to attachment property of a foreign state when the

property is 'used for a commercial activity' *and* when the foreign state 'has waived its immunity

from attachment.'" *Id.* (emphasis in original).  Thus, the Second Circuit has definitively held,

consistent with the Fifth Circuit's decision in *Af-Cap I*, that the FSIA requires a court to conduct

an FSIA analysis on the FSIA's limitations on execution, even if the foreign state has signed a

contractual waiver.

Other courts have consistently reached the same conclusion.  *See, e.g., 767 Third

Ave. Assoc. v. Permanent Mission of the Republic of Zaire*, 787 F. Supp. 389, 393 n.3 (S.D.N.Y.

1992) (noting the waiver exception "apparently extends only to property 'used for a commercial

activity'"); *Birch Shipping Corp. v. Embassy of United Republic of Tanzania*, 507 F. Supp. 311,

312 (D.D.C. 1980) ("The statute thus sets forth a two-step analysis relevant here for determining

immunity:  the foreign state must have waived its immunity, and the property attached must be

used for a commercial purpose."); *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16, 22

(D.D.C. 1999) ("[T]he threshold requirement for invoking [the exceptions to immunity under

Section 1610(a)] is that the property is 'used for commercial activity in the United States.'");

*Fidelity Partners, Inc. v. Philippine Export & Foreign Loan Guar. Corp.*, 921 F. Supp. 1113,

1118 (S.D.N.Y. 1996) ("Section 1610 . . . 'speaks only of a foreign state's property in the United

States . . . [and] creates no exception to immunity for property outside the United States.'");

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) ("It is true

that section 1610 does not empower United States courts to levy on assets located outside the

United States.").

        **2.**      **The FSIA's Mandatory Limitations on the Authority of a
United States Court to Execute on a Foreign State's Property,
and the Purposes Underlying Those Limitations, Apply
Regardless of Whether the Foreign State Has Formally
Appeared**

        The mandatory language of the FSIA and its purposes as described in the

preceding section inform the Court's resolution of the "standing" issue that Af-Cap has raised in

this case.  The same policies that caused Congress to prohibit seizure of a foreign state's property

that is not "in the United States" and "used for a commercial activity in the United States," even

in the face of a complete contractual waiver of immunity, preclude a rule that would allow a

court to sidestep the FSIA analysis, based merely on the fact that the foreign state has not

formally appeared.

        For these very reasons, the Fifth Circuit has rejected the precise "standing"

argument that Af-Cap makes here, in another case involving efforts to garnish property of the

Congo, in which the Congo did not appear. In *Walker International Holdings Limited v. Republic of Congo*, 395 F.3d 229 (5th Cir. 2004), Walker, a judgment creditor of the Congo (represented by the same lawyers representing Af-Cap in this case) attempted to garnish a bonus payment allegedly owed to the Congo by Murphy Oil. The Congo did not appear, and Murphy argued that the bonus payment did not meet the requirements for an exception to immunity under the FSIA, as there was no showing that the property was "used for a commercial activity in the United States" as required by Section 1610(a) of the FSIA. Walker argued that no FSIA analysis was appropriate because the Congo had not appeared and Murphy purportedly did not have standing to raise the FSIA issue.

The Fifth Circuit rejected this argument. The Court held that "the very language of the FSIA makes clear that the [Congo's] presence is irrelevant." 395 F.3d at 233. The Court cited *Af-Cap I* for the proposition that by way of the "in the United States" and "commercial activity" requirements set out in Section 1610, "[t]he FSIA sets parameters in which property may be attached: 'the court may order the attachment or execution only as "referred to in subsections (a) and (b)."'" *Id.* (quoting *Af-Cap I*, 309 F.3d at 250). The Court concluded that "[n]either 28 U.S.C. 1610(a) nor (b) requires the presence of the foreign sovereign or gives the sovereign exclusive standing to raise the waiver element. Hence, we find no merit to Walker's standing argument . . . ." *Id.*

The Fifth Circuit applied this same reasoning again in the *FG Hemisphere* case in holding that the FSIA's requirements for an exception to immunity from execution are jurisdictional, waivable only if the foreign state appears and fails to raise them:

> The general rule under the FSIA is that property of a foreign sovereign is immune from attachment and execution. 28 U.S.C. § 1609 (2000 ed. & Supp. III); *Atwood Turnkey Drilling, Inc. v. Petroleo Brasiliero, S.A.*, 875 F.2d 1174, 1176-77 (5th Cir.

