# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CONNECTICUT BANK OF COMMERCE, :
                                :
                    Plaintiff,  :
                                :
THE REPUBLIC OF CONGO,          :     Civil Action No. 05-762 SLR
                                :
                    Defendant,  :
                                :
CMS NOMECO CONGO INC.,          :
                                :
                    Garnishee.  :


## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF
## CROSS MOTION FOR JUDGMENT ON THE PLEADINGS
## AND IN OPPOSITION TO GARNISHEE'S RELATED MOTION


GREENBERG TRAURIG, LLP

Donald J. Detweiler (No. 3087)
Dennis J. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
(302) 661-7000

Sanford M. Saunders, Jr.
Kenneth P. Kaplan
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3100

James W. Perkins
200 Park Avenue
New York, New York 10166
(212) 801-9200

Dated: February 9, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. i

PRELIMINARY STATEMENT ....................................................................................... 1

NATURE AND STATE OF PROCEEDINGS................................................................... 3

STATEMENT OF FACTS ............................................................................................... 4

SUMMARY OF ARGUMENT ....................................................................................... 7

ARGUMENT

I.  THE STANDARD FOR MOTION FOR JUDGMENT ON THE PLEADINGS ........... 8

II. THE WRIT OF GARNISHMENT ISSUES AGAINST CMS IS VALID AND
    ENFORCEABLE ...................................................................................................... 8

    A. CMS Has No Standing To Raise FSIA Issues ........................................................ 8

    B. FG Hemisphere Has no Impact on the Validity of Af-Cap's Writ ........................... 14

    C. CMS Nomeco's Status as a Delaware Limited Liability Company is
       Sufficient to Render the Congo's In-Kind Royalty Payment in the
       United States For Purposes of the FSIA .............................................................. 18

    D. Af-Cap II Precludes Re-Litigation of the FSIA Immunity Issues ........................... 21

III. THE DELAWARE WRIT DOES CAPTURE THE ROYALTY OBLIGATIONS ... 34

    A. Delaware Attachment Statute Encompasses Non-Monetary Obligations............... 34

    B. The Fifth Circuit Has Already Rejected CMS's Argument That An "In Kind"
       Obligation Has Legal Significance ...................................................................... 39

    C. The Fifth Circuit Ruling Concerning the Texas Attachment Statute Has No
       Bearing on the Scope of the Delaware Attachment Statutes .................................. 39

CONCLUSION............................................................................................................... 40

TABLE OF AUTHORITIES

**Federal Cases**

*Acosta v. Artuz*, 221 F.3d 117 (2d Cir. 2000) ............................................................... 8

*Af-Cap v. Republic of Congo,* 309 F.3d 240 (5th Cir. 2002) ........................................ 23

*Af-Cap v. Republic of Congo,* 383 F.2d 361 (5th Cir. 2004) .................................... 1, 18

*Af-Cap v. Republic of Congo,* 462 F.3d 417 (5th Cir. 2006) ........................................ 1

*Allen v. McCurry*, 449 U.S. 90 (1980) ....................................................................... 21

*Allen v. Wright*, 468 U.S. 737 (1984) ......................................................................... 12

*Aquamar, S.A. v. Del Monte Fresh Produce, N.A., Inc.*, 179 F.3d 1279 (11th Cir. 1999) ............. 30

*Astoria Fed. Sav. & Loan Ass'n v. Solmino*, 501 U.S. 104 (1991) ............................... 21

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro*, 875 F.2d 1174 (5th Cir. 1989) ........... 26, 30

*Birch Shipping Corp. v. Embassy of the Rep. of Tanzania*, 507 F. Supp. 311 (D.D.C. 1980) ....... 31

*Burlington N. R.R. Co. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227 (3d Cir. 1995) ........ 21, 23

*Callejo v. Bancomer*, 764 F.2d 1101 (5th Cir. 1985) ............................................. 19, 24

*Carl Marks & Co. v. Union of Soviet Socialist Republics*, 841 F.2d 26 (2d Cir. 1988) ........... 16

*Chicago Rock Island & P. Railway Co. v. Sturm*, 174 U.S. 710 (1899) ........................ 18

*Chisholm v. Defense Logistics Agency*, 656 F.2d 42 (3d Cir. 1981) ............................. 22

*Clinton v. Acequia, Inc.*, 94 F.3d 568 (9th Cir. 1996) .................................................. 12

*Cuba v. Sabbatino*, 376 U.S. 398 (1964) ..................................................................... 24

*D'Angelo v. Petroleos Mexicanos*, 378 F.Supp. 1034 (D. Del. 1974) ............... 18, 35, 36

*Dennis v. United States*, 384 U.S. 855 (1966) ............................................................... 9

*Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1 (2004) .................................... 12

*Elliot & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312 (3d Cir. 2006) ........................ 8

*FG Hemisphere Assocs. v. Republique du Congo*, 455 F.3d 575 (5th Cir. 2006) ............ 13, 14

*Florida v. Thomas*, 532 U.S. 774 (2001) ...................................................................... 8

*Food & Commercial Workers v. Brown Group*, 517 U.S. 544 (1996) ........................... 12

*Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989) ........................................... 8

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) ....................................................... 11

*Harris v. Balk*, 198 U.S. 215 (1905) ............................................................ 18, 19

*Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201 (3d Cir. 2001) .......................... 22

*Hilton v. Guyot*, 159 U.S. 113 (1895) .............................................................. 25

*Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417 (5th Cir. 2001) .................................. 4

*In re Chi-Chi's, Inc.*, 338 B.R. 618 (Del. Bankr. 2006) ........................................... 38

*In re Graham*, 973 F.2d 1089 (3d Cir. 1992) ...................................................... 21

*In re TCW/Camil Holding LLC. v. Fox Haron & Camerlini LLP*, Nos. 03-1071, 03-53929, 03-1154-SLR, 2004 WL 1151562 (D. Del. 2004) ................................................... 7, 8

*Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289 (3d Cir. 1988) .......................... 8

*Jacobs v. Tenney*, 316 F. Supp. 151 (D. Del. 1970) ............................................... 18

*Kensington Int'l. Ltd. v. Rep. of Congo*, 461 F.3d 238 (2d Cir. 2006) ............................. 5

*Knight v. International Longshoremen's Ass'n*, 457 F.3d 331 (3d Cir. 2006) ..................... 8, 9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................. 11

*Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80 (2d Cir. 1961) ..................... 22

*Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000) ............................................... 12

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) .............................................. 10

*McNeil v. Wisconsin*, 501 U.S. 171 (1991) ......................................................... 9

*Molex Inc. v. Wyler*, 334 F. Supp. 2d 1083 (N.D. Ill. 2004) ..................................... 12

*Montana v. United States*, 440 U.S. 117 (1979) .................................................. 20

*Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004) .............................. 38

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*, 2006 WL 2711527 (D.D.C. 2006) .............. 25

*Paramount Aviation Corp. v. Augusta*, 178 F.3d 132 (3d Cir. 1999) .............................. 21

*Powers v. Ohio*, 499 U.S. 400 (1991) ............................................................. 10

*Raytech Corp. v. White*, 54 F.3d 187 (3d Cir. 1995) ............................................. 21

*Renne v. Geary*, 501 U.S. 312 (1991) ............................................................ 10

*Rep. of Austria v. Altmann*, 544 U.S. 677 (2004)......................................................... 24

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) ...................................... 16

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ..................................................... 9

*Republic of Phillipines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) ................................... 30

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992)............ 31, 32

*Rubin v. Islamic Republic of Iran*, 408 F. Supp. 2d 549 (N.D. Ill. 2005) ............... 9, 10, 24

*Russello v. United States*, 464 U.S. 16 (1983) ............................................................... 26

*Samportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435 (3d Cir. 1971)........ 25

*Schmidt v. Polish People's Republic*, 579 F. Supp. 23 (S.D.N.Y. 1984) ........................ 16

*Simon v. Eastern K. Welfare Rights Organization*, 426 U.S. 26 (1976) ......................... 11

*Soviet Socialist Republics*, 558 F. Supp. 358 (N.D. Ill. 1983) ...................................... 32

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998).......................... 8, 11

*United States v. Burke*, 504 U.S. 229 (1992) ................................................................... 9

*Urena-Tavarez v. Ashcroft*, 367 F.3d 154 (3d Cir. 2004) ............................................... 8

*USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190 (3d Cir. 2003)......................................... 9

*Viceroy Gold Corp. v. Aubry*, 75 F.3d 482 (9th Cir. 1996) .......................................... 13

*Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56 (9th Cir. 1994) ...... 13

*Wilmington Trust v. United States District Court*, 934 F.2d 1026 (9th Cir. 1991)........ 30

*Witowski v. Welch*, 173 F.3d 192 (3d Cir. 1999) ........................................................... 21

*Zelson v. Thomforde*, 412 F.2d 56 (3d Cir. 1969)........................................................... 8

**State Cases**

*Blaustein v. Standard Oil of Indiana*, 54 A.2d 596 (Del. Super. Ct. 1947) ................... 36

*Blumenthal v. Blumenthal*, 35 A.2d 831 (Del. Ch. 1944) .............................................. 36

*Delaware Trust Co. v. Carolina Freight Carriers Corp.*, 1986 WL 28312 (Del. Super. Ct. 1986).......................................................................................................................... 33, 35

*First Western Financial Corp. v. Neumeyer*, 240 A.2d 579 (Del. Super. Ct. 1968)........ 35, 36

*Forest Products Co. v. Magistrelli*, 14 A.2d 397 (Del. Super. Ct. 1940) ...................... 18

iv

*Hughes Tool Co. v. Fawcett Publications, Inc.*, 290 A.2d 693 (Del. Ch. 1972)...........................36

*John Julian Constr. v. Monarch Builders, Inc.*, 306 A.2d 29 (Del. Super. Ct. 1973)...................34

*Local Union 1034 AFL-CIO v. Glover*, 460 A.2d 541 (Del. Super. Ct. 1983) ............................18

*Lowe v. Hulliger*, 46 Del. 562, 86 A.2d 749 (Del. 1952)................................................................32

*McNeilly v. Furman*, 95 A.2d 267 (Del. 1953) .................................................................32, 33, 34

*Pagliaro, Inc. v. Zimbo*, 1987 WL 10275  (Del. Super. Ct. 1987)........................................11, 15

*Pauley Petroleum, Inc. v. Continental Oil Co.*, 235 A.2d 284 (Del. 1967) .......................19, 20, 35

*Trans World Airlines, Inc.*, 185 A.2d 762 (Del. Ch. 1962).............................................................35

*UMS Partners, Ltd. v. Jackson*, 1995 WL 413395 (Del. Super. Ct. 1995)..................18, 22, 33, 34

*Weinress v. Bland*, 71 A.2d 59 (Del. Ch. 1950)...............................................................................36

## Federal Statutes

28 U.S.C. § 1330..............................................................................................................................9

28 U.S.C. § 1604..............................................................................................................................9

28 U.S.C. § 1606......................................................................................................................16, 29

28 U.S.C. §§ 1609-10 ......................................................................................................................8

28 U.S.C. § 1610............................................................................................................................25

28 U.S.C. § 1610(a) .......................................................................................................................28

28 U.S.C. § 1610(c) .......................................................................................................................22

28 U.S.C. § 1611............................................................................................................................30

## State Statutes

10 Del. C. § 3502 ..........................................................................................................................23

10 Del. C. § 366.....................................................................................................................35, 36

10 Del. C. §3502(a).......................................................................................................................17

10 Del. Code § 3508 ...............................................................................................................32, 33

## Other Authorities

99 Am. J. Int'l L. 257 (1994).......................................................................................................26

1976 U.S.C.C.A.N. 6604 ............................................................................................................. 25

1976 U.S.C.C.AN. 6609 ............................................................................................................. 16

H.R. Rep. 94-1487 ........................................................................................................... 16, 25, 29

Pursuant to Fed. R. Civ. P. 12(c), and the Court's direction at the January 18, 2007 hearing, Af-Cap, Inc. ("Af-Cap") files its opening brief in support of its Cross-Motion for Judgment on the Pleadings and in opposition to Garnishee CMS Nomeco Congo, Inc.'s ("CMS") Motion for Judgment on the Pleadings.

