# EXHIBIT I

Corrected 1/30/07

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AF-CAP INC.,
        *Plaintiff-counter-*
        *defendant-Appellant,*
        v.

CHEVRON OVERSEAS (CONGO) LIMITED;
CHEVRON INTERNATIONAL (CONGO)
LIMITED; CABINDA GULF OIL
COMPANY LIMITED; THE REPUBLIC OF
CONGO,
        *Defendants-Appellees,*

CHEVRON TEXACO CORPORATION;
CHEVRON TEXACO GLOBAL ENERGY
INC.; CHEVRON TEXACO OVERSEAS
PETROLEUM INC.,
        *Defendants-counter-*
        *claimants-Appellees.*

No. 04-16387
D.C. No.
CV-03-01963-PJH

AF-CAP INC.,
        *Plaintiff-Appellant,*
        v.

THE REPUBLIC OF CONGO,
        *Defendant-Appellee,*
        v.

CHEVRON TEXACO CORPORATION;
CHEVRON TEXACO GLOBAL ENERGY
INC.; CHEVRON TEXACO OVERSEAS
PETROLEUM INC.,
        *Third-party-defendants-Appellees.*

No. 04-16388
D.C. No.
CV-01-01548-PJH

979

AF-CAP INC.,

       *Plaintiff-counter-*
*defendant-Appellant,*

       v.

CHEVRON OVERSEAS (CONGO) LIMITED;
CHEVRON INTERNATIONAL (CONGO)
LIMITED; CABINDA GULF OIL
COMPANY LIMITED; THE REPUBLIC OF
CONGO,

       *Defendants-Appellees,*

CHEVRON TEXACO CORPORATION;
CHEVRON TEXACO GLOBAL ENERGY
INC.; CHEVRON TEXACO OVERSEAS
PETROLEUM INC.,

       *Defendants-counter-*
*claimants-Appellees.*

No. 04-16788
D.C. No.
CV-03-01963-PJH

AF-CAP INC.,

       *Plaintiff-Appellant,*

       v.

THE REPUBLIC OF CONGO,

       *Defendant-Appellee,*

       v.

CHEVRON TEXACO CORPORATION;
CHEVRON TEXACO GLOBAL ENERGY
INC.; CHEVRON TEXACO OVERSEAS
PETROLEUM INC.,

       *Third-party-defendants-*
*Appellees.*

No. 04-16810
D.C. No.
CV-01-01548-PJH

OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
April 3, 2006—San Francisco, California

Filed January 25, 2007

Before: Marsha S. Berzon, Johnnie B. Rawlinson, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Rawlinson

984                AF-CAP v. CHEVRONTEXACO

## COUNSEL

Adam C. Belsky (briefed), Terry Gross (argued), Gross & Belsky, San Francisco, California, for plaintiff-appellant-counterdefendant Af-Cap.

Neil A.F. Popovic (briefed and argued), Heller Ehrman LLP, San Francisco, California; Jonathan Blackman and Boaz S. Morag, Cleary, Gottlieb, Steen & Hamilton, LLP, New York, New York, for defendant-appellee The Republic of Congo.

Douglas G. Boven, Reed Smith LLP, San Francisco, California, for third-party defendants-appellees ChevronTexaco Corporation, et al.

## OPINION

RAWLINSON, Circuit Judge:

In this consolidated action, Af-Cap Inc. (Af-Cap), the judgment creditor, appeals the district court's judgment dissolving and vacating garnishments and liens filed against any property of the Republic of Congo (the Congo), the judgment debtor, held by third party ChevronTexaco Corporation (CT Corp) and domestic ChevronTexaco subsidiaries (collectively ChevronTexaco), and dismissing Af-Cap's writ of execution action filed against ChevronTexaco, three ChevronTexaco foreign subsidiaries, and the Congo, a sovereign country.

The Congo asserts a sovereign immunity defense against Af-Cap's attempted execution of its judgment against the Congo's property allegedly held by ChevronTexaco. The property sought to be garnished includes intangible obligations of ChevronTexaco owed to the Congo for various bonuses, taxes, and royalties related to the extraction of hydrocarbons, oil, and other of the Congo's natural resources.

Because these obligations were not "used for a commercial activity in the United States," they are protected from execution or collection under the Foreign Sovereign Immunity Act (FSIA) codified at 28 U.S.C. § 1610(a). We therefore affirm the dismissal of this garnishment action.

## I. BACKGROUND

This case involves a garnishment action against the Congo's property in execution of a judgment for a defaulted $6.5 million loan made to the Congo by Af-Cap's predecessor, Equator Bank.

On December 18, 1984, pursuant to a loan agreement (the 1984 Loan Agreement), Equator Bank loaned $6.5 million to the Congo for the construction of a highway. The Congo consented to "execution against any property whatsoever (irrespective of its use or intended use)," based on any action arising out of the 1984 Loan Agreement. The Congo also agreed to waive its "[sovereign] immunity from suit, execution, attachment . . . or other legal process." However, in 1985, the Congo defaulted on the loan. In 1986, the Connecticut Bank of Commerce (CBC), Equator Bank's assignee, obtained an English judgment against the Congo, which it converted into a United States judgment in New York. CBC subsequently registered the judgment in Texas and California. The California action was removed to federal district court in the Northern District of California, Case No. 01-1548, where the litigation was stayed pending a final decision in the Texas case.

