## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONNECTICUT BANK OF COMMERCE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-762-SLR |
| THE REPUBLIC OF CONGO, | ) ) | |
| Defendant; | ) ) | |
| CMS NOMECO CONGO INC., | ) ) | |
| Garnishee. | ) | |

## CMS NOMECO CONGO INC.'S ANSWERING BRIEF IN OPPOSITION TO AF-CAP INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS AND REPLY BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

OF COUNSEL:

Guy S. Lipe

Jason M. Powers

VINSON & ELKINS L.L.P.

First City Tower

1001 Fannin Street, Suite 2300

Houston, TX 77002-6760

(713) 758-2222

M. Duncan Grant (Del. Bar No. 2994)

James C. Carignan (Del. Bar No. 4230)

PEPPER HAMILTON LLP

Hercules Plaza, Suite 5100

1313 N. Market Street

P.O. Box 1709

Wilmington, DE 19899-1709

(302) 777-6500

Dated: February 21, 2007

Attorneys for Garnishee CMS Nomeco Congo Inc.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 6

ARGUMENT .......................................................................................................... 8

    I.    The October 2005 Writ of Garnishment is Invalid Under the FSIA .................................. 8

        A.    Af-Cap's "Standing" Arguments Are Meritless ............................................. 9

        B.    Under the Fifth Circuit's Decision in FG, the Writ is Void Ab Initio ......................... 20

        C.    CMS's Status as a Delaware Limited Liability Company is Not Sufficient to Render the Congo's In-Kind Royalty in the United States for Purposes of the FSIA ...................... 24

        D.    Af-Cap II Does Not Bar CMS Nomeco's FSIA Arguments......................................... 26

        E.    The Loan Agreement Does Not Preclude the FSIA Immunity Arguments ................ 28

    II.    The Congo's In-Kind Royalty Is Not Amenable to Garnishment Under Delaware Garnishment Law ....................................................................................................... 31

    III.    Af-Cap's Request that the Court Reject CMS Nomeco's Act of State Defense and Af-Cap's Request for Judgment on the Entire Case Violate This Court's Briefing Order and is Improper...................................................................................................................... 37

CONCLUSION ....................................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
__ F.3d __, 2007 WL. 177823 (9th Cir. January 25, 2007)....................................................23

*Af-Cap, Inc. v. Republic of Congo*,
383 F.3d 361 ...............................................................................................................3, 23

*Af-Cap, Inc. v. Republic of Congo*,
462 F.3d 417 (5th Cir. 2006) ...................................................................................1, 31, 32

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997)..........................................................................................................9, 10

*Blumenthal v. Blumenthal*,
35 A.2d 831 (Del. Ch. 1944).................................................................................................30

*Brewer v. Socialist People's Republic of Iraq*,
890 F.2d 97 (8th Cir. 1989) ..................................................................................................6

*Callejo v. Bancomer, S.A.*,
764 F.2d 1101 (5th Cir. 1985) .............................................................................................20

*Connecticut Bank of Commerce v. CMS Nomeco Congo Inc.*,
440 F. Supp. 2d 346 (D. Del. 2006)..........................................................................2, 12, 18

*Connecticut Bank of Commerce v. Republic of Congo*,
309 F.3d 240 (5th Cir. 2002) ...........................................................................................5, 23

*D'Angelo v. Petroleos Mexicanos*,
378 F. Supp. 1034 (D. Del. 1974).........................................................................................30

*Daimler Chrysler Corp v. Cuno*,
126 S. Ct. 1854 (2006).....................................................................................................8, 9

*Delaware Trust Co. v. Carolina Freight Carriers Corp.*,
1986 WL. 2831 (Del. Super. Mar. 5, 1986).........................................................14, 15, 29, 30

*EM Ltd. v. Republic of Argentina*,
473 F.3d 463 (2d Cir. 2007)................................................................................................25

*FG Hemisphere v. Republic of Congo*,
455 F.3d 575 (5th Cir. 2006) ..............................................1, 3, 5, 15, 16, 17, 18, 19, 20, 22, 23

*First Western Finance Corp. v. Neumeyer*,
   240 A.2d 579 (Del. Super. 1968) .......................................................................30

*Goldberg v. Tarpey*,
   419 A.2d 932 (Del. 1980) .................................................................................14

*In re Graham*,
   973 F.2d 1089 (3d Cir. 1992).............................................................................22

*Hercaire International, Inc. v. Argentina*,
   821 F.2d 559 (11th Cir. 1987) .............................................................................5

*John Julian Construction v. Monarch Builders, Inc.*,
   306 A.2d 29 (Del. Super. 1973) ........................................................................30

*K-M Automobile Supply, Inc. v. Reno*,
   236 A.2d 706 (Del. Super. 1967) ......................................................................28

*Kensington International Ltd. v. Republic of Congo*,
   461 F.3d 238 (2d Cir. 2006)..............................................................................11

*LNC Investments Inc. v. Republic of Nicaragua*,
   No. 01-134-JJF, 2002 WL. 32818644 (D. Del. Dec. 18, 2002),
   *appeal dismissed*, 396 F.3d 342 (3d Cir. 2005) ...............................................12

*McNeilly v. Furman*,
   95 A.2d 267 (Del. 1953) ................................................................26, 27, 28, 29

*Natural Resources Defense Council v. Jamison*,
   787 F. Supp. 231 (D.D.C. 1990) .........................................................................9

*Pauley Petroleum, Inc. v. Cont. Oil Co.*,
   235 A.2d 284 (Del. 1967) .................................................................................30

*Powers v. Ohio*,
   499 U.S. 400 (1991)......................................................................................9, 10

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004)........................................................................................6, 7

*Rubin v. Islamic Republic of Iran*,
   408 F. Supp. 2d 549 ...........................................................................................8

*Trans World Airlines v. Hughes*,
   185 A.2d 762 (Del. Ch. Ct. 1962)......................................................................30

*USX Corp v. Adriatic Insurance Co.*,
    345 F.3d 190 (3d Cir. 2003)........................................................................................7

*Valley Forge Christian College v. Americans United for Separation of Church and State*,
    454 U.S. 464 (1982)...............................................................................................8

*Walker International Holdings Limited v. Republic of Congo*,
    395 F.3d 229 (5th Cir. 2004) .............................................................................5, 6

*Wilmington Trust Co. v. Barron*,
    470 A.2d 257 (1983)...........................................................................................29

## STATUTES

28 U.S.C. § 1610(a) ..........................................................................................24

38 C.J.S. *Garnishment* § 105 ...............................................................................26

Am. Jur. 2d, *Attachment and Garnishment* § 401...........................................13, 26, 29

Superior Ct. Civ. Rule 4(b)(2) ..............................................................................28

Pursuant to this Court's directives at the conference held on January 18, 2007, and in this Court's Order dated February 9, 2007, CMS Nomeco Congo Inc. ("CMS Nomeco") files this Answering Brief in opposition to the Motion for Judgment on the Pleadings of Af-Cap, Inc. ("Af-Cap") filed on February 9, 2007, and its Reply Brief in support of CMS Nomeco's Motion for Judgment on the Pleadings filed on January 26, 2007. For the reasons set out herein, Af-Cap's motion should be denied, and CMS Nomeco's motion should be granted.

## PRELIMINARY STATEMENT

In a remarkable display of lack of candor with the Court, Af-Cap has misrepresented decisions of (1) the United States Courts of Appeals for the Fifth Circuit, Second Circuit, and Ninth Circuit, (2) this Court, and (3) the Delaware state courts. It also has recklessly, and without factual basis, misrepresented the facts.[1]

---

[1] For example, without reference to any supporting evidence, Af-Cap asserts that "[a]fter *Af-Cap II* [decided by the Fifth Circuit in September 2004], CMS fled Texas." Af-Cap Answer Brief at 1. To the contrary, as specifically stated by the Fifth Circuit *in FG Hemisphere v. Republic of Congo*, 455 F.3d 575, 582 (5th Cir. 2006), "[i]n September 2002, CMS Nomeco . . . became a member of the Perenco group of companies with officers and directors located in Paris and London. Operations relating to the Congo that previously had been performed in the United States were performed in the Congo. . . . By July 2004 none of the Garnishees [including CMS Nomeco] had operations, officers, or a physical presence in the United States." As this quote from the Fifth Circuit makes clear, Af-Cap's suggestion that CMS Nomeco "fled Texas" in response to the Fifth Circuit's decision in *Af-Cap II* is blatantly and demonstrably false. Likewise, Af-Cap asserts, without any supporting evidence, that CMS Nomeco re-incorporated in the Bahamas "as part of its, and Congo's, strategy to insulate itself from future garnishment actions," and that "CMS has been a willing participant and integral part of Congo's efforts to avoid repayment of undisputed debts." Af-Cap Answer Brief at 2. Af-Cap's allegations that the Congo had a hand in CMS Nomeco's conversion to a Bahamas corporation and that CMS Nomeco has been a "willing participant" in the Congo's efforts to avoid payment of its debts, as well as its additional allegations that CMS Nomeco has "defied court orders" and engaged in a "charade," are outrageous falsehoods. To the contrary, CMS Nomeco has been dragged into disputes between the Congo and its creditors in which CMS Nomeco is not involved, with vulture funds like Af-Cap attempting to obtain a windfall recovery on known bad debts that they purchased for pennies on the dollar, seeking to force CMS Nomeco to pay the Congo's debts at 100 cents on the dollar, effectively making CMS Nomeco a guarantor of the Congo's debts. Along the way, CMS Nomeco has been subjected to threats of termination of its concession in the Congo and detention of its President in the Congo, Congo court orders compelling its compliance with its contractual obligations to the Congo, and the armed boarding of the storage vessel by Congolese gendarmes to insure compliance with those Congo court orders. Contrary to Af-Cap's allegations, CMS Nomeco converted to a Bahamas corporation in part to order its business affairs so that it would not be subjected to new, future litigation that threatens its own legitimate business interests, not to protect the Congo. Af-Cap also asserts that the Congo and CMS Nomeco engaged in "subsequent efforts [after Af-Cap II] to . . . convert the royalty to an 'in kind' payment." Af-Cap Answer Brief at 7. That is blatantly false. As the Fifth Circuit said in Af-Cap's Texas litigation, "[s]ince 1999, the Congo has opted to receive 100 percent of its payments 'in kind.'" *Af-Cap, Inc. v. Republic of Congo,* 462

(continued...)