> 1989).  The exceptions to the general rule of immunity are central
> to the FSIA's functioning. *Republic of Austria*, 541 U.S. at 691,
> 124 S.Ct. 2240.  "At the threshold of every district court action
> against a foreign state, the court must satisfy itself that one of the
> exceptions applies [because its] subject-matter jurisdiction . . .
> depends on that application."  *Id.*

*FG Hemisphere*, 455 F.3d at 584.  Rejecting Af-Cap's argument here, the Court stated that "[t]he

sovereign immunity claim may be raised by a garnishee as well as by a foreign sovereign."  *Id.*

(citing *Walker*, 395 F.3d at 233).

The Fifth Circuit is not the only circuit to require consideration of the FSIA

requirements for exceptions to execution immunity even when the foreign state does not appear.

In *Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97 (8th Cir. 1989), the Eighth Circuit

was presented with an appeal from a district court order that denied execution on certain assets of

Iraq on FSIA grounds, even though Iraq had not appeared in the action.  The Eighth Circuit first

confirmed that an FSIA analysis was necessary and appropriate with regard to the amenability of

the Iraq's property to execution, even though Iraq had not appeared:

> [E]ven if a party fails to enter an appearance and assert its
> claim of immunity, a court must determine whether immunity is
> available pursuant to the FSIA. *Verlinden B.V. v. Central Bank of
> Nigeria*, 461 U.S. 480, 494 n. 20, 103 S.Ct. 1962, 1971 n. 20, 76
> L.Ed.2d 81 (1983). We must, therefore, consider whether the
> district court properly invoked jurisdiction and, if so, whether it
> correctly permitted or disallowed execution.

The Eighth Circuit then held that the exception to execution immunity that the plaintiff relied on

under Section 1610(a) was inapplicable, precluding the requested execution.  *Id.* at 102.

The only authority to the contrary that Af-Cap has brought to CMS Nomeco's

attention is a district court decision out of Illinois.  *Rubin v. Islamic Republic of Iran*, 408

F.Supp.2d 589 (N.D. Ill. 2005), *Magistrate recommendation adopted*, 436 F.Supp.2d 938 (N.D.

Ill. 2006).  In that case, a judgment creditor of Iran sought to execute on Iranian antiquities on

loan to a university in Chicago. The court refused to permit the university to raise issues

concerning immunity under the FSIA. The court rejected the position of the United States

government, submitted in a statement of interest filed in that case that argued that the court

should consider the FSIA's requirements even when the foreign state has not appeared. 436

F.Supp.2d at 932, 945-46. In taking that position, the United States relied heavily on the policies

underlying the FSIA and the need to prevent friction in international relations that the limitations

on execution in the FSIA are designed to address. *Id.* at 945-46. While the district court in

*Rubin* acknowledged that it was "sympathetic" with the fears expressed by the United States

government, *i.e.*, that its interpretation of the FSIA would negatively impact foreign relations, it

concluded that the cure was a "petition [to] Congress to amend" the FSIA. *Id.* at 945-46.

As the discussion of the FSIA, its legislative history, and the myriad cases cited

above demonstrate, the *Rubin* case is a lone dissenting voice among the many courts that have

recognized the necessity and propriety of conducting a mandatory FSIA analysis before

permitting execution against the assets of a foreign state. As the *Rubin* court acknowledged, the

United States government has formally taken a position on this issue, which is consistent with

that expressed by the Fifth and Eighth Circuits in *Walker*, *FG Hemisphere*, and *Brewer*. CMS

Nomeco respectfully submits that there is no persuasive reason for this Court to depart from the

rule applied by the Fifth and Eighth Circuits and recognized as correct by the United States

government.

In summary, in order to prevail on its "standing" argument, Af-Cap must

convince this Court to disregard the decisions of the Fifth Circuit and the Eighth Circuit rejecting

Af-Cap's argument, and to disregard the position of the United States government rejecting Af-

Cap's argument. CMS Nomeco respectfully submits that the Court should refuse that invitation.

The FSIA requires an analysis of the FSIA requirements that restrict execution on assets of a foreign state, notwithstanding the fact that the Congo has not appeared in this case. For the reasons set out below, the writ issued by the Superior Court in October 2005 violates those requirements, mandating dismissal of this case.