## PRELIMINARY STATEMENT

This is an enforcement proceeding to collect a debt which the debtor the Republic of Congo ("Congo"), has never denied is justly due and owing. Related enforcement proceedings in the United States have been ongoing since May 2000, when Connecticut Bank of Commerce ("Connecticut Bank") obtained a money judgment against Congo from the Supreme Court of New York, and then registered the judgment in Texas state court in May 2001. Af-Cap, as assignee of the judgment, initiated garnishment proceedings and obtained writs of garnishment against CMS in Texas (referred to as the "Texas Litigation"), in order to capture the royalty obligation CMS owes to Congo under a multi-billion dollar oil Convention to exploit and sell oil.[1]

The Texas litigation has been on appeal to the Fifth Circuit four times. In the second appeal, the Fifth Circuit held that the oil royalty obligation that Af-Cap attached is subject to execution under the Foreign Sovereign Immunities Act ("FSIA") *Af-Cap v. Republic. of Congo*, 383 F.2d 361 (5th Cir. 2004) clarified on reh'g, 389 F.3d. 503 (5th Cir. 2004). Ultimately, however, the Fifth Circuit denied the relief Af-Cap requested based upon its interpretation of Texas State garnishment law. *Af-Cap v. Rep. of Congo*, 467 F.3d 417, 424 (5th Cir. 2006) ("Af-Cap III").

After *Af-Cap II*, CMS fled Texas and Af-Cap filed this action and requested, received and served on CMS writs of garnishment from the Delaware Superior Court. During this time, CMS

---

[1]    By a September 3, 2002 Transfer of Judgment executed by Federal Deposit Insurance Corporation, acting as receiver for Connecticut Bank, Af-Cap was assigned the money judgment at issue in this case. A true and correct copy of the Transfer of Judgment is attached hereto as Exhibit B. Significantly, the English court that originally entered the judgment also entered an order substituting Af-Cap for Connecticut Bank. *See* Queen's Bench Order dated 5 September 2002, attached hereto as Exhibit C. Moreover, the New York Supreme Court (where the judgment was originally obtained in the United States) entered an order of substitution permitting Af-Cap to act as plaintiff, as assignee, in place and instead of CBC. Exhibit D.

purported to flee Delaware by filing a Certificate of Conversion with the Delaware Secretary of State seeking to convert to a non-Delaware entity. See Exhibit E. CMS re-incorporated in the Bahamas as part of its, and Congo's, strategy to insulate itself from future garnishment actions.[2]

CMS's self-portrait as the unfortunate and innocent victim of numerous lawsuits attempting to attach its assets simply because it does unrelated business with the Congo is inaccurate. (Op. Br. at 1.) The Court should not be fooled as this strategy is designed solely to divert the Court from the real issues in this case. CMS has been a willing participant and integral part of Congo's efforts to avoid repayment of undisputed debts. CMS has asserted Congo's defenses and its has fled jurisdictions to avoid attachment actions. Additionally, CMS has defied Court orders. Af-Cap has been forced to endlessly pursue Congo and CMS even though Congo has never disputed owing the debt. This Court should put an end to CMS's charade and grant Af-Cap's requested relief.

The parties have stipulated that the Court should determine two principle legal questions before proceeding further in this case:

> (i) whether the FSIA permits execution against Congo's asset that CMS admittedly holds, or whether, in CMS's view, the writ issued by the Delaware Superior Court and served on CMS is void. *See* 28 U.S.C. §§ 1602-1611;
>
> (ii) whether Delaware law permits attachment of an intangible, what CMS characterizes as a "non-monetary," obligation.

As explained below, Af-Cap satisfies the requirements of federal and state law and the Court should grant Af-Cap's request to permit execution upon the oil royalty obligation.

---

[2]     Recognizing that it fled the jurisdiction notwithstanding a lawfully issued writ attaching the property at issue - the debt from CMS to Congo, CMS has agreed to act as if it did not flee for purposes of this proceeding.

*DEL-FS1\166118v01*

## NATURE AND STAGE OF PROCEEDINGS

### A.    The Delaware Litigation

Af-Cap instituted this action in August 2005, because CMS had left Texas and its only remaining, known U.S. location was Delaware, its place of incorporation.  At that time, Af-Cap domesticated its judgment against Congo in Delaware and sought writs of garnishment against Congo's asset held by CMS in accordance with Section 1610 of the FSIA.  It served Congo in accordance with Section 1608 of the FSIA, and also served CMS.

On September 30, 2005, Af-Cap presented its Motion to Superior Court, and Judge Silverman found that Af-Cap was entitled to writs in accordance with section 1610(c) of the FSIA.  *See* Order Granting Writ of Garnishment, Exhibit A.  Both CMS and Congo failed to appear.[3]  The writ was served on CMS on October 12, 2005.  Congo is in default having failed to appear.  CMS , thereafter, appeared to contest the writ and, in doing so, raised Congo's sovereign immunity as a defense to this action.  After CMS removed the action to this Court, Af-Cap sought remand and the Court denied Af-Cap's request.  On or about December 14, 2005, the parties cross-moved for summary judgment; however, by order dated July 20, 2006, this Court denied the motions, leaving the writ of garnishment in place.  On or about January 10, 2007, after CMS had made oil royalty payment to Congo and had notified Af-Cap that it was about to pay another, Af-Cap moved for an order of contempt, injunctive and other related relief.  On January 18, 2007, the matter came before the Court for a status conference and at the Court's direction, the parties agreed to brief the above-stated fundamental legal issues and file cross-motions under Rule 12(c), Fed. R. Civ., P.

---

[3]    CMS asserts that Af-Cap misled the Superior Court based on the notation on the order: "unopposed."  It is CMS who is misleading.  CMS was timely served with the motion papers, but failed to appear.  *See* Affidavit of Service attached hereto as Exhibit A.  The Court wrote "unopposed" on the order based on Congo's and CMS's non-appearance.

-3-

**B.     The Texas Litigation**

Congo's refusal to repay the millions of dollars it borrowed forced Af-Cap's predecessor to register the New York judgment in a Texas state court and then to obtain from a Texas state court a writ of garnishment directed to CMS.  At the time, CMS was a Delaware company with its base of operations in Houston, Texas and it was the assignee of an Oil Convention to explore and develop Congo's oil reserves for commercial purposes and pay Congo royalties and taxes. Congo and CMS removed the case to federal court and jointly moved to dismiss the garnishment actions, even though the Loan Agreement barred such action.

As discussed below, the legacy of the *Af-Cap* cases before the Fifth Circuit demonstrates that Congo's royalty obligation held by CMS is not protected by sovereign immunity and is located in the United States wherever the garnishee, CMS, is located.  *See Af-Cap, Inc. v. Reublic of Congo (Af-Cap II)*, 383 F.3d 361 (5th Cir. 2004 *clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004), *cert. denied*, 125 S. Ct. 1735 (2005).  The Fifth Circuit, however, ultimately determined that Texas law would not allow garnishment of nonmonetary obligations.  Af-Cap has filed for *certiorari* on the Fifth Circuit's failure to enforce the FSIA and has sought certification of the Texas state law question to the Texas Supreme Court in a related appeal to the Fifth Circuit.[4]

## STATEMENT OF FACTS

This enforcement action arises out of a Loan Agreement executed by Congo with Equator Bank Limited dated December 18, 1984, to provide funds for the construction of a highway (the "Loan Agreement").  The Congo expressly agreed that the execution and performance of the Loan Agreement, including Congo's consents and waivers, constitute "private and commercial rather than public or governmental acts."  Loan Agreement at ¶ 8(C).  The Congo further agreed

---

[4]     CMS's statement in footnote 2 of its brief that Af-Cap withheld information from the Court concerning its request for certification is one of several unfounded attempts to mischaracterize Af-Cap's enforcement efforts.  Af-Cap's request for certification of a Texas state law question to the Texas Supreme Court is pending before the Fifth Circuit.  Af-Cap's request is not relevant to the matter before this Court, which arises under Delaware state law.  Additionally, CMS's reliance upon a diversity case to support its view of Af-Cap's certification request is misplaced because FSIA cases arise under the federal court's federal question jurisdiction (28 U.S.C. § 1330).  *See* CMS Br. at 4, n.2 (citing *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 425 (5th Cir. 2001)).

that the Loan Agreement would be governed by the laws of England, and that any suit, action or proceeding against it to collect repayment could be brought in England, the federal or state courts of New York or any other court of competent jurisdiction. *Id.* at ¶ 19(A).

To obtain the loan, Congo committed that all of its assets and properties, wherever located, would be available to repay the loan upon default. Thus, the Congo expressly consented generally:

> in respect of any suit, action or proceedings arising out of or in connection with this Agreement to the giving of any such relief, or the issuance of any process in connection with any such suit, action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment that may be made or given in such action or proceedings.

*Id.* at ¶ 19(C). Additionally, the Congo expressly waived sovereign immunity by agreeing that:

> To the extent that the Borrower [the Congo] may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed) the Borrower [the Congo] agrees not to claim and waives such immunity to the fullest extent permitted by the laws of that jurisdiction intending, in particular, that in any proceedings taken in New York the foregoing waiver of immunity shall have effect under and be construed in accordance with the United States Foreign Sovereign Immunities Act of 1976.

*Id.* at ¶ 19(D). Finally, the Congo represented that "[a]ll of the obligations expressed to be assumed by the Borrower [i.e., the Congo] under this Agreement are legal, valid and binding as obligations of The People's Republic of the Congo, enforceable in accordance with their respective terms." *Id.* at ¶ 8(B). Congo has never disputed its obligation to repay this loan.

CMS and Congo are business partners under an Oil Convention first entered into in 1979 between CMS's predecessor and Congo (the "Convention"). The Convention obligates CMS, among other things, to pay Congo a royalty based upon oil production. CMS presently adheres to this obligation and both CMS and Congo have profited handsomely from the oil revenue throughout the years. Despite the profits it earns under the Convention and other oil revenues,

-5-

Congo is a well-known scofflaw that refuses to pay its just debts.[5]  However, while a Delaware corporation, CMS, over an eleven year period, paid another of Congo's creditors from a bank account located in the United States. *Af-Cap II,* 383 F.3d at 370-371.

CMS has conceded in its Answer to the writ of garnishment that it holds property belonging to Congo. (*See* CMS Answer at 19, ¶¶ 1-3 (D.I.2)).  Specifically, CMS admits that it is "the current owner[s] of working interests in a convention for the production of oil in the Republic of Congo .. . ." (*id.* at ¶ 1) and that under its agreement with Congo that "the Congo is entitled to royalty." (*Id.*).[6]  The royalty is owing based upon the amount of oil extracted on a daily basis. *See* Oil Convention at Arts. 7 and 10.  Thus, there is no dispute that CMS currently is party to an oil deal with the Congo under which it holds an asset, an oil royalty payment right, belonging to the Congo.  CMS objects to Af-Cap's attachment of this property, despite the Fifth Circuit rulings against CMS in *Af-Cap II*:

- the oil royalty obligation at issue in this case is not immune from attachment under FSIA.

- Congo used its oil royalty obligation for "commercial activity" in the United States.

- Congo's action to ignore Af-Cap's debt does not occur in Congo and, thus, the Act of State doctrine does not apply.

- Congo's asset is present wherever CMS can be found in the United States.

---

[5]    The Second Circuit has recognized, "Congo is a[n] oil-rich nation with more than sufficient assets to pay its debt, but one of the worlds most notorious debtors." *Kensington Int'l. Ltd. v. Rep. of Congo*, 461 F.3d 238, 244 (2d Cir. 2006).
[6]    Furthermore, CMS admits that it paid Congo a royalty during the pendency of this action.  In particular, it states that "[i]n September 2005, SNPC (Congo's state run oil Company) took a lifting of oil for the Congo and SNPC." (*Id.* at ¶ 3)  On April 15, 2006, in violation of the Af-Cap Writ, CMS made royalty payments to Congo at least in excess of $27 million.  (*See* Deposition of Roland Fox, dated November 30, 2006 at 144:14 - 156:24) (attached as Exhibit F).