Meanwhile, parallel litigation based on the Texas judgment proceeded. In *Connecticut Bank of Commerce v. Republic of Congo,* 309 F.3d 240 (5th Cir. 2002) (*CBC*), the Fifth Circuit addressed the parallel garnishment action filed by CBC against property held by CMS, a third party oil company that owed tax and royalty obligations to the Congo. *CBC* recognized the validity of the judgment, but remanded for a deter-

mination of whether the Congo "used" the CMS obligations "in a commercial activity in the United States." *Id.* at 249, 260-61. *Af-Cap v. Republic of Congo*, 383 F.3d 361 (5th Cir. 2004), addressed the appeal from the district court decision after remand, and held that tax and royalty obligations owed to the Congo that were used to pay a commercial loan from a United States bank were used for commercial purposes in the United States, thereby rendering them amenable to execution. *Id.* at 368, 371.

In addition to the pending action in the Northern District of California seeking to enforce the registered judgment, Af-Cap filed a creditor's suit, Case No. 03-1963, against the Congo and six ChevronTexaco corporations: CT Corp, Chevron Texaco Global Energy Inc. (CTGEI), ChevronTexaco Overseas Petroleum Inc. (CTOPI), Chevron Overseas Congo Ltd. (COCL), Chevron International Congo Limited (CICL), and Cabinda Gulf Oil Co. (CABGOC).

Af-Cap identified the following intangible obligations that it alleged were the property of the Congo:

(1) Certain obligations used to offset prepayments made by ChevronTexaco to the Congo, including a $3.8 million participation bonus payable by CABGOC, a $3.5 million signature bonus previously transferred by COCL for the development of the K/AIMI oil field located on the border of the Congo and Angola, and a $5 million operator bonus previously transferred by COCL for the development of the K/AIMI oil field;

(2) CTGEI's $7 million payment to the Congo for the acquisition of Society Commune de Logistique (SCLOG), a Congolese joint venture for the distribution of oil within the Congo;

   (3)  COCL's and CICL's various fees and tax obligations payable to the Congo;

   (4)  COCL's contingent obligation for a portion of a $10 million signing bonus if a permit is issued for the Moho and Bilondo oil fields;

   (5)  In-kind royalties payable by COCL and CICL to the Congo and SNPC for extractions from the N'Kossa, Marine VII and Kitina fields; and

   (6)  $2 million payable by COPCL directly to third-party contractors for social programs within the Congo, including the construction of a university and a high school.

The district court entertained a motion based solely on the second prong of FSIA § 1610(a): whether the Congo's property, represented by the above-described obligations, was "used for a commercial activity in the United States." For purposes of the dispositive motion, the parties stipulated that: (1) the offshore ChevronTexaco subsidiaries were in the United States; (2) the district court had personal jurisdiction over all of the ChevronTexaco corporations involved in this action; (3) SNPC is the alter ego of the Congo; and (4) "all disputed facts [would] be presumed in favor of Af-Cap."

The district court ruled that none of the ChevronTexaco obligations identified by Af-Cap was property used by the Congo in a commercial activity in the United States. Thus, the obligations were not amenable to execution under the sovereign immunity exception described in § 1610(a). The district court therefore dissolved and vacated all garnishments and liens. This appeal followed.

## II.   GENERAL STANDARDS OF REVIEW

"The existence of sovereign immunity and subject matter jurisdiction under the [FSIA] are questions of law that [this

Court] review[s] de novo." *Park v. Shin*, 313 F.3d 1138, 1141 (9th Cir. 2002) (citation omitted). "The availability of issue preclusion is also reviewed de novo on appeal." *Dias v. Elique*, 436 F.3d 1125, 1128 (9th Cir. 2006) (citation omitted). "Discovery rulings are reviewed for an abuse of discretion," *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005) (citation omitted), as is the district court's decision to conclude discovery. *Villegas-Valenzuela v. INS*, 103 F.3d 805, 813 (9th Cir. 1996).

## III.  DISCUSSION

### A.  We Are Not Collaterally Estopped By The Texas Judgment From Analyzing The Scope Of The Congo's Waiver Of Immunity.

[1] As a general proposition, "[t]he doctrine of collateral estoppel (or issue preclusion) prevents relitigation of issues actually litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding." *Kourtis v. Cameron*, 419 F.3d 989, 994 (9th Cir. 2005) (citation and internal quotation marks omitted). We have applied the doctrine "where (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding." *Id.* (citation omitted). Although "[i]ssue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact *or law* . . . ," *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001) (emphasis added) (citations omitted), "[i]ssue preclusion has never been applied to issues of law with the same rigor as to issues of fact," *Segal v. Am. Tel. & Tel. Co., Inc.*, 606 F.2d 842, 845 (9th Cir. 1979) (citations omitted). Considering whether to grant preclusive effect to a legal determination is constrained in a case like this one where "[i]f the rule of issue preclusion is applied . . . [we are] foreclosed from an opportu-