Af-Cap's approach evidences the weakness of its legal position on the threshold legal issues that this Court has ordered the parties to brief. Unable to deal with the fact that its positions have been rejected by numerous federal courts of appeals, the United States government, and the Delaware Supreme Court, Af-Cap has resorted to misrepresentation and fabrication.

Af-Cap's arguments have no credibility or viability. As a matter of law, the writ of garnishment issued in this case violated the Foreign Sovereign Immunities Act ("FSIA"), and in any event, Delaware garnishment law does not provide for garnishment of the Congo's in-kind royalty.[2] The writ should be dissolved, and this garnishment proceeding should be dismissed.

_____

(continued...)

F.3d 417, 422 (5th Cir. 2006). The in-kind election was made years before *Af-Cap II*. Af-Cap's reckless and unsupported allegations, made in the context of motions that Af-Cap recognizes must be based on undisputed facts, can be explained only as a desperate attempt to deflect attention away from the controlling legal issues, which mandate that its claims be dismissed, as discussed herein.

[2] CMS Nomeco notes that Af-Cap has attempted to re-characterize the two legal questions to be addressed in the current briefing in a way different than that set out in the Court's briefing order of February 9, 2007, which was based on the language agreed to by the parties at the January 18, 2007 conference before the Court. For example, Af-Cap has inserted a reference to "Congo's asset that CMS admittedly holds" into its description of the FSIA issue to be briefed. Af-Cap Answer Brief at 2. That language is not in the language of the issues as agreed by the parties and as ordered by the Court, and Af-Cap's inclusion of that language in the statement of the issues is improper. As CMS Nomeco's answer makes clear, it has not "admitted" that it holds an asset of the Congo in this garnishment proceeding. To the contrary, as CMS Nomeco's answer makes clear, the Congo had no right to take any royalty oil at any time during the period between service and answer dates for the writs, and under Delaware law, the writ would capture no property, even if Af-Cap could overcome the other numerous legal obstacles that it faces in this case. *See Connecticut Bank of Commerce v. CMS Nomeco Congo Inc.*, 440 F.Supp.2d 346, 353 (D. Del. 2006) ("a creditor's right to recover from the garnishee is derived from, and no greater than, the debtor's right to recover from the garnishee in an action at law") (quoting *Wilmington Trust Co. v. Barron*, 470 A.2d 257, 263 (Del.1983)). Af-Cap also attempts to change the second question to be addressed in the briefing to "whether Delaware law permits attachment of an intangible, what CMS characterizes as a 'non-monetary,' obligation." Af-Cap Answer Brief at 2. In short, Af-Cap is improperly attempting to change the question to whether Delaware law permits garnishment of any intangible property rather than whether Delaware law permits garnishment of non-monetary obligations. CMS Nomeco objects to Af-Cap's attempt to change the questions presented. CMS Nomeco will present arguments only on the issues as phrased in the Court's February 9, 2007 briefing order.

## ARGUMENT

I.     **The October 2005 Writ of Garnishment is Invalid Under the FSIA.**

In *FG Hemisphere Associates LLC v. Republic of Congo*, 455 F.3d 575 (5th Cir. 2006), the Fifth Circuit held that writs of garnishment issued against CMS Nomeco in October and December 2004 directed to the Congo's in-kind royalty were void *ab initio* under the FSIA, and it directed dissolution of those garnishment writs.  In *FG*, the Fifth Circuit expressly rejected the argument made by Af-Cap here, *i.e.*, that the Fifth Circuit's prior decision in *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, *clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004) ("*Af-Cap II*") settled the FSIA immunity issue once and for all.  455 F.3d at 584-591.  Instead, the Court held that *Af-Cap II* was not controlling, concluding that the FSIA requires a fresh determination of the applicability of the FSIA's requirements for exceptions to execution immunity each time that writs are authorized, based on the circumstances then-existing.  *Id.* at 584-591, 594 n. 3, 596.  Because the authorizing court order in FG had made no findings concerning the mandatory requirements for issuance of garnishment writs under the FSIA, i.e., that the property was "in the United States" and "used for commercial activity in the United States," based on the circumstances existing at the time the writs were authorized, the Fifth Circuit ordered the writs dissolved.  *Id.*

Af-Cap refuses to face the fact that under the Fifth Circuit's decision in *FG*, the writ of garnishment issued by the Superior Court that is at issue in this case cannot stand.  The authorizing court order issued by the Superior Court shows on its face that no findings on the "in the United States" and "used for commercial activity" requirements of the FSIA were made.  *See* Exhibit B to CMS Nomeco's Opening Brief.  In fact, Af-Cap's motion filed in the Superior Court neither apprised the Superior Court of those requirements nor made any showing that those requirements were satisfied.  *See* Exhibit A to CMS Nomeco's Opening Brief.  It is beyond

dispute that under the rationale of *FG*, the writ of garnishment issued in this case suffers the same fate as the writs that the Fifth Circuit ordered dissolved in the *FG* case.

Rather than concede that fact and simply attempt to convince this Court to reject the Fifth Circuit's reasoning, Af-Cap engages in a futile effort to distinguish *FG* by (1) misrepresenting its holdings, and (2) urging this Court to adopt an interpretation of the Fifth Circuit's prior decision in *Af-Cap II* that the Fifth Circuit itself rejected in *FG*.  It also raises standing arguments that are refuted by decisions of the Fifth Circuit and the Eighth Circuit, by the United States government's formal position on the issue, and by Delaware case law.  Each of Af-Cap's arguments is addressed below.

     A.     *Af-Cap's "Standing" Arguments Are Meritless*

Af-Cap's position is that because the Congo has not appeared in this case to assert FSIA immunity, this Court need not and must not consider the FSIA's requirements, on "standing" grounds.  Adoption of Af-Cap's arguments would require this Court to reject the positions of the Fifth Circuit, the Eighth Circuit, and the United States government on the issue. It also ignores (and misrepresents) Delaware garnishment law on the issue.

     *1     The FSIA Requirements Are Mandatory Requirements That Af-Cap Was Required to Show, and that the Superior Court Was Required to Find Satisfied, Before Garnishment Writs Were Issued.*

Af-Cap's "standing" argument turns the procedural and substantive requirements of the FSIA on their head.  The essence of Af-Cap's argument is that a court need not (indeed must not) consider the FSIA's limitations on execution against a foreign state's property unless and until the foreign state appears in the execution proceedings to raise the FSIA's limitations as an affirmative defense to writs that the court has already issued.  This ignores the mandatory procedural and substantive requirements and limitations that the FSIA imposes on a court's authority to issue writs directed to the property of a foreign state.

As the House Report on the FSIA makes clear, the assets of a foreign state were absolutely immune from execution prior to passage of the FSIA.  H.R. Rep. No. 94-1487 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6606 ("Under existing law, a foreign state in our courts enjoys absolute immunity from execution, even in ordinary commercial litigation").  The FSIA only "partially lower[ed] the barrier of immunity from execution." *Id.*  The FSIA provides the exclusive basis on which execution is permitted to satisfy a judgment against a foreign state. *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 563 (11th Cir. 1987).

Consistent with the mandatory nature of the FSIA's requirements, the Fifth Circuit said in *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 247 (5th Cir. 2002), that the FSIA precludes, in the context of execution against property of a foreign state, the typical practice by which a clerk or sheriff issues execution against property, without court intervention.  *Id.*  "Instead, [the FSIA] requires a court to enter the writ of execution, so that the court can determine whether the property in question falls within one of the statutory exceptions to foreign sovereign immunity."  *Id.*  In *FG*, the Fifth Circuit held that these mandatory statutory prerequisites to issuance of a writ of garnishment are jurisdictional.  455 F.3d at 590.