      **B.**    ***The Garnishment Writ is Void Ab Initio and Violates the FSIA Under the Fifth Circuit's Decision in FG Hemisphere***

In *FG Hemisphere*, the Fifth Circuit held that writs of garnishment directed to the Congo's in-kind royalty that were issued by a Houston federal district court in October 2004 and December 2004 were issued in violation of the FSIA and were void *ab initio*. 455 F.3d at 580, 588-591, 594, 596. The Court held that due to the absence of any findings by the district court that the Congo's in-kind royalty was "in the United States," as required by the FSIA, based on the circumstances existing at the time the court authorized the writs, and also due to the absence of findings concerning the amenability to garnishment of the property in question as a matter of state garnishment law, the writs were invalid under the FSIA. 455 F.3d at 580, 588-591, 594, 596.

In addressing the FSIA issues with regard to the Congo's in-kind royalty, *FG* held that *Af-Cap II* (relied on heavily by Af-Cap in this case) did not decide the issues pertinent to resolution of the FSIA issues with regard to writs issued in the *FG Hemisphere* case in October and December 2004. *Id.* at 585-590. The *FG Hemisphere* Court distinguished *Af-Cap II*, noting that on the *Af-Cap II* record (which related to facts in early 2003 and previously), "it was undisputed that Texas was the locus from which the garnishees had supervised, directed, and financed the activities that gave rise to their obligations to make royalty payments to the Congo" and that at that time, the Garnishees had a "continuous presence in Texas." *Id.* at 586. However, by virtue of a stock acquisition transaction by which CMS Nomeco "became a member of the

Perenco group of companies with officers and directors located in Paris and London, . . .
[o]perations relating to the Congo that previously had been performed in the United States were
performed in the Congo." *Id.* at 582. Accordingly, "[b]y July 2004, none of the Garnishees
[including CMS Nomeco] had operations, officers, or a physical presence in the United States."
*Id.* at 582.[5]

    The Court held that under the FSIA's "in the United States" requirement, a district
court is required to determine the situs of the foreign state's property on which execution is
sought each time that execution is authorized, based on the circumstances existing when
execution is authorized. *Id.* at 588-591, 594 n.3, 596. The Court recognized that "exemption
from executional immunity during one situs snapshot does not mean that, during another situs
snapshot, the property is not immune from execution." *Id.* at 594 n.3. The Court held that the
property sought to be executed "must be in the United States when the district court authorizes
execution" and that it was improper for the district court to resolve the "in the United States"
issue with regard to the writs issued in October 2004 and December 2004 without making a fresh
determination of the location of the Congo's in-kind royalty based on the facts and circumstances
existing at that time. *Id.* at 580, 588-591, 594 n.3, 596. The Court noted that such a rule best
prevents disruption of foreign sovereigns' public acts by not executing on property that was but
is no longer in the United States. *Id.* at 589. The Court held that a district court is
jurisdictionally required to make fact findings on the relevant issues under the FSIA, based on
the circumstances then existing, in support of any order authorizing garnishment. *Id.* at 590-591,

---

[5] These facts are set out in CMS Nomeco's Answer (D.I. 2) at paragraph 5. Af-Cap's Exceptions (D.I. 4)
do not challenge those facts. Af-Cap relies only on the fact that CMS Nomeco was a Delaware limited liability
company at the time the writ was served for its argument that there is a sufficient U.S. nexus under the FSIA. *See*
Af-Cap's Exceptions (D.I.. 4) at page 8, paragraph 5.

594, 596.  In the absence of such fact findings, an order authorizing garnishment is void *ab initio*.  *Id.* at 590-591.

Because the district court in the *FG Hemisphere* case did not make the required findings, the Fifth Circuit found it unnecessary to address the question of whether mere incorporation in Delaware of CMS Nomeco would be sufficient connection to the United States to make the Congo's in-kind royalty properly subject to being characterized as "in the United States" for purposes of the FSIA's "in the United States" requirement.  *Id.*  Based on the absence of required findings, the Fifth Circuit reversed the authorizing court order and instructed the district court to dissolve the writs.  *Id.* at 590-591, 594, 596

The fatal defect in the writs of garnishment issued by the Southern District of Texas that were the subject of the Fifth Circuit's *FG Hemisphere* decision applies equally to the writ that is the subject of this case.  The Superior Court order that authorized issuance of the writ made no findings concerning the "in the United States" or "commercial activity" requirements of the FSIA, nor did it make any findings concerning the amenability to garnishment of the Congo's property under state law.  *See* Exhibit B.  In fact, Af-Cap's motion filed in the Superior Court made no effort to make any such showing.  *See* Exhibit A.  Under the rationale of the decision in *FG Hemisphere*, the authorizing order for the writ that is the subject of this case is void *ab initio* and invalid, and the writ issued pursuant thereto likewise is void *ab initio* and invalid.  As such, there is a fatal, threshold obstacle to Af-Cap's case as a whole.