## SUMMARY OF ARGUMENT

CMS is not entitled to judgment on the pleadings. First, CMS has no standing, as a garnishee, to raise the Congo's FSIA defenses. Second, even if it could step into the Congo's shoes, the Fifth Circuit's prior decision in *Af-Cap II* precludes CMS from re-litigating whether the Congo's asset is subject to sovereign immunity. The Fifth Circuit held in no uncertain terms in *Af-Cap II,* an appeal CMS participated in, that the very asset that is at issue in this proceeding -- Congo's royalty right -- was not immune from attachment and execution under the FSIA and that it was located wherever the garnishee CMS could be found. Contrary to CMS's position, *FG Hemisphere's* ruling did not disturb the Court's rulings in *Af-Cap II* because (1) the *FG Hemisphere* litigation involved different litigants; (2) the District Court in *FG Hemisphere* failed to make any findings of fact and merely relied on the findings unique to the litigants in *Af-Cap II;* (3) the Fifth Circuit never revisited its prior ruling in *Af-Cap II* that the oil royalty was used for commercial purposes in the United States.

Third, the Congo's and CMS's subsequent efforts to leave the United States and convert the royalty to an "in kind" payment does not change the analysis. The Fifth Circuit was clear that its finding the oil royalty obligation was used for commercial purposes in the United States. CMS's and Congo's recent attempts to manipulate those facts (by leaving the United States, Texas and Delaware) are exactly what the Fifth Circuit warned against when it admonished any court conducting an FSIA analysis that it should consider "whether the use of property in question was being manipulated by a sovereign nation to avoid being subject to garnishment under the FSIA." *Af-Cap II* at 369, n.8. Fourth, it is equally clear that a debt can be garnished wherever the garnishee is found and CMS's attempts to flee Delaware are unavailing since it is now before this Court and has submitted itself to jurisdiction.

Thus, try as CMS might to re-litigate the dispositive questions that have been decided against its position, Af-Cap is entitled to judgment as a matter of law as to the following:

- The royalty obligation at issue was used for commercial purposes in the United States.

-7-

- The royalty obligation is located in the United States.

- The royalty obligation is not protected by sovereign immunity.

- The writ of garnishment is valid under FSIA.

- Delaware law allows for the attachment of intangible property such as the royalty obligations.

- CMS shall hold the royalty owed to debtor Congo pending execution and payment of Congo's debt to Af-Cap.

## ARGUMENT

## I.    THE STANDARD FOR MOTION FOR JUDGMENT ON THE PLEADINGS

A motion for judgment on the pleadings is treated the same way as a motion under Rule 12(b)(6), Fed. R. Civ. P. *See In re TCW/Camil Holding LLC. v. Fox Haron & Camerlini LLP*, Nos. 03-1071, 03-53929, 03-1154-SLR, 2004 WL 1151562 (D. Del. May 12, 2004). The Court is bound to view all facts in a light most favorable to non-moving party and the requested relief should be granted only where the movant clearly establishes that there are no material facts in dispute and the movant is entitled to judgment as a matter of law. *See id.* (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988). As explained below, Af-Cap satisfies that standard for judgment in its favor, but CMS does not.

## II.   THE WRIT OF GARNISHMENT ISSUED AGAINST CMS IS VALID AND ENFORCEABLE

### A.    CMS Has No Standing To Raise FSIA Issues

It is axiomatic that the first obligation of any federal court is to "consider whether [it has] jurisdiction to decide" the issue before it. *Florida v. Thomas*, 532 U.S. 774, 777 (2001); *See also Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (expressly rejecting the "doctrine of hypothetical jurisdiction," that is, the practice of assuming Article III jurisdiction where the issue can be more readily resolved on the merits in favor of the party objecting to jurisdiction.); *Elk Grove Unified School Dist. v. Newdow*, 02-1624 (U.S. June 14, 2004) ("In

essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.[7]

### 1.    A Court's Authority to Issue Writs in Aid of Judgment is Not Jurisdictional

CMS operates under the assumption that the post judgment provisions of the FSIA (*see* 28 U.S.C. §§ 1609-11) are somehow jurisdictional and that potential defenses under those provisions can be raised by anyone at anytime including by an entity without standing or by the court *sua sponte*. However, if the post judgment defenses under the FSIA are not jurisdictional, then like any affirmative defenses, they can be waived and are subject to normal standing requirements. *See Knight v. International Longshoremen's Ass'n*, 457 F.3d 331, 344 n.15 (3d Cir. 2006) (holding that failure to exhaust is an affirmative defense and as such is waived if not raised as an affirmative defense); *Elliot & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 317 (3d Cir. 2006).[8] As the Supreme Court has made abundantly clear, the FSIA has only one jurisdictional provision, 28 U.S.C. § 1330. *See Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (footnote omitted) (holding the FSIA "itself grants federal courts jurisdiction over civil actions against foreign states, § 1330(a), *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 197 (3d Cir. 2003) (holding that 28 U.S.C. § 1330(a) "gives district courts jurisdiction over actions

---

[7]    *See Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 54 (1989) ("Before we address the merits of petitioner's claims, we must first consider our jurisdiction to hear this" issue.); *Urena-Tavarez v. Ashcroft*, 367 F.3d 154, 157 (3d Cir. 2004) (quoting *United States v. Touby*, 909 F.2d 759, 763 (3d Cir. 1990)) (holding that it is "axiomatic that [a federal] court has a special obligation to satisfy itself of its own jurisdiction[.]"); *Nanda v. Bd. of Trustees of the Univ. of Illinois*, 01-3448 at n.9 (7th Cir. 2002) (A "court must assure itself of its own jurisdiction").

[8]    Nor is it appropriate for a court to sua sponte raise nonjurisdictional defenses not raised by the parties. *See Acosta v. Artuz*, 221 F.3d 117, 122 (2d Cir. 2000) ("Generally, courts should not raise sua sponte nonjurisdictional defenses not raised by the parties."); *cf. Zelson v. Thomforde*, 412 F.2d 56, 58 (3d Cir. 1969) (holding that a court may not raise the defense of lack of personal jurisdiction — a nonjurisdictional defense because it does not concern the power of the court to entertain the suit — once the defendant has waived the issue by appearing). *See also United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring) ("The rule that points of law not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one."); *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991) ("What makes a system adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties.") (emphasis added). As the Court has explained, "[t]he determination of what may be useful to the defense can properly and effectively be made only by an advocate." *Dennis v. United States*, 384 U.S. 855, 875 (1966).

*DEL-FS1\166118v01*

against foreign states"). Correspondingly, the FSIA contains only one provision dealing with jurisdictional immunity, namely 28 U.S.C. § 1604, which provides as follows:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

In this case, no one is claiming either that this Court lacks subject matter jurisdiction under § 1330 or that some immunity from jurisdiction under § 1604 has been triggered. Since this Court's subject matter jurisdiction is not in question, any other so-called immunity is, by the process of elimination, non-jurisdictional and subject to waiver by inaction in much the same way that the quasi-jurisdictional exhaustion requirement was in *Knight v. Int. Longshoremen's Ass'n*, 457 F.3d at 344 n.15 and the *in personam* jurisdictional requirement in *Zelson v. Thomforde*, 412 F.2d at 58. Correspondingly, since the issue does not go to this Court's subject matter jurisdiction, this Court ought not act *sua sponte*, and instead, should carefully consider whether CMS has met its burden by providing this Court with evidence that it has standing either directly or representationally to raise the Congo's FSIA defenses.

We believe that the district court's analysis in *Rubin* more accurately reflects the current trend in standing jurisprudence than does the Fifth Circuit's views in the *Walker*. *See Rubin v. Islamic Republic of Iran*, 408 F.Supp.2d 549 (N.D. Ill. 2005), aff'd, 436 F.Supp.2d 938 (N.D. Ill. 2006). The *Walker* court failed to analyze whether the garnishee actually had standing; it concluded without analysis that it did. *See Walker*, 395 F.3d at 233. In contrast, the court in *Rubin* undertook an extensive analysis of a garnishee's standing to raise a sovereign's immunity under sections 1609-10. The *Rubin* court, first noted, that immunity under sections 1609-10 was an affirmative defense and not jurisdictional, a point never examined by the *Walker* Court. The *Rubin* court properly held that absent a true jurisdictional concern a normal standing analysis would have to be undertaken and under such analysis a garnishee is a stakeholder and lacks the independent interest necessarily to satisfy either Article III or prudential standing requirements. Specifically, the *Rubin* court in ascertaining whether a third-party (e.g., garnishee) had standing

-10-

to assert the sovereign's immunity under sections 1609-10, held that it was obligated, under

*Powers v. Ohio*, 499 U.S. 400, 410-11 (1991), to apply a two part test. "First the litigant must

have suffered an 'injury in fact.' *Id.* at 411. Second, certain prudential considerations must point

in favor of permitting the litigant to assert the third party's rights." *Rubin*, 408 F. Supp. 2d at

562. The court then concluded that neither prong had been satisfied. This traditional standing

analysis, mandated by the Supreme Court, was ignored by the Fifth Circuit in *Walker*, but not by

the *Rubin* court.

### 2.   CMS Has Failed to Provide Any Evidence that it Has Article III Standing in Its Own Right to Invoke the FSIA

If a party has no standing to raise an issue, then by definition there is no "case or

controversy" with respect to that issue and the court lacks Article III jurisdiction to entertain that

issue. There is, in short, no independent duty to skirt the requirements of Article III. To the

contrary, a court's first obligation is to determine whether a putative party has Article III standing

to raise a particular issue.[9]

Correspondingly, "a litigant carr[ies] the burden of establishing [its] standing under

Article III" with respect to each issue it seeks to litigate. *DaimlerChrysler Corp. v. Cuno*, No. 04-

1704 2006 WL 2793084 (U.S. May 15, 2006). Indeed, a federal court must approach each issue

"presum[ing] that [it] lack[s] jurisdiction unless the contrary appears affirmatively from the

record," and that "the party asserting federal jurisdiction when it is challenged has the burden of

establishing it." *Renne v. Geary*, 501 U.S. 312, 316 & n.3 (1991) (internal quotation marks

omitted). CMS is asking this court both (i) to ignore its independent obligation to determine

whether CMS has standing, and (ii) to dispense with CMS' burden of establishing its standing.

CMS has not satisfied this burden: it devoted nearly ten pages discussing "standing," but

at no time did it ever attempt to articulate how it satisfies any of the three elements that constitute

---

9      CMS suggests that the FSIA authorizes courts to entertain issues of sovereign immunity even
though the court may lack Article III jurisdiction to do so. CMS cites nothing to support this rather novel
proposition, one that is at odds with virtually every Court decision on Article III from *Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) through *Elk Grove Unified School Dist., supra*.

the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). Specifically,

> (i) CMS must have suffered an "injury in fact"—"an invasion of a legally-protected interest which is (a) concrete and particularized," and (b) "actual or imminent, not 'conjectural' or 'hypothetical'";
>
> (ii) there must be causal relationship between the injury in fact and the conduct at issue;
>
> (iii) it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *See, e.g., Simon v. Eastern K. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *Steel Co. v. Citizens For Better Env.*, 523 U.S. 83 (1998).

Here, if the property at issue were owned by the garnishee and not Congo, then the garnishee would have standing to raise this defense. However, a court could not provide the garnishee any relief under the FSIA, because the FSIA applies only to property owned by a foreign nation. Conversely, if, as is the case here, the property at issue is owned by the sovereign and not by the garnishee, then permitting perfection of the garnishment can cause no injury-in-fact to the garnishee which after all has no ownership interest in the property. Indeed, CMS's status as garnishee is antithetical to any claim that CMS has a protectable interest. *See Pagliaro, Inc. v. Zimbo*, 1987 WL 10275, at *4 (Del. Super. Ct. 1987) ("The garnishee is a mere stakeholder who should do nothing either in aid of or to the detriment of, the real parties (plaintiff and defendant) to the suit."). CMS has alluded to the possibility that should the Court enforce the writ of garnishment, it would suffer injury because the Congo would possibly breach its contract with CMS and would require CMS to pay the money to the Congo, thus exposing CMS to possible double payment. This possible breach *in futuro* has no bearing in a standing analysis. First, courts have consistently held that a possible breach of contract by a third party *in futuro* is not a cognizable injury sufficient to bestow standing. Thus, in *Maio v. Aetna, Inc.*, 221 F.3d 472, 495 (3d Cir. 2000), the court held that the plaintiff lacked standing where its "injury is predicated exclusively on the possibility that future events might occur," namely that their insurance contracts would be breached. *See also Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996)

-12-

(holding that a "a breach of contract lawsuit is not ripe until it becomes certain that the contractual obligation will not be honored."); *Molex Inc. v. Wyler*, 334 F. Supp. 2d 1083, 1089 (N.D. Ill. 2004) ("We simply cannot adjudicate now whether Wyler has breached his contractual duties based on events that may or may not occur."). Second, it is questionable, whether as a matter of law, the garnishee would suffer any legally cognizable injury even if the Congo were to breach its contract with CMS and require it double pay. After all, under its agreement with Congo, CMS has various remedies available, including an international arbitration or litigating the matter in the Congo or elsewhere. If Congo abides by the rule of law, then CMS should suffer no loss. If, on the other had, Congo does not abide by the rule of law, then that is a risk that CMS shouldered when it entered into its agreement with the Congo. The risk appears to have been well worth it. It is difficult to envision how CMS would suffer any injury where the price of oil has nearly quintupled since it entered into its agreement with the Congo.