nity to reconsider the applicable rule, and thus to perform [our] function of developing the law." Restatement (Second) of Judgments § 29 cmt. i (1982); *see also Montana v. United States*, 440 U.S. 147, 163 (1979) (cautioning that the "[u]nreflective invocation of collateral estoppel . . . could freeze doctrine in areas of the law where responsiveness to changing patterns of conduct or social mores is critical"); *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 690 (9th Cir. 2004) (declining to apply nonmutual collateral estoppel where it would "substantially thwart the development of important questions of law") (citations omitted). "This consideration is especially pertinent when [as is the case here] . . . the issue was determined in an appellate court whose jurisdiction is coordinate with . . . that of [our court]; [and] the issue is of general interest and has not been resolved by the United States Supreme Court." Restatement (Second) of Judgments § 29 cmt. i (1982). We conclude that Af-Cap deserves a "fresh determination of [the] law" regarding the extent of the Congo's waiver of immunity under the FSIA, and whether the Congo's obligations were used in connection with commercial activity in the United States pursuant to the FSIA. *See id.* Accordingly, we will not apply the doctrine of collateral estoppel in deciding this case.

**B. The Congo's Waiver Of Immunity From Execution Subjects The 1984 Loan Agreement To 28 U.S.C. § 1610(a)'s Provisions.**

The 1984 Loan Agreement provides:

> To the extent that the Borrower may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed) the Borrower agrees

not to claim and waives such immunity to the fullest extent permitted by the laws of that jurisdiction . . .

[2] Af-Cap argues that the Congo's agreement not to assert immunity from execution renders § 1610(a)'s provisions inapplicable to the 1984 Loan Agreement. We disagree. In fact, the opposite is true. Under § 1609, "the property in the United States of a foreign state shall be immune from attachment[,] arrest and execution except as provided in section[ ] 1610 . . ." 28 U.S.C. § 1609. In turn, § 1610(a), the exception at issue in this case, provides: "The property in the United States of a foreign state . . . *used for a commercial activity in the United States*, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State . . . if: (1) the foreign state has waived its immunity from attachment in aid of execution, or from execution . . ." 28 U.S.C. § 1610(a) (emphasis added). Af-Cap's contention that the Congo's waiver renders 28 U.S.C. § 1610(a) inapplicable is self-defeating because, in the absence of a waiver, the property of the Congo would be immune from attachment under § 1609. We agree with the Fifth Circuit that the waiver merely triggers the exception to the immunity from execution that would otherwise be in effect. *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro (Atwood)*, 875 F.2d 1174, 1176-77 (5th Cir. 1989). Rather than end our inquiry, the Congo's waiver requires that we turn to the second requirement at issue in this case: whether the property was "used for a commercial activity in the United States." *CBC*, 309 F.3d at 251 (citation omitted) (emphasis removed).

[3] The parties dispute the meaning of "used for" in § 1610(a), and the precise meaning of the term is an issue of first impression in this Circuit. The Congo asks us to adopt the Fifth Circuit's interpretation of the term. According to the Fifth Circuit: "To use property for a commercial activity, within the ordinary meaning of 'use,' would be to put the property in the service of the commercial activity, to carry out

the activity by means of the property." *CBC*, 309 F.3d at 254. "What matters under the statute is what the property is 'used for,' not how it was generated or produced," *id.* at 251, and not whether the property merely has a "nexus or connection to a commercial activity in the United States." *Id.* at 254. In contrast, Af-Cap asks us to expand the Fifth Circuit's definition and determine whether property was used for a commercial activity in the United States by examining the entire underlying activity that generated the property in question.

We agree with the Fifth Circuit that "[t]he phrase 'used for' in § 1610(a) is not a mere syntactical infelicity that permits courts to look beyond the 'use' of property, and instead try to find any kind of nexus or connection to a commercial activity in the United States." *Id.* We are also mindful that we must construe the waiver provisions in the FSIA narrowly. *See Corporacion Mexicana de Servicios Maritimos, S.A. De C.V. v. The M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996) (analyzing the waiver exception in 28 U.S.C. § 1605(a)(1)).

[4] "In interpreting the FSIA, we first look to the plain meaning of the language employed by Congress." *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 307 (9th Cir. 1997) (citation omitted). When determining the plain meaning of language, we may consult dictionary definitions. *See San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). *The American Heritage College Dictionary*, 1486 (3d ed. 2000) defines use as: "To put into service or apply for a purpose; employ." This definition is very similar to the way we have defined "use" in applying a different statute. In *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002), we stated: "The statute does not define the word 'use,' so we apply the ordinary definition, which is 'to put into action or service, avail oneself of, employ.'" *Id.* at 880 (quoting Webster's Ninth New Collegiate Dictionary, 1299 (1985)) (parallel citation omitted). The United States Supreme Court has similarly defined "use" as being "most sensibly read to mean active employment for commercial purposes,

and not merely a passive, passing, or past connection to commerce . . . . [T]he word 'use,' in legislation as in conversation, ordinarily signifies 'active employment.' " *Jones v. United States*, 529 U.S. 848, 855 (2000) (citations omitted).