Consistent with the mandatory requirement that a court make threshold determinations on the requirements of the FSIA before authorizing execution against the property of a foreign state, the Fifth Circuit in *Walker International Holdings Limited v. Republic of Congo*, 395 F.3d 229, 233 (5th Cir. 2004) specifically considered and rejected the same standing argument that Af-Cap makes here.  The court said that "the very language of the FSIA makes clear that the Congo's presence is irrelevant," and that the "FSIA sets parameters in which property may be attached: 'the court may order the attachment or execution only as 'referred to in subsections (a) and (b).' " (quoting *Connecticut. Bank of Commerce*, 309 F.3d at 250).  In *FG*,

the Fifth Circuit again confirmed the rule that FSIA immunity from execution "may be raised by a garnishee as well as by a foreign sovereign."  455 F.2d at 584.

Consistent with the Fifth Circuit's resolution of the issue, the Eighth Circuit in *Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97 (8th Cir. 1989) also held that the court must analyze the FSIA requirements for execution, even when the foreign state does not appear.  As noted in CMS Nomeco's Opening Brief, the United States government also has taken the formal position that a court must consider the FSIA requirements even when the foreign state does not appear.  In its Answer Brief, Af-Cap argues that the Fifth Circuit and the United States government are wrong.  It does not even mention the Eighth Circuit's decision in *Brewer*.

Af-Cap attempts to explain and distinguish the Fifth Circuit decisions by arguing that Texas law imposes a "unique statutory duty to the judgment debtor to defend against any writ of garnishment."  Answer Brief at 13-14.  However, the Fifth Circuit in *Walker* explicitly disclaimed any reliance on that duty.  395 F.3d at 233.  The Fifth Circuit noted the garnishee's argument in that case that Texas garnishment law imposes a duty on garnishees to assert defenses of the judgment debtor, but the Fifth Circuit concluded that in light of the FSIA's mandatory requirements, this "duty" argument was "irrelevant," and it held that that it "need not address" the state law "duty" issue in light of the FSIA's mandatory requirements.  395 F.3d at 233.  In short, Af-Cap's purported distinction of the Fifth Circuit rule based on the existence of a Texas law "duty" on the part of garnishees to assert defenses was expressly rejected by the Fifth Circuit in *Walker*.

In further support of its attack on CMS Nomeco's standing, Af-Cap suggests that its position is supported by the United States Supreme Court's decision in *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004).  Af-Cap argues that *Altmann* stands for the proposition that

the FSIA "has only one jurisdictional provision."  Af-Cap Answer Brief at 9.  The portion of the

opinion to which Af-Cap points actually stands for opposite conclusion.  The Court in *Altmann*

said:

> The Act itself grants federal courts jurisdiction over civil actions against foreign states, § 1330(a), and over diversity actions in which a foreign state is the plaintiff, § 1332(a)(4); it contains venue and removal provisions, §§ 1391(f), 1441(d); it prescribes the procedures for obtaining personal jurisdiction over a foreign state, § 1330(b); *and it governs the extent to which a state's property may be subject to attachment or execution*, §§ 1609-1611. Finally, *the Act carves out certain exceptions to its general grant of immunity*, including the expropriation exception on which respondent's complaint relies. *These exceptions are central to the Act's functioning:* "At the threshold of every action in a district court against a foreign state, ••• the court must satisfy itself that one of the exceptions applies," as "subject-matter jurisdiction in any such action depends" on that application*.

*Id.* at 691.  By this language, the Court discussed both immunity from jurisdiction from suit and

immunity from execution, said that the FSIA carves out "exceptions to its general grant of

immunity" (clearly referring to both immunity from jurisdiction and immunity from execution),

and concluded that the exceptions to immunity "are central to the Act's functioning," noting the

requirement that at inception, the court "must satisfy itself that one of the exceptions applies."

*Id.*  Thus, *Altmann* confirms the mandatory nature of the FSIA limitations, both with regard to

immunity from jurisdiction and immunity from execution, and the requirement that the court

"satisfy itself that one of the exceptions applies" before authorizing execution.  *Id.*  In short,

*Altmann* does not support Af-Cap's position; it refutes it.[3]

---

[3] Af-Cap cites the Third Circuit's decision in *USX Corp v. Adriatic Ins. Co.*, 345 F.3d 190 (3d Cir. 2003) for the proposition that there is only one jurisdictional provision in the FSIA and that the execution immunity provisions therefore are not jurisdictional.  Af-Cap Answer Brief at 9.  *USX* did not so hold.  To the contrary, *USX* did not even involve execution immunity.

> **2**     *Article III of the Constitution Does Not Impose*
> *Jurisdictional Limitations on this Court's Obligation or Ability to*
> *Address the FSIA's Limitations on Execution*

In the face of this overwhelming authority requiring rejection of its "standing" argument, Af-Cap asks this Court to follow a lone decision from a district court in Illinois, relying on the argument that Article III standing requirements mandate such a result.  Af-Cap Answer Brief at 10-11 (citing *Rubin v. Islamic Republic of Iran*, 408 F. Supp. 2d 549, *magistrate recommendation adopted*, 436 F. Supp. 2d 938 (N.D. Ill. 2006)).

As a threshold matter, it is important to understand the ramifications of Af-Cap's argument.  According to Af-Cap, the courts are precluded, jurisdictionally, from considering the FSIA limitations on execution unless and until the foreign state appears in the execution proceedings and affirmatively asserts execution immunity, after writs have already issued.  Thus, under Af-Cap's proposed rule, a court would be required to authorize execution against property of a foreign state, even if it is used for sovereign purposes or is located outside the United States, with the FSIA's limitations against execution coming into play only if and when the foreign state makes an appearance in the proceeding to seek an order dissolving the writ.

The "standing" requirements under Article III, on which Af-Cap and the court in *Rubin* rely, do not compel this ridiculous result.  Article III standing arises out of the Constitution's "case or controversy" requirement.  *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982).  As the Court made clear in *Daimler Chrysler Corp v. Cuno*, 126 S.Ct. 1854, 1861 (2006), the Article III "case or controversy" requirement is typically focused on the plaintiff, with the question being whether the case that the plaintiffs seeks to have adjudicated in the federal courts presents a justiciable "case or controversy" within the federal courts' Article III jurisdiction:

> The requisite elements of this "core component derived directly from the Constitution" are familiar: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.""

*Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The Court said that "we must find that the question is presented in a 'case' or 'controversy.'" *Id.*

It is true that the Supreme Court has recognized that an Article III standing issue can be raised with regard to a defendant, but that is in the context of a defendant seeking to invoke the mechanisms of the federal appellate courts by appealing an adverse ruling on such an issue. For example, in *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997), the Court's discussion of Article III standing addressed two contexts: (1) a plaintiff's standing to assert claims, and (2) a defendant's standing to appeal. The Court said that a defendant's standing in an appeal requires that the defendant have "a direct stake in the outcome." *Id.* It was precisely in that context that the Court decided *Powers v. Ohio*, 499 U.S. 400 (1991), on which Af-Cap and the *Rubin* court rely. The defendant sought review in the United States Supreme Court of his conviction by the Ohio state courts. *Id.* at 403-404. The Court said that as a general rule, "a litigant must assert his or her own legal rights and interests, and cannot rest *a claim to relief* on the legal rights or interests of third parties." *Id.* at 410 (emphasis added). It then discussed the circumstances in which it had recognized "the right of litigants *to bring actions* on behalf of third parties." *Id.* at 411.

Consistent with these principles, the court in *Natural Resources Defense Council v. Jamison*, 787 F. Supp. 231, 235 n.1 (D.D.C. 1990) said that the focus of the Article III standing analysis is on the plaintiff, except in the rare case where there are "questions related to whether the defendant has a sufficient interest to present a justiciable controversy with the

plaintiff." (citing 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction 2d*, § 3531).

Af-Cap has no legitimate basis for contending that there is no "justiciable controversy" between Af-Cap and CMS Nomeco. *Id.* CMS Nomeco is not seeking "to bring actions on behalf of" the Congo. *Powers*, 499 U.S. at 411. Instead, CMS Nomeco is defending against a garnishment action brought against it in which Af-Cap seeks a multi-million dollar monetary judgment against it. Af-Cap claims in this case that the writ of garnishment is valid and enforceable and imposes monetary liability on CMS Nomeco in the tens of millions of dollars, by virtue of the Congo's taking, under compulsion of Congo court orders, its royalty oil in its own territory. Thus, Af-Cap seeks an order that requires CMS Nomeco to pay the Congo's debt, effectively as the Congo's guarantor, even though it had no involvement in the underlying debt transaction. Using the words of the Supreme Court in *Arizonans for Official English*, CMS Nomeco indisputably has "a direct stake in the outcome" of this case. 520 U.S. at 64. Af-Cap's claims against CMS Nomeco present a "case or controversy" under Article III, and nothing in the Constitution prevents this Court from considering the mandatory limitations of the FSIA on execution against the property of a foreign state in resolving those claims.