Like in *FG Hemisphere*, the absence of required findings under the FSIA in the Superior Court's authorizing order makes it unnecessary for this Court to determine whether CMS Nomeco's mere status as a Delaware limited liability company at the time the writ was served is sufficient to satisfy the "in the United States" requirement of the FSIA, since the writ is

-19-

void *ab initio*.  455 F.3d at 590.  The invalidity of the October 2005 writ under the Fifth Circuit's

analysis in *FG Hemisphere* is indisputable.  Af-Cap is simply left with the argument that the

Fifth Circuit is wrong.

      For the reasons set out in the Fifth Circuit's decision in *FG* Hemisphere, the

October 2005 writ is invalid, and the writ should be dissolved and this case dismissed.

    **C.**    ***CMS Nomeco's Status as a Delaware Limited Liability Company at the Time the Writ Was Served Is Not Sufficient to Render the Congo's In-Kind Royalty "In the United States" For Purposes of the FSIA***

      Just as the Fifth Circuit in *FG Hemisphere* found it unnecessary to decide whether

CMS Nomeco's mere status as a Delaware entity is sufficient to place the Congo's in-kind

royalty "in the United States" for FSIA purposes (due to the absence of required findings under

the FSIA), it likewise is unnecessary for this Court to reach that issue (due to the Superior

Court's failure to make those same findings).  Nevertheless, even if the lack of necessary

findings were ignored, there is no basis for Af-Cap's contention that CMS Nomeco's mere status

as a Delaware limited liability company at the time of service of the writ is sufficient to render

the Congo's royalty "in the United States" for purposes of the FSIA.

      The international relations concerns that are implicated by the limitations on

execution set out in the FSIA mandate that a single, "true situs" of intangible property of a

foreign state be identified to ensure that U.S. courts are not reaching outside of U.S. territory and

interfering with the foreign state's property rights outside of U.S. territory.  *See Callejo v.*

*Bancomer, S.A.*, 764 F.2d 1101, 1122 (5th Cir. 1985) (court must discern the "true situs" of

intangible property where an "overriding national concern" is implicated) (quoting *Tabacalara*

*Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 714-15 (5th Cir. 1968)).  The Fifth

Circuit in *Af-Cap II* specifically recognized that a single situs is necessary when international

relations are implicated, quoting the language in *Tabacalero* that recognizes the requirement of a single situs in that context. *Af-Cap*, 383 F.3d at 371 (quoting *Tabacalero*, 392 F.2d at 714-15). Af-Cap's reliance on CMS Nomeco's mere status as a Delaware limited liability company at the time of service of the writ provides no rational basis for concluding that the "true situs" of the Congo's in-kind royalty was "in the United States" in October 2005 when the writ was issued and served.

    To the contrary, under federal standards established in several circuits, the true situs of a foreign state's intangible property cannot turn on mere legal incorporation in the United States. For example, the Second, Fifth, and Seventh Circuits have applied a rule that the situs of an intangible debt is in the sovereign's territory if the foreign state has the parties before it in its territory and can act in a manner to change the relationship between the parties with regard to the debt wholly within its own territory. *See*, *e.g*., *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 224-25 (2d Cir. 1985); *Callejo*, 764 F.2d at 1122 (citing *Tabacalero*, 392 F.2d at 715-716); *Tchacosh Co. Ltd. v. Rockwell Int'l Corp.*, 766 F.2d 1333, 1336-39 (9th Cir. 1985).

    In *Tchacosh*, the Court held that a debt allegedly owed by a United States company to an entity controlled by Iran did not have a United States situs where "[t]he only connection the relationship between [the debtor and creditor] had to the United States is that [the debtor] is incorporated under United States law, and has a place of business in this country." 766 F.2d at 1338-39. The Court held that there was no authority for finding that the debt had its situs in the United States where "the nexus of the relevant relationship with a foreign country is so strong, and that with the United States so weak." *Id.* at 1338.