In sum, CNS lacks standing and nothing in any of the cases cited by CMS, including *Walke*r and *F.G. Hemisphere*, would relieve CMS of its burden to demonstrate the irreducible minimum necessary to establish its standing.

### 3.     CMS Does Not Have Representational Standing to Invoke the FSIA

Absent first-person standing, the only way that a court could entertain the FSIA defenses of the defaulted Congo, is if a court determines that CMS somehow has representational standing to raise those defenses on behalf of the Congo. However, representational standing is disfavored and that there is a "background presumption . . . that litigants may not assert the rights of absent third parties*." Food & Commercial Workers v. Brown Group*, 517 U.S. 544, 557 (1996). *See Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 19 (2004) (Rehnquist, CJ., O'Connor, and Thomas, JJ., concurring)(recounting that there is a "general prohibition on a litigant's raising another person's legal rights (*quoting Allen v. Wright*, 468 U.S. 737, 751 (1984)).

It is against this backdrop that CMS now argues that it has representational standing in the Article III sense, but CMS never explains why. Instead, CMS cites to Fifth Circuit cases

-13-

involving Texas law for the proposition that it has representational standing. Those cases though are not relevant here because, in each of them the garnishee argued that under Texas law it owed a unique statutorily imposed duty to the judgment debtor to defend against any writ of garnishment. Delaware law imposes no such duty on the garnishee and, in fact, Delaware law mandates that the garnishee remain neutral. Absent such a unique duty, CMS has presented no evidence to overcome the presumption against representational standing.

Although in certain circumstances a party who satisfies the strictures of Article III with respect to a given case or controversy will be able to litigate the rights of a third party with respect to that case, under prudential standing guidelines such "third party" standing is permissible only "where there [exists] some hindrance to the third party's ability to protect his or her own interests." *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). *See also Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 489 (9th Cir. 1996) (no standing to assert a third party's rights unless there exists a "genuine obstacle" to the third party's asserting its own interests, and "a simple lack of motivation does not constitute a `genuine obstacle' to asserting an interest). No showing has been made here that there is any obstacle to Congo's asserting its own rights, should it so desire. *See id.* at 488 (noting that one purpose of the prudential standing rule barring assertion of third party rights is "to avoid adjudicating rights a third party may not wish to assert"). To the contrary, Congo has chosen, as a condition of obtaining the defaulted loan, not to assert its rights under the FSIA. One could only conclude from Congo's absence that it does not wish to raise the issues that CMS seeks to raise. In short, CMS has not presented any legally sufficient evidence that it has representational standing to assert the rights of the Congo.

**B.    *FG Hemisphere* Has No Impact On the Validity Of Af-Cap's Writ**

CMS argues that this Court is bound by the Fifth Circuit's decision in *FG Hemisphere Assoc. LLC v. Republic du Congo*, 455 F.3d 575 (5th Cir. 2006), a decision by another court in

-14-

another state addressing applications for writs by another party at another time. In any event, *FG Hemisphere* does not compel the dismissal of Af-Cap's writs in Delaware.

First, the Fifth Circuit vacated the writs in *FG Hemisphere*, because the district court did not render any finding of FSIA immunity; it simply relied on *Af-Cap II* to find that the property at issue was not immune from execution. The Court did not perform an independent analysis of the plaintiff's circumstance. The Court in *FG Hemisphere* found that *Af-Cap II* was distinguishable "on its facts and reasoning." *FG Hemisphere*, 455 F.3d at 586.

Second, even if this Court considered this case to be an entirely new proceeding and even if *FG Hemisphere* applies, all that it holds is that this Court must determine whether to apply Section 1610(a) to the property sought to be garnished. Although CMS argued to the Fifth Circuit in *FG Hemisphere* as it does here, that a court is required to make jurisdictional findings under the FSIA each time writs are issued (Op. Br. At 19) that is not what the Court held. Instead, the Court in *FG Hemisphere* explained:

> The Congo Defendants contend that the § 1610(a) situs snapshot should be taken when the writs of garnishment issue. In contrast, FG Hemisphere argues that the situs determination should be made either when the suit commenced or when the Garnishees received notice of the garnishment action against them. We find that for purposes of § 1610(a), the foreign sovereign's property must be in the United States when the district court applies the exception to immunity from execution.

*FG Hemisphere*, 455 F.3d at 588. The Court reasoned that this "best prevents disruption of the public acts of foreign sovereigns by not garnishing property that was in the United States but is now exclusively in a foreign country." *Id.*

In *FG Hemisphere*, the Fifth Circuit decided that FG Hemisphere's attempt to garnish CMS's assets failed because by the time FG Hemisphere filed for garnishment writs, CMS had no physical presence in Texas; the Fifth Circuit did not decide whether CMS's incorporation in Delaware was sufficient to satisfy section 1610(a). *FG Hemisphere*, 455 F.3d at 590. As explained below, CMS's presence here does provide a basis for the relief against Congo that Af-Cap seeks. In addition, the *FG Hemisphere* Court did not take issue with the finding in *Af-Cap II*

that the royalty right had been used for commercial purposes in the United States and, therefore, was subject to attachment and execution (provided local state law permitted such a remedy). CMS admits that it holds an asset belonging to the Congo. It admits it is present in Delaware. It admits paying Congo as a result of that asset while Af-Cap's writ was live. Finally, the Fifth Circuit already has found that considering the totality of circumstances, that asset lost any immunity under the FSIA. As the Fifth Circuit explained:

> [F]or nearly half of the twenty-four years that these obligations existed, the Congo has used at least fifty percent of them to repay a commercial debt. The amount of the debt repaid was not insignificant; during the course of this extended period of time, over $26,000,000 was diverted from these obligations to the Congo's commercial creditor. Such a continuing, extended and monetarily significant use is neither exceptional nor de minimis. Moreover, it is difficult to say that execution on this obligation would be so unusual that it would shock and disrupt the public affairs of the Congo.
>
> Indeed, on at least one other occasion, the Congo contemplated engaging in the same type of use again. Although such contemplated use is not actual use, it is strongly suggestive that the proceeds of these tax and royalty obligations were not cordoned off for use of the Congo in its sovereign capacity. Instead, it indicates the availability of this property for whatever purpose — commercial or otherwise — the Congo deems appropriate. Such property seems hardly the type of foreign property the FSIA was designed as a shield to protect, i.e., funds so central to a nation's operations as a sovereign that uses thereof would "interrupt[] the public acts of [this] foreign state." Id. at 253. Accordingly, we conclude that these tax and royalty obligations are used for commercial purposes for purposes of § 1610(a) of the FSIA.

383 F.3d at 370-71 (footnotes omitted). This ruling is dispositive of the question of whether the property sought to be garnished is immune from attachment under the FSIA.

Accepting CMS's view that the asset may change its character at the time each writ is issued against the asset (which, for example, in Texas is every 30 days) is not a correct reading of the decision and would lead to the mischief the Fifth Circuit warned against in footnote 8 of *Af-Cap II. See Af-Cap II,* 383 F.3d at 369, n.8. *See also e.g.* House FSIA Report at 6627 (discussing section 1610(a)(2) and noting that the "is or was used" language of FSIA contemplated property being transferred from commercial activity to non-commercial activity to avoid suit). Moreover,

-16-

even assuming there had been a profound change in use of the asset, that would be for the sovereign to appear and make that case, *not the garnishee*, whose role is a "mere stakeholder." *See Pagliaro*, 1987 WL 10275, at *4; *see also* § I.A. *supra*.

If a new determination of FSIA immunity is required under *FG Hemisphere*, then that determination must be made in light of the Loan Agreement that is at the heart of this proceeding. The result is still the same. The Congo expressly acknowledged the loan was commercial and waived immunity from attachment and execution.[10] *See* Statement of Facts above.

By its design, the FSIA protects the private commercial lending market from foreign sovereigns by providing that when a foreign state is not protected by sovereign immunity, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. The Congressional history of the FSIA makes clear that borrowing by foreign sovereigns from private commercial sources is "commercial" and not sovereign activity. H.R. No. 94-1487 at 10, *reprinted in,* 1976 U.S.C.C.AN. 6609. ("[B]oth a sale of bonds to the public and a direct loan from a U.S. commercial bank to a foreign government are activities which are of a commercial nature and should be treated like other similar commercial transactions. *See also id.* at 17, 1976 U.S.C.C.AN. at 6615 ("This definition includes . . . an indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States or which receives financing from a private or public lending institution located in the United States."). Those same sources, and subsequent judicial applications of the FSIA, including *Af-Cap II*, demonstrate that the use of assets such as the royalty debt to repay such loans is also commercial activity. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (recognizing that commercial activity is defined by the particular actions that the foreign state performs, whatever the motive behind them); *Schmidt v. Polish People's Republic*, 579 F. Supp. 23, 26-27 (S.D.N.Y. 1984) (holding that negotiating debt and issuing bonds and executing a loan agreement are commercial activities within the meaning of the

---

[10]    If the parties are not barred by the *Af-Cap II* decision, then the decision in *Af-Cap I* should be inapplicable as well.

-17-

FSIA); *Carl Marks & Co. v. Union of Soviet Socialist Republics*, 841 F.2d 26 (2d Cir.), *cert.*
*denied*, 487 U.S. 1219 (1988).

This case then presents three straightforward dispositive issues.

> (1) Congo expressly has consented to the enforcement of the underlying
> judgments against all assets of any type or nature—and was obligated to
> consent to the enforcement of the New York Court's Section 1610(c)
> order. There is no basis or justification to relieve Congo of this wholly
> legal and enforceable obligation, in a case where it has elected not to
> appear and defend and has consented to execution against its assets;

> (2) even if Congo is relieved of its obligation to consent to enforcement
> (including enforcement of the Section 1610(c) order) and is allowed to
> defend, it still waived sovereign immunity to the maximum extent
> allowed under the FSIA, without regard to the use or intended use of its
> assets in the U.S. The FSIA allows not only waiver for property used for
> commercial activity in the United States, but it also allows waiver for
> any other property as to which the foreign sovereign expressly commits
> for execution. In this case, Congo expressly consented to attachment of
> all of its assets in the U.S. Its waiver subjects Congo to liability to the
> same extent as any private individual under like circumstances; and

> (3) the Fifth Circuit has already concluded that the property at issue is
> subject to execution by Af-Cap because it was used for commercial
> purposes in the United States. As explained above, any effort by Congo
> to evade its obligations to Af-Cap by recharacterizing its assets now that
> enforcement measures have been taken against it run afoul of the Fifth
> Circuit's admonition against manipulation of assets to avoid execution.
> *See Af-Cap II*, 383 F.3d at 369 n.8.

**C.    CMS Nomeco's Status As A Delaware Limited Liability Company Is
Sufficient To Render The Congo's In-Kind Royalty Payment In The
United States For Purposes Of The FSIA.**

At the time the writ of garnishment was issued, CMS was a limited liability company,
duly organized and existing under the laws of the State of Delaware. (*See* August 10, 2005
Certificate of Formation Of Limited Liability Company. Exhibit G. *See also* 6 Del. C. §§ 18-101
- 18-1109, Delaware Limited Liability Company Act.) It is undisputed that as a Delaware
Limited Liability Company, CMS is (and was) "subject to the operations of the attachment laws
of [the State of Delaware.]" 10 Del. C. § 3502(a). Moreover, as a Delaware Limited Liability
Company CMS is (and was) "liable to be summoned as a garnishee." *See id.* (Emphasis added.)