[5] The legislative history of § 1610(a) reiterates that "[t]he property in question must be used for a commercial activity in the United States." H.R. Rep. No. 94-1487, at 28 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6627; *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 435 n.3 (1989) (noting that the legislative history of the FSIA, as presented in H.R. Rep. No. 94-1487, supported the Court's conclusion). The structure of the FSIA also supports our definition of "used for." *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 872 (9th Cir. 2005), *as amended*, (interpreting statutory text in the context of the overall statutory scheme). As the Fifth Circuit noted:

> Two subsections of the FSIA spell out the exceptions to immunity from execution. 28 U.S.C. § 1610(a) governs the immunity from execution of property belonging to foreign states. 28 U.S.C. § 1610(b) governs the immunity from execution of property belonging to an "agency or instrumentality" of a foreign state engaged in commercial activity in the United States. Subsection (a), regarding property belonging directly to a foreign state, permits execution only narrowly, when the property is "in the United States" and "used for a commercial purpose in the United States." Subsection (b) is broader; it permits execution of "*any* property in the United States" belonging to the agency or instrumentality, regardless of how the agency or instrumentality uses the property . . . .

*CBC*, 309 F.3d at 252-53 (emphasis in the original).

We agree with the Fifth Circuit's analysis: § 1610(a) is a narrower exception by operation of the phrase "used for," a

conclusion well supported in the case law. *See, e.g., Ministry of Def. & Support for the Armed Forces of Iran v. Elahi (MOD)*, 126 S. Ct. 1193, 1194 (2006) (distinguishing § 1610(a) from § 1610(b) by highlighting the phrase "used for a commercial activity" in § 1610(a)); *De Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984) ("The FSIA distinguishes between execution against property of an agency or instrumentality of a foreign state, which may be executed against regardless of whether the property was used for the activity on which the claim is based under § 1610(b)(2), and the property of the foreign state itself, which may be executed against only when the property was used for the commercial activity on which the claim is based under § 1610(a)(2). In making the distinction, Congress sharply restricted immunity from execution against agencies and instrumentalities, but was more cautious when lifting immunity from execution against property owned by the State itself."); *see also* Working Group of the A.B.A., *Reforming the Foreign Sovereign Immunities Act*, 40 Colum. J. Transnat'l L. 489, 584 (2002) ("Several factors combine to make execution against foreign states extremely restrictive. First is the threshold requirement in section 1610(a) that the property against which attachment in aid of execution or execution is sought must be 'used for a commercial activity in the United States.' At the outset, this eliminates large classes of property that might be candidates for execution in satisfaction of a judgment against a foreign sovereign.").

In sum, the statutory structure and construction reflect a pivotal purpose of the FSIA: to "limit[ ] execution against property directly belonging to a foreign state . . ." *CBC*, 309 F.3d at 253.

"As the Restatement explains, [f]or purposes of post-judgment attachment and execution, the Foreign Sovereign Immunities Act draws a sharp distinction between the property of states and the property of state instrumentalities. The property of states may be

> attached only if it is or was used in commercial activity; the property of state instrumentalities may be attached without any such limitation, so long as the instrumentality itself is engaged in commercial activity in the United States."

*Id.* (quoting Restatement (Third) of the Foreign Relations Law of the United States § 460 cmt. b (1987)) (alteration and internal quotation marks omitted). According the phrase "used for" its ordinary meaning helps preserve this distinction. *Id.*

We also agree with the Fifth Circuit's observation that the FSIA's separate commercial activity exception to immunity informs our analysis. Section 1605(a)(2) provides: "A foreign state shall not be immune from the jurisdiction of courts of the United States [when] . . . the action is based upon . . . an act performed in the United States in connection with a commercial activity of the foreign state elsewhere . . ." 28 U.S.C. § 1605(a)(2). As the Fifth Circuit noted, "used for a commercial activity" in § 1610(a) and "in connection with a commercial activity" in § 1605(a)(2) are very different phrases. "Used for" is "more specific" and narrower than "in connection with," which is akin to the alternative interpretation of "used for" proposed by the appellant in *CBC* — "integral to" or "related to."[1] *CBC*, 309 F.3d at 254-55. Accordingly, the Fifth Circuit reasoned, if it were to interpret "used for" to mean "in-

---

[1] The Fifth Circuit's conclusion that the phrases "in connection with" and "related to" are largely synonymous is supported by the legislative history of the FSIA, which uses the phrases interchangeably. *See* H.R. Rep. No. 94-1487, at 19, *as reprinted in* 1976 U.S.C.C.A.N. at 6617 ("The second situation, an 'act performed in the United States *in connection with* a commercial activity of the foreign state elsewhere,' looks to conduct of the foreign state in the United States which *relates . . . to* a regular course of commercial conduct elsewhere or to a particular commercial transaction concluded or carried out in part elsewhere.") (emphases added); *id.* at 6618 ("[I]t has seemed advisable to provide expressly for the case where a claim arises out of a specific act in the United States which is commercial or private in nature and which *relates to* a commercial activity abroad.") (emphasis added).

tegral to" or "related to," it would "interpret away the difference in phrasing between [§ 1610(a) and § 1605(a)(2)]." *Id.* at 255. The Fifth Circuit observed that if Congress had intended to equate "used for" with "integral to" or "related to," Congress likely would have used the phrase "in connection with," as it did in § 1605. *Id.* We agree.