The absurdity of Af-Cap's argument is confirmed by its "injury-in-fact" arguments at pages 12-13 of its Brief. It claims that CMS Nomeco will suffer no "injury-in-fact" if the writ is enforced against it in this case. It claims that imposition of a multi-million dollar judgment against CMS Nomeco would cause no "injury" to CMS Nomeco, alleging that "CMS has various remedies available, including an international arbitration or litigating the matter in the Congo or elsewhere." Answer Brief at 13. It asserts that "[i]f Congo abides by the rule of law, then CMS should suffer no loss." *Id.*

As a threshold matter, Af-Cap makes this unsupported assertion without explaining how CMS Nomeco could prevail in an "international arbitration" in the face of the fact that Congolese law, which governs CMS Nomeco's contractual relationship with the Congo, gave the Congo the contractual right to take its royalty oil.  Af-Cap fails to explain why the Congo should be required, under Congolese law, to reimburse CMS Nomeco for the monetary judgment that Af-Cap seeks in this case.

In any event, even if CMS Nomeco could obtain an international arbitration award against the Congo, Af-Cap fails to explain how CMS Nomeco could collect it.  Af-Cap asserts in its Answer Brief that one court has characterized the Congo as "one of the world's most notorious debtors."  Answer Brief at 6 n. 5 (quoting *Kensington Int'l Ltd. v. Republic of Congo*, 461 F.3d 238, 244 (2d Cir. 2006)).  Implicitly recognizing that there would be no real chance of any reimbursement by the Congo of the multi-million dollar judgment that Af-Cap seeks against CMS Nomeco in this case, Af-Cap suggests that the risk of double liability for the Congo's royalty "is a risk that CMS shouldered when it entered into its agreement with the Congo."  It is anomalous that Af-Cap makes such an "assumption of the risk" argument, asserting that the risk of loss resulting from the Congo's non-payment of its debt should be shifted from Af-Cap to CMS Nomeco.  Af-Cap acquired the debt as a known bad debt of the Congo that was long in default at the time of acquisition, whereas CMS Nomeco had no involvement in the underlying debt transaction and had no reason to expect that it would be a target of debt collection litigation, when it acquired the concession.  Af-Cap cites no legal or factual support for the assertion that CMS Nomeco assumed the risk of having to pay the Congo's unrelated debts when it entered into a concession agreement with the Congo, or that the law imposes such a risk of loss on a garnishee like CMS Nomeco.  To the contrary, as this Court

has already noted, Delaware law protects a garnishee from double liability. *Connecticut Bank of Commerce v. CMS Nomeco Congo Inc.*, 440 F. Supp. 2d 346, 351 & n.7 (D. Del. 2006) (citing *LNC Invs. Inc. v. Republic of Nicaragua*, No. 01-134-JJF, 2002 WL 32818644, at *1 (D. Del. Dec. 18, 2002), *appeal dismissed*, 396 F.3d 342 (3d Cir. 2005)).

      Nor do Af-Cap's arguments concerning the alleged speculative nature of CMS Nomeco's double liability risk have any validity. Af-Cap alleges that the risk of double liability arises from the "possibility" that the Congo "would possibly breach its contract with CMS" by requiring CMS Nomeco "to pay the money to the Congo, thus exposing CMS to possible double payment," and that a "possible *in futuro* breach" that is not a "cognizable injury sufficient to bestow standing." Af-Cap Answer Brief at 12. These arguments completely mischaracterize the risk that CMS Nomeco faces in this case.

      Plaintiffs' theory, as shown in its emergency motion filed in this case in January 2007, is that the writ prevented the royalty oil lifting taken by the government in April 2006, giving rise to monetary liability on CMS Nomeco for the full value of the oil taken by the Congo in that lifting. As shown by the Declarations attached hereto as Exhibits A and B, the Congo took that oil lifting under compulsion of a Congo court order, using public force to enforce compliance by the boarding of the storage vessel by armed gendarmes. As determined by the Congo court, the Congo had the right to take that oil as a matter of Congolese law, which governs the Convention. There is no basis for Af-Cap's allegation that the risk of double liability upon enforcement of the writ arises only from a "possible breach" of the Convention by the Congo "in futuro"; to the contrary, the Congo court has already held that the Congo had the right under the Convention and applicable Congolese law to take its own oil in its own territory, and the Congo has taken that oil. Af-Cap asks this Court to enforce the writ and impose tens of

millions of dollars of liability on CMS Nomeco based on a holding that the writ required CMS

Nomeco to overcome the Congo's use of public force in April 2006 and stop the Congo from

taking its oil in April 2006 pursuant to the Congo court orders, in breach of its contract with the

Congo.  The Congo has taken its royalty oil, and a ruling by this Court that CMS Nomeco is

required to pay the value of that oil to Af-Cap would necessarily impose double liability on CMS

Nomeco.  Finally, Af-Cap asserts that "[i]t is difficult to envision how CMS would suffer any

injury where the price of oil has nearly quintupled since it entered into its agreement with the

Congo."  Af-Cap Answer Brief at 13.  Apparently, Af-Cap is suggesting that CMS Nomeco

should be indifferent to having double liability imposed on it and to being required to pay

millions of dollars of the Congo's debts, simply because current oil prices are high.  Suffice it to

say that CMS Nomeco is unwilling to be a volunteer, after-the-fact guarantor of tens of millions

of dollars of the Congo's debts.  Af-Cap's suggestion that enforcement of the writ as sought by

Af-Cap would cause no "injury-in-fact" to CMS Nomeco is disingenuous and ludicrous.

> 3     *Under State Garnishment Law, CMS Nomeco, as
> Garnishee, Has the Right to Raise All Defenses Available,
> Including the FSIA*

The general rule in the United States is that a garnishee has the right and duty to

raise known defenses to a garnishment action.  As stated in 6 Am. Jur. 2d, *Attachment and*

*Garnishment* § 401:

> The general rule is that a garnishee may plead as a defense to the
> garnishment the exemptions of the defendant from the process.  If the garnishee
> fails to claim the exemption as required, satisfaction of the judgment rendered
> against him will not constitute a defense in a subsequent action by the principal
> defendant on the claim.

Similarly, Section 397 of that same treatise says that "a garnishee is under a duty to assert all

proper defenses of which he has knowledge."  *Id.* § 397.

Without citation to any authority, Af-Cap asserts that while Texas follows this rule, Delaware does not.  Answer Brief at 14 (asserting, without citation to authority, that "Delaware law imposes no such duty on the garnishee and, in fact, Delaware law mandates that the garnishee remain neutral").  Again, Af-Cap has misrepresented the Delaware law.

Delaware case law makes clear that CMS Nomeco has the right to raise defensive issues like the issue of FSIA immunity involved in this case.  In *Goldberg v. Tarpey*, 419 A.2d 932 (Del. 1980), the plaintiff sought to garnish the proceeds of a check deposited into the account of a law firm.  The law firm moved to quash the garnishment on the grounds that the funds were owned by a third party, not the defendant.  *Id.* at 933.  The plaintiff argued that the garnishee did not have standing to raise this challenge to the garnishment, because it would not be prejudiced by the court's resolution of the ownership issue.  *Id.*  The Delaware Supreme Court, citing Am. Jur. 2d, rejected that argument, holding that a garnishee is "charged with preservation of the property in dispute" and that the garnishee had standing to raise the jurisdictional defect at issue in the case.  *Id.* at 934.

Similarly, in *Delaware Trust Co. v. Carolina Freight Carriers Corp.*, 1986 WL 2831 (Del. Super. Mar. 5, 1986), a garnishee contended that garnishment was improper because the property sought to be garnished was property that was exempt pursuant to Delaware statute. The court addressed the merits of the exemption issue, noting that "[o]ne of the purposes of garnishment proceedings is to ascertain whether the judgment debtor owns property which can be applied in satisfaction of the judgment."  *Id.* at *2.  The court, citing Am. Jur. 2d, noted that the property "which can be applied in satisfaction of the judgment" is limited to that which is "not exempt by statute."  *Id.*  This case makes clear that in Delaware, a garnishee is permitted to raise issues going to the question of whether the property is exempt from garnishment, such as

FSIA immunity, for purposes of determining whether the property in question "can be applied in satisfaction of the judgment." *Id.*

In short, Delaware garnishment law does not support Af-Cap's efforts to avoid a ruling on the merits of the FSIA issues raised by this case.

B.    *Under the Fifth Circuit's Decision in FG, the Writ is Void Ab Initio*

In its Answer Brief, Af-Cap attempts to avoid the Fifth Circuit's decision in *FG* in a variety of ways. Rather than concede, as it should, that the rationale of the Fifth Circuit is fatal to its writ and simply attempt to convince this Court that the Fifth Circuit is wrong, Af-Cap makes a series of misrepresentations to the Court about the decision.

For example, in its Answer Brief, Af-Cap makes the following argument:

> [A]ll that [*FG*] holds is that this Court must determine whether to apply Section 1610(a) to the property sought to be garnished. Although CMS argued to the Fifth Circuit in *FG Hemisphere* as it does here, that a court is required to make jurisdictional findings under the FSIA each time writs are issued . . . that is not what the Court held.

Af-Cap's Answer Brief at 15. Af-Cap also argues that in *FG*, the Fifth Circuit decided that the plaintiff's garnishment efforts failed in that case "because by the time [the plaintiff] filed for garnishment writs, CMS [Nomeco] had no physical presence in Texas."