    Similarly, the Seventh Circuit in *F. & H.R. Farman-Farmaian v. Harza*, 882 F.2d 281, 283-84, 286-87 (7th Cir. 1988) (Posner, J.), addressed the question whether a debt owed by

a Chicago-based corporation to an Iranian consulting firm that was confiscated by the Iranian government had its "situs" in the United States by virtue of the debtor being located "in Chicago." The Court held that the debt's situs was in Iran, concluding that the plaintiff's effort to characterize the Chicago company's debt as an asset "in Chicago" was "a clearly untenable proposition." *Id.* at 286. The Court reasoned that "it is strange to describe the Consulting Firm as having an 'American' asset by virtue merely of having a claim against an American company for services performed on that company's behalf in Iran." *Id.* The Court concluded that it was appropriate to keep litigation over such a debt "out of our courts in an effort to minimize interference with the foreign relations of the United States." *Id.*

The *Braka*, *Tchacosh*, *Callejo*, *Tabacalero*, and *Harza* cases are all act of state doctrine cases, but those principles are fully applicable to the FSIA analysis here. As the Fifth Circuit noted in *Callejo*, the purposes underlying the act of state doctrine and the FSIA are similar, focused on avoidance of friction in international relations. 764 F.2d at 1112-13. "Where either the foreign state's interest in independence is great or the United States' interest in asserting jurisdiction is weak, the FSIA grants sovereign immunity in order to serve our larger interest in preserving international amity." *Callejo*, 764 F.2d at 1112. The Congo's interest in its independence with regard to its activities in developing its own natural resources and exercising its property rights in connection with its own natural resources in its own territory is great, and the United States' interest in asserting authority over those property rights is non-existent, where the only United States connection relied on for the propriety of the execution is the fact that the operator of the concession is a Delaware limited liability company. Under these circumstances, the "in the United States" limitation on execution precludes garnishment of the Congo's in-kind royalty.

A contrary holding would create substantial disincentive for American companies to pursue overseas oil, gas, mineral, and other investment opportunities in places such as West Africa that are vital to the economy of the United States. If the FSIA does not preclude garnishment actions in such circumstances, American companies conducting business with foreign governments in their territory will be subjected to claims by creditors of the foreign governments, exposing those companies to double liability or contract termination by virtue of court proceedings in the United States arising out of debt transactions to which they are not parties, in connection with the companies' operations conducted within the sovereign territory of a foreign state subject to that foreign state's laws. Those companies also will be subject to huge legal costs associated with the defense of such litigation, such as those incurred by CMS Nomeco. Perhaps even more important, there would exist a major disincentive for any foreign government to award such concessions or contracts to an American company.

A contrary holding also would threaten international relations between the United States and oil-producing countries such as the Congo, because the development of natural resources is a uniquely sovereign function. Natural resources are "'affected with the public interest'" and "'goods in which only the sovereign may deal.'" *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir. 1989)). As the Fourth Circuit said in *Globe Nuclear Services and Supply (GNSS) Ltd. v. AO Techsnabexport*, 376 F.3d 282, 291 (4th Cir. 2004), "the grant of a license to operate in sovereign territory and to extract natural resources from that territory is sovereign activity." Seizure by a U.S. court of a foreign state's right to take, in its own territory, natural resources produced and stored in its own territory, under

an agreement for the development of its own natural resources, is precisely the type of affront to a foreign government that the FSIA was designed to prevent.

**D.    *The Fifth Circuit's Decision in Af-Cap II Does Not Bar CMS Nomeco's FSIA Arguments***

Af-Cap has argued that the Fifth Circuit's decision in *Af-Cap II* bars CMS Nomeco from contending that the FSIA precludes garnishment of the Congo's in-kind royalty. That argument is completely refuted by the Fifth Circuit's later decision in *FG Hemisphere*.