Having availed itself of the benefits of the laws of the State of Delaware, CMS now seeks to shed its ties[11] and avoid Delaware's explicit attachment laws by arguing that "CMS Nomeco's status as a Delaware Limited Liability Company is insufficient to render the Congo's in-kind royalty 'in the United States' for purposes of the FSIA." (Op. Br. at pp. 20-25.) CMS's argument ignores the specific findings and conclusions of law reached by the Fifth Circuit in *Af-Cap II*, namely, that "the situs of these royalty obligations is the United States - the situs of the Garnishees [CMS]." (*Af-Cap II*, 383 F.2d at 371-72): The Circuit Court reached this conclusion by applying the long-standing rule of law that "the situs of a debt obligation is the situs of the debtor." *Id.* at 372 (*internal citations omitted*). The Fifth Circuit firmly rejected the idea, as CMS again floats, that the analysis should be any different under the FSIA because it supposedly "implicate[s] delicate issues concerning the availability of foreign sovereign immunity and comity between nations." *Id.* Specifically, the Court held:

> While we agree that the two contexts implicate different issues and interests, we think that these differences are immaterial for present purposes, as we see nothing about the general rule regarding the situs of debt obligations that would frustrate the purpose of the FSIA, which is to "limit as much as possible disruption the 'public acts' or 'jure imperii' of sovereigns." *Connecticut Bank*, 309 F.3d at 253. Specifically, we fail to see how permitting Af-Cap to execute against intangible commercial debt obligations owed by business entities *formed and headquartered in the United States* "interrupts [the Congo's] public acts," particularly when the Congo has proven more than willing to divert these obligations directly to commercial creditors in the United States. . . .

383 F.3d at 372-73 (emphasis added). This explicit Fifth Circuit ruling, which binds CMS, is consistent with the long standing rule of law in Delaware that "indebtedness of a Delaware corporation has its situs in Delaware." *See D'Angelo v. Petroleos Mexicanos*, 378 F.Supp. 1034, 1038 (D. Del. 1974); *Jacobs v. Tenney*, 316 F. Supp. 151, 166 (D. Del. 1970); *UMS Partners, Ltd. v. Jackson*, 1995 WL 413395, Op. and Order, Babiarz, J. (Del. Super. Ct. 1995). The conclusion is also consistent with the decisions of the United States Supreme Court in *Harris v.*

---

[11]    In fact, on November 21, 2006, following the Fifth Circuit's *AF-Cap II* decision finding that "situs is where the garnishee is located", and following its leaving Texas, CMS filed a Certificate of Conversion From A Delaware Limited Liability Company To A Non-Delaware Entity Pursuant to § 18-216 of The Delaware Limited Liability Company Act.

*Balk*, 198 U.S. 215; (1905) *Chicago Rock Island & P. Railway Co. v. Sturm*, 174 U.S. 710 (1899), which specifically recognize that a state has jurisdiction, if it cares to exercise it, to garnish any debt owed by a person subject to its process. Accordingly, personal jurisdiction over the garnishee, not the fact that the debt may have been payable outside of Delaware, is what matters. *See e.g. Forest Products Co. v. Magistrelli*, 14 A.2d 397 (Del. Super. 1940); *Local Union 1034 AFL-CIO v. Glover*, 460 A.2d 541, 542 (Del. Super. 1983).

In *Harris*, a case involving foreign attachment at law, the United States Supreme Court noted:

> If there be a law of the state providing for the attachment of the debt, then, if the garnishee be found in that state, and process be personally served upon him therein, we think the court thereby acquires jurisdiction over him, and can garnish the debt due from him to the debtor of the plaintiff, and condemn it, provided the garnishee could himself be sued by his creditors in that state. * * * Power over the person of the garnishee confers jurisdiction on the courts of the state where the writ issues. *(Internal citation omitted.) If while temporarily there, his creditor might sue him there and recover the debt, then he is liable to process of garnishment, no matter where the situs of the debt was originally.* * * * It is nothing but the obligation to pay which is garnished or attached. * * * It is not a question of possession in the foreign state, for possession cannot be taken of a debt or of the obligation to pay it, as tangible property might be taken possession of.

Emphasis added, *Harris*, 198 U.S. at 223. Delaware follows these very same principles. *See, e.g., Pauley Petroleum, Inc. v. Continental Oil Co.*, 235 A.2d 284, 291 (Del. Supr. 1967).

CMS does not dispute, nor can it, that as a Delaware Limited Liability Company, CMS is *"subject to the operation of the attachment laws"* of the State of Delaware and is *"liable to be summoned as a garnishee"* in Delaware law. 10 *Del. C.* §3502(a), *Emphasis added.* Nor can CMS credibly challenge, as explained in greater detail below, that Delaware's attachment laws *extend* to intangible property of a debtor who is found within the State, including its property that *"that is not susceptible of physical seizure within the State."* Del. Super. R. Civ. P. 4(b)(6) (emphasis added).

CMS asks this Court to ignore long settled and binding principles of law that the situs of a *debt* obligation is wherever a garnishee can be served with process. As a Delaware limited

-20-

liability company, CMS was subject to all of the laws and rules of Delaware, including its garnishment laws. CMS's presence in Delaware at the time the writ issued was sufficient to create jurisdiction over CMS as a garnishee.

CMS relies on several "act of state" cases in support of its "mere incorporation" argument. However, the "act of state doctrine" is inapplicable in the context of this case. More importantly, CMS urges the Court to determine the "situs" of the royalty obligations by the "act of state doctrine." As CMS concedes at page 22 of its brief, the analysis is entirely different under the FSIA. *See, e.g., Callejo v. Bancomer*, 764 F.2d 1101, 1112, 1125 (5th Cir. 1985) (court examining and noting differences between the FSIA and act of state doctrine and finding that jurisdiction over defendant was not barred by sovereign immunity under FSIA, even though action was barred by act of state doctrine.)[12] In short, despite CMS's colorful arguments, CMS's incorporation in Delaware at the time the writ issued, and its presence here today, provides a basis for this Court to exercise jurisdiction over Congo's assets it has in its possession, including CMS's obligation to make royalty payments under the Convention.

**D.    *Af-Cap II* Precludes Re-Litigation of the FSIA Immunity Issues**

### 1.    The FSIA Issues Were Fully and Fairly Litigated Between the Parties

Ignoring explicit holdings of the Fifth Circuit to the contrary, CMS makes Congo's argument that CMS's royalty obligations to Congo are immune from execution under the FSIA. (Op. Br. at 7-25). However, as CMS is well aware (because it filed joint briefs with Congo in the Texas Litigation) that exact issue has already been decided against CMS by the Fifth Circuit. In *Af-Cap II*, Af-Cap appealed a district court ruling that the royalty obligations at issue in this case were immune from execution. The Fifth Circuit found that the royalty obligations could be attached under § 1610(a) because the property was (1) in the United States and (2) used for commercial activity in the United States. The Court summarized by stating that:

---

12    It should also be noted that *Callejo* is also distinguishable from the present case in that it was decided under section 1605(a)(2) of FSIA, not section 1610(a) at issue in the present case. Thus, CMS's reliance on *Callejo* is further misplaced.

> "[w]e further hold . . . that the district court erred in concluding that the tax and royalty obligations at issue in this case were not used for commercial purposes in the United States. We also hold that the situs of these obligations is the United States. We have thus determined that both these FSIA conditions have been satisfied. These tax and royalty obligations therefore are not protected by sovereign immunity.

*Id.* at 373. In light of this determination by the Fifth Circuit, CMS's current arguments to the contrary are barred by the doctrine of collateral estoppel.

The doctrine of collateral estoppel (or issue preclusion) operates to prohibit CMS's immunity argument because it ensures that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits . . . involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 117, 153 (1979). The doctrine forecloses the re-litigation of facts, law, or the application of law to fact, *Witowski v. Welch*, 173 F.3d 192, 199 (3d Cir. 1999), because "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise. *Astoria Fed. Sav. & Loan Ass'n v. Solmino*, 501 U.S. 104, 107 (1991). By doing so, the costs of multiple lawsuits are reduced, judicial consistency is facilitated, and judicial resources are conserved. *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

The Fifth Circuit has already rejected CMS's arguments, and such arguments, are now barred under federal common law principles of issue preclusion. *See Burlington N. R.R. Co. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1238 (3d 1995); *Paramount Aviation Corp. v. Augusta,* 178 F.3d 132, 144 (3d Cir. 1999) (holding that federal courts have significant interest in determining preclusive effects of federal judgments). The prerequisites for the application of issue preclusion are satisfied when: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." *In re Graham*, 973 F.2d 1089 (3d Cir. 1992) (quoting *In re Braen*, 900 F.2d 621, 628-29 n.5 (3d Cir. 1979)). Moreover, "federal courts may look to the . . . policies supporting . . . collateral estoppel

-22-

in assessing the preclusive effect of decisions of other federal courts . . . ." CMS has not disputed

that the four elements of issue preclusion are present in this case. (Op. Br. § I.D at 24-25).

> (i) *The issues sought to be precluded are the same as that involved in the prior action* – is satisfied because the governing statute, the parties, and the asset Af-Cap seeks to execute upon in each case is identical to the prior case. "To defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be 'substantial.'" *Raytech Corp. v. White*, 54 F.3d 187, 193 (3d Cir. 1995). Here, there is no difference between the applicable legal standards. In *Af-Cap II*, the Fifth Circuit found that, under § 1610(a) of the FSIA, the royalty obligation was: (1) used for commercial purposes in the United States; and (2) royalty obligation was in the United States. 383 F.3d at 371, 373. Similarly, in this case, Af-Cap is attempting to establish that, under § 1610(a) of the FSIA, the royalty obligation was: (1) used for commercial purposes in the United States; and (2) the royalty obligation was in the United States. Thus, the issues are identical.
>
> (ii) *The issue was actually litigated* – is proven by reference to the published opinion of the Fifth Circuit. To establish the basis of a judgment, courts may look to the record of the first proceeding, including the pleadings, evidence, and any other relevant matters to determine what issues were specifically decided. *Chisholm v. Defense Logistics Agency*, 656 F.2d 42, 48 (3d. Cir. 1981). The Fifth Circuit's *Af-Cap II* decision expressly identified the issues it was resolving. The court held that "we conclude that these . . . royalty obligations are used for commercial purposes of § 1610(a) of the FSIA[]"; and "the situs of these . . . royalty obligations is the United States." Af-Cap therefore satisfies the second prong of the collateral estoppel test because CMS, in its joint brief with Congo, actually litigated and lost the issue it seeks to re-raise in this case.
>
> (iii) *The issues were determined by a final and valid judgment* – is satisfied because the issues were resolved on appeal by the Fifth Circuit and the Supreme Court denied *certiorari*. A decision is final even it is not a final judgment or subject to appeal, so long as the prior adjudication was "sufficiently firm." *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 210 (3d Cir. 2001) (citations omitted). In the present case, the circumstances for applying issue preclusion cannot be disputed because a final judgment has been entered. *Id.* (finding that entry of final judgment is ultimate indicia of finality for purposes of applying collateral estoppel). Moreover, unlike in <u>Henglein</u>, CMS was able to (and did) appeal the adverse decision.
>
> (iv) *The determination was essential to the judgment* – is satisfied because: (1) the issue could have been dispositive to the resolution of the case and was subject to an appeal; and (2) resolution of the issues was necessary to the ultimate conclusion of the Texas litigation. *See,*

-23-

*Henglein*, 260 F.3d 201, 212 (3d Cir. 2001) (holding that "essential" element has diminished in importance).CMS cannot dispute that Af-Cap satisfies the fourth prong of the collateral estoppel test. First, a judgment that the royalty obligation was not used for commercial activity in the United States, or was not located in the United States, would have ended the Texas litigation, and the decision was in fact appealed to the Fifth Circuit. *See also Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89-90 (2d Cir. 1961) (Friendly, J.) (holding that interlocutory decision concerning immunity that was subject to an appeal was an essential determination). Second, the decision was "necessary" to the ultimate resolution because the Texas Litigation could not be resolved until the Section 1610(a) issue was decided. Under Section 1610(c) of the FSIA, 28 U.S.C. § 1610(c), and the Fifth Circuit's decision in *Af-Cap I*, 309 F.3d 240, 260-261, Af-Cap was required to prove that the royalty obligation was subject to execution before litigating the merits of the state-based garnishment law.