Af-Cap contends that we should not adopt the Fifth Circuit's definition of "used for" because "[c]ourts have traditionally applied an interpretation consistent with [Af-Cap's] view and contrary to the Fifth Circuit . . ." In support of this contention, Af-Cap relies on a number of cases, including *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 676 F.2d 47 (2d Cir. 1982); *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64 (D.D.C. 2001); *Itel Containers International Corp. v. Companhia de Navegacao Lloyd Brasileiro*, No. 90 Civ. 8191, 1991 WL 12131 (S.D.N.Y. Jan. 25, 1991); *Triton Container International v. M/S Itaite*, No. 90 Civ. 7725, 1991 WL 255613 (S.D.N.Y. Jan. 24, 1991); *National Union Fire Insurance Co. of Pittsburgh, PA v. People's Republic of the Congo*, No. 91 C 3172 *confirmed*, 1991 U.S. Dist. LEXIS 21581 (N.D. Ill. Dec. 26, 1991); *Red Mountain Finance, Inc. v. Democratic Republic of Congo*, No. CV-00-0164R (C.D. Cal. June 8, 2001), and *LNC Investments, Inc. v. Democratic Republic of Congo*, No. CV-99-02529R (C.D. Cal. June 28, 1999).

However, this litany of cases fails to enlighten our discussion because none of them analyze the pivotal phrase at issue in this case — "used for a commercial activity in the United States." Only two of the cited cases appear to support Af-Cap's argument. *See Lloyd's Underwriters v. AO Gazsnabtranzit*, No. CIVA1:00-MI-0242-CAP, 2000 WL 1719493, at *1-2 (N.D. Ga. Nov. 2, 2000) (concluding, without elaboration, that license fees owed by United States companies to the Republic of Moldova were used by Moldova for a commercial activity in the United States); *Alejandre v. Republic of Cuba*, 42 F. Supp. 2d 1317, 1339-41 (S.D. Fla. 1999) (hold-

ing, without analysis, that because payments by United States companies to a Cuban entity "are monetary property that this Court has determined exist in the United States for jurisdictional purposes, they by definition are used by [the Cuban entity] . . . for commercial activity in the United States"), *vacated on other grounds sub nom. Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1283 n.15 (11th Cir. 1999) ("The district court held that the amounts owed [the Cuban entity] were both within the United States and used for a commercial activity therein. We express no opinion on the correctness of this holding.") (citation omitted).

Both decisions, from district courts in the Eleventh Circuit, pre-date *Venus Lines Agency v. CVG Industria Venezolana de Aluminio, C.A.*, 210 F.3d 1309 (11th Cir. 2000) (per curiam). In that case, "Venus [Lines] claim[ed] that the Mexico cargo was used for the commercial activity of facilitating [CVG's] sale of the [Alabama] cargo." *Id.* at 1313. The Eleventh Circuit concluded: "*If true*, the Mexico cargo would indeed have been 'used for a commercial activity in the United States.'" *Id.* (emphasis added). Because a question of fact existed, the Eleventh Circuit was not called upon to fully analyze the "used for" requirement. However, it does not appear that the Eleventh Circuit's approach differs radically from that of the Fifth Circuit.

**[6]** The Fifth Circuit emphasized that "what matters under the statute is how the *foreign state* uses the property, not how private parties may have used the property in the past . . ." *CBC*, 309 F.3d at 256 n.5 (emphasis in the original) (citation omitted), reasoning that, "[i]f we were to allow a private party's commercial use of the property to count for § 1610(a), we would erase the commercial/noncommercial use distinction for almost all of a foreign state's tangible property." *Id.* We agree that to allow a private party's commercial use of the property to waive a foreign sovereign's immunity would not only frustrate "one of the principal goals of the FSIA" — to

restrain, to the extent practicable, "judicial interference with the *jus imperii*, or sovereign acts, of a foreign state," *id.* at 257 n.6 (citing H.R. Rep. No. 94-1487, at 7, *as reprinted in* 1976 U.S.C.C.A.N. at 6605) — but would also effectively eviscerate the protections of the FSIA by essentially placing the power to waive the foreign sovereign's immunity in the hands of private parties.

Other sections of the FSIA, as well as the legislative history, suggest that it is indeed the foreign sovereign's use of the property that is determinative. Congress's "Findings and declaration of purpose," for example, clarify that "[foreign] states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with *their commercial activities*." 28 U.S.C. § 1602 (emphasis added).

[7] In sum, we adopt in principle the test articulated by the Fifth Circuit in *CBC* to determine whether property was "used for a commercial activity in the United States," as that term is used in the FSIA. Like the Fifth Circuit, we conclude that property is "used for a commercial activity in the United States" when the property in question is put into action, put into service, availed or employed *for* a commercial activity, not *in connection* with a commercial activity or *in relation* to a commercial activity.