These arguments by Af-Cap constitute blatantly and demonstrably false representations to this Court concerning the Fifth Circuit's decision in *FG*. The Fifth Circuit's decision in *FG* focused on the fact that the district court had authorized the issuance of the writs without making the required findings under the FSIA, based on the circumstances existing at the time the writ was authorized, rendering the authorizing order void *ab initio* and requiring dissolution of the writs, without further inquiry by the Court. 455 F.3d at 584-591, 596.

Specifically, in the *FG* case, the district court entered an order authorizing issuance of garnishment writs against CMS Nomeco in October 2004, directed to the Congo's in-kind royalty.  *Id.* at 582-583.  The district court did not make any findings that the Congo's in-kind royalty was "in the United States" and "used for commercial activity in the United States" as required by the FSIA. *Id.*  Instead, the district court merely accepted the plaintiff's argument in that case that the Fifth Circuit's decision in *Af-Cap II* had definitively established that no FSIA immunity existed, concluding that further FSIA inquiry was unnecessary.  *Id.* at 585-586, 590-591.

The Fifth Circuit rejected the district court's reasoning, holding that a fresh determination on the FSIA issues was required when the district court authorized the writs in October 2004, based on the circumstances existing at that time.  455 F.3d at 588-591, 594 n. 3. The Fifth Circuit conducted an in-depth analysis of what it referred to as the "situs snapshot," i.e., the relevant time for determining whether a foreign state's property is "in the United States" for purposes of the FSIA.  *Id.* at 588-591.  The Fifth Circuit held that "to satisfy the § 1610(a) exception to immunity, the property must be in the Untied States when the district court authorizes execution.  This result best prevents disruption of the public acts of foreign sovereigns by not garnishing property that *was* in the United States but is now exclusively in a foreign country."  *Id.* at 589 (emphasis in original).  The Fifth Circuit made it clear that "exemption from executional immunity during one situs snapshot does not mean that, during another situs snapshot, the property is not immune from execution."  *Id.* at 594 n.3.  Thus, even if the property previously met the FSIA requirements at a prior point in time in connection with a prior writ, a fresh determination of the FSIA requirements, based on the circumstances existing at the time the court makes that fresh determination, is required in order to "prevent[] disruption of the

public acts of foreign sovereigns by not garnishing property that *was* in the United States but is now exclusively in a foreign country." *Id.* at 589.

After determining that the writ in *FG* was improperly issued due to the lack of a proper FSIA inquiry and findings prior to issuance of the authorizing order, the Fifth Circuit did not then turn to the question of whether the Congo's in-kind royalty was in fact "in the United States" based on the circumstances that existed in October 2004, when the district court authorized issuance of the writ. To the contrary, the Fifth Circuit held that "[w]e need not determine whether any Garnishee was in the United States when the district court granted FG Hemisphere's applications for writs of garnishment because the garnishment writs must be dissolved." *Id.* at 590. Citing the Supreme Court's decision in *Altmann* discussed above, the Fifth Circuit held that "there must be a determination that the obligation to pay the royalty interest conforms to the two § 1610(a) requirements before the district court has subject matter jurisdiction," and that "the district court erred when it authorized issuance of the October 2004 writs without first determining that an exception to the FSIA immunity applied to the property executed against." *Id.* at 590-591. The court said that "[t]his kind of error cannot be cured . . . because the order was void *ab initio*." The Fifth Circuit summarized its holdings as follows:

> We hold that, *prior to authorizing execution against the property of a foreign sovereign, the district court must make factual findings that support application of the § 1610(a) exception to the FSIA immunity from execution*. We also hold that § 1610(a) requires that the foreign sovereign's property be located in the United States *when the district court determines whether the exception applies*.

*Id.* at 596 (emphasis added).

As shown in CMS Nomeco's Opening Brief, the authorizing order issued by the Superior Court, like the order of the district court in *FG*, contained no findings or determination concerning the FSIA requirements for issuance of a writ of garnishment, *i.e.*, that the Congo's in-

kind royalty was "in the United States" and "used for commercial activity in the United States" based on the circumstances existing at that time. Under the Fifth Circuit's decision in *FG*, the authorizing order was void *ab initio* and "cannot be cured." *Id.*

As the language of the *FG* decision makes clear, Af-Cap has misrepresented the *FG* case to this Court in arguing that "all [*FG*] holds is that this Court must determine whether to apply Section 1610(a) to the property sought to be garnished." Under *FG*, this Court cannot cure the Superior Court's error in issuing a garnishment writ without making any FSIA findings. Likewise, as the foregoing quotations from the opinion in *FG* demonstrate, Af-Cap's representations to this Court that *FG* does not require a court to make jurisdictional findings under the FSIA before a new writ is issued, and that the Fifth Circuit's decision was based on CMS Nomeco's departure from Texas, are demonstrably false.

Under *FG*, the Superior Court violated the FSIA by issuing the garnishment writ at issue in this case without conducting the required analysis under the FSIA and without making the required findings under the FSIA. The writ is invalid and should be dissolved, and this garnishment action should be dismissed.[4]

---

[4] As shown by the face of the superior court order authorizing the issuance of the writ, Af-Cap apparently induced the issuance of the writ by the Superior Court by informing the court that the application for the writ was "unopposed." See Exhibit B to CMS Nomeco's Opening Brief. Af-Cap attempts to justify its conduct by asserting that "CMS was timely served with the motion papers, but failed to appear. . . . The Court wrote 'unopposed' on the order based on Congo's and CMS's non-appearance." Af-Cap Answer Brief at 3. As this Court has already noted in overruling Af-Cap's motion to remand, CMS Nomeco was not summoned to appear until it was served with the writ on October 12, 2005, more than a week after the authorizing order was signed by the superior court, and "until the Writ of Garnishment was issued, CMS was not required to appear and answer." *Connecticut Bank of Commerce v. CMS Nomeco Congo Inc.*, 440 F.Supp.2d at 352-353. Af-Cap's assertion that CMS Nomeco "failed to appear" despite being "timely served with motion papers" is another example of Af-Cap's willingness to misrepresent the facts to the Court.

C.     *CMS's Status as a Delaware Limited Liability Company is Not Sufficient to Render the Congo's In-Kind Royalty in the United States for Purposes of the FSIA*

Even if this Court were inclined to conduct an after-the-fact review of the FSIA requirements, notwithstanding the invalidity of the writ at inception, there is no legal basis for concluding that the Congo's in-kind royalty was "in the United States" for purposes of the FSIA in October 2005, based solely on CMS Nomeco's status as a Delaware limited liability company at that time.

Af-Cap argues that the Fifth Circuit's decision in *Af-Cap II* is dispositive on this issue. The Fifth Circuit expressly rejected that contention in *FG*. In *FG*, the plaintiff argued that *Af-Cap II* "settles the immunity issue." 455 F.3d at 585. The Fifth Circuit rejected that argument, stating that "[o]n the *Af-Cap I* and *Af-Cap II* record, it was undisputed that Texas was the locus from which the garnishees had supervised, directed, and financed the activities that gave rise to their obligations to make royalty payments to the Congo." *Id.* at 586. The Fifth Circuit noted that by virtue of stock acquisition transactions by which CMS Nomeco became a member of the Perenco group of companies with officers and directors located in Paris and London, "operations that previously had been performed in the Untied States were performed in the Congo." *Id.* at 582. The court said that "by July 2004, none of the Garnishees [including CMS Nomeco] had operations, officers, or a physical presence in the United States." *Id.* The court held that a fresh FSIA analysis is required each time a new set of writs is issued, *id.* at 588-591, 594 n.3, 596, and the court concluded that "the *Af-Cap II* panel did not make the determinations there that are essential to the issues in this case." *Id.* at 586. Ultimately, the Fifth Circuit said that "[w]e need not determine whether any Garnishee [including CMS Nomeco] was in the United States when the district court granted FG Hemisphere's applications for writs of garnishment because the garnishment writs must be dissolved," and "we express no opinion

whether the Delaware incorporation of a Garnishee is, alone, sufficient to satisfy the § 1610(a)

location in the United States requirement."  *Id.* at 590.

As this discussion makes clear, the Fifth Circuit itself did not interpret its decision

in *Af-Cap II* as being dispositive of the FSIA issues for subsequently-issued writs against CMS

Nomeco or as having decided that mere incorporation in Delaware of a garnishee alone is

sufficient to render property of a foreign state "in the United States" for purposes of the FSIA.

In short, Af-Cap is asking this Court to adopt an interpretation of *Af-Cap II* that the Fifth Circuit

itself has refused to adopt.

There is no legal basis for Af-Cap's argument that a foreign state's property, for

purposes of the FSIA, is wherever the garnishee may be found.  CMS Nomeco in its Opening

Brief has cited numerous cases that demonstrate that when international relations issues are

implicated, mere incorporation of a contract party in a particular state cannot be determinative in

resolving the "situs" issue.  While these are cases that arise under the act of state doctrine, that

fact is irrelevant because, as noted by the Fifth Circuit in *See Callejo v. Bancomer, S.A.,* 764 F.2d

1101, 1112, 1113 (5th Cir. 1985), the same policy underlies both the act of state doctrine and the

FSIA – protection of United States foreign relations with other countries.  In *Callejo*, the Fifth

Circuit said that "[l]ike the doctrine of sovereign immunity, the act of state doctrine springs

'from the thoroughly sound principle that on occasion individual litigants may have to forgo

decision on the merits of their claims because the involvement of the courts in such a decision

might frustrate the conduct of the Nation's foreign policy.'"  Af-Cap fails to explain why the

rationale of cases applying the act of state doctrine that reject "situs" determinations that are

based on the place of incorporation of a contract party should not be applied to "situs"

determinations under the "in the United States" requirement of the FSIA.