In *FG Hemisphere*, the Fifth Circuit addressed the question of whether the FSIA invalidated writs of garnishment directed to the Congo's royalty in October 2004 and December 2004. The judgment creditor in that case argued that the prior decision in *Af-Cap II* was dispositive on the FSIA issues, but the Fifth Circuit rejected that argument. 455 F.3d at 585-90. The Court noted that "on the *Af-Cap I* and *Af-Cap II* record, it was undisputed that Texas was the locus from which the garnishees had supervised, directed, and financed the activities that gave rise to their obligations to make royalty payments to the Congo" *id.* at 586, but that by virtue of the stock acquisition transaction by which CMS Nomeco became a member of a European-based group of companies, "[b]y July 2004, none of the Garnishees [including CMS Nomeco] had operations, officers, or a physical presence in the United States." *Id.* at 582. The Court held that under the FSIA, a new "situs" determination is required each time a court authorizes new writs, based on the circumstances existing at the time the authorizing order is issued. *Id.* at 588-591, 594 n.3, 596. Thus, the Court held that the fact that the Congo's in-kind royalty had been determined to be "in the United States" in *Af-Cap II*, at a time when CMS Nomeco's activities were being directed from the United States, was not dispositive of the "situs" issue in October 2004, at a time when CMS Nomeco (following its acquisition by a European-based group of companies) had no physical presence in the United States. *Id.*

-24-

In short, the Fifth Circuit, in *FG Hemisphere*, interpreted its *Af-Cap II* decision as not controlling on the question of whether the Congo's in-kind royalty was "in the United States" in October 2004 and thereafter. To the contrary, the Fifth Circuit held that writs issued against CMS Nomeco in October 2004 and December 2004 were *invalid* under the FSIA, notwithstanding *Af-Cap II*. Just as *Af-Cap II* was not controlling with regard to the FSIA issues raised by the garnishment writs issued by the Southern District of Texas in October 2004 and December 2004, it is not controlling with regard to the FSIA issues raised by the October 2005 writ issued by the Superior Court that is at issue in this case.

Again, acceptance of Af-Cap's collateral estoppel arguments would require this Court to disregard the Fifth Circuit's decision in *FG Hemisphere* and adopt an interpretation of the Fifth Circuit's prior decision in *Af-Cap II* that is different than the interpretation given that decision by the Fifth Circuit itself. In light of *FG Hemisphere*, Af-Cap's argument that *Af-Cap II* is controlling on the FSIA issues is frivolous.

## II.    The Garnishment Writ Does Not Apply to Non-Monetary Obligations

Af-Cap seeks to garnish the Congo's in-kind royalty as a "debt" or "obligation" of CMS Nomeco to Congo. However, non-monetary obligations are not subject to garnishment, meaning that the writ does not apply to the Congo's in-kind royalty.

In August 2006, the Fifth Circuit determined that the Congo's royalty is an "in-kind" royalty and has been "in-kind" since 1999. *Af-Cap III*, 462 F.3d at 422 ("Since 1999, the Congo has opted to receive 100 percent of its payments 'in kind.'") That in-kind election was made long before any garnishment actions were initiated against CMS Nomeco. The Fifth Circuit held that the Texas garnishment statute and rules do not permit garnishment of the Congo's in-kind royalty because non-monetary obligations are not subject to garnishment. *Af-*

*Cap III,* 462 F.3d at 423-425.  The Fifth Circuit affirmed the Western District of Texas'

dissolution of the writs of garnishment directed to the Congo's in-kind royalty, holding that

Texas garnishment law precludes garnishment of non-monetary obligations.  *Id.*  By virtue of the

Fifth Circuit's judgment affirming dismissal of Af-Cap's garnishment action in Texas based on

the "in-kind" nature of the royalty, Af-Cap is collaterally estopped from contending that the

Congo's royalty is a monetary obligation.[6]  As discussed below, the rationale of the Fifth

Circuit's decision in holding that the Congo's in-kind royalty is not subject to garnishment under

Texas law applies equally under Delaware garnishment law.

      The Fifth Circuit began its analysis by noting that garnishment is a harsh remedy,

bringing a garnishee into a dispute in which it is a stranger, and that the garnishment statute

therefore must be "strictly construed."  *Id.* at 424.  The same is true of garnishment in Delaware.

*See John Julian Constr. Co. v. Monarch Builders, Inc.*, 306 A.2d 29, 33 (Del. Super. 1973) (in

the context of garnishment, "[a]ttachment is a summary process in derogation of the common

law and, therefore, the statute is to be strictly construed in favor of the party against whom the

proceedings is employed, both as to the subject matter of the attachment and the method of

enforcing the remedy").