*Af-Cap II* makes evident that issue preclusion is appropriate despite the fact that CMS left Texas as noted in *FG Hemisphere*. The Fifth Circuit held that the situs of the royalty obligation was the United States because CMS was present in the United States. *Af-Cap II*, 383 F.3d at 367. That essential fact has not changed and CMS cannot re-litigate the situs question. This holding is <u>not</u> only just, but as explained in detail below, it is also in accord with substantive Delaware law. *See UMS Partners*, 1995 WL 413395, *5 (business incorporated under Delaware law may be brought before Delaware courts as garnishees). *See, e.g.* 10 Del. C. § 3502.

CMS can not credibly argue that it is entitled to relitigate the Fifth Circuit ruling that the oil royalty was "used for" commercial activity in the United States. The *FG Hemisphere* decision did not touch on that question. More importantly, the Fifth Circuit made clear that its ruling was based on the Congo's use of that asset in commercial activity that cannot be erased by Congo's and CMS's later manipulation of the asset to evade creditors. *Af-Cap II* at 369 n.7 and 8 ("we think that any analysis applied to such a question should examine the totality of circumstances surrounding the property").

The equities and the policies of collateral estoppel bar CMS from re-litigating the FSIA issues. *See Burlington* 63 F.3d at 1238. In *Burlington*, the Third Circuit held that the application of issue preclusion would not constitute an inequitable administration of the law because Burlington was aware of Hyundai's claim at the time of the original action. Similarly, CMS was

-24-

aware of Af-Cap's claims in the present litigation when it was defending the Texas litigation. Because the Texas Litigation and this case involve the same exact federal issues, CMS had as great an incentive to contest the current issues in the Fifth Circuit as it currently does now. It would operate as an injustice upon Af-Cap were the Court to allow CMS's subsequent attempts to flee the United States' jurisdiction to stymie Af-Cap's judgment enforcement efforts. Additionally, it would reward precisely the type of conduct the Fifth Circuit warned against when it noted that attempts to manipulate an asset are relevant considerations under FSIA. *Af-Cap*, 383 F.3d at 369 n.8. Thus, the Court should bar CMS from re-litigating that the debt is immune from attachment or that the debt is not located where CMS is found.

### 2. <u>CMS is Barred From Raising the Act of State Doctrine</u>

CMS's argument that the "Act of State" Doctrine applies is misplaced. (Op. Br. At 22.) The Fifth Circuit has already rejected CMS's argument and held that the Act of State Doctrine does not apply to the aspects of this case. *See Af-Cap II*, 383 F.3d at 372, n. 14. In addition, the Act of State Doctrine is restricted to the legitimate public acts undertaken by a sovereign nation within that sovereign's nation territory. In this case, Congo has stated in no uncertain terms that this agreement involves private, commercial acts. The dispute over payment of the debt is in the United States and, therefore, the Act of State Doctrine does not apply. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *see also Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1112-24 (5th Cir. 1985). The other authorities cited by CMS are equally inapplicable in the absence of any public act by Congo. *Af-Cap II* has definitively concluded that the situs of the intangible debt is wherever CMS is located and no amount of re-argument on CMS's part will change that holding.[13]

Moreover, there are no international relations at issue in this commercial case. The U.S. Department of State, which is authorized to represent the interests of the U.S. Government, has

---

[13]    CMS and Congo jointly petitioned the Supreme Court to seek review of the *Af-Cap II* court's situs decision. CMS and Congo made exactly the same arguments that they are making here regarding the circuit split, including citation to the same cases. The Supreme Court declined to hear the case, effectively rejecting the same arguments rehashed here, and this Court should so follow.

not filed any statement in this case. Furthermore, if the State Department did decide to file an executive branch submission, it would not be dispositive of the foreign sovereign immunity question. As the Supreme Court discussed in *Altmann*, cited by CMS, "[w]hile the United States views on such an issue are of considerable interest to the Court, they merit no special deference." *Rep. of Austria v. Altmann*, 544 U.S. 677, 701 (2004). *See also e.g. Rubin v. Islamic Rep. of Iran*, (N.D. Ill. Dec. 15, 2005) 408 F. Supp. 2d 549 (N.D. Ill. 2005), *aff'd*, 486 F. Supp. 2d 938 (N.D. 2006) (rejecting position of U.S. Government's position concerning assets at issue for execution). As noted by the *Altmann* Court FSIA's reach is "well within the province of the Judiciary." *Id.* (internal citation omitted). Additionally, as the Fifth Circuit observed in *Af-Cap II*, there is nothing about allowing Af-Cap to collect on this commercial debt "that would shock and disrupt the public affairs of Congo." *See Af-Cap II*, 383 F.3d 370.

Finally, CMS's attempt to turn this case into a matter involving Congo's natural resources is unavailing. (Op. Br. at 23-24.) The fact that the Oil Convention involves Congo's natural resources does not change the commercial nature of the contracts. *See* H.R. Rep. *reprinted in* 1976 U.S.C.C.A.N. at 6615-16 (discussing what constitutes commercial activity). Nor does it preclude this Court from imposing liability on a contract involving a sovereign's natural resources without interfering with that sovereign's right to regulate its natural resources. *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, C.A. No. 04-332, 2006 WL 2711527, at*5 (D.D.C. 2006). There court stated that "when the [foreign government agency] entered [oil] production sharing contracts with ConocoPhillips to engage in production and marketing of oil and natural gas, it acted 'in connection with a commercial activity,' satisfying the first prong of [the jurisdictional immunity] exception." This contract is no different.[14]

---

[14]    Af-Cap's judgment against Congo is from the Queen's Bench. The United States Supreme Court has long-held that U.S. courts are bound to grant recognition to "judicial acts of another nation having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113 (1895). The Third Circuit has granted comity to enforce a default judgment entered in the Queens' Bench Division of the High Court of Justice. *See Samportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 439, 440-444 (3d Cir. 1971). This Court should grant comity to the Queen's Bench Order and allow Af-Cap to enforce its judgment against the Congo through execution upon the garnishment writ issued to CMS.

-26-

3.    **Even Assuming CMS Was Not Barred From Re-litigating the FSIA Defenses, They Are Not A Bar to This Enforcement Proceeding.**

CMS states that the "FSIA is a comprehensive regulatory statute designed to 'facilitate and depoliticize litigation against foreign states and to minimize irritations in foreign relations arising out of such litigation'(H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6634 ("House FSIA Report") by codifying the modern doctrine of 'restrictive' foreign sovereign immunity recognized under international law." (Op. Br. At 8.) That is true enough, but the portion of the legislative history cited by CMS comes from the text of a Departments of State and Justice letter to the House of Representatives containing proposed revisions to the draft bill, and does not encapsulate the *ratio legis* of the Act -- namely that it was designed to give plaintiffs, such as Af-Cap, the ability to levy against the commercial property of a foreign sovereign.

FSIA establishes a process for obtaining enforcement of judgments against foreign states through attachment and execution against a foreign sovereign's assets and property. This process is codified at 28 U.S.C. § 1610. That statutory precept is set out in the main body of the House Report, which provides:

> Fourth, the bill would remedy, in part, the present predicament of a plaintiff who has obtained a judgment against a foreign state. Under existing law, a foreign state in our courts enjoys absolute immunity from execution, even in ordinary commercial litigation where commercial assets are available for the satisfaction of a judgment. H.R. 11315 seeks to restrict this broad immunity from execution. It would conform the execution immunity rules more closely to the jurisdiction immunity rules. **It would provide the judgment creditor some remedy if, after a reasonable period of time, a foreign state or its enterprise failed to satisfy a final judgment.**

*Id.* at 6606 (emphasis added). CMS's brief overlooks this central aspect of the legislation.

CMS also omits that Congress removed a provision relating to public debt obligations because it found the pro vision superfluous on the grounds that banks lending to foreign governments "would invariably include an express waiver of immunity in the debt instrument." *See id.* at 6609. That is precisely what Af-Cap's predecessor insisted upon in the present case and

-27-

exactly what Congo agreed to in taking out the loan from Af-Cap's predecessor.[15] The waiver

obtained by Af-Cap's predecessor is consistent with FSIA, which provides that a foreign

sovereign is fully empowered to waive its rights and defenses in respect of sovereign immunities

with only two statutorily-established restrictions.[16] *See, e.g., Restatement (Third) of Foreign*

*Relations Law*, § 456 & cmt. b ("a state may waive its immunity from attachment of its property

or from execution against its property; . . . A waiver may be general or may be limited to

particular transaction, claims or property"); G. Delaume, "The Foreign Sovereign Immunities Act

and Public Debt Litigation: Some Fifteen Years Later," 99 Am. J. Int'l L. 257, 266 (1994)

("Pursuant to section 1610(a)(2) [of the FSIA], a foreign state's property in the United States is

not immune from execution if that state has waived its immunity . . . "); *Atwood Turnkey Drilling,*

*Inc. v. Petroleo Brasileiro*, 875 F.2d 1174 (5th Cir. 1989) (upholding a foreign sovereign's waiver

of "any right of immunity from the jurisdiction of any court or from any execution or attachment

in aid of execution prior to judgment or otherwise" and its agreement "not to assert any such right

or claim in any such action or proceeding, whether in the United States or otherwise" under

Section 1610).[17]

---

[15]     Af-Cap recognizes that recent Ninth Circuit decisions in *Af-Cap, Inc. v. Congo*, Nos. 04-16388, 04-16810 (9th Cir. Jan. 25, 2007) and *Af-Cap, Inc. v. ChevronTexaco Corp.*, Nos. 04-16387, 04-16788 (9th Cir. Jan. 25, 2007) held, like the Fifth Circuit in *Af-Cap I*, that the waiver provision of the Loan Agreement at issue in this case under which consent waived sovereign immunity and consented to enforcement does not operate to completely waive the "commercial activity" requirement of FSIA. Slip. Op. at 990. Af-Cap submits that the Ninth Circuit erred in reaching that finding. However, the Ninth Circuit's finding has no bearing on this case because there is no question that Congo waived its right to sovereign immunity and also that the property Af-Cap seeks to execute upon in this case has been used for commercial activity in the United States.

16     Section 1611 of FSIA contains a special rule exempting military property and central bank funds from the waiver provision and neither type of property is subject of the garnishment writs in this case. Congress's inclusion of this specific category of property falling outside the waiver provision demonstrates its intent that all other property would be subject to a foreign sovereign's decision to waive immunity over that property. See *Russello v. United States*, 464 U.S. 16, 23 (1983) (fundamental principle of statutory construction that Congress acts intentionally when it includes particular language in one section and then omits it from another section of the same legislation).

17     *See also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW, Reporters' Note 2:

Waiver by contract. A state or state instrumentality may waive immunity by contract. Contractual waivers of immunity, often coupled with consent to jurisdiction in a particular forum, are common, particularly in loan agreements involving sovereign borrowers.

-28-

The legislative history also states that "[t]he courts would have great latitude in determining what is 'commercial activity' for purposes of this bill. Activities such as . . . leasing of property, borrowing of money . . . would be included within the definition." *Id.* at 6615. There is no question that Congo has engaged in commercial activity in this case. The Congo entered into an oil lease with the Oil Convention. It also borrowed money from Af-Cap's predecessor. These are all commercial activities.

CMS also downplays that aspect of the legislative history that explains the court's front-and-center role in determining sovereign immunity. As stated in the House Report,

> [a] principal purpose of this bill [FSIA] is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that inure due process.

*Id.* at 6606; *see also id.* at 6604 & 6613 ("That decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law."). The determination of whether sovereign immunity attaches is strictly within the Court's province.

The FSIA adopts a restrictive theory of immunity, as clearly expressed during Congressional consideration of the Act:

> When the foreign state enters the marketplace or when it acts as a private party, there is no justification in modern international law for allowing the foreign state to avoid the economic costs of the agreements which it may breach or the accidents which it may cause. . . . The law should not permit the foreign state to shift these everyday burdens of the marketplace onto the shoulders of private parties.

House Comm. On the Judiciary, Hearings Before the Subcomm. On Administrative Law and Governmental Relations on H.R. 11315 (94th Cong., 2d Sess.) at 25, 27 (Testimony of Monroe Leigh, Dep't of State). The FSIA was intended to assure that American courts would be available for legal redress against foreign states "who engage in ordinary commercial transactions or otherwise act as a private party would" including through execution of final judgments against a

-29-

foreign state. *Id.* at 24, 26.[18] This Court should not validate CMS's attempt to judicially repeal FSIA or shift its risk of doing business with a known scofflaw.