The FSIA does not contemplate a strained analysis of the words "used for" and "commercial activity," and neither do we. *See Corporacion Mexicana*, 89 F.3d at 655 (instructing that the FSIA provisions should be narrowly construed). Rather, we anticipate that this determination will be made by considering the use of the property in question in a straightforward manner, with a proper appreciation of the fact that the further removed the property is from the referenced commercial transaction, the less likely it is that the property was used *for* that transaction. *See id.*

We expressly decline, however, to incorporate the Fifth
Circuit's articulated "reservations about defining property use
as commercial in nature solely by reference to past single and/
or exceptional commercial uses." *Af-Cap*, 383 F.3d at 369. In
our view, attempting to quantify the number of commercial
uses associated with the property, or to embark upon charac-
terizing property use as exceptional or unexceptional, would
unnecessarily complicate the determination to be made under
§ 1610(a).

### C.  Application Of § 1610(a) To The Obligations.

Having defined the meaning of "used for a commercial
activity," we now turn to the application of § 1610(a) to the
property claimed by Af-Cap.

#### 1.  Af-Cap's Global Argument Regarding The Obligations At Issue.

[8] Af-Cap first argues that all the obligations at issue were
used for a commercial activity in the United States because
the Congo and SNPC pledged the obligations as security for
the 1984 Loan Agreement. However, Af-Cap's reliance on the
1984 Loan Agreement is misplaced. That Loan Agreement
was between the Congo and a bank located in the Bahamas
for the financing and construction of a highway in the Congo,
to be managed by an English contractor. None of the obliga-
tions presently at issue and purportedly used for a commercial
activity in the United States was in existence in 1984. For
these reasons, *Atwood*, 875 F.2d 1174, is inapposite. In
*Atwood*, Petrobras, a Brazilian entity and foreign sovereign
under the FSIA, entered into a contract with Atwood, a United
States company, for Atwood to drill oil wells off the coast of
Brazil. *Id.* at 1175-76. As security for the money due Atwood
under the contract, Petrobras provided a letter of credit issued
by a United States bank. *Id.* at 1175. Examining *Atwood*, the
*CBC* court noted that "[a]lthough *Atwood* did not explicitly
consider the 'used for' requirement, Petrobras plainly used the

letter of credit for a commercial purpose within the ordinary meaning of the phrase 'used for.' Petrobras used the letter of credit to secure the services of an American corporation to do drilling work . . . . Petrobas put the letter of credit in service of the commercial activity, it 'spent' the letter of credit on that activity." 309 F.3d at 258. The facts of *Atwood* — a United States party to the contract, a contract requiring services to be provided by the United States company, services secured by a letter of credit from a United States bank, and a letter of credit in existence at the time of the contract — are far different from the details pertinent to the 1984 Loan Agreement in this case.

### 2. The Obligations Used To Offset Prepayments Made By ChevronTexaco To The Congo.[2]

Based on a "Participation Agreement" between the parties, COCL is obligated to pay certain bonuses to the Congo because the Congo selected it to develop an oil field.[3] A separate agreement between the Congo and COCL — a "$25 Million Prepaid Crude Oil Sales Contract" — provided that COCL would make a prepayment to the Congo for oil in the amount of $25 million, and also specified that: (1) "[t]he value of cargoes lifted by [COCL would] be credited by

---

[2]Although our discussion revolves around the $25 million prepayment and the obligations purportedly used to secure it, our discussion applies with equal force to the $5 million prepayment and its attendant obligations.

[3]The Participation Agreement contemplated three participation bonuses that Participants such as COCL were obligated to pay. First, "a signature bonus of twenty million Dollars . . . upon the due execution and proper approval of [the Participation] Agreement . . ." Second, "a project sanction bonus of four million Dollars . . . upon the final approval of the Development Plan." Finally, "a production bonus, [that varied] based on the gross production of Crude Oil [once the field began producing oil]." The record reflects that COCL has paid $8.5 million in bonus payments, and that Af-Cap seeks to execute only on those payments, not on any bonus payments that may be due in the future, including any beyond the prepayment amount.

[COCL] against the outstanding Prepayment Amount," and (2) "in the event a participation bonus [was] payable by [COCL to the Congo], the amount of such participation bonus [would be] . . . applied as a credit against the [Congo's] obligation to reimburse the [$25 million] Prepayment Amount."

Af-Cap maintains that the obligation of COCL[4] to pay bonuses to the Congo is the Congo's property, which the Congo used as collateral for the $25 million "loan"[5] from COCL, an entity that the district court presumed was present in the United States for purposes of the dispositive motion. Relying on *CBC*, Af-Cap postulates that this obligation was therefore used for a commercial activity in the United States.[6] *See id.* at 259 ("[T]he royalty and tax obligations would be used for a commercial activity in the United States if the Congo used them as collateral for loans obtained from United States banks.").

The district court disagreed, finding that the obligation was COCL's property, not the Congo's, because "the parties previously agreed that the money that would otherwise be used to pay the bonuses be credited instead to the Congo's preexisting $25 million debt to COCL, as a setoff payment." Because "Af-Cap only has the right to attach the Congo's

[4]Af-Cap asserts that CABGOC is likewise obligated to pay bonuses to the Congo. Disagreeing with Af-Cap, the district court found that CABGOC is not obligated to pay bonuses to the Congo; "CABGOC is responsible only for [bonus] payments to Angola . . ." We discern no clear error in this finding, which is adequately supported by evidence in the record.