Af-Cap contends that there is no "international relations" issue presented in this case, asserting that the State Department has filed no statement of position in this case. Af-Cap Answer Brief at 25-26. Af-Cap fails to mention that the United States government filed an amicus curiae brief in support of the Congo in the Fifth Circuit proceedings arising out of Af-Cap's Texas litigation, in which our government had this to say about the international relations implications of an order that interferes with the Congo's right to take its oil in its own territory:

> Foreign nations that have statutes governing sovereign immunity do not permit a court to enter an injunction against a foreign state, and the foreign state may expect the United States to extend to it the same respect and courtesy. The potential for affront may be particularly acute where the district court issues an injunction, such as the turnover order in this case, that purports to control the foreign state's conduct within its borders. . . . Were a foreign court to assert the same power over the United States Government that the district court has asserted in this litigation over the Republic of Congo, ordering the United States Government to turn over assets within this country to a foreign plaintiff in direct contravention of our nation's foreign policy, it would undoubtedly lead to great public outcry.

Brief of the United States as Amicus Curiae in Support of Defendant-Appellant Republic of Congo, Case No. 05-51168.

The irrefutable fact is that a rule that permits a United States court to reach into the borders of a foreign state and interfere with the exercise of that foreign state's property rights in its own territory, based solely on the legal fiction that a party contracting with that foreign state is incorporated in the United States and is deemed to be "found" there under state law, violates the purposes of the "in the United States" limitation in the FSIA and threatens the United States' foreign relations.

D.     *Af-Cap II Does Not Bar CMS Nomeco's FSIA Arguments*

Af-Cap argues that CMS Nomeco is barred from raising FSIA issues in this case by virtue of the Fifth Circuit's decision in *Af-Cap II*. In essence, Af-Cap contends that the Fifth Circuit's decision in *Af-Cap II* settled once and for all the FSIA immunity issues with regard to

the Congo's in-kind royalty, such that further analysis of FSIA issues with regard to that property
is not necessary.

That is precisely the argument that the Fifth Circuit itself rejected in its later *FG*
decision.  In addressing whether writs issued against CMS Nomeco directed to the Congo's in-
kind royalty in October 2004 were valid under the FSIA, the court held that a fresh determination
of the FSIA issues is required each time that writs are sought, based on  the circumstances
existing at the time.  455 F.3d at 588-598, 594 n.3, 596.  The court specifically said that
"exemption from executional immunity during one situs snapshot does not mean that, during
another situs snapshot, the property is not immune from execution."  *Id.* at 594 n.3.  Thus, in
light of these holdings, the Fifth Circuit said that "the *Af-Cap II* panel did not make the
determinations there that are essential to the issues in this case."  *Id.* at 586.

Af-Cap acknowledges in its Answer Brief that collateral estoppel can apply only
if "the issue sought to be precluded is the same as that involved in the prior action" and "the
issue was actually litigated."  Answer Brief at 22 (quoting *In re Graham*, 973 F.2d 1089 (3d Cir.
1992)).  As noted above, the Fifth Circuit has already said that the FSIA "issues" raised by later
writs of garnishment are not the same as those litigated in *Af-Cap II*, as they require analysis of
the facts existing at the time each writ is authorized.  455 F.3d at 588-591, 594 n.3.  The Fifth
Circuit recognized the change in circumstances that had occurred between the time the record
was created in *Af-Cap II* and those that existed in October 2004, when the FG writs were issued.
455 F.3d at 582, 586.  Just as "the *Af-Cap II* panel did not make the determinations there that are
essential to the issues" with regard to writs issued in October 2004 in the *FG* case, i*d.* at 586, the
*Af-Cap II* panel did not make the determinations that are essential to the FSIA issues raised by

the October 2005 writ issued by the superior court that is at issue in this case.[5]  Collateral

estoppel does not apply.  Af-Cap's argument to the contrary, asking this Court to adopt an

interpretation of the Fifth Circuit's decision in *Af-Cap II* that the Fifth Circuit itself has rejected,

is frivolous.

      E.      *The Loan Agreement Does Not Preclude the FSIA Immunity Arguments*

      Af-Cap argues in its brief that the waiver of immunity in the Loan Agreement

eliminates the relevance of the FSIA inquiry.  Af-Cap made that argument in both *Af-Cap I* and

*Af-Cap II*, and it was rejected in both cases.  See *Af-Cap I*, 309 F.3d at 247; *Af-Cap II*, 383 F.3d

at 366-367.  It also made that same argument, with regard to the same loan agreement, in a

separate lawsuit with Chevron, and the Ninth Circuit rejected it.  *See Af-Cap, Inc. v. Chevron

Overseas (Congo) Ltd.*, __ F.3d __, 2007 WL 177823 (9th Cir. January 25, 2007).  The Ninth

Circuit said:

> *Af-Cap argues that the Congo's agreement not to assert immunity from
> execution renders § 1610(a)'s provisions inapplicable to the 1984 Loan
> Agreement. We disagree. In fact, the opposite is true.* Under § 1609, "the property
> in the United States of a foreign state shall be immune from attachment[,] arrest
> and execution except as provided in section [ ] 1610 ..." 28 U.S.C. § 1609. In turn,
> § 1610(a), the exception at issue in this case, provides: "The property in the
> United States of a foreign state ... used for a commercial activity in the United

---

[5] This is true not only with regard to the first prong of the FSIA test under Section 1610(a), i.e., the "in the United States" prong, but also with regard to the second prong of the Section 1610(a) analysis, i.e., whether the property is "used for commercial activity in the United States."  The Fifth Circuit said in *FG* that "there must be a determination that the obligation to pay the royalty interest conforms to the *two* § 1610(a) requirements before the district court has subject matter jurisdiction.  These *two* requirements cannot be waived because they are jurisdictional."  455 F.3d at 590 (emphasis added).  Thus, the requirement for FSIA findings encompasses both the "in the United States" and the "commercial activity" prongs of the test.  *Af-Cap II* itself says that the "commercial activity" inquiry mandates a "holistic approach" requiring consideration of the "totality of the circumstances," including "all facts relating to its present use."  383 F.3d at 369.  *Af-Cap II* and *FG*, read together, stand for the proposition that each time a new set of writs is issued, the court must undertake a fresh analysis of (1) the "in the United States" prong of the test, based on the circumstances then existing, and (2) the "commercial activity" prong of the test, based on a "holistic approach" requiring consideration of "a totality of the circumstances," including "all facts relating to its present use" at that time.  It is undisputed that the superior court conducted no analysis of either the "in the United States" prong or the "commercial activity" prong based on the circumstances existing in October 2005, when it authorized issuance of the writ at issue in this case.

> States, shall not be immune from attachment in aid of execution, or from
> execution, upon a judgment entered by a court of the United States or of a State ...
> if: (1) the foreign state has waived its immunity from attachment in aid of
> execution, or from execution ..." 28 U.S.C. § 1610(a) (emphasis added). Af-Cap's
> contention that the Congo's waiver renders 28 U.S.C. § 1610(a) inapplicable is
> self-defeating because, in the absence of a waiver, the property of the Congo
> would be immune from attachment under § 1609. We agree with the Fifth Circuit
> that the waiver merely triggers the exception to the immunity from execution that
> would otherwise be in effect.  Rather than end our inquiry, the Congo's waiver
> requires that we turn to the second requirement at issue in this case: whether the
> property was "used for a commercial activity in the United States."

*Id.* at *4 (citations omitted) (emphasis added in part, omitted in part).  Thus, the Fifth and Ninth

Circuits agree that the existence of a contractual waiver does not end the inquiry; to the contrary,

it merely triggers the Section 1610(a) inquiry of whether the property is "in the United States"

and "used for commercial activity in the United States."

Af-Cap attempts to argue that the Ninth Circuit's decision in *Af-Cap v. Chevron* is

distinguishable because the "commercial use" facts are different.  Af-Cap Answer Brief at 28 n.

15.  In making this argument, Af-Cap implies that the Ninth Circuit rejected the "in the United

States" requirement.  That is not true.  The motion that was granted by the district court in that

case and that was the subject of the appeal in that case was based "solely on the second prong of

FSIA § 1610(a): whether the Congo's property, represented by the above-described obligations,

was 'used for a commercial activity in the United States.'"  *Id.* at *2.  The first prong of the

Section 1610(a) requirements, whether the property is "in the United States," was not at issue in

the appeal, but the Ninth Circuit specifically acknowledged its relevance under Section 1610(a).

*Id.* ("The property in the United States . . . used for a commercial activity in the United States,

shall not be immune from attachment in aid of execution, or from execution, upon a judgment

entered by a court of the United States or of a State ... if: (1) the foreign state has waived its

immunity from attachment in aid of execution, or from execution ...") (quoting 28 U.S.C.