      The Fifth Circuit then analyzed the Texas garnishment statute and rules and

concluded that they did not allow garnishment of non-monetary obligations.  The court noted

that the Texas garnishment rules provide for a monetary judgment against the garnishee "for the

amount found to be due to the defendant from the garnishee," contemplating that only *monetary*

debts are subject to garnishment.  462 F.3d at 424.  The Fifth Circuit also noted that the portion

---

[6] *See Board of Trustees v. Centra*, 983 F.2d 495, 505-506 (3d Cir. 1995) (a litigant is collaterally estopped when "(1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question.")

of the Texas garnishment statute permitting garnishment of "effects" (which a garnishee is required to "deliver" to a sheriff for sale) applies only to property of the debtor that has a physical existence and that is in the possession of the garnishee and capable of delivery, rendering it inapplicable to intangible obligations. *Id.*

This rationale also applies under the Delaware garnishment statute and rules. The Delaware statute limits the categories of property subject to garnishment to "[g]oods, chattels, rights, credits, moneys, effects, lands and tenements." 10 *Del. C.* § 3508. With regard to the language in Section 3508 that potentially reaches obligations, i.e., "rights" and "credits," the Delaware Supreme Court has held that "'it is well settled that not all rights are subject to attachment'" *McNeilly v. Furman*, 95 A.2d 267, 271 (Del. 1953) (citations omitted). The Court emphasized that "[h]istorically attachment was strictly confined to a 'debt', that is, a liquidated claim," and that "[t]he word 'rights' is bracketed with the word 'credits', *which imports a fixed monetary obligation*." *Id.* (emphasis added). Thus, the Delaware Supreme Court has already held that the type of obligation that is subject to garnishment in Delaware is a "fixed monetary obligation." *Id.*

Analysis of the Delaware procedural rules dealing with garnishment also compels the conclusion that non-monetary obligations are not subject to garnishment. Superior Court Civil Rule 5(aa)(2) provides that a garnishee is discharged upon delivery to the sheriff of the property of the debtor that is in the garnishee's possession, and that a failure by the garnishee to deliver the property to the sheriff will result in a judgment against the garnishee for the value of the property that the garnishee failed to deliver to the sheriff. Del. Sup. Ct. R. Civ. P. 5(aa)(2). Implicit in this rule is the requirement that property subject to garnishment must be capable of delivery to the sheriff. CMS Nomeco cannot deliver to a sheriff in Delaware the Congo's rights

to take in-kind royalty oil in the Congo, nor can CMS Nomeco deliver the oil itself to a sheriff in Delaware.[7]  Being incapable of delivery to a sheriff in Delaware, the Congo's right to take oil in the Congo simply is not a type of property interest that is within the scope of garnishable property under Delaware law.

It is noteworthy that Af-Cap has never suggested how CMS Nomeco could deliver oil for the benefit of Af-Cap against the dictates of the Congo.  It is instructive that Af-Cap itself has never suggested that it send its own hired tanker into Congolese waters to take delivery of the oil in defiance of Congo court orders decreeing that the Congo is entitled to its oil.  Af-Cap offers no explanation as to how CMS Nomeco could deliver possession of the Congo's rights to take oil in its own territory to a sheriff in Delaware.  Af-Cap simply wants this Court to impose a money judgment against CMS Nomeco, making CMS Nomeco a guarantor of the Congo's debts in which CMS Nomeco had no involvement.  The Delaware garnishment statute and rules simply do not contemplate such a result.

The conclusion that only monetary obligations are subject to garnishment is fully consistent with general garnishment principles in the United States.  In the "absence of specific statutory sanction, *obligations other than for the payment of money* are generally not subject to garnishment prior to a default which gives the debtor a cause of action for money."  38 C.J.S. *Garnishment* § 105 (emphasis added).  Indeed, it is "a rule of wide acceptance, at least in the absence of statutory provision to the contrary, . . . that *only debts payable in money are attachable*," and a debt or obligation "payable in specific articles cannot be attached or garnished."  6 Am. Jur. 2d, *Attachment and Garnishment* § 111 (emphasis added).

---

[7] It is undisputed that the oil itself is not garnishable in Delaware, as it is located in the Congo and outside the jurisdiction of a court sitting in Delaware.