CMS wants to focus the Court on Sections 1609 and 1610 of FSIA and the legislative history regarding those sections. (Op. Br. at 8-10.) CMS argues all the same points that it and Congo made in its joint briefing in *Af-Cap II* and, which the Fifth Circuit rejected. CMS never explains why the Court should ignore the Fifth Circuit. Instead, CMS pretends as if *Af-Cap II* was never decided. (Op. Br. at 8-13.) (failing to mention let alone cite *Af-Cap II*). There is no basis for this Court to depart from the Fifth Circuit's holding that Congo's property held by CMS -- an oil royalty obligation -- was used for commercial activity in the United States within the scope to satisfy the FSIA.

CMS also argues that the application of FSIA's "waiver" exception is limited to "a foreign state's 'property in the United States' that is 'used for commercial activity in the United States'. . .." (Op. Br. at 8-9 (citing 28 U.S.C. § 1610(a)). The Court should ignore CMS's attempt to attach a temporal scope to the commercial activity test. If the Court were to allow CMS to do so, then it would in essence be allowing it to define the nature of the activity in an effort to subvert the FSIA. There is no support for such an approach in the statute.

CMS contends that the legislative history of the FSIA supports its attempt to proscribe FSIA's reach. (Op. Br. at 10.) CMS's "sound byte" from the legislative history is part of its diversionary tactic in this litigation. A full reading of the legislative history demonstrates that Congress expressed concern over the use of attachment for "jurisdictional purposes" not for purposes of judgment enforcement against a defaulted debt. *See* H.R. Rep. 94-1487 *reprinted in*

---

[18]    In enacting the FSIA, Congress went so far as to include as Section 1606, a provision confirming the equivalency between the rules applicable to private parties generally and those that, after FSIA enactment, would apply to foreign states:

> as to any claim for relief with respect to which a foreign state is not entitled under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner as, and to the same extent as a private individual under the same circumstances . . .

This case, of course, is one involving a claim for relief as to which Congo is not immune by operation of Section 1605.

1976 U.S.C.C.A.N. at 6625-6626.  The legislative history shows that FSIA was intended to expand methods for bringing a foreign sovereign before a U.S. court.  *See id.*  Contrary to CMS's argument, FSIA envisions the use of a judgment enforcement attachment against the asset of a foreign sovereign.  *See id.* at 6627 (discussing the use of state procedures to enforce judgments issued by state and federal courts).  CMS's argument that Congress feared that the type of attachment Af-Cap has obtained in this case would create friction in the United States' foreign relations" is, therefore, unfounded.  Congress clearly intended that once a Federal Court made a decision such as the one in *Af-Cap II*, a foreign sovereign was in the same shoes as any citizen litigant.  *See* 28 U.S.C. § 1606.

In the Loan Agreement, Congo did not merely agree to waive any sovereign immunity defense, it expressly agreed to affirmatively "consent" to enforcement--and to consent to enforcement without regard to any defense based on the use of the property.  By allowing Congo to interpose *any* defense to this proceeding (and especially to allow Congo to interpose a defense based on the use of property), the district court failed to give effect to Congo's agreement to waive any defense to immunity or enforcement.

The FSIA does not protect the Congo from the effect of its consent or otherwise restrict the extent and manner in which Congo would agree to forego defenses (such as embodied in Paragraph 19(C)).  To the contrary, courts have repeatedly found that a foreign government may implicitly or explicitly waive defenses under the FSIA and have upheld those waivers.  *See, e.g., Aquamar, S.A. v. Del Monte Fresh Produce, N.A., Inc.,* 179 F.3d 1279, 1291-92 (11th Cir. 1999)(stating that, in enacting FSIA, Congress contemplated that sovereign immunity could be waived by filing a responsive pleading that did not raise the defense); *Atwood Turnkey Drilling, Inc.,* 875 F.2d at 1177 (holding that express contractual waiver of sovereign immunity including "from any execution or attachment in aid of execution" precludes a foreign state from asserting sovereign immunity as a defense).  The FSIA itself recognizes that foreign states have a sovereign right to affirmatively waive the protections of sovereign immunity for themselves and their

-31-

property. 28 U.S.C. §§ 1610, 1611. That is precisely what Congo did in order to enhance its ability to obtain substantial loans in the commercial financial markets and to induce lenders to make substantial loans on terms that Congo otherwise found attractive.[19] This Court should not allow CMS to rewrite that Loan Agreement in its attempt to defeat Af-Cap's recovery.

CMS's reliance upon *EM Ltd v. Republic of Argentina* is misplaced. 2007 WL 29978 (2d Cir. Jan. 5, 2007). *EM Ltd.* addressed a situation where a party sought a **pre-judgment attachment**. (Op. Br. at 11.) CMS omits this fact, stating only that it sought an "attachment." *Id.* at 12. In addition, the funds at issue in *EM* were a central bank's funds. Under FSIA, central bank funds are one of two classes of property that are specifically immune from attachment. *See* 28 U.S.C. § 1611 (central bank and military property are absolutely immune). In this case, the funds at issue are not central bank funds, have been used for commercial purpose, and Congo has waived its right to contest enforcement. Accordingly, *EM* provides no impediment to allowing execution in this post-judgment FSIA enforcement action.

CMS's citation to the cases on pages 12-13 of its brief are either inapposite or support Af-Cap's request to attach the asset at issue in this case. Specifically, in *767 Third Ave. Assoc.*, CMS relies upon a footnote in which the court explains that the waiver "exception apparently extends only to property 'used for commercial activity.'" 787 F. Supp. 389, 392-393 n.3. CMS fails to mention that the case involved a landlord and tenant dispute in which a landlord sought to evict the Permanent Mission of the Republic of Zaire to the United Nations from its office space. *Id.* at 390-391. CMS also does not disclose that the Court ultimately allowed the eviction despite the objection of the US Government. *Id.* at 397. Similarly, in *Flatow v. Islamic Republic of Iran*, the district court denied execution because the property, a diplomatic mission and two bank accounts, was used for diplomatic and not "commercial activity." 76 F.Supp.2d 16, 18-19

---

[19]     Congo's failure to appear in this case evidences its intent to abide by that waiver and consent to enforcement. Indeed, this Court upholding CMS's supposed defenses when Congo has waived those defenses constitutes an affront to Congo's sovereignty. And, of course, if Congo was barred from making such a defense, then the garnishees are also barred because they have no defense greater than those available to the judgment debtor. *See Wilmington Trust v. United States District Court*, 934 F.2d 1026, 1033 (9th Cir. 1991), *cert. denied*, 503 U.S. 966 (1992); *Republic of Phillipines v. Marcos*, 806 F.2d 344, 360 (2d Cir. 1986), *cert. denied*, 481 U.S. 1048 (1987).

(D.D.C. 1999). Here, there is no question that the property at issue is "commercial", not "diplomatic." In *Fidelity Partners, Inc. v. Phillipine Export & Foreign Loan Guar. Corp.* the Southern District of New York held that a party seeking to levy upon a bank account of a foreign state's agent and instrumentality needed to establish that the funds were in the United States. 921 F. Supp. 1113, 1120-21 (S.D.N.Y. 1996). That holding has no bearing on this case where there can be no dispute that Congo's asset, an oil royalty obligation, is present in the United States.

CMS also cites *Birch Shipping Corp. v. Embassy of the Rep. of Tanzania*, 507 F. Supp. 311, 312 (Del. 1980). There, the Court found that the sovereign waived immunity under an arbitration agreement that included a consent to enforcement of the arbitration award. The Court further found that the property plaintiff sought to levy upon was used for commercial activity in the United States. 507 F. Supp. at 313. Based upon those findings, the court granted plaintiff's request to attach the bank account held by the Republic. CMS's citation to *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992), underscores this Court's authority to grant Af-Cap relief. There, a Chinese company resisted a discover order in a judgment enforcement proceeding that required that it turn over certain information about its assets to plaintiffs. The Chinese company argued, *inter alia*, that the cure for its failure to turn information over, either posting a *supresedeas* bond or paying the judgment, "would violate its 'immunity' from execution [under FSIA section 1610(b)." The Court found that the Chinese company's reliance on section 1610(b) was misplaced because the FSIA does not grant a foreign sovereign, or its agency and instrumentality, a "'right' not to pay a valid judgment against it." *Id.* at 1477-78 (quoting *Fravola v. Union of Soviet Socialist Republics*, 558 F. Supp. 358, 361 (N.D. Ill. 1983) (purpose of section 1610 is to provide a remedy against foreign states who fail to pay judgments against them), *aff'd* 761 F.2d 370 (7th Cir. 1985)). The same should hold true for CMS and Congo in this case. Accordingly, both *Birch Shipping* and *Richmark* support Af-Cap's position and, this Court should grant Af-Cap's request to levy upon Congo's oil royalty obligation that CMS admittedly holds.

III.    **THE DELAWARE WRIT CAPTURES THE ROYALTY OBLIGATIONS**

CMS contends that the writ of attachment *fieri facias* did not catch its contractual royalty obligation to Congo because in 1999 Congo elected to take its royalty payment "in kind" (*i.e.*, in oil). According to CMS, the Delaware attachment statute does not encompass garnishment of "non-monetary" obligations. (Op. Br. at 25.) CMS further argues that the Fifth Circuit ruling in *Af-Cap III*, 462 F.3d 422, concerning the Texas attachment statute compels the conclusion that non-monetary obligations are not subject to attachment in Delaware. CMS is wrong on both counts.

A.    **Delaware Attachment Statute Encompasses Non-Monetary Obligations**

The Delaware attachment statute defines the property that is subject to attachment in broad terms: "Goods, chattels, rights, credits, moneys, effects, lands and tenements may be attached under this chapter." 10 Del. Code § 3508.[20] Moreover, the Delaware Supreme Court has recognized that "garnishment statutes are remedial in nature *and should be liberally construed....*" *McNeilly v. Furman*, 95 A.2d 267, 271 (Del. Supr. Ct. 1953) (citations omitted, emphasis added). The attachment statute has been defined to reach both tangible and intangible property rights. *See, e.g., Delaware Trust Co. v. Carolina Freight Carriers Corp.*, 1986 WL 2381, at*2 (Del. Super. 1986) (observing that the attachment statute applies to intangibles).

In fact, in *McNeilly*, 95 A.2d at 271, the very case CMS relies upon in its brief to claim that non-monetary obligations are not subject to attachment, the Delaware Supreme Court stated the opposite. CMS relies upon the Court's cryptic statement concerning a superseded version of the present statute that "[t]he word 'rights' is bracketed with the word 'credits' which imports a fixed monetary obligation." *Id.* (quoted in Op. Br. at 27.) *However*, CMS has omitted the critical next sentence of the *McNeilly* opinion from its analysis. The Supreme Court went on to

---

[20]    The statutory provision setting forth the types of property subject to attachment is found in the Attachments Chapter 35. The Delaware Supreme Court has held that there is no distinction between the scope of writs under that section and the scope of an execution writ *fieri facia*, found in the Executions Chapter 49, such as has been issued in this case. *See Lowe v. Hulliger*, 46 Del. 562, 86 A.2d 749 (1952)("[W]e make no distinction between writs of foreign attachment and writs of attachment *fi. fa.* with respect to what may be attached or garnished.")

-34-

observe that "[i]n practice the statute has been construed to apply only to contract obligations liquidated *or readily capable of liquidation.*" *Id.* (Emphasis added.) In other words, non-monetary obligations *are* subject to attachment if they are readily capable of liquidation.