[5]The Congo asserts that the $25 million prepayment is not a loan, but the district court found to the contrary. This finding is not clearly erroneous because it is reasonably supported by evidence in the record. For example, at least two declarations, which were provided by the Congo, indicate that the "$25 Million Prepaid Oil Sales Contract" is a "loan or credit agreement[ ] . . ."

[6]To be clear, Af-Cap does not seek to attach the $25 million prepayment; it seeks to attach the obligations purportedly used as collateral for the prepayment, up to $8.5 million.

assets, not ChevronTexaco's," 28 U.S.C. § 1610(a); *CBC*, 309 F.3d at 251, the district court concluded that Af-Cap could not garnish the obligation.

**[9]** Regardless of whether the obligation was previously used as collateral for the $25 million prepayment, when the $25 Million Prepaid Oil Sales Contract was consummated, the obligation was transferred to COCL and became the property of COCL up to the prepayment amount, which had not yet been satisfied. Given the unique structure of this transaction, which among other things allowed for other companies owing participation bonuses to the Congo to put their payments into COCL's designated bank account rather than paying the Congo directly, the district court did not clearly err in finding that the obligation is COCL's property. *See United States v. Perez-Lopez*, 348 F.3d 839, 845 (9th Cir. 2003) ("Even if other judges might have reached a different conclusion, if the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (citation, alteration, and internal quotation marks omitted). Because only "[t]he property in the United States *of a foreign state*" is subject to garnishment, 28 U.S.C. § 1610(a) (emphasis added); *CBC*, 309 F.3d at 251 ("Under the FSIA, courts may attach *only a foreign state's property* . . .") (emphasis added) (internal quotation marks omitted), Af-Cap cannot garnish the obligation to pay bonuses or the bonus payments up to the prepayment amount.[7]

---

[7]This conclusion is not inconsistent with *Af-Cap*. There, a 1979 agreement obligated the garnishees to make periodic tax and royalty payments to the Congo. 383 F.3d at 364-65. In the early 1990s, the Congo assigned a percentage of its tax and royalty obligation to an insurance company in the United States to repay a commercial debt which, in August 2002, was fully repaid. *Id.* at 368. Unlike Af-Cap, we do not read *Af-Cap* to hold that

[10] Af-Cap also contends that the operator bonus was used for a commercial activity in the United States as "COCL paid the bonus to the Congo . . . by wire transferring funds from COCL's Citibank New York account . . ." However, the method of payment is not determinative. The appropriate inquiry is whether the property in question was used for a commercial activity in the United States. *Cf. Af-Cap*, 383 F.3d at 368, 371 (holding that the Congo put property in the service of a commercial activity in the United States when the Congo used tax and royalty obligations to repay a commercial debt owed to an insurance company in the United States). At best, Af-Cap's evidence indicates that the obligation or bonus payment is related to, or has a connection with, a commercial activity in the United States. Yet, in order to satisfy § 1610(a), the property must have been "used"; the mere fact that the property has a "nexus or connection to a commercial activity in the United States" is insufficient. *CBC*, 309 F.3d at 254.

### 3.   CTGEI's $7 Million Payment To The Congo For The Acquisition Of SCLOG.

According to Af-Cap, CTGEI's obligation "to make payments of over $7 million to the Congo in exchange for 25% of the shares in the commercial joint venture" was "integral to the commercial activity" and, therefore, used for it. Af-Cap also declares that the joint venture was formed as a result of "substantial activities" in the United States and that substan-

---

the appellant could garnish the tax and royalty obligation *previously assigned to the insurance company.* Instead, we read *Af-Cap* to hold that the post-August 2002 obligation did not belong to the insurance company; it was the Congo's property, and, as "[t]he property . . . of a foreign state," it was subject to garnishment. 28 U.S.C. § 1610(a). In this case, by contrast, the district court found that the property at issue is not the Congo's, but COCL's, a determination in which we perceive no clear error. Therefore, the property may not be garnished under § 1610(a).

tial activities pertaining to the operation of the joint venture took place in the United States.[8]

We reject Af-Cap's contention that the joint venture, located entirely in the Congo, constitutes commercial activity in the United States. Property that is "integral to" but not "used for" commercial activity in the United States does not meet the requirements of § 1610(a). *See id.* (explaining that the phrase "used for" is different from, and more specific than, the phrase "integral to"). In addition, "[w]hat matters under the statute is what the property is 'used for,' not how it was generated or produced," *id.* at 251, and not whether the property has a "nexus or connection to a commercial activity in the United States." *Id.* at 254. Accordingly, whether the joint venture was formed as a result of substantial activities in the United States or whether substantial activities involving the operation of the joint venture took place in the United States is of no import.

### 4. $2 Million Payable by COPCL Directly To Third-Party Contractors For Social Programs Within The Congo.

Af-Cap argues that the obligations to pay for social programs, or the payments themselves, constitute Congolese property used for a commercial activity in the United States because under the agreement, "the obligations were paid for the benefit of, and at the direction of, the Congo." This argument is not convincing.