§ 1610(a)) (emphasis omitted).  As held by both the Fifth and Ninth Circuits, a contractual

waiver merely triggers the FSIA analysis; it does not dispense with it.

          The Second Circuit has also agreed with that rule, quoting with approval the Fifth

Circuit's holding that even a complete contractual waiver of sovereign immunity does not

dispense with the need for an FSIA analysis with regard to the requirements of Section 1610(a),

which include both the "in the United States" and "commercial activity" requirements.  *EM Ltd.*

*v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007).  Af-Cap misrepresents to the Court that

the *EM Ltd.* case is distinguishable because it involved pre-judgment attachment.  See Af-Cap's

Answer Brief at 32.  To the contrary, the Second Circuit noted that the appeal included issues

arising out of "orders of prejudgment attachment obtained by [one plaintiff], *and postjudgment*

*restraining notices* obtained by [the other plaintiff]."  *Id.* at 465 (emphasis added).  The Second

Circuit held that that "we could not authorize the pre- *or postjudgment attachment* of the [bank

reserves]" without making the inquiry required by the FSIA.  *Id.*  As support for that holding, the

Second Circuit quoted with approval the Fifth Circuit's holding in *Af-Cap I* that "if a foreign

sovereign waives its immunity from execution, U.S. courts may execute against 'property in the

United States . . . used for a commercial activity in the United States.' 28 U.S.C. 1610(a)(1).

Even when a foreign state completely waives its immunity from execution, courts in the U.S.

may execute only against property that meets these two statutory criteria."  *Id.*at 481 n.19

(quoting *Connecticut Bank of Commerce v.Republic of the Congo*, 309 F.3d at 247).  Af-Cap's

argument that the Second Circuit's decision was based on rules applicable only to pre-judgment

attachments and central bank reserves, and not on the requirements of Section 1610(a), is a

blatant misrepresentation.[6]

        Consistent with the decisions of the Fifth Circuit, Ninth Circuit, Second Circuit,

and all other courts that have addressed the issue, the Loan Agreement does not dispense with

the FSIA issues raised in this case.  For all of the reasons set out in CMS Nomeco's Opening

Brief and this Reply Brief, the writ of garnishment issued by the Superior Court violates the

FSIA.  The writ should be ordered dissolved, and this case should be dismissed.

## II.    The Congo's In-Kind Royalty Is Not Amenable to Garnishment Under Delaware Garnishment Law

        Even if Af-Cap could overcome the fatal FSIA problems with its case, another

fatal obstacle exists, under Delaware garnishment law:  non-monetary obligations are not subject

to garnishment.

        As set out in CMS Nomeco's Opening Brief, the Delaware Supreme Court held in

*McNeilly v. Furman*, 95 A.2d 267, 271 (Del. 1953), that the terms "rights" and "credits" as used

in the Delaware garnishment statute "import a fixed monetary obligation."  That rule is

consistent with the general rule applied in the United States that non-monetary obligations are

not subject to garnishment.  *See* 38 C.J.S. *Garnishment* § 105 (in the "absence of specific

statutory sanction, obligations other than for the payment of money are generally not subject to

garnishment prior to a default which gives the debtor a cause of action for money");  6 Am. Jur.

2d, *Attachment and Garnishment* § 111 (it is "a rule of wide acceptance, at least in the absence of

statutory provision to the contrary, . . . that only debts payable in money are attachable").

---

[6] At pages 32 and 33 of its Brief, Af-Cap embarks on a factual analysis of a number of other cases cited in CMS Nomeco's Opening Brief for the proposition that a contractual waiver does not dispense with the FSIA analysis.  Af-Cap's attempt to distinguish the facts involved in those cases from the facts involved in this case is irrelevant to the legal question that Af-Cap raises in its Answer Brief, i.e., whether a contractual waiver dispenses with the FSIA analysis.  None of those cases support Af-Cap's argument on that legal issue.

Notwithstanding the clear language of *McNeilly* that "rights" and "credits" as used in the garnishment statute are limited to "fixed monetary obligations," Af-Cap argues that the Court in *McNeilly* "stated the opposite." Answer Brief at 34. A review of the language of the opinion definitively establishes that Af-Cap is wrong.

The Delaware Supreme Court held in *McNeilly* as follows:

> The word 'rights' is bracketed with the word 'credits', which imports a fixed monetary obligation. In practice the statute has been construed to apply only to contract obligations liquidated or readily capable of liquidation.

95 A.2d at 271. Af-Cap points to the second sentence from this quote for the purported proposition that the Delaware Supreme Court has said that non-monetary obligations *are* subject to garnishment. The court said no such thing. By way of the second sentence in the quoted excerpt from *McNeilly*, the court was not contradicting what it said in the first sentence. Only "fixed monetary obligations" fall within the scope of "rights" and "credits," and the second sentence of the quote simply makes it clear that only those monetary obligations that are liquidated or capable of liquidation can be garnished.

In a further effort to avoid *McNeilly*, Af-Cap represents to this Court that "[l]ater, however, in *UMS Partners, Ltd. v. Jackson*, 1995 WL 413395, at *6 (Del. Super. June 15, 1995), the Delaware Superior Court expressly held that a non-monetary obligation was subject to garnishment." Af-Cap Answer Brief at 35. That assertion is demonstrably and blatantly false. That case involved an effort to attach stock that had been the subject of a demand for appraisal rights by the owner of the stock. The court held that stock for which there had been an appraisal demand could not be attached, and it then discussed the amenability to garnishment of the appraisal rights. In describing the nature of those rights, the court in *UMS Partners* said the following:

[O]nce a petitioner has perfected his right to an appraisal, he relinquishes his status as a shareholder and assumes the role of a quasi-creditor *with a purely monetary claim against the [surviving] corporation*."

*Id.* at *4 (emphasis in original).  Thus, contrary to Af-Cap's representation to this Court in its Brief at 35 that *UMS Partners* "expressly held that a non-monetary obligation was subject to garnishment," the opinion in *UMS Partners* states on its face that the rights at issue in that case constituted "a purely monetary claim."  The court went on to say that "[t]he test of the right to garnish is whether or not the garnishee has *funds* in his hands belonging to the debtor for which the debtor could bring suit." *Id.* (emphasis added) (quoting *K-M Auto Supply, Inc. v. Reno*, 236 A.2d 706, 707 (Del. Super. 1967)).

In short, *UMS Partners* involved a "purely monetary" obligation, and the case says that the garnishment test is whether the garnishee has "funds" in his hands for which the debtor could bring suit.  *UMS Partners* is fully consistent with the rule mandated by *McNeilly* that only fixed monetary obligations are subject to garnishment in Delaware.[7]

Next, Af-Cap argues that Superior Court Civil Rule 4(b)(6) authorizes garnishment of property that "is not susceptible of physical seizure within the state."  While Rule 4(b)(6) was not the procedural vehicle used in this case (a procedure that requires posting of bond to secure against costs, losses, and damages prior to issuance of the writ (*see* Superior Ct. Civ. Rule 4(b)(2)) and is therefore inapplicable, the language in that rule referring to property

---

[7] Even if *McNeilly* and *UMS* stood for the proposition asserted by Af-Cap, *i.e.*, that a non-monetary obligation that "is readily capable of liquidation" could be subjected to garnishment (and those cases clearly do not stand for such a proposition as shown above), such a rule would not help Af-Cap.  The Congo's in-kind royalty gives it the right to take a certain number of barrels of royalty oil at the next lifting after the combined under-lifted position of the Congo exceeds 275,000 barrels.  The value of the Congo's rights to take that royalty oil at that lifting may be less or more than the monetary calculation that is referenced in Af-Cap's brief, depending *inter alia*, on the price of oil at the relevant time.  The value of the Congo's royalty rights cannot be readily determined by reference to a fixed standard.

that "is not susceptible of physical seizure within the state" does not suggest that non-monetary

obligations are subject to garnishment.  To the contrary, the Delaware Supreme Court has used

that same language in reference to "rights" and "credits," which the court in *McNeilly* held

"imports a fixed monetary obligation," in the sense that the sheriff cannot take physical

possession of "rights" and "credits."  Specifically, in *Wilmington Trust Co. v. Barron*, 470 A.2d

257, 263 (1983), the Delaware Supreme Court described garnishment in Delaware as follows:

> [W]hen the property attached is not to be physically seized, but is in the possession or control of another, *or if the thing to be attached is not such property as is susceptible of seizure, such as rights and credits*, the sheriff must summon the person who has the goods, chattels, rights, credits, money or effects of the defendant in his possession, who is termed the garnishee, to appear at the court to which the writ is returnable, and declare what property of the defendant he has in his hands.

As this language makes clear, the courts have characterized "rights" and "credits" under the

garnishment statute as property that is "not susceptible to seizure," as it is intangible property

that cannot be physically seized by the sheriff.  The fact that such "rights" and "credits" cannot

be physically seized by a sheriff does not change the rule adopted in *McNeilly* that "rights" and

"credits" are limited to "fixed monetary obligations."  95 A.2d at 271.