Af-Cap's principal argument on the non-monetary obligations issue is its contention that *D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034 (D. Del. 1974), is Delaware precedent that permits garnishment of an in-kind royalty. That argument is a total misstatement of the decision in *D'Angelo*. As a threshold matter, *D'Angelo* did not even involve the Delaware garnishment statute; it involved the Delaware sequestration statute, 10 *Del. C.* § 366, which permits the Court of Chancery to sequester property for the purpose of compelling the appearance of a defendant in an *in personam* action in the Chancery Court. *See, e.g., Hughes Tool Co. v. Fawcett Publications, Inc.*, 290 A.2d 693, 695 (Del. Ch. 1972) ("[t]he primary purpose of 10 Del C. s. 366 is to compel the appearance in this Court of a non-resident having a seizable interest with a situs in Delaware"). *D'Angelo* simply does not involve the garnishment statute at issue in this case.

Even more significantly, *D'Angelo* did not involve an effort to attach or sequester a non-monetary obligation. To the contrary, this Court described the debt at issue as follows: "The property sequestered purports to be an indebtedness owed on open account by Mobil to the defendant based upon sales of crude oil to Mobil by defendant." 378 F.Supp. at 1036. Thus, the debt that was the subject of the sequestration in *D'Angelo* was a monetary debt on open account that Mobil owed to Petroleos Mexicanos for oil sold by Petroleos Mexicanos to Mobil. That debt was not a "royalty," as repeatedly represented to this Court by Af-Cap, nor was it non-monetary. *D'Angelo* simply does not speak to the issue before this Court.

In summary, Af-Cap cannot prevail in this case without convincing this Court that either (1) the Fifth Circuit's analysis of state garnishment law principles in *Af-Cap III* was wrong, or (2) there are unique aspects of the Delaware garnishment statute that distinguish it from the Texas garnishment statute and that require rejection of the Fifth Circuit's decision in *Af-*

*Cap III* and the general rule recognized in the United States that garnishment of non-monetary obligations is not permitted. In making such an effort, Af-Cap also must convince this Court to disregard the Delaware Supreme Court's statement in *McNeilly v. Furman*, 95 A.2d at 271, that "rights" and "credits" as used in the Delaware garnishment statute "import[] a fixed monetary obligation."

CMS Nomeco respectfully submits that there is no basis for Af-Cap's requests that this Court disregard those authorities. Because Delaware garnishment law (like Texas law and United States garnishment principles generally) precludes garnishment of non-monetary obligations, this case should be dismissed.

## CONCLUSION

Af-Cap's Delaware garnishment litigation should suffer the same fate as its Texas garnishment litigation.  Unless Af-Cap can convince this Court to (1) disregard Fifth Circuit authority, Eighth Circuit authority, and the formal statement of position of the United States government on the FSIA issues, and (2) disregard Fifth Circuit authority, Delaware Supreme Court authority, and generally accepted principles of United States garnishment law providing that non-monetary obligations are not subject to garnishment, Af-Cap's garnishment litigation fails as a matter of law, without any need for the Court to reach the double liability, foreign state compulsion, and act of state issues raised by the Congo court orders that have compelled CMS Nomeco to permit the Congo to take its oil in its own territory, notwithstanding garnishment writs issued by courts in the United States.

CMS Nomeco respectfully requests that the Court grant its motion for judgment on the pleadings and dismiss this action.

Respectfully submitted,

OF COUNSEL:

/s/ M. Duncan Grant
M. Duncan Grant (Del. Bar No. 2994)

Guy S. Lipe
Jason M. Powers
VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin Street, Suite 2300
Houston, TX  77002-6760
(713) 758-2222

James C. Carignan (Del. Bar No. 4230)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500

Attorneys for Garnishee CMS Nomeco
Congo Inc.

Dated:  January 26, 2007

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2007, the foregoing Motion for Judgment on

the Pleadings and Opening Brief were electronically filed with the Clerk of the Court using

CM/ECF, which will send notification of such filing to counsel as set forth below:

> Donald Detweiler, Esq.
> Dennis Meloro, Esq.
> Greenberg Traurig, LLP
> The Brandywine Building
> 1000 West Street, Suite 1540
> Wilmington, DE 19801

> /s/ M. Duncan Grant
> M. Duncan Grant (Del. Bar No. 2994)
> PEPPER HAMILTON LLP
> Hercules Plaza, Suite 5100
> 1313 North Market Street
> P.O. Box 1709
> Wilmington, DE  19899-1709
> (302) 777-6500