The *McNeilly* court recognized that "there has been a steady trend of the law to make all species of property, so far as possible, freely alienable and subject to the demands of the owner's creditors." *Id.* Nonetheless, it ultimately held that an unliquidated tort claim was not subject to attachment "because of its speculative nature." *Id.*

Later, however, in *UMS Partners, Ltd. v. Jackson*, 1995 WL 413395, at *6 (Del. Super. June 15, 1995), the Delaware Superior Court expressly held that a non-monetary obligation was subject to garnishment. Specifically, it ruled that the debtor's appraisal rights could be garnished as a debt of the surviving corporation. The court reasoned that, "[u]nlike appraisal shares, which are not assignable, the cause of action in appraisal is transferable…and is regarded as a creditor's claim against the surviving corporation." *Id.* at 5 (citations omitted). Refuting CMS's argument here, the Court rejected the debtor's position that the appraisal rights should not be subject to garnishment since it represented an unliquidated debt, reasoning:

> In this Court's view, *McNeilly* does not prohibit garnishment of Jackson's appraisal claim. The instant case does not involve a tort claim; it involves a statutory claim for the fair value of [debtor's] L'Nard shares. A cause of action in appraisal is not speculative in the same sense as an ordinary tort claim because an appraisal action involves no uncertainty regarding the surviving corporation's liability to the petitioner. For example, in the instant case it is beyond dispute that RCA is liable to pay [debtor] the fair value of his L'Nard shares as of the merger's effective date. Thus, the scope of the appraisal proceeding is duly limited to determining that value. *Cede & Co.*, 542 A.2d at 1187. In addition, the *McNeilly* Court indicated that "demands readily capable of liquidation," particularly claims arising out of contract, may be susceptible to attachment or garnishment under Delaware law. *McNeilly*, 95 A.2d at 271. Being "entirely a creature of statute," *Cede & Co.*, 542 A.2d at 1186 (quoting *Kaye*, 395 A.2d at 374), the cause of action in appraisal is analogous to a cause of action in contract. . . Thus, in this Court's view, an appraisal claim is readily capable of liquidation and, accordingly, is susceptible to attachment through garnishment.

1995 WL 413395 6 (citations omitted).  *See also John Julian Constr. v. Monarch Builders, Inc.,*
306 A.2d 29, 35 (Del. Super. 1973) ("Monarch [defendant] averred that it had certain valuable
assets in the form of mortgages receivable which were susceptible to execution process.  Since it
does not appear that plaintiff sought to reach these assets, it may wish to pursue this course of
action further.")

In contrast to the tort claim in *McNeilly,* and even more readily capable of liquidation
than the appraisal claim in *UMS Partners* (which first requires a judicial proceeding), there can be
no serious dispute that the asset at issue here, an obligation to pay a royalty, is readily capable of
liquidation.  Indeed, the Convention itself provides a mechanism to quantify the dollar value of
the royalty oil owing and that amount is paid to Congo based on the then current market value of
the oil.  (Convention Art. 7.)  Moreover, even if the Convention itself did not have such a
provision, oil is a commodity that is priced on a daily basis, and any volume due and owing under
the Convention is readily capable of being liquidated in the spot market for oil.  *See International*
*Energy Price Information,* Energy Information Application, U.S. Department of Energy,
http://www.eia.doe.gov/emeu/ international/prices.html1#CrudeSpot (last visited Feb. 8, 2007).
Finally, the Convention provides that, at Congo's election, the royalty may be taken "in kind" or
"in cash."  (Convention § 7.02.)  For years Congo accepted the royalty payment in cash and, as
held by the Fifth Circuit, used that payment stream for commercial activity in the United States.
*Af-Cap II,* 383 F.3d 361, 371 (5th Cir. 2004).[21]

There is no merit to CMS's argument that the Superior Court Civil Rule, which concerns
the delivery of garnished property to the sheriff, "compels the conclusion that non-monetary
obligations are not subject to garnishment."  (Op. Br. at 27-28.)  CMS again ignores controlling
authority.  This time Superior Court Civil Rule 4(b)(6) that address the situation where the

---

[21]    In *Walker International Holdings, Inc. v. Congo,* Civil Action No. A-03-CA-117-SS (W.D. Tex.
Apr. 7, 2005), the Western District of Texas ordered, and the Clerk of the Court issued instructions to CMS
on behalf of the Congo, to take the royalty in cash and pay such amounts into court. [cite] Congo has not
appealed that order and the time to do so has expired.  Thus, the instruction to CMS to pay the royalty in
cash into court is a standing one, which CMS has ignored

-36-

property "is not susceptible of physical seizure within the state." *See* Superior Ct. Civ. Rule 4(b)(6). As the Supreme Court of Delaware explained in *Pauley Petroleum, Inc. v. Cont. Oil Co.*, 235 A.2d 284, 290-91 (Del. 1967), Rule 4(b)(6) covers the situation where intangible obligations are garnished and cannot be delivered to the sheriff:

> It seems clear that Rule 4(b)(6) provides a procedure for a special kind of garnishment, particularly designed for property not susceptible of physical seizure. The first part of the Rule 4(b)(6) procedure calls for service upon the garnishee of a writ of attachment, together with a certified copy of an Order of the Court directing the garnishee to retain, subject to the further Order of the Court, any property of the defendant in its possession, custody or control. This, we think, is a plain and readily understandable direction to the garnishee as to the Court's expectation of it at the outset - ….Clearly, in the context of Rule 4 as a whole, Rule 4(b)(6) provides for that type of process for intangible property.

The very purpose of this procedure "is to transfer custody *and supervision* of defendant's property to the Court" without a physical transfer. *First Western Fin. Corp. v. Neumeyer* 240 A.2d 579, 581 (Del. Super. 1968) (emphasis added). *See also Delaware Trust Co. v. Carolina Freight Carriers Corp.*, 1986 WL 28312 (Del. Super. Ct. 1986) (noting that purpose of post judgment garnishment proceeding is to enable judgment creditor "to reach and tangible *or intangible* property rights of the judgment debtor not exempt by statute") (emphasis added).

Delaware's sequestration statute, 10 Del. C. § 366, and the case law developed under the statute, further confirm that non-monetary obligations are subject to attachment in Delaware. The sequestration statute was simply "enacted to provide in equity a procedure of attachment analogous to foreign attachment at law. . .." *Trans World* Airlines, *Inc.*, 185 A.2d 762, 764 (Del. Ch. Ct. 1962) (citations omitted). *See also D'Angelo v. Petroleos Mexicanos*, 378 F.Supp. 1034, 1039 (D. Del. 1974)(noting that distinction between sequestration and attachment "is not material. Sequestration in equity is simply analogous to foreign attachment at law."); *First Western Fin. Corp. v. Neumeyer*, 240 A.2d 579, 582 (Del. Super. Ct. 1968) ("The analogy to sequestration is appropriate because the purposes of attachment and sequestration proceedings are the same; . . . and the proceedings involved in both cases are similar.") Property reachable under Delaware's sequestration statute has been defined to have "broad and comprehensive meaning,

-37-

including legal and equitable interests in both real and personal property." *Blumenthal v. Blumenthal,* 35 A.2d 831, 836 (Del. Ch. 1944) (granting equitable attachment seizing shares of Delaware corporation to compel appearance of non-resident defendant and, if defendant defaulted in appearance, to permit sale of such shares).

Thus, CMS's effort to distinguish the seizure of the garnishee's obligation to pay royalty rights granted in *D'Angelo,* 378 F. Supp. at 1034, on the ground that the case involved the sequestration statute, is unavailing. Indeed, *D'Angelo*'s significance is that this Court has already sustained the seizure of the very asset that is at issue in this litigation – the obligation to pay royalty rights based upon the amount of oil extracted from an oil concession. This Court recognized the asset to be seized was the defendant's "legal or equitable interest in debts or credits due or to become due to defendant from ten named companies of which Mobile was one." 378 F. Supp. at 1037. Finding that it had the power to seize such a debt obligation, the Court reasoned: "a state has jurisdiction, if it cares to exercise it, to garnish any debt owed by a person subject to its process, and that such garnishment is not only constitutional but will be entitled to full faith and credit." *Id.* at 1038 (quoting *Weinress v. Bland,* 71 A.2d 59, 64 (Del. Ch. 1950) (sequestering obligation to debtor that was contingent on payment of earnings of corporation).[22]

CMS also attempts to distinguish *D'Angelo,* by asserting that the obligation involved a cash royalty payment, but that assertion is wholly unsupported. The Court described the asset to be seized as "an indebtedness owed on open account by Mobil to the defendant based upon sales of crude oil to Mobil [garnishee] to defendant." 379 F. Supp. at 1036. In fact, there is no

---

[22]    CMS also erroneously contends that the sequestration statute is different from the attachment statutes because the sequestration statute attempts to compel "the appearance of a defendant in an *in personam* action in the Chancery Court." (CMS Br. at 29.) Not so. The sequestration statute, like the attachment statutes, is fundamentally a proceeding *quasi in rem* because it permits a court to exercise jurisdiction over a foreign defendant, such as Congo, when it would not otherwise have personal jurisdiction, but only to the extent of the debtor's property that is seized within Delaware. 10 Del. Code § 366. Both statutes are designed to compel the debtor to appear in Delaware, and if the debtor does not appear, to sell the property over which the court has obtained jurisdiction by seizure of debtor's property. *Compare Hughes Tool Co. v. Fawcett Publications, Inc.,* 290 A.2d 693, 695 (Del. Ch. 1972)(cited in CMS Br. at 29) *with Blaustein v. Standard Oil of Indiana,* 54 A.2d 596, 603-04 (Del. Super. Ct. 1947)(noting that attachment statute is designed to compel appearance of defendant and if defendant fails to appear, *quasi in rem* jurisdiction may be exercised over the property seized).

indication in the opinion whether this contract obligation was to pay the royalty in cash or in kind. Rather, the focus (and the significance) of the decision, is that the Court permitted the seizure of the intangible contractual "*indebtedness* owed on open account" that was based on oil produced.

### B.    The Fifth Circuit Has Rejected CMS's Argument That An "In Kind" Obligation Has Legal Significance

If there were any doubt that the in cash/in kind distinction is irrelevant, the Fifth Circuit erased it in *Af-Cap II*, 383 F.3d 361, 371-72 at n.13.  There, the Fifth Circuit rejected CMS's argument that the royalty obligation was not available for attachment since, in CMS's view, the asset sought to be attached was the delivery of oil in Congo.  The Circuit Court held:

> [t]he Congo Defendants [including CMS] attempt to avoid the conclusion that these tax and royalty obligations are debt obligations by attempting to fix a physical location to them.  Specifically, they point to the fact that the Convention permits the Congo to elect how these royalties will be paid and the Congo always elects to have them paid in kind. . . .. They thus essentially contend that the property at issue here is actually the oil stored in a tanker in Congolese waters . . ...  Here, Af-Cap is not seeking to attach any of the Congo's physical property (like its oil) but instead it seeks to attach the *obligations* to pay royalties owed by the Garnishees.  As noted previously, such debtor obligations are intangible assets, which by definition have no physical existence.  For these reasons, the Congo Defendants' attempt to essentially ascribe a physical existence to them fails.

(Emphasis in original.)  Thus, ironically, it is CMS which is barred by collateral estoppel from claiming that the asset to be garnished is anything other than the "*obligations* to pay royalties owed by the Garnishees."  Whether the obligation is satisfied in cash or "in kind" is immaterial.

### C.    The Fifth Circuit Ruling Concerning the Texas Attachment Statute Has No Bearing on the Scope of the Delaware Attachment Statutes

Relying on the Fifth Circuit's observation that the Congo had "opted" to receive its royalty payments in kind and, thereafter, its conclusion that the Texas garnishment statute did not encompass intangible debt obligations, CMS suggests that Af-Cap is somehow collaterally estopped from seeking to attach the contractual royalty right in Delaware.  (Op. Br. at 26.)  The Fifth Circuit's analysis of the Texas garnishment statute has no bearing on this Court's analysis of

the Delaware attachment statute for the obvious reason that two different statutory schemes are at issue. Collateral estoppel requires an identity of issues and the two different statutes from two different states preclude such a finding. *See, e.g., In re Chi-Chi's, Inc.,* 338 B.R. 618, 627 (Del. Bankr. 2006)(refusing to apply collateral estoppel where two different statutes were at issue in two proceedings). *See also Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1303 (D.C. Cir. 2004)(noting that consideration of one statute in prior proceeding does not bar consideration of different statute in later proceeding). The Delaware statute expressly defines the types of property that may be attached, including "rights and credits" and it has been interpreted by the Courts to encompass a variety of property rights, including tangible and intangible property. The Fifth Circuit ruling under Texas law has no bearing on this Court's analysis of Delaware law.

## CONCLUSION

For each of the foregoing reasons, judgment creditor Af-Cap, Inc. respectfully requests that its cross-motion for judgment on the pleadings be granted in all respects and it be permitted to execute on Congo's asset held by garnishee CMS and that CMS's motion be denied in all respects.

Dated: February 8, 2007

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: _____
Donald J. Detweiler (No. 3087)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000 (phone)
(302) 661-7360 (fax)

-40-