---

[8]Af-Cap makes a very similar argument with respect to the tax and royalty obligations and the Moho/Bilondo bonuses, contending, for example, that they were used for a commercial activity in the United States "since they are an integral part of oil exploration operations conducted in substantial part in the U.S." However, as the district court noted, no oil has been discovered in those fields. Therefore, any demand for execution on royalties and bonuses attributable to those fields is premature.

Assuming, without deciding, that the obligations or payments are Congolese property, "there was no commercial activity separate from the transaction that generated the property in the first place," *Walker Int'l Holdings Ltd.*, 395 F.3d at 236, and, as we have held, *supra*, how that property was generated is irrelevant. *See id.* at 235 ("[T]he fact that the property was generated by commercial activity, namely, oil exploration, is irrelevant."). The decisive point is that Af-Cap has presented no evidence that the Congo put the obligations or payments in the service of a commercial activity in the United States. *Cf. CBC*, 309 F.3d at 258 (concluding that by using a letter of credit provided by a United States bank to secure the services of a United States company, the foreign sovereign used the letter of credit for a commercial activity in the United States).

**D.    The "Used For a Commercial Activity" Immunity Standard Applies to Property of SNPC as the Congo's Stipulated Alter Ego.**

Af-Cap asserts that as an instrumentality of the Congo, SNPC's immunity from execution is governed by the standard prescribed in 28 U.S.C. § 1610(b), providing an exception from immunity for the property of an "instrumentality of a foreign state *engaged in* a commercial activity in the United States," rather than the more restrictive standard of § 1610(a), excepting from immunity only property of a sovereign *"used for* a commercial activity in the United States."

Af-Cap's contention is unavailing because, as part of the dispositive motion procedure, the parties stipulated that SNPC was an alter ego of the Congo, and an alter ego is not a "separate legal entity." *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 618, 632-33 (1983) (holding that the instrumentality was the alter ego of the sovereign, and refusing to give effect to the instrumentality's separate juridical status).[9]

---

[9] The § 1610(b) standard would be inapplicable even if SNPC had separate legal status because § 1610(b)(1) requires that the instrumentality

### E.    The District Court Did Not Abuse Its Discretion in Limiting Discovery.

Af-Cap asserts that immunity from discovery is more limited in an execution action than in a liability action, and suggests that the district court misinterpreted the law on this point, abusing its discretion when it "den[ied] 'full discovery' once it ha[d] determined that a sovereign has no immunity from suit." *See First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 177 (2d Cir. 1998). Af-Cap contends specifically that the district court abused its discretion when it accepted the Congo's declarations in lieu of "meaningful discovery" into how the Congo used the ChevronTexaco payment obligations. Af-Cap also argues that *de novo* review, rather than the abuse of discretion standard, applies to the limitation on discovery, because the district court misinterpreted the FSIA preemption of California's general debtor statute, California Civil Procedure Code § 708.110.

Af-Cap points to no evidence in the record that any misapprehension of the appropriate scope of discovery impacted the district court's discovery orders. Rather, the district court acted consistently with *CBC*'s admonition that *discovery against a foreign sovereign should be ordered "circumspectly and only to verify allegations of specific facts crucial to the immunity determination." CBC*, 309 F.3d at 260 n.10 (citation and alteration omitted) (emphasis added).

Af-Cap also fails to acknowledge that the district court permitted Af-Cap more than fifteen months of discovery from both the Congo and ChevronTexaco, and that the district court did not restrict discovery because of the Congo's sovereign immunity, but because Af-Cap's discovery requests had "gone too far." The district court "has extensive control over the discovery process." *Flatow v. Islamic Republic of Iran*,

---

waive its immunity. As SNPC was not a party to the original 1984 Loan Agreement, there is no evidence in the record that SNPC waived immunity.

308 F.3d 1065, 1074 (9th Cir. 2002) (citation and internal quotation marks omitted). The district court did not abuse this broad discretion when it limited discovery related to whether there was personal jurisdiction over the foreign subsidiaries, whether SNPC's assets belonged to the Congo, or whether the obligations were located in the United States, because the court and the parties stipulated, for purposes of the dispositive motion, that Af-Cap had proven all of these allegations. Terminating discovery related to how the Congo "used" the obligations was likewise not an abuse of discretion because Af-Cap has not specified what additional discovery was warranted. *See Theis Research, Inc. v. Brown & Bain*, 400 F.3d 659, 666 (9th Cir. 2005) (concluding that the district court did not abuse its discretion when it refused to permit additional discovery because "the movant failed to show how allowing additional discovery would have precluded summary judgment") (emphasis omitted).

None of the court's discovery rulings was based on an interpretation of FSIA preemption; thus, *de novo* review is not required. Nevertheless, *de novo* review of the district court's interpretation of the interaction between the FSIA discovery procedures and California's general creditor discovery rules reveals that FSIA, a federal law, preempts state law provisions. *See* Fed. R. Civ. P. 69(a).

## IV. CONCLUSION

[11] The obligations identified by Af-Cap are not property of the Congo used for commercial activity in the United States and are, therefore, not subject to execution or collection under § 1610(a) of the FSIA. Accordingly, the district court's judgments dissolving and vacating garnishments and liens and dismissing the actions for execution and the creditor's suit are **AFFIRMED.**