Similarly, Af-Cap's citation to *Delaware Trust Co. v. Carolina Freight Carriers*

*Corp.*, 1986 WL 2831 (Del. Super Ct. 1986) for the proposition that garnishment proceeding

reaches "tangible or intangible property rights of the judgment debtor not exempt by statute" is

misleading.  Af-Cap is suggesting that the court in that case held that *any* intangible property not

exempt by statute is subject to garnishment.  To the contrary, the language that Af-Cap quotes is

simply a quote by the court from Am. Jur. 2d, which, as noted above, also states that it is "a rule

of wide acceptance, at least in the absence of statutory provision to the contrary, . . . that only

debts payable in money are attachable."  6 Am. Jur. 2d, *Attachment and Garnishment* § 111.  The

court's reliance on Am. Jur. 2d as stating the applicable rules of Delaware garnishment law supports CMS Nomeco's position, not Af-Cap's.

It is important to note that none of the cases that Af-Cap cites in its brief involved garnishment of a non-monetary obligation.  As noted above, *UMS Partners* involved garnishment of a "purely monetary" claim for appraisal.  *John Julian Constr. v. Monarch Builders, Inc.*, 306 A.2d 29, 35 (Del. Super. 1973) discussed garnishment of mortgage payments, a monetary obligation.  *Pauley Petroleum, Inc. v. Cont. Oil Co.*, 235 A.2d 284 (Del. 1967) involved garnishment of a portion of an $8,000,000 monetary debt.  *Delaware Trust Co. v. Carolina Freight Carriers Corp.,* 1986 WL 2831 (Del. Super. Ct. 1986) involved garnishment of wages.  *First Western Fin. Corp. v. Neumeyer*, 240 A.2d 579 (Del. Super. 1968), *Trans World Airlines v. Hughes*, 185 A.2d 762, 764 (Del. Ch. Ct. 1962), and *Blumenthal v. Blumenthal*, 35 A.2d 831 (Del. Ch. 1944) all involved garnishment of corporate stock.

With regard to *D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034 (D. Del. 1974), Af-Cap continues its refusal to acknowledge that it has misrepresented that case to this Court throughout these proceedings, despite clear evidence that it has.  It has repeatedly argued to this Court that *D'Angelo* involved an effort to sequester "royalty."  In its Answer Brief, it continues to characterize the debt sought to be sequestered in that case as "the garnishee's obligation to pay royalty rights" that was "based on oil produced."  Af-Cap's Answer Brief at 38. As shown in CMS Nomeco's Opening Brief, the debt that was the subject of *D'Angelo* in fact was a monetary debt owed by Mobil to the defendant on sales of crude oil by the defendant to Mobil.  This Court in *D'Angelo* specifically described the debt at issue in that case as "an indebtedness owed on open account by Mobil to the defendant based upon sales of crude oil to Mobil by defendant."  379 F. Supp. at 1036.  Af-Cap's continuing characterization of the debt in

its latest brief as "the garnishee's obligation to pay royalty rights" that was "based on oil produced" is simply false and can only be characterized as an effort to mislead this Court. Not only did the debt in *D'Angelo* not involve a royalty obligation, it clearly involved a monetary debt. Mobil was purchasing crude oil on open account, and by definition, a company purchasing crude oil does not make "in-kind" payments. Certainly, there is nothing in the opinion that would suggest that Mobil was paying for the oil with oil.

It is likewise important to note that Af-Cap still has not provided any explanation of how CMS Nomeco can turn over to the sheriff or otherwise deliver control to the Court of the Congo's right to take its own oil in its own territory. For garnishment to work, the property in question must be property that the garnishee can deliver or pay over to a sheriff, or over which the court can exercise control. There simply is no mechanism by which CMS Nomeco can deliver the Congo's rights to take royalty oil in its own territory to a sheriff or to the Court. Non-monetary obligations such as the Congo's in-kind royalty simply are not garnishable.

Finally, Af-Cap makes the bizarre argument that the Fifth Circuit, in *Af-Cap II*, rejected, as a matter of law, CMS Nomeco's argument that the Congo's in-kind royalty is not subject to garnishment. Specifically, Af-Cap argues in its Brief that "[i]f there were any doubt that the in cash/in kind distinction is irrelevant, the Fifth Circuit erased it in *Af-Cap II*.," contending that the Fifth Circuit in that case "rejected CMS's argument that the royalty obligation was not available for attachment." Af-Cap Answer Brief at 39.

Af-Cap made this precise argument to the Fifth Circuit after the district court dismissed its garnishment case on state law grounds, following remand after *Af-Cap II*, and the Fifth Circuit rejected that argument in *Af-Cap III*, *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 423-424 (5th Cir. 2006). The Fifth Circuit expressly held in *Af-Cap III* that *Af-Cap II* did

not address any state law issues, and the Fifth Circuit held that the district court correctly

dismissed Af-Cap's garnishment action because non-monetary obligations are not subject to

garnishment under Texas state garnishment law.  *Id.*  To suggest that the Fifth Circuit "rejected

CMS's argument that the royalty obligation was not available for attachment" in the face of *Af-Cap III* is not only bizarre, it is so frivolous as to be sanctionable.

### III.    Af-Cap's Request that the Court Reject CMS Nomeco's Act of State Defense and Af-Cap's Request for Judgment on the Entire Case Violate This Court's Briefing Order and is Improper

This Court's February 9, 2007 briefing order, which was an agreed order

memorializing the directives and agreements at the January 18, 2007 conference before the

Court, made clear that Af-Cap's motion was to be a motion for *partial* judgment on the

pleadings, with the parties expressly directed to not address any issues other than the threshold

FSIA and non-monetary obligation issues.  The Court directed the parties to not brief other

issues, including defenses based on the Congo court orders, such as the defenses of double

liability, foreign state compulsion, and act of state.  Also among the issues not encompassed

within the issues that the Court directed the parties to brief was the issue of whether Af-Cap's

claims are barred by virtue of the fact that the Congo had no right to take any oil during the

period between service date and answer date of the writ.  CMS Nomeco proposed to include that

issue in the briefing, but Af-Cap objected to its inclusion, arguing that that issue raised factual

issues.  The Court agreed that the briefing would be limited to the two issues and related subparts

identified in the February 9, 2007 briefing order.

Notwithstanding this Court's contrary directives, Af-Cap has sought judgment on

the entire case.  This request is inexplicable in light of this Court's briefing order which

precluded the parties from addressing issues other than those expressly addressed in the briefing

order.  In direct violation of that order, Af-Cap has argued in its Brief that CMS Nomeco is

barred from raising the act of state doctrine as a defense in this case.  *See* Af-Cap Answer Brief

at 25-26.[8]  By including arguments in its papers that it is entitled to judgment as a matter of law

on the entire case, and by expressly challenging CMS Nomeco's act of state defense in its

briefing, Af-Cap has directly violated this Court's briefing order, which directed that the parties'

briefs "shall not address any issues other than" the FSIA and non-monetary obligation issues

identified in the Order, "and in particular, shall not address defenses based on the Congo court

orders, including the defenses of double liability, foreign state compulsion, and act of state."  By

asking this Court to enter judgment on the pleadings "that it be permitted to execute on Congo's

asset held by garnishee," and by expressly asking this Court to hold that CMS Nomeco's act of

state defense is barred, Af-Cap is asking this Court to address and reject CMS Nomeco's

defenses and arguments on the issues that this Court expressly directed would NOT be addressed

in the briefing.  CMS Nomeco will comply with this Court's order and not address its act of state

defenses in its briefing or any of its other defensive arguments that demonstrate that Af-Cap is

not entitled to any relief in this case.  CMS Nomeco asks that this Court disregard the briefing

submitted by Af-Cap on the act of state doctrine and that the Court disregard Af-Cap's improper

request that this Court enter judgment on the entire case without considering CMS Nomeco's

other defensive arguments that fall outside the scope of the briefing order.

---

[8] Although Af-Cap suggests that CMS Nomeco raised that issue in its Brief, it did not.  CMS Nomeco's arguments were limited to the FSIA and non-monetary obligation issues, as directed by the Court.

## CONCLUSION

Rather than hit the weaknesses in its legal arguments head on, Af-Cap has chosen to misrepresent the law to this Court and to make reckless and unsupported factual allegations that have no bearing on the legal issues. Af-Cap's arguments have no credibility or viability. The writ of garnishment issued by the Superior Court is invalid under the FSIA, and in any event, as a matter of Delaware garnishment law, the Congo's in-kind royalty is not subject to garnishment.

CMS Nomeco asks that this Court grant its motion for judgment on the pleadings, deny Af-Cap's motion for judgment on the pleadings, dissolve the writ of garnishment issued by the Superior Court in October 2005, and dismiss this action.

Respectfully submitted,

OF COUNSEL:

Guy S. Lipe
Jason M. Powers
VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin Street, Suite 2300
Houston, TX  77002-6760
(713) 758-2222

Dated:  February 21, 2007

/s/ M. Duncan Grant
M. Duncan Grant (Del. Bar No. 2994)
James C. Carignan (Del. Bar No. 4230)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500

Attorneys for Garnishee CMS Nomeco Congo Inc.

